**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

CYRANO, INC.,

                  Plaintiff,

      - against -

QUOTIUM TECHNOLOGIES, INC.,
QUOTIUM TECHNOLOGIES, S.A and
TECHNOLOGIES, S.A.,

                  Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

**MAGISTRATE JUDGE** RBC

**05 - 11558 JLT**

RECEIPT # 65842
AMOUNT $ 250.00
SUMMONS ISSUED 3
LOCAL RULE 4.1 ___
WAIVER FORM ___
MCF ISSUED ___
BY DPTY. CLK. MR.
DATE 7/26/2005

## COMPLAINT

Cyrano, Inc. ("Cyrano") files this complaint to declare its copyright and distribution rights in the United States as previously recognized more generally by the courts of France and for damages and injunctive relief for infringement of those rights and for deceit, unfair competition. A related action was commenced July 12, 2002, in this district by Technologies, S.A. and Quotium, S.A. (collectively "Quotium"), *Technologies, S.A. et al. v. Cyrano, Inc.*, No. 02-CV-11416-JLT, and is still pending; a June 8, 2005 Memorandum in that case, while declining to remove the default judgments entered, expressly subordinated the accompanying Order to any recognition in a subsequent action of Cyrano's rights under the French judgments and against the "Cyrano trademark" in the United States Patent and Trademark Office ("USPTO").

### PARTIES

1.     Plaintiff Cyrano is a Delaware Corporation with its principal place of business located at 26 Parker Street, Newburyport, Massachusetts.

1

2.     On information and belief, Defendant Technologies, S.A. is a French Corporation with its principal place of business located at 84-88 Boulevard de la Mission Marchand in Courbevoie, France.

3.     On information and belief, Defendant Quotium Technologies, S.A, a wholly-owned subsidiary of Technologies, S.A., is a French Corporation with its principal place of business located at 84-88 Boulevard de la Mission Marchand in Courbevoie, France.

4.     On information and belief, Defendant Quotium Technologies, Inc. is a wholly-owned subsidiary of Quotium Technologies, S.A., and is a Delaware corporation with its principal place of business at 100 Cummings Center, Suite 336B, Beverly, Massachusetts. (The defendants are collectively referred to herein as "Quotium").

## JURISDICTION AND VENUE

5.     This Court has subject matter jurisdiction over this Counterclaim pursuant to Fed. R. Civ. P. 13, 28 U.S.C. § 1338, the Copyright Act, 17 U.S.C. §§ 101 et. seq., the Lanham Act, 15 U.S.C. §§ 1119 and 1125, and the Declaratory Judgment Act, 28 U.S.C. § 2201. This Court also has subject matter jurisdiction on the independent basis of diversity of citizenship, 28 U.S.C. § 1332(a)(2). The amount in controversy in this action exceeds $75,000, exclusive of interest and costs. Additionally, this Court has supplemental jurisdiction over the related state law claims pursuant to 28 U.S.C. §§ 1338(b) and 1367.

6.     Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391 and 1400.

## FACTUAL BACKGROUND

### I.     The Cyrano Entities

7.     Cyrano distributes software that enables users to test, monitor, and optimize their data processing and information management systems.

2

8.     From about 1995 to 2001, Cyrano was affiliated with two legally independent

foreign companies, Cyrano U.K. Limited ("Cyrano UK"), an English software company, and

Cyrano S.A. ("Cyrano SA"), a French company. Both foreign companies were liquidated in

2001-2002, when Cyrano acquired the assets of Cyrano UK. Cyrano is the direct descendant of

Performance Software Limited, which took on the name Cyrano U.K. Limited in an affiliation

with the French company, Images Multimedia, S.A. ("I.M.M.") effectuated in 1995-1996, at

which time they coordinated their new name. Cyrano has operated since then using the Cyrano

name and the "cyrano.com" domain name for its e-mail communications and its website,

"www.cyrano.com". Cyrano S.A. was the repository for the trademarks, including the

CYRANO® trademark registered in the USPTO on July 28, 1998, as No. 2,175,949, now

statutorily invalid.

9.     Among the many products developed, marketed, and sold by Cyrano, and

previously Cyrano UK before it was liquidated, are computer software products formerly called

"CYRANO Test" and "CYRANO Impact", now respectively called "Test" and "Impact".

Created and first published in 1987 in the United Kingdom by the predecessor of Cyrano UK,

Test is protected under the copyright law of the signatories to the Berne Convention, including

the United States. Impact, based on Test, was published in 1997 in the United Kingdom by

Cyrano UK, and is also protected under the copyright law of the United States. In March 2002,

Cyrano US acquired the assets and intellectual property of Cyrano UK, including all of its

copyright ownership and rights to Test and Impact.

10.     Under an International Distributor Agreement ("Distributor Agreement", attached

as Exhibit 1) between Cyrano SA. and Cyrano last amended in April 2001, Cyrano hold until June

30, 2007, the exclusive license to distribute, use, support, and deal in several additional software

3

products throughout the World, other than Continental Europe. These licensed software products include two products that were developed by I.M.M. (or Cyrano SA), "CYRANO Workbench" ("Workbench") and "CYRANO Production" ("Production"), and a third product, "OpenSTA" that was developed from Impact with some Cyrano SA components. Notably, the Distributor Agreement licensed as "trademarks" only "CYRANO Workbench", "CYRANO Production" and "OpenSTA", that is, "CYRANO" in its trademark use; obviously "Cyrano, Inc." being the *trade name* of Cyrano – as distinguished from the trademark of Cyrano SA – could operate as Cyrano, Inc. or Cyrano under the Distributor Agreement.

## II.    Quotium's Use of the French Courts To Obtain Software for Distribution

11.    Quotium are also engaged in the business of distributing software. Through their use of the courts of France, Quotium came into possession in 2002 of software that belongs to Cyrano and have modified and distributed that software since 2002 in unfair competition with Cyrano.

12.    According to their website at www.quotium.com, "Groupe Technologies" was an independent software distributor (not attached to a product that it developed) that established Quotium in 2002. As recounted in their Complaint in the pending action, "[o]n June 11, 2001, the Commercial Court of Paris (the "Commercial Court") declared a bankruptcy proceeding against Cyrano, S.A. On October 15, 2001, the Commercial Court ordered the liquidation of Cyrano, S.A. (the "Liquidation") and appointed the firm SCP Brouard-Duade as trustee of the liquidation (the "Trustee")." (No. 02-CV-11416-JLT, Paper #1 ["Quotium Complaint"] ¶ 11).

13.    During extended negotiations between Quotium and the Trustee, upon information and belief, Quotium obtained access to source code for Test, Impact and OpenSTA that belonged to Cyrano, and "[o] n March 13, 2002, the Commercial Court ordered the sale of

4

Cyrano, S.A.'s tangible and intangible assets to Technologies" (Quotium Complaint ¶¶ 12-14).

14.     Despite objection from Cyrano that a significant portion of those assets, namely Test, Impact and OpenSTA, belonged to it, "on May 16, 2002, Technologies, Quotium, and the Trustee entered into a Contract of Transfer of Business Components (the "Transfer Contract")" (Quotium Complaint ¶ 15). Upon information and belief, Quotium used the Test, Impact and OpenSTA code to develop its QuotiumPRO product.

15.     Although Quotium did not claim ownership of Test, Impact and OpenSTA in their Complaint, they began to manipulate the federal court with less-than-candid statements, stating, for example, "Plaintiffs are not aware of any determination to date by the Trustee regarding the rightful ownership of the Contested Software"(Quotium Complaint ¶ 17), when Quotium had already filed in the Commercial Court an action to recover its Test, Impact and OpenSTA code from the "Logibox" (the French means of software registration) in the Trustee's possession.

## III.    Quotium's Pattern of Deception and Unfair Competition in the United States

16.     Immediately upon obtaining in 2001-2002 the assets that it admitted were "Contested", Quotium began to manufacture, distribute, promote and sell QuotiumPRO and other products created from Test, Impact, and OpenSTA throughout the World, including in the United Kingdom, Latin America, and the United States, in violation of Cyrano's copyrights. In or around August 2002, Quotium began marketing a product called "Quotium Impact," which based upon information and belief, is substantially similar, if not identical, to Cyrano's Impact product.

17.     From at latest May 2002 to the present, Quotium have marketed, distributed and sold OpenSTA's commercial modules, DB Monitor and SQL Analysis, Workbench, and Production throughout the World, including in the United Kingdom, Latin America, and the United States in violation of Cyrano's copyrights in Test, Impact and OpenSTA and Cyrano's

exclusive distribution rights for Workbench, Production and OpenSTA under the Distributor
Agreement.

18.    Since on or about May 2002 until they succeeded by 2003 in reducing Cyrano to a
fraction of its former size, Quotium have engaged in a deceptive marketing campaign, consisting
of misrepresentations concerning its rights to Cyrano's software products and the status of Cyrano.
Quotium have engaged in their activities in a wrongful effort to steal customers, distributors, and
employees of Cyrano:

    a.    In or around May and July 2002, Quotium released new open-source
versions of OpenSTA, called Version 1.4.0 and Version 1.4.1, in which they have altered
the information displayed in OpenSTA to indicate that all copyrights to OpenSTA are
owned by Quotium Technologies, S.A.

    b.    Upon information and belief, from May 2002 through 2003, Quotium
knowingly and repeatedly misrepresented to Cyrano's prospective and current customers
and distributors in the United States and United Kingdom that: (1) Quotium owned to
copyrights to and were the source of all Cyrano products, including Test and Impact; (2)
none of the Cyrano companies continued to exist; (3) the customers contracts with
Cyrano were no longer valid; and (4) Cyrano would not be providing any new updates to
its customers.  In July 2002, Quotium falsely and deceptively misrepresented to Cyrano
customers and distributors by e-mail and telephone that Cyrano had gone out of business.

    c.    In 2002, often during regular business hours, Quotium solicited key
Cyrano employees to terminate their employment with Cyrano and work for Quotium.
Quotium succeeded in soliciting away former Cyrano Senior Account Manager William
Sweeney, and, upon information and belief, induced him to breach his confidentiality

6

agreement by soliciting a Cyrano prospective customer known to him, DB Consultores, resulting in Cyrano's loss of the business.

Quotium's campaign of deception materially contributed to a 90% reduction of Cyrano's software maintenance and service business and the reduction of its workforce from 35 to 9.

## IV.   Quotium's Fraud Upon and Misuse of the Courts

19.   Quotium commenced *Technologies, S.A. et al. v. Cyrano, Inc.*, No. 02-CV-11416-JLT ("*Technologies* (D.Mass.)"), in this district on July 12, 2002, a week after Cyrano commenced an action in the Commercial Court (of Paris), *Cyrano, Inc. v. Technologies, S.A. et al.*, No. RG 2002050224 (filed July 4, 2002), to recover the Test, Impact and OpenSTA code from the Logibox held by the Trustee (the "Logibox" case).

20.   On December 16, 2002, after a flurry of court activity, Hon. Joseph L. Tauro, U.S.D.J. denied cross-motions for preliminary injunction in *Technologies* (D.Mass.).

21.   On February 3, 2003, Judge Tauro denied Quotium's motion to file an amended complaint. Two days later, Quotium files a new action in the Commercial Court (of Paris), *Quotium Technologies, S.A. v. Cyrano, Inc.*, No. 2003010895 (filed Feb. 5, 2003), to void the Distributor Agreement (the "Distribution" case).

22.   Starting from the disintegration of Cyrano's first law firm, Hill & Barlow, at the end of 2002 through December 2003, there were multiple withdrawals of counsel, the last being the motion for withdrawal by Edwards & Angell as counsel for Cyrano on December 12, 2003, because Cyrano could no longer pay.

23.   Cyrano had made a motion for partial summary judgment and a motion to compel production of documents, and in the Winter of 2003-2004, there appeared to be a lull in the *Technologies* (D.Mass.) case. Nor was there advocacy required in the French proceedings, as

7

briefing had been completed and the court-appointed expert filed his report in the Logibox case on November 4, 2003.

24.     One week after Cyrano's primary counsel, from Hill & Barlow through Edwards & Angell, Stephanie Siegmann, Esq., noticed her withdrawal, the Commercial Court had entered a decision in Cyrano's favor, finding the Distributor Agreement valid. *Quotium Technologies, S.A. v. Cyrano, Inc.*, No. 2003010895 (Comm. Ct of Paris Sept. 19, 2003) (official translation attached as Exhibit 2). Neither side reported the decision to Judge Tauro.

25.     Quotium, however, appealed the Distributor decision to the Appeals Court of Paris, and its counsel in the *Technologies* (D.Mass.) case wrote, on or about November 28, 2003, for submission to the French court, that "a timely appellate court ruling in the French action would likely resolve the issues in the U.S. court action of whether Cyrano, Inc.'s post-liquidation sale and marketing of Workbench and Production constitute copyright and trademark infringement."

26.     On January 2, 2004, Judge Tauro granted Cyrano's motion to compel, but Quotium still has not complied. On January 13, 2004, he denied Cyrano's motion for partial summary judgment on the ownership of the copyright for one of the Test products. On March 16, 2004, however, the Commercial Court of Paris ruled in Cyrano's favor in *Cyrano, Inc. v. Technologies, S.A. et al.*, No. RG 2002050224 (Comm. Ct. Paris March 16, 2004) (official translation attached as Exhibit 3), finding Cyrano's ownership of Test and Impact. Neither side reported the decision to Judge Tauro.

27.     Judge Tauro in the meantime, on February 10, 2004, had allowed Edwards & Angell to withdraw but ordered Cyrano to hire new counsel by March 10, 2004. Cyrano was unable to comply. Because both sides missed a status hearing, Judge Tauro on March 17, 2004

8

dismissed the *Technologies* (D.Mass.) case.

28.     Quotium moved to reinstate the case on March 22, 2004, but certified that they had served Cyrano's counsel, when Cyrano had no counsel. With no opposition, Judge Tauro granted the motion.

29.     On June 30, 2004, the Appeals Court of Paris affirmed the trial court's decision in the Distributor case. Quotium did not report this decision to Judge Tauro notwithstanding its representation to the French court that the ruling "would likely resolve the issues in the U.S. court action."

30.     On October 6, 2004, Quotium moved for entry of default for Cyrano's failure to engage new counsel, certifying delivery by hand upon Cyrano's Chief Executive Officer, while on the transmittal letter to the court, indicating service by mail. The papers do not mention the four French court decisions against Quotium (on September 14, 2004, the court in the Logibox case made its decision immediately executable).

31.     After entry of default in the *Technologies* (D.Mass.) case on December 6, 2004, a Standing Order was sent to counsel with a timetable for filing of a motion for entry of default judgment and time to respond. Cyrano had no notice of either. Quotium obtained an extension to January 27, 2005 – the day before the invalidation under 15 U.S.C. § 1058(a) (failure to file mandatory affidavit of use) of the CYRANO® trademark, which Quotium expressly asserted in seven of the eleven counts of its Complaint in the *Technologies* (D.Mass.) case and which is the basis for the injunction it proposed and that was issued on February 24, 2005. Only Quotium knew that it had not used the trademark and could not file the mandatory affidavit.

32.     Cyrano's current counsel – engaged on February 14, 2005, after the response time provided by the Standing Order – brought the French judgments to Judge Tauro's attention the

9

day after the issuance of the February 24, 2005 Order.

33.     Quotium's counsel – the same who had advised the Appeals Court of Paris that its decision "would likely resolve the issues in the U.S. court action" – repeatedly argued to Judge Tauro that French proceedings "adjudicated a discrete issue of French law that is not dispositive of the legal issues in this case" (E.g., Paper #124 at 6, March 11, 2005).

34.     Quotium's misrepresentations to Judge Tauro or to the Clerk of the Court continue. As examples,

        a.      Quotium misrepresented in its June 16, 2005 Motion for Leave To File Supplemental Materials (Paper #151) that Cyrano's counsel made statements agreeing with Quotium's self-serving statements.

        b.      Quotium misrepresented in its July 6, 2005 Third Emergency Motion for Issuance of Contempt (Paper #160) that it sent notice to confer the Thursday before the July 4th weekend rather than after the close of business on Friday and that nothing could be done at an appeals court settlement conference.

While individually these may be viewed as aggressive advocacy or as lapses in recollection or understanding, here they form a pattern of deception that so kept Judge Tauro from considering the effect of the French judgments and the validity of Quotium's claim to a validly registered CYRANO® trademark that he subordinated his decision on the default judgment in this June 8, 2005 Memorandum to any decision on the merits made by another tribunal.

## COUNT I

### *(Declaratory Judgment of Copyright Ownership)*

35.     Cyrano repeats and incorporates by reference as though fully set forth herein the allegations contained in paragraphs 1 through 34 of the Complaint.

10

36.    The Commercial Court of Paris determined in *Cyrano, Inc. v. Technologies, S.A. et al.*, No. RG 2002050224 (Comm. Ct. Paris March 16, 2004) (official translation attached as Exhibit 3) that Cyrano owns the copyrights in Test and Impact.

37.    The courts of France recognize the final judgments of courts of the United States and of the Commonwealth of Massachusetts.

38.    OpenSTA is a work derivative of Test and Impact, wherein Cyrano owns copyrights in the additions so that Cyrano owns the copyrights in OpenSTA.

38.    A justiciable controversy within the meaning of 28 U.S.C. § 2201 exists between Cyrano and Quotium concerning the ownership of the copyrights to Test, Impact, and OpenSTA.

39.    Cyrano is entitled to a declaration that it is the owner of all copyrights to Test, Impact, and OpenSTA.

## COUNT II

### *(Declaratory Judgment of Validity of Distributor Agreement)*

40.    Cyrano repeats and incorporates by reference as though fully set forth herein the allegations contained in paragraphs 1 through 39 of the Complaint.

41.    The Commercial Court of Paris determined in *Quotium Technologies, S.A. v. Cyrano, Inc.*, No. 2003010895 (Comm. Ct of Paris Sept. 19, 2003) (official translation attached as Exhibit 2). that the Distributor Agreement is in effect relative to Cyrano SA's interests until June 30, 2007. The judgment was affirmed by the Appeals Court of Paris on June 30, 2004.

42.    The courts of France recognize the final judgments of courts of the United States and of the Commonwealth of Massachusetts.

43.    A justiciable controversy within the meaning of 28 U.S.C. § 2201 exists between Cyrano and Quotium concerning the effect of the Distributor Agreement.

11

44.     Cyrano is entitled to a declaration that the Distributor Agreement is in effect relative to the interests of Quotium as successor in interest to Cyrano SA.

## COUNT III

*(Copyright Infringement in violation of 17 U.S. C. §§ 101 et seq.)*

45.     Cyrano repeats and incorporates by reference as though fully set forth herein the allegations contained in paragraphs 1 through 44 of the Complaint.

46.     Test, Impact, and OpenSTA were first published in the United Kingdom, which was a member of the Berne Convention at the time of such publication.

47.     Cyrano is and has at all times since March 2002 been the sole owner of all right, title, and interest in and to all copyrights in Test and Impact.

48.     Cyrano is and has at all times since March 2002 been the copyright owner of the UK/US OpenSTA and the owner or exclusive licensee of its Gateway, Modeller, and HTTP Replay modules.

49.     Under the Distributor Agreement, Cyrano is also the exclusive licensee of Workbench and Production, and of certain rights in OpenSTA and its associated commercial modules, DB Monitor and SQL Analysis.

50.     Cyrano has not authorized Quotium to reproduce, distribute, manufacture, advertise, or sell Test, Impact, OpenSTA and its modules or any product containing portions thereof, or Workbench or Production.

51.     Since on or about May 2002, Quotium have reproduced, advertised, offered for sale, sold and distributed throughout the World, including in the United States, copies of Test and Impact, thereby infringing Cyrano's copyrights in the software products.

52.     Since on or about May 2002, Quotium have reproduced, advertised, offered for

12

sale, sold and distributed throughout the World, including in the United States, copies of OpenSTA and its associated commercial modules, thereby infringing Cyrano 's copyright and exclusive license.

53.     Since on or about May 2002, Quotium have reproduced, advertised, offered for sale, sold and distributed throughout the World, including in the United States, copies of Workbench and Production, thereby infringing Cyrano's exclusive license in these products.

54.     On July 11, 2005, Quotium announced the release of QTest 4.0 as a major new release of QuotiumPRO, thus a derivative work of Test, Impact and OpenSTA, the derivation, reproduction and distribution being infringements of Cyrano's copyrights in Test, Impact and OpenSTA.

55.     Quotium's infringing activities are continuing, willful, and intentional in total disregard of Cyrano's rights.

56.     As a result of Quotium's infringing activities, Cyrano has suffered and will continue to suffer, substantial and irreparable damage to its business reputations, goodwill, market share, and customer and distributor relationships. Cyrano has no adequate remedy at law and is therefore entitled to preliminary and permanent injunctive relief pursuant to 17 U.S.C. § 502.

57.     Cyrano is also entitled to recover actual damages and profits in an amount to be determined at trial (17 U.S.C. § 504(b)) or statutory damages (17 U.S.C. § 504(c)) as well as attorneys' fees and costs pursuant 17 U.S.C. § 505.

## COUNT IV

### *(Breach of Distributor Agreement)*

58.     Cyrano repeats and incorporates by reference as though fully set forth herein the

13

allegations contained in paragraphs 1 through 57 of the Complaint.

59. To the extent that Quotium claim to be selling Workbench, Production or OpenSTA products or their derivatives under intellectual property rights acquired from Cyrano SA, those rights are subject to the Distributor Agreement, and Quotium are in breach of the Agreement by making such sales outside of Continental Europe.

60. Such breach is willful.

61. Cyrano has been injured to the extent of, an is entitled to recover its contract benefits, the revenue from Quotium's past sales or licensing of Workbench, Production and OpenSTA products and their derivatives adjusted for royalties to Quotium.

62. Cyrano has been injured to the extent of and is entitled to recover damages caused by such breach to Cyrano's sales or licensing provided for by the Distributor Agreement.

63. Cyrano is further entitled to specific performance of the Distributor Agreement for current sales or licenses, including the QTest 4.0 product.

## COUNT V

*(Declaratory Judgment of Invalidity and Cancellation of CYRANO®)*

64. Cyrano repeats and incorporates by reference as though fully set forth herein the allegations contained in paragraphs 1 through 63 of the Complaint.

65. The CYRANO® trademark was registered in the USPTO to Cyrano SA for certain computer software on July 28, 1998, as No. 2,175,949.

66. The CYRANO® trademark was abandoned by cessation of Cyrano SA's business. Quotium admitted at an April 13, 2005, hearing that it has never used the mark.

67. No affidavit of use was filed by January 28, 2005 as required by15 U.S.C. § 1058(a) to avoid cancellation by the USPTO.

14

68.     Although statutorily invalid, the CYRANO® trademark registration has not yet been cancelled on its website by the USPTO. Upon information and belief, the current policy is to perform that cancellation after seven years, that is, on July 28, 2005.

69.     A justiciable controversy within the meaning of 28 U.S.C. § 2201 exists between Cyrano and Quotium concerning the validity of the CYRANO® trademark No. 2,175,949.

70.     Cyrano is entitled to a declaration that CYRANO® trademark No. 2,175,949 is invalid.

71.     If the USPTO has not cancelled CYRANO® trademark No. 2,175,949 by July 28, 2005, Cyrano is entitled to an order by this Court under 15 U.S.C. § 1119 for its cancellation..

## COUNT VI

### *(Unfair Competition and False Designation of Origin in Violation of the Lanham Act, 15 U.S.C. §1125 (a))*

72.     Cyrano repeats and incorporates by reference as though fully set forth herein the allegations contained in paragraphs 1 through 71 of the Complaint.

73.     Quotium have made false and misleading representations of fact to the public and in commerce in connection with commercial advertising and promotion in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

74.     Quotium's false and deceptive misrepresentations related to Cyrano's rights to sell its own copyrighted products, the copyright ownership and authorship of OpenSTA and derivatives such as QuotiumPRO and QTest 4.0, and products to which Cyrano holds the exclusive license, as well as Cyrano's commercial activities.

75.     Quotium's misrepresentations were intended to cause, have caused and/or are likely to cause confusion or mistake regarding Cyrano's rights to sell products to which it owns the copyright or exclusive license, and regarding Cyrano's commercial activities and existence.

76.     Quotium's conduct constitutes unfair competition with Cyrano, and has enabled and will continue to enable Quotium to make sales and earn profits to which Quotium are not in equity or good conscience entitled.

77.     Quotium's misrepresentations concerning the authorship and ownership of OpenSTA also constitute a false designation of origin by falsely suggesting or implying that the owner, author, and source of OpenSTA, QuotiumPRO and QTest 4.0 is Quotium rather than Cyrano.

78.     As a direct and proximate result of Quotium's conduct, Cyrano has suffered and will continue to suffer substantial and irreparable damage, including loss of customers and distributors, dilution of goodwill, injury to its reputation, confusion of existing and potential customers and distributors, and diminution of the value of its products. Cyrano has no adequate remedy at law and is therefore entitled to preliminary and permanent injunctive relief.

79.     Cyrano has also suffered and will continue to suffer, substantial economic damages in an amount to be determined at trial.

## COUNT VII

### *(Common Law Unfair Competition)*

80.     Cyrano repeats and incorporates by reference as though fully set forth herein the allegations contained in paragraphs 1 through 79 of the Complaint.

81.     Quotium have made false and/or misleading statements with the intention of misleading and deceiving the public in order to make sales and earn profits to which it is not in equity or good conscience entitled, which has been to Quotium benefit and to Cyrano's detriment.

82.     Quotium have further misused the court system by making false representations

16

both on substantive and procedural matters in order to

83.    Quotium's conduct constitutes unfair competition with Cyrano.

84.    As a direct and proximate result of Quotium's conduct, Cyrano has suffered and will continue to suffer substantial and irreparable damage, including loss of customers and distributors, dilution of goodwill, injury to its reputation, confusion of existing and potential customers and distributors, and diminution of the value of its products. Cyrano has no adequate remedy at law and is therefore entitled to preliminary and permanent injunctive relief.

85.    Cyrano has also suffered and will continue to suffer, substantial economic damages in an amount to be determined at trial.

## COUNT VIII

*(Unfair and Deceptive Acts or Practices - Violation of Mass. Gen. Laws. ch. 93A)*

86.    Cyrano repeats and incorporates by reference as though fully set forth here the allegations contained in paragraphs 1 through 85 of the Complaint.

87.    Cyrano and Quotium are "persons" and engaged in "trade or commerce" within the meaning of Mass. Gen. Laws ch. 93A, § 1.

88.    The acts and practices of Quotium occurred primarily and substantially in the Commonwealth of Massachusetts.

89.    The actions of Quotium constitute unfair and deceptive business practices in violation of Mass. Gen. Laws ch. 93A, § 11.

90.    Quotium's unfair and deceptive acts were committed knowingly and willfully.

91.    As a direct and proximate result of Quotium's conduct, Quotium has caused Cyrano irreparable harm and injury and will continue to do so unless Quotium is restrained and enjoined by this Court from further violations of Quotium's' rights.

17

92.    Quotium's violations of Mass. Gen. Laws ch. 93A also have cost Cyrano the loss of money and property in an amount to be determined at trial.

93.    Cyrano is entitled to recover up to treble damages, and no less than double damages, for said acts and omissions pursuant to Mass. Gen. Laws ch. 93A, § 11. Cyrano is also entitled to recover their reasonable attorneys' fees and costs incurred in this action.

## COUNT IX

### *(Fraud on the Court)*

94.    Cyrano repeats and incorporates by reference as though fully set forth here the allegations contained in paragraphs 1 through 93 of the Complaint.

95.    Quotium committed fraud on the United States District Court for the District of Massachusetts ("the Court") by failing to advise the Court of the decisions of the French courts that it had represented to the Appeals Court of Paris "would likely resolve the issues in the U.S. court action." Quotium should have advised the Court at least when it moved for entry of default on October 6, 2004 and for default judgment on January 27, 2005. When confronted with the judgments, it responded falsely on March 11, 2005 that the French judgments merely "adjudicated a discrete issue of French law that is not dispositive of the legal issues in this case."

96.    Quotium committed fraud on the Court by failing to disclose, when it filed on January 27, 2005, for a default judgment order enforcing the CYRANO® trademark, knowing that it had not used the mark and therefore could not prevent the statutory invalidation of the mark the next day. Quotium continues to misrepresent that the CYRANO® trademark is enforceable and infringed by Cyrano's use of its own name.

97.    Quotium committed fraud on the Court on numerous other occasions on procedural representations:

18

a.    Quotium misrepresented on its motion to reinstate the case on March 22, 2004, that they had served Cyrano's counsel, when Cyrano had no counsel. With no opposition, Judge Tauro granted the motion.

.b.    Quotium misrepresented in its June 16, 2005 Motion for Leave To File Supplemental Materials (Paper #151) that Cyrano's counsel made statements agreeing with Quotium's self-serving statements.

c.    Quotium misrepresented in its July 6, 2005 Third Emergency Motion for Issuance of Contempt (Paper #160) that it sent notice to confer the Thursday before the July 4th weekend rather than after the close of business on Friday and that nothing could be done at an appeals court settlement conference.

The combined effect of these misrepresentations has been the issuance of Orders, compliance with which has seriously damaged Cyrano's good will and resulted in significant legal costs and loss of business.

98.    Cyrano is entitled to recover damages caused by this fraud on the Court.

## PRAYER FOR RELIEF

WHEREFORE, Cyrano respectfully requests that this Court:

1.    Enter an order declaring the following:

   a)    Cyrano owns the copyrights in Test, Impact and OpenSTA.

   b)    the International Distributor Agreement is valid and effective against Quotium through June 30, 2007, and

   c)    the CYRANO® trademark registered in the USPTO as No. 2,175,949 is invalid.

2.    Enter an order canceling the CYRANO® trademark registered in the USPTO as

No. 2,175,949.

3.     Enter an order granting Cyrano the following preliminary and permanent injunctive relief:

a)     Ordering Quotium to immediately cease and desist manufacturing, reproducing, copying, marketing, selling, distributing, displaying, demonstrating, or otherwise using Test, Impact, OpenSTA, and Modeller (collectively, the "Cyrano Software"), and any software products that are substantially similar to, derivative of, or that otherwise infringe the Cyrano's copyright in Cyrano Software (collectively, "Infringing Software") in the United States and Worldwide with the exception that defendants-in-counterclaim may use OpenSTA non-commercially on the open-source GNU site as permitted by the GNU Public License;

b)     Ordering Quotium to immediately cease and desist manufacturing, reproducing, copying, marketing, selling, distributing, displaying, demonstrating or otherwise using their software products QuotiumPRO, QTest 4.0, and any other products that are substantially similar to the Cyrano Software as they constitute Infringing Software;

c)     Ordering Quotium to immediately cease and desist representing, by any form of communication (including on any internet or open source code forum), that they own, created or are the source of origin of any of the Cyrano Software, and to supplement and correct all previous representations to that effect within five (5) business days;

20

d)     Ordering Quotium to immediately identify all persons (as those terms are defined in Local Rule 26.5) to whom they have distributed or sold Cyrano Software or Infringing Software, including but not limited to QuotiumPRO and QTest 4.0, providing such information to Cyrano within five (5) business days;

e)     Ordering Quotium to deliver to Cyrano within five (5) business days the originals and all copies of the Cyrano Software (except OpenSTA, as it is an open source product) and Infringing Software, and all related materials, which are within Quotium's possession, custody, or control, for inspection by Cyrano and impoundment with the Court during the pendency of this action;

f)     Ordering Quotium to immediately recall all copies of Cyrano Software and Infringing Software, and all portions thereof, from all distributors, resellers, or agents to which such Software has been provided by defendants-in-counterclaim; Enjoining Quotium from interfering in any way, shape or manner with Cyrano's sole, exclusive rights under the International Distributor Agreement "to market, distribute, support and deal in" the software products Workbench, Production, OpenSTA and its associated commercial modules, DB Monitor and SQL Analysis, and its right to use the trademarks "Cyrano Workbench" and "Cyrano Production" everywhere in the world except Continental Europe;

h)     Ordering Quotium to immediately cease and desist reproducing,

21

distributing or otherwise using Workbench and Production throughout the

World excepting Continental Europe; and

i)     Enjoining Quotium from soliciting or otherwise contacting Cyrano's

customers, distributors, and employees.

4.     Enter judgment and award damages in favor of Cyrano on Counts I-IX of the

Complaint, in an amount to be determined at trial.

5.     Award Cyrano statutory damages, attorneys' fees and costs under the Copyright

Act and Lanham Act.

6.     Award Cyrano ttreble damages, attorneys' fees and expenses incurred in this

action as a result of defendants-in-counterclaim's violations of Mass. Gen.Laws ch. 93A.

7.     Award Cyrano any equitable or other relief requested including but not limited to

pre judgment interest, costs and attorneys' fees.

8.     Grant such other and further relief as the Court deems just and proper.

## JURY DEMAND

Cyrano demands a jury trial on all issues so triable.

Respectfully submitted,

Plaintiff,
**CYRANO, INC.,**
By its attorneys,

Stephen Y. Chow, BBO #082990
Michael K. Sugrue, BBO #655878
PERKINS SMITH & COHEN LLP
One Beacon Street, 30th Floor
Boston, Massachusetts 02108-3106
July 25, 2005                                        (617) 854-4000

## CERTIFICATE OF SERVICE

I, *Michael K. Sugrue*, hereby certify that a true copy of the foregoing was served upon the following counsel by hand-delivery on this the 25th day of July, 2005:

Kevin J. O'Connor, Esq.                Mayeti Gametchu, Esq.
Paragon Law Group LLP                  Paragon Law Group LLP
184 High Street                        184 High Street
Boston, MA 02110                       Boston, MA 02110

23

18 `02 09:44a      Rozan & Nilson, LLP        (212)687-1118                    P.3

# EXHIBiT A

u émis par: 33 01 42 86 97 97     RIAL TRADING    le 22/04/02 15:43 A4 NORM Pg: 2/25

*INTERNATIONAL DISTRIBUTOR AGREEMENT BETWEEN*
*CYRANO SA & CYRANO INC*

# INTERNATIONAL DISTRIBUTOR AGREEMENT

**THIS AGREEMENT** dated the 31ˢᵗ day of December Nineteen Hundred and Ninety Six is made by and between

**CYRANO SA**
**30 rue du Général Foy**
**75008 Paris**
**France**

(hereinafter referred to as "Cyrano")



**AND**

**CYRANO Inc**
**26 Parker Street**
**Newburyport**
**Massachusetts**
**01950**
**USA**

(hereinafter referred to as "the Distributor")

**WHEREAS**, Cyrano is in the business of, inter alia, the distribution, marketing and licensing of computer software products, and

**WHEREAS**, Cyrano is desirous of appointing the Distributor as a non-exclusive distributor in certain territories (as hereinafter defined) for certain computer software products of Cyrano, and

**WHEREAS**, the Distributor is desirous of accepting such appointment and has represented that it will exercise its best endeavours to effectively market, distribute and support the said computer software products.

**NOW THEREFORE**, in consideration of the mutual covenants and undertakings herein contained and intending to be legally bound by the provisions of this Agreement, the parties hereto agree as follows:

**1.    DEFINITIONS**

Initialled by Distributor: _____        Initialled by Cyrano: _____

International Distributor Agreement            Cyrano SA
Inter'l Standard Agreement.                    Page 1

Rozan & Nilson, LLP          (212)687-1118          P.4

Fax émis par: 33 01 42 86 97 97     RIAL TRADING     le 22/04/02 15:43 A4 NORM Pg: 3/25

### INTERNATIONAL DISTRIBUTOR AGREEMENT BETWEEN CYRANO SA & CYRANO INC

For the purposes of this Agreement the following words shall have the meaning set forth against them:

| | |
|---|---|
| "Commencement Date" | shall mean the 3rd day of October 1996 |
| "Licensed Products" | shall mean the computer software products set forth in Schedule A, including all and/or any enhancements, additions, modifications and/or upgrades thereto; but, for the avoidance of doubt, not including new computer software products whether based on the Licensed Products or not |
| "Source Code" | shall mean any computer program, whether stored on or in any magnetic or optical medium, in any computer memory of whatsoever kind or in eye-readable form, from which it is possible to discern the logic, algorithms, internal structure, operating features and any other design characteristic of such computer program. |
| "Object Code" | shall mean the computer executable binary code derived from compiled Source Code for execution on a computer hardware system. |
| "Cyrano Product Contract Requirements" | means the legal and contractual criteria set out in Schedule C. |
| "Software Licence & Support Agreement" | means the Distributor's form of agreement (or part of it) which embodies the Cyrano Product Contract Requirements. |
| "End-User" | shall mean any person, partnership, firm, company or any other entity or organisation being a client or customer of the Distributor and who enters into a Software Licence & Support Agreement with the Distributor for the use of the Licensed Products. |
| "User Manual" | shall mean any instruction manual, designed to and intended to teach, aid and assist any End-User in the operation and use of the Licensed Products. |
| "Territory" | shall mean those persons, organisations, market types, commercial activity areas, countries, states, republics, territories, principalities and/or geographic areas set forth in Schedule B. |
| "Trade Mark" | shall mean the name of the Licensed Products and such other names, logos, drawings and/or devices as set forth in Schedule A. |
| "Marketing" | shall mean the general promotion of the Licensed Products to prospective End-Users and the market-place of the Licensed Products in general which shall include, but not be limited to, market research, market definition, the construction of and implementation of promotional campaigns, the placing of advertisements, the preparation and distribution of sales literature |

TRADUCTEUR - INTERPRETE - ANGLAIS
BONNEFOUS
30 bis, RUE ÉMILE MENIER
75116 PARIS - FRANCE
☎ 01 45 53 23 13
EXPERT (00) PRÈS LA COUR D'APPEL DE PARIS

Initialled by Distributor: [signature]

Initialled by Cyrano: [signature]

International Distributor Agreement
form E. Product Agreement.

Cyrano SA
Page 1

mis par: 33 01 42 80 97 97    ------



*INTERNATIONAL DISTRIBUTOR AGREEMENT BETWEEN*
*CYRANO SA & CYRANO INC*

and all other types of communication material.

shall mean the general activity of granting sub-licences for the use of the Licensed Products to End-Users, such activity including, but not limited to, customer identification, customer proposal preparation and presentation, contract negotiations, continued client relation activities and all other activities usually carried on by a competent sales function.

"Product Support"

shall mean the general activity of supporting the End-User in its use of the Licensed Products, such activity including, but not limited to, liaison with End-Users on errors in the Licensed Products, advice on User Manual interpretation and the update of End-Users with releases of enhancements and updates to the Licensed Products.

"Pre-Sales Support"

shall mean the general activity of supporting the Distributor in its Marketing and Sales activities, such activity including, but not limited to, customer proposal preparation and presentation, customer contact and technical support.

"Transborder Rules"

shall mean the rules established by Cyrano, from time to time, for the coordination of the Distributor with other distributors and Cyrano companies throughout the world and as more particularly set forth in Schedule G.

"Software Key"

shall mean any number, sequence of numbers, computer program or code provided by Cyrano to the Distributor to be entered into the Licensed Products during its execution so as to enable the full and continuing use of the Licensed Products by any End-User.

"Cyrano Response Centre"

shall mean each office of Cyrano (whether a branch office of Cyrano, an associated company, subsidiary, or parent company of Cyrano) which Cyrano may nominate to the Distributor from time to time in writing at Cyrano's discretion.

"Schedule"

shall mean the provisions set out in any schedule attached hereto and made part hereof.

All references to Clauses, Sub-clauses, Schedules and Appendices are to Clauses, Sub-clauses, Schedules and Appendices of this Agreement.

Words importing the singular number only shall include the plural number and vice versa; words importing the masculine gender only shall include the feminine gender; and words importing persons shall include corporations.

References to accounts, records and/or information shall include any means or modes of storage or retrieval of the same including (but without limiting the generality of the foregoing) computer disk, tape, cassette, microfiche and the like.

## 2.  APPOINTMENT AND LICENCE GRANT

2.1  Cyrano hereby appoints the Distributor as its non-exclusive distributor for the Marketing, Sales and Product Support of the Licensed Products in the Territory.

Fax émis par: 33 01 42 86 97 97    RIAL TRADING    le 22/04/02 15:43 A4 NORM Pg: 5/25

*INTERNATIONAL DISTRIBUTOR AGREEMENT BETWEEN*
*CYRANO SA & CYRANO INC*

2.2    Cyrano hereby grants to the Distributor a personal, revocable, non-exclusive and non-transferable licence to market, distribute, support and deal in the Licensed Products and to use the Licensed Products for sales demonstrations and promotions in the Territory only. For the avoidance of doubt, this license includes the right of the Distributor to grant sublicences to third parties to use the Licensed Products but does not include the right for the Distributor to appoint sub-distributors and/or dealers without the prior written consent of Cyrano, which may be given or withheld in Cyrano's sole and absolute discretion.

3.    **ACCEPTANCE OF APPOINTMENT**

The Distributor accepts such appointment and agrees to the following:

(i)    to develop, organise and maintain business facilities and business intelligence to fully and properly exploit the market potential of the Licensed Products in the Territory;

(ii)    to establish, develop and maintain a competent Sales and Marketing office network throughout the Territory structured in such a way that the market for the Licensed Products subsisting within the Territory can be efficiently and effectively penetrated and serviced;

(iii)    to staff such Sales and Marketing offices with personnel who are well trained in the technical aspects of the demonstration, installation, operation and use of the Licensed Products;

(iv)    to establish, develop and maintain a competent Product Support office capability throughout the Territory structured in such a way that the End-Users throughout the Territory may be properly and efficiently supported with respect to those services set forth in the Software Licence & Support Agreement;

(v)    to staff such Product Support offices with personnel who are well trained in the technical aspects of the demonstration, installation, operation and use of the Licensed Products;

(vi)    to make available services for training in the use of the Licensed Products which End-Users may, at their option, take up;

(vii)    that in the event of the Distributor wishing to translate the Software Licence & Support Agreement into a language other than the English language, the Distributor shall accurately translate such Software Licence & Support Agreement, promptly forward a copy to Cyrano and attach to such translation the copyright notice of Cyrano or its licensor as the case may be;

(viii)    prior to the transfer of any Licensed Product from the Distributor to any prospective End-User, the Distributor shall enter into an agreement with the prospective End-User substantially and materially in the form of the Software Licence & Support Agreement or such other agreement that Cyrano may, from time to time, approve. With respect to trials of the Licensed Products by prospective End-Users, the Distributor shall follow such guide-lines as Cyrano may lay down, from time to time;

(ix)    to ensure that all Software Licence & Support Agreements include an effective provision whereby, upon the termination of this Agreement, such Software Licence & Support Agreements shall automatically and effectively be assigned to Cyrano;

(x)    that in the event of an End-User wishing to take only a licence to use, or only maintenance services, with respect to the Licensed Products; then the Distributor may only enter into such an agreement with the prior written permission of Cyrano;

(xi)    to forward a copy of all such Software Licence & Support Agreements to the Cyrano Response Centre

Initialled by Distributor: [    ]

Initialled by Cyrano: [    ]

International Distributor Agreement
Issue 1. Standard Agreement.

Cyrano SA
Page 4

ax émis par: 33 01 42 86 97 97      RIAL TRADING     le 22/04/02 15:45 A4 NORM. Pg: 53 23 13

*INTERNATIONAL DISTRIBUTOR AGREEMENT BETWEEN*
*CYRANO SA & CYRANO INC*

promptly following the execution thereof;

*(xii)* to maintain a complete record of all such Software Licence & Support Agreements and permit Cyrano and/or the Cyrano Response Centre, upon reasonable notice and during normal the Distributor business hours to inspect and make copies of such agreements upon the request of Cyrano;

*(xiii)* to maintain a complete record of all prospective End-Users for the Licensed Products and to forward a copy of such record to the Cyrano Response Centre upon the request of the same by Cyrano or the Cyrano Response Centre and in any event at least once in every three (3) months;

*(xiv)* to provide the Cyrano Response Centre, on a three (3) monthly basis with a sales and promotional plan which, inter alia, identifies and describes the number of licences granted, current prospective End-Users, details promotional activities undertaken by the Distributor and generally describes the state of the market within the Territory. Such sales and promotional plan shall include such other information as Cyrano and/or the Cyrano Response Centre may reasonably, from time to time, request;

*(xv)* to support the Licensed Products licensed to End-Users substantially and materially in accordance with the terms of the Standard Software and Licence Agreement;

*(xvi)* to promptly inform Cyrano and the Cyrano Response Centre of all enquiries from End-Users and prospective End-Users outside the Territory;

*(xvii)* to incorporate, merge or fix the appropriate Software Key with or into any Licensed Product in strict accordance with the instructions of Cyrano and/or the Cyrano Response Centre given to the Distributor from time to time;

*(xviii)* to fulfil orders by End-Users for additional copies of User Manuals;

*(xix)* to observe and comply with the Transborder Rules set forth in Schedule G. The Distributor agrees that the Transborder Rules may be replaced and/or amended or modified by Cyrano on giving written notice thereof to the Distributor.

4. **LICENCE RESTRICTIONS**

   4.1 The parties hereto specifically agree that it shall be a condition of this Agreement that the Distributor shall not alter or in any way modify the Licensed Products or User Manuals in any manner whatsoever.

   4.2 The Distributor agrees not to decompile, reverse compile, reverse engineer, interrogate, or decode the Licensed Products to bypass or delete protection methods provided for preventing unauthorised uses of the Licensed Products, to derive from them any Source Code in any form whatsoever or for any other purpose whatsoever.

   4.3 The User Manual shall only be distributed by the Distributor in connection with the Licensed Products.

   4.4 The Distributor agrees during the life of this Agreement and for a period of one (1) year thereafter not to deal in, market or distribute (whether directly or indirectly) any computer software product which can reasonably be said to be competitive with the Licensed Products, except without the prior written consent of Cyrano. In the event that the Distributor does so market and distribute such competitive computer software products, then Cyrano shall, entirely at its discretion, have the option of revoking any or all exclusive rights the Distributor may enjoy hereunder or terminate this Agreement.

5. **ORDERS**

   5.1 All orders submitted by the Distributor to Cyrano and/or the Cyrano Response Centre for the Licensed

*INTERNATIONAL DISTRIBUTOR AGREEMENT BETWEEN*
*CYRANO SA & CYRANO INC*

Products and/or the User Manual shall be governed by the terms contained herein, notwithstanding any additional or different terms which may be contained in any such order.

5.2    Upon receipt of written proof showing the existence of an executed Software Licence & Support Agreement (or such other agreement which Cyrano may have approved in writing) between the Distributor and an End-User, Cyrano or the Cyrano Response Centre shall promptly send or transmit by facsimile or e-mail (whichever shall be, in Cyrano's opinion, the most fitting mode of communication) the appropriate Software Key to the Distributor.

## 6.    DURATION OF THE AGREEMENT AND THE COMPLETION OF SCHEDULES

### 6.1    Non-Completion of Schedules at the Commencement Date

6.1.1    The parties hereto specifically represent, each to the other, their mutual understanding and agreement that the fashioning of a mutually agreeable performance and revenue structure for the Licensed Products in the Territory may not be achievable at the execution hereof but may only be achievable after an initial period during which the Distributor and Cyrano evaluate the actual commercial performance of the Licensed Products in the Territory.

6.1.2    Consequent upon Clause 6.1.1 hereinabove, the parties hereto agree that it shall not be necessary for the operation of this Agreement for Schedules D and E to be completed at the execution hereof so long as Schedule H has been completed which shall govern, inter alia, the royalties, fees and payments to be made by the Distributor to Cyrano together with such interim provisions as the parties hereto may agree during the Initial Term (as hereinafter defined). For the avoidance of doubt, nothing herein shall oblige or shall be construed to oblige either party to agree the content of Schedules D and/or E. Upon the completion and agreement of Schedules D and E, Schedule H shall have no further force and effect.

### 6.2    Initial Term

This Agreement shall commence on the Commencement Date and shall continue for the period of days set forth in Schedule A against the heading "Initial Term" (such period being hereinafter referred to as the "Initial Term").

### 6.3    Principal Term

6.3.1    Except in circumstances where:

(i)    this Agreement has been terminated during the Initial Term in accordance with Clause 14. hereinbelow; or

(ii)    Schedules D and E have not been completed and agreed by the last day of the Initial Term;

at the end of the Initial Term this Agreement shall continue for the term set out in Schedule A against the heading "Principal Term" (such period being hereinafter referred to as the "Principal Term") and will continue for successive one (1) year periods, unless terminated by either party giving written notice to the other at least sixty (60) days prior to the renewal date or unless otherwise terminated in accordance with the provisions of this Agreement.

6.3.2    Any extension shall be on the same terms and conditions contained in this Agreement.

## 7.    ROYALTIES, FEES AND PAYMENT

BONNEFOUS
30 bis, RUE ÉMILE MENIER
75116 PARIS · FRANCE
☎ 01 44 66 99 19

Initialled by Distributor:

International Distributor Agreement
Issue 2. Standard Agreement.

Initialled by Cyrano:

Cyrano SA
Page 6

8 02 09:46a      Rozan & Nilson, LLP      (212)687-1118        p.9

Fax émis par: 33 01 42 86 97 97     RIAL TRADING    le 22/04/02 15:43 A4 NORM Pg: 8/25

*INTERNATIONAL DISTRIBUTOR AGREEMENT BETWEEN*
*CYRANO SA & CYRANO INC*

7.1   The Distributor shall remit to Cyrano (or, if instructed by Cyrano in writing - to the Cyrano Response Centre) such royalties and fees:

(i)   during the Initial Term as are set forth in Schedule H; and

(ii)   during the Principal Term as are set forth in Schedule D.

7.2   Cyrano or the Cyrano Response Centre shall supply the Distributor with a standard Cyrano price list for the Licensed Program applicable to the Territory for the calculation of royalties in accordance with Schedule D and Schedule H. Cyrano may amend such price list from time to time, giving the Distributor thirty (30) days written notice thereof and, in the case of quotations given by the Distributor to End-Users or prospective End-Users which are extant when such notice is received, such notice period shall be deemed to be ninety (90) days with respect to such quotations only.

7.3   The Distributor shall be solely and exclusively responsible for the payment of any tax, impost, excise or tariff of whatsoever nature (including, but without limitation, withholding tax) applied to, related to or concerned with any payment to be made by the Distributor by virtue of Clause 7.1 hereinabove.

7.4   The Distributor shall be solely and exclusively responsible for the gaining of any Government or official permission and/or sanction related to or concerned with any payment to be made by the Distributor by virtue of Clause 7.1 hereinabove.

**8.   REVENUE TARGETS**

8.1   There shall be no revenue targets unless agreed by both parties in writing

**9.   GENERAL CYRANO OBLIGATIONS**

9.1   Cyrano or the Cyrano Response Centre shall, within fourteen (14) days from the execution hereof forward to the Distributor one (1) master copy of the Licensed Products in Object Code form and such number of copies of the User Manual and other documentation as Cyrano shall determine will facilitate the discharge of the Distributors obligations arising hereunder.

9.2   Cyrano may, from time to time, make enhancements and upgrades to the Licensed Products. These enhancements and upgrades shall be offered to the Distributor. Such acquisition and licence of these enhancements and upgrades shall be governed by the terms and conditions of this Agreement and the Distributor shall be responsible for providing such enhancements and upgrades to its End-Users.

8.3   Cyrano shall provide, through the Cyrano Response Centre, maintenance services with respect to the Licensed Products to the Distributor consistent with those terms of the Software Licence & Support Agreement relating to the provision of such maintenance services.

8.4   Upon the written request of the Distributor Cyrano may, in its sole discretion, provide Pre-Sales Support to the Distributor. The content and duration of such Pre-Sales Support shall be decided by Cyrano on a case by case basis and such Pre-Sales Support shall be chargeable by Cyrano at its then current standard charges and fees.

**9.   ACKNOWLEDGEMENT OF OWNERSHIP**

9.1   By accepting the licences set forth herein, the Distributor does not become the owner of the Licensed Products or gain any interest therein other than that granted by Cyrano hereinabove. Title to and ownership of the Licensed Products and all enhancements and upgrades thereto shall at all time remain with Cyrano or its licensor.

9.2   The Distributor agrees when discharging its obligations hereunder to identify the Licensed Products as being

Initialled by Distributor
International Distribution Agreement
Issue B. Standard Agreement.
Cyrano SA
Page 7
Initialled by Cyrano

8 02 09:48a    Rozan & Nilson, lllP    (212)687-1118    P.11

ax émis par: 33 01 42 86 97 97    RIAL TRADING    le 22/04/02 15:43 A4 NORM Pg: 9/25

*INTERNATIONAL DISTRIBUTOR AGREEMENT BETWEEN*
*CYRANO SA & CYRANO INC*

the invention, development or proprietary property of Cyrano or its licensor. The Distributor agrees not to remove any copyright notices or confidential or proprietary legends or identification from the Licensed Products or User Manuals.

10.    **TRADE MARKS**

10.1    Use of the Trade Mark

10.1.1    The Distributor shall not market, distribute or deal in any product of whatsoever nature (other than the Licensed Products):

(I)    with or under the Trade Mark;

(II)    which incorporates the Trade Mark into its name;

nor shall the Distributor apply the Trade Mark to any product of whatsoever nature other than the Licensed Products.

10.1.2    The Distributor shall not use in its business in the Territory any other trade marks so resembling the Trade Mark as to be likely to cause confusion or deception.

10.2    Recognition of Ownership

The Distributor recognises that Cyrano is the owner of the Trade Mark in the Territory and of the goodwill attaching to the business in the Licensed Products in respect of which it is used and agrees that the Trade Mark shall remain vested in Cyrano both during the term of this Agreement and thereafter and the Distributor agrees never to challenge the validity or ownership of the Trade Mark or that the use thereof by the Distributor is on behalf of Cyrano as a licensee under its control.

10.3    Registration of the Trade Mark in the Territory

10.3.1    In the event that Cyrano decides to apply for registration of the Trade Mark in the Territory as the first user thereof (through the Distributor's use) the Distributor will render to Cyrano all reasonable assistance towards the obtaining of a registration.

10.3.2    If at the time when Cyrano desires to apply for registration or has so applied the Distributor is deemed in law to be the proprietor of the Trade Mark so as to make it necessary for the application to be made or proceeded with in the name of the Distributor, the Distributor will, at the request and expense of Cyrano, make or proceed with such application and do all acts and execute all documents necessary for obtaining registration in the name of the Distributor, and thereupon the Distributor shall assign such registration to Cyrano.

10.3.3    On the registration of the Trade Mark becoming vested in Cyrano, the Distributor shall be entitled to the like rights under such registration as are granted by this Agreement and Cyrano shall, at the request and expense of the Distributor, do all acts and execute all documents for establishing the Distributor as a user thereunder and, where applicable, for the registration of the Distributor's permitted use at any appropriate trade marks registry.

10.3.4    After the Trade Mark has been registered, the Distributor shall, where practicable, in the representations of the Trade Mark used by the Distributor in relation to the Licensed Products to be licensed in the Territory, append to or place adjacent to or related to the Trade Mark such inscription as is usual or proper for indicating that the Trade Mark is registered.

Initialled by Distributor [.......]

Initialled by Cyrano [.....]

International Distributor Agreement
Issue 8. Standard Agreement

Cyrano SA
Page 8

Fax émis par: 33 01 42 86 97 97     RIAL TRADING   le 22/04/02 15:43 A4 NORM Pg: 10/25

*INTERNATIONAL DISTRIBUTOR AGREEMENT BETWEEN*
*CYRANO SA & CYRANO INC*

**11.   WARRANTIES AND OTHER LICENCES**

11.1   Cyrano has entered into this Agreement with the Distributor relying on the representations of the Distributor that it is a commercially sound enterprise operating in the computer software industry in the Territory. Concomitant upon the foregoing, the Licensed Products and User Manuals are provided to the Distributor on the basis that the Distributor has exercised its own judgement and relied on its own expertise with respect to them. Cyrano makes no representations or warranties, express or implied, of any kind whatsoever and there shall be excluded from this Agreement any warranties or conditions, either express or implied, statutory or otherwise. Without prejudice to the generality of the foregoing, no implied warranties of quality or fitness for a particular purpose are given hereunder, and no implied warranty arising by usage or trade, course of dealing, or course of performance is made by Cyrano nor shall any such implied warranty arise by this Agreement and/or Cyrano's and/or the Distributor's conduct in relation hereto or to each other, and in no event shall Cyrano be liable on any such warranty with respect to any part or all of the Licensed Products or any service provided by Cyrano hereunder.

11.2   Cyrano does not warrant or represent that the functions contained in the Licensed Products will meet the Distributors or its End-Users requirements or will operate in the combination selected by the Distributor or its End-User, or that the operation of the Licensed Products will be error free.

11.3   Except for the express licence given in Clause 2.2 above, Cyrano grants no other licences with respect to the Licensed Products and there shall be excluded from this Agreement any further licences, either express or implied, statutory or otherwise, with regard to the Licensed Products. Without prejudice to the generality of the foregoing, no implied licence arising by usage or trade, course of dealing, or course of performance is made by Cyrano nor shall any such implied licence arise by this Agreement and/or Cyrano's and/or the Distributor's conduct in relation hereto or to each other.

11.4   Except as expressly provided for in Clause 13.2 hereinbelow, in no event shall Cyrano be liable for any incidental, indirect, special or consequential damages whatsoever (including, but not limited to, lost profits or interruption of business) arising out of or related to this Agreement or the sublicense or use of any Licensed Products or User Manual or for any claim by any third party. Cyrano's liability arising out of contract, negligence or strict liability in tort shall not exceed any amounts paid by Distributor for the particular Licensed Products or User Manual involved.

**12.   INDEMNITIES**

12.1   The Distributor agrees to indemnify and hold Cyrano harmless from all damages and liability whatsoever claimed against Cyrano based upon the misrepresentation by the Distributor or any of its employees or agents, as to the performance of the Licensed Products. Further, the Distributor agrees to indemnify and hold Cyrano harmless from all damages and liability whatsoever, claimed against Cyrano based upon activities of the Distributor or any of its employees and agents in the licensing, marketing, installation and support of Licensed Products.

12.2   Cyrano shall indemnify, hold harmless and defend the Distributor from and against any and all damages, costs, losses and expenses (including settlement awards and proper legal expenses) awarded by a Court of Law against the Distributor arising from or in connection with any claim that Cyrano did not have the right to grant the Distributor the licence set forth in Clause 2.2 hereinabove.

**13.   TERMINATION**

13.1   This Agreement may be terminated by Cyrano forthwith at any time effective on giving written notice to the Distributor in the event of any of the following:

(i)   Any transfer or assignment of this Agreement or any licence granted herein by the Distributor without the prior written consent of Cyrano; or

Initialed by Distributor: [signature]                                    Initialed by Cyrano: [signature]

International Distributor Agreement                                       Cyrano SA
Issue E. Standard Agreement                                              Page 8

Fax émis par: 33 01 42 86 97 97     RIAL TRADING    le 22/04/02 15:43 A4 NORM Pg: 11/25

*INTERNATIONAL DISTRIBUTOR AGREEMENT BETWEEN*
*CYRANO SA & CYRANO ENGLAS*

    (ii)    Failure by the Distributor to comply with the terms of any licence granted hereunder;

    (iii)    the Distributor becoming insolvent or committing any act of bankruptcy; or

    (iv)    Failure by the Distributor to make any licence fee payment or any payment due hereunder, or perform any of the other terms and conditions herein, provided any such failure is not cured within thirty (30) days after written notice of same by Cyrano; or

    (v)    during the Initial Term only, on giving the Distributor fourteen (14) days written notice thereof.

13.2    This Agreement may be terminated forthwith by the Distributor at any time effective on giving written notice to Cyrano in the event of any of the following:

    (i)    Cyrano failing to perform any of the terms, being in the nature of a condition and fundamental to this Agreement, provided any such failure is not cured within thirty (30) days after written notice of same by the Distributor; or

    (ii)    during the Initial Term only, on giving Cyrano fourteen (14) days written notice thereof.

13.3    In the event of the parties hereto wishing to terminate this Agreement by their mutual consent, such termination shall only be effective upon the recording of such consent by the parties hereto in writing.

13.4    In the event of any termination or expiration of this Agreement, the Distributor shall:

    (i)    pay to Cyrano all license fees and other amounts due and/or owing to Cyrano at the time of such termination;

    (ii)    immediately return to Cyrano all Licensed Products and all copies thereof, not sublicensed to third parties and further, the Distributor shall have no right to sell, licence the use of, or dispose of in any manner whatsoever, any stock of Licensed Products and/or User Manuals that the Distributor or its agents and employees may hold at such termination;

    (iii)    cause all of those Software Licence and Maintenance Agreements in force at the time of termination to be legally and effectively assigned to Cyrano.

13.5    The Distributor shall have no claim against Cyrano for loss of prospective profits or expenditures in connection with the Distributors loss of its rights herein in the event of any termination made pursuant to this Agreement.

13.6    This Agreement may only be terminated in strict accordance with this Clause 14..

## 14.   ASSIGNMENT

Neither this Agreement nor the licences hereunder may be assigned or transferred, in whole or in part, by the Distributor, or by operation of law, or otherwise, without the prior written consent of Cyrano.

## 15.   CONFIDENTIALITY

Each party undertakes to keep and treat as confidential and not to disclose to any third party, any information relating to the business or trade secrets of the other nor make use of such information for any purpose whatsoever, except for the purposes of this Agreement, provided that the foregoing obligation shall not extend to information which is:

Initialed by Distributor [ ]

Initialed by Cyrano [ ]

International Distributor Agreement
Issue E. Standard Agreement

Cyrano SA
Page 10

Fax émis par: 33 01 42 86 97 97       RIAL TRADING       le 22/04/02 15:43 A4 NORM Pg: 12/25

*INTERNATIONAL DISTRIBUTOR AGREEMENT BETWEEN*
*CYRANO SA & CYRANO Inc*

(i)     is or comes into the public domain other than by breach of this Agreement;

(ii)    in the possession of one party prior to receipt from the other party;

(iii)   received bona fide by one party from a third party not receiving the information directly or indirectly from the other party.

This Clause is binding on all parties during the Agreement and for a period of ten (10) years after termination and each party shall so bind its directors and employees.

### 16.   RIGHT OF AUDIT

16.1   The Distributor shall keep such records and books of account as are normally kept by any competent and prudent business and in any event of such quality and detail as to permit the ascertainment and validation of any payment due from the Distributor to Cyrano in line with the scheme of payment between the parties set forth herein.

16.2   Cyrano or its duly authorised representative shall have the right at any reasonable time during normal business hours (at its own expense) to inspect and audit the accounts and records of the Distributor and any other book, record, voucher, receipt or invoice relating to the manufacture, sale, licensing, sub-licensing or disposal of the Licensed Products and of the make up of the invoice therefor and all other facts or matters relating to the calculation of the amount of royalty due including papers and vouchers received from sub-extracts from any such matter. In the event that any examination of such records reveals an error exceeding 3% (three per centum) of the total sums paid to the party concerned, the cost of such inspection and audit shall be borne by the party in error. Notwithstanding the expiration or termination of this Agreement such inspection may take place until all outstanding claims have been settled to the satisfaction of the parties hereto.

### 17.   FORCE MAJEURE

Neither party shall be under any liability to the other in respect of anything which, apart from this provision, may constitute a breach of this Agreement arising by reason of force majeure, namely, circumstances beyond the control of either of the parties hereto which shall include (but not be limited to) acts of God, perils of the sea or air, fire, flood, drought, explosion, sabotage, accident, embargo, riot, civil commotion, including acts of local government and parliamentary authority; inability to supply the Licensed Products, materials, breakdown of equipment and labour disputes of whatever nature and whatever cause arising, including (but without prejudice to the generality of the foregoing) work to rule, overtime bars, strikes and lockouts and whether between either of the parties and any or all of its employees and/or any other employer and any or all of its employees and/or between any two or more groups of employees (and whether of either of the parties hereto and any other employer).

### 18.   WAIVER

Failure by any party at any time to require the performance of any provision of this Agreement shall not affect the right of such party to require full performance thereof at any time thereafter and the waiver by any party of any breach of any such provision of this Agreement shall not be taken or held to be a waiver of any subsequent breach thereof or as nullifying the effectiveness of any such provision or in any way prejudicing such party's right hereunder.

### 19.   PARTIAL INEFFECTIVENESS

Initialled by Distributor [....]          Initialled by Cyrano [....]

International Distributor Agreement
Issue E Standard Agreement.

Cyrano SA
Page 11

18.02 09:53a      Rozan & Nilson, LLP        (212)687-1118            P.15

Fax émis par: 33 01 42 86 97 97      RIAL TRADING    le 22/04/02 15:43 A4 NORM Pg: 13/25

*INTERNATIONAL DISTRIBUTOR AGREEMENT BETWEEN*
*CYRANO SA & CYRANO INC*

If any term or provision or part of this Agreement, not being of a fundamental nature, shall be held illegal or unenforceable, it is to that extent deemed omitted; the validity and enforceability of the remainder of this Agreement shall not be affected.

**20.    CLAUSE HEADINGS**

The Clause Headings in this Agreement are inserted for ease of reference only and shall not affect the construction or interpretation of this Agreement.

**21.    RELATIONSHIP OF THE PARTIES**

It is hereby declared and acknowledged by the parties hereto that nothing herein shall constitute them partners or agents one for the other. No party shall have any authority to bind the other legally or equitably by contract, admission, acknowledgement, undertaking or estoppel, nor may any party claim from any other any losses suffered by him out of the operation of this Agreement otherwise than is expressly provided herein. It is further hereby declared and acknowledged by the parties hereto that the Cyrano Response Centre is not a party to this Agreement but acts hereunder as the agent of Cyrano so as to facilitate the discharge of Cyrano's duties and obligations hereunder by Cyrano.

**22.    CONTROLLING LANGUAGE**

The parties hereto hereby agree that the official and controlling language of this Agreement shall be English and undertake that all communications (including, but without limitation, notices, processes, certificates and any other document of whatsoever kind) between the parties with respect to this Agreement shall be in the English Language.

**23.    REPRESENTATIONS**

It is hereby declared and acknowledged by the parties hereto that neither party has made any representations to the other and neither party has acted on or relied upon any representation made by the other except as is expressly provided and set forth herein.

**24.    ENTIRE AGREEMENT**

This Agreement constitutes the entire agreement of the parties and supersedes all prior agreements, understandings and negotiations. Cyrano and the Distributor specifically represent, each to the other, that there are no additional, contemporaneous or supplemental agreements between them related in any way to the Licensed Products or the use and service thereof unless copies of the same are presently attached hereto and made a part hereof. This Agreement may not be changed or modified in any way subsequent to the date of execution hereof except in writing by the parties hereto.

**25.    PROPER LAW**

25.1    This Agreement shall be governed and construed in accordance with English Law and the parties hereto irrevocably submit to the exclusive jurisdiction of the English Courts of Law.

25.2    The Distributor hereby agrees during the term of this Agreement and thereafter that it shall never challenge the validity of this Clause 25. in any manner whatsoever nor in any forum whatsoever.

Initialled by Distributor [....]

Initialled by Cyrano [....]

International Distributor Agreement
Issue 8. Standard Agreement.

Cyrano SA
Page 12

18 02 09:54a    Rozan & Nilson, LLP    (212)687-1118    P.16

Fax émis par: 33 01 42 66 97 97    RIAL TRADING   le 22/04/02 15:43 A4 NORM Pg: 14/25

*INTERNATIONAL DISTRIBUTOR AGREEMENT BETWEEN*
*CYRANO SA & CYRANO INC*



**IN WITNESS WHEREOF,** the parties hereto have executed this Agreement

Signed:                              Signed:

Name:    Philippe Eyries            Name:    Martin Greenbank

Title:    Director                  Title:    Chief Financial Officer

For and on behalf of                For and on behalf of
CYRANO SA                           CYRANO Inc
("Cyrano")                          ("Distributor")

Initialled by Distributor [.....]                Initialled by Cyrano [.....]

International Distributor Agreement                Cyrano SA
Issue 5. Standard Agreement.                       Page 13

*INTERNATIONAL DISTRIBUTOR AGREEMENT BETWEEN*
*CYRANO SA & CYRANO INC*



## SCHEDULE A

## LICENSED PRODUCTS and TRADE MARK

**Licensed Products:**
    100% of all modules comprising Client Pack but excluding Cyrano Robot, Cyrano Manager and TeamTest
    100% of all modules comprising DB Pack but excluding LoadTest and Cyrano LoadTest
    0%   of all modules comprising VT Pack
    0%   of Systel
    33 1/3% of all modules comprising Server Pack

**Trade Marks:**
    DB Pack
    Client Pack
    Server Pack
    VT Pack

**Term:**

| | |
|---|---|
| Initial Term: | not applicable |
| Principal Term: | 3rd October 1996 to 30th June 2007 |

Initialled by Distributor:

Initialled by Cyrano:

International Distributor Agreement
Issue E. Standard Agreement

Cyrano SA
Page 14

BONNEFOUS
30 bis, RUE ÉMILE MENIER
75116 PARIS · FRANCE
☎ 01 45 53 23 15

18 02 '10:03a    Rozan & Nilson, LLP    (212)687-1118    P.19

Fax émis par: 33 01 42 86 97 97    RIAL TRADING    le 22/04/02 15:43 A4 NORM Pg: 17/25

*INTERNATIONAL DISTRIBUTOR AGREEMENT BETWEEN*
*CYRANO SA & CYRANO INC*

### SCHEDULE C

#### CYRANO PRODUCT CONTRACT REQUIREMENTS

[stamp: BONNEFOUS — 30 bis, RUE ÉMILE MENIER — 75116 PARIS - FRANCE — 01 46 88 29 18]

The Software Licence & Support Agreement must comply with the following criteria (which the Distributor must ensure are legally effective in all respects in the legal jurisdictions in which the Software Licence & Support Agreements are executed and/or subject to):

(i)    The End-User must be granted a personal, non-transferable, non-exclusive and revocable licence to use the Licensed Products on a specified computer hardware system at a specified location.

(ii)   The End-User must be obliged to use the Licensed Products only for the End-User's benefit in the course of its normal business activities.

(iii)  The End-User must be obliged to use the Licensed Products so that they are executed only at the Location and on the Authorised Hardware by employees of the End-User or by staff under contract to the End-User and under the End-User's direct supervision who require such access in order to permit and enable the use by the End-User of the Licensed Products in the manner contemplated by this Agreement.

(iv)   The End-User must be obliged not to permit:

   (a)   any other person or entity to use the Licensed Products; nor

   (b)   a greater number of Users than that specified in the Software Licence & Support Agreement to use the Licensed Products.

(v)    The End-User must only be permitted to use the Licensed Products for its own business purposes.

(vi)   Where the legal jurisdiction permits, the End-User must be obliged to undertake to respect the confidentiality of the Licensed Products and the trade secrets therein and not to use any disassembly, decompilation or reverse compilation techniques or any other similar or like method to gain access to the Source Code to the Licensed Products and/or to determine any design, structure, concepts and/or methodology employed in the Licensed Products; whether to incorporate within any product or computer program of its own creation or for any other purpose whatsoever.

(vii)  In the Software Licence & Support Agreements subject to the legal jurisdiction of any Member State of the European Union only; the Distributor will include a provision to the following effect:

The Distributor or its licensor makes available at reasonable charges a range of information which could assist the End-User in the creation of independent computer programs to operate with the Licensed Products. In view of this ready availability, the End-User undertakes to respect the confidentiality of the Licensed Products and the trade secrets therein and not to use any disassembly, decompilation or reverse compilation techniques or any other similar or like method to gain access to the Source Code to the Licensed Products and/or to determine any design, structure, concepts and/or methodology employed in the Licensed Products; whether to incorporate within any product or computer program of its own creation or for any other purpose whatsoever.

(viii) The End-User shall be permitted to make, for back-up purposes only, such number of copies of the Licensed Products as may be necessary to ensure the satisfactory secure operation of its business but shall not be permitted to make any other copies for any other purpose whatsoever and shall only use a back-up copy in the place of the copy of the Licensed Products on the authorised hardware.

Initialled by Distributor:

Initialled by Cyrano:

International Distributor Agreement
Issue 2. Standard Agreement.

Cyrano SA
Page 16

Fax émis par: 33 01 42 66 97 97     RIAL TRADING   le 22/04/02 15:43 A4 NORM Pg: 18/25

*INTERNATIONAL DISTRIBUTOR AGREEMENT BETWEEN*
*CYRANO SA & CYRANO INC*

(ii)   The Distributor will represent that the Licensed Products and all parts thereof and all patent, copyright and other intellectual property rights therein are and shall remain the property of Cyrano S.A. or its licensor.

(x)   No warranties or representations are to be made with respect to the Licensed Products.



Initialled by Distributor

International Distributor Agreement
Issue 5. Standard Agreement

Initialled by Cyrano

Cyrano SA
Page 17

**INTERNATIONAL DISTRIBUTOR AGREEMENT BETWEEN**
**CYRANO SA & CYRANO INC**

**SCHEDULE D**

**ROYALTIES, FEES AND PAYMENT**



*Underlined:* Royalties

The royalty payable by the Distributor with respect to every licence connected with the Licensed Products shall be:

(i)     30% (Thirty per centum) of the sales value of the Distributors Licensed Products; and

(ii)    30% (Thirty per centum) of all incremental revenue recognised by the Distributor with respect to the maintenance and support of the Licensed Products.

For the exclusion of doubt, sales by the Distributor of any modules of Server Pack shall attract an effective royalty of 10% to CYRANO, with a further 20% payable to Cyrano (UK) Limited under a separate agreement.

For example:-     Server pack licence sale for US$ 20,000
                  Royalty to CYRANO       US$ 2,000
                  Royalty to Cyrano (UK) Ltd US$ 4,000

*Underlined:* Payment

The Distributor shall make payment of all royalties in the following manner:

(a)     all royalties shall be paid in US Dollars; and

(b)     all royalties arising with respect to the licensing, maintenance and/or support of the Licensed Products shall be paid not later than thirty (30) days following the quarter end; and

The Distributor shall make payment for all Pre-Sales Support provided to the Distributor by Cyrano within thirty (30) days of the date of the relevant Cyrano invoice.

Initialled by Distributor: [signature]

Initialled by Cyrano: [signature]

International Distributor Agreement
Issue E standard Agreement.

Cyrano SA
Page 18





18.02 10:29a    Rozan & Nilson, LLP    (212)687-1118

Fax émis par: 33 01 42 86 97 97    RIAL TRADING    le 22/04/02 15:43 A4 NORM Pg: 22/25

*INTERNATIONAL DISTRIBUTOR AGREEMENT BETWEEN*
*CYRANO SA & CYRANO INC*

### SCHEDULE G

### TRANSBORDER RULES



BONNEFOUS
30 bis, RUE ÉMILE MENIER
75116 PARIS - FRANCE
☎ 01 45 53 23 13

**1.   Transborder Rules Definitions**

For the purposes of the Transborder Rules in this Schedule G only the following words shall have the meaning set forth against them:

"Cyrano Products"    shall mean all and/or any of Cyrano computer software products (whether owned by Cyrano or licensed to Cyrano and whether including the Licensed Products or not) which may be marketed and/or distributed by Cyrano from time to time.

"Multinational Customer"    shall mean any potential or existing customer, whether domiciled inside or outside of the Territory, that is licensed to use or desires to be licensed to use any Cyrano Product in more than one legal jurisdiction.

"Commission"    shall mean a payment from Cyrano to the Distributor in respect of a Multinational customer calculated in accordance with these Transborder Rules.

**2.   General**

The Distributor acknowledges and agrees that the global marketing and support of the Cyrano Products requires a substantial degree of coordination among Cyrano, Cyrano companies, Cyrano distributors and the Distributor which assists in giving this Agreement business efficacy and which inures to the benefit of the Distributor and Cyrano generally. The Distributor undertakes to co-operate with Cyrano at all times in Cyrano's determination on how to respond to any enquiry or order from a Multinational Customer in order to best satisfy the particular Multinational Customer's requirements and Cyrano's relationships with other parties (including the Distributor).

**3.   Reservation**

Cyrano expressly reserves the right to license any Cyrano Product to a Multinational Customer directly or through its distributors (including the Distributor). Upon receiving any enquiry or order from any Multinational Customer, the Distributor will promptly notify Cyrano and inform Cyrano of:

(i)    the name and address of the Multinational Customer;

(ii)   the location of any existing and proposed installations in the Territory (or known to the Distributor);

(iii)  the anticipated number and type of Cyrano Products to be ordered; and

(iv)   any additional information that Cyrano might periodically request.

Initialled by Distributor ___    Initialled by Cyrano ___

International Distributor Agreement
Issue E. Standard Agreement

Cyrano SA
Page 21

Fax émis par: 53 01 42 86 97 97      RIAL TRADING    le 22/04/02 15:43 A4 NORM Pg: 23/25

*INTERNATIONAL DISTRIBUTOR AGREEMENT BETWEEN*
*CYRANO SA & CYRANO INC*

4.    **Services**

The Distributor agrees that it will, upon Cyrano's written request, provide Multinational Customers in the Territory with Product Support, installation and training services. Distributor will provide such services, in whole or in part, under a service agreement executed between the Distributor and the Multinational Customer (or its affiliate in the Territory) or as a sub-contractor of Cyrano as Cyrano deems appropriate. The Distributor will offer such services to either the Multinational Customer or Cyrano, as the case may be, at prices and under terms no less favourable than GUAG... advantageous terms offered to any other customer of the Distributor.

: 18 02 10:31a    Rozan & Nilson, LLP    (212)687-1118    p.26

Fax émis par: 33 01 42 86 97 97    RIAL TRADING    le 22/04/02 15:43 A4 NORM Pg: 24/25

*International Distributor Agreement between*
*CYRANO SA & CYRANO Inc*

**8.    Termination**

Unless otherwise agreed in writing by Cyrano, the Distributor shall not be entitled to any commission with respect to orders from Multinational Customers (and/or their affiliates) that Cyrano may receive subsequent to the termination of this Agreement or, if such order was received by Cyrano prior to the termination of this Agreement, that Cyrano accepts more than one month following the termination hereof.



International Distributor Agreement
Inse E. Standard Agreement

Cyrano SA
Page 33

INTERNATIONAL DISTRIBUTION AGREEMENT BETWEEN
CYRANO SA & CYRANO INC

SCHEDULE M

INITIAL TERM

ROYALTIES, FEES AND PAYMENT AND OTHER INTERIM ARRANGEMENTS

There shall be no Initial term. All Principle terms will run from the 1st October CM annual resolution.

**BONNEFOUS**
30 bis, RUE ÉMILE MENIER
75116 PARIS - FRANCE
☎ 01 45 53 23 13
TRADUCTEUR - INTERPRÈTE - ANGLAIS - ALLEMAND
EXPERT ... LA COUR D'APPEL DE PARIS

; 18 02 -10:32a    Rozan & Nilson, LLP    (212)687-1118    p.28

07/23/2002 12:15 FAX                                           ☒002

07/22/02  15:27 FAX 617 426 3500    HILL & BARLOW    ☒002

01/04/1994  06:50    9784624489    PAGE  02

*International Distributor Agreement between*
*CYRANO S.A. & CYRANO Inc.*

### FIRST AMENDMENT

1.  Amendments to the body of the agreement.

Clause 2.1 is amended as follow:

*Cyrano hereby appoints the Distributor as its exclusive distributor for the Marketing, Sales and Product of the Licensed Products in the Territory.*

Clause 2.2 is amended as follow:

*Cyrano hereby grants to the Distributor a personal, revocable, exclusive, and non-transferable license to market, distribute, support and deal in the Licensed Products and to use the Licensed Products for sales demonstration, promotions, in the Territory only. For the avoidance of doubt, this license includes the right of the Distributor to grant sublicenses to third parties to use the Licensed Products and does include the right for the Distributor to appoint sub-distributors and/or dealers without the prior written consent of Cyrano as long as Cyrano is duly advised of such agreements.*

Clause 13.8 is amended as follow:

*This agreement may only be terminated in strict accordance with this Clause 13.*

2.  Amendments to SCHEDULE A - LICENSED PRODUCTS and TRADE MARK

*Licensed Products: Workbench, Production, OpenSTA™ and its associated modules as they become available, Wincap*
*Trade Marks: CYRANO Workbench, CYRANO Production, OpenSTA™, CYRANO Wincap*

*Terms remain unchanged*

3.  Amendments to SCHEDULE B -- TERRITORY

*USA, Canada, Latin America, Rest of the World except Europe and Africa*

4.  Amendments to SCHEDULE D --ROYALTIES, FEES AND PAYMENT

Royalties:  *The royalty payable by the Distributor with respect to every license connected with the Licensed Products shall be:*
(i)  *30% (thirty per centum) of the sales value of the Distributors Licensed Products; and*
(ii)  *30% (thirty per centum) of all incremental revenue recognized by the Distributor with respect to the maintenance and support of the Licensed Products.*

Payment:  *The Distributor shall make payment of all royalties in the following manner:*
(a)  *all royalties shall be paid in US Dollars; and*
(b)  *all royalties arising with respect to the licensing, maintenance and/or support of the Licensed Products shall be credited to the account of Cyrano within the Distributor accounting books;*
(c)  *when requested in writing by Cyrano, within 90 days of such request and for the amount requested, as long as such amount is not higher than what has been credited to the account of Cyrano within the Distributor accounting books during the 90 days prior to Cyrano request, through a wire to the specified Cyrano bank account.*

*In witness whereof, the parties hereto have executed this First Amendment on August    , 2002*

Signed: _____    Signed: _____

Name:  *Didier Bitton*    Name:  Robert E.

Title:  *Directeur Général*    Title:  CEO
*For and on behalf of*    *For and on behalf of*
CYRANO SA    CYRANO Inc.
("Cyrano")    ("Distributor")

BONNEFOUS
30 bis, RUE ÉMILE MENIER
75116 PARIS - FRANCE
☎ 01 45 53 23 13

10 18 02 10:32a    Rozan & Nilson, LLP    (212)687-1718    p.29    @003
07/23/2002 12:16 FAX

07/22/02 15:26 FAX 617 428 3500    HILL & BARLOW    @003

01/04/1994 06:50    9784624489    PAGE 03

International Distributor Agreement between
CYRANO S.A. & CYRANO Inc.

SECOND AMENDMENT

1.  Amendments to the body of the agreement.

Clause 13.1. (iii) is removed.

Clause 13.4. (iii) is removed.

2.  Amendments to SCHEDULE A - LICENSED PRODUCTS and TRADE MARK:

Licensed Products: Workbench, Production, OpenSTA™ and its associated modules as they become available.

Trade Marks: CYRANO Workbench, CYRANO Production, OpenSTA™

Terms remain unchanged

3.  Amendments to SCHEDULE B – TERRITORY

USA, Canada, Latin America, the United Kingdom, Ireland, Rest of the World except Continental Europe

In witness whereof, the parties hereto have executed this Second Amendment on April 5, 2001

Signed:                          Signed:

Name:    Denis Shan             Name:    Robert Empey

Title:   Directeur General      Title:   CEO

         For and on behalf of            For and on behalf of
         CYRANO SA                        CYRANO Inc.
         ("Cyrano")                       ("Distributor")

TRADUCTEUR · INTERPRÈTE · ANGLAIS · ALLEMAND
BONNEFOUS
30 bis, RUE ÉMILE MENIER
75116 PARIS - FRANCE
☎ 01 45 53 23 13
EXPERT (H) PRÈS LA COUR D'APPEL DE PARIS

International Distributor Agreement
Second Amendment                                    CYRANO S.A.
                                                    Page 1

*International Distributor Agreement between*
**CYRANO S.A. & CYRANO Inc.**

**FIRST AMENDMENT**

1.   Amendments to the body of the agreement.

Clause 2.1 is amended as follow:

*Cyrano hereby appoints the Distributor as its exclusive distributor for the Marketing, Sales and Product Support of the Licensed Products in the Territory.*

Clause 2.2 is amended as follow:

*Cyrano hereby grants to the Distributor a personal, revocable, exclusive, and non-transferable license to market, distribute, support and deal in the Licensed Products and to use the Licensed Products for sales demonstration, promotions, in the Territory only. For the avoidance of doubt, this license includes the right of the Distributor to grant sublicenses to third parties to use the Licensed Products and does include the right for the Distributor to appoint sub-distributors and/or dealers without the prior written consent of Cyrano as long as Cyrano is duly advised of such appointment.*

Clause 13.6 is amended as follow:

*This agreement may only be terminated in strict accordance with this Clause 13.*

2.   Amendments to SCHEDULE A - LICENSED PRODUCTS and TRADE MARK:

*Licensed Products: Workbench, Production, OpenSTA™ and its associated modules as they become available, Wincap*
*Trade Marks: CYRANO Workbench, CYRANO Production, OpenSTA™, CYRANO Wincap*

*Terms remain unchanged*

3.   Amendments to SCHEDULE B – TERRITORY

*USA, Canada, Latin America, Rest of the World except Europe and Africa*

4.   Amendments to SCHEDULE D – ROYALTIES, FEES AND PAYMENT

Royalties:   *The royalty payable by the Distributor with respect to every license connected with the Licensed Products shall be:*
*(i)      30% (thirty per centum) of the sales value of the Distributors Licensed Products; and*
*(ii)     30% (thirty per centum) of all incremental revenue recognized by the Distributor with respect to the maintenance and support of the Licensed Products.*

Payment:    *The Distributor shall make payment of all royalties in the following manner:*
*(a)     all royalties shall be paid in US Dollars; and*
*(b)     all royalties arising with respect to the licensing, maintenance and/or support of the Licensed Products shall be credited to the account of Cyrano within the Distributor accounting books;*
*(c)     when requested in writing by Cyrano, within 90 days of such request and for the amount requested, as long as such amount is not higher than what has been credited to the account of Cyrano within the Distributor accounting books during the 90 days prior to Cyrano request, through a wire to the specified Cyrano bank account.*

In witness whereof, the parties hereto have executed this First Amendment on August 31, 2000

| | | | |
|---|---|---|---|
| Signed: | | Signed: | |
| Name: | Denis Bitan | Name: | Robert Erra |
| Title: | Director | Title: | CEO |
| | For and on behalf of CYRANO SA ("Cyrano") | | For and on behalf of CYRANO inc. ("Distributor") |

*International Distributor Agreement between*
**CYRANO S.A. & CYRANO Inc.**

### SECOND AMENDMENT

1.  Amendments to the body of the agreement.

Clause 13.1. (iii) is removed.

Clause 13.4. (iii) is removed.

2.  Amendments to SCHEDULE A - LICENSED PRODUCTS and TRADE MARK:

*Licensed Products: Workbench, Production, OpenSTA™ and its associated modules as they become available,*

*Trade Marks: CYRANO Workbench, CYRANO Production, OpenSTA™*

*Terms remain unchanged*

3.  Amendments to SCHEDULE B – TERRITORY

*USA, Canada, Latin America, the United Kingdom, Ireland, Rest of the World except Continental Europe*

In witness whereof, the parties hereto have executed this Second Amendment on April 9ᵗʰ 2001

Signed:                              Signed:

Name:          Denis Bitan          Name:          Robert Emens

Title:         Director             Title:         CEO

               For and on behalf of                For and on behalf of
               CYRANO SA                            CYRANO inc.
               ("Cyrano")                           ("Distributor")

*STAMP (ON EACH PAGE) : The COMMERCIAL COURT*          *The French Republic*

Maître Wernert Barrister
Maîtres Vandel Schermann
Masselin Barristers
Maître Dujardin Barrister



OFFICIAL TRANSLATOR(H)
**P. BONNEFOUS**
30 bis, rue Émile-Menier
75116 PARIS FRANCE
☎ 01 45 53 23 13
APPOINTED BY THE PARIS COURT OF APPEAL

## COMMERCIAL COURT OF PARIS
## JUDGMENT HANDED DOWN ON FRIDAY 19
## SEPTEMBER 2003
## FIFTEENTH CHAMBER

21/02/ 2003
CASE LIST N0 2003010895

**BETWEEN:** 1) The QUOTIUM TECHNOLOGIES SA Company- a French law joint-stock company- whose registered office is located at 84-88 Boulevard de la Mission Marchand F-92400 COURBEVOIE

2) The TECHNOLOGIES Company- a French law joint stock company- whose registered office is located at 84- 88 Boulevard de l a  Mission  Marchand  F-92400 COURBEVOIE

The PLAINTIFF PARTIES appearing through Maître Dominique WERNERT Barrister, 48 Avenue Victor Hugo F-75116 PARIS,

P373

**AND:** 1) The CYRANO INC company, an American law company, located at 26 Parker Street NEWBURY PORT, MASSACHUSETTS 70950 USA, summoned to appear by means of a copy of said summons handed in to the Public Prosecutor's (DA) Office
DEFENDANT PARTY assisted by the SCP FISCHER TANDEAU DE MARSAC SUR& ASSOCIES firm of Barristers, and appearing through Maitres VANDEL, SCHERMANN MASSELIN, Barristers in partnership, R1420

2) The SCP BROUARD –DAUDE firm, 34 rue Sainte Anne F-75001 PARIS, in its capacity of Official receiver for the court ordered liquidation of  the SA CYRANO company, 123 rue de Tocqeville, F-75017 PARIS
DEFENDANT PARTY, in its capacity, appearing through Maître Marc DUJARDIN Barrister, 89/91 rue du Faubourg Saint Honoré F-75008 PARIS

---

The word "ORIGINAL" means that you are in possession  of an original copy delivered by the Clerk of the Court's Office

*STAMP (ON EACH PAGE) : The COMMERCIAL COURT*      *The French Republic*

## AFTER DELIBERATION



## The Facts

CYRANO SA's business is the design and realization of software applications. It has two subsidiaries, CYRANO INC in the USA and CYRANO UK in Great Britain. CYRANO UK and CYRANO SA have, separately, developed programmes which, when put together, constituted lines of products. CYRANO INC is a company which sells and markets in the USA lines of CYRANO products. CYRANO possesses a stock of software applications , in particular those constituting the two lines of products, that is to say:

- the OPENSTA option (…)
- "DB Pack" which contains the sources of the "WORKBENCH", "PRODUCTION" and "MIGRATION PACK" products,
- "ClientPack" which contains the sources of the "WINSCOPE", "ST AN DARD" and "INSIGHT" products
- "ServerPack" which contains the sources of the "IMPACT" products
- "VTPack"

certain source progammes of which have been developed by CYRANO SA and others by CYRANO UK.

CYRANO SA went into court ordered receivership on June 11 2001 and liquidation proceedings began on 15 October 2001 , the SCP BROUARD DAUDE firm being appointed as liquidator.

BROUARD DAUDE carried out the sale of the intangible assets of CYRANO and after requesting two repurchaser candidates TECHNOLOGIES and SOFITRADE to make competitive bids, it sold the aforementioned programmes to TECHNOLOGIES which was replaced by the QUOTIUM TECHNOLOGIES company, on the order of this court, against its will.

Moreover, SOFITRADE acquired (a) the CYRANO UK company and, consequently, is the holder of the source programs developed by the latter , part of the aforementioned lines of products, but not of those developed by CYRANO SA, and (b), CYRANO INC which has held a license for the sale and marketing from CYRANO SA for said products for the USA since 1996, and a license for the use of the software programs created by CYRANO UK.

*STAMP (ON EACH PAGE) : The COMMERCIAL COURT*     **The French Republic**

The BROUARD DAUDE firm asserts that ,as liquidator, it was not aware of the existence of the license agreement when it carried out the sale to TECHNOLOGIES and TECHNOLOGIES claims that said licensing agreement was terminated pursuant to liquidation.

Such is the origin of the present dispute.

*OFFICIAL TRANSLATOR(H)*
**P. BONNEFOUS**
*30 bis, rue Émile-Menier*
*75116 PARIS FRANCE*
*☎ 01 45 53 23 13*
*APPOINTED BY THE PARIS COURT OF APPEAL*

## Procedure

It was under these circumstances that , in accordance with their latest submissions:

1) The TECHNOLOGIES and QUOTIUM TECHNOLOGIES companies , by means of summons personally served at short notice dated FEBRUARY 5 2003, requests the court to:

- hold that the distribution contract dated DECEMBER 31 1996 and its two riders were terminated ipso jure pursuant to the court ordered liquidation of the CYRANO SA company
- hold that, consequently, CYRANO INC wrongfully continued to execute the distribution contract for its own benefit
- hold and judge that , in the light of the prejudice henceforth proven by QUOTIUM TECHNOLOGIES, CYRANO INC should be ordered to pay a temporary amount of 400 000 euros , value drawn up at JANUARY 31 2003, in damages, subject to its being updated on the day of the forthcoming judgment
- officially acknowledge the supplementary claims of QUOTIUM TECHNOLOGIES which it reserves the faculty of asserting to obtain reparation of the prejudice incurred, should CYRANO INC continue its exploitation of the license after the judgment is handed down , over and above
- order CYRANO INC to pay the sum of 3 000 euros under article 700 of the French New Code of Civil Procedure –NCPC)
- order temporary  execution of the forthcoming judgment notwithstanding appeal, no deposit being required
- and finally, order CYRANO INC to pay all costs.

2) In its submissions of May 16 2003, CYRANO INC requests the court to

- Hold and judge that TECHNOLOGIES and QUOTIUM TECHNOLOGIES are inadmissible in requesting the court in charge of the receivership proceedings to rule that the contract of DECEMBER 31 1996 is terminated, and

---

The word "ORIGINAL" means that you are in possession of an original copy delivered by the Clerk of the Court's Office

*STAMP (ON EACH PAGE) : The COMMERCIAL COURT*     *The French Republic*



Subsidiarily

- hold and judge that the court ordered liquidation judgment has not caused any prejudice to the rights which CYRANO INC holds under the distribution contract signed on DECEMBER 31 1996 with CYRANO SA
- dismiss all of the claims, aims an submissions of TECHNOLOGIES and QUOTIUM TECHNOLOGIES, and that of the SCP DAUDE firm
- order TECHNOLOGIES and QUOTIUM TECHNOLOGIES, in solidum, to pay CYRANO INC the sum of 10 000 euros on the basis of article 700 of the NCPC, and all costs.

3) The SCP BROARD DAUDE firm requests the court in its submissions of MARCH 14 2003 to:
- grant SCP BROUARD DAUDE, in its capacity, a percentage of 40 % of the amount of the damages allocated jointly to the QUOTIUM TECHNOLOGIES company and the TECHNOLOGIES company , should the court hand down a decision against the CYRANO INC company
- order CYRANO INC to pay SCP BROUARD DAUDE, in its capacity, the sum of 3000 euros under article 700 of the NCPC
- order CYRANO INC to pay all costs

**Pursuant to which the Court rules as follows:**

Beforehand, CYRANO INC claims that :

-the licensing contract was properly and validly signed between CYRANO SA and CYRANO INC and authorized by a Board of Directors meeting of NOVEMBER 24 1995

-the task of carrying out an audit of the situation allocated by the Official Receiver to DELOITTE et TOUCHE specified as follows: "the cash flow balance of CYRANO SA is closely linked ... to the transfers from CYRANO INC" and specified that " the US and British subsidiaries are not expecting any cash flow incomings over the next few weeks", and that under these circumstances, the Official receiver was aware of the licensing contact and CYRANO INC cannot be accused of concealment.

The word "ORIGINAL" means that you are in possession of an original copy delivered by the Clerk of the Court's Office

*STAMP (ON EACH PAGE) : The COMMERCIAL COURT*    *The French Republic*

**Concerning the admissibility of the action**
CYRANO INC asserts that:



- as contracts only produce their effects between the parties thereto, and as , in accordance with the arguments of the plaintiffs, the contract of DECEMBER 31 1996 was terminated ipso jure on the day on which the liquidation decision was handed down, that is to say OCTOBER 15 2001, the plaintiffs who only acquired their rights on MAY 16 2002 and "as of that date", consequently have no capacity to take action requesting the court to rule that the contract was terminated;

- Under article L622-9, only the liquidator is entitled to act on behalf of the company being liquidated; consequently, the creditor cannot exercise a right devolved upon the debtor; if therefore the liquidation decision has had an effect on the contract signed, only the liquidator has the capacity to act and go before the court requesting it to rule concerning any issue which may be affected by the latter; consequently, the plaintiffs have no capacity to act, this right belonging to the liquidator, which is not the case.
The plaintiffs assert no argument in response.

**Concerning termination of the distribution contract**

The QUOTIUM TECHNOLOGIES and TECHNOLOGIES companies assert that:

- Under the software distribution contract dated DECEMBER 31 1996 and its two riders, the CYRANO SA company granted the distribution rights for the CLIENT PAK DB PACK VT PACK SERVER PACK WORKBENCH , PRODUCTION, PENST A, CYRANO WIN CAP software applications to the CYRANO INC company, its subsidiary;
- This contract provided , in favour of the CYRANO INC company, for the right to distribute and sell the abovementioned software applications for a period ending JUNE 30 2007, in consideration for payment of an annual fee calculated on sales achieved;
- In accordance with the provisions of article L622-14 which concerns both immediate court ordered liquidation and court ordered liquidation by conversion of court ordered receivership, only " articles L621-51 to L621-53 and L 621-103 to L621-129 apply to the court ordered liquidation procedure
- Article L621-28 concerning the continuation of ongoing contracts during court ordered receivership is apparently not concerned by article L621-14;

The word "ORIGINAL" means that you are in possession of an original copy delivered by the Clerk of the Court's Office

*STAMP (ON EACH PAGE) : The COMMERCIAL COURT*        *The French Republic*

- Article L622-12 in fact provides, in its paragraph 2, that the official receiver, or failing which, the liquidator, has the faculty of demanding execution of ongoing contracts in accordance with the terms and conditions laid down in article L621-28;
- Article L622-12 contains provisions which are exclusively reserved for court ordered liquidation accompanied by maintaining of the business activities. This therefore apparently shows that ongoing contracts must only be continued in the case of liquidation with temporary maintaining of business activities.

This position is bolstered by the provisions of article L621-13 (sic in fact L 622-13) of the French Commercial Code, which specifies that the lease contract is continued irrespective of whether the business activities are or are not maintained.

SCP BROUARD DAUDE points out that it did not receive the official summons provided for in article L621-28 of the French Commercial Code.

The CYRANO INC company explains that:

*OFFICIAL TRANSLATOR(H)*
*P. BONNEFOUS*
*30 bis, rue Émlie-Menier*
*75116 PARIS FRANCE*
*☎ 01 45 53 23 13*
*APPOINTED BY T... ...COURT OF APPEAL*

- Article L621-28, which sets up the regulations for the continuation of "ongoing" contracts gives no definition of them and that the allegation in accordance with which the licensing agreement was terminated ipso jure on the date of the liquidation judgment is not founded with respect to case law
- a contract is no longer ongoing where the principal services expected have been supplied before the judgment opening the receivership proceedings, even although the principle obligations of the beneficiary of the transfer have not been executed.

Pursuant to which, whereas:

- the facts which are presented by CYRANO INC concerning the disclosure and the validity of the licensing contract signed in 1996 and which are not contested by the other parties, show the validity of the latter
- said licensing contract transferred, at the very moment it was signed, the exploitation rights to the software applications concerned by said contract to CYRANO INC for the regions concerned ; whereas this constituted the principal obligation of CYRANO SA as the latter could not transfer more rights than it had, and in accordance with case law, it cannot be held that the contract was ongoing within the meaning of article L 621-28;

The word "ORIGINAL" means that you are in possession of an original copy delivered by the Clerk of the Court's Office



-   said licensing contract moreover can be interpreted as a lease contract for the rights attaching in the intellectual property held by CYRANO SA over the programs in question
-   steady case law holds that termination of a contract cannot arise from the sole fact that court ordered receivership proceedings have been opened, with respect to which those concerning the opening of court ordered liquidation must be deemed equivalent
-   at no point did the official receiver require termination of the contract, which, in any case, would have run counter to the interests of the general body of creditors, the existence of which, despite its claims, it could not be unaware of, unless it did not fulfill the requirements of its assignment.

Without attempting to determine whether the plaintiffs are admissible, the Court shall dismiss their claim and hold that the licensing contact was not terminated and that the court ordered liquidation decision has not caused a prejudice to the rights of CYRANO INC, and shall dismiss the other wider and /or contrary claims.

### Concerning temporary execution, the irrecoverable expenses and costs.

Whereas temporary execution does not appear necessary, taking account of the nature of the case and, consequently, shall not be ordered.

Whereas , the plaintiffs, losing the case, and having obliged the defendants to commit non taxable costs to assert their rights before the courts, it is expedient to order the QUOTIUM TECHNOLOGIES and TECHNOLOGIES companies jointly and severally to pay the CYRANO INC company compensation of 2 000 euros , and the SCP BROUARD DAUDE firm 500 euros on the basis of article 700 of the NCPC, dismissing the rest of the claims;

Whereas, finally, the QUOTIUM TECHNOLOGIES and TECHNOLOGIES companies shall be ordered jointly and severally to pay the costs committed to date.

### ON THESE GROUNDS

The Court, ruling pursuant to adversary judgment, appeal being possible, holds that the licensing contract has not been terminated and that the court ordered liquidation decision has not caused any prejudice to the rights of the CYRANO INC company

Dismisses the claims of the QUOTIUM TECHNOLOGIES and TECHNOLOGIES companies

---

The word "ORIGINAL" means that you are in possession of an original copy delivered by the Clerk of the Court's Office

*STAMP (ON EACH PAGE) : The COMMERCIAL COURT*     *The French Republic*



Dismisses the other wider and/or contrary claims of the parties

Orders the QUOTIUM TECHNOLOGIES and TECHNOLOGIES companies

- to pay the CYRANO INC company the sum of 2000 euros under article 700 of the NCPC
- to pay the SCP BROUARD DAUDE firm , in its capacity of Official Receiver for the court ordered liquidation of SA CYRANO, the sum of 500 euros under article 700 of the NCPC

Holds that there is no reason to order temporary execution

Orders the QUOTIUM TECHNOLOGIES and TECHNOLOGIES companies  to pay costs, including those to be collected by the Clerk of the Court's Office set at the sum of 62.40 euros tax included ( including 9.91 euros of VAT)

ENTRUSTED during the hearing of MAY 16 200 to Mr. SEVRAY in his capacity of Reporting Judge.

Deliberated on June 6 2003.

---

The word "ORIGINAL" means that you are in possession  of an original copy delivered by the Clerk of the Court's Office

*STAMP (ON EACH PAGE) : The COMMERCIAL COURT*      *The French Republic*



DELIBERATED by Messrs. SEVRAY, PERRAUD and LASSALLE and handed down in open court where the following persons sat:

Mr. SEVRAY, Judge chairing the hearing, Mr. LUCQUIN, Mrs. CHARLIER-BONATTI, Messrs PERRAUD and LASSALLE , Judges, assisted by Mr. DURAFOUR, Clerk of the Court. The parties were informed of the fact in advance.

The minute of the judgment was signed by the President of the deliberation and the Clerk of the Court.

---

The word "ORIGINAL" means that you are in possession of an original copy delivered by the Clerk of the Court's Office

*STAMP (ON EACH PAGE) : The COMMERCIAL COURT*     *The French Republic*

OFFICIAL TRANSLATOR(H)
**P. BONNEFOUS**
30 bis, rue Émile-Menier
75116 PARIS FRANCE
☎ 01 45 53 23 13
APPOINTED BY THE PARIS COURT OF APP.

Consequently, the French Republic hereby empowers and orders all Bailiffs , pursuant to this request, to execute said decision , the Public Prosecutors with the Appeal courts and the Deputy Public Prosecutors with the High Courts , to assist each other, and all Commanders and Officers of the forcers of law and order to lends physical assistance if legally required to do so.

Certified true COPY
Bearing the excutory formula.

Copy delivered on: Tuesday September 23 2003.

The word "ORIGINAL" means that you are in possession of an original copy delivered by the Clerk of the Court's Office

**Maître HERNE**
**CAB. DEBETZ**
**Attorney Maître DUJARDIN L176**
**Maître CHEVRIER de ZITTER HA**
**B10**

## TRIBUNAL DE COMMERCE DE PARIS
### [THE PARIS COMMERCIAL COURT]

## RULING DELIVERED ON MARCH 16, 2004

## 17TH DIVISION

RG 2002050224
07/17/2002

**BETWEEN:**

CYRANO INC, a company incorporated in the United States – registered headquarters: 26, Parker Street, Newbury Port, Massachusetts, 70950 4010 United States of America – the company being domiciled for the purposes of these proceedings at the chambers of attorneys SCP MOLAS LEGER CUSIN & ASSOCIES (P159), 87, boulevard Saint Michel, 75005 Paris, France.

**PLAINTIFFS, whose solicitor is attorney Maître Olivier ITEANU of attorneys ITEANU & Associés, (D1380) and which is represented in court by attorney Maître Pierre HERNE (B835).**

**AND:**

1) TECHNOLOGIES SA – registered headquarters: 84/88, boulevard de la Mission Marchand, 92400 Courbevoie, France – registered in Nanterre, France, no. 325 826 469).

**DEFENDANTS, whose solicitor is attorney Maître Dominique WERNERT (P0373) and which is represented in court by attorneys SCP DEBETZ et Associés (P146).**

2) SCP BROUARD ET DAUDE, of 34, rue Sainte Anne, 75001 Paris, France, acting in their capacity as receivers of CYRANO SA,

3) Maître Denis FACQUES, of 22, avenue Victoria, 75001 Paris, France, official receiver, acting in his capacity as trustee bailee.

**DEFENDANTS, represented in court by Maître Marc DUJARDIN, attorney (L176), of 170, boulevard Haussmann, 75008 Paris, France.**

**In the presence of the following parties voluntarily joined to the proceedings:**

- QUOTIUM TECHNOLOGIES SA – registered headquarters: 84/88, boulevard de la Mission Marchand, 92400 Courbevoie, France.

- TECHNOLOGIES SA – registered headquarters: 84/88, boulevard de la Mission Marchand, 92400 Courbevoie, France – registered in Nanterre, France, no. 325 826 469 84 B 01421).

**Whose solicitor is attorney Maître Dominique WERNERT (P0373) and which are represented in court by attorneys SCP DEBETZ et Associés (P146).**

**HAVING DEBATED THE FACTS AND MERITS OF THE CASE**

**THE FACTS**

**Tribunal de Commerce de Paris**      **A**
Ruling dated 03/16/2004                **RG no. 2002050224**
17th Division                          CMO – Page 2

Pursuant to a sale that took place as part of the realization of the assets of CYRANO
UK, a UK company undergoing court-ordered liquidation proceedings, CYRANO
INC., a US company, acquired title over certain software applications.

However, as part of the realization of the assets of CYRANO SA, a French company
undergoing court-ordered liquidation proceedings, TECHNOLOGIES SA acquired
software applications contained in *logiboxes* [official software registration boxes]
lodged with France's *Agence pour la Protection des Programmes* [software
registration agency] which had been forwarded to SCP BROUARD DAUDE in their
capacity as court-appointed receivers of CYRANO SA.

CYRANO INC. having subsequently claimed ownership of some of these software
applications, SCP BROUARD DAUDE, QUOTIUM TECHNOLOGIES and
TECHNOLOGIES SA agreed to entrust the logiboxes containing the software whose
ownership was claimed by CYRANO INC. to Maître FACQUES who would act as
trustee bailee.

CYRANO INC., in a bid to take possession of the software applications in question,
thereupon brought a lawsuit against TECHNOLOGIES SA and QUOTIUM
TECHNOLOGIES as well as SCP BROUARD DAUDE and Maître FACQUES in
their respective aforementioned capacities. The defendants responded by challenging
the grounds for the action.

These are the facts of the case.

## THE PROCEEDINGS TO DATE AND THE PARTIES' CLAIMS

1) CYRANO INC., having sought and obtained permission to serve a writ upon the
defendants at short notice on July 4, 2003, served writs upon them on July 8 and 9,
2002, and petitioned the Court:

- to declare that CYRANO INC. was the owner of all the intellectual property rights
  over the following software applications:

  - CYRANO TEST V 5.2 (archive)
  - CYRANO TIMER V 5.0 (archive)
  - CYRANO VIDEO (archive)
  - SOURCES SERVER PACK
  - BRADFORD SOURCE
  - SAFE BACK UP (CYRANO TEST and IMPACT PV FILES)
  - CYRANO TEST V 5.4 (archive)
  - CYRANO MILLENIUM TEST
  - CYRANO EUROTEST

- to order Maître Denis FACQUES in his capacity as trustee bailee to hand over the following *logiboxes* to CYRANO INC.:

  - The *logibox* lodged on March 12, 1998 under no. 98-11015-00 (VT PACK);
  - The *logibox* lodged on March 12, 1998 under no. 98-11014-00 (SERVER PACK);
  - The *logibox* lodged on December 10, 1998 under no. 98-500030-00;

- to declare that CYRANO INC. was entitled to open the seals of the *logibox* lodged on March 12, 1998 under no. 98-11015-00 (VT PACK), the *logibox* lodged on March 12, 1998 under no. 98-11014-00 (SERVER PACK) and the *logibox* lodged on December 10, 1998 under no. 98-500030-00;

**Tribunal de Commerce de Paris**    **A**
Ruling dated 03/16/2004    **RG no. 2002050224**
17th Division    CMO – Page 3

- to order summary performance of its ruling on the matter notwithstanding any appeals or rejoinders;

- to declare that the costs of the proceedings should be labelled as a secure debt to be levied out of the proceeds of the liquidation of CYRANO SA.

On September 20, 2002, the Court deferred the proceedings at the parties' request pending translation into French of all those exhibits that were drawn up in English by a sworn translator.

2) In a brief submitted on October 18, 2002, QUOTIUM TECHNOLOGIES and TECHNOLOGIES SA, having been voluntarily joined to the proceedings, petitioned the Court:

- to dismiss all of CYRANO INC.'s claims;

- to declare that CYRANO INC.'s claim over the *logiboxes* was vexatious due to the fact that it was groundless and inadmissible;

- therefore, and in accordance with the deed of sale dated May 16, 2002, to authorize Maître FACQUES in his capacity as trustee bailee to hand over the *logiboxes* to TECHNOLOGIES SA;

- to declare that in accordance with the deed of sale dated May 16, 2002, TECHNOLOGIES SA is the sole owner of the *logiboxes* held by the trustee bailee;

- therefore to declare that TECHNOLOGIES SA is entitled to all rights over the software applications contained within the *logiboxes*, given that CYRANO INC.'s claims to fame are clearly vexatious and groundless. Furthermore, since CYRANO INC had no rights over the *logiboxes* held by the trustee bailee, to order that it compensate TECHNOLOGIES SA for all the damage incurred by the latter.

To that end, TECHNOLOGIES SA claimed that it was manifest that it had incurred commercial losses as a result of its inability to make use of the *logiboxes* held by the trustee bailee since May 16, 2002 owing to the vexatious proceedings brought by CYRANO INC.

TECHNOLOGIES SA claimed that it had drawn up an estimate of its lost sales: these were said to amount to € 350,000 excluding tax for the first six month, and would have yielded foreseeable earnings of € 50,000.

- In view of the above, to order CYRANO INC. to pay € 350,000 in damages as determined on August 31, 2002, subject to adjustment as appropriate up to the actual payment date.

On top of this, to order CYRANO INC. to pay:

- a penalty of € 3,000 for bringing vexatious proceedings,

- a penalty of € 3,000 under article 700 of France's NCPC [new rules governing civil proceedings].

**Tribunal de Commerce de Paris**          **A**
Ruling dated 03/16/2004                    **RG no. 2002050224**
17th Division                   CMO – Page 4

Furthermore, owing to the urgent nature of the matter and in order to enable
TECHNOLOGIES SA to continue performing its activities normally, which it had
been prevented from doing since May 16, 2002:

- to order summary performance of its ruling on the matter notwithstanding any
  appeals or rejoinders;

- to order CYRANO INC. to pay the entire costs of the proceedings.


3) In a brief submitted on January 24, 2003, QUOTIUM TECHNOLOGIES and
TECHNOLOGIES SA reiterated their previous claims but replaced
TECHNOLOGIES SA by QUOTIUM TECHNOLOGIES and raised the amount of
damages sought to € 400,000.


4) In a brief submitted to the Court on February 21, 2003, CYRANO INC. reiterated
its previous claims and further petitioned the Court:

- to acknowledge and declare that CYRANO INC. was the legitimate owner of the
  CYRANO and CYRANO IMPACT software applications in accordance with the
  foregoing list,

- to order TECHNOLOGIES and QUOTIUM to pay CYRANO INC. € 10,000
  under article 700 of France's NCPC and to order them to pay the entire costs of
  the proceedings.


5) In a brief submitted to the Court session that was held on March 28, 2003, SCP
BROUARD DAUDE and Maître FACQUES, acting in their respective
aforementioned capacities, petitioned the Court:

Principally,

- to acknowledge that they were relying on the Court to determine the ownership of
  the *logiboxes* that were entrusted to the trustee bailee;

Secondly,

- to award them 40% of any damages awarded jointly to QUOTIUM
  TECHNOLOGIES and TECHNOLOGIES SA should the Court deem that
  CYRANO INC.'s claims were unfounded and should it therefore enter a verdict
  against the latter;

- to order CYRANO INC to pay them a penalty of € 3,000 under article 700 of France's NCPC;

- to order CYRANO INC. to pay the entire costs of the proceedings.

On April 4, 2003, the Court issued an injunction ordering an expert assessment of the situation on the following terms:

- the Court appointed Mr. Michel VILLARD as the Court expert;

- he was empowered to request disclosure by the parties of any documents and items that he should deem to be useful to his assignment;

He was instructed:

- to deliver an opinion on the validity of the sale of the assets of CYRANO UK to CYRANO INC. under the contract dated March 21, 2002 and on the validity of the declaration by the British receiver of CYRANO UK, given the fact that the aforementioned contract did not enclose the certificates of ownership of the software applications that were sold;

**Tribunal de Commerce de Paris** **A**
Ruling dated 03/16/2004 **RG no. 2002050224**
17th Division CMO – Page 5

- to deliver an opinion on the scope of the assets entrusted to the trustee bailee under the terms of the contract of sale of the assets of CYRANO SA dated May 16, 2002 by Maître BROUARD acting in his aforementioned capacity, after comparing this contract with the list of software applications claimed by CYRANO INC., and to deliver an opinion as to the validity of the contract, given the fact that it enclosed certificates of ownership relating to the *logiboxes* involved;

- in view of the foregoing opinions, to deliver an opinion on the ownership of the disputed software applications and on the reality and nature of the disputed facts and alleged damages in general;

- to hear all the parties whom he should deem it useful to hear;

- to perform his assessment in an independent and fair manner, hearing both sides to the dispute wherever he should deem this to be necessary, and to inform the parties of his opinions, either verbally or in writing, with a view to eliciting their final comments prior to submitting his report;

- the Court also ordered CYRANO INC. to deposit a provision of 1,500.00 euros prior to May 5, 2003 with the Court Clerk's office in accordance with the provisions of article 269 of France's NCPC;

- the Court stated that should the parties not have reached an amicable settlement in the meantime, the expert's report would have to be submitted to the Court Clerk's office within three months of the date on which the above-mentioned provision was deposited;

The expert having submitted his report on November 4, 2003, the matter was brought back before the Court.

6) In a brief submitted on January 20, 2004, CYRANO INC. petitioned the Court:

Given the injunction issued on April 4, 2003,

Given the Court-appointed expert's report submitted on November 4, 2003,

Given article 1382 of France's Civil Code,

- to validate the expert's report submitted on November 4, 2003 by Mr. Michel VILLARD;

- to consequently order that the "CYRANO TEST" and "CYRANO IMPACT" software applications be handed over to CYRANO INC.;

And to that end:

- to instruct any Bailiff whom the Court should see fit to appoint:

  - to take possession of the *logiboxes* containing all of the software applications lodged with *Agence pour la Protection des Programmes* and held by the trustee bailee, Maître Denis FACQUES;

  - to join *Agence pour la Protection des Programmes* to the proceedings as an initiated party;

ISSUE: 24 March 2004 – 09 – 03: 31

**Tribunal de Commerce de Paris**        **A**
Ruling dated 03/16/2004                  **RG no. 2002050224**
17th Division                            CMO – Page 6

- • to open the *logiboxes* in the presence of *Agence pour la Protection des Programmes* and to take copies of the TEST and IMPACT software applications;

- • to hand these copies to CYRANO INC.;

- • to destroy all copies of the TEST and IMPACT software applications found in the *logiboxes*;

- to seal the *logiboxes* anew and to return them to *Agence pour la Protection des Programmes*;

- to order TECHNOLOGIES SA and QUOTIUM TECHNOLOGIES to pay CYRANO INC. jointly and severally the following sums of money:

- • damages of € 7,773,904.78;

- • € 150,000 under article 700 of France's NCPC;

- to order summary performance of the Court's ruling;

- to order TECHNOLOGIES SA and QUOTIUM TECHNOLOGIES to pay the entire costs of the proceedings.


7) In a brief submitted on January 20, 2004, TECHNOLOGIES SA and QUOTIUM TECHNOLOGIES petitioned the Court:

- to dismiss all of CYRANO INC.'s claims;

- to declare that the conclusions in the expert's report were not in keeping with the provisions of article 238 of NCPC;

- to authorize Maître FACQUES acting in his capacity as trustee bailee to hand over the *logiboxes* to QUOTIUM TECHNOLOGIES in accordance with the deed of sale dated May 16, 2002;

- to declare that in accordance with the deed of sale dated May 16, 2002, QUOTIUM TECHNOLOGIES was the legitimate owner of the *logiboxes* held by the trustee bailee;

- therefore to declare that QUOTIUM TECHNOLOGIES was entitled to claim all the rights over the software applications involved;

- to order CYRANO INC. to pay the following sums of money:

  - € 2,000.00 of damages calculated effective January 31, 2004, subject to adjustment up to the actual payment date,

  - € 20,000 under article 700 of France's NCPC;

- to order summary performance of the Court's ruling;

- to apportion costs accordingly.

8) In a brief submitted to the Court session that was held on February 10, 2004, CYRANO INC. reiterated its previous claims and further petitioned the Court to dismiss all the claims of TECHNOLOGIES SA and QUOTIUM TECHNOLOGIES.

9) In a brief submitted to the Court session that was held on February 10, 2004, TECHNOLOGIES SA and QUOTIUM TECHNOLOGIES reiterated their previous claims and stated that CYRANO INC. was already in possession of the source codes and documentation of the disputed software applications and that there was therefore every reason to authorize Maître FACQUES acting in his capacity as trustee bailee to hand over the *logiboxes* to QUOTIUM TECHNOLOGIES in accordance with the deed of sale dated May 16, 2002.

**Tribunal de Commerce de Paris**    **A**
Ruling dated 03/16/2004    **RG no. 2002050224**
17th Division    CMO – Page 7

10) In a brief submitted to the Court session that was held on February 10, 2004, SCP BROUARD DAUDE and Maître FACQUES, acting in their respective aforementioned capacities, petitioned the Court:

Given the injunction issued on April 4, 2003,

Given the Court-appointed expert's report submitted on November 4, 2003,

- to acknowledge that they were relying on the Court to determine the conclusions to be drawn from the Court-appointed expert's report;

- to acknowledge the precautions taken by SCP BROUARD DAUDE, acting in its aforementioned capacity, in the face of the claims of ownership brought by CYRANO INC.;

And therefore:

- to exonerate SCP BROUARD DAUDE, acting in its aforementioned capacity,

- to dismiss all of CYRANO INC.'s claims for damages against SCP BROUARD DAUDE, acting in its aforementioned capacity,

- to order CYRANO INC. to pay SCP BROUARD DAUDE, acting in its aforementioned capacity, the sum of € 3,000 under article 700 of France's NCPC;

- to order CYRANO INC. to pay the entire costs of the proceedings.

At the end of the hearing that was held on February 10, 2004, the Court, having heard the parties, announced the end of the proceedings and retired to consider its verdict that it announced would be delivered at the hearing to be held on March 16, 2004.

## THE MERITS

### As to the facts,

CYRANO INC. claims:

- that it acquired the disputed software applications from CYRANO UK pursuant to a transfer deed dated March 21, 2002;

- that pursuant to a deed delivered under private seal on May 16, 2002, Maître Brouard, acting in his aforementioned capacity pursuant to the Court's ruling handed down on March 13, 2002, finalized and completed the transfer of part of

the assets of CYRANO SA to QUOTIUM TECHNOLOGIES and to
TECHNOLOGIES SA with the exception of the software applications which
CYRANO INC. claims to own and which are the subject of these proceedings;

- that CYRANO INC.'s ownership of the disputed software applications was
demonstrated by the fact that TECHNOLOGIES SA could not challenge the
contract of sale which CYRANO INC. had signed with CYRANO UK, as shown
by the letter from the British receiver of CYRANO UK dated June 14, 2002 which
was submitted as an exhibit to these proceedings.

**Tribunal de Commerce de Paris**     **A**
Ruling dated 03/16/2004            **RG no. 2002050224**
17th Division            CMO – Page 8

- that the lodging of the software applications with France's APP was designed to act as proof of chronological precedence but did not amount to proof of title.

CYRANO INC. backs the validity of the expert's report on the following grounds:

- that the expert assessment was carried out fairly and independently, the expert having addressed the claims of all the parties involved;

- that the expert did not issue any legal opinion and that TECHNOLOGIES SA and QUOTIUM TECHNOLOGIES did not raise any objections during the assessment process itself;

- that the expert interviewed the Chairman of France's APP, determined which software applications were not disputed and drew up a list of those software applications that were disputed after studying all the documents produced by the parties;

- that the expert's conclusion was patently clear, namely: "CYRANO UK owned 100% of the CYRANO TEST and CYRANO IMPACT software applications at the time when these assets were transferred to CYRANO INC. pursuant to the contract of sale dated March 21, 2002".

For their part, TECHNOLOGIES SA and QUOTIUM TECHNOLOGIES claim:

- that pursuant to an order issued on December 11, 2001, the Official Receiver in charge of the liquidation of CYRANO SA authorized the sale of various tangible and intangible assets belonging to that company to SOFITRADE and that when TECHNOLOGIES SA and QUOTIUM TECHNOLOGIES appealed against this order, the Court backtracked and ordered that these items be transferred instead to TECHNOLOGIES SA "under the terms on offer by the latter";

- that SCP BROUARD DAUDE, acting in their capacity as receivers, refused to sign the deed of sale and that TECHNOLOGIES SA and QUOTIUM TECHNOLOGIES therefore summoned SCP BROUARD DAUDE to sign the deed of sale;

- that in a letter dated April 10, 2002, CYRANO INC. claimed ownership over the intangible elements for which CYRANO SA owned the source codes;

- that on May 16, 2002, SCP BROUARD DAUDE, acting in its aforementioned capacity, signed a deed of sale relating to specific elements forming part of CYRANO SA's assets;

- that given the claims that were put forward regarding the existence of software applications whose ownership is claimed by CYRANO INC. on a physical

medium (*logiboxes*) belonging to CYRANO SA, the parties agreed to instruct Maître FACQUES, an official receiver, to act as trustee bailee and hold the following *logiboxes* containing the following source codes deposited with France's APP:

- The *logibox* lodged on March 12, 1998 under no. 98-11015-00, containing the following source codes: the source codes of CYRANO TEST V 5.2 (Archive), CYRANO TIMER V 5.0 (Archive), CYRANO VIDEO (Archive), and under no. 98-11014-00, containing the following source codes: the source codes of SERVER PACK, BRADFORD SOURCE, SAFE BACK UP (CYRANO TEST and IMPACT PC FILES);

**Tribunal de Commerce de Paris**    **A**
Ruling dated 03/16/2004    **RG no. 2002050224**
17th Division    CMO – Page 9

- The *logibox* lodged on December 10, 1998 under no. 98-500030-00, containing the following source codes: the source codes of CYRANO TEST V 5.4, CYRANO MILLENIUM TEST and CYRANO EUROTEST.

TECHNOLOGIES SA and QUOTIUM TECHNOLOGIES further stated:

- that Mr. BITAN, the Chief Executive Officer of CYRANO SA, a Director of CYRANO UK and Chief Executive Officer of CYRANO INC. at the time when CYRANO SA had filed for bankruptcy had played a leading role in the sell-off of that company's assets and had taken part in the expert's assessment as a representative of CYRANO INC.;

- that Mr. ERNENS, the former Chairman of CYRANO SA was now a director of CYRANO INC.;

- that the conclusions of the expert's report were not founded on technical considerations as stipulated by article 238 of France's NCPC;

- that the software applications held by the trustee bailee formed an integral part of the product range of TECHNOLOGIES SA which had won the invitation to tender issued by SCP BROUARD DAUDE, acting in its aforementioned capacity, said invitation to tender being within the scope of the sell-off mandate ordered by the Court;

- that the deed of sale dated May 16, 2002 between SCP BROUARD DAUDE and TECHNOLOGIES SA related to the sale of specific parts of the assets of CYRANO SA;

- that the mandate of the trustee bailee stipulated that upon expiry of a period of thirty days, SPC BROUARD DAUDE had irrevocably pledged to transfer all of the software applications held by the trustee bailee unless CYRANO INC. was able to demonstrate ownership over the software applications that it claimed belonged to it;

- that it was up to the expert to determine the ownership of the software applications held by the trustee bailee in view of the contracts for sale dated May 16, 2002 and March 21, 2002, but that in merely reproducing the declarations of CYRANO INC., the expert failed to fulfill his obligations;

- that the document entitled "WHITE PAPER" drawn up by TECHNOLOGIES SA and QUOTIUM TECHNOLOGIES demonstrates that the team which developed the WORKBENCH, PRODUCTION and OPENSTA applications was the same one which developed the TEST software, namely the team at CYRANO SA;

- that the question was how could SCP BROUARD DAUDE have been able to sell an asset belonging to CYRANO UK, namely the OPENSTA application, on the same basis as the TEST and IMPACT applications;

Regarding the ownership of the intellectual property rights over the software applications, TECHNOLOGIES SA and QUOTIUM TECHNOLOGIES claim:

- that the various elements produced at the proceedings demonstrate the presence of overlapping rights between TECHNOLOGIES SA and QUOTIUM TECHNOLOGIES and CYRANO INC.;

**Tribunal de Commerce de Paris**          **A**
Ruling dated 03/16/2004                    **RG no. 2002050224**
17th Division                              CMO – Page 10

- that in fact, why should the depositions of the former employees of Cyrano SA - who are now employed by QUOTIUM TECHNOLOGIES - which have been discredited by the declarations made by the employees of CYRANO INC, not be more credible, bearing in mind that the latter have been informed of the sanctions applicable in the case of committing perjury,
- that both companies CYRANO SA and CYRANO UK have a common origin and that it is reasonable to think that until 1996 the software programs were indiscriminately developed by the teams based both in France and the United Kingdom,
- that given the fact that as of 1997 and 1998, one third of the royalties were paid to CYRANO SA CYRANO INC and that CYRANO SA became the joint –owner of IMPACT,
- that the results of the report produced by the auditing company KPMG show that CYRANO SA assigned to CYRANO UK a licence for the distribution of the SERVERPACK software, i.e. IMPACT, for the flat fee of FFr 4 M – which is a point about which the expert indicated that it did not pertain to the nature of his mission,
- that moreover, more than two thirds of the funds allocated to research and development were being borne by CYRANO SA and that the quality control was carried out from the Paris office.
- that the source code of the software programs had been registered with the APP or l'Agence pour la Protection des Programmes (the French computer software copyright agency) as a result of the deliberate choice made by Mr. BITAN who had appointed CYRANO INC rather than CYRANO SA,
- That CYRANO INC's lawsuit was dismissed by the US Court which estimated that the evidence put forward by CYRANO INC and more precisely the statements made by the employees could not allow for delivering a ruling regarding the ownership of the software program TEST, and that those statements are not the same as those produced by CYRANO INC during the proceedings.

SCP BROUARD DAUDE, ex officio, states that:
- CYRANO SA was the object of the opening of receivership proceedings by virtue of the ruling of June 11, 2001 by this very Court, and this ruling became a receivership procedure on October 15, 2001,
- Following an invitation to tender concerning its shareholding on November 10, 2001 and by order of the Juge Commissaire (the bankruptcy judge), the offer made by the SOFITRADE company was accepted,
- By ruling on opposition, the Court, in its ruling of March 13, 2002, ordered the sale of the assets held by CYRANO SA to TECHNOLOGIES,
- That by means of a registered letter dated April 10, 2002, CYRANO INC formulated a claim of ownership regarding certain intangible elements of which CYRANO SA held the source code,

- In the assignment document of May 16, 2002 signed by the latter and TECHNOLOGIES ET QUOTIUM TECHNOLOGIES, on account of the expressed claim, SCP BROUARD DAUDE and TECHNOLOGIES have agreed to appoint Maitre Jacques, an official receiver, as the guardian of the sequestrated property, i.e. the afore – mentioned software programs

**Tribunal de Commerce de Paris**    **A**
Ruling dated 03/16/2004    **RG no. 2002050224**
17th Division    CMO – Page 11

containing the following source code and registered with APP ((the French computer software copyright agency)

- On 12 March 1998, under No 98 – 11015 - 00, comprising the source code for the following: source code for CYRANO TEST V. 5.2 (Archive), CYRANO TIMER V. 5. 0. (Archive), CYRANO VIDEO (Archive) and under No 98 – 11014 – 00, comprising the source code for the following: source code for the SERVER PACK, BRADFORD SOURCE, PRODUCTION, SAFE BACKUP (CYRANO TEST and IMPACT PC FILES),
- On 10 December 1998 under No 98 – 500030 -00, comprising the following source code: CYRANO TEST V. 5. 4, CYRANO MILLENIUM TEST, CYRANO EUROTEST,
- - In this assignment document which contained the restrictions included in its invitation to tender dated November 10, 2001, i.e. that " the assignee takes personal responsibility over any dispute that may arise regarding the ownership and the enjoyment of the intangible elements, which are the object of the assignment and more precisely, the assignee takes personal responsibility over any ownership claim on the part of any natural or artificial person ",
- - Therefore, the TEST software program was not included in the framework of the assignment,
- In the terms of the expert's report,
- Within the framework of the assignment corresponding to the assignment agreed on May 16, 2002,
- - - the expert's report confirms that the CYRANO TEST product was not included within the framework of the assignment, with regard to the ownership claimed on some software programs,
- -The expert's report attributes the ownership to CYRANO INC,
- - In turn, the Expert has declared that he was unable to cast a judgement with regard to the other products,
- SCP BROUARD DAUDE is arguing that:
- - The assignment of intangible elements within the framework of a receivership procedure has an unpredictable and all – inclusive character as the official receiver is not in a position to guarantee to the purchaser the substance of the assigned elements, as he has to take a personal responsibility over any element that many be challenged,
- - It has put into motion all useful precautions whether in the invitation to tender or in the assignment document and it opposed the relinquishment of the source codes to TECHNOLOGIES ET QUOTIUM TECHNOLOGIES WHEREAS THE Court, in its ruling of March 13, 2002 had actually ordered their assignment,
- - It has found itself being summoned before the JEX judge at the Tribunal de Grande Instance (the French Higher District Court) in order to regularize the assignment document within the 48 hours following the ruling to come,

- - following two sessions being currently examined, the JEX judge has, by way of a ruling of May 2, 2002, dismissed the appeal made by TECHNOLOGIES ET QUOTIUM TECHNOLOGIES,

**ISSUE: 24 March 2004 – 09 – 03: 31**

**Tribunal de Commerce de Paris**      **A**
Ruling dated 03/16/2004               **RG no. 2002050224**
17th Division                          CMO – Page 12

- The assignment document makes provisions for any appeal relating to the documents handed in by CYRANO INC would be heard before this very Court,
- **On account of which,**
- **And on account of the validity of the expert's report**,
- Whereas it appears on the basis of the contents of the expert's report that it has given rise to several meetings, to the production of many documents and accounts on the part of the parties and, more precisely, on the part of TECHNOLOGIES ET QUOTIUM TECHNOLOGIES, whereas the latter have enjoyed the possibility of developing the same arguments as those put forward in the first instance;
- - In fact, the Court notes that TECHNOLOGIES ET QUOTIUM TECHNOLOGIES have put forward and included in it their arguments particularly with regard to the contentious points such as the various contradictory statements on the part of the employees of PERFORMANCE SOFTWARE LTD, CYRANO UK, CYRANO SA AND CYRANO INC, the payment of royalties, the invoicing of the GATEWAY module raised in the KPMG report, the organization of the quality control, the TECHNICAL WHITE PAPER ON OPEN STA;
- - The expert's assessment has clearly taken place on the basis of unjustified claims,
- - Moreover, this expert's assessment has been based particularly on all the elements provided by the parties within the framework the mission in question, but also on the elements of which it cannot be seriously argued that they do not present a technical aspect, with regard to the subject in question which is well – known for its simplicity and its obviousness;
- - Moreover, the expert's assessment has complied, point by point, with the mission that it had been ordered by the Court and it left it to the Court to carry out its legal interpretation of it;
- - The fact that the expert qualified some statements made by TECHNOLOGIES ET QUOTIUM TECHNOLOGIES as being gratuitous statements cannot constitute substance enough to question the validity of the expert's report;
- - Therefore, the provisions contained in article 238 of NCPC appear to have been respected;
- On account of this, the Court shall validate the expert's report, thereby dismissing the appeals made by TECHNOLOGIES ET QUOTIUM TECHNOLOGIES on this matter.

**With regard to the ownership of the software programs and the extent of the assignment**
- Whereas it appears on the basis of the analysis of the expert's report:
- - that CYRANO owned the " CYRANO TEST " and " CYRANO IMPACT " products in their entirety at the time when these assets were assigned to

CYRANO INC in accordance with the assignment document of March 21, 2002 ";

- Therefore, the claim made by CYRANO INC on these software programs seems to be justified, and the said elements are not part of the contents of the transfer of assets that took place on the basis of the assignment document of May 16, 2002 between SCP

**Tribunal de Commerce de Paris**    **A**
Ruling dated 03/16/2004    **RG no. 2002050224**
17th Division    CMO – Page 13

BROUARD DAUDE, ex officio, and TECHNOLOGIES ET QUOTIUM
TECHNOLOGIES;

    Therefore the Court rules that CYRANO INC is justified in its claim and it
dismisses the claims made by TECHNOLOGIES ET QUOTIUM
TECHNOLOGIES with regard to this matter.

    Therefore the Court shall rule that the " CYRANO TEST " and the "
CYRANO IMPACT " software programs that have been the object of a sequestration
order be handed over to CYRANO INC.

    On this account, the Court shall appoint Maitre CHEVRIER de ZITTER, the
bailiff at this Court, to carry out the following mission:

. To take possession of the Logibox deposits containing all the software
programs registered with the Agence pour la Protection des Programmes (the French
computer software copyright agency) under sequestration at the hands of Maitre
Denis FACQUES,

-   Call in the Agence pour la Protection des Programmes(the French computer
software copyright agency) in the knowledge that,

-   In the presence of the Agence pour la protection des Programmes (the French
computer software copyright agency) the Logibox deposits will be opened and the
TEST and IMPACT software programs will be extracted by means of a copy of the
same,

-   To hand over to the company CYRANO INC the copies made in the manner
    aforementioned,

-   To destroy all copies of the TEST and IMPACT software programs contained
    in the Logibox deposits,

To seal again the Logibox deposits and return them to the Agence pour la
Protection des Programmes (the French computer software copyright agency),

-   With the expenses arising from this operation to be borne by the company
    CYRANO INC,

-   Whereas pursuant to the contents of article 4 called " Fees and conditions
    pertaining to assigned items " of the assignment document of 16 May 2002, "
    the assignee shall expressly acknowledge that the assignment has an
    unpredictable and all – inclusive character and the assignee shall take
    responsibility for any possible part thereof that may be claimed by third parties
    ";

-   Therefore SCP BROUARD DAUDE should not be blamed for not taking the
    necessary precautions in the light of the fact that the said assignment
    document makes provisions for the appointment of Maitre Jacques as the
    guardian of the said sequestered software programs in order to take into
    account the claim made by CYRANO INC;

-   Therefore, the Court shall rule that neither SCP BROUARD DAUDE nor
    Maitre FACQUES should be accused of wrongdoing.

**With regard to the prejudice,**
CYRANO INC argues that:

- -It has suffered colossal prejudice on the basis that TECHNOLOGIES ET QUOTIUM TECHNOLOGIES have kept and unlawfully made use of the software programs in question for many years,

**Tribunal de Commerce de Paris**   **A**
Ruling dated 03/16/2004   **RG no. 2002050224**
17th Division   CMO – Page 14

- The reconstitution of part of the source code of the TEST software program represents a prejudice of 22,349.34 euros, that the non – renewal of the maintenance contracts pertaining to the TEST software program by the clients represents a prejudice to the income over a period of three years, i.e. 1,753,587.20 euros, that the loss of earnings in the turnover over the three – year period represents a prejudice of 6,000,000 euros, or a total prejudice amounting to the sum of 7,773,904.78 euros,

- Moreover, the expenses arising from the various lawsuits have amounted to the sum of US$ 735,524.77 or 668,658.88 euros on the basis of an exchange rate of 1 euro = 1.10 US$.

- It also argues that the claim that TECHNOLOGIES ET QUOTIUM TECHNOLOGIES may have suffered any form of prejudice.

In turn, TECHNOLOGIES ET QUOTIUM TECHNOLOGIES argue that:
Only the expenses borne by CYRANO INC within the framework of the present lawsuit can be brought to the fore by the latter, and that any expenses arising from other lawsuits taking place in US courts are irrelevant to this case,

- They have never influenced the market, as all the messages were sent to the users of the OPENSTA software program that is not part of the expertise claimed by CYRANO INC and for which QUOTIUM TECHNOLOGIES has acquired the copyright by means of a deed dated 16 May 2002,

- Under those conditions the latter has informed the users of the WORKBENCH and   PRODUCTION products that it held the copyright on those products and that it was not bound by any distribution contract,

-With regard to the alleged sacking of CYRANO INC staff, the company QUOTIUM INC is a subsidiary of neither TECHNOLOGIES nor QUOTIUM SA – the latter not being party to the present dispute,

- with regard to the alleged loss of earnings arising from the commercial dealing of the  TEST software program,

- CYRANO INC has at no time ceased its operations, as it held and enjoyed at all   times the source code of this software program,

The said software program was handed over to the purchaser of CYRANO UK by the English receiver, and unless it had been acknowledged that the receiver of this company did not have the source code in its possession, CYRANO INC would become   its sole owner,

- they have never had in their possession the source code of the TEST software program, nor have they ever had in their possession any technical or commercial documentation,
- QUOTIUM does not offer any maintenance service with regard to the software in question.
- However, due to the fact that it is impossible to capitalize on the software programs acquired within the framework of the receivership of CYRANO SA, they have suffered a significant prejudice, which they estimate at 2,000,000 euros on the basis of a provisional result over a period of two years based on a 2,000,000 euros annual turnover.

ISSUE: 24 March 2004 – 09 – 03: 31

**Tribunal de Commerce de Paris**    **A**
Ruling dated 03/16/2004    **RG no. 2002050224**
17th Division    CMO – Page 15

- **On account of this,**
- Whereas according to the expert's report, the proceedings started by TECHNOLOGIES ET QUOTIUM TECHNOLOGIES have given rise to expenses for CYRANO INC and it is likely that their commercial dealings have also given rise to expenses to be borne by CYRANO INC on account of the non – renewal of the maintenance contracts and the drop in the sale of licences and services, CYRANO INC shall have to produce evidence related to those expenses and costs;
- - Short of finding such evidence produced by the plaintiff justifying in a satisfactory and unquestionable fashion its claim for damages except for the prejudice arising from the reconstitution of the source codes;
- The Court shall set the sum of the damages at 25,000 euros as compensation for any prejudice suffered, with all categories taken together.
- Whereas TECHNOLOGIES ET QUOTIUM TECHNOLOGIES have no choice but agree to this ruling, they should give up their claim for damages and they will therefore be dismissed.
- **Provisional execution, legal costs not included in the damages awarded by the Court, and legal costs whose payment is to be determined by the Court as to which party they are assigned,**
- Whereas there is a case for allowing the immediate restitution of the software programs, the Court shall deem it necessary to order the provisional execution of the present ruling.
- Whereas CYRANO INC has been ordered to provide evidence of its rights, to provide evidence of its legal costs not included in its legal costs awarded by the Court and that would be unfair for that company to be forced to bear;
- There is a good case to award the company compensation to the amount of 150,000 euros pursuant to article 700 of the NCPC (French New Code of Civil Procedure), while denying any extra amount being claimed.
- Whereas SCP BROUARD DAUDE has a case to provide evidence of its rights, to provide evidence of its legal costs not included in the legal costs awarded by the Court and that would unfair for that company to be forced to bear;
- That there is a good case to award the company compensation to the amount of 3 000 euros pursuant to article 700 of the NCPC (the French New Code of Civil Procedure).
- Whereas TECHNOLOGIES AND QUOTIUM TECHNOLOGIES have no choice but agree to this ruling, they should give up their claim for damages and it will therefore be dismissed.

### On account of this

- As a first resort, the Court shall publicly and openly rule that,
- - The expert's report filed on November 4,2003 is valid,
- - It exonerates SCP BROUARD DAUDE, the receiver of the company CYRANO SA and Maitre Denis FACQUES, the trustee,

-    - It orders that the software programs " CYRANO TEST " and " CYRANO IMPACT " that were kept under sequestration by Me Denis FACQUES, ex officio, be returned to the company CYRANO INC

**Tribunal de Commerce de Paris**   **A**
Ruling dated 03/16/2004   **RG no. 2002050224**
17th Division   CMO – Page 16

- in accordance with the assignment document dated May 16, 2002,
- - It appoints Maitre CHEVRIER DE ZITTER, the bailiff at this Court as the recorder to carry out the following mission:
  . To take possession of the Logibox deposits containing all of the software programs registered and the Agence pour la Protection des Programmes (the French computer software copyright agency) and placed under sequestration in the hands of Maitre Denis FACQUES, in his position as trustee,
  . To call in the Agence pour la Protection des Programmes (the French computer software copyright agency) in the knowledge that,
  He shall open the Logibox deposits in the presence of the Agence pour la Protection des Programmes (the French computer software copyright agency) and he shall extract the TEST and IMPACT software programs by making copies of them,
- He shall hand over such copies to the company CYRANO INC,
- He shall destroy all copies if the TEST and IMPACT software programs contained in the Logibox deposits,
  He shall reseal the Logibox deposits and return them to the Agence pour la protection des programmes (the French computer software copyright agency),
- - On the understanding that all expenses related to this mission shall be borne by the company CYRANO INC,
- - The Court sentences the companies TECHNOLOGIES ET QUOTIUM TECHNOLOGIES to pay to the company CYRANO INC the sum of 25,000 euros as compensation for all the prejudice suffered,
- - The Court sentences the companies TECHNOLOGIES ET QUOTIUM TECHNOLOGIES to pay the following sums pursuant to article 700 of the NCPC (the French New Code of Civil Procedure):
- 150,000 euros to the company CYRANO INC,
- 3,000 euros to SCP BROUARD DAUDE in its capacity of receiver for the company CYRANO SA,
- - On account of the unjustified, excessive and unjustifiable claims of some parties whose claims are disallowed,
- - The Court sentences the companies TECHNOLOGIES ET QUOTIUM TECHNOLOGIES to pay all legal costs, including the legal costs to be recovered by the Court Office and deemed to reach the sum of: 109.56 euros – all costs included, of which 20.35 euros as VAT.
- During the sitting of the Court on January 20, 2004 this document was handed over to Monsieur LUCQUIN in his capacity of Judge Rapporteur.
- Following the deliberation of February 10, 2004.

**Tribunal de Commerce de Paris**    **A**
Ruling dated 03/16/2004    **RG no. 2002050224**
17th Division    CMO – Page 17

- Deliberation involving Messieurs SCHIFF, LUCQUIN, BLOCH and read to the public sitting where the following were sitting:

Monsieur LUCQUIN, presiding judge, Monsieur BEHAR and Madame ACHOUR, judges and assisted by Madame VASSEUR, Court Clerk. The parties to this case were informed beforehand.
The minutes of this ruling were signed by the Presiding Judge and the Court Clerk.

**Tribunal de Commerce de Paris**     **A**
Ruling dated 03/16/2004     **RG no. 2002050224**
17th Division     CMO – Page 18

    To be sent as a certified copy,
Without being enforceable

[seal:] Seal of the Tribunal de Commerce de Paris (the Commercial Court in Paris)

[signature]

℘JS 44  (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a)  PLAINTIFFS

CYRANO, INC.

**(b)** County of Residence of First Listed Plaintiff _____
(EXCEPT IN U.S. PLAINTIFF CASES)

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

PERKINS SMITH & COHEN LLP
ONE BEACON STREET, BOSTON, MA  02108; (617) 854-4000

## DEFENDANTS

QUOTIUM TECHNOLOGIES, INC., QUOTIUM
TECHNOLOGIES, S.A., and TECHNOLOGIES, S.A.

County of Residence of First Listed Defendant    **ESSEX**
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

Attorneys (If Known)

PARAGON LAW GROUP LLP
NO HIGH STREET, BOSTON, MA  02110; (617) 399-7955

## II. BASIS OF JURISDICTION    (Place an "X" in One Box Only)

| | |
|---|---|
| ❏ 1  U.S. Government Plaintiff | ☒ 3  Federal Question (U.S. Government Not a Party) |
| ❏ 2  U.S. Government Defendant | ❏ 4  Diversity (Indicate Citizenship of Parties in Item III) |

## III. CITIZENSHIP OF PRINCIPAL PARTIES(Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)                              and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ❏ 1 | ❏ 1 | Incorporated or Principal Place of Business In This State | ❏ 4 | ❏ 4 |
| Citizen of Another State | ❏ 2 | ❏ 2 | Incorporated and Principal Place of Business In Another State | ❏ 5 | ❏ 5 |
| Citizen or Subject of a Foreign Country | ❏ 3 | ❏ 3 | Foreign Nation | ❏ 6 | ❏ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ❏ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ❏ 610 Agriculture | ❏ 422 Appeal 28 USC 158 | ❏ 400 State Reapportionment |
| ❏ 120 Marine | ❏ 310 Airplane | ❏ 362 Personal Injury - | ❏ 620 Other Food & Drug | ❏ 423 Withdrawal | ❏ 410 Antitrust |
| ❏ 130 Miller Act | ❏ 315 Airplane Product | Med. Malpractice | ❏ 625 Drug Related Seizure | 28 USC 157 | ❏ 430 Banks and Banking |
| ❏ 140 Negotiable Instrument | Liability | ❏ 365 Personal Injury - | of Property 21 USC 881 | | ❏ 450 Commerce |
| ❏ 150 Recovery of Overpayment | ❏ 320 Assault, Libel & | Product Liability | ❏ 630 Liquor Laws | **PROPERTY RIGHTS** | ❏ 460 Deportation |
| & Enforcement of Judgment | Slander | ❏ 368 Asbestos Personal | ❏ 640 R.R. & Truck | ☒ 820 Copyrights | ❏ 470 Racketeer Influenced and |
| ❏ 151 Medicare Act | ❏ 330 Federal Employers' | Injury Product | ❏ 650 Airline Regs. | ❏ 830 Patent | Corrupt Organizations |
| ❏ 152 Recovery of Defaulted | Liability | Liability | ❏ 660 Occupational | ❏ 840 Trademark | ❏ 480 Consumer Credit |
| Student Loans | ❏ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ❏ 490 Cable/Sat TV |
| (Excl. Veterans) | ❏ 345 Marine Product | ❏ 370 Other Fraud | ❏ 690 Other | | ❏ 810 Selective Service |
| ❏ 153 Recovery of Overpayment | Liability | ❏ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ❏ 850 Securities/Commodities/ |
| of Veteran's Benefits | ❏ 350 Motor Vehicle | ❏ 380 Other Personal | ❏ 710 Fair Labor Standards | ❏ 861 HIA (1395ff) | Exchange |
| ❏ 160 Stockholders' Suits | ❏ 355 Motor Vehicle | Property Damage | Act | ❏ 862 Black Lung (923) | ❏ 875 Customer Challenge |
| ❏ 190 Other Contract | Product Liability | ❏ 385 Property Damage | ❏ 720 Labor/Mgmt. Relations | ❏ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ❏ 195 Contract Product Liability | ❏ 360 Other Personal | Product Liability | ❏ 730 Labor/Mgmt.Reporting | ❏ 864 SSID Title XVI | ❏ 890 Other Statutory Actions |
| ❏ 196 Franchise | Injury | | & Disclosure Act | ❏ 865 RSI (405(g)) | ❏ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ❏ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ❏ 892 Economic Stabilization Act |
| ❏ 210 Land Condemnation | ❏ 441 Voting | ❏ 510 Motions to Vacate | ❏ 790 Other Labor Litigation | ❏ 870 Taxes (U.S. Plaintiff | ❏ 893 Environmental Matters |
| ❏ 220 Foreclosure | ❏ 442 Employment | Sentence | ❏ 791 Empl. Ret. Inc. | or Defendant) | ❏ 894 Energy Allocation Act |
| ❏ 230 Rent Lease & Ejectment | ❏ 443 Housing/ | **Habeas Corpus:** | Security Act | ❏ 871 IRS—Third Party | ❏ 895 Freedom of Information |
| ❏ 240 Torts to Land | Accommodations | ❏ 530 General | | 26 USC 7609 | Act |
| ❏ 245 Tort Product Liability | ❏ 444 Welfare | ❏ 535 Death Penalty | | | ❏ 900Appeal of Fee Determination |
| ❏ 290 All Other Real Property | ❏ 445 Amer. w/Disabilities - | ❏ 540 Mandamus & Other | | | Under Equal Access |
| | Employment | ❏ 550 Civil Rights | | | to Justice |
| | ❏ 446 Amer. w/Disabilities - | ❏ 555 Prison Condition | | | ❏ 950 Constitutionality of |
| | Other | | | | State Statutes |
| | ❏ 440 Other Civil Rights | | | | |

## V. ORIGIN    (Place an "X" in One Box Only)

| | | | | | Appeal to District |
|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ❏ 2 Removed from State Court | ❏ 3 Remanded from Appellate Court | ❏ 4 Reinstated or Reopened | ❏ 5 Transferred from another district (specify) | ❏ 6 Multidistrict Litigation | ❏ 7 Judge from Magistrate Judgment |

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):  17 U.S.C. §§101 et seq.

Brief description of cause:
Copyright infringement

## VII. REQUESTED IN COMPLAINT:

❏ CHECK IF THIS IS A CLASS ACTION
UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ Yes   ❏ No

## VIII. RELATED CASE(S) IF ANY

(See instructions):
JUDGE  JOSEPH L. TAURO    DOCKET NUMBER 02-cv-11416-JLT

DATE  7/25/2005

SIGNATURE OF ATTORNEY OF RECORD

## FOR OFFICE USE ONLY

RECEIPT #_____   AMOUNT_____   APPLYING IFP_____   JUDGE_____   MAG. JUDGE_____

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

1. Title of case (name of first party on each side only) ___CYRANO, INC. V. QUOTIUM TECHNOLOGIES, INC.___

2. Category in which the case belongs based upon the numbered nature of suit code listed on the civil cover sheet. (See local rule 40.1(a)(1)).

| | | |
|---|---|---|
| ☐ | I. | 160, 410, 470, 535, R.23, REGARDLESS OF NATURE OF SUIT. |
| ☑ | II. | 195, 196, 368, 400, 440, 441-446, 540, 550, 555, 625, 710, 720, 730,  *Also complete AO 120 or AO 121<br>740, 790, 791, 820*, 830*, 840*, 850, 890, 892-894, 895, 950.    for patent, trademark or copyright cases |
| ☐ | III. | 110, 120, 130, 140, 151, 190, 210, 230, 240, 245, 290, 310,<br>315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 370, 375,<br>380, 385, 450, 891. |
| ☐ | IV. | 220, 422, 423, 430, 460, 480, 490, 510, 530, 610, 620, 630, 640, 650, 660,<br>690, 810, 861-865, 870, 871, 875, 900. |
| ☐ | V. | 150, 152, 153. |

05   11558 JLT

3. Title and number, if any, of related cases. (See local rule 40.1(g)). If more than one prior related case has been filed in this district please indicate the title and number of the first filed case in this court.

   TECHNOLOGIES, S.A. ET AL V. CYRANO, INC.  DOCKET NO. 02-cv-11416-JLT

4. Has a prior action between the same parties and based on the same claim ever been filed in this court?

   YES ☐    NO ☑

5. Does the complaint in this case question the constitutionality of an act of congress affecting the public interest? (See 28 USC §2403)

   YES ☐    NO ☑

   If so, is the U.S.A. or an officer, agent or employee of the U.S. a party?

   YES ☐    NO ☐

6. Is this case required to be heard and determined by a district court of three judges pursuant to title 28 USC §2284?

   YES ☐    NO ☐

7. Do all of the parties in this action, excluding governmental agencies of the united states and the Commonwealth of Massachusetts ("governmental agencies"), residing in Massachusetts reside in the same division? - (See Local Rule 40.1(d)).

   YES ☑    NO ☐

   A.    If yes, in which division do all of the non-governmental parties reside?

   Eastern Division ☑    Central Division ☐    Western Division ☐

   B.    If no, in which division do the majority of the plaintiffs or the only parties, excluding governmental agencies, residing in Massachusetts reside?

   Eastern Division ☐    Central Division ☐    Western Division ☐

8. If filing a Notice of Removal - are there any motions pending in the state court requiring the attention of this Court? (If yes, submit a separate sheet identifying the motions)

   YES ☐    NO ☐

(PLEASE TYPE OR PRINT)

ATTORNEY'S NAME ___STEPHEN Y. CHOW___

ADDRESS ___PERKINS SMITH 7 COHEN LLP, ONE BEACON STREET, BOSTON, MA 02108-3106___

TELEPHONE NO. ___(617) 854-4000___

(CategoryForm.wpd - 5/2/05)