UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CYRANO, INC.,
                    Plaintiff,

v.

QUOTIUM TECHNOLOGIES, INC.,

QUOTIUM TECHNOLOGIES, S.A.,

and

TECHNOLOGIES, S.A.,
                    Defendants.

**CIVIL ACTION NO. 05-CV-11558-DPW**

**MEMORANDUM OF LAW IN SUPPORT
OF QUOTIUM'S MOTION TO DISMISS OR STAY**

DATED: September 23, 2005

Kevin J. O'Connor (BBO# 555250)
Mayeti Gametchu (BBO# 647787)
John Pagliaro (BBO# 634483)
James W. Bell (BBO# 658123)
PARAGON LAW GROUP, LLP
184 High Street
Boston, MA 02110
Tel. (617) 399-7950


Counsel For Defendants

QUOTIUM TECHNOLOGIES, INC.,
TECHNOLOGIES, S.A. and
QUOTIUM TECHNOLOGIES, S.A.

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

FACTUAL AND PROCEDURAL BACKGROUND ..................................................... 1

ARGUMENT ............................................................................................................... 9

I.      Counts I-IV And VI-VIII Should Be Dismissed Because
        They Have Already Been Dismissed With Prejudice In The
        Quotium Action Under Rule 41(b) .............................................................. 9

        A.      CI's Complaint Here -- Namely Counts I-IV and
                VI-VIII -- And Its Counterclaims In The Quotium
                Action Are Substantially Identical On Their Face ........................ 9

        B.      Having Been Dismissed With Prejudice In The
                Quotium Action, The Counterclaim-Based Counts
                Are Barred Here ........................................................................... 10

II.     The Counterclaim-Based Counts Should Also Be
        Dismissed On Grounds Of Claim-Splitting ............................................... 11

        A.      Claim-Splitting Is Grounds For Dismissal .................................. 11

        B.      CI Is Claim-Splitting Because Counts I-IV And VI-
                VIII Arise From Same Cause Of Action As CI's
                Counterclaims ............................................................................... 13

III.    After Waiving Its Claims and Defenses With Respect To The
        French Judgments Due To Its Willful Default In The Quotium
        Action, CI Cannot Now Try to Enforce Them Here .................................. 15

        A.      Judge Tauro Never Reached The Issue Of Whether
                The French Judgments Could Be Enforced In A
                Later Action ................................................................................. 15

        B.      The Court Should Find That CI Cannot Enforce The
                French Judgments In This Action ................................................ 17

IV.     As With The French Judgments, This Court Should
        Dismiss Count V Because The Count V Allegations Have
        Already Been Rejected By Judge Tauro ................................................... 20

V.    Count IX For Fraud On The Court Fails To State A Claim
And Is Frivolous ......................................................................................22

A.    Fraud On The Court Is Not An Independent Cause
Of Action For Damages.................................................................22

B.    This Court Should Defer To Judge Tauro's Decision
On CI's Fraud And Non-Disclosure Arguments
Because Final Judgment Is About To Enter ...................................23

C.    CI's Allegations Are Frivolous......................................................24

VI.    Alternatively, The Court Should Stay Action Pending
Outcome Of The Appeal ..........................................................................26

CONCLUSION...............................................................................................................27

## <u>TABLE OF AUTHORITIES</u>

**<u>CASES</u>**                                                                                                 **<u>Page(s)</u>**

*Adam v. Jacobs,*
   950 F.2d 89 (2nd Cir. 1991)......................................................................26

*Aoude v. Mobil Oil Corp.,*
   892 F.2d 1115 (1st Cir. 1989)..................................................................24

*Apparel Art International, Inc. v. Amertex Enterprises Ltd.,*
   48 F.3d 576 (1st Cir. 1995)..........................................................12, 13, 14, 22

*Chewning v. Ford Motor Co.,*
   35 F. Supp. 2d 487 (D.S.C. 1998).......................................................... 22-23

*CIVIX-DDI v. Expedia, Inc.,*
   No. 04-C-8031, 2005 WL 1126906 (N.D. Ill. May 2, 2005)......................11, 13, 20 n.6

*Davidson v. Cao,*
   211 F. Supp. 2d 264 (D. Mass 2002) ...........................................................22

*Diaz v. Methodist Hospital,*
   46 F.3d 492 (5th Cir. 1995) .....................................................................25

*Explosives Corp. of America v. Garlam Enterprises Corp.,*
   817 F.2d 894 (1st Cir. 1987) ................................................................ 18-19

*Federated Department Stores, Inc. v. Moitie,*
   452 U.S. 394 (1981).......................................................................12, 20 n.6

*Florida Evergreen Foliage v. E.I. Dupont De Nemours and Co.,*
   336 F. Supp. 2d 1239 (S.D. Fla. 2004) .........................................................23

*Geo. P. Reintjes Co., Inc. v. Riley Stoker Corp.,*
   71 F.3d 44 (1st Cir. 1995)......................................................................24

*Hartsel Springs Ranch Of Colorado, Inc. v. Bluegreen Corp.,*
   296 F.3d 982 (10th Cir. 2002) .................................................................12

*Iannochino v. Rodolakis,*
   242 F.3d 36 (1st Cir. 2001).....................................................................14

*Karak v. Bursaw Oil Corp.,*
   288 F.3d 15 (1st Cir. 2002)............................................................. 25, 25-26

*Landis v. North American Co.*,
   299 U.S. 248 (1936)......................................................................................26

*Oxbow Energy, Inc. v. Koch Indus., Inc.*,
   686 F. Supp. 278 (D. Kansas 1988) ........................................... 11-12, 20 n.6

*Puerto Rico Maritime Shipping Authority v. Federal Maritime Com'n*,
   75 F.3d 63 (1st Cir. 1996)..................................................................... 21-22

*Ridge Gold Standard Liquors v. Joseph E. Seagram*,
   572 F. Supp. 1210 (N.D. Ill. 1983) .............................................................13

*Robi v. Five Platters, Inc.*,
   838 F.2d 318 (9th Cir. 1988) ......................................................................19

*Semtek International, Inc. v. Lockheed Martin Corp.*,
   531 U.S. 497 (2001)....................................................................................11

*Sensormatic Security Corp. v. Sensormatic Elec. Corp.*,
   329 F. Supp. 2d 574 (D. Md. 2004)....................................................20 n.6

*Serlin v. Arthur Andersen & Co.*,
   3 F.3d 221 (7th Cir. 1993) ..........................................................................13

*Sriberg v. Raymond*,
   544 F.2d 15 (1st Cir. 1976)........................................................................26

*Sutcliffe Storage & Warehouse Co.*,
   162 F.2d 849 (1st Cir. 1947).......................................................................13

*Tonka Corp. v. Rose Art Industries, Inc.*,
   836 F. Supp. 200 (D.N.J. 1993)..................................................................22

*Walton v. Eaton Corp.*,
   563 F.2d 66 (3rd Cir. 1977) ........................................................................26

*Weisman v. Charles E. Smith Management, Inc.*,
   829 F.2d 511 (4th Cir. 1987) ................................................................ 23-24

## OTHER AUTHORITIES AND TREATISES

Fed. R. Civ. P. 41 ................................................................................9, 10, 11

Fed. R. Civ. P. 60................................................................22, 23, 24, 25, 26

Moore, 7 Fed. Pract. & Proc. ......................................................................24

Moore, 18 Fed. Pract. & Proc. ....................................................................16

## INTRODUCTION

Pursuant to Fed. R. Civ. P. 12(b)(6), Defendants Quotium Technologies, Inc., Quotium Technologies, S.A., and Technologies, S.A. (collectively, "Quotium") submit this memorandum in support of their motion to dismiss the Complaint (Counts I-IX) or, in the alternative, stay the present action commenced by Plaintiff Cyrano, Inc. ("CI").

The Court should grant Quotium's motion for the following reasons:

- At least seven of CI's nine counts (Counts I-IV and VI-VIII) have already been dismissed with prejudice by Judge Tauro in a still pending related action (the "Quotium Action");
- CI is engaged in improper claim-splitting with respect to at least the same seven counts;
- The allegations of Counts V and IX
    - are frivolous,
    - were rejected by Judge Tauro in the Quotium Action, and/or
    - were found unpersuasive by the First Circuit, when denying CI's two motions for a stay pending appeal; and
- The Quotium Action is on interlocutory appeal to the First Circuit, and some or all of the present action may be mooted by the resulting decision.

For these and for the further reasons set forth below, the Court should grant Quotium's motion.

## FACTUAL AND PROCEDURAL BACKGROUND

### *Quotium's Complaint In The Quotium Action*

On July 12, 2002, Quotium commenced Civil Action No. 02-cv-11416-JLT against CI in the U.S. District Court for the District of Massachusetts ("Quotium Action"). In its complaint, attached hereto as Exhibit 1, Quotium alleged that it had acquired certain intellectual property from a French corporation called Cyrano, S.A. ("CSA"), which was formerly affiliated with CI. *See* Ex. 1 hereto ¶¶ 11, 15 ("Quotium Compl."). The complaint further alleged that CSA was declared bankrupt in July 2001,

that Quotium bid on CSA's assets, and that the French Commercial Court ordered the sale of CSA's assets to Quotium in March 2002. *See* Ex. 1 (Quotium Compl. ¶¶ 11-15). Among the CSA assets transferred to Quotium were all intellectual property rights belonging to CSA in certain software products, including Workbench, Production, and version 0.9.1 of a software product named OpenSTA (the "Transferred Software"). *See* Ex. 1 (Quotium Compl. ¶¶ 15, 15 n.1, 22). Quotium was also granted "all artistic, intellectual or industrial property rights which may exist" in certain trademarks owned by CSA, including the federally registered trademark "Cyrano," U.S. Registration Number 2,175,949. *See* Ex. 1 (Quotium Compl. ¶ 19).

In addition, the complaint alleged that CI wrongfully reproduced, distributed, licensed or otherwise dealt with the Transferred Software, and wrongfully used the Cyrano® trademark in its business name, website address, and elsewhere. *See* Ex. 1 (Quotium Compl. ¶¶ 25-31).

### *CI's Amended Answer And Counterclaim In The Quotium Action*

In its Amended Answer and Counterclaim in the Quotium Action, attached hereto as Exhibit 2, CI asserted various claims (the "Counterclaims") and also sought a declaratory judgment concerning its rights under a licensing agreement -- the International Distributor Agreement ("Distributor Agreement") -- into which it had entered with CSA before CSA's bankruptcy. *See* Ex. 2 hereto ¶¶ 52-117.

In its Counterclaims, CI alleged that Cyrano UK, Limited ("CUK"), a British affiliate, had developed and owned two software products, Test and Impact. When CUK went bankrupt, CI alleged that it acquired CUK's assets, including Test and Impact. *See* Ex. 2 ¶¶ 7-16. Upon CI's submission to the CSA bankruptcy trustee of a claim of

ownership of Test and Impact, these products were put into escrow pending determination of the issue. *See* Ex. 1 (Quotium Compl. ¶ 17) According to CI, CUK used code found in Test and Impact to create a software product that CI dubbed UK/US OpenSTA. CI alleged that it acquired these rights, as well, when CUK went into bankruptcy. *See* Ex. 2 ¶¶ 17-21.

CI also alleged that, under the Distributor Agreement, CI had an exclusive license to distribute, license and market Workbench, Production, OpenSTA and related software worldwide, excluding Continental Europe. *See* Ex. 2 ¶¶ 22-23. CI contended that Quotium had improperly obtained source code of Test, Impact, and OpenSTA, and used it to develop products similar to Test, Impact, and OpenSTA. *See* Ex. 2 ¶¶ 26-35. In addition, CI pled that Quotium marketed and sold two OpenSTA modules, DB Monitor and SQL Analysis, as well as the products Workbench and Production, throughout the world, allegedly infringing CI's copyrights and licensing rights under the Distributor Agreement. *See* Ex. 2 ¶¶ 24-35.

### CI's Allegations In This Action Are The Same As Its Allegations In The Quotium Action

The allegations in CI's Complaint here are virtually *identical* to those contained in CI's Counterclaims in the Quotium Action. For this reason, the Complaint's allegations are not repeated here. To illustrate the point for the Court's convenience, attached hereto at Exhibits 3-5 are charts comparing the allegations and claims in CI's Complaint with the Counterclaims in the Quotium Action.

**The French Proceedings In Regard To The**
**Distributor Agreement, And Test And Impact**

As alleged in CI's Complaint here, two separate actions between Quotium and CI relating to the intellectual property rights in dispute here were pending in French courts during the time of the Quotium Action.  In the first suit, which was initiated in July 2002 by CI in the Commercial Court of Paris, CI sought to obtain, *inter alia*, the Test and Impact code held in escrow in the CSA bankruptcy.  *See* CI Complaint ¶ 19 ("CI Compl.").  On March 16, 2004, the French court ruled that CI owned Test and Impact. *See* CI Compl. ¶ 26.

In the second suit, initiated by Quotium on February 5, 2003 in the Commercial Court of Paris, Quotium sought a determination that the Distributor Agreement had been invalidated by the CSA bankruptcy.  *See* CI Compl. ¶ 21.  On September 19, 2003, the court ruled that the bankruptcy had not invalidated the Distributor Agreement.[1]  *See* CI Compl. ¶ 24, CI Compl. Ex. 2 at 7.  Upon Quotium's appeal of that decision, a French appellate court affirmed the lower court's determination on June 30, 2004.  *See* CI Compl. ¶¶ 25, 29.  Together, the outcomes of these proceedings are referred to hereinafter as the "French Judgments."

**CI's Default In The Quotium Action, Judge Tauro's Denial Of CI's**
**Request To Reopen, And The <u>First</u> Finding Of Contempt Against CI**

As Judge Tauro found in his memorandum issued on June 8, 2005 (the "June 8th Memorandum") -- wherein he denied CI's request to reopen the Quotium Action following CI's default and issued an order of contempt against CI for failing to comply

---

[1] Although CI states in its Complaint that "the Commercial Court had entered a decision in Cyrano's favor, finding the Distributor Agreement valid," that decision, which is attached at Exhibit 2 to the Complaint, actually determined only that the "court ordered liquidation decision has not caused any prejudice to the rights of the Cyrano, Inc. company."  *See* CI Compl. Ex. 2 at 7.

with the court's permanent injunction -- CI actively litigated in the Quotium Action until it began experiencing adverse decisions in the district court. *See* Ex. 9 hereto, Paper #144 at 3-4 (6/8/05 J. Tauro Mem.).[2]  Thereafter, CI turned its attention exclusively to the proceedings in France and entirely ignored the Quotium Action for over one year. *See* Ex. 9, Paper #144 at 9 (6/8/05 J. Tauro Mem.).  In fact, CI knowingly disabled itself from litigating the Quotium Action.  When CI's then-counsel filed a motion to withdraw, Judge Tauro instructed CI to secure successor counsel by March 10, 2004 in order to proceed with the case. *See* Ex. 9, Paper #144 at 9 (6/8/05 J. Tauro Mem.) and Paper # 94. CI ignored this order, as well as subsequent proceedings, and remained without counsel until *February* 2005. *Id*. at 5.  As a result of CI's failure to defend or prosecute in the Quotium Action and its utter disregard of several court orders along the way, on February 24, 2005 Judge Tauro (i) entered default judgment against CI (paper #111), (ii) dismissed CI's Counterclaims (2/24/05 Electronic Order), and (iii) issued a permanent injunction enjoining CI from, *inter alia*, using the Cyrano name (paper #112).

Beginning the next day -- February 25, 2005 -- and continuing to the present, CI, through new counsel, has filed a barrage of documents in the Quotium Action through which it has attempted to undo the consequences of its protracted disregard of the Quotium Action. *See, e.g.,* Papers ##113-115, 118-123, 127, 131, 133-139.  Most relevant here is CI's opposition to the default judgment and dismissal of its counterclaims. *See* Paper #127.  In it, CI argued that Quotium had committed fraud on the court by failing to disclose the French Judgments to Judge Tauro. *See* Paper #127 at 1, 8-9.  In addition, despite the fact that CI admitted that it was actively litigating against Quotium in France while defaulting in Judge Tauro's court, CI argued to Judge Tauro

---

[2] The citations to "Paper" refer to documents recorded on the docket in the Quotium Action.

that it should be excused from its default because it lacked resources to devote to that case. *See* Ex. 9, Paper #144 at 5-6, 8-10 (6/8/05 J. Tauro Mem.).

Meanwhile, CI refused to comply fully with the terms of the permanent injunction (paper #112) entered against it in February by, among other things, continuing to use and do business under the Cyrano name. In response, on March 25, 2005 Quotium filed the first of three emergency motions for contempt against CI. *See* Paper #129.

Judge Tauro scheduled a hearing for April 13, 2005 to hear the various motions pending before him, most of which consisted of CI's many post-default judgment submissions. On the eve of that hearing, April 12, 2005, CI filed yet another motion, entitled "Emergency Motion for Leave to File Supplemental Trade Mark Documents," wherein CI argued that Quotium had failed to "file an affidavit of use of the [Cyrano] mark" by January 28, 2005 as required by the Patent and Trademark Office, and asked that Quotium not be allowed to pursue its trademark based allegations against CI. *See* Paper #135 at 1-2. It also alleged that Quotium failed to disclose these facts to the Court. *Id*.

The outcome of the April 13th hearing is contained in Judge Tauro's June 8th Memorandum (Ex. 9, paper #144) and his accompanying Order (paper #145). In that Order, Judge Tauro denied CI's emergency motion to remove default judgment and denied reconsideration of the dismissal of its Counterclaims. *See* Ex. 9, Papers #144 (6/8/05 J. Tauro Mem.) and Paper #145. Judge Tauro also granted Quotium's motion for contempt against CI for violating the permanent injunction. *See* Paper #145. In so ruling, Judge Tauro ultimately rejected CI's "lack of resources" excuse as a basis for reopening the case and determined that CI deliberately chose to litigate in France while

ceasing its participation in the Quotium Action.  *See* Ex. 9, Paper #144 at 8-10 (6/8/05 J.

Tauro Mem.).  In addition -- finding that CI failed to timely bring the allegations

regarding the French Judgments and the January 28, 2005 lapse of the registration of the

Cyrano trademark to the court's attention -- Judge Tauro also rejected these as grounds

for relief.  *See* Ex. 9, Paper #144 at 11-13 (6/8/05 J. Tauro Mem.).

**The <u>Second</u> Order Of Contempt Against CI,**
**CI's Appeal, And The First Circuit's Repeated Denials Of**
**CI's Request For An Emergency Stay In The District Court**

Rather than simply complying with the injunction and the contempt order, on

June 14, 2005 CI filed another emergency motion with the district court, requesting

reconsideration of the Court's prior rulings, as well as an array of relief in the alternative.

*See* Paper #148.  In response to CI's continuing intransigence, Quotium filed a second

emergency motion for contempt on the same day.  *See* Paper #149.  Judge Tauro denied

both motions.  *See* 6/15/05 Electronic Order and 6/26/05 Electronic Order.

On June 15, 2005, CI filed a Notice of Appeal (paper #152) in the district court,

followed the next day by the filing, with the U.S. Court of Appeals for the First Circuit,

of an emergency motion for a stay of the district court's injunctive orders pending appeal.

On June 20, 2005, before Quotium could file an opposition, the Court of Appeals denied

the emergency motion, finding that CI appeared unable to establish a substantial

likelihood of success on the merits.  The denial was without prejudice to CI's right to

attempt to make the required showing.  *See* Ex. 6 hereto (attaching First Circuit Orders).

On June 22, 2005, CI filed an Amended Notice of Appeal (paper #156) with the

district court, and on June 28, 2005 CI renewed its motion to the Court of Appeals for a

stay, raising again its argument that Quotium fraudulently failed to disclose the French

Judgments to Judge Tauro. The Court of Appeals summarily denied the renewed motion on June 30, 2005, again without waiting for Quotium to file an opposition. *See* Ex. 6.

With CI still refusing to comply with the district court's orders, Quotium filed a **third** emergency motion for contempt against CI on July 6, 2005. *See* Paper #160. Judge Tauro granted this motion on July 25, 2005 and imposed a fine of $1,000 a day on CI, to accrue until CI comes into compliance with the June 8th contempt order. *See* Paper #166. Judge Tauro also ordered Quotium to file an affidavit concerning damages. *Id*. Quotium filed a damages affidavit and related papers on September 16, 2005. *See* Papers ##172-174.

Even though CI continues to use the Cyrano name in violation of the permanent injunction and after entry of two orders of contempt for doing so, CI filed a motion for certificate of compliance with the second contempt order on September 1, 2005. *See* Paper #170. That motion, which Quotium opposed, was denied yesterday, September 22, 2005. *See* 9/22/05 Electronic Order. Quotium is now seeking enforcement of the sanctions Judge Tauro has imposed against CI for its multiple violations of the permanent injunction and contempt orders. *See* Paper #171.

Currently pending in the Court of Appeals for the First Circuit is Quotium's motion to dismiss certain orders from CI's interlocutory appeal for lack of subject matter jurisdiction. CI's appellant brief is due three weeks after the Court of Appeals decides which orders are reviewable.

<u>**ARGUMENT**</u>

I.    **Counts I-IV And VI-VIII Should Be Dismissed Because They Have Already**
      <u>**Been Dismissed With Prejudice In The Quotium Action Under Rule 41(b)**</u>

CI is precluded from maintaining an action on Counts I-IV and VI-VIII (the

"Counterclaim-based Counts") because Judge Tauro dismissed these claims *with*

*prejudice* last February under Fed. R. Civ. P. 41(b).  Notably, nowhere in its complaint

does CI bother to inform the Court of this legally dispositive action by the district court.

      A.    **CI's Complaint Here -- Namely Counts I-IV**
            **And VI-VIII -- And Its Counterclaims In The**
            <u>**Quotium Action Are Substantially Identical On Their Face**</u>

CI's Complaint here is, literally, the product of a cut and paste job from its

Counterclaims in the Quotium Action.  This fact is evident immediately in the "Parties"

and "Jurisdiction" sections of the Complaint.  In the latter, for example, CI mechanically

pleads that jurisdiction here is based in part on "Fed. R. Civ. P. 13," which, of course,

deals with counterclaims.  *See* CI Compl. ¶ 5.

      The allegations comprising Counts I-IV and VIII of the complaint (i.e., ¶¶ 7-18,

35-63 and 72-93) also clearly derive from the Counterclaims.  The wording is virtually

the same, and the same story is told about the same parties (Quotium, CI, CSA, etc.), the

same software (Test, Impact, Workbench, Production, and OpenSTA), and the same

alleged wrongful acts (infringement, unfair competition).  *See* Ex. 3 (attaching for the

court's convenience a chart comparing the allegations in CI's complaint to the

Counterclaims).  The alterations CI has made to its complaint are generally small and

include added background information (*e.g.*, in ¶¶ 8-9), some rearrangement of materials

(*compare* Complaint ¶ 18 and Counterclaims ¶ 36), changes in verb tense, etc.  The only

allegations in the complaint that have no basis in the Counterclaims are those recounting Quotium's alleged "fraud on the court."  *See* CI Compl. ¶¶ 19-34, 94-98.

The legal theories asserted in both pleadings are also virtually identical.  As shown in the comparison attached hereto as Exhibit 4, Counts I-IV and VI-VIII are identical to the legal theories in the Counterclaims, in addition to being based on virtually identical allegations.  *See* Ex. 4.  The only exceptions are Count V (the "Invalidity Count") for declaration of invalidity of Quotium's registration of Cyrano® and Count IX ("Fraud Count") for "fraud on court."  *Id*.

Not surprisingly, the relief sought in the two pleadings is also virtually identical. This too is clearly an example of straight copying and pasting from the Counterclaims, as illustrated in the comparison attached at Exhibit 5 hereto.  In fact, the language of the Counterclaims is so mechanically copied here that CI refers by rote to the Quotium defendants as the "defendants-in-counterclaim" at prayers 3(a), (f) and 6 of the Complaint, just as in the same passages of the Counterclaims.  *See* CI Compl. at 20, 21, 22 ¶¶ 3(a), 3(f), 6; Ex. 2 at 30, 32, 33 ¶¶ 3(a), 3(f), 6.

Simply put, CI has merely repackaged its Counterclaims from the Quotium Action in CI's Complaint in this action.

### B.    Having Been Dismissed With Prejudice In The Quotium Action, The Counterclaim-Based Counts Are Barred Here

On January 27, 2005, Quotium moved for dismissal of the Counterclaims under Fed. R. Civ. P. 41(b).[3]  *See* Paper #107.  As grounds for the motion, Quotium argued that CI, which had remained incommunicado and without counsel since February 2004, had failed to comply with a series of court orders and had done nothing to prosecute or defend

---

[3] These provisions are made applicable to counterclaims by Fed. R. Civ. P. 41(c).

in the Quotium Action for over a year. *See* Paper #107. On February 24, 2005, Judge Tauro granted the motion and dismissed the Counterclaims with prejudice. *See* 2/24/05 Electronic Order. In addition -- finding that CI deliberately ignored the Quotium Action, including its Counterclaims, and chose instead to litigate against Quotium in France -- Judge Tauro also denied CI's subsequent request to reopen the case. *See* Ex. 9, Paper #144 (6/8/05 J. Tauro Mem.) and Paper #145.

Having once had its Counterclaims dismissed with prejudice in this judicial district, CI cannot now refile the same claims in the same court.[4] *See Semtek International Inc. v. Lockheed Martin Corp.*, 531 U.S. 497, 506 (2001) (Rule 41(b) dismissal with prejudice barred refiling same claim in court in same judicial district). For this reason alone, the Counterclaim-based Counts are barred here and should therefore be dismissed.

## II.    The Counterclaim-Based Counts Should Also Be Dismissed On Grounds Of Claim-Splitting

An independent ground for dismissing the Counts I-IV and VI-VIII is that they are compulsory counterclaims and belong in the Quotium Action. CI, having lost them in that action, has lost them entirely. CI should not be permitted to engage in claim-splitting, least of all with claims previously dismissed with prejudice in this judicial district.

### A.    Claim-Splitting Is Grounds For Dismissal

Even in the absence of final judgment, a party generally may not split claims. *See CIVIX-DDI v. Expedia, Inc*., No. 04-C-8031, 2005 WL 1126906, at *4-5 (N.D. Ill. May 2, 2005) (attached hereto at Ex. 7); *Oxbow Energy, Inc. v. Koch Indus., Inc.*, 686 F. Supp.

---

[4] Since Judge Tauro did not specify otherwise, the dismissal is deemed to be with prejudice, pursuant to Rule 41(b).

278, 282 (D. Kansas 1988). *See also* 18 Wright and Miller, *Fed. Pract. & Proc.* § 4406 (Suppl. 2005) ("In dealing with simultaneous actions on related theories, courts at times express principles of 'claim splitting' that are similar to claim preclusion, but that do not require a prior judgment."). As one court of appeals has observed, "It is clear that a motion to dismiss based on improper claim-splitting need not—indeed, often cannot— wait until the first suit reaches final judgment. . . . Thus, in the claim-splitting context, the appropriate inquiry is whether, *assuming that the first suit were already final*, the second suit could be precluded pursuant to claim preclusion." *See Hartsel Springs Ranch Of Colorado, Inc. v. Bluegreen Corporation*, 296 F.3d 982, 987 n. 1 (10th Cir. 2002) (emphasis added).

Because of the similarities between *res judicata* and claim-splitting, the policy considerations behind them are largely the same. The Supreme Court has observed of *res judicata*:

> This Court has long recognized that public policy dictates that there be an end of litigation; that those who have contested an issue shall be bound by the result of the contest, and that matters once tried shall be considered forever settled as between the parties.

*Federated Department Stores, Inc. v. Moitie*, 452 U.S. 394, 401 (1981) (citation and quotations omitted). *See also Apparel Art International, Inc. v. Amertex Enterprises Ltd.*, 48 F.3d 576, 583 (1st Cir. 1995) (policy of *res judicata* to "relieve parties of cost and vexation of multiple law suits, conserve judicial resources, and, by preventing inconsistent decisions, encourage reliance on adjudication"). Similar concerns underpin the doctrine of claim-splitting. As the Seventh Circuit explained,

> The irrationality of tolerating duplicative litigation in the federal system is all the more pronounced where, as here, two federal judges sitting on the same district court are . . . devoting scarce judicial resources to the

adjudication of the same charges by essentially the same plaintiffs against the same defendants.

*Serlin v. Arthur Andersen & Company*, 3 F.3d 221, 224 (7th Cir. 1993), quoting *Ridge Gold Standard Liquors v. Joseph E. Seagram*, 572 F. Supp. 1210, 1213 (N.D. Ill.1983).

*See also Sutcliffe Storage & Warehouse Co.*, 162 F.2d 849, 851 (1st Cir. 1947) (prior pending action in same federal court ground for abatement of second action; "There is no reason why a court should be bothered or a litigant harassed with duplicating lawsuits on the same docket; it is enough if one complete adjudication of the controversy be had.").

Thus, claim-splitting is grounds for dismissal. *See, e.g., CIVIX-DDI*, 2005 WL 1126906, at *3-5 (in non-final context, dismissing duplicative claims on grounds that they were compulsory counterclaims belonging in earlier pending action and that plaintiff was claim splitting).

> **B.    CI Is Claim-Splitting Because Counts I-IV and VI-VIII
> Arise From Same Cause Of Action As CI's Counterclaims**

The First Circuit applies a transactional test in order to determine whether causes of action are the same:

> Under this approach, a cause of action is defined as a set of facts which can be characterized as a single transaction or a series of related transactions. The cause of action, therefore, is a transaction that is identified by a common nucleus of operative facts. Although a set of facts may give rise to multiple counts based on different legal theories, if the facts form a common nucleus that is identifiable as a transaction or series of related transactions, then those facts represent one cause of action…. Only if the actions' factual bases are the same will Apparel's claims be barred by res judicata.

*Apparel Art*, 48 F.3d at 583-584. The main factors to be considered are "1) whether the facts are related in time, space, origin or motivation; 2) whether the facts form a convenient trial unit; and 3) whether treating the facts as a unit conforms to the parties'

expectations." *Id*. at 584. In addition, "it is often helpful to consider the nature of the injury for which the litigant seeks to recover." *Id.*

Application of these factors here shows that Counts I-IV and VI-VIII arise from the same cause of action as CI's Counterclaims. In each case, the allegations relate to facts identical in time and space, *i.e*., the same story about the related Cyrano entities, the bankruptcy of CSA and sale of its assets to Quotium; and in each case, the rights to the same software programs (Test, Impact, Workbench, Production, and OpenSTA) are put at issue as a result of these and subsequent events. *See* Exs. 3-5. In weighing whether the facts form a convenient unit for trial, the Court should look with an eye toward conserving judicial resources and to the witnesses and proofs necessary for trial of the claims. *See Iannochino v. Rodolakis (In re Iannochino)*, 242 F.3d 36, 47 (1st Cir. 2001). Here again, the facts alleged involve the same entitles, same property, same events, and a dispute over the same rights. *See* Exs. 3-5. There could hardly be a more convenient unit for trial.

In order to judge the parties' expectations as a factor, the Court looks to the parties' knowledge at the time of the first suit. *See Iannochino*, 242 F.3d at 48. For the same reasons already given, it was obviously CI's expectation that the facts it alleged here would be treated as a unit with the Counterclaims since they are virtually identical to the allegations pled for the Counterclaims, as shown by the cut-and-paste job illustrated in Exhibit 3. Finally, the nearly identical word-for-word description of the relief sought by CI in each case also underscores the duplicativeness of the underlying causes of action in CI's Complaint and the Counterclaims. *See Apparel Art*, 48 F.3d at 584; Ex. 5.

14

In sum, Counts I-IV and VI-VIII clearly spring from the same cause of action as the Counterclaims. They should, therefore, be barred on grounds of claim-splitting.

**III.    After Waiving Its Claims And Defenses With Respect To The French Judgments Due To Its Willful Default In the Quotium Action, CI Cannot Now Try To Enforce Them Here**

As a fig leaf for filing this improper action asserting claims already dismissed with prejudice in an earlier action, CI purports merely to be enforcing the French Judgments in a manner supposedly blessed by Judge Tauro in his June 8th Memorandum. *See* CI Compl. at 1 (prefatory statements) and ¶ 34. In fact, Judge Tauro said nothing that would authorize CI to attempt to enforce the French Judgments either in themselves or as a vehicle for pursuing dismissed Counterclaims. Based on the circumstances of this case, including CI's waiver of its claims and defenses due to its willful default in the Quotium Action, this Court should find that the French Judgments cannot be enforced in this action.

**A.    Judge Tauro Never Reached The Issue Of Whether The French Judgments Could Be Enforced In A Later Action**

In its Complaint, CI mischaracterizes what Judge Tauro said about enforcement of the French Judgments. *See* CI Compl. at 1 and ¶ 34. Having himself refused to allow CI to tardily raise them as a *res judicata* defense in the Quotium Action, Judge Tauro specifically stated that he was *not* reaching the issue of whether they could be enforced in a later action:

> Yet, as the French proceedings and rulings were not considered by this court when deciding Plaintiffs' motion for default judgment, this court's judgment *does not reach the issue of whether Defendant may enforce its French judgments **after this litigation is ended***.

Ex. 9, Paper #144 at 14 (6/8/05 J. Tauro Mem.) (emphasis added). [5]  That is also the sum

total of what Judge Tauro says about bringing a new action based on the dismissed

Counterclaims, *i.e.*, nothing.

Judge Tauro's following sentence does not support CI's right to maintain this

action, either.  There he says no more than that "*if*" a later tribunal, which "decides to"

enforce the French Judgments, determines CI's rights in a manner that contradicts Judge

Tauro's February injunction, then the terms of the February injunction would yield.  *See*

Ex. 9, Paper #144 at 11 (emphasis added).  Again, Judge Tauro offered no opinion as to

whether CI should or could bring an enforcement action, and he said nothing about a

hypothetical future decision altering his dismissal with prejudice of CI's counterclaims.

Despite CI's pinning its hopes on this second sentence, Judge Tauro's

hypothetical statement simply reflects the general law of judgments, *i.e.*, of two

inconsistent judgments, the later-entered controls the disposition of common claims and

issues.  *See* 18 Wright and Miller, *Federal Practice & Procedure* § 4404 (2nd ed. 1973)

("If a second action is pursued to entry of a final judgment inconsistent with a prior

judgment, the second judgment ordinarily prevails whether the res judicata effects of the

first judgment were ignored by the parties or expressly rejected by the court in the second

action."); 18 Moore's Federal Practice § 131.31[3] (3d ed. 2002) ("the rule is that

preclusive effect is given to the *last* judgment entered") (emphasis in original).

Of course, this general principle means that when a final judgment enters in the

Quotium Action (as it will very soon), that judgment will trump the earlier French

---

[5] Not only does Judge Tauro *not* say that CI may bring an enforcement action, but even in declining to
address the issue he speaks only of an action brought "after this litigation is ended."  *See* Paper #144 at 14.
CI thus misreads every part of Judge Tauro's statement.  CI has no right to bring this action, and if it did,
the action it brought is premature.

Judgments if there are any inconsistencies. CI could have, perhaps, avoided that result if it had timely asserted the French Judgments as a *res judicata* defense in the Quotium Action, but it did not do so. In addition, a final judgment in the Quotium Action can, and will, be raised by Quotium as a *res judicata* defense in any future enforcement action CI may try to bring, *including this one*. *See* RESTATEMENT (SECOND) OF JUDGMENTS § 15 (1982) ("When in two actions inconsistent final judgments are rendered, it is the later, not the earlier, judgment that is accorded conclusive effect in a third action under the rules of res judicata.").

In short, Judge Tauro did not authorize enforcement of the French Judgments in a later action such as this one, did not 'subordinate' his dismissal with prejudice of the Counterclaims to any later judgment, and did not make any exception to the general law of judgments for CI's benefit. Thus, nothing in his June 8th Memorandum empowers CI to attempt to use the French Judgments to relitigate its already dismissed Counterclaims.

**B.    The Court Should Find That CI Cannot
        <u>Enforce The French Judgments In This Action</u>**

This Court should not permit CI to use the French Judgments as a pretext to litigate its Counterclaims again as if nothing had happened in the Quotium Action. For the over seventeen months after the first French Judgment and eleven months after the second French Judgment were issued, CI did nothing with them in the Quotium Action. As a result of that deliberate choice, CI forfeited any right to assert the French Judgments as a *res judicata* defense there. *See* Ex. 9, Paper #144 at 9-10 (6/8/05 J. Tauro Mem.). This Court should find that CI also lost any right to pursue enforcement of the French Judgments here, and should not give CI a second, unmerited bite at the apple. (Actually,

17

since CI is attempting to raise the issue in the First Circuit, this would be a *third* bite of the apple.).

Although CI alleges that Judge Tauro was informed of the foreign judgments too late to "consider[] the effect" they would have on the dispute in the Quotium Action, *see* CI Compl. ¶ 34, CI's contention is belied by the record in that case.  In trying to salvage its case after default judgment entered, CI vigorously advanced the position that the French Judgments "cover[ed] all the rights at issue in [the Quotium Action]" (paper #114 at 3) and that "The French Judgments Should Be Recognized To Bar Quotium's Claims" (paper #127 at 6).  Thus, CI made its best arguments to Judge Tauro that the French Judgments provided a basis for removing the default judgment and for reinstating the Counterclaims.  *See* Paper #127 at 5-8.

Having considered CI's arguments, Judge Tauro concluded that CI's failure to timely come forward to assert the French Judgments was fatal to its use of them as a *res judicata* defense.  *See* Ex. 9, Paper #144 at 9-10 (6/8/05 J. Tauo Mem.).  Although the French Judgments were issued in *September 2003* and *March 2004*, CI did not bother to bring them to Judge Tauro's attention until after default judgment had entered in *February 2005*.  In his Memorandum, Judge Tauro found that CI's default was the result of willful neglect of the Quotium Action, and he placed the responsibility squarely on CI for failing to timely inform him of the defense supposedly afforded by the French Judgments.  *See* Ex. 9, Paper #144 at 9, 11 (6/8/05 J. Tauro Mem.).  Significantly, he repeated this finding when denying CI motion to reconsider dismissal of the Counterclaims, the same claims CI brings in this action.  *Id.* at 12-13.  In light of CI's excessive delay, Judge Tauro was acting well within his discretion in declining to provide

any relief to CI on the basis of the foreign judgments.  *See, e.g., Explosives Corp. of America v. Garlam Enterprises Corp.*, 817 F.2d 894, 900-901 (1st Cir. 1987) (laches applies to bar *res judicata* defense when plaintiff did not inform federal district court until November 24, 1982 of preclusive state court decision dated June 6, 1982).

Thus, it was not, as CI claims, that Judge Tauro was "kept from considering the effect of the French judgments" by Quotium's supposed machinations, *see* CI Compl. ¶ 34, but rather that he *chose* not to consider it because of CI's own deliberate neglect of its responsibilities in the Quotium Action for nearly a year, including its failure to assert its own affirmative defenses.  *See* Ex. 9, Paper #144 at 11 (6/8/05 J. Tauro Mem.).

Consistent with the principles of the conservation of judicial resources and fairness to Quotium as the other litigant, this Court should find that CI may not now use the *res judicata* defense it lost in the Quotium Action to reopen the litigation of the Counterclaims it lost in that action.  As one treatise expresses it, "there is good reason for the traditional rule that res judicata is an affirmative defense that must be raised or lost. A party who has inadvertently failed to afford the courts an opportunity to avoid embarrassment and repetitive work may fairly be precluded from demanding that they offer one more entry into the lists."  18 Wright and Miller, *Fed. Prac. & Proc*. § 4404, *citing cases*.  *See also Robi v. Five Platters, Inc*., 838 F.2d 318, 322-323 (9th Cir. 1988) ("When two inconsistent judgments exist, it is tempting for a court to reexamine the merits of the litigants' dispute and choose the result it likes best.  There are important reasons to avoid this temptation. First, if one party could have raised *res judicata,* but did not, that litigant must bear the cost of its tactic or inadvertence.")  Here these principles are particularly applicable since Judge Tauro found not inadvertence, but *willful neglect*,

on CI's part in failing to assert its defense.  *See* Ex. 9, Paper #144 at 9 (6/8/05 J. Tauro Mem.).

Contrary to the pretext put forward in the first page of CI's Complaint, Judge Tauro never granted CI any right to bring in through the back door claims he ushered out the front door.  CI should not be allowed to circumvent the dismissal *with prejudice* of its Counterclaims by commencing a new action.[6]  The Quotium Action is very close to final judgment.  As demonstrated above, once final judgment enters in that action, it will control all of the common issues, if any, in preference to the French Judgments and can be raised as *res judicata* in an enforcement action such as this one purports in part to be.  The present supposed enforcement action is therefore futile, in addition to its other notable deficiencies.  The French Judgments should not be enforced here.

## IV.    As With The French Judgments, This Court Should Dismiss Count V Because The Count V Allegations Have Already Been Rejected By Judge Tauro

For essentially the same reasons articulated in § III.B, *supra*, this Court should dismiss Count V.  As with the French Judgments, Count V of the complaint merely retreads allegations that CI unsuccessfully raised in front of Judge Tauro.  As stated above, *see supra* at 5, on February 23, 2005 Judge Tauro entered judgment finding CI liable for all counts of the complaint in the Quotium Action, including trademark infringement of the Cyrano® mark.  *See* Paper #111.  Amongst the flurry of motions filed by CI after the order of liability had entered was an "Emergency Motion for Leave to File Supplemental Trade Mark Documents" (Paper #135), submitted on the eve of an April 13, 2005 hearing held to adjudicate CI's request to reopen the Quotium Action.  *See*

---

[6] For cases in which courts have recognized that parties improperly seek to circumvent adverse rulings by filing second actions, see *Moitie*, 452 U.S. at 398; *CIVIX*, 2005 WL 1126906, at *4; *Oxbow*, 686 F. Supp. at 280; *Sensormatic Security Corp. v. Sensormatic Elec. Corp*, 329 F. Supp. 2d 574, 579 (D. Md. 2004).

*supra at 6*; Paper #135.  In that late submission, CI argued that Quotium had failed to "file an affidavit of use of the mark" by January 28, 2005 as required by the Patent and Trademark Office, and asked that Quotium not be permitted to pursue its trademark based allegations.  *See* Paper #135 at 1-2.  This post-default judgment emergency motion was submitted on April 12, 2005, two and half months *after* the information that was the subject of the "emergency" was available.  Consistent with CI's pattern of neglect, at no point during this time did CI ever raise its allegation regarding the trademark registration with Judge Tauro, despite the fact that over the same period CI had made no fewer than a dozen separate submissions to the court.  *See* Papers ##113-115, 118-123, 127, 131, 133-134.

As with the French Judgments, Judge Tauro considered and then rejected CI's untimely argument, stating, "Defendant had ample time to inform this court of Plaintiff's alleged omission prior to entry of the default judgment.  Instead, Defendant chose not to act.  And this court will not remove the default judgment based on Defendant's after the fact submissions."  *See* Ex. 9, Paper #144 at 13 (6/8/05 J. Tauro Mem.).

The claim contained in Count V of the Complaint simply duplicates the defense rejected by Judge Tauro.  Under principles of preclusion, CI cannot now attempt to couch a defense that should have been timely raised in the underlying litigation as a fresh claim in this forum.  *See Puerto Rico Maritime Shipping Authority v. Federal Maritime Com'n.*, 75 F.3d 63, 67 (1st Cir. 1996) (*relying on* RESTATEMENT (SECOND) OF JUDGMENTS § 22(2)(b), cmt. b & f, illus. 2, 3, 9 (1982)) ("A defendant is barred from relitigating a defense which was available in a prior action by making it the basis of a claim that would nullify the initial judgment or would impair rights established in the

initial action.  A defendant's failure to raise such a defense precludes the defendant from

seeking restitution of the amount that may have been awarded to the plaintiff in the first

action.") (quotations and citation omitted); *Tonka Corp. v. Rose Art Industries, Inc.*, 836

F.Supp. 200, 212 (D.N.J. 1993) ("A potential defense which was either raised in a prior

proceeding, or should have been, is waived under claim preclusion principles."); *Apparel*

*Art*, 48 F.3d at 583 (final judgment on merits precludes party relitigating claims raised or

that could have been raised in that action).

     Thus, Count V of CI's complaint should be dismissed.

**V.**    **Count IX For Fraud On The Court Fails To State A Claim And Is Frivolous**

     CI's allegations of fraud on the court, *see* CI Compl. ¶¶19-34, 94-98, underscore

the desperate lengths to which CI will go in order to get itself out of the hole it has dug

for itself.[7]

       **A.**    **Fraud On The Court Is Not An**
               **Independent Cause Of Action For Damages**

     Two avenues are open to CI to pursue its fraud on the court theory.  It can either

make a Rule 60(b)(3) motion or commence "an independent action . . . to set aside a

judgment for fraud upon the court."  *See* Fed. R. Civ. P. 60(b).  Having failed in the

former endeavor with Judge Tauro, CI now has chosen to travel up the dead-end street of

seeking money damages for a non-existent tort.

     A tort claim for damages based on "fraud on the court" does not exist in

Massachusetts law.  *See Davidson v. Cao*, 211 F. Supp. 2d 264, 276 (D. Mass. 2002).

Neither does it exist in the federal law of the First Circuit, or for that matter in any other

---

[7] CI's accusation that Quotium committed "fraud" in not informing the trial court that CI had a supposed complete defense in the form of the French Judgments rings hollow in light of CI's own failure to disclose to this Court the earlier dismissal with prejudice of Counts I-IV and VI-VIII.

federal circuit.  *See Chewning v. Ford Motor Co.,* 35 F.Supp.2d 487, 491 (D.S.C. 1998)

("None of the three cases suggest the existence of an independent action for damages.

Plaintiff has pointed to no cases that suggest otherwise."); *Florida Evergreen Foliage v.*

*E.I. Dupont De Nemours and Co.*, 336 F.Supp.2d 1239, 1271 (S.D. Fla. 2004) ("Just as in

the *Chewning* case, Plaintiffs [] did not provide me with any authorities that suggest an

independent action for damages in a separate court exists under Rule 60(b), particularly

based on fraud on the court.").

In the present case, the most CI may do, therefore, is bring "an independent action

. . . to set aside a judgment for fraud upon the court."  Fed. R. Civ. P. 60(b).  This is not

what CI purports to do, however.  Nowhere in its Complaint does CI ask the Court to set

aside any judgment.  Instead, the sole relief that CI seeks consists of money damages.

*See* CI Compl. ¶ 98 and at 22 (prayer for relief number 4).  Such relief is not provided for

under the savings clause of Rule 60(b), and has no basis in the law of the First Circuit.

CI has failed to state a claim under the Fraud Count, and the Count should therefore be

dismissed.

> **B.    This Court Should Defer To Judge Tauro's**
> **Decision On CI's Fraud And Non-Disclosure**
> **Arguments Because Final Judgment Is About to Enter**

Undisclosed to this Court by CI is the fact that CI made its allegations of fraud

and non-disclosure in motions to Judge Tauro when seeking to remove the default

judgment and elsewhere.[8]  *See* Paper #127 at 1, 8-9; #135 at 2.  *See Chewning,* 35

F.Supp.2d at 491 (quoting *Weisman v. Charles E. Smith Management, Inc.,* 829 F.2d 511,

513 (4th Cir. 1987) ("[T]he proper forum in which to assert that a party has perpetrated a

---

[8] CI also raised them to the First Circuit in its renewed emergency motion for stay pending appeal.  The
First Circuit denied the motion.

'fraud on the court' is the court which allegedly was a victim of that fraud.").  As with

CI's allegations regarding the registration of the Cyrano trademark, Judge Tauro was

unpersuaded by CI's arguments and declined to grant it any relief.  *See* Ex. 9, Paper #144

at 10-11, 13 (6/8/05 J. Tauro Mem.).  In light of the final judgment that will soon enter in

the Quotium Action, this Court should defer to Judge Tauro's decision inasmuch as it

will have legally preclusive effect once final judgment enters.  *See also Geo. P. Reintjes*

*Co., Inc. v. Riley Stoker Corp.*, 71 F.3d 44, 49 (1st Cir. 1995) (*citing* Moore, 7 *Federal*

*Practice,* ¶ 60.37) ("Rule 60(b) does not license a party to relitigate, whether via motion

*or independent action*, any 'issues that were made or open to litigation in the former

action where he had a fair opportunity to make his claim or defense'") (emphasis added).

### C.    CI's Allegations Are Frivolous

Based on the allegations CI makes, its claim fails as a matter of law because CI

cannot remotely satisfy the difficult standard for finding fraud on the court.  This

standard has been set forth as follows:

> A 'fraud on the court' occurs where it can be demonstrated, clearly and
> convincingly, that a party has sentiently set in motion some
> unconscionable scheme calculated to interfere with the judicial system's
> ability impartially to adjudicate a matter by improperly influencing the
> trier or unfairly hampering the presentation of the opposing party's claim
> or defense.

*Aoude v. Mobil Oil Corporation,* 892 F.2d 1115, 1118 (1st Cir.1989) (citations omitted).

The conduct complained of does not even remotely approach the standard as

stated in *Aoude*.  Besides the allegations already dealt with by Judge Tauro, the only

other allegations are that a certificate of service was inaccurate, that counsel for Quotium

mischaracterized a statement in a telephone conversation by CI's counsel, and that a

certificate of conferral was inaccurate.  *See* CI Compl. at ¶ 97a-c.  Cyrano alleges three

minor issues from three years worth of court filings and packages them as fraud on the

court. Clearly, this falls woefully short of an "unconscionable scheme."[9]

Moreover, in rejecting CI's argument under Fed. R. Civ. P. 60(b)(3), Judge Tauro

put his finger on the fatal weakness in CI's claims:

> As stated above, Defendant was capable of presenting its case, but made
> the tactical decision to litigate in France and ignore this action. Moreover,
> nothing prevented Defendant from exposing Plaintiffs' alleged fraud by
> informing this court of the French proceedings and rulings. Instead,
> Defendant chose to neglect this case for nearly a year.

Ex. 9, Paper #144 at 11 (6/8/05 J. Tauro Mem.); *see also id.* at 9, 13. Judge Tauro's

reasoning accurately reflects the law of this circuit as set forth in the Rule 60(b)(3)

context. Quotium concealed nothing from CI, which, of course, was a party to the French

law suits. *See Karak v. Bursaw Oil Corp.*, 288 F.3d 15, 21-22 (1st Cir. 2002) (no fraud

where Rule 60(b)(3) movant knew and/or with reasonable diligence could have

discovered information). Like the situation described in *Karak*, CI was at all times

clearly "capable of fully and fairly preparing and presenting its case," as Judge Tauro

found, and was not "hampered by anything except [its] own reluctance to undertake an

assiduous [prosecution]" of its case, as Judge Tauro also found. *Id. See also Diaz v.*

*Methodist Hospital*, 46 F.3d 492, 497 (5th Cir. 1995) (no Rule 60(b)(3) fraud where

movant had independent access to information and was not "foreclosed" from presenting

case fully and fairly), *cited in Karak*, 288 F.3d at 22.

In addition, CI has no grounds to maintain a claim for money damages against

Quotium because Quotium "falsely," *see* CI Compl. ¶ 95, told the court in papers its

opinion of the effect of the judgment that actually issued in the Distributor Agreement

---

[9] In addition to the legal insufficiency of CI's "claim" as found by Judge Tauro, Quotium also disputes the
factual assertions underlying the "claim."

suit. *See Karak*, 288 F.3d at 21 (no fraud when parties have different view of evidence). *See also Sriberg v. Raymond*, 544 F.2d 15, 16 (1st Cir.1976) ("The public interest in the untrammeled flow of communication in connection with judicial proceedings requires freedom from inquiry into the propriety of, as well as ***freedom from civil liability*** for, such utterances.") (emphasis added).

Last June, Judge Tauro rejected CI's fraud theory when it was cloaked as a Rule 60(b)(3) motion. This Court should not now permit itself to be used by CI as a court of appeal from the decision of another district court judge (not least of all because CI is currently also attempting to take its fraud theory up to the First Circuit Court of Appeals).[10]

## VI.    Alternatively, The Court Should Stay Action Pending Outcome Of The Appeal

This Court has the general power to stay an action. "[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Landis v. North American Co.*, 299 U.S. 248, 254 (1936). *See also Walton v. Eaton Corp.,* 563 F.2d 66, 69 (3rd Cir. 1977) (court may dismiss or stay second of two nearly identical actions); *Adam v. Jacobs*, 950 F.2d 89, 92 (2nd Cir. 1991) (where two competing lawsuits exist, first should have priority, absent showing of balance of convenience or special circumstances, and court may dismiss or stay second action).

A stay is especially appropriate here, where further litigation between the parties may soon be made redundant by the First Circuit's decision on CI's interlocutory appeal. If, for example, the First Circuit were to restore CI's Counterclaims and remove the

---

[10] *See* Defendant-Appellant's Statement of the Issues for Review and Designation of the Contents of the Appendix at 2, issue E, attached hereto at Exhibit 8.

default judgment against it, even CI would then have to admit that all or most of this action would be unnecessary. Similarly, if the First Circuit addresses the issue of Judge Tauro's refusal to consider the French Judgments (Issue E, in CI's Statement of the Issues for Review), what it says may well determine the fate of CI's attempt to enforce those judgments in this action.

Thus, if the Court decides that not all of the claims here are subject to dismissal, it should dismiss the untenable ones and stay action what remains claims until a final disposition of the Quotium Action is reached. Even if the Court decides not to dismiss any of the claims, it would still be prudent to stay the action until a resolution of the Quotium Action, for the reasons given here.

## CONCLUSION

For the reasons set forth above, the Court should grant Quotium's motion and dismiss the Complaint. Alternatively, the Court should stay the action until the final disposition of the Quotium Action.

DATED: September 23, 2005       Respectfully submitted,

  /s/ John Pagliaro       
Kevin J. O'Connor (BBO# 555250)
Mayeti Gametchu (BBO# 647787)
John Pagliaro (BBO# 634483)
James W. Bell (BBO# 658123)
PARAGON LAW GROUP, LLP
184 High Street
Boston, MA 02110
Tel. (617) 399-7950

Counsel For Defendants

QUOTIUM TECHNOLOGIES, INC.,
TECHNOLOGIES, S.A. and
QUOTIUM TECHNOLOGIES, S.A.

27

**<u>Certificate of Service</u>**

I, Mayeti Gametchu, hereby certify that on September 23, 2005, I served a copy of the foregoing motion by overnight mail to be delivered next business day, post pre-paid, on counsel of record for Cyrano, Inc., Stephen Y. Chow and Michael Sugrue, Perkins, Smith & Cohen, 1 Beacon St., 30th Floor, Boston, MA 02108-3106.

   /s/ Mayeti Gametchu
Mayeti Gametchu

0004-003-102146.doc

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

2002 JUL 12 P 4:06

|  |  |
|---|---|
| TECHNOLOGIES, S.A. and QUOTIUM TECHNOLOGIES, S.A., | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| CYRANO, INC., | ) ) |
| Defendant. | ) ) ) |

RECEIPT # 4041
AMOUNT $ 150 0
SUMMONS ISSUED 4/0
LOCAL RULE 4.1
CIVIL ACTION NO. WAIVER FORM
MCF ISSUED
BY DPTY. CLK. SFS
JURY TRIAL DATE 9/12/02
DEMANDED

## 02 CV 11416 JLT

### COMPLAINT

Plaintiffs Technologies, S.A. ("Technologies") and Quotium Technologies, S.A. ("Quotium"), by and through their undersigned attorneys, allege upon personal knowledge with respect to their own acts and understandings and upon information and belief as to all other matters, as follows:

### NATURE OF THE ACTION

1.      Plaintiffs bring this action against Defendant for, among other claims, copyright infringement, trademark infringement, trademark dilution, cyberpiracy, unfair competition, false advertising, unjust enrichment, intentional interference with contractual relations, and unfair and deceptive trade practices in violation of Mass. Gen. Laws ch. 93A, § 11.

2.      As described more fully below, for the last two months, Defendant has engaged in a deliberate and unrelenting assault upon Plaintiffs' intellectual property rights and competitive position. Defendant's ongoing violations of Plaintiffs' intellectual property rights include, *inter alia*, (a) unauthorized marketing, reproduction, and sale of computer software programs and

related materials owned by Quotium that are protected under federal copyright law (the "Software"), and (b) unauthorized use of the federally registered Cyrano® trademark -- which is also owned by Quotium.

3.    Furthermore, acting at all relevant times under the Cyrano® name without authorization, Defendant has knowingly and repeatedly misrepresented to actual and prospective purchasers of the Software that it owns a valid copyright for, and/or is an authorized distributor of, the Software.

4.    Through these and other unlawful acts, Defendant has inflicted substantial economic injury and irreparable harm upon Plaintiffs. Quotium and its parent, Technologies, have been unlawfully deprived of profits related to the licensing of the Software and the sale of related goods and services; the goodwill associated with the Cyrano® trademark has been substantially devalued; and Plaintiffs have suffered damage to their business reputations. Defendant has also inflicted irreparable harm in the form of, *inter alia*, deprivation of Quotium's right to exclusive control over the use of its intellectual property, and the creation of market confusion regarding the origin, affiliation, sponsorship, and approval of the Software.

5.    Despite due demand by Plaintiffs, Defendant has failed and refused to cease its unlawful conduct. Due to the purposeful and continuing nature of Defendant's misconduct -- and the irreparable harm that continues to mount as a result thereof -- Plaintiffs respectfully request, among other relief, that this Court issue a preliminary injunction relief barring Defendant from further infringement of Plaintiffs' intellectual property rights, as well as permanent injunctive relief, damages in an amount to be determined at trial, and other relief specified below.

## PARTIES

6.    Plaintiff Technologies is a French corporation with its principal office at 84-88 Boulevard de la Mission Marchand in Courbevoie, France.  Technologies is essentially a holding company that produces and distributes commercial software through a group of wholly-owned subsidiaries.  The company was founded in 1983 by Michel Tiberini -- who remains the company's President.

7.    Plaintiff Quotium is wholly-owned subsidiary of Technologies.  Like Technologies, Quotium is a French corporation with its principal office at 84-88, Boulevard de la Mission Marchand in Courbevoie, France.   Technologies formed Quotium in January 2002 to pursue opportunities in the growing international market for software that enables users to test, monitor, and optimize their data processing and management solutions.  Mr. Tiberini is also the President of Quotium.

8.    Defendant Cyrano, Inc. is a corporation formed under the laws of the state of Delaware with its principal office at 26 Parker Street, Newburyport, Massachusetts.

## JURISDICTION AND VENUE

9.    This Court has subject matter jurisdiction because this is an action arising under the Copyright Act, 17 U.S.C. § 101 et seq., jurisdiction being conferred in accordance with 28 U.S.C. § 1338(a), and under the Lanham Act, 15 U.S.C. §§ 1051-1127, jurisdiction being conferred in accordance with 15 U.S.C. § 1121 and 28 U.S.C. § 1338(a).  This Court has supplemental jurisdiction over the related state law claims pursuant to 28 U.S.C. §§ 1338(b) and 1367.

10.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391.

## FACTS COMMON TO ALL COUNTS

**Plaintiffs' Investment In The**
**Intellectual Property Rights At Issue**

11.     The intellectual property rights at issue in this action were all previously owned by Defendant's former parent company, Cyrano, S.A.  On June 11, 2001, the Commercial Court of Paris (the "Commercial Court") declared a bankruptcy proceeding against Cyrano, S.A.  On October 15, 2001, the Commercial Court ordered the liquidation of Cyrano, S.A. (the "Liquidation") and appointed the firm SCP Brouard-Duade as trustee of the liquidation (the "Trustee").

12.     On November 10, 2001, the Trustee invited bids on certain tangible and intangible assets of Cyrano, S.A.

13.     On November 15, 2001, Plaintiff Technologies submitted to the Trustee an offer to purchase certain of those assets, including, *inter alia*, the intellectual property rights at issue in this action.

14.     On March 13, 2002, the Commercial Court ordered the sale of Cyrano, S.A.'s tangible and intangible assets to Technologies (the "March 13 Judgment").

15.     In accordance with French liquidation procedure, on May 16, 2002, Technologies, Quotium, and the Trustee entered into a Contract of Transfer of Business Components (the "Transfer Contract").  Pursuant to the Transfer Contract, Quotium was granted "all intellectual property rights belonging to [Cyrano, S.A.]" in the following software products and all materials related hereto:  DBPack, ClientPack, ServerPack, and VT Pack (together, as limited by the following sentence, the "Software").  Two modules of ClientPack software suite (Robot and

Manager), and one module of the ServerPack suite (Loadtest) did not belong to Cyrano, S.A., and were not transferred to Quotium.[1]

16.     The entire contents of the Software are copyrightable subject matter protected under the laws of France, and fully protected as copyrighted matter under the laws of the United States pursuant to the Convention of the Protection of Literary and Artistic Works -- a/k/a the "Berne Convention" -- to which France and the United States are parties, 17 U.S.C. § 104.

17.     During the negotiation of the Transfer Contract, Defendant submitted a claim of ownership to the Trustee as to the Test and Impact software modules (the "Contested Software"), which are modules in the ServerPack and VT Pack software suites, respectively. In response to Defendant's claim, the Trustee advised the parties that all rights, materials, and documentation held by Cyrano S.A. relating to the Contested Software would be held in escrow for thirty (30) days, during which time Defendant was to prove its ownership of the Contested Software. Accordingly, the Contested Software was not transferred to Quotium under the Transfer Agreement. (Plaintiffs are not aware of any determination to date by the Trustee regarding the rightful ownership of the Contested Software.)

18.     At no time during the Liquidation proceedings or the negotiation of the Transfer Contract has Defendant claimed to own any rights relating to the use or ownership of the Software.

19.     The Transfer Contract also granted to Quotium "all artistic, intellectual or industrial property rights which may exist" in certain trademarks owned by Cyrano, S.A. (the

---

[1] Quotium was also granted all intellectual property rights owned by Cyrano, S.A. in version 0.9.1 of a software program called OpenSTA. Plaintiffs understand and believe at this time that version 0.9.1 may have been offered to the public for use pursuant to an open source license agreement. Plaintiffs continue to investigate the scope of Quotium's rights in connection with this software program and reserve all rights related thereto.

"Trademarks"), including, among other rights, the federally registered trademark in the name "Cyrano," U.S. Registration Number 2,175,949. The Cyrano® trademark is valid and subsisting, and Quotium owns all, right, title, and interest therein.

20. At no time during the Liquidation proceedings or the negotiations of the Transfer Contract did Defendant claim any rights relating to the Cyrano® trademark, or any of the other Trademarks.

**Illegal Conduct Of Defendant**

21. As explained above, Defendant's ongoing participation in the Liquidation pre-dates the execution of the Transfer Agreement. Defendant has thereby known, at all times since May 16, 2002, that Quotium is the exclusive owner of the Software and the Trademarks. Defendant has also known at least as early as the execution of the Transfer Agreement that Defendant has is not authorized to produce, distribute or sell the Software.

22. In connection with that unauthorized activity -- which continues unabated -- Defendant is falsely holding itself out to the public as the copyright holder, and/or a lawful source and distributor, of the Software. For example, Defendant falsely represents on its publicly available web site -- www.cyrano.com (the "Web Site") -- that it is authorized to grant end-user licenses to the Workbench and Production modules of DBPack. ("If you have a CYRANO CD and would like to obtain a full licensed version of the product you are using, please contact our Support Centers and you will receive a license immediately").

23. Defendant is also using Quotium's federally registered Cyrano® trademark without authorization in connection with its sale and marketing of software products in the United States. Defendant does business under the name "*Cyrano, Inc.*" (emphasis added) and illegally advertises and sells certain modules of the Software on the Web Site.

24.     Defendant's pattern and practice of knowingly false and deceptive sales and marketing activity is further evident in Defendant's statements on the Web Site about its own business. Defendant falsely represents in English that it is currently affiliated with Cyrano, S.A., and does not explain in English that Cyrano S.A. is in liquidation. Notably, every press release posted on the Web Site is posted in English, *except* for a September 2001 press release announcing the liquidation of Cyrano, S.A., which appears only in French.

25.     Counsel for Plaintiffs has notified Defendant that Defendant does not have any legal right or authority to distribute the Software. Despite due demand by Plaintiffs, Defendant failed and has refused to cease its ongoing campaign of infringement upon Quotium's intellectual property rights and false and misleading sales and marketing activity.

## COUNT I

### (Copyright Infringement In Violation of 17 U.S.C. § 101)

26.     Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 25 of this Complaint as if fully set forth herein.

27.     The Software was first published in France on both another member nation of the Berne Convention at the time of such first publication.

28.     Quotium is, and at all times since May 16, 2002 has been, the sole owner of all right, title, and interest in and to all copyrights in the Software.

29.     Quotium has not authorized Defendant to reproduce, distribute, license or otherwise utilize the Software.

30.     Since May 16, 2002, Defendant has reproduced and distributed some or all of the Software and has thereby infringed Quotium's copyrights in the Software.

31.     By reason of Defendant's acts of copyright infringement, Quotium has suffered, and will continue to suffer, substantial and irreparable damage to its business reputation and goodwill, as well as diversion of trade and economic losses in an amount not yet ascertained.

32.     Defendant's acts of copyright infringement have caused Quotium irreparable injury, and Defendant has refused to cease and desist and threatens to continue to commit these acts. It is difficult or impossible to calculate fully the amount of compensation by money damages which could afford Quotium adequate relief for these continuing acts.

33.     Quotium has no adequate remedy at law for Defendant's wrongful conduct in that (i) Defendant's infringement constitutes an interference with Quotium's goodwill, business reputation, business market, and customer relationships; and (ii) Defendant's wrongful conduct, and the damages resultant to Quotium therefrom, is continuing. Accordingly, Quotium is entitled to preliminary and permanent injunctive relief pursuant to 17 U.S.C. §502.

34.     Quotium also is entitled to recover actual damages and profits in an amount to be determined at trial (17 U.S.C § 504(b)) or statutory damages (17 U.S.C. § 504(c)), as well as their attorneys' fees and costs of suit pursuant to 17 U.S.C. §505.

### COUNT II

**(Trademark Infringement in
Violation of § 32(a) the Lanham Act -- 15 U.S.C. § 1114)**

35.     Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 34 of this Complaint as if fully set forth herein.

36.     Defendant's unauthorized use of the federally registered Cyrano® trademark on or in connection with the promotion and sale of software products is likely to cause confusion, to cause mistake, or to deceive the relevant purchasing public so that it would be led to believe that

Defendant's products originate from or are produced, provided, or authorized by Quotium, when that is not the case.

37.    Defendant's unauthorized use of the federally registered Cyrano® trademark on or in connection with software products trades on the goodwill which Quotium has developed and/or purchased with respect to the Cyrano® trademark, and such acts damage the rights of Quotium in its trademark and the goodwill represented thereby within Quotium's relevant market, all to the damage of Quotium.

38.    As a result direct and proximate of Defendant's unauthorized use of the Cyrano® trademark, Defendant has caused Quotium irreparable harm and injury and will continue to do so unless Defendant is restrained and enjoined by this Court from further violations of Quotium's rights.  Accordingly, Quotium is entitled to preliminary and permanent injunctive relief pursuant to 15 U.S.C. § 1116.

39.    Quotium also has suffered, and will continue to suffer, substantial economic loss in an amount to be determined at trial.

## COUNT III

### (Trademark Dilution in Violation of
### § 43 (c) of the Lanham Act -- 15 U.S.C. § 1125(c))

40.    Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 39 of this Complaint as if fully set forth herein.

41.    The Cyrano® trademark is distinctive and famous, and has been so since before Defendant began its infringing activity, based upon:  (a) the mark having inherent as well as acquired distinctiveness in the United States; (b) the mark having been long used throughout the United States and the world in connection with software programs; (c) the mark having been

extensively advertised and publicized throughout the United States and the world for many years; (d) the mark's trading area being extensive, covering both the United States and the world; (e) the mark's being used in a variety of different channels of trade; (f) the mark's being highly recognizable in a variety of trading areas and channels of trade; and (g) the trademark being currently registered in the United States.

42.     Defendant's unauthorized use of the Cyrano® trademark in the advertising, promotion and sale of software products is diluting Quotium's substantial rights in its Cyrano® trademark.

43.     Defendant's unauthorized use of the Cyrano® trademark has caused Quotium irreparable harm and injury and will continue to do so unless Defendants is restrained and enjoined by this court from further violations of Quotium's rights.  Accordingly, Quotium is entitled to preliminary and permanent injunctive relief pursuant to 15 U.S.C. § 1116.

44.     Quotium also has suffered, and will continue to suffer, substantial economic loss in an amount to be determined at trial.

## COUNT IV

### (Unfair Competition in Violation
### of § 43(a) the Lanham Act -- 15 U.S.C. § 1125(a))

45.     Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 44 of this Complaint as if fully set forth herein.

46.     The acts of Defendant described above -- including without limitation its representations to the public that it is the rightful copyright holder and/or authorized distributor of the Software and its misuse of the Cyrano® trademark -- constitute false and/or misleading

representations in connection with commercial advertising and promotion in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

47.     Defendant has made false and/or misleading descriptions and representations of fact in commerce relating to the Software and the Cyrano® trademark, which were intended to cause, and have caused and/or are likely to cause, confusion or mistake regarding the origin, sponsorship or approval of those products.

48.     Defendant has made false and/or misleading representations of fact in commercial advertising or promotion that misrepresent the nature, characteristics, origin or qualities of the Software and the Cyrano® trademark.

49.     Defendant's conduct constitutes unfair competition with Plaintiffs, and has enabled and will continue to enable Defendant to make sales and earn profits to which Defendant is not in equity or good conscience entitled.

50.     As a direct and proximate result of Defendant's above-described conduct, Defendant has caused Plaintiffs irreparable harm and injury and will continue to do so unless Defendant is restrained and enjoined by this Court from further violations of Plaintiffs' rights. Accordingly, Plaintiffs are entitled to preliminary and permanent injunctive relief pursuant to 15 U.S.C. § 1116.

51.     Plaintiffs also have suffered, and will continue to suffer, substantial economic loss in an amount to be determined at trial.

## COUNT V

**(Violation of the Anticyberpiracy Consumer Protection Act
a/k/a § 43(a) of the Lanham Act -- 15 U.S.C. § 1125(d))**

52.     Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 51 of this Complaint as if fully set forth herein.

53.     Defendant has a bad faith intent to profit from Quotium's federally registered Cyrano® mark.

54.     Defendant has registered, is trafficking in and/or is using the cyrano.com domain name which is identical or confusingly similar to, or dilutive of, Quotium's federally registered Cyrano® mark.

55.     Defendant's conduct constitutes trademark cyberpiracy in violation of the Lanham Act, 15 U.S.C. § 1125(d), and has enabled and will continue to enable Defendant to make sales and earn profits to which Defendant is not in equity or good conscience entitled.

56.     As a direct and proximate result of Defendant's above-described conduct, Defendant has caused Quotium irreparable harm and injury and will continue to do so unless Defendant is restrained and enjoined by this Court from further violations of Quotium's rights. Accordingly, Quotium is entitled to preliminary and permanent injunctive relief, specifically the forfeiture or cancellation of the cyrano.com domain name or the transfer of the cyrano.com domain name to Quotium, the owner of the Cyrano® mark.

57.     Quotium also has suffered, and will continue to suffer, substantial economic loss in an amount to be determined at trial.

### COUNT VI

**(False Advertising in Violation
of Mass. Gen. Laws ch. 266, § 91)**

58.     Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 57 of this Complaint as if fully set forth herein.

59.    The actions of Defendant described above constitute untrue, deceptive, or misleading advertising in violation of Mass. Gen. L. ch. 266, § 91.

60.    Defendant knew, or on reasonable investigation might have ascertained, that its statements were untrue, deceptive or misleading.  In fact, Defendant actively participated in the Liquidation and the negotiation of the Transfer Contract pursuant to which all rights relating to the Software and Cyrano® trademark were transferred to Quotium.

61.    As a direct and proximate result of Defendant's above-described conduct, Defendant has caused Plaintiffs irreparable harm and injury and will continue to do so unless Defendant is restrained and enjoined by this Court from further violations of Plaintiffs' rights.

### COUNT VII

### (Trademark Dilution in
### Violation of Mass. Gen. Laws ch. 110B, § 12)

62.    Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 61 of this Complaint as if fully set forth herein.

63.    Defendant's unauthorized use of the federally registered Cyrano® trademark has and will continue to injure Quotium's business reputation and dilute the distinctive quality of Quotium's trademark.

64.    As a result of Defendant's unauthorized use of Quotium's Cyrano® trademark, Defendant has caused Quotium irreparable harm and injury and will continue to do so unless Defendant is restrained and enjoined by this Court from further violations of Quotium's rights. Accordingly, Quotium is entitled to preliminary and permanent injunctive relief pursuant to Mass. Gen. Laws ch. 110B § 12.

- 13 -

65.    Quotium also has suffered, and will continue to suffer, substantial economic loss in an amount to be determined at trial.

## COUNT VIII

### (Common Law Unfair Competition)

66.    Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 65 of this Complaint as if fully set forth herein.

67.    As explained above, Defendant has made false and/or misleading statements with the intention of misleading and deceiving the public in order to make sales and earn profits to which it is not in equity or good conscience entitled, which has been to Defendant's benefit and to Plaintiffs' detriment.

68.    Defendant's conduct constitutes unfair competition with Plaintiffs. As a direct and proximate result of Defendant's above-described conduct, Defendant has caused Plaintiffs irreparable harm and injury and will continue to do so unless Defendant is restrained and enjoined by this Court from further violations of Plaintiffs' rights. Plaintiffs also have suffered, and will continue to suffer, substantial economic loss in an amount to be determined at trial.

## COUNT IX

### (Intentional Interference with Contractual Relations)

69.    Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 68 of this Complaint as if fully set forth herein.

70.    The Transfer Contract constitutes a binding and enforceable contract between Plaintiffs and the-court appointed Trustee in the Liquidation of Cyrano, S.A.

- 14 -

71.     At all times relevant to this action, Defendant has been aware of the Transfer Contract and the rights of Plaintiffs' thereunder.

72.     Defendant knowingly and willfully interfered with the Transfer Contract and deprived Plaintiffs of the full benefit of the consideration they received under the Transfer Contract.

73.     Defendant's interference with the Transfer Contract was improper and wrongful in motive and means.

74.     As a result of Defendant's interference, Plaintiffs have suffered economic loss in an amount to be determined at trial.

## COUNT X

### (Unjust Enrichment)

75.     Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 74 of this Complaint as if fully set forth herein.

76.     Defendant knowingly received benefits from its unauthorized reproduction, distribution and sale of the Software and its unauthorized use of the Cyrano® mark.

77.     Defendant unjustly failed to pay Plaintiffs for its use of the Software and the Cyrano® trademark.  As a consequence, Plaintiffs have suffered and will continue to suffer substantial and foreseeable damages.

78.     Plaintiffs are entitled to receive any profits that Defendant made through the wrongful distribution of the Software and use of the Cyrano® trademark.

## COUNT XI

### (Violation of Mass. Gen. Laws ch. 93A, §11)

79. Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 78 of this Complaint as if fully set forth herein.

80. Plaintiffs and Defendant are "persons" and engaged in "trade or commerce" within the meaning of Mass. Gen. Laws ch. 93A, § 1.

81. The acts and practices of Defendant described above occurred primarily and substantially in the Commonwealth of Massachusetts.

82. The actions of Defendant constitute unfair and deceptive business practices in violation of Mass. Gen. Laws ch. 93A, § 11.

83. Defendant's unfair and deceptive acts were committed knowingly and willfully.

84. As a direct and proximate result of Defendant's above-described conduct, Defendant has caused Plaintiffs irreparable harm and injury and will continue to do so unless Defendant is restrained and enjoined by this Court from further violations of Plaintiffs' rights.

85. Defendant's violations of Mass. Gen. Laws ch. 93A also have cost Plaintiffs the loss of money and property in an amount to be determined at trial.

86. Plaintiffs are entitled to recover up to treble damages, and no less than double damages, for said acts and omissions pursuant to Mass. Gen. Laws ch. 93A, § 11. Plaintiffs are also entitled to recover their reasonable attorneys' fees and costs incurred in this action.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court:

1. Enter an order granting, *inter alia*, the following preliminary injunctive relief:

- 16 -

(a)     Ordering Defendant to immediately cease and desist reproducing,

distributing or otherwise using the Software and the Cyrano®

trademark;

(b)     Ordering Defendant to return to Quotium -- within three (3)

business days of the issuance of the Order granting such

preliminary injunctive relief -- the originals and copies of the

Software and all related materials currently in Defendant's

possession, custody, or control, and to certify in writing to the

Court that it has done so;

(c)     Ordering Defendant to immediately and permanently shut down the

Cyrano web site;

(d)     Ordering the forfeiture or cancellation of the cyrano.com domain

name or the transfer of the cyrano.com domain name to Quotium;

and

(e)     Enjoining Defendant from making any further false or misleading

statements regarding the Software and/or the Cyrano® trademark.

2.     Enter an order granting judgment in Plaintiffs' favor on all Counts asserted

in this Complaint.

3.     Enter an order granting the following permanent injunctive relief:

(a)     Ordering Defendant to immediately cease and desist reproducing, distributing or otherwise using the Software and the Cyrano® trademark;

(b)     Ordering Defendant to return to Quotium -- within three (3) business days of the issuance of such permanent injunctive Order -- the originals and all copies of the Software and all related written materials currently in Defendant's possession, custody, or control, and certify in writing to the Court that it has done so;

(c)     Ordering Defendant to shut down immediately the www.cyrano.com web site;

(d)     Ordering the forfeiture or cancellation of the cyrano.com domain name or the transfer of the cyrano.com domain name to Quotium; and

(e)     Enjoining Defendant from making any further false or misleading statements regarding the Software and/or the Cyrano® trademark.

4.     Enter an order requiring an accounting to determine Defendant's revenues, sales and profits gained by way of its illegal activity.

5.     Pursuant to the Federal Copyright Act, 17 U.S.C. §§ 504 and 505, award Plaintiffs the greater of the following as to Count I of this Complaint:

(a)     the actual damages suffered by Plaintiffs as a result of Defendants' infringement of the copyrights at issue and any profits of Defendants that are attributable to the infringement, including

- 18 -

without limitation profits on any services related to Plaintiffs' products and any other profits Defendant earned from any of its operations that were enhanced by its illegal activity;

(b) prejudgment interest on the actual damages suffered by Plaintiffs; and

(c) Plaintiffs' costs of suit in this action, including but not limited to reasonable attorneys' fees;

OR

(a) statutory damages, as determined by the Court;

(b) prejudgment interest on the actual damages suffered by Plaintiffs; and

(c) Plaintiffs' costs of suit in this action, including but not limited to reasonable attorneys' fees;

6. Award Plaintiffs treble damages pursuant to Mass. Gen. Laws ch. 93A § 11 and their reasonable attorneys' fees and costs in connection with this action;

7. Enter an order disgorging Defendants of all ill-gotten gains obtained through their unlawful conduct;

8. Award Plaintiffs prejudgment interest in an amount to be determined prior to entry of final judgment in Plaintiffs' favor; and

9. Grant such other and further relief as this Court deems just and equitable under the circumstances.

# DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury of all issues so triable.

Dated: July 12, 2002

Respectfully submitted,

TECHNOLOGIES, S.A. and
QUOTIUM TECHNOLOGIES, S.A.,
By their attorneys,

Kevin J. O'Connor (BBO# 555250)
Kristina E. Barclay (BBO# 640848)
Liza J. Tran (BBO# 646818)
TESTA, HURWITZ & THIBEAULT, LLP
125 High Street
Boston, MA 02110
(617) 248-7000

2426902-5

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| TECHNOLOGIES, S.A., and<br>QUOTIUM TECHNOLOGIES, S.A.,<br><br>      Plaintiffs,<br><br>    v.<br><br>CYRANO, INC.,<br><br>      Defendant,<br> and<br><br>CYRANO, INC.,<br><br>      Plaintiff-in-Counterclaim,<br><br>    v.<br><br>TECHNOLOGIES, S.A.,<br>QUOTIUM TECHNOLOGIES, S.A., and<br>QUOTIUM TECHNOLOGIES, INC.,<br><br>      Defendants-in-Counterclaim. | CIVIL ACTION NO. 02-11416-JLT<br>**(Jury Trial Demanded)** |

## AMENDED ANSWER AND COUNTERCLAIM OF CYRANO, INC.

### ANSWER TO COMPLAINT

The defendant Cyrano, Inc. ("Cyrano US") hereby answers the Complaint of Technologies, S.A., and Quotium Technologies, S.A. (collectively "Technologies" or "Plaintiffs"), as follows:

### FIRST DEFENSE

For its First Defense, Cyrano US answers the numbered paragraphs of the Complaint as follows:

## NATURE OF THE ACTION

1.    Paragraph 1 is descriptive in nature and no response is required.

2.    Denied.

3.    Denied.

4.    Denied.

5.    Cyrano US denies the allegations contained in the first sentence of paragraph 5. The last sentence of paragraph 5 states requested relief and requires no response.

## PARTIES

6.    Cyrano US lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 6.

7.    Cyrano US lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 7.

8.    Admitted.

## JURISDICTION AND VENUE

9.    Paragraph 9 states a conclusion of law, to which no response is required.

10.    Paragraph 10 states a conclusion of law, to which no response is required.

## FACTS COMMON TO ALL COUNTS

**Plaintiffs' Investment In the**
**Intellectual Property Rights At Issue**

11.    Cyrano US denies the allegations contained in the first sentence of paragraph 11. Cyrano US admits the remaining allegations of paragraph 11.

12.    Cyrano US lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 12.

13.     Cyrano US lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 13.

14.     Cyrano US lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 14.

15.     Cyrano US admits, upon information and belief, that plaintiffs and the Liquidation Trustee entered into a form of contract on or around May 16, 2002, but lacks knowledge or information sufficient to form a belief as to the truth of the allegation that the plaintiffs and the Trustee entered into the alleged contract in accordance with French liquidation procedure.  Further answering, Cyrano US states that the alleged contract document speaks for itself, and that any interpretations of the alleged contract state conclusions of law to which no response is required.  Cyrano US admits that Cyrano, S.A. did not own two modules of the ClientPack software suite (Robot and Manager) and one module of the ServerPack suite (LoadTest).  The remaining allegations are denied or require no response.

16.     Paragraph 16 states a conclusion of law, to which no response is required.

17.     Cyrano US admits that it submitted a claim of ownership to the Trustee for the Test and Impact software modules, which are modules in the ServerPack and VT Pack software suites, respectively.  Cyrano US further states that it also submitted a claim of ownership to the Trustee as to a software product called OpenSTA.  Cyrano US denies that these ownership claims were made as part of the negotiation of the alleged Transfer Contract, as Cyrano US was not a party to the alleged Transfer Contract and was not involved in its negotiation.  Cyrano US lacks knowledge or information sufficient to form a belief as the allegations contained in the second sentence of paragraph of 17.  Cyrano

3

US admits that the Trustee did not transfer to Technologies any ownership rights to any version of Test or Impact. The remaining allegations are denied or require no response.

18.     Denied.

19.     Cyrano US states that the alleged contract speaks for itself, and that the remaining allegations state conclusions of law to which no response is required.

20.     Denied.

**Illegal Conduct of Defendant**

21.     Cyrano US admits some involvement and knowledge of the liquidation proceedings, but the remaining allegations are denied.

22.     Denied.

23.     Cyrano US admits that as of this date it still does business, in part, under the name Cyrano, Inc., but denies the remaining allegations.

24.     Denied.

25.     Cyrano US admits that plaintiffs' counsel has notified it of the plaintiffs' legal position concerning Cyrano US's rights to distribute certain software products. Cyrano US denies the remaining allegations of paragraph 25.

COUNT I
(Copyright Infringement in Violation of 17 U.S.C. § 101)

26.     Cyrano US repeats and reaffirms its answers to the allegations of paragraphs 1 through 25 of the Complaint.

27.     Cyrano US states that the allegations of paragraph 27 are unintelligible, and therefore denies the allegations.

28.     Denied.

29.     Denied.

4

30.     Cyrano US admits that it has reproduced and/or distributed some of the Software products since May 16, 2002, but denies the remaining allegations.

31.     Denied.

32.     Paragraph 32 is denied and otherwise states a conclusion of law, to which no response is required.

33.     Paragraph 33 is denied and otherwise states a conclusion of law, to which no response is required.

34.     Paragraph 34 is denied and otherwise states a conclusion of law, to which no response is required.

## COUNT II
### (Trademark Infringement in
### Violation of § 32(a) of the Lanham Act – 15 U.S.C. § 1114)

35.     Cyrano US repeats and reaffirms its answers to the allegations of paragraphs 1 through 34 of the Complaint.

36.     Denied.

37.     Denied.

38.     Denied.

39.     Denied.

## COUNT III
### (Trademark Dilution in Violation of
### § 43 (c) of the Lanham Act – 15 U.S.C. § 1125 (c))

40.     Cyrano US repeats and reaffirms its answers to the allegations of paragraphs 1 through 39 of the Complaint.

41.     Cyrano US denies it engaged in any "infringing activity." The remaining allegations of paragraph 41 state legal conclusions, to which no response is required.

42.    Denied.

43.    Denied.

44.    Denied.

## COUNT IV
### (Unfair Competition in Violation of
§ 43 (a) of the Lanham Act – 15 U.S.C. § 1125(a))

45.    Cyrano US repeats and reaffirms its answers to the allegations of paragraphs 1

through 44 of the Complaint.

46.    Denied.

47.    Denied.

48.    Denied.

49.    Denied.

50.    Denied.

51.    Denied.

## COUNT V
### (Violation of the Anticyperpiracy Consumer Protection Act
a/k/a/ § 43 (a) of the Lanham Act – 15 U.S.C. § 1125(d))

52.    Cyrano US repeats and reaffirms its answers to the allegations of paragraphs 1

through 51 of the Complaint.

53.    Denied.

54.    Paragraph 54 is denied and otherwise states a conclusion of law, to which no

response is required.

55.    Denied.

56.    Denied.

57.    Denied.

## COUNT VI
### (False Advertising in Violation
### of Mass. Gen. Laws ch. 266 § 91)

58.     Cyrano US repeats and reaffirms its answers to the allegations of paragraphs 1

through 57 of the Complaint.

59.     Denied.

60.     Denied.

61.     Denied.

## COUNT VII
### (Trademark Dilution in
### Violation of Mass. Gen. Laws ch. 110B § 12)

62.     Cyrano US repeats and reaffirms its answers to the allegations of paragraphs 1

through 61 of the Complaint.

63.     Denied.

64.     Denied.

65.     Denied.

## COUNT VIII
### (Common Law Unfair Competition)

66.     Cyrano US repeats and reaffirms its answers to the allegations of paragraphs 1

through 65 of the Complaint.

67.     Denied.

68.     Denied.

## COUNT IX
### (Intentional Interference with Contractual Relations)

69.     Cyrano US repeats and reaffirms its answers to the allegations of paragraphs 1

through 68 of the Complaint.

70.     Paragraph 70 states a conclusion of law, to which no response is required.

71.     Denied.

72.     Denied.

73.     Denied.

74.     Denied.

### COUNT X
(Unjust Enrichment)

75.     Cyrano US repeats and reaffirms its answers to the allegations of paragraphs 1

through 74 of the Complaint.

76.     Denied.

77.     Denied.

78.     Paragraph 78 states a conclusion of law, to which no response is required.

### COUNT XI
(Violation of Mass. Gen. Laws ch. 93A § 11)

79.     Cyrano US repeats and reaffirms its answers to the allegations of paragraphs 1

through 78 of the Complaint.

80.     Paragraph 80 states a conclusion of law, to which no response is required.

81.     Paragraph 81 states a conclusion of law, to which no response is required.

82.     Denied.

83.     Denied.

84.     Denied.

85.     Denied.

86.     Denied.

8

## SECOND DEFENSE

With respect to each and every count of plaintiffs' Complaint, the plaintiffs have failed to state a claim upon which relief can be granted.

## THIRD DEFENSE

The plaintiffs' claims are barred because Cyrano US owns the software or trademarks at issue, or its activities are permitted by license, abandonment, acquiescence, or consent.

## FOURTH DEFENSE

Cyrano US has not infringed any copyright or trademark of the plaintiffs.

## FIFTH DEFENSE

The plaintiffs' claims are barred by plaintiffs' own breaches of an International Distributor Agreement with Cyrano US.

## SIXTH DEFENSE

Cyrano US's activities constitute fair use of any copyrights, trademarks, or other rights held by the plaintiffs.

## SEVENTH DEFENSE

The plaintiffs' claims are barred by the doctrine of unclean hands.

## EIGHTH DEFENSE

The plaintiffs' claims are barred in whole or in part by the equitable doctrines of waiver and estoppel.

## NINTH DEFENSE

The plaintiffs' state law claims are preempted.

## TENTH DEFENSE

Count VI fails to state a claim because no private right of action for damages may be brought under Massachusetts General Laws c. 266 § 91.

## ELEVENTH DEFENSE

With respect to Count XI, the conduct allegedly constituting unfair and deceptive acts or practices did not take place primarily or substantially within the Commonwealth of Massachusetts.

## **COUNTERCLAIM**

Cyrano, Inc. ("Cyrano US") hereby asserts its counterclaim for copyright infringement, unfair competition, interference with contractual relationships, defamation, breach of contract, violation of Massachusetts General Laws c. 93A, and a declaratory judgment.

## PARTIES

1.      Plaintiff-in-Counterclaim Cyrano US is a Delaware Corporation with its principal place of business located at 26 Parker Street, Newburyport, Massachusetts.

2.      On information and belief, Defendant-in-Counterclaim Technologies, S.A. is a French Corporation with its principal place of business located at 84-88 Boulevard de la Mission Marchand in Courbevoie, France.

3.      On information and belief, Defendant-in-Counterclaim Quotium Technologies, S.A, a wholly-owned subsidiary of Technologies, S.A., is a French Corporation with its principal place of business located at 84-88 Boulevard de la Mission Marchand in Courbevoie, France.

4.     On information and belief, Defendant-in-Counterclaim Quotium Technologies,

Inc. is a wholly-owned subsidiary of Quotium Technologies, S.A., and is a Delaware

corporation with its principal place of business at 100 Cummings Center, Suite 336B,

Beverly, Massachusetts.  (The defendants-in-counterclaim are collectively referred to

herein as "Technologies").

## JURISDICTION AND VENUE

5.     This Court has subject matter jurisdiction over this Counterclaim pursuant to Fed.

R. Civ. P. 13, 28 U.S.C. § 1338, the Copyright Act, 17 U.S.C. §§ 101 et. seq., the

Lanham Act, 15 U.S.C. § 1125, and the Declaratory Judgment Act, 28 U.S.C. § 2201.

This Court also has subject matter jurisdiction on the independent basis of diversity of

citizenship, 28 U.S.C. § 1332(a)(2).  The amount in controversy in this action exceeds

$75,000, exclusive of interest and costs.  Additionally, this Court has supplemental

jurisdiction over the related state law claims pursuant to 28 U.S.C. §§ 1338(b) and 1367.

6.     Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391 and 1400.

## FACTUAL BACKGROUND

**I.     Cyrano US's Ownership Rights in the Software**

a)     Cyrano US's Ownership of Test and Impact

7.     Cyrano US distributes software that enables users to test, monitor, and optimize

their data processing and information management systems.

8.     In the 1990s and prior to 2001, Cyrano US was affiliated with two legally

independent foreign companies, Cyrano U.K. Limited ("Cyrano UK"), an English

software company, and Cyrano S.A. ("Cyrano SA"), a French company.  Both foreign

companies have been liquidated and Cyrano US has acquired the assets of Cyrano UK.

11

9.      Among the many products developed, marketed, and sold by Cyrano US, and previously Cyrano UK before it was liquidated, are computer software products called "Cyrano Test" ("Test") and "Cyrano Impact" ("Impact").

10.     The first version of Test was created by Performance Software Limited, an English software company, in the United Kingdom. The United Kingdom is a signatory to the Berne Convention. Test contains original, highly complex material that is copyrightable under the laws of the United Kingdom and the United States. Test was first published in the United Kingdom in late 1989, and all copyrights to Test were owned by Performance Software Limited.

11.     In October 1996, Performance Software Limited was renamed to Cyrano UK Limited and all of the assets and intellectual property of Performance Software Limited (including its copyright ownership and all other rights to Test) were then owned by Cyrano UK.

12.     Subsequently, Cyrano UK created other versions of Test, up to and including version 5.4.2. Like the original version of Test, the subsequent versions of Test contain original, highly complex material, copyrightable under the laws of the United Kingdom and the United States, and first published in the United Kingdom. The copyrights to all versions of Test were owned by Cyrano UK.

13.     Cyrano UK developed the first version of Impact in its offices in Bradford, England, with the exception of a small amount of computer code it commissioned from Cyrano SA called "SQL Capture" (the "Gateway"). The first version of Impact was heavily based upon Test and contained original, highly complex material, copyrightable under the laws of the United Kingdom and the United States. Cyrano UK is the equitable

and beneficial owner of the copyright to Gateway under English law. Cyrano UK is therefore the copyright owner of Impact in its entirety. The first version of Impact was first published in the United Kingdom in mid-1997.

14. Following the launch of the first version of Impact, Cyrano UK created other versions of Impact, including the most recent version. Like the first version of Impact, the following and current versions of Impact contain original, highly complex material, copyrightable under the laws of the United Kingdom and the United States, and first published in the United Kingdom. All copyrights to Impact were at all times owned by Cyrano UK.

15. In March 2002, Cyrano US acquired the assets and intellectual property of Cyrano UK, including all of its copyright ownership and rights to Test and Impact. This copyright ownership includes the design, materials, prototypes and architecture to Test and Impact. Prior to acquiring these rights in March 2002, Cyrano US had also been licensed by Cyrano UK to distribute, use, support, develop, and sell Test and Impact.

16. Cyrano US is currently and since March 2002 has been the sole proprietor of all right, title, and interest in, and owner of all copyrights to, Test and Impact. Cyrano US and its predecessors in interest published the works in strict conformity with the Copyright laws of the United Kingdom, like the United States a signatory of the Berne Convention.

b) Cyrano US's Ownership Rights in OpenSTA

17. From 1998 through 2000, Cyrano UK used certain source code and non-literal elements from Test and Impact to create the core technology and majority of the source code of a new software product called OpenSTA. After Cyrano UK completed

13

developing the core technology and majority of OpenSTA's source code in 2000, Cyrano UK added three discrete and separable modules (Gateway, Modeller, and HTTP Replay) supplied by Cyrano SA to OpenSTA.

18.     The Gateway supplied by Cyrano SA for OpenSTA was the HTTP equivalent of the Gateway used in Impact and commissioned from Cyrano SA, the copyright to which vested in Cyrano UK. Cyrano UK further developed the Modeller prior to adding it to OpenSTA. By the time Cyrano UK published its last version of OpenSTA, version 1.3.2 in October 2001, 40% of OpenSTA's Modeller module, which itself was only a small part of OpenSTA as a whole, had been authored by Cyrano UK.

19.     Cyrano UK, the copyright owner of "UK/US OpenSTA" (OpenSTA except the HTTP Replay and Modeller modules), first published the first version, version 0.9.0, of OpenSTA in the United Kingdom in September 2000. Cyrano UK also created updated versions up to and including version 1.3.2 of OpenSTA prior to its liquidation in October 2001.

20.     Version 1.3.2 of OpenSTA, and all prior versions, contain, in addition to original copyrightable source code from Test and Impact, additional original source code created by Cyrano UK, copyrightable under the laws of the United Kingdom and the United States, and first published from the United Kingdom. Cyrano UK owned the copyrights to UK/US OpenSTA as well as a copyright and license from Cyrano S.A. to the Modeller and HTTP Replay modules in OpenSTA, respectively.

21.     When Cyrano US acquired the assets of Cyrano UK in March 2002, it also acquired all Cyrano UK's copyright ownership and rights to UK/US OpenSTA and its modules.

c)    Cyrano US's Rights under the Exclusive License with Cyrano SA.

22.    Pursuant to an International Distributor Agreement between Cyrano S.A. and Cyrano US, Cyrano US holds the exclusive license to distribute, use, support, and deal in several additional software products throughout the World, including in the United States, Canada, Latin America, Ireland, and the United Kingdom, with the sole exception of Continental Europe.  These licensed software products include two products that were owned by Cyrano SA, Cyrano Workbench ("Workbench") and Cyrano Production ("Production").  In addition, the Distributor Agreement granted Cyrano US an exclusive license to Cyrano SA's rights in OpenSTA and any associated commercial modules.  The agreement expires on June 30, 2007 and has not been properly terminated.

23.    Prior to Cyrano SA's liquidation, it developed two commercial plug-in modules for OpenSTA called DB Monitor and SQL Analysis, which are included within the exclusively Licensed Products under the Distributor Agreement.

**II.    Technologies' Infringing Conduct**

24.    Technologies are also engaged in the business of developing, marketing, manufacturing, and selling computer software products.  Technologies are competitors of Cyrano US.

25.    In late 2001 and continuing in early 2002, Technologies began negotiating to purchase certain assets of Cyrano SA, which had gone into liquidation in France in October 2001.

26.    During these negotiations, on information and belief, Technologies obtained access to the source code of various software products that had been owned, licensed, or available to Cyrano SA.

27.     In or around May 2002, on information and belief, Technologies purchased certain of Cyrano SA's assets, including its software products Workbench and Production, and certain rights to OpenSTA and its associated commercial modules to the extent held by Cyrano SA.  In April 2002, prior to its alleged acquisition of Cyrano SA's assets, Cyrano US notified Technologies' President, Michel Tiberini, that it owned the copyrights to Test, Impact, and "the constituent parts of OpenSTA."

28.     Technologies did not and could not purchase from the Liquidation Trustee of Cyrano SA, and does not own, any copyrights or other interest in Test, Impact, or the majority of OpenSTA owned by Cyrano US.

29.     Nevertheless, beginning in or about May 2002, Technologies obtained copies of the source code of Test and Impact.  On information and belief, Technologies thereafter knowingly and willfully copied the source code of Test and Impact.  Technologies copied the source code of these products for the specific purpose of duplicating Cyrano US's software products and infringing Cyrano US's copyrights.

30.     Beginning in or about May 2002, Technologies also obtained copies of the source code of OpenSTA.  On information and belief, Technologies thereafter knowingly and willfully copied the source code of OpenSTA for the specific purpose of duplicating the software product and infringing Cyrano US's copyright.

31.     On information and belief, using copies of the source code of Test, Impact, and OpenSTA, Technologies have also developed one or more products or portions thereof which are identical or substantially similar to Test, Impact, and OpenSTA not only in their underlying logic, structure, organization and sequence, but also in the employment

of critical components of Test and Impact in their literal source code form, as well as in other various respects.

32.    One of the products that Technologies has developed by copying OpenSTA is called Quotium.Pro., a "load testing tool." This tool includes the source code from version 1.3.2 of OpenSTA, which contains the source code from Test and Impact.

33.    After May 2002, Technologies began to manufacture, distribute, promote and sell Quotium.Pro and other products created from Test, Impact, and OpenSTA throughout the World, including in the United Kingdom, Latin America, and the United States, in violation of Cyrano US's copyrights. In or around August 2002, Technologies began marketing a product called "Quotium Impact," which based upon information and belief, is substantially similar, if not identical, to Cyrano US's Impact product.

34.    Additionally, in or around May 2002, Technologies also began marketing, distributing and selling OpenSTA's commercial modules, DB Monitor and SQL Analysis, Workbench, and Production throughout the World, including in the United Kingdom, Latin America, and the United States.

35.    In addition to infringement of Cyrano US's ownership rights in Test, Impact and OpenSTA, Technologies' distribution, marketing, and sale of OpenSTA and its associated commercial modules (DB Monitor and SQL Analysis), Workbench, and Production outside of Continental Europe also violates Cyrano US's copyright by exclusive license to those products.

**III.    Technologies' Unfair Competition and Contractual Interference**

36.    Since on or about May 2002, Technologies have engaged in a deceptive marketing campaign, consisting of misrepresentations concerning its rights to Cyrano

17

US's software products and the status of Cyrano US. Technologies have engaged in their activities in a wrongful effort to steal customers, distributors, and employees of Cyrano US.

37.     In or around May and July 2002, Technologies released new open-source versions of OpenSTA, called Version 1.4.0 and Version 1.4.1, in which they have altered the information displayed in OpenSTA to indicate that all copyrights to OpenSTA are owned by Quotium Technologies, S.A. Technologies have also made false representations of copyright ownership to, and authorship of, OpenSTA including on the GNU open-source sites.

        a)     Customers and Distributors

38.     Technologies have aggressively pursued and contacted Cyrano US's current and prospective customers, many of which have contracts for licenses, or maintenance and support with Cyrano US, and has knowingly and repeatedly misrepresented its rights to sell and distribute Cyrano products including Test, Impact, OpenSTA, Workbench, and Production. On information and belief, Technologies has contacted the majority of Cyrano US's customers in the United States and United Kingdom, if not throughout the World.

39.     Similarly, Technologies have pursued and contacted Cyrano US's current distributors and has knowingly and repeatedly misrepresented their rights and the rights of Cyrano US to sell and distribute Cyrano products including Test, Impact, OpenSTA, Workbench, and Production. Such misrepresentations have negatively affected Cyrano US's relationships with its distributors and irreparably harmed its goodwill.

40.     Beginning in or about May 2002 and continuing through the present,

Technologies have solicited Cyrano's customers and distributors in the United States and

the United Kingdom and made false and misleading statements, including that: 1)

Technologies was the sole owner and source of all Cyrano products, including Test and

Impact; 2) none of the Cyrano companies continued to exist; 3) the customers contracts

with Cyrano US were no longer valid; and 4) Cyrano US would not be providing any new

updates to its customers but Cyrano US's customers could be immediately enrolled as

Technologies' customers and once they entered a contract with Technologies,

Technologies would send them updated software.

41.     Additionally, to encourage Cyrano US's customers and distributors to breach their

contracts with Cyrano US, and in an effort to damage Cyrano US's goodwill, in or about

July 2002 Technologies began distributing e-mails to Cyrano US's customers and

distributors which falsely and deceptively misrepresented that Cyrano US had gone out of

business.  Similarly, Technologies also has verbally told Cyrano US's customers that

Cyrano US has gone out of business.

42.     When Technologies made and published these statements to Cyrano US's

customers and distributors, Technologies knew they were false.

        b)     Employees

43.     Technologies has targeted and solicited key Cyrano US employees to terminate

their employment with Cyrano US, and work for Technologies.  These contacts are often

made during regular business hours, which disrupts Cyrano US's business.

44.     At Technologies' urging, at least one former employee, William Sweeney,

recently resigned from his employment at Cyrano US in order to work for Technologies.

19

45.     Mr. Sweeney began working for Cyrano US in or around mid-2001, and as a condition of employment signed a Confidentiality and Intellectual Property Agreement. Pursuant to this Agreement, Mr. Sweeney agreed not to use or disclose Cyrano US's confidential information.

46.     By July 2002, Mr. Sweeney had become a Senior Account Manager for Cyrano US. He had access to Cyrano US's confidential customer and distributor lists as well as its business plan. Cyrano US's business plan included a list of prospective customers, whom it had been targeting and with whom it was close to finalizing certain contracts.

47.     Technologies knew before hiring Mr. Sweeney that he held confidential information of Cyrano US, and hired him for the express purpose of inducing him to breach his obligations to Cyrano US and misuse Cyrano US's confidential information. Moreover, Technologies intended to and has used Cyrano US's confidential information for the express purpose of selling software owned by, and licensed to Cyrano US, in violation of Cyrano US's copyrights.

48.     Since resigning from Cyrano US and joining Technologies in or about July 2002, Mr. Sweeney has, at Technologies instruction, taken, used, and disclosed confidential and proprietary Cyrano US information in the course of his employment at Technologies.

49.     For example, Mr. Sweeney used and disclosed Cyrano US's confidential information concerning a prospective customer in Costa Rica, DB Consultores, with whom Cyrano US had been in negotiations for over four months. As a result of these negotiations and Cyrano US's work with DB Consultores, a software contract was being finalized in July 2002. Shortly before the contract was to be signed, Cyrano US learned that Mr. Sweeney, immediately after starting his employment at Technologies, contacted

DB Consultores to try to sell software for Technologies using Cyrano US's confidential information and in violation of Cyrano US's copyrights. At that time, Mr. Sweeney had full knowledge of Cyrano US's business development activities and the status and content of Cyrano US's contract negotiations with DB Consultores.

50.     As a result of Mr. Sweeney's unlawful solicitation of DB Consultores on behalf of Technologies, DB Consultores terminated its contract negotiations with Cyrano US and notified it that it would not be entering any contract with Cyrano US. On information and belief, Cyrano US has also lost other prospective and current customers as a result of Technologies unlawful and deceptive conduct.

51.     As a result of the Technologies' conduct summarized above, Cyrano US has already suffered irreparable harm. Without immediate judicial intervention, Cyrano US's confidential business and proprietary information, its copyrights, its goodwill, and its relationships with its own employees, customers, and distributors, will continue to be at risk, causing Cyrano US continuing irreparable harm.

COUNT I
*(Copyright Infringement in violation of 17 U.S.C. §§ 101 et seq.)*

52.     Cyrano US repeats and incorporates by reference as though fully set forth herein the allegations contained in paragraphs 1 through 51 of the Counterclaim.

53.     Test, Impact, and OpenSTA were first published in the United Kingdom, which was a member of the Berne Convention at the time of such publication.

54.     Cyrano US is and has at all times since March 2002 been the sole owner of all right, title, and interest in and to all copyrights in Test and Impact.

21

55.     Cyrano US is and has at all times since March 2002 been the copyright owner of the UK/US OpenSTA and the owner or exclusive licensee of its Gateway, Modeller, and HTTP Replay modules.

56.     Cyrano US is also the exclusive licensee of Workbench and Production, and of certain rights in OpenSTA and its associated commercial modules, DB Monitor and SQL Analysis.

57.     Cyrano US has not authorized Technologies to reproduce, distribute, manufacture, advertise, or sell Test, Impact, OpenSTA and its modules or any product containing portions thereof, or Workbench or Production.

58.     Since on or about May 2002, Technologies have reproduced, advertised, offered for sale, sold and distributed throughout the World, including in the United States, copies of Test and Impact, thereby infringing Cyrano US's copyrights in the software products.

59.     Since on or about May 2002, Technologies have reproduced, advertised, offered for sale, sold and distributed throughout the World, including in the United States, copies of OpenSTA and its associated commercial modules, thereby infringing Cyrano US 's copyright and exclusive license.

60.     Since on or about May 2002, Technologies have reproduced, advertised, offered for sale, sold and distributed throughout the World, including in the United States, copies of Workbench and Production, thereby infringing Cyrano US's exclusive license in these products.

61.     Technologies' infringing activities are continuing, willful, and intentional in total disregard of Cyrano US's rights.

62.     As a result of Technologies' infringing activities, Cyrano US has suffered and will continue to suffer, substantial and irreparable damage to its business reputations, goodwill, market share, and customer and distributor relationships.  Cyrano US has no adequate remedy at law and is therefore entitled to preliminary and permanent injunctive relief pursuant to 17 U.S.C. § 502.

63.     Cyrano US is also entitled to recover actual damages and profits in an amount to be determined at trial (17 U.S.C. § 504(b)) or statutory damages (17 U.S.C. § 504(c)) as well as attorneys' fees and costs pursuant  17 U.S.C. § 505.

COUNT II
*(Unfair Competition and False Designation of Origin  in Violation of the*
*Lanham Act, 15 U.S.C. §1125 (a))*

64     Cyrano US repeats and incorporates by reference as though fully set forth herein the allegations contained in paragraphs 1 through 63 of the Counterclaim.

65.     As described above, Technologies have made false and misleading representations of fact to the public and in commerce in connection with commercial advertising and promotion in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

66.     Technologies' false and deceptive misrepresentations related to Cyrano US's rights to sell its own copyrighted products, the copyright ownership and authorship of OpenSTA, and products to which Cyrano US holds the exclusive license, as well as Cyrano US's commercial activities.

67.     Technologies' misrepresentations were intended to cause, have caused and/or are likely to cause confusion or mistake regarding Cyrano US's rights to sell products to

23

which it owns the copyright or exclusive license, and regarding Cyrano US's commercial activities and existence.

68.     Technologies' conduct constitutes unfair competition with Cyrano US, and has enabled and will continue to enable Technologies to make sales and earn profits to which Technologies are not in equity or good conscience entitled.

69.     Technologies' misrepresentations concerning the authorship and ownership of OpenSTA also constitute a false designation of origin by falsely suggesting or implying that the owner, author, and source of OpenSTA is Technologies rather than Cyrano US. Such misrepresentations are likely to cause confusion or mistake as to the affiliation, connection, or association of Technologies with Cyrano US or as to the origin, sponsorship, or approval of Technologies' goods by Cyrano US.

70.     As a direct and proximate result of Technologies' conduct described above, Cyrano US has suffered and will continue to suffer substantial and irreparable damage, including loss of customers and distributors, dilution of goodwill, injury to its reputation, confusion of existing and potential customers and distributors, and diminution of the value of its products.  Cyrano US has no adequate remedy at law and is therefore entitled to preliminary and permanent injunctive relief.

71.     Cyrano US has also suffered and will continue to suffer, substantial economic damages in an amount to be determined at trial.

COUNT III
*(Common Law Unfair Competition)*

72.     Cyrano US repeats and incorporates by reference as though fully set forth herein the allegations contained in paragraphs 1 through 71 of the Counterclaim.

24

73.     As described above, Technologies have made false and/or misleading statements with the intention of misleading and deceiving the public in order to make sales and earn profits to which it is not in equity or good conscience entitled, which has been to Technologies' benefit and to Cyrano US's detriment.

74.     Technologies' conduct constitutes unfair competition with Cyrano US.

75.      As a direct and proximate result of Technologies' conduct described above, Cyrano US has suffered and will continue to suffer substantial and irreparable damage, including loss of customers and distributors, dilution of goodwill, injury to its reputation, confusion of existing and potential customers and distributors, and diminution of the value of its products.  Cyrano US has no adequate remedy at law and is therefore entitled to preliminary and permanent injunctive relief.

76.     Cyrano US has also suffered and will continue to suffer, substantial economic damages in an amount to be determined at trial.

COUNT IV
*(Intentional Interference with Contractual Relations)*

77.     Cyrano US repeats and incorporates by reference as though fully set forth herein the allegations contained in paragraphs 1 through 76 of the Counterclaim.

78.     Cyrano US's License Agreements with its customers constitute valid and existing contracts.

79.     Cyrano US's Support and Maintenance Agreements with its customers constitute valid and existing contracts.

80.     Cyrano US's Distributor Agreements with its distributors constitute valid and existing contracts.

25

81.     Cyrano US's Employment Agreements, both express and implied, constitute valid and existing contracts.

82.     The defendants-in-counterclaim knew or should have known of the existence of these contracts.

83.     The defendants-in-counterclaim wrongfully, intentionally, and without justification, interfered with these contracts, causing customers, distributors, and employees to breach their contracts with Cyrano US.

84.     The defendants-in-counterclaim's conduct was improper and wrongful in motive and means.

85.     As a result of the foregoing acts and conduct of the defendants-in-counterclaim, Cyrano US has suffered, and will continue to suffer, substantial, irreparable harm to its goodwill, reputation, contractual relationships, and value of its products.  Cyrano US has no adequate remedy at law and is therefore entitled to preliminary and permanent injunctive relief.

86.     Cyrano US has also suffered and will continue to suffer, substantial economic damages in an amount to be determined at trial.

## COUNT V
*(Interference with Advantageous Relations)*

87.     Cyrano US repeats and incorporates by reference as though fully set forth here the allegations contained in paragraphs 1 through 86 of the Counterclaim.

88.     Cyrano US has developed business relationships with its employees, customers, and distributors.

89.     The defendants-in-counterclaim have obtained detailed knowledge of such relationships.

90.     By their conduct set forth above, the defendants-in-counterclaim have intentionally, willfully, and unjustifiably interfered with Cyrano US's business and advantageous relationships for the unlawful purpose of causing damage or loss to Cyrano US.

91.     As a direct and proximate result of defendants-in-counterclaim's conduct, Cyrano US has suffered damages for which the defendants are liable.

COUNT VI
*(Defamation)*

92.     Cyrano US repeats and incorporates by reference as though fully set forth here the allegations contained in paragraphs 1 through 91 of the Counterclaim.

93.     The defendants-in-counterclaim orally made to Cyrano US's customers, prospective customers, distributors and others false statements of fact or implied fact concerning Cyrano US. These statements and implications are slanderous.

94.     The defendants-in-counterclaim have published e-mails to Cyrano US's customers, prospective customers, distributors, and others that contained several false statements of fact or implied facts concerning Cyrano US.  These statements and implications are libelous.

95.     Specifically, the statements defamed Cyrano US by stating or implying Cyrano US was no longer in business.

96.     The defendants-in-counterclaim made these defamatory statements knowing them to be false or with reckless disregard of whether they were false.

97.     As a direct and proximate result of defendants-in-counterclaim's defamation, Cyrano US has suffered, and will continue to suffer, substantial, irreparable harm, including loss of customers and distributors, dilution of goodwill, injury to its reputation,

27

confusion of existing and potential customers and distributors, and diminution of the value of its products.

98.    Cyrano US has also suffered and will continue to suffer, substantial economic damages in an amount to be determined at trial.

## COUNT VII
### *(Breach of Contract)*

99.    Cyrano US repeats and incorporates by reference as though fully set forth here the allegations contained in paragraphs 1 through 98 of the Counterclaim.

100.   Cyrano US and Cyrano SA entered into a valid and binding license agreement concerning Workbench, Production, and Cyrano SA's rights in OpenSTA and its associated modules, which remains valid and enforceable until properly terminated or the term of the contract expires on June 30, 2007.

101.   Cyrano US has complied with all of its contractual obligations and was at all times ready, willing, and able to perform its obligations under the contract.

102.   If Technologies contends it assumed the license contract from Cyrano SA, they have materially breached the contract, causing Cyrano US to suffer monetary damages, plus pre-judgment interest, costs, and attorneys' fees.

## COUNT VIII
(Unfair and Deceptive Acts or Practices - Violation of G.L. c. 93A)

103.   Cyrano US repeats and incorporates by reference as though fully set forth here the allegations contained in paragraphs 1 through 102 of the Counterclaim.

104.   At all relevant times, defendants-in-counterclaim were engaged in trade and commerce within the meaning of G.L. c.93A, §§ 2 and 11.

105.    The defendants-in-counterclaim's actions, as described above, constitute willful or knowing unfair and deceptive acts and practices in violation of Massachusetts General Laws Chapter 93A, §§ 2 and 11.

106.    The defendants-in-counterclaim's unfair and deceptive acts and practice occurred primarily and substantially within the Commonwealth of Massachusetts.

107.    As a result of defendants-in-counterclaim's unfair and deceptive acts, Cyrano US has suffered substantial monetary damages.

<u>COUNT IX</u>
(Declaratory Judgment)

108.    Cyrano US repeats and incorporates by reference as though fully set forth here the allegations contained in paragraphs 1 through 107 of the Counterclaim.

109.    Cyrano US is and has at all times since March 2002 been the sole owner of all right, title, and interest in and to all copyrights in Test and Impact.

110.    Cyrano US is and has at all times since March 2002 been the sole copyright owner of UK/US OpenSTA (OpenSTA except Modeller and HTTP Replay modules).

111.    Cyrano US also owns copyrights in OpenSTA's Modeller module.

112.    Cyrano US is the sole exclusive licensee of Workbench, Production, and Cyrano SA's rights in OpenSTA, and OpenSTA's two commercial modules, DB Monitor and SQL Analysis, until June 30, 2007 under the International Distributor Agreement.

113.    Beginning in or around May 2002, Technologies have made false representations that they own Test, Impact, and OpenSTA, and that Cyrano US no longer has rights under the exclusive license contained in the International Distributor Agreement.  In addition, Technologies have infringed Cyrano US's rights as the copyright owner or exclusive licensee of these products.

114.    A justiciable controversy within the meaning of 28 U.S.C. § 2201 exists between

Cyrano US and Technologies concerning the ownership of the copyrights to Test, Impact,

and OpenSTA, and the license rights to Workbench, Production, OpenSTA, and its

related modules.

115.    Cyrano US is entitled to a declaration that it is the owner of all copyrights to Test,

Impact, and UK/US OpenSTA.

116.    Cyrano US is entitled to a declaration that it owns certain copyrights to

OpenSTA's Modeller module.

117.    Cyrano US is entitled to a declaration that it remains the exclusive licensee of

Workbench, Production, and Cyrano SA's rights in OpenSTA and OpenSTA's

commercial modules, DB Monitor and SQL Analysis, under the International Distributor

Agreement.

<u>REQUESTS FOR RELIEF</u>

WHEREFORE, the Defendant and Plaintiff-In-Counterclaim, Cyrano US,

respectfully requests that this Court:

1.    Dismiss the Plaintiffs' Complaint in its entirety with prejudice and award

Cyrano US its attorneys' fees and costs under Rule 11, General Laws c. 231 § 6F, the

Copyrights laws, and other applicable law.

2.    Deny Plaintiffs' requests for preliminary and permanent injunctive relief.

3.    Enter an order granting Cyrano US the following preliminary and

permanent injunctive relief:

a)    Ordering defendants-in-counterclaim to immediately cease and

desist manufacturing, reproducing, copying, marketing, selling,

30

distributing, displaying, demonstrating, or otherwise using Test, Impact, UK/US OpenSTA, and Modeller (collectively, the "Cyrano US Software"), and any software products that are substantially similar to, derivative of, or that otherwise infringe the Cyrano US Software (collectively, "Infringing Software") in the United States and Worldwide with the exception that defendants-in-counterclaim may use OpenSTA non-commercially on the open-source GNU site as permitted by the GNU Public License;

b)    Ordering defendants-in-counterclaim to immediately cease and desist manufacturing, reproducing, copying, marketing, selling, distributing, displaying, demonstrating or otherwise using their software products Quotium Pro, Quotium Impact, and any other products that are substantially similar to the Cyrano US Software as they constitute Infringing Software;

c)    Ordering defendants-in-counterclaim to immediately cease and desist representing, by any form of communication (including on any internet or open source code forum), that they own, created or are the source of origin of any of the Cyrano US Software, and to supplement and correct all previous representations to that effect within two (2) business days;

d)    Ordering defendants-in-counterclaim to immediately identify all persons (as those terms are defined in Local Rule 26.5) to whom they have distributed or sold Cyrano US Software or Infringing

31

Software, including but not limited to Quotium Pro and Quotium
Impact, providing such information to Cyrano US within two (2)
business days;

e)     Ordering defendants-in-counterclaim to deliver to Cyrano US
within three (3) business days the originals and all copies of the
Cyrano US Software (except OpenSTA, as it is an open source
product) and Infringing Software, and all related materials, which
are within defendants-in-counterclaim's possession, custody, or
control, for inspection by Cyrano US and impoundment with the
Court during the pendency of this action;

f)     Ordering defendants-in-counterclaim to immediately recall all
copies of Cyrano US Software and Infringing Software, and all
portions thereof, from all distributors, resellers, or agents to which
such Software has been provided by defendants-in-counterclaim;

g)     Enjoining defendants-in-counterclaim from interfering in any way,
shape or manner with Cyrano US's sole, exclusive rights under the
International Distributor Agreement "to market, distribute, support
and deal in" the software products Workbench, Production,
OpenSTA and its associated commercial modules, DB Monitor
and SQL Analysis, and its right to use the trademarks "Cyrano
Workbench" and "Cyrano Production" everywhere in the world
except Continental Europe;

32

        h)      Ordering defendants-in-counterclaim to immediately cease and desist reproducing, distributing or otherwise using Workbench and Production throughout the World excepting Continental Europe; and

        i)      Enjoining defendants-in-counterclaim from soliciting or otherwise contacting Cyrano's customers, distributors, and employees.

4.      Enter judgment and award damages in favor of Cyrano US on Counts I-IX of the Counterclaim, in an amount to be determined at trial.

5.      Award Cyrano US statutory damages, attorneys' fees and costs under the Copyright Act and Lanham Act.

6.      Award Cyrano US treble damages, attorneys' fees and expenses incurred in this action as a result of defendants-in-counterclaim's violations of G.L. c. 93A.

7.      Award Cyrano US any equitable or other relief requested including but not limited to pre-judgment interest, costs and attorneys' fees.

8.      Grant such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Cyrano US demands a jury trial on all issues so triable.

Respectfully Submitted,

CYRANO, INC.

By its Attorneys,

_signature_

Daniel C. Winston, BBO #562209
B. Stephanie Siegmann, BBO #638257
HILL & BARLOW,
*a Professional Corporation*
One International Place
Boston, Massachusetts 02110
(617) 428-3000

Dated:   November 19, 2002

Certificate of Service

I hereby certify that a true copy of the above document was served upon the attorney of record for Technologies, S.A., and Quotium Technologies, S.A., and upon Quotium Technologies, Inc. by mail on November 19, 2002.

_signature_

B. Stephanie Siegmann

QQZV01_.DOC (879391 v. 1)

**CERTIFICATE OF SERVICE**
I hereby certify that a true copy of the above document was served upon the attorney of record for each other party by mail (by hand) on 12/2/02

_signature_

34

# COMPARISON OF ALLEGATIONS

Note:   This table is only a partial listing of parallels.  Compare, e.g., Complaint ¶¶ 46-57, 73-79 and Counterclaim ¶¶ 53-63, 65-71.

| **Present Action**<br>Complaint by ¶ | **Quotium Action**<br>Counterclaim by ¶ |
|---|---|
| "7. Cyrano distributes software that enables users to test, monitor, and optimize their data processing and information management systems." | "7. Cyrano US distributes software that enables users to test, monitor, and optimize their data processing and information management systems." |
| "8. From about 1995 to 2001, Cyrano was affiliated with two legally independent foreign companies, Cyrano U.K. Limited ('Cyrano UK'), an English software company, and Cyrano S.A. ('Cyrano SA'), a French company.  Both foreign companies were liquidated in 2001-2002, when Cyrano US has acquired the assets of Cyrano UK." | "8. In the 1990s and prior to 2001, Cyrano US was affiliated with two legally independent foreign companies, Cyrano U.K. Limited ('Cyrano UK'), an English software company, and Cyrano S.A. ('Cyrano SA'), a French company.  Both foreign companies have been liquidated and Cyrano US has acquired the assets of Cyrano UK." |
| "9. Among the many products developed, marketed, and sold by Cyrano, and previously Cyrano UK before it was liquidated, are computer software products formerly called 'CYRANO Test' and 'CYRANO Impact', now respectively called 'Test' and 'Impact.'. . . In March 2002, Cyrano US acquired the assets and intellectual property of Cyrano UK, including all of its copyright ownership and rights to Test and Impact." | "9. Among the many products developed, marketed, and sold by Cyrano US, and previously Cyrano UK before it was liquidated, are computer software products called 'Cyrano Test' ('Test') and 'Cyrano Impact' ('Impact')."<br><br>"15. In March 2002, Cyrano US acquired the assets and intellectual property of Cyrano UK, including all of its copyright ownership and rights to Test and Impact." |
| "10. Under an International Distributor Agreement ('Distributor Agreement', attached as Exhibit 1) between Cyrano SA and Cyrano last amended in April 2001, Cyrano hold [sic] until June 30, 2007, the exclusive license to distribute, use, support, and deal in several additional software products throughout the World, other than Continental Europe.  These licensed software products include two products that were developed by I.M.M. (or Cyrano SA), | "22. Pursuant to an International Distributor Agreement between Cyrano S.A. and Cyrano US, Cyrano US holds the exclusive license to distribute, use, support, and deal in several additional software products throughout the World, including in the United States, Canada, Latin America, Ireland, and the United Kingdom, with the sole exception of the Continental Europe.  These licensed software products include two products that were owned by |

| | |
|---|---|
| 'CYRANO Workbench' ('Workbench') and 'CYRANO Production' ('Production'), and a third product, 'OpenSTA' that was developed from Impact with some Cyrano SA components. . . ." | Cyrano SA, Cyrano Workbench ('Workbench') and Cyrano Production ('Production'). In addition, the Distributor Agreement granted Cyrano US an exclusive license to Cyrano SA's rights in OpenSTA and any associated commercial modules. The agreement expires on June 30, 2007 and has not been properly terminated" |
| "11. Quotium are also engaged in the business of distributing software." | "24. Technologies are also engaged in the business of developing, marketing, manufacturing, and selling computer software products. Technologies are competitors of Cyrano US." |
| "13. During extended negotiations between Quotium and the Trustee, upon information and belief, Quotium obtained access to source code for Test, Impact and OpenSTA that belonged to Cyrano, . . ." | "26. During these negotiations, on information and belief, Technologies obtained access to the source code of various software products that had been owned, licensed, or available to Cyrano SA." |
| "16. Immediately upon obtaining in 2001-2002 the assets that it admitted were 'Contested', Quotium began to manufacture, distribute, promote and sell QuotiumPro and other products created from Test, Impact, and OpenSTA throughout the World, including in the United Kingdom, Latin America, and the United States, in violation of Cyrano's copyrights. In or around August 2002, Quotium began marketing a product called 'Quotium Impact,' which based upon information and belief, is substantially similar, if not identical, to Cyrano's Impact product." | "33. After May 2002, Technologies began to manufacture, distribute, promote and sell QuotiumPro and other products created from Test, Impact, and OpenSTA throughout the World, including in the United Kingdom, Latin America, and the United States, in violation of Cyrano US's copyrights. In or around August 2002, Technologies began marketing a product called 'Quotium Impact,' which based on information and belief, is substantially similar, if not identical, to Cyrano US's Impact product." |
| "17. From at least May 2002 to the present, Quotium have marketed, distributed and sold OpenSTA's commercial modules, DB Monitor and SQL Analysis, Workbench, and Production throughout the World, including the United Kingdom, Latin America, and the United States in violation of Cyrano's copyrights in Test, Impact and | "34. Additionally, in or around May 2002, Technologies also began marketing, distributing and selling OpenSTA's commercial modules, DB Monitor and SQL Analysis, Workbench, and Production throughout the World, including the United Kingdom, Latin America, and the United States." |

| | |
|---|---|
| OpenSTA and Cyrano's exclusive distribution rights for Workbench, Production and OpenSTA under the Distributor Agreement." | States." |
| "18. Since on or about May 2002, until they succeeded by 2003 in reducing Cyrano to a fraction of its former size, Quotium have engaged in a deceptive marketing campaign, consisting of misrepresentations concerning its rights to Cyrano's software products and the status of Cyrano. Quotium have engaged in their activities in a wrongful effort to steal customers, distributors, and employees of Cyrano:" | "36. Since on or about May 2002, Technologies have engaged in a deceptive marketing campaign, consisting of misrepresentations concerning its rights to Cyrano US's software products and the status of Cyrano US. Technologies have engaged in their activities in a wrongful effort to steal customers, distributors, and employees of Cyrano US." |
| "18(a) In or around May and July 2002, Quotium released new open-source versions of OpenSTA, called Version 1.4.0 and Version 1.4.1, in which they have altered the information displayed in OpenSTA to indicate that all copyrights to OpenSTA are owned by Quotium Technologies, S.A." | "37. In or around May and July 2002, Technologies released new open-source versions of OpenSTA, called Version 1.4.0 and Version 1.4.1, in which they have altered the information displayed in OpenSTA to indicate that all copyrights to OpenSTA are owned by Quotium Technologies, S.A. Technologies have also made false representations of copyright ownership to, and authorship of, OpenSTA including on the GNU open-source site." |
| "18(c) In 2002, often during regular business hours, Quotium solicited key Cyrano employees to terminate their employment with Cyrano and work for Quotium. Quotium succeeded in soliciting away former Cyrano Senior Account Manager William Sweeney, and, upon information and belief, induced him to breach his confidentiality agreement by soliciting a Cyrano prospective customer known to him, DB Consultores, resulting in Cyrano's loss of business." | "43. Technologies have targeted and solicited key Cyrano US employees to terminate their employment with Cyrano US, and work for Technologies. These contacts are often made during regular business hours, which disrupts Cyrano US's business."<br><br>"49. For example, Mr. Sweeney used and disclosed Cyrano US's confidential information concerning a prospective customer in Costa Rica, DB Consultores, with whom Cyrano US had been in negotiations for over four months. As a result of these negotiations and Cyrano US's work with DB Consultores, a |

|  | software contract was being finalized in July 2002.  Shortly before the contract was to be signed, Cyrano US learned that Mr. Sweeney, immediately after starting his employment at Technologies, contacted DB Consultores to try to sell software for Technologies using Cyrano US's confidential information and in violation of Cyrano US's copyrights.  At that time, Mr. Sweeney had full knowledge of Cyrano US's business development activities and the status and content of Cyrano US's contract negotiations with DB Consultores." |

## COMPARISON OF COUNTS

| Present Action | Counterclaims |
| --- | --- |
| I: Declaratory Judgment of Copyright Ownership | IX: Declaratory Judgment (¶¶ 53-62) |
| II: Declaratory Judgment of Validity of Distributor Agreement | IX: Declaratory Judgment (¶ 63) |
| III: Copyright Infringement in violation of 17 U.S.C. §§ 101 et seq. | I: Copyright Infringement in violation of 17 U.S.C. §§ 101 et seq. |
| IV: Breach of Distributor Agreement | VII: Breach of Contract |
| V: Declaratory Judgment of Invalidity and Cancellation of CYRANO® | [new count] |
| VI: Unfair Competition and False Designation of Origin in Violation of the Lanham act, 15 U.S.C. § 1125(a) | II: Unfair Competition and False Designation of Origin in Violation of the Lanham act, 15 U.S.C. § 1125(a) |
| VII: Common Law Unfair Competition | III: Common Law Unfair Competition |
| VIII: Unfair and Deceptive Acts or Practices—Violation of Mass. Gen. Laws ch. 93A | VIII: Unfair and Deceptive Acts or Practices—Violation of G.L c. 93A |
| IX: Fraud on the Court | [new count] |

**COMPARISON OF PRAYERS FOR RELIEF**

| <u>Present Action</u><br>Complaint at 19-22 | <u>Quotium Action</u><br>Counterclaims at 30-33 |
|---|---|
| 1(a): [Enter an order declaring] "Cyrano owns the copyrights in Test, Impact and OpenSTA." | ¶ 115: "Cyrano is entitled to a declaration that it is the owner of all copyrights to Test, Impact, and UK/US OpenSTA." |
| 1(b): "the International Distributor Agreement is valid and effective against Quotium through June 30, 2007…" | ¶ 117: "Cyrano US is entitled to a declaration that it remains the exclusive licensee of Workbench, Production, and Cyrano SA's rights in OpenSTA and OpenSTA's commercial modules, DB Monitor and SQL Analysis, under the International Distributor Agreement." |
| 3(a): [Enter an order] "Ordering Quotium to immediately cease and desist manufacturing, reproducing, copying, marketing, selling, distributing, displaying, demonstrating, or otherwise using Test, Impact, OpenSTA, and Modeller (collectively, the "Cyrano Software"), and any software products that are substantially similar to, derivative of, or that otherwise infringe the Cyrano's copyright in Cyrano Software (collectively, "Infringing Software") in the United States and Worldwide with the exception that defendants-in-counterclaim may use OpenSTA non-commercially on the open-source GNU site as permitted by the GNU Public License;" | 3(a): [Enter an order] "Ordering defendants-in-counterclaim to immediately cease and desist manufacturing, reproducing, copying, marketing, selling, distributing, displaying, demonstrating, or otherwise using Test, Impact, UK/US OpenSTA, and Modeller (collectively, the "Cyrano US Software"), and any software products that are substantially similar to, derivative of, or that otherwise infringe the Cyrano US Software (collectively, "Infringing Software") in the United States and Worldwide with the exception that defendants-in-counterclaim may use OpenSTA non-commercially on the open-source GNU site as permitted by the GNU Public License;" |
| 3(b): "Ordering Quotium to immediately cease and desist manufacturing, reproducing, copying, marketing, selling, distributing, displaying, demonstrating, or otherwise using their software products QuotiumPRO, QTest 4.0, and any other products that are substantially similar to the Cyrano Software as they constitute Infringing Software;" | 3(b): "Ordering Quotium to immediately cease and desist manufacturing, reproducing, copying, marketing, selling, distributing, displaying, demonstrating, or otherwise using their software products QuotiumPRO, Quotium Impact, and any other products that are substantially similar to the Cyrano US Software as they constitute Infringing Software;" |

| | |
|---|---|
| 3(c): "Ordering Quotium to immediately cease and desist representing, by any form of communication (including on any internet or open source code forum), that they own, created or are the source of origin of any of the Cyrano Software, and to supplement and correct all previous representations to that effect within five (5) business days;" | 3(c): "Ordering Quotium to immediately cease and desist representing, by any form of communication (including on any internet or open source code forum), that they own, created or are the source of origin of any of the Cyrano US Software, and to supplement and correct all previous representations to that effect within two (2) business days;" |
| 3(d): "Ordering Quotium to immediately identify (as those terms are defined in Local Rule 26.5) to whom they have distributed or sold Cyrano Software or Infringing Software, including but not limited to QuotiumPRO and QTest 4.0, providing such information to Cyrano within five (5) business days:" | 3(d): "Ordering Quotium to immediately identify (as those terms are defined in Local Rule 26.5) to whom they have distributed or sold Cyrano US Software or Infringing Software, including but not limited to QuotiumPRO and Quotium Impact, providing such information to Cyrano within two (2) business days:" |
| 3(e): "Ordering Quotium to deliver to Cyrano within five (5) business days the originals and all copies of the Cyrano Software (except OpenSTA, as it is an open source product) and Infringing Software, and all related materials, which are within Quotium's possession, custody, or control, for inspection by Cyrano and impoundment with the Court during the pendency of this action:" | 3(e): "Ordering Quotium to deliver to Cyrano within three (3) business days the originals and all copies of the Cyrano US Software (except OpenSTA, as it is an open source product) and Infringing Software, and all related materials, which are within defendants-in-counterclaim's possession, custody, or control, for inspection by Cyrano US and impoundment with the Court during the pendency of this action:" |
| 3(f): "Ordering Quotium to immediately recall all copies of Cyrano Software and Infringing Software, and all portions thereof, from all distributors, resellers, or agents to which such Software has been provided by defendants-in-counterclaim;" | 3(f): "Ordering defendants-in-counterclaim to immediately recall all copies of Cyrano US Software and Infringing Software, and all portions thereof, from all distributors, resellers, or agents to which such Software has been provided by defendants-in-counterclaim;" |
| 3(f):[1] "Enjoining Quotium from interfering in any way, shape or manner with Cyrano's sole, exclusive rights under the International Distributor Agreement 'to market, distribute, support and deal in' the | 3(g): "Enjoining defendants-in-counterclaim from interfering in any way, shape or manner with Cyrano US's sole, exclusive rights under the International Distributor Agreement 'to market, |

---

[1] The prayers jump from 3(f) to 3(h). It is clear that a typing error has run what should have been 3(g) into 3(f).

| | |
|---|---|
| software products Workbench, Production, OpenSTA and its associated commercial modules, DB Monitor and SQL Analysis, and its right to use the trademarks 'Cyrano Workbench' and 'Cyrano Production' everywhere in the world except Continental Europe;" | distribute, support and deal in' the software products Workbench, Production, OpenSTA and its associated commercial modules, DB Monitor and SQL Analysis, and its right to use the trademarks 'Cyrano Workbench' and 'Cyrano Production' everywhere in the world except Continental Europe;" |
| 3(h): "Ordering Quotium to immediately cease and desist reproducing, distributing or otherwise using Workbench and Production throughout the World excepting Continental Europe;" | 3(h): "Ordering defendants-in-counterclaim to immediately cease and desist reproducing, distributing or otherwise using Workbench and Production throughout the World excepting Continental Europe;" |
| 3(i): "Enjoining Quotium from soliciting or otherwise contacting Cyrano's customers, distributors, and employees." | 3(i): "Enjoining defendants-in-counterclaim from soliciting or otherwise contacting Cyrano's customers, distributors, and employees." |
| 4: "Enter judgment and award damages in favor of Cyrano on Counts I-IX of the Complaint, in an amount to be determined at trial." | 4: "Enter judgment and award damages in favor of Cyrano US on Counts I-IX of the Counterclaim, in an amount to be determined at trial." |
| 5: "Award Cyrano statutory damages, attorneys' fees and costs under the Copyright Act and Lanham Act." | 5: "Award Cyrano US statutory damages, attorneys' fees and costs under the Copyright Act and Lanham Act." |
| 6: "Award Cyrano ttreble [sic] damages, attorneys' fees and expenses incurred in this action as a result of the defendants-in-counterclaim's violations of Mass. Gen. Laws ch. 93A." | 6: "Award Cyrano treble damages, attorneys' fees and expenses incurred in this action as a result of the defendants-in-counterclaim's violations of Mass. Gen. Laws ch. 93A." |
| 7: "Award Cyrano any equitable or other relief requested including but not limited to pre judgment interest, costs and attorneys' fees." | 7: "Award Cyrano US any equitable or other relief requested including but not limited to pre-judgment interest, costs and attorneys' fees." |
| 8: Grant such other and further relief as the Court deems just and proper." | 8: Grant such other and further relief as the Court deems just and proper." |

# United States Court of Appeals
## For the First Circuit

---

No. 05-1901

TECHNOLOGIES, S.A.; QUOTIUM TECHNOLOGIES, S.A.,

Plaintiffs, Appellees,

v.

CYRANO, INC.,

Defendant, Appellant.

---

Before

Boudin, <u>Chief Judge</u>,
Torruella, <u>Circuit Judge</u>.

---

ORDER OF COURT
Entered: June 20, 2005

The appellant has filed an Emergency Motion for Stay Pending
Appeal requesting a stay of the trademark-based injunctions of
paragraph 6 of the district court's June 8, 2005 order and
paragraphs D-F of the district court's February 24, 2005 order.
From the arguments presented, we cannot see how the appellant can
establish a substantial likelihood of success on the merits of its
appeal from the default judgment, even assuming that the appellant
would have had a legitimate case on the merits had it properly
opposed the appellee's motion for entry of a default judgment. Nor
can we identify any reason why the injunctions imposed by the
district court should matter on a short-term basis if the appellant
cannot demonstrate a probability of success on the merits of the
appeal from the default judgment. Accordingly, we are constrained
to deny the appellant's motion for a stay, no matter what the
equities in this case may be. However, in view of the unusual
circumstances of this case, our denial of the motion is without
prejudice to the appellant's ability to file a new application for
a stay which attempts to make the required showing on the

likelihood of success of the appeal from the default judgment.

The motion for stay is denied without prejudice.

By the Court:

Richard Cushing Donovan, Clerk.

MARGARET CARTER

By:_____
           Chief Deputy Clerk.

[cc: Kevin J. O'Connor, Esq., Mayeti Gametchu, Esq.,
Michael A. McCann, Esq., Christine M. Griffin, Esq.,
Daniel C. Winston, Esq., Stephen Y. Chow, Esq.,
Michael K. Sugrue, Esq.]

# United States Court of Appeals
## For the First Circuit

---

No. 05-1901

TECHNOLOGIES, S.A.; QUOTIUM TECHNOLOGIES, S.A.,

Plaintiffs, Appellees,

v.

CYRANO, INC.,

Defendant, Appellant.

---

**ORDER OF COURT**
**Entered: June 30, 2005**

The appellant's Renewed Emergency Motion for Stay Pending Appeal is <u>denied</u>.

By the Court:

Richard Cushing Donovan, Clerk.

MARGARET CARTER

By:_____

Chief Deputy Clerk.

[cc: Kevin J. O'Connor, Esq., Mayeti Gametchu, Esq., Michael A. McCann, Esq., Christine M. Griffin, Esq., Daniel C. Winston, Esq., Stephen Y. Chow, Esq., Michael K. Sugrue, Esq.]

**Westlaw Attached Printing Summary Report for OCONNOR,KEVIN 5021716**

| | |
|---|---|
| Date/Time of Request: | Thursday, September 22, 2005 17:29:00 Central |
| Client Identifier: | TECH |
| Database: | DCT |
| Citation Text: | Slip Copy |
| Lines: | 325 |
| Documents: | 1 |
| Images: | 0 |

The material accompanying this summary is subject to copyright. Usage is governed by contract with Thomson, West and their affiliates.



Slip Copy                                                                                                          Page 1

Slip Copy, 2005 WL 1126906 (N.D.Ill.)

**(Cite as: 2005 WL 1126906 (N.D.Ill.))**


**H**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.


United States District Court,
N.D. Illinois, Eastern Division.
CIVIX-DDI, LLC, Plaintiff,
v.
EXPEDIA, INC., Travelscape, Inc., and Verizon
Information Services, Inc.,
Defendants.
**No. 04 C 8031.**


May 2, 2005.

Raymond P. Niro, David Joseph Mahalek, David J.
Sheikh, Gregory T. Casimer, Niro, Scavone, Haller
& Niro, Ltd., Chicago, IL, for Plaintiff.


*MEMORANDUM OPINION AND ORDER*

ST. EVE, J.

**\*1** Plaintiff CIVIX-DDI, LLC ("Civix") filed this
suit against Defendant Verizon Information
Services, Inc. ("VIS"), Expedia, Inc. ("Expedia"),
and Travelscape, Inc. ("Travelscape") alleging
infringement of various claims of U.S. Patent Nos.
6,385,622 ("the '622 patent"), 6,408,307 ("the '307
patent"), and 6,415,291 ("the '291 patent"),
(collectively the "Patents-in-Suit"). Defendants
move to dismiss pursuant to Fed.R.Civ.P. 12(b)(6),
or in the alternative to stay, Civix's patent
infringement claims. The Court grants Defendants'
motion to dismiss.


BACKGROUND

In a separate action, currently pending before the
Court, Civix filed suit against several defendants,
including VIS, Expedia, and Travelscape alleging
infringement of five patents, including the

Patents-in-Suit. *Civix-DDI, LLC v. Motorola et al.,*
No. 03-C-3792, (N.D.Ill.) ("Initial Action"). In that
action, Defendants filed a declaratory judgment
counterclaim alleging noninfringement and
invalidity of all of the claims of the Patents-in-Suit.
(R. 26-1; Expedia and Travelscape's Counterclaims;
R. 104-1; VIS's Counterclaims at 31-2.) [FN1]

> FN1. Unless indicated otherwise, all
> citations to the record, cite to the docket of
> the Initial Action, No. 03-C-3792.

At the Status Hearing on September 9, 2004,
Defendants requested that the Court stay third party
discovery on prior art issues pending the Court's
decisions on Defendants' motions for summary
judgment on their licensing defenses. One of the
reasons cited by Defendants for requesting the stay
was that they needed certainty on the identity of
claims asserted by Civix prior to commencing third
party discovery. (R. 198-1; Sept. 9, 2004 Transcript
at 4:8- 23.) In light of Defendants' concerns, the
Court questioned counsel for Civix regarding
whether it had identified the claims it was asserting
against Defendants. (*Id.* at 8:22-9:2.) Civix
represented to Defendants and the Court that it had
identified the claims it was asserting against
Defendants:

> So, what we're talking about are five patents,
> approximately    one    independent--or    two
> independent--claims per patent. So, I think we've
> tried to focus it and narrow it so they know. I
> think the problem, at least that I'm hearing from
> them is that they don't like what we've picked.
> They say, "Well, you've expanded, rather than
> narrowed, the scope." I think we've narrowed the
> scope considerably. At least that was the goal.
> Your Honor indicated that's where you wanted us
> to be, and that's what we did. So, I think, at least
> from our perspective, there's nothing else we can
> do except tell them which claims-- [ ] and we've
> done that.

(R. 198-1; Sept. 9, 2004 Transcript at 5:12-25.) In

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                    Page 2

Slip Copy, 2005 WL 1126906 (N.D.Ill.)

**(Cite as: 2005 WL 1126906 (N.D.Ill.))**

direct response to the Court's questions, counsel for Civix later confirmed that its list of asserted claims provided to Defendants was not contingent on any proposal or deals:

Civix: Well, let me get rid of the deal business. I don't know about any details, but we're not proposing any deals. This is what we have. What [counsel] said in his letter was, "We understand now that this is going to narrow--"because we're narrowing"--this is going to narrow the invalidity contentions." If they don't want to narrow them, that's their business. Fine. They'll have to live with that at some point in time in this litigation. But as far as we're concerned, these are the claims. This is a summary chart that identifies the claims. We will have claim charts for every one of those claims, applying every one of the claims. Most of them we've done already, but we'll have the rest of them today or tomorrow at the latest. So, from our perspective as the plaintiff, we've identified with specificity what the claims are. We have narrowed it considerably from the number of claims that existed before. We've got five patents with nine independent claims. Dependent claims from those are also identified. They're more narrow. So, I don't think there's anything else we can do. And this is the summary chart.

**\*2** Court: So, it is your position, [ ], that putting aside everything else in the letter, which you handed to me, the claims at issue are those that are set forth on Page 2 of your -

Civix: That's correct.

Court:--letter?

[ ]

Court: And that is not contingent on any deal or any -

Civix: No

Court:--kind of agreement?

Civix: No continencies. If they think there's a deal that we proposed, we'll eliminate that.

Court: Okay.

Civix: Just so you understand, the letter says, "we understand now that this is going to narrow the validity contentions." They're apparently concerned that it doesn't. They've cited all the prior art known to man. That's fine. If they want

to do that, let them go ahead and do it. So, this is what our position is. No deals.

Court: Okay.

(*Id.* at 7:24-9:20.)

On September 30, 2004, at the close of fact discovery, VIS served its Supplemental Objections and Response to Civix's Interrogatory No. 3 identifying additional prior art. (No. 04-C-8031, R. 13-1; Civix's Resp. to Def.'s Mot. to Dismiss, Ex. B.) On November 22, 2004, Civix served on Defendants its Third Supplemental Interrogatory Response identifying additional claims it was asserting that Defendants had infringed. (*Id.* at Ex. 3.) On November 30, the Court lifted the stay on third party prior art discovery. (R. 201-1; Ct.'s Dec. 1, 2004 Minute Order.)

After receiving Civix's newly asserted claims, VIS moved to strike Civix's Supplemental Interrogatory Response identifying those new claims. (R. 206-1; VIS's Mot. to Strike.) In response, Civix withdrew its new claims, indicating it would file a separate suit asserting those claims. (R. 207-1; Civix's Resp. to VIS's Mot. to Strike.) Civix proceeded to file this action (the "Second Action") on December 13, 2004.

The Court issued its *Markman* Order in the Initial Action on April 6, 2005. Shortly thereafter, on April 13, 2005, Civix submitted to the Court a Supplemental Citation of Authority regarding its amendments to infringement contentions. (R. 275-1; Pl.'s Supp. Authority.) Civix included as exhibits its Supplemental Initial Disclosures to Defendants asserting additional patent claims against Defendants in the Initial Action. Many of these new claims are included in the patent claims asserted against Defendants in the Second Action.

### ANALYSIS

Defendants make two primary arguments in support of their motions to dismiss the Second Action. First, Defendants argue that Fed.R.Civ .P. 13(a) bars the Second Action because the newly asserted claims were compulsory counterclaims to Defendants's declaratory judgment claims in the Initial Action. Second, Defendants argue that the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                          Page 3

Slip Copy, 2005 WL 1126906 (N.D.Ill.)

**(Cite as: 2005 WL 1126906 (N.D.Ill.))**

doctrine of claim splitting bars the Second Action. In the alternative, if the Court does not dismiss Civix's Second Action, Defendants request that the Court stay this Second Action pending resolution of the Initial Action. Civix opposes dismissal and moves to consolidate the Second Action with the Initial Action. [FN2]

> FN2. Civix submitted additional authority on this issue on April 13, 2005, arguing that because the Court issued its *Markman* Opinion on April 6, 2005 in the Initial Action, that Civix now had the right to assert new patent claims against Defendants either in the Initial Action or in the Second Action. The Court addresses this new authority in Section V below.

I. Legal Standard

**\*3** The purpose of a motion to dismiss pursuant to Rule 12(b)(6) is to test the legal sufficiency of a complaint, not the merits of the case. *Triad Assocs., Inc. v. Chicago Hous. Auth.,* 892 F.2d 583, 586 (7th Cir.1989). When deciding a motion to dismiss pursuant to Rule 12(b)(6), the Court views "the complaint in the light most favorable to the plaintiff, taking as true all well-pleaded factual allegations and making all possible inferences from those allegations in his or her favor." *Lee v. City of Chicago,* 330 F.3d 456, 459 (7th Cir.2003).

II. Rule 13 Prohibits Civix From Asserting Its New Claims In The Second Action

Fed.R.Civ.P. 13(a) provides that:
  A pleading shall state as a counterclaim any claim which at the time of serving the pleading the pleader has against any opposing party, if it arises out of the transaction or occurrence that is the subject matter of the opposing party's claim.
Fed.R.Civ.P. 13(a). Rule 13(a) promotes judicial economy by avoiding multiple actions involving disputes arising from a common factual background. *In re Price,* 42 F.3d 1068, 1073 (7th Cir.1994).

Under Federal Circuit law, Civix's new claims of

infringement were compulsory counterclaims to Defendants' declaratory judgment claims of noninfringement. *Polymer Indus. Prods. Co. v. Bridgestone/Firestone, Inc.,* 347 F.3d 935, 937 (Fed.Cir.2003) (holding that "[w]hen the same patent is at issue in an action for declaration of noninfringement, a counterclaim for patent infringement is compulsory and if not made is deemed waived"). [FN3] Therefore, Rule 13(a) requires Civix to assert its new claims in the Initial Action and not in a separate law suit.

> FN3. The Court agrees with Defendants that the Court reaches the same result analyzing the compulsory counterclaim issue under Seventh Circuit precedent. Under the Seventh Circuit's "logical relationship" test Civix's newly asserted infringement claims involving the same patents and the same accused technology have a logical relationship to, and therefore arise out of the same transaction or occurrence as, Defendants declaratory judgment claims of noninfringement from the Initial Action. *In re Price,* 42 F.3d at 1072-73.

Civix argues that Rule 13(a) does not apply to the instant action because that rule only bars a claim in a second suit if the earlier suit has proceeded to a final judgment. Civix relies on *Asset Allocation & Management Co. v. Weston Employers Ins. Co.,* 892 F.2d 566, 572 (7th Cir.1989) in support of this argument. Civix's reliance is misplaced. *Asset Allocation* does not permit Civix to file this second action, merely because the Initial Action is still pending. In *Asset Allocation,* the Court held that a first court could not enjoin a party from bringing a compulsory counterclaim in a second court. In addressing the issue of the injunction, the Seventh Circuit noted that Rule 13(a) is usually enforced by a party pleading the first judgment as res judicata in the second suit. *Asset Allocation,* 892 F.2d at 572. The Seventh Circuit did not, however, address the issue of whether the second court could dismiss the lawsuit under Rule 13(a), nor did it state that Rule 13(a) required that the first suit proceed to judgment.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                    Page 4

Slip Copy, 2005 WL 1126906 (N.D.Ill.)

**(Cite as: 2005 WL 1126906 (N.D.Ill.))**

The plain language of Rule 13(a) does not require that the first case proceed to judgment before a compulsory counterclaim is barred. Instead, Civix relies on Advisory Committee Note 7 to Rule 13 stating that "[i]f the action proceeds to judgment without the interposition of a counterclaim as required by subdivision (a) of this rule, the counterclaim is barred." Fed.R.Civ.P. 13(a), Adv. Comm. N. 7. Advisory notes, however, are non-binding on the Court. *U.S. v. Hayes,* 983 F.2d 78, 82 (7th Cir.1992); *Deppe v. Tripp,* 863 F.2d 1356, 1362 (7th Cir.1988). Additionally, the note does not state that a final judgment in the first action is required before a court may bar a compulsory counterclaim in a second action. Instead, it merely confirms the scenario under which this situation typically arises--after a final judgment in the first action. Although no final judgment has been entered, the Initial Action is in its late stages. The Initial Action has been pending since June 2003, (R. 1-1; Compl), and fact discovery between the parties closed on September 30, 2004. (R. 108-1; Ct.'s April 14, 2004 Minute Order.) Rule 13(a) bars Civix from asserting its new patent claims in the Second Action because those claims were compulsory counterclaims to Defendants declaratory judgment claims in the Initial Action.

III. The Prohibition Against Claim Splitting Also Bars Civix From Asserting Its New Claims In The Second Action

**\*4** Alternatively, this action is also barred by the doctrine of claim splitting. Courts prohibit a litigant from splitting its claims into multiple actions when the litigant should have brought the claims in a single action. *American Stock Exch., LLC, v. Mopex, Inc.* 215 F.R.D. 87, 91 (S.D.N.Y.2002) ( "It is well established, under the doctrine of 'claim splitting,' that a party cannot avoid the effects of *res judicata* by splitting her cause of action into separate grounds of recovery and then raising the separate grounds in successive lawsuits"). As discussed above, Civix seeks to assert in the Second Action the identical patents against the identical accused technology as in the Initial Action.

Similar to its argument related to Rule 13(a), Civix argues that the doctrine of claim splitting only applies when the first action has proceeded to judgment. As Defendants point out, however, district courts have applied the doctrine of claim splitting when the first action was still pending. *Oxbow Energy, Inc. v. Koch Indus.,* 686 F.Supp. 278, 281-82 (D.Kan.1988) (holding that "even absent a final judgment [in the first action,] a party may not split his causes of action"); *In re Dual-Deck Video Cassette Recorder Antitrust Litig.,* No. 90-0118, 1991 U.S. Dist. LEXIS 20924, \*7-8 and \*14 (D.Ariz. Jan. 4, 1991) (dismissing second action under doctrine of claim splitting even though first action was still pending). Further, the Seventh Circuit has also stated that a court may dismiss an action "for reasons of wise judicial administration [ ] whenever it is duplicative of a parallel action already pending in another federal court." *Serlin v. Arthur Anderson & Co.,* 3 F.3d 221, 223 (7th Cir.1993).

Here, judicial economy requires the Court to dismiss this action. Civix attempts to assert new patent claims that it should have timely brought in the Initial Action. The doctrine of claim splitting prevents Civix from avoiding a potential adverse ruling from the Court regarding the timeliness of asserting the new claims in the Initial Action, by attempting to assert its new claims in the Second Action.

IV. The Court Will Address Civix's New Claims In The Initial Action

Alternatively, the Court dismisses this action for reasons of judicial economy. Even if Civix had properly filed the Second Action, Civix concedes that the new claims should be addressed in the Initial Action by requesting that the Court consolidate [FN4] the Second with the Initial Action. On April 13, 2005, Civix submitted Supplemental Initial Disclosures asserting new claims against Defendants in the Initial Action. (R. 275-1; Pl.'s Supp. Authority, Exs. A, B.) Many of those new claims in the Initial Action are also included in the new claims before the Court here. In the interests of judicial economy, the Court will

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                          Page 5

Slip Copy, 2005 WL 1126906 (N.D.Ill.)

**(Cite as: 2005 WL 1126906 (N.D.Ill.))**

address whether Civix may assert these new claims in the Initial Action. *See Abbott Labs. v. Selfcare, Inc.,* No. 98-C-7102, 1999 WL 162805, *3 (N.D.Ill. Mar.15, 1999) (noting that the district court has discretion in matters of judicial economy, including in which of multiple patent cases common disputes should be litigated) (citing *Serco Servx. Co., L.P. v. Kelley Co., Inc.,* 51 F.3d 1037, 1039 (Fed.Cir.1995) ).

> FN4. In its Response to the Defendants' Motions to Dismiss, Civix requests the Court to consolidate this action with the Initial action to promote judicial economy. (No. 04-C-8031, R. 13-1; Pl.'s Resp. to Def.'s Mot. to Dismiss at 2, 14.)

V. Civix's Supplemental Authority Does Not Support Allowing it to Assert New Patent Claims

*5 Civix cites *Becton Dickinson & Co. v. Syntron Bioresearch, Inc.,* 1998 U.S. Dist. LEXIS 222082, *46 (S.D.Cal.1998) and *Johns Hopkins University v. Cellpro, Inc.,* 152 F.2d 1342, 1357 (Fed.Cir.1998), arguing that because the Court has construed the claims following a claim construction hearing, Civix has the right to assert new patent claims against Defendants. The Court disagrees with Civix's interpretation of its supplemental authority. Each of the cases cited by Civix involves a party supplementing a liability theory for existing patent claims. [FN5] Here, Civix seeks to assert an entire new set of patent claims against Defendants after the Court has issued its *Markman* ruling. The *Markman* ruling followed the close of all fact discovery [FN6] and was based on disputed claim terms from a set of asserted claims that Civix had previously identified as its final set of asserted claims. (R. 198-1; Sept. 9, 2004 Transcript at 8:22-9:19.) Allowing Civix the right to assert new claims against Defendants based on the *Markman* ruling would require at least some additional fact discovery and would likely require an additional *Markman* decision by the Court on any new disputed claim terms.

> FN5. In *Becton Dickinson,* the patentee sought to amend its theory of infringement

for the same claims that it was already asserting. In other words, the patentee sought to change the aspect of the accused product that it contended satisfied a particular claim element. Similarly, in *Johns Hopkins,* the accused infringer sought to add a new prior art reference in support of its invalidity theory for an existing asserted patent claim.

> FN6. The parties have long known that the Court would hold a *Markman* hearing at or near the close of discovery. Counsel for Civix was also aware that the *Markman* process was forthcoming when it made its unequivocal representation that its list of asserted claims was final. (R. 198-1; Sept. 9, 2004 Transcript at 8:22-9:19.)

Allowing the Court's *Markman* ruling to automatically give the patentee the right to assert a new set of patent claims would also defeat one of the purposes of rendering a *Markman* ruling prior to trial--narrowing the factual issues in the case. *See State Contracting & Eng'g Corp. v. Condotte Am., Inc.,* 346 F.3d 1057, 1071 (Fed.Cir.2003). With numerous claims in the five Patents-in-Suit, Civix could maintain its litigation against Defendants for years under this procedure. This would be inefficient and unfair to Defendants. Accordingly, the supplemental authority cited by Civix does not demonstrate that Civix has the right to assert new patent claims against Defendants merely because the Court issued its *Markman* ruling.

CONCLUSION
Rule 13(a) and the doctrine of claim splitting prohibit Civix from asserting patent claims in this Second Action that it failed to timely assert in the Initial Action, involving the same patents, the same parties, and the same accused products. Because Civix now seeks to add new claims in the Initial Action, the Court will address in that case Civix's attempt to bring new claims. Accordingly, the Court grants Defendants Motions to Dismiss Pursuant to Rule 12(b)(6).

Slip Copy, 2005 WL 1126906 (N.D.Ill.)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                    Page 6

Slip Copy, 2005 WL 1126906 (N.D.Ill.)

**(Cite as: 2005 WL 1126906 (N.D.Ill.))**

**Motions, Pleadings and Filings (Back to top)**

• 2004 WL 3023199 (Trial Pleading) Complaint (Dec. 13, 2004)

• 1:04cv08031 (Docket)
                                (Dec. 13, 2004)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

## UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

```
                                        )
TECHNOLOGIES, S.A. and                  )
QUOTIUM TECHNOLOGIES, S.A.,             )
                                        )
        Plaintiffs - Appellees,         )
                                        )
v.                                      )       Appeal Docket No. 05-1901
                                        )
CYRANO, INC.,                           )
                                        )
        Defendant - Appellants.         )
                                        )
```

## DEFENDANT-APPELLANT'S STATEMENT OF THE ISSUES FOR REVIEW AND DESIGNATION OF THE CONTENTS OF THE APPENDIX

Pursuant to Rule 30(b)(1) of the Federal Rules of Civil Procedure, Defendant-Appellant

Cyrano, Inc. ("Cyrano") hereby states the issues for review and designates the materials for the

joint appendix, as follows:

I.     Statement of the Issues

    A.    Are the trial court's judgments and orders of February 24, 2005 and June 8, 2005 interlocutory because there has been no evidentiary hearing and no finding on damages?

    B.    If the default judgment entered on February 24, 2005 is final, did the trial court abuse its discretion by entering default judgment against Defendant after allowing Defendant's prior counsel to withdraw during a lull in the litigation with an order to hire new counsel that Defendant was ably to comply with only after it received the first notice of Plaintiffs' motion for a default judgment, and where Defendant's new counsel had just entered an appearance?

    C.    If the dismissal of counterclaims entered on February 24, 2005 is final, did the trial court abuse its discretion by dismissing Defendant's counterclaims after allowing Defendant's prior counsel to withdraw during a lull in the litigation with an order to hire new counsel that Defendant was able to comply with only after it

received the first notice of Plaintiffs' motion for a default judgment, and where Defendant's new counsel had just entered an appearance?

D.    Did the trial court abuse its discretion by ordering injunctive relief against the Defendant in its Order that entered on February 24, 2005 that would irreparably injure both Defendant and the public, if enforced as attempted by Plaintiffs, based on Defendant's failure to earlier hire an attorney, rather than on any findings of fact?

E.    Did the trial court abuse its discretion in its Order that entered on June 8, 2005 when it denied Defendant's Emergency Motion to Remove Entry of Default and Request for Emergency Hearing; in the Alternative, Motion for Stay of Default Judgment; in the Alternative, Motion for Reconsideration, where Defendant showed that Plaintiffs had served "Counsel" when there was no counsel and had failed to advise the trial court of judgments in French courts that defeated Plaintiffs' case?

F.    Did the trial court abuse its discretion in its June 8, 2005 Order when it denied Defendant's Motion for Injunctive Relief, pending a final determination of the rights of the parties, to prohibit the dissemination of information and hold in escrow materials that it was forced to deliver to Plaintiff pursuant to the Court's Order that entered on February 24, 2005 where Defendant showed that it was reasonably likely to prevail on the merits and that it, and the public, would suffer substantial harm if the previous Order continued to be implemented?

G.    Did the trial court abuse its discretion in its June 8, 2005 Order when it denied Defendant's Motion to Reconsider Order Granting Motion to Dismiss, which included additional showings that Plaintiffs, having recently admitted non-use of the trademark on which the injunctive relief was based, had failed to advise the trial court of the invalidity of the registration?

H.    Did the trial court abuse its discretion by ordering injunctive relief against Defendant in its June 8, 2005 Order that, by extending an invalid trademark registration to compel transfer of an Internet domain name, would eliminate the only means by which thousands of users of Defendant's software communicate with Defendant, thus irreparably injuring both Defendant and the public?

I.    Did the trial court abuse its discretion by denying Defendant's Emergency Motion to Stay or Reconsider the Court's June 8, 2005 Order, notwithstanding a showing that Plaintiffs' admission of non-use of the trademark in dispute was newly-discovered evidence and that invalidation of that trademark registration made the current and future application of the injunction manifestly unjust?

2

II.    Designation of the Materials for the Joint Appendix

    A.    Relevant docket entries in the proceeding below

        1.    A certified copy of the complete district court docket through June 22, 2005.

    B.    Relevant portions of the pleadings, charge, findings, or opinion

| *Date:* | *Paper No.:* | *Description:* |
| --- | --- | --- |
| 07/12/02 | 1 | Complaint |
| 10/11/02 | 11 | Cyrano's motion for preliminary injunction |
| 10/11/02 | 13 | Cyrano's appendix in support of motion for preliminary injunction, including all affidavits and exhibits |
| 10/18/02 | 15 | Affidavit of Geoffrey Hall |
| 10/18/02 | 16 | Affidavit of Malcolm Charles Green |
| 10/28/02 | 18 | Quotium's cross-motion for preliminary injunction |
| 10/28/02 | 21 | Quotium's appendix/exhibits in support of opposition memorandum, volume I |
| 10/28/02 | 22 | Quotium's appendix/exhibits in support of opposition memorandum, volume II |
| 11/13/02 | 23 | Cyrano's cross-motion for preliminary injunction |
| 11/13/02 | 26 | Cyrano's appendix in support of cross-motion for preliminary injunction, including all affidavits and exhibits |
| 12/04/02 | 32 | Quotium's appendix/exhibits in support of opposition memorandum |
| 12/16/02 | 38 | Cyrano's amended answer to complaint and amended counterclaim |
| 12/18/02 | 40 | Quotium's answer to amended counterclaim |
| 06/19/03 | 71 | Cyrano's motion for partial summary judgment |

3

| 06/19/03 | 73 | Cyrano's undisputed statement of facts |
| 06/19/03 | 74 | Appendix of exhibits in support of Cyrano's motion for partial summary judgment, volume I |
| 06/19/03 | 75 | Appendix of exhibits in support of Cyrano's motion for partial summary judgment, volume II |
| 06/19/03 | 76 | Exhibit A to supplemental affidavit of Philippe Eyries in support of Cyrano's motion for partial summary judgment |
| 06/24/03 | 78 | Affidavit of Malcolm Charles Green |
| 07/31/03 | 84 | Quotium's statement of disputed facts |
| 12/10/03 | 92 | Edwards & Angell's motion for leave to withdraw |
| 02/10/04 | 94 | Court order allowing E&A's motion to withdraw |
| 03/17/04 | 95 | Court order dismissing case |
| 03/22/04 | 96 | Quotium's emergency motion to reopen case |
| 09/21/04 | 97 | Court order regarding status report |
| 10/06/04 | 100 | Quotium's motion for entry of default |
| 12/06/04 | 102 | Clerk's entry of default as to Cyrano |
| 12/06/04 | 103 | Standing order on motions for default judgment |
| 01/27/05 | 105 | Quotium's motion for entry of default, equitable relief, and hearing on damages |
| 01/27/05 | 107 | Quotium's motion to dismiss counterclaims |
| 02/15/05 | 110 | Notice of appearance of Perkins Smith & Cohen on behalf of Cyrano |
| 02/25/05 | 113 | Cyrano's emergency motion to remove entry of default judgment and request for emergency hearing; alternative motion for stay; alternative motion for reconsideration |
| 02/25/05 | 114 | Affidavit of C. Simon |

4

| 02/25/05 | 114 | Affidavit of Scott Almeda |
| 02/28/05 | 115 | Cyrano's motion for hearing removal of default, including attachments |
| 03/03/05 | 120 | Cyrano's motion for preliminary injunction |
| 03/07/05 | 121 | Cyrano's motion for reconsideration of order granting motion to dismiss |
| 03/08/05 | 123 | Supplemental affidavit of Scott Almeda |
| 03/16/05 | 127 | All affidavits and attachments to Cyrano's opposition to motion for entry of default and motion to dismiss |
| 03/25/05 | 129 | Quotium's motion for contempt against Cyrano |
| 04/12/05 | 134 | Affidavit of Scott Almeda in response to declaration |
| 04/12/05 | 135 | Cyrano's emergency motion for leave to file supplemental trademark documents, including all affidavits and attachments |
| 04/15/05 | 137 | Cyrano's motion for leave to advise court of trademark application with supplemental affidavits |
| 04/15/05 | 138 | Affidavit of Scott Almeda dated 04/15/05 |
| 04/15/05 | 139 | Affidavit of Mary B. Aversano |
| 05/18/05 | 141 | Quotium's response to Cyrano's motion for leave to file supplemental trademark documents |
| 05/18/05 | 142 | Affidavits supporting Quotium's response |
| 06/14/05 | 148 | Cyrano's emergency motion to stay or reconsider, including Attachment No. 1, Affidavit of Scott Almeda dated 06/12/05 |
| 06/14/05 | 149 | Quotium's emergency motion for contempt against Cyrano |
| 06/22/05 | 156 | Amended notice of appeal |

C.    The judgment, order, or decision in question

    1.    Electronic order entered on February 24, 2005 granting motion for entry of default, granting motion to dismiss counterclaims

    2.    Order of default judgment as to liability entered on February 24, 2005 (Paper No. 111)

    3.    Order regarding injunctive relief entered on February 24, 2005 (Paper No. 112)

    4.    Memorandum of Judge Joseph L. Tauro entered 06/08/05 (Paper No. 144)

    5.    Order entered on June 8, 2005 (Paper No. 145)

    6.    Electronic order entered on June 15, 2005 denying emergency motion to stay or reconsider

D.    Other parts of the record

| 09/30/04 | 98  | Letter from Kevin O'Connor |
| 10/06/04 | 99  | Letter from Mayeti Gametchu |
| 01/03/05 | 104 | Letter from John Pagliaro |
| 04/13/05 | 143 | Transcript of 04/13/05 motions hearing |

Respectfully submitted,

CYRANO, INC.,
Defendant-Appellant,
By its attorneys,

Stephen Y. Chow
1st Cir. Bar No. 106459
Michael K. Sugrue
1st Cir. Bar No. 106460
PERKINS SMITH & COHEN LLP
One Beacon Street, 30th Floor
Boston, MA 02108-3106
617-854-4000

Dated: July 25, 2005

6

## CERTIFICATE OF SERVICE

I, Michael K. Sugrue, certify that a copy of the foregoing Statement of the Issues for Review and Designation of the Contents of the Appendix has been hand-delivered this 25th day of July, 2005 to Kevin J. O'Connor and Mayeti Gametchu, Paragon Law Group LLP, 184 High Street, Boston, MA 02110.

Michael K. Sugrue

31610-3-designationappendix.doc

7

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| TECHNOLOGIES, S.A. and | * |
| QUOTIUM TECHNOLOGIES, S.A., | * |
|  | * |
| Plaintiffs, | * |
|  | * |
| v. | * |
|  | * |
| CYRANO, INC., | * |
|  | * |
| Defendant. | * |

Civil Action No. 02-11416-JLT

<u>MEMORANDUM</u>

June 8, 2005

TAURO, J.

Technologies, S.A. ("Technologies"), a French corporation, and its wholly-owned subsidiary Quotium Technologies ("Quotium"), also a French corporation, (collectively "Plaintiffs") brought suit against Cyrano, Inc. ("Defendant"), a Delaware corporation with its principal place of business in Newburyport, Massachusetts, for infringing their intellectual property rights.  On February 23, 2005, this court entered default judgment against Defendant and dismissed its counterclaims for failing to defend this action.  Subsequently, Defendant has filed a plethora of motions asking this court to remove the default judgment, reinstate its counterclaims, and for various other relief.

**Background**

Technologies is "a holding company that produces and distributes commercial software through a group of wholly-owned subsidiaries."[1]  Quotium and Defendant distribute computer

_____

[1] Compl. ¶ 6.

"software that enables users to test, monitor, and optimize their data processing and management solutions."[2]

From October of 1996 through 2001, Defendant claims that it "was affiliated with two legally independent foreign companies," Cyrano U.K., an English computer software company, and Cyrano S.A., a French computer software company.[3]  Prior to their affiliation, Cyrano U.K. was named Performance Software Limited ("Performance U.K.") and Defendant was Performance U.K.'s United States subsidiary named Performance Software, Inc. ("Performance U.S.").[4]  "In October of 1996, IMM, a French Company, purchased all the Ordinary Shares and Preference Shares of Performance UK."[5]  After the acquisition, IMM was renamed Cyrano S.A., Performance U.K. was renamed Cyrano U.K. Limited, and Performance U.S. was renamed Cyrano, Inc.[6]

In 1996, through an International Distributor Agreement ("Distribution Agreement"), which was amended in August of 2000 and April of 2001, Cyrano S.A. granted Defendant an exclusive license to market and distribute, *inter alia*, software entitled "Cyrano Production" and "Cyrano Workbench," and the trademark rights for these products, in the United States until June of 2007.[7]

---

[2]Id. ¶ 7; Cyrano, Inc.'s Undisputed Statement of Facts [#73] ¶ 1.

[3]Cyrano, Inc.'s Undisputed Statement of Facts [#73] ¶ 4.

[4]Id. ¶ 5.

[5]Id. ¶ 6.

[6]Id.

[7]Bitan Aff. Oct. 1, 2002 [#74] Ex. A.

2

In 2001, both Cyrano U.K. and Cyrano S.A. were liquidated.[8]  On March 21, 2002,

Defendant obtained the assets of Cyrano U.K. through a "Liquidators Sale Agreement."[9]  On May

16, 2002, Plaintiffs obtained the assets of Cyrano S.A. through a "Transfer Contract."[10]

On July 12, 2002, Plaintiffs brought suit in this court alleging that Defendant was

infringing the intellectual property rights Plaintiffs obtained from Cyrano S.A.  Plaintiffs claimed

that Defendant wrongly held itself out as the copyright holder and distributor of the software

Plaintiffs obtained from Cyrano S.A., such as Production and Workbench.[11]  Plaintiffs also alleged

that Defendant used the Cyrano trademark Plaintiffs purchased from Cyrano S.A.[12]  Moreover,

Plaintiffs asserted that Defendant did not claim any rights relating to the use or ownership of

Production, Workbench, or the Cyrano trademark, during the liquidation proceedings of Cyrano

S.A.[13]

After Plaintiffs filed their complaint, Defendant participated in this litigation.  In October

of 2002, Defendant moved for a preliminary injunction, which this court denied.  By December of

2002, Defendant filed an answer with counterclaims and an amended answer with amended

counterclaims.

In June of 2003, Defendant moved for partial summary judgment on its counterclaim for a

---

[8]Cyrano, Inc.'s Undisputed Statement of Facts [#73] ¶ 4.

[9]Bandey Aff. Oct. 8, 2002 [#74] Ex. C.

[10]Tiberini Decl. Oct. 25, 2002 [#21] Ex. J.

[11]Compl. ¶ 22.

[12]Id. ¶¶ 19, 23.

[13]Id. ¶¶ 18, 20.

declaratory judgment "that it is the sole owner to the copyrights of all versions of the computer

software called 'Cyrano Test'" ("Test").[14]  Defendant argued that it obtained the copyrights for

Test from Cyrano U.K. through the Liquidators Sale Agreement.[15]  Plaintiffs, however, alleged

that Cyrano U.K.'s copyrights to Test were transferred to Cyrano S.A. some time after Cyrano

S.A.'s acquisition of Cyrano U.K.[16]  In January of 2004, this court denied Defendant's motion for

partial summary judgment.

After this court denied its motion for summary judgment, Defendant's participation in this

litigation disappeared.  In December of 2003, Defendant's counsel, Edwards & Angell, LLP, filed

a motion for leave to withdraw from this case.[17]  On February 10, 2004, this court allowed

Edwards & Angell, LLP's motion and ordered Defendant to appoint new counsel by March 10,

2004.[18]  Defendant failed to appoint new counsel by the March 10, 2004 deadline and provided

this court with no explanation for its noncompliance.  On March 17, 2004, Defendant failed to

appear at the scheduled further conference.[19]  On September 21, 2004, after not hearing from

either party for six months, this court ordered the parties to file a status report by September 29,

---

[14]Cyrano, Inc.'s Mot. for Partial Summ. J. [#71] at 1.

[15]Mem. Supp. Cyrano, Inc.'s Mot. for Partial Summ. J. [#72] at 1-2.

[16]Pls.' Opp'n to Cyrano, Inc.'s Mot. for Partial Summ. J. [#81] at 10-11.

[17]Mot. of Edwards & Angell, LLP for Leave to Withdraw as Def.'s Counsel [#92].

[18]Order Feb. 10, 2004 [#94].

[19]On March 17, 2004, this court dismissed this case because neither party appeared at the
scheduled further conference.  On March 24, 2004, this court granted Plaintiffs' motion to reopen
the case.

2004.[20]  Again, Defendant failed to respond.

On October 6, 2004, Plaintiffs filed a motion for entry of default.  Plaintiffs argued that this court should enter default against Defendant because it failed to appoint new counsel and failed to defend or prosecute its counterclaims.[21]  On November 8, 2004, after waiting over a month and receiving no opposition from Defendant, this court allowed Plaintiffs' motion.  Almost one month later, on December 6, 2004, this court issued a notice of default and a standing order notifying the parties that default had been entered against Defendant and outlining the procedures the parties needed to follow to file a motion for entry of default judgment and to oppose such a motion.[22]

On January 27, 2005, Plaintiffs filed a motion for entry of default judgment and a motion to dismiss Defendant's counterclaims.  On February 15, 2005, nearly one year after this court ordered it to appoint new counsel, Defendant's counsel filed a notice of appearance and indicated that they would be responding to Plaintiffs' motions, "shortly."[23]  One week later, almost a month after Plaintiffs had filed their motions, and having received no response from Defendant's counsel, this court granted Plaintiffs' motion for entry of default judgment and motion to dismiss, entered injunctive relief for Plaintiffs, and scheduled a hearing for damages.

On February 25, 2005, Defendant filed an emergency motion for this court to remove the

---

[20]Procedural Order Sept. 21, 2004 [#97].

[21]Pls.' Mot. for Entry of Default [#100] at 2.

[22]Notice of Default [#102]; Standing Order Regarding Mots. for Default J. [#103].

[23]Notice of Appearance of Counsel for Def. [#110].

entry of default.[24]  Defendant informed this court of judicial proceedings in France regarding the intellectual property at issue in this case.[25]  Defendant noted that on or about July 9, 2002, it initiated suit against Plaintiffs in the Commercial Court of Paris, France ("Commercial Court").[26] In this suit, Defendant sought a declaration that it owned the computer software it acquired from Cyrano U.K.[27]  In addition, Defendant indicated that on or about February 5, 2003, Plaintiffs brought suit against Defendant in the Commercial Court alleging that the Distribution Agreement between Cyrano S.A. and Defendant was "terminated *ipso jure* pursuant to the court ordered liquidation" of Cyrano S.A.[28]

Apparently, on September 19, 2003, the Commercial Court held that Defendant's Distribution Agreement with Cyrano S.A. was not terminated when the latter was liquidated.[29] On June 30, 2004, the Paris Appeals Court upheld the Commercial Court's decision.[30]  And, on March 16, 2004, the Commercial Court found that the Impact and Test software programs were owned by Cyrano U.K. when its assets were transferred to Defendant.[31]

---

[24]Def.'s Emergency Mot. to Remove Entry of Default and Request for Emergency Hr'g; In the Alternative, Mot. for Stay of Entry of Default J.; In the Alternative, Mot. for Recons. ("Def.'s Mot. to Remove Entry of Default").

[25]Mem. Supp. Def.'s Mot. to Remove Entry of Default at 2-3.

[26]Iteanu Aff. Feb. 28, 2005 ¶ 5.

[27]Fischer Aff. Mar. 16, 2005 Ex. 4A.

[28]Fischer Aff. Mar. 16, 2005 Ex. 2A at 3.

[29]Id. at 7-8.

[30]Fischer Aff. Mar. 16, 2005 Ex. 5A.

[31]Fischer Aff. Mar. 16, 2005 Ex. 4A.

In addition to filing its motion to remove the entry of default, Defendant has filed a motion for injunctive relief and a motion for reconsideration of this court's dismissal of its counterclaims. For their part, Plaintiffs have filed motions to strike Defendant's motions to remove entry of default and injunctive relief.  Plaintiffs also filed an emergency motion for issuance of an order of contempt against Defendant, for failing to comply with this court's injunction.  On April 13, 2005, this court held a hearing on the pending motions.

## Discussion

A.    <u>Motion to Remove Entry of Default</u>

Defendant seeks to set aside the entry of default judgment.[32]  Under Rule 60(b) of the Federal Rules of Civil Procedure, "the party seeking to have the judgment vacated bears the heavy burden of showing both a good reason for the default and the existence of a meritorious defense."[33]  The good reason prong is guided by the six factors listed within the Rule.  Defendant argues that it satisfies three of the factors: (1) "excusable neglect," (2) "fraud . . . , misrepresentation, or other misconduct of an adverse party," and (3) the "any other reason" factor.[34]  The meritorious defense prong requires only that the moving party establish a "defense

---

[32] Defendant also seeks review under Rule 55(c), which allows a more lenient standard than Rule 60(b).  Because default judgment has already been entered and considering the First Circuit's conservative attitude to lifting such judgments, this court reviews under Rule 60(b).

[33] <u>United States v. Proceeds of Sale of 3,888 Pounds Atlantic Sea Scallops</u>, 857 F.2d 46, 48 (1st Cir. 1988); <u>Maine Nat'l Bank v. F/V Explorer</u>, 833 F.2d 375, 378 (1st Cir. 1987).

[34] Mem. Supp. Def.'s Mot. to Remove Entry of Default at 8 (quoting Fed. R. Civ. P. 60(b)(1), (3), (6)).

which, if proven, will bring success in its wake."[35]  The First Circuit, however, has indicated "that

relief under Rule 60(b) is extraordinary in nature and that motions invoking that rule should be

granted sparingly."[36]

      1.    <u>Excusable Neglect</u>

Excusable neglect is an equitable determination.[37]  Some of the factors this court should

consider are the length of the delay, prejudice to the non-moving party, impact on the

proceedings, and reason for the delay, "including whether it was within the reasonable control of

the movant, and whether the movant acted in good faith."[38]  And while the other factors are

important, the First Circuit has stated that "'the reason-for-delay factor will always be critical to

the inquiry . . .'"[39]

To satisfy the excusable neglect factor, Defendant argues that it prosecuted this action

until it ran out of funds.  Defendant insists that it had no income to litigate this case because it was

defending two additional actions in France, and Plaintiffs reduced its "cash flow through

misrepresentations regarding the rights and ownership of the intellectual property rights at issue in

---

[35]<u>Teamsters Union, Local No. 59 v. Superline Transp. Co.</u>, 953 F.2d 17, 21 (1st Cir. 1992).

[36] <u>Karak v. Bursaw Oil Corp.</u>, 288 F.3d 15, 19 (1st Cir. 2002).

[37]<u>Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship</u>, 507 U.S. 380, 395 (1993). Although, in *Pioneer*, the Supreme Court's definition of excusable neglect concerned the bankruptcy code, the definition also applies to the excusable neglect standard under Rule 60(b). <u>United States v. $23,000 in U.S. Currency</u>, 356 F.3d 157, 164 n.7 (1st Cir. 2004).

[38]<u>Graphic Communications Int'l Union, Local 12-N v. Quebecor Printing Providence, Inc.</u>, 270 F.3d 1, 5 (1st Cir. 2001) (quoting <u>Pioneer</u>, 507 U.S. at 395).

[39]<u>$23,000 in U.S. Currency</u>, 356 F.3d at 164 (quoting <u>Hospital del Maestro v. Nat'l Labor Relations Bd.</u>, 263 F.3d 173, 175 (1st Cir. 2001)).

this matter.["40]  Defendant also contends that without the aid of counsel it was unaware of the

orders and motions in this case until January 27, 2005.[41]

Defendant's excuse that it "ran out of money" to defend this action does not constitute

excusable neglect.  As Plaintiffs point out, Defendant had the money to defend this case, but made

the tactical decision to devote its resources to litigate the French actions.[42]  Indeed, Defendant

states that it "was placed in the position of, with no money, defending three separate actions, the

two French actions and this action in the United States."[43]  Thus, with dwindling resources, and

three cases to litigate, Defendant willfully chose to proceed in France, forego this case, and ignore

this court's orders.  What is more, Defendant now wants this court to remove the entry of default

judgment in spite of its decision to willfully neglect this case.[44]

In addition, Defendant offers no substantial reason why it failed, for almost a year, to

notify this court of its financial difficulties or the French judgments, to request a stay, or to move

for an extension.  Defendant's lapses are numerous: (1) failure to comply with this court's

February 10, 2004 order to appoint new counsel; (2) failure to appear at the March 17, 2004

conference; (3) failure to comply with this court's order to submit a status report by September

---

[40]Mem. Supp. Def.'s Mot. to Remove Entry of Default at 2, 9.

[41]Cyrano's Opp'n to: Pls.' Mot. for Entry of Default; Pls.' Mot. for Entry of Default J., Equitable Relief, and Hr'g for Assessment of Damages; and Pls.' Mot. to Dismiss Countercls. of Cyrano, Inc. ("Def.'s Opp'n to Pls.' Mot. for Entry of Default") at 9-10.

[42]See Pls.' Opp'n to Cyrano, Inc.'s Mot. for Removal of Entry of Default J. at 2.

[43]Mem. Supp. Def.'s Mot. to Remove Entry of Default at 2.

[44]See Jacobson v. Official Comm. of Unsecured Creditors of Mahoney Hawkes, LLP (In re Mahoney Hawkes, LLP), 272 B.R. 19, 20 (B.A.P. 1st Cir. 2002) (holding that delay based on calculation rather than neglect cannot constitute excusable neglect).

29, 2004; (4) failure to oppose Plaintiffs' motion for entry of default; (5) failure to respond to this court's notice of entry of default and standing order; and (6) failure to oppose Plaintiffs' motion for entry of default judgment and motion to dismiss its counterclaims.

Defendant's lack of notice argument fares no better. Defendant contends that it was unaware of the proceedings of this case because it had no counsel. This court, however, ordered Defendant to appoint new counsel by March 10, 2004. Defendant cannot use its failure to comply or even acknowledge this court's order as a valid excuse to remove the default judgment.

This argument also "ignores an abecedarian rule of civil practice . . . [that] parties to an ongoing case have an independent obligation to monitor all developments in the case."[45] Defendant was a party to this case. It filed counterclaims, a motion for preliminary injunction, and a motion for partial summary judgment. As a result, Defendant should have and "could easily have kept track of the case by monitoring the public record."[46] Its failure to do so cannot be labeled as excusable neglect.[47]

2.    Fraud

To prevail under Rule 60(b)(3), Defendant must: (1) demonstrate fraud or misrepresentation by clear and convincing evidence, and (2) "'show that the misconduct

---

[45]Witty v. Dukakis, 3 F.3d 517, 520 (1st Cir. 1993).

[46]See Citibank, N.A. v. Roanca Realty, Inc. (*In re* Roanca Realty, Inc.), 747 F.2d 816, 817 (1st Cir. 1984).

[47] Balzotti v. RAD Invs., LLC (*In re* Shepherds Hill Dev. Co.), 316 B.R. 406, 415 (B.A.P. 1st Cir. 2004) (noting that failure to receive notice does not constitute excusable neglect).

foreclosed full and fair preparation or presentation of . . . [its] case.'"[48]  Defendant argues that Plaintiffs made misrepresentations to its customers concerning the ownership of the intellectual property at issue in this case.[49]  Defendant also contends that Plaintiffs fraudulently omitted any reference to the French actions in their motions for entry of default and default judgment.[50]

Even assuming, *arguendo*, that Plaintiffs' actions constituted fraud and misrepresentation, Defendant's argument fails because it cannot show that Plaintiffs' misconduct prevented it from presenting its case.  As stated above, Defendant was capable of presenting its case, but made the tactical decision to litigate in France and ignore this action.  Moreover, nothing prevented Defendant from exposing Plaintiffs' alleged fraud by informing this court of the French proceedings and rulings.  Instead, Defendant chose to neglect this case for nearly a year.

3.    Any Other Reason

Finally, Defendant fails under the "any other reason" factor.  A motion under Rule 60(b)(6) cannot be premised upon the other five grounds of relief.[51]  To prevail under Rule 60(b)(6), "a party must show 'extraordinary circumstances' suggesting that the party is faultless in the delay."[52]  Here, Defendant offers no circumstances whatsoever to merit relief under Rule

---

[48] See Karak v. Bursaw Oil Corp., 288 F.3d 15, 21 (1st Cir. 2002) (quoting Anderson v. Cryovac, Inc., 862 F.2d 910, 923 (1st Cir. 1988)).

[49] Almeda Aff. Feb. 25, 2005 ¶¶ 13-14.

[50] Def.'s Opp'n to Pls.' Mot. for Entry of Default at 8-9.

[51] Liljeberg v. Health Servs. Acquisition Corp., 486 U.S. 847, 863 (1988).

[52] Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship, 507 U.S. 380, 393 (1993).

60(b)(6), citing only reasons under Rules 60(b)(1) and 60(b)(3).[53]  In addition, there are no

extraordinary circumstances, and Defendant is not faultless.

       4.    <u>Meritorious Defense</u>

       Defendant argues that it possesses a meritorious defense to Plaintiffs' claims.  And its

apparent victories in the proceedings before the Commercial Court and Paris Court of Appeals

seem to support this argument.  Under Rule 60(b), however, a party must show *both* a good

reason for the default and the existence of a meritorious defense.[54]  Because it failed to show a

good reason for the default, Defendant's emergency motion to remove entry of default; in the

alternative, motion to stay of entry of default judgment; in the alternative, motion for

reconsideration is DENIED.

**B.**    <u>Motion to Reconsider Dismissal of Counterclaims</u>

       Defendant has asked this court to reconsider the order dismissing its counterclaims.[55]

Under Rule 59(e) of the Federal Rules of Civil Procedure, a district court has the discretion to

amend its own judgments.  Generally, this Rule allows a court to correct its own errors

concerning "newly discovered material evidence or a manifest error of law or fact."[56]  The Rule,

however, is not "a vehicle for a party to undo its own procedural failures, and it certainly does not

allow a party to introduce new evidence or advance arguments that *could and should have been*

---

     [53]Mem. Supp. Def.'s Mot. to Remove Entry of Default at 8-9.

     [54]<u>United States v. Proceeds of Sale of 3,888 Pounds Atlantic Sea Scallops</u>, 857 F.2d 46, 48 (1st Cir. 1988); <u>Maine Nat'l Bank v. F/V Explorer</u>, 833 F.2d 375, 378 (1st Cir. 1987).

     [55]Def.'s Mot. to Recons. Order Granting Mot. to Dismiss.

     [56]<u>Aybar v. Crispin-Reyes</u>, 118 F.3d 10, 16 (1st Cir. 1997) (quoting <u>Moro v. Shell Oil Co.</u>, 91 F.3d 872, 876 (7th Cir. 1996)).

*presented to the district court prior to the judgment*."[57]

Defendant has not shown a manifest error of law or any new material evidence that *could not* have been presented to this court prior to judgment. Defendant relinquished pursuit of its counterclaims for nearly a year. In addition, Defendant could have informed this court of the French proceedings and rulings before this court dismissed its counterclaims. Accordingly, Defendant's motion for reconsideration is DENIED.

C.    Trademark and Other Issues

Defendant further argues that Plaintiffs' right to the Cyrano trademark extinguished on January 28, 2005, one day after they filed their motion for entry of default judgment.[58] Defendant insists that the default judgment should be set aside because Plaintiffs failed to disclose this fact.[59] This court disagrees.

Like its fraud argument, Defendant had ample time to inform this court of Plaintiffs' alleged omission prior to the entry of the default judgment. Instead, Defendant chose not to act. And this court will not remove the default judgment based on Defendant's after the fact submissions.

This court, however, will not order Defendant to remove its application before the United States Patent and Trademark Office ("USPTO") to obtain the rights to the Cyrano trademark.[60] If

---

[57]Id. (emphasis added).

[58]Def.'s Mot. for Leave to Advise Ct. of Trademark Application with Supplemental Affs. at 1.

[59]Def.'s Emergency Mot. for Leave to File Supplemental Trademark Docs. at 2.

[60]See Aversano Aff. Apr. 15, 2005 ¶ 3.

Plaintiffs have sat on their rights and failed to file the appropriate documents with the USPTO,

then Plaintiffs, like Defendant, must suffer the consequences of their neglect.

Additionally, this court understands that a default judgment "is as conclusive an

adjudication of the issues for the purposes of res judicata as a judgment rendered after trial on the

merits."[61] Yet, as the French proceedings and rulings were not considered by this court when

deciding Plaintiffs' motion for entry of default judgment, this court's judgment does not reach the

issue of whether Defendant may enforce its French judgments after this litigation has ended.

Moreover, if the USPTO, or a court in the United States which decides to enforce the French

judgments, determines Defendant's rights in a manner that contradicts the provisions of the

injunction issued in this case, then any conflicting aspects of this court's injunction shall expire

and give way to the subsequent tribunal's decision.

D.    Plaintiffs' Contempt Motion

Plaintiffs argue that Defendant has failed to comply with this court's injunction by

continuing to use the www.cyrano.com website for its commercial benefit and failing to transfer

the ownership of the website domain to Plaintiffs.[62]  Defendant insists that it complied with the

order by disabling www.cyrano.com.[63]  Defendant, though, admits that it has not yet transferred

www.cyrano.com to Plaintiffs and that it still is redirecting customers that log onto

---

[61]Fox v. Southeast Transp., Inc., Civ. A. Nos. 89-1442, 1993 WL 543203, at *1 (D. Mass. Dec. 9, 1993) (citing Riehle v. Margolies, 279 U.S. 218, 225 (1929)).

[62]Quotium's Emergency Mot. for Issuance of Order of Contempt against Def. at 2.

[63]Cyrano's Opp'n to Quotium's Emergency Mot. for Issuance of Order of Contempt against Def. at 5-6.

14

www.cryano.com to its alternate website, www.azimith.com.[64]  Defendant argues that this court's order does not prohibit it from redirecting customers to another website or specify that it must "immediately" transfer ownership of www.cyrano.com to Plaintiffs.[65]

The party seeking an order of contempt must establish by clear and convincing evidence that the opposing party violated an order that is clear and unambiguous.[66]  "[A]ny ambiguities or uncertainties . . . must be read in a light favorable to the person charged with contempt."[67]  And a court "must exercise the least possible power suitable to achieve the end proposed."[68]

This court's injunction ordered Defendants to "[i]mmediately and permanently shut down the CI website www.cyrano.com" and to "[t]ransfer ownership of the domain name cyrano.com to Quotium."[69]  Defendant has not "permanently shut down" the website www.cyrano.com. Defendant is still using the website to redirect customers to its alternate website, www.azimith.com.  As a result, customers can access Defendant's website using either domain name.  The fact that Defendant failed to transfer ownership of the domain name to Plaintiffs belies its argument that it disabled www.cyrano.com.  Clearly, Defendant knew that if it transferred ownership of the website, Plaintiffs would have stopped redirecting customers to www.azimith.com.

---

[64]Id. at 6.

[65]Id.

[66]Project B.A.S.I.C. v. Kemp, 947 F.2d 11, 16 (1st Cir. 1991).

[67]Id.

[68]Id.

[69]Order Feb. 23, 2005 [#112] ¶¶ D-E.

15

Defendant's argument that it did not transfer the domain name to Plaintiffs because the order had no deadline also fails. This court's order directed Defendant to do a specific act, and Defendant failed to comply. Defendant's argument that there was no specific deadline notwithstanding, Defendant should have complied reasonably and promptly. But, to clarify any ambiguity or uncertainty regarding this court's order, Defendant is to transfer ownership of the domain name www.cyrano.com to Quotium within three (3) business days of the date of the Order accompanying this memorandum.

Lastly, Plaintiffs have moved for an order of contempt because Defendant has continued to use the Cyrano trademark in its name, Cyrano, Inc., and to market products.[70] Defendant argues that this court's order did not prevent it from using its name, Cyrano, Inc., and that the French courts have upheld the Distribution Agreement, which gives Defendant the right to market products using the Cyrano trademark.[71]

This court ordered Defendant to "[h]ereafter refrain from making any further false or misleading statements regarding . . . the Cyrano® trademark."[72] Like its website, Defendant's continued use of Cyrano, Inc. misrepresents to the public that Defendant is tied to the Cyrano name. Defendant's arguments that the French courts have upheld the Distribution Agreement and that it has exclusively used the mark are unavailing because no court in the United States has enforced the French judgment. Again, to clarify any ambiguity, Defendant is to immediately

---

[70]Quotium's Emergency Mot. for Issuance of Order of Contempt against Def. at 3, 5.

[71]Cyrano's Opp'n to Quotium's Emergency Mot. for Issuance of Order of Contempt against Def. at 5.

[72]Order Feb. 23, 2005 [#112] ¶ F.

refrain from using the Cyrano trademark in its name and to market its products.

AN ORDER WILL ISSUE.


    /s/ Joseph L. Tauro
United States District Judge