## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| CYRANO, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | CIVIL ACTION NO. 05-CV-11558-DPW |
| QUOTIUM TECHNOLOGIES, INC., | ) | |
| QUOTIUM TECHNOLOGIES, S.A., and | ) | |
| TECHNOLOGIES, S.A., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION
## AND REQUEST FOR ORAL ARGUMENT

Pursuant to Fed. R. Civ. P. 65, the Plaintiff, Cyrano, Inc. ("Cyrano"), now known as

Vedant Incorporated, hereby moves for a preliminary injunction against the Defendants,

Quotium Technologies, Inc., Quotium Technologies, S.A., and Technologies, S.A. (collectively,

"Quotium"), seeking the relief set forth in the Proposed Order, attached hereto as Exhibit A.

As set forth in the Proposed Order, Cyrano seeks, inter alia:  (1) to enjoin Quotium from

continuing to manufacture, reproduce, copy, market, sell, distribute, display, demonstrate, and/or

otherwise use Test, Impact, and OpenSTA (with the exception of OpenSTA's HTTP Replay and

Modeller components) (collectively, the "Cyrano Software"); (2) to enjoin Quotium from

continuing to manufacture, reproduce, copy, market, sell, distribute, display, demonstrate, and/or

otherwise use their software products QuotiumPRO and QTest 4.0, and any other Quotium

products that are substantially similar to the Cyrano Software; and (3) to require Quotium to

deliver to Cyrano within three (3) business days the originals and all copies of the Cyrano

Software (except OpenSTA, because it is an open-source product) and infringing software and

related materials within Quotium's possession, custody, and/or control, to be impounded during the pendency of this action.

Quotium Technologies, S.A. and Technologies, S.A. have recently argued to the Commercial Court of Nantierre that infringement of Cyrano's rights in Test and Impact are being litigated in the United States.  However, the matter of Quotium's infringement of Cyrano's rights before this Court have been stayed for over six months.  As the attached Exhibit D indicates, Quotium has recently threatened another action with regard to the decision of the Court of Appeal of Paris without recognizing the main import of that decision, namely, Cyrano's ownership of Test and Impact.  Quotium's imminent threat of yet another action makes this Court the appropriate venue to preserve the status quo of the litigation while resolving once and for all the ownership rights to Test and Impact in the United States, which Judge Taruo expressly reserved in an earlier action between these parties.  Accordingly, Cyrano seeks immediate injunctive relief to cease Quotium Technologies, Inc.'s distribution in the United States of QuotiumPRO and QTest 4.0, which are derived from Test and Impact.

Alternatively, if the Court finds insufficient evidence of derivation from or commingling of Cyrano's code to order the proposed relief, Cyrano requests the following:

(1)    that the Court order Quotium to produce and deliver to Cyrano within three (3) business days all copies of Test and Impact;

(2)    that the Court order an inspection of QTest 4.0; and

(3)    that the Court schedule an evidentiary hearing, with discovery under a suitable protective order to allow for inspection of the source, object, and executable code for QuotiumPRO and QTest 4.0, and the reservation of Cyrano's right to submit additional evidence of expert witnesses.

The method of examination set forth in the alternative above is necessary because downloading these programs off of Quotium's website does not permit the analysis needed to determine the origin of the code.  Moreover, the continuing infringement of Cyrano's code will become difficult, if not impossible, to demonstrate in the likely event that Quotium further commingles that code with its own when making further enhancements to QuotiumPRO and QTest 4.0.

In support of this motion, Cyrano states that there is a substantial likelihood that it will succeed on the merits of its claims, and that it will suffer irreparable harm in the absence of an injunction.  In further support, Cyrano relies on the following documents:

(1)    Plaintiff's Memorandum in Support of Motion for Preliminary Injunction;

(2)    Affidavit of Scott Almeda in Support of Plaintiff's Motion for Preliminary Injunction, with attached exhibits (attached hereto as Exhibit B);

(3)    Affidavit of Dr. Brian Bandey in Support of Plaintiff's Motion for Preliminary Injunction, with attached exhibits (attached hereto as Exhibit C);

(4)    Letter from Kevin J. O'Connor, Esq. dated June 9, 2006 (attached hereto as Exhibit D); and

(5)    Letter from Stephen Y. Chow, Esq. dated June 19, 2006 (attached hereto as Exhibit E).

WHEREFORE, Cyrano moves for a preliminary injunction as set forth in the Proposed Order attached hereto as Exhibit A, for the reasons stated more fully in its supporting memorandum, or for the alternative relief as stated above.

<u>REQUEST FOR ORAL ARGUMENT</u>

Pursuant to Local Rule 7.1(D), the Plaintiff, Cyrano, Inc., respectfully requests a hearing on this motion for preliminary injunction.  The Plaintiff believes that a hearing would be of great assistance to the Court.

Respectfully submitted,

Plaintiff,
**CYRANO, INC.,**
By its attorneys,

/s/ Stephen Y. Chow_____
Stephen Y. Chow, BBO #082990
Michael K. Sugrue, BBO #655878
BURNS & LEVINSON LLP
125 Summer Street
Boston, Massachusetts 02110
Dated:  June 20, 2006                    (617) 345-3000


## LOCAL RULE 7.1(A)(2) CERTIFICATION

Pursuant to Local Rule 7.1(A)(2), I hereby certify that I have conferred with Kevin O'Connor, Esq., counsel of record for the Defendants, in a good faith attempt to resolve or narrow the issues, but was unable to do so.

/s/ Stephen Y. Chow_____
Stephen Y. Chow


## CERTIFICATE OF SERVICE

I, Michael K. Sugrue, hereby certify that a true copy of the foregoing Motion for Preliminary Injunction and Request for Oral Argument was served upon the following counsel by regular mail on this the 20th day of June, 2006:

Kevin J. O'Connor, Esq.
Mayeti Gametchu, Esq.
Paragon Law Group LLP
184 High Street
Boston, MA 02110

/s/ Michael K. Sugrue_____
Michael K. Sugrue

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CYRANO, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CIVIL ACTION NO. 05-CV-11558-DPW |
| ) | |
| QUOTIUM TECHNOLOGIES, INC., ) | |
| QUOTIUM TECHNOLOGIES, S.A., and ) | |
| TECHNOLOGIES, S.A., ) | |
| ) | |
| Defendants. ) | |
| ) | |

## PROPOSED ORDER

Upon consideration of the Plaintiff's Motion for Preliminary Injunction dated June 20, 2006, the Court orders as follows:

1.   The Defendants shall immediately cease and desist manufacturing, reproducing, copying, marketing, selling, distributing, displaying, demonstrating, and/or otherwise using (1) Test, Impact, and/or OpenSTA (with the exception of OpenSTA's HTTP Replay and Modeller components) (collectively, the "Cyrano Software"); and (2) any software products that are substantially similar to, derivative of, or that otherwise infringe the Plaintiff's copyright in the Cyrano Software (collectively, the "Infringing Software") in the United States and worldwide, with the exception that the Defendants may use OpenSTA non-commercially on the open-source GNU site as permitted by the GNU Public License;

2.   The Defendants shall immediately cease and desist manufacturing, reproducing, copying, marketing, selling, distributing, displaying, demonstrating, and/or otherwise using their software products QuotiumPRO, QTest 4.0, and any other products that are substantially similar to the Cyrano Software as they constitute Infringing Software;

3.   The Defendants shall immediately cease and desist representing, by any form of communication (including on any internet or open source code forum), that they own, created, and/or are the source of origin of any of the Cyrano Software, and the Defendants shall supplement and correct all previous representations to that effect within three (3) business days;

4.      The Defendants shall immediately identify all persons (as those terms are defined in Local Rule 26.5) to whom they have distributed and/or sold the Cyrano Software or Infringing Software, including but not limited to QuotiumPRO and QTest 4.0, providing such information to the Plaintiff within three (3) business days;

5.      The Defendants shall deliver to the Plaintiff within three (3) business days the originals and all copies of the Cyrano Software (except OpenSTA, as it is an open-source product) and Infringing Software, and all related materials that are within the Defendants' possession, custody, and/or control, for inspection by the Plaintiff and impoundment with the Court during the pendency of this action:

6.      The Defendants shall immediately recall all copies of the Cyrano Software and Infringing Software, and all portions thereof, from all distributors, resellers, and/or agents to which such Software has been provided by the Defendants;

7.      The Defendants shall each file affidavits with the Court detailing the manner in which they have complied with this Order.

Dated:  _____          _____

                                     Douglas P. Woodlock
                                     United States District Court Judge

2

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| CYRANO, INC.,      ) | |
| ) | |
| Plaintiff,      ) | |
| ) | |
| v.      ) | CIVIL ACTION NO. 05-CV-11558-DPW |
| ) | |
| QUOTIUM TECHNOLOGIES, INC.,      ) | |
| QUOTIUM TECHNOLOGIES, S.A., and      ) | |
| TECHNOLOGIES, S.A.,      ) | |
| ) | |
| Defendants.      ) | |

## AFFIDAVIT OF SCOTT ALMEDA
## IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

I, Scott Almeda, declare and state as follows:

1. I am the Chief Executive Officer of Vedant Incorporated, formerly known as Cyrano, Inc. (hereafter referred to as "Cyrano," unless otherwise noted), a Delaware corporation with its principal place of business located at 26 Parker Street, Newburyport, Massachusetts, U.S.A. Cyrano publicly began to use its new name, Vedant Incorporated, on September 1, 2005.

2. Cyrano distributes software that enables users to test, monitor, and optimize their data processing and information management systems.

3. I became the Chief Executive Officer of Cyrano in June 2002. From October 2001 to June 2002, I served as Cyrano's Chief Operating Officer, and from March 2001 to October 2001, I served as Cyrano's Vice President of Corporate Development. Additionally, I have worked in the computer industry and for computer related companies since 1984. During the course of my career, I have worked as a consultant on information technology and have built and developed the businesses of information services and integration companies.

4. Consequently, I am familiar with every facet of Cyrano's business, including its copyrighted software products and its prior relationships with two affiliated foreign companies, Cyrano S.A. ("Cyrano SA"), a French software company, and Cyrano U.K. Limited ("Cyrano UK"), an English software company. Cyrano had been affiliated with these two legally independent foreign software companies from 1996 through 2001.

5.   Prior to October 1996, Cyrano UK had been named Performance Software Limited ("Performance") and designed its software testing products from its offices in Bradford, England. Performance also had a subsidiary in the United States named Performance Software, Inc. In October 1996, Performance became affiliated with IMM, a French company that also developed its own performance software applications. At that time, all three companies changed their names as follows: IMM became known as Cyrano SA; Performance became known as Cyrano UK; and Performance Software, Inc. became known as Cyrano, Inc. Cyrano UK became the wholly-owned -- yet independent -- subsidiary of Cyrano SA. Despite this affiliation, Cyrano UK separately retained its assets and intellectual property rights and owned its own copyrights despite any subsidiary relationship to Cyrano SA. Cyrano SA and Cyrano U.K. each maintained its own research and development team, and each developed its own software products. After a product was fully developed, either by Cyrano UK or Cyrano SA, the developing company retained ownership of the product's copyright and did not transfer any ownership rights to the other. Instead, the developing company would grant the other a license to use the product, as well as subsequent versions, premised on the companies' continued affiliation.

6.   Cyrano UK created the source code for the first version of Test and first published it in the United Kingdom in 1990. Test is a software application that performs all aspects of load, regression and application stress testing on computer systems, and can perform such testing on an entire network simultaneously. Test helps a computer system user, or most often the system administrator, ensure that application performance and quality are preserved after changes have been made to one of the components in the computer system. Test essentially runs real applications upon the computer system using hundreds to thousands of simulated users.

7.   In 1996, Cyrano UK expanded Test to databases -- an endeavor that resulted in Cyrano UK's computer software product called Impact. Cyrano UK first published Impact in 1997. As Cyrano UK integrated the Test code into Impact, the majority of that code remained unchanged. Test Commander Graphical User Interface ("GUI") was used in the development of Impact. Impact is a database load and stress testing tool. It simulates, manages, and measures complex multi-client loads on mission critical database servers. Impact pinpoints potential performance bottlenecks by using a graphical modeling tool to simulate, manage, and measure complex dynamic transactions by simulated users. When it detects unacceptable performance, Impact helps to identify the transactions that are the source of the anomaly. Subsequent to Impact's first publication in 1997, Cyrano UK published other versions in the United Kingdom. All versions of Impact are complex works that exhibit a high degree of originality and creativity.

8.   Cyrano UK developed Impact in its offices in Bradford, England, with the exception of a small amount of computer code called SQL Capture ("Gateway"), which Cyrano UK commissioned Cyrano S.A. to produce in exchange for 1,403,188 francs. Twenty-five percent of this amount represented Cyrano SA's profit. Because Cyrano UK commissioned the production of Gateway to complete its larger work -- Impact -- it is my

2

understanding that Cyrano UK is the equitable and beneficial owner of the copyright to Gateway under English law.

9.    In 1998, Cyrano UK began working on a series of projects -- Cormorant, Impact 3, and Concert -- that resulted in the creation of a new software product that became known as OpenSTA. OpenSTA is an open-source web performance testing software, largely based on Test and Impact, that enables users to perform realistic heavy load or stress tests on web-based applications with performance measurements. As well as its use in the development of Impact, Test Commander GUI became the basis for the project management and test control features in OpenSTA. OpenSTA's entire scripting language is based on Test and Impact.

10.   Cyrano UK's Research and Development Team in Bradford, England developed the highly original and complex source code for OpenSTA, partly by incorporating substantial portions of both Test and Impact. Cyrano SA provided three lesser components of OpenSTA: HTTP, HTTP Replay, and Script Modeller. Cyrano SA provided these three discrete components of OpenSTA to Cyrano UK at the latter's request and not in collaboration with Cyrano UK. Cyrano SA supplied HTTP Replay, a small portion of computer code that executes specific commands produced by OpenSTA's Script Compiler, which is a vital portion of OpenSTA that Cyrano UK created and owned. Cyrano SA also provided Modeller, an independent software module that, although able to work with OpenSTA, is not a required component of OpenSTA. Because Modeller was and is an add-on feature, OpenSTA can still operate without it.

11.   Cyrano UK decided if and how the components would be integrated into OpenSTA. By early 2000, Cyrano UK had completed a wholly functional version of OpenSTA, which included these three components. Cyrano UK separately retained its copyright to OpenSTA despite its relationship to Cyrano SA. On May 22, 2001, Cyrano registered OpenSTA as a trademark of Cyrano and paid the registration fee.

12.   Cyrano decided to launch OpenSTA as an open-source product. From June through September 2000, OpenSTA was extensively modified for its first public release as OpenSTA 0.9.0. Thereafter, Cyrano UK developed subsequent versions of OpenSTA, first publishing them in the United Kingdom. All of the OpenSTA versions are highly complex works that exhibit a high degree of originality and creativity. Pursuant to a GNU General Public License, the source code of OpenSTA is available on the GNU's website www.gnu.org.

13.   In 2001, both Cyrano SA and Cyrano UK declared bankruptcy. In October 2001, the Commercial Court of Paris ordered Cyrano SA's liquidation and, in November 2001, the Kings Court in the UK ordered Cyrano UK's liquidation. Prior to its liquidation, Cyrano UK never transferred or assigned its copyrights to Test and Impact. Further, it never transferred or assigned its copyrights in the source code for all of the most vital components of OpenSTA ("UK/US OpenSTA") -- that is, all of OpenSTA except HTTP, HTTP Replay, and Modeller Script. Thus, when Cyrano UK was liquidated, the English

liquidator had the legal capacity to transfer all copyright ownership in Test, Impact, and UK/US OpenSTA.

14.    Prior to their respective liquidations, Cyrano UK and Cyrano SA each granted the other an implied license to its respective parts in OpenSTA. These cross-licenses were premised on the continued business relationship between the Cyrano companies. Accordingly, these implied licenses terminated on the liquidation of both Cyrano UK and Cyrano S.A.

15.    In March 2002, Cyrano purchased and acquired the assets and intellectual property of Cyrano UK, including all of its copyright ownership and rights to the software products Test, Impact, and UK/US OpenSTA, as well as to miscellaneous other software titles related to these core products. Prior to Cyrano acquiring the copyrights to Test and Impact in March 2002, Cyrano UK had granted Cyrano a license to distribute, use, support, and sell Test and Impact.

16.    Test and Impact are among the many products that Cyrano has marketed, distributed, and sold. Cyrano also supports and provides maintenance to OpenSTA. However, because OpenSTA is open source, Cyrano does not commercially sell it.

17.    Cyrano distributes Test, Impact, and other products through direct sales and licenses to customers ("license contracts") and through international distributors. Cyrano also provides maintenance and support to its customers pursuant to "maintenance and support contracts" for Test, Impact, OpenSTA, and other products. The maintenance and support charges are typically equal to a certain percentage of the applicable license fee. Maintenance and support contracts are generally required for the first year of a license and renewable at the option of the customer thereafter. Similarly, the term of most maintenance and support contracts is typically one year and renewable annually at the customer's option. Such maintenance and support contracts entitle customers to free product updates.

18.    Pursuant to an International Distributor Agreement ("Distributor Agreement") between Cyrano SA and Cyrano, Cyrano holds the exclusive license to distribute, sell, use, support, and otherwise deal in several products throughout the world, including the United States, with the sole exception of continental Europe. The Distributor Agreement also excludes Cyrano SA and any and all other affiliated Cyrano companies, giving Cyrano an unrestricted and exclusive license to do business with all of these products everywhere in the world except for continental Europe. These licensed software products include "Workbench" and "Production." This Agreement also granted Cyrano an exclusive license to Cyrano SA's rights in OpenSTA and related commercial modules.

19.    The Distributor Agreement expires on June 30, 2007 and Cyrano is still performing its obligations under it. Neither Cyrano nor Cyrano SA (or its successor) have terminated the Agreement. Further, there are no grounds for Cyrano SA (or its successor) to terminate the Agreement.

20.  Technologies, S.A., Quotium Technologies, S.A., and Quotium Technologies, Inc. (collectively, "Quotium") are also engaged in the business of developing, marketing, manufacturing, and selling computer software products. In January 2002, Technologies, S.A. formed Quotium Technologies, S.A. as a wholly-owned subsidiary to pursue opportunities in the testing software market. Quotium are competitors of Cyrano.

21.  I understand that Quotium purchased certain of Cyrano SA's assets from the French liquidator of Cyrano SA, including rights to OpenSTA to the extent held by Cyrano SA. I further understand that, on May 16, 2002, Technologies, S.A., Quotium Technologies, S.A., and the Trustee of Cyrano SA's liquidation entered into a Contract of Transfer of Business Components (the "Transfer Contract"), pursuant to which Quotium was granted intellectual property rights to certain software products believed to be the property of Cyrano SA. A significant portion of the assets Quotium obtained pursuant to the Transfer Contract included Test, Impact, and OpenSTA.

22.  Prior to this alleged acquisition, however, Cyrano's specialist of law in the United Kingdom, Dr. Brian Bandey, notified Michael Tiberini, the President of Quotium, in writing, that Cyrano owned the copyrights to Test, Impact, and "the constituent parts of OpenSTA." Dr. Bandey's letter to Mr. Tiberini was included as an exhibit to the Transfer Contract. Thus, both Quotium and the French liquidator were aware of Cyrano's rights to Test, Impact, and UK OpenSTA. Accordingly, the French liquidator made clear in the Transfer Contract that competing claims existed with regard to Test, Impact, and OpenSTA, and that this software was sold subject to such limitations. (See Affidavit of Robert Ernens dated November 10, 2002, attached hereto as Exhibit A.)

23.  I understand, based upon the Transfer Contract, that during the negotiations between Quotium and the liquidation Trustee, Quotium also obtained boxes of software and computer equipment from Cyrano SA's offices. These boxes and equipment contained source code of various Cyrano software products, including versions of Test, Impact, and Open STA that belonged to Cyrano.

24.  Quotium have maintained in a related litigation that, pursuant to the Transfer Contract, they were granted Cyrano SA's intellectual property rights to the software products DBPack, ClientPack, ServerPack, and VT Pack. Test and Impact are modules in the ServerPack and VT Pack software suites, respectively. Also during that related litigation, Quotium admitted that they obtained the source code to Test and Impact and that they obtained "one or more copies of the source code of OpenSTA."

25.  Before the execution of the Transfer Contract, Cyrano objected to the transfer of Test, Impact, and OpenSTA to Quotium and submitted a claim of ownership to the Trustee, who then caused this contested software to be held in escrow in a "Logibox." In July 2002, Cyrano filed suit in the Commercial Court in Paris to release from escrow its Test, Impact, and OpenSTA code. On March 16, 2004, the Commercial Court ruled in Cyrano's favor, finding that Cyrano owned Test and Impact. Quotium appealed, and on October 21, 2005, the Court of Appeal of Paris determined in an Arret, inter alia, that Cyrano U.K.'s research and development teams in Bradford England created the design

and development of Test and Impact, with the exception of Impact's Gateway component, which was transferred to Cyrano UK in 1998. (See Court of Appeal of Paris Judgment of October 21, 2005, attached hereto as Exhibit B.) I understand that the courts of the United States will recognize the October 21, 2005 judgment of the Court of Appeal of Paris regarding Cyrano's ownership of Test and Impact. (See Affidavit of Olivier Iteanu dated February 28, 2005, attached hereto as Exhibit C, at ¶ 3.)

26.    After obtaining the source code of OpenSTA, Quotium announced an intent to capitalize on OpenSTA by developing and marketing the OpenSTA technology. Further, Quotium have made representations that they own Test, Impact, and OpenSTA. Cyrano has never authorized Quotium to use Test, Impact, and UK/US OpenSTA.

27.    In June 2002, after purchasing certain assets of Cyrano SA and obtaining copies of source code for various Cyrano products, Quotium began for the first time distributing, manufacturing, promoting, and selling QuotiumPRO 2.0, a "load testing tool." Based upon the representations of Quotium and the timing of QuotiumPRO's release, this product includes direct copies of the source code from, is based upon, and is substantially similar to Test, Impact, and OpenSTA in its underlying purpose, logic, structure, organization, sequence, and literal source code form. Additionally, Quotium announced that they had "acquired the assets of Cyrano, S.A." following Cyrano SA's liquidation.

28.    Based upon the timing of its release, QuotiumPRO must have been developed by copying the source code of Test, Impact, and OpenSTA. Quotium could not have developed a similar non-infringing product with the same capabilities as OpenSTA in a period of a couple of months. In comparison, it took Cyrano UK three years to develop OpenSTA from Test and Impact, which had previously taken Cyrano UK many years to develop.

29.    In 2002, after it launched QuotiumPRO, Quotium stated on its website that QuotiumPRO was "[b]uilt around an Open Source core (developed by Quotium), and adding a particularly user-friendly GUI. . . ." As stated above, Cyrano UK developed and authored the entire source code of OpenSTA, except two minor components and a commercial module. Cyrano owns the copyright to more than the majority of OpenSTA and also holds the exclusive license, under the Distributor Agreement, to the remaining portions of OpenSTA that Cyrano SA previously owned. To the best of my knowledge, Quotium began advertising QuotiumPRO after Cyrano provided it notice of copyright ownership to Test, Impact, and portions of OpenSTA.

30.    In or around July 2002, one of Quotium's employees in the United States, William Sweeney, formerly of Cyrano, distributed letters on Quotium's behalf from the United States to Cyrano's customers concerning QuotiumPRO. Quotium's letter stated that its product QuotiumPRO "incorporates much of the advanced development of OpenSTA."

31.    Shortly after obtaining the source code of Test, Impact and OpenSTA, in or around May and July 2002, Quotium released new open-source versions of OpenSTA, called Version 1.4.0 and Version 1.4.1, in which they altered the information displayed in OpenSTA to indicate that Quotium owned all copyrights to OpenSTA. Quotium have admitted that

they have affixed information concerning Quotium's ownership of all OpenSTA copyrights to the open-source versions of OpenSTA they released in or around May 2002 and that they have represented that they own all copyrights in OpenSTA.

32.  Subsequent to Quotium's release of QuotiumPRO 2.0 in 2002, Quotium released subsequent versions, including QuotiumPRO 2.5 in December 2002; QuotiumPRO 3.1 Beta in September 2003; QuotiumPRO 3.2 in November 2003; QuotiumPRO 3.5 Beta in March 2004; and QuotiumPRO 3.5 in April 2004.

33.  In July 2005, Quotium introduced QTest 4.0. Quotium's website states that QTest 4.0 is an "upgrade" of QuotiumPRO. See printout from www.quotium.com, attached hereto as Exhibit D. Generally, "upgrades" do not involve substantial modification to the underlying source code and functionality. Thus, upon my information and belief, the current QTest 4.0 is derived from Test and Impact, as are all of the product versions and releases that preceded it and that are associated with it. Inasmuch as QTest 4.0 derives from QuotiumPRO, which appropriated the core functionality (and code) of OpenSTA, including Test and Impact, the derivation, reproduction, and distribution of QTest 4.0 are infringements of Cyrano's copyrights in Test, Impact, and OpenSTA. Moreover, as stated in the aforementioned Exhibit D, Quotium intends to fulfill contractual commitments to its QuotiumPRO users through the end of 2006, which typically includes "updates" that are further infringing and derivative publications.

34.  Although Cyrano has proceeded, in March 2006, against Technologies, S.A. and Quotium Technologies, S.A. in the Commercial Court of Nantierre, France, based on Cyrano's adjudicated ownership of the copyrights in Test and Impact, the defendants have argued that the Commercial Court of Nantierre should defer to this Court under the French doctrine of lis pendens. This Court, however, has stayed the action pending further developments either in the action before Judge Tauro or otherwise, including the possibility of a preliminary injunction motion based on QTest 4.0, raised by Cyrano's counsel at the November 3, 2005 hearing.

35.  Counsel for defendants have demanded that Cyrano repay certain attorney's fees allegedly due to it under the Arret of the Court of Appeal of Paris, under threat of a new action, without acknowledging the effect of the Arret in determining Cyrano's ownership of the copyrights in Test and Impact. Cyrano has responded that any such enforcement here in the United States should be moved in this action in which defendants have argued against the effect of the Arret at the November 3, 2005 hearing.

36.  QuotiumPRO and QTest, as distributed by Quotium, Inc. in the United States, should be seized for analysis by an expert. Because future enhancements to these products imminently threatens further commingling of Cyrano's code with Quotium's new code, it will be harder to show this infringement if QuotiumPRO and QTest are not seized and analyzed immediately.

37.  I believe that, as a result of Quotium's infringement of Cyrano's intellectual property, Cyrano has lost current and prospective customers, which has contributed to a 90%

7

reduction of Cyrano's software maintenance and service business. Additionally, Cyrano's workforce has been reduced from 35 employees to 10. If Quotium is permitted to infringe on Cyrano's intellectual property as it has been, Cyrano's business relationships and competitive position will be irreparably harmed.

I declare under penalty of perjury that the foregoing is true and correct. Signed this 20th day of June, 2006 at Newburyport, Massachusetts.

Scott Almeda

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| TECHNOLOGIES, S.A., and QUOTIUM TECHNOLOGIES, S.A., <br><br> Plaintiffs and <br> Defendants-in-Counterclaim, <br><br> v. <br><br> CYRANO, INC., <br><br> Defendant and <br> Plaintiff-in-Counterclaim. | ) ) ) ) ) ) ) ) ) ) ) ) ) |

Civil Action No. 02-CV-11416-JLT

## AFFIDAVIT OF ROBERT ERNENS

I, Robert Ernens, declare and state as follows:

1.    My name is Robert Ernens.  I am a citizen of the Republic of France and reside in

Etiolles, France.

2.    In May through June 2000, I became a consultant to the Cyrano companies (i.e.,

Cyrano S.A., Cyrano U.K. Limited, Cyrano Inc. as well as other affiliates) and became a

member of the Board of Directors for the Cyrano companies in June 2000.  In July 2000,

I replaced Philippe Eyries as the Chairman of the Board of the Cyrano companies (i.e.,

Cyrano S.A., Cyrano U.K. Limited, Cyrano Inc. as well as other affiliates). I served in

this capacity until Cyrano S.A. ("Cyrano SA") and Cyrano U.K. Limited ("Cyrano UK")

were liquidated in October 2001.  I also served as the Chairman and Chief Executive

Officer of Cyrano Inc. ("Cyrano US"). I resigned as Chairman and CEO of Cyrano US in

February 2002.

3.    In June 2000, the decision was made by the Directors of the Cyrano companies, including myself and Mr. Eyries, to release Concert as an open source product. The open source product was named "OpenSTA" by Noelle Beaudin and Daniel Sutcliffe of Cyrano US. Under the direction of Geoff Hall of Cyrano UK, Cyrano converted Concert, an unreleased commercially based product, into an open source product. Geoff Hall was the development manager of OpenSTA. Ms. Beaudin was responsible for marketing OpenSTA and Mr. Sutcliffe, a specialist in open source products, advised Mr. Hall on technical issues relating to how to convert Concert into an open source product. All the development work on OpenSTA, however, had been and was performed under Mr. Hall's direction at Cyrano UK.

4.    Philippe Villame had left Cyrano SA prior to my arrival and was not in charge of converting Concert into OpenSTA, which occurred between June and September 2000. Nor were any other developers from Cyrano SA's office in charge of OpenSTA. Cyrano SA's developers were not major players in the development of OpenSTA. The core of OpenSTA was developed in Bradford, England by the Cyrano UK research and development team. Olivier Cante and other members of the Cyrano SA's development team developed Cyrano Production and Workbench and two commercial modules for OpenSTA, called DB Monitor and SQL Analysis.

5.    Cyrano SA did not commission Cyrano UK to develop the core architecture of OpenSTA and Cyrano UK never transferred its copyright ownership to the majority of OpenSTA to Cyrano SA. Similarly, Cyrano SA did not transfer its rights to the modules it developed for OpenSTA to Cyrano UK.

6.    In October 2000, we decided that Denis Bitan, in his capacity as Managing Director of the Cyrano Companies (which also included several companies other than Cyrano UK and Cyrano SA), should register the source code for OpenSTA version 0.9.1 with the Agency for the Protection of Programs in Paris ("APP"). The purpose of this registration was simply to preserve the source code of OpenSTA for the Cyrano's customers and stockholders in case any of the Cyrano companies encountered financial difficulties. At that time, Cyrano UK was experiencing financial problems and some of its marketing and sales staff had been let go. There was no similar depository for source code in the United Kingdom of which we were aware.

7.    I don't believe that the intent of the APP registration filed by Mr. Bitan was to indicate who among the different Cyrano companies owned the copyright to OpenSTA. My understanding as a non-lawyer is that APP is not a copyright registration system; it is simply a method of protecting source code for software. If we were interested in registering the copyright ownership in a particular entities' name, we would have registered OpenSTA with the United States Copyright Office.

8.    Technologies has argued that references in press releases of Cyrano SA and Cyrano US announcing the release of OpenSTA by "Cyrano" demonstrate that Cyrano SA owned OpenSTA. This conclusion is inappropriate. The term "Cyrano" was used as a shorthand in press releases to refer to all of the Cyrano companies and did not connote ownership of a product by any one Cyrano entity. I am quoted in many press releases describing products and the future of Cyrano but was at all times referring to the Cyrano companies in general terms. Accordingly, the Court should not attach any significance to the press releases referred to by Technologies in determining the ownership of OpenSTA.

3

9.    I have read the pleadings filed by Technologies in which they have falsely

implied that the two amendments to the International Distributor Agreement, which were

signed by Denis Bitan and me, were fraudulent. The first amendment to the Distributor

Agreement dated August 31, 2000 was made for the primary purpose of adding

OpenSTA and its associated modules as licensed products under the Agreement. This

amendment corresponded to the first public release of OpenSTA that was scheduled for

September 2000. Cyrano SA had itself developed certain components in OpenSTA

(Gateway, Modeller, HTTP Replay), as well as related commercial modules DB Monitor

and SQL Analysis, which included Cyrano Workbench and Cyrano Production, and had

the right as the owner to license them to Cyrano US. Cyrano SA further obtained the

right to license the remainder of OpenSTA from its licensor, Cyrano UK. See

International Distributor Agreement between Cyrano SA and Cyrano US ¶ 9.1. We

decided that OpenSTA should be centrally distributed by Cyrano SA, through license

from Cyrano UK, because Cyrano UK was at that time in financial difficulty.

10.    When the Agreement was first amended in August 2000, Cyrano SA also made

the decision to convert the Distributor Agreement to Cyrano US from a non-exclusive

agreement to an exclusive agreement (with the exception of Europe and Africa), for a

number of reasons including that the number of marketing and sales staff at Cyrano UK

was decreasing and the project managers of OpenSTA, Daniel Sutcliffe and Noelle

Beaudin, worked at Cyrano US and Open Source products like OpenSTA were well-

established in the United States and not in France. Strategically, I thought Cyrano US

would be the most successful distributor and that the United States market would

generate the most business and royalties for Cyrano SA and Cyrano UK. Thus, through

4

the August 31, 2000 Amendment, Cyrano SA gained an experienced, reliable, and dedicated distributor to distribute Workbench and Production, and market OpenSTA and its associated modules.

11.    On April 9, 2001, Cyrano SA and Cyrano US amended the Distributor Agreement a second time. At that time, the agreement was primarily changed to expand Cyrano US's exclusive license to the United Kingdom and the rest of world except Continental Europe because the Cyrano UK Sales, Pre-sales and Consulting staff had been fired and its Thatcham office closed in the United Kingdom.

12.    Technologies allegation that Denis Bitan, Cyrano Inc., and I failed to disclose the Distributor Agreement as amended to the Liquidation Trustee for Cyrano SA is false. In October 2001, Mr. Bitan and I had met with the Liquidation Trustee for Cyrano SA in his office in Paris and orally informed him about the International Distributor Agreement between Cyrano SA and Cyrano US which granted Cyrano US an exclusive license "to market, distribute, support and deal in the Licensed Products" defined as "Workbench, Production, and OpenSTA and its associated modules as they become available" in the entire world except Continental Europe. See International Distributor Agreement ¶ 2.2 & Sch. A as amended. During this meeting, Mr. Bitan and I also informed him about the relationships between the Cyrano companies (Cyrano SA, Cyrano UK, Cyrano US, and other wholly-owned Cyrano subsidiaries in Germany, Switzerland, Asia) and the distribution rights given to the affiliated companies.

13.    The Liquidation Trustee, however, did not appear to care about Cyrano SA's contracts, including the International Distributor Agreement with Cyrano US. In addition to advising the Trustee about the existence of the Distributor Agreement, in or about

October 2001, we also informed the Trustee where all of the Cyrano SA's contracts, including that one, were kept in its office. I was advised by Mr. Bitan that the Trustee eventually collected them but I do not know if he ever read them.

14. I not remember seeing the Bankruptcy Declaration of Cyrano SA, which Technologies alleges should have listed the Distributor Agreement as an asset of Cyrano SA. I disclosed the existence of the Distributor Agreement to the Liquidation Trustee and never sought to conceal it.

15. Additionally, the Liquidation Trustee never sought my consent or, to my knowledge, that of any other executive of Cyrano SA concerning the invitation to bid, which listed OpenSTA as intangible asset of Cyrano SA. I wrote several letters to the Liquidation Trustee and his lawyer concerning Cyrano UK's rights to OpenSTA. In those letters, I explained that Cyrano UK owned the copyright to the majority of OpenSTA, that Cyrano UK was being liquidated separately in the United Kingdom, and that Cyrano US acquired all of the intellectual property of Cyrano UK, including its copyrights to Test, Impact, and OpenSTA. I informed the Trustee's counsel that

> OpenSTA was not developed from scratch. Its core code is based on Cyrano Impact version 3 code and the language allowing the description of the test cases is from the language used in Cyrano Test. The heart of OpenSTA is more than 60% based on the code from the intellectual property belonging to Cyrano (UK) Limited. The attribution of OpenSTA to a buyer other than that of Cyrano Test and Cyrano Impact would open the door to claims to the intellectual property rights ... The core of OpenSTA was primarily developed in England.

Attached hereto as Exhibit A are true and accurate copies of my letters that have been translated from French to English.

16. Subsequently, at the French Commercial Court's hearing to consider whether to order the sale of Cyrano SA's assets to Technologies, at which I was present, I attempted

to tell the Judge about the risks associated with selling OpenSTA to Technologies but the Judge would not allow me to speak.

17.    Despite my warnings and those of Dr. Bandey to Mr. Tiberini of Technologies, I understand that the French Court ordered the sale of Cyrano SA's assets to Technologies. I do not believe however that the Liquidation Trustee had the power to sell the majority of OpenSTA.


I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Signed this 10th day of November 2002 at Etiolles, France.

_____
Robert Ernens

7

First authentic copy issued
to the parties on:

## THE FRENCH REPUBLIC
ON BEHALF OF THE FRENCH PEOPLE

### COURT OF APPEAL OF PARIS

4th Chamber – Section B

### JUDGEMENT OF 21ST OCTOBER 2005

(no.              , 9 pages)

Registration number in the general registry: 04/12357

Judgement referred to the Court: Judgement of 16th March 2004 – Commercial Court of Paris – General Registry no. 2002/50224

**THE APPELANTS**

**S.A. TECHNOLOGIES**
**represented in the conduct of the present proceedings by its legal representatives**
and having its registered office at 84/88, boulevard de la Mission Marchand
92400 COURBEVOIE

represented by SCP MIRA – BETTAN, Solicitors to the Court,
assisted by Mr Fabrice DALAT, member of the Bar Association of Paris P373,
WERNERT chambers.

**S.A. QUOTIUM TECHNOLOGIES**
**represented in the conduct of the present proceedings by its legal representatives**
and having its registered office at 84/88, avenue de la Mission Marchand
92400 COURBEVOIE, France

represented by SCP MIRA – BETTAN, Solicitors to the Court,
assisted by Mr Olivier ITEANU, member of the Bar Association of Paris D1380.

**THE RESPONDENTS**

**CYRANO INC**
**a company constituted under US law,**
**acting through the agency of its legal representatives**
and having its registered office at 26, Parker Street
NEWBURY PORT
70950 4010 MASSACHUSETTS
USA

represented by Mr François TEYTAUD, Solicitor to the Court,
and by Mr Marc DUJARDIN, Barrister.

1

EDIT
INTERNET & TRANSLATION
50, rue Miromesnil
75008 Paris, France
Tel. : 33 (0)1 42 68 18 14
Fax : 33 (0)1 42 68 18 16
contact@edit.fr
SARL with capital 38112 euros
VAT : FR 37 302 233 250 000 27

- 9 NOV. 2006

**S.C.P. BROUARD DAUDE**
**in their capacity as liquidators of the company CYRANO,**
resident at 34, rue Sainte-Anne
75001 PARIS, France


represented by the SCP VARIN
and by Mr DUJARDIN, Barrister

**Mr Denis FACQUES**
**in his capacity as receiver,**
resident at 22, Avenue Victoria
75001 PARIS, France

in default

## COMPOSITION OF THE COURT

These proceedings were conducted at a public hearing of 2nd September 2005 before a court comprising the following:
Mrs PEZARD, Presiding Judge,
Mrs REGNIEZ, Counsel,
Mr MARCUS, Counsel,
who have delivered their verdict accordingly.

REGISTRAR of proceedings: L. MALTERRE-PAYARD

## JUDGEMENT:

- handed down by way of judgement after trial,
- handed down at a public hearing by Mrs PEZARD, Presiding Judge
- signed by Mrs PEZARD, Presiding Judge, and by L. MALTERRE-PAYARD, the Registrar present at the delivery of judgement.

Under the terms of a judgement of 11th June 2001, the Commercial Court of Paris initiated judicial settlement proceedings in respect of the limited company CYRANO, which were subsequently converted into judicial liquidation proceedings on 15th October following, for the purposes of which SCP BROUARD DAUDE were appointed as liquidators.

On 10th November 2001, and acting in the above capacity, Mr BROUARD invited the limited company TECHNOLOGIES to formulate an offer for the acquisition of the tangible and intangible elements of various products forming part of the assets of the limited company CYRANO, namely "the OPENSTA solution", entitlements and holdings associated with the registration of the "OPENSTA" brand name, and all intellectual property rights held by the company CYRANO FRANCE in respect of the following data processing solutions and which have been filed with the agency for the protection of programs: DB PACK, which contains product sources for WORKBENCH, PRODUCTION and MIGRATION PACK, CLIENT PACK, which contains product sources for WINSCOPE, STANDARD and INSIGHT (ROBOT and MANAGER, which are not the property of CYRANO, are excluded from the offer accordingly), SERVER PACK, which contains product sources for IMPACT (subject to the proviso that the LOADTEST product, which is not the property of CYRANO, is excluded from the offer, and that recent developments of IMPACT have been acquired by the company CYRANO UK Ltd.) and

2

- 9 NOV. 2006


EDIT
INTERNET & TRANSLATION
50, rue Miromesnil
75008 Paris, France
Tel. : 33 (0) 1 42 68 18 14
Fax : 33 (0) 1 42 68 18 16
contact@edit.fr
SARL with capital 38112 euros
VAT

VT PACK (subject to the proviso that sources of the "TEST" product are the property of CYRANO UK Ltd).

The company TECHNOLOGIES, through the agency of its subsidiary QUOTIUM TECHNOLOGIES, a limited company, duly formulated an offer in respect of the following:
- the OPENSTA solution
- the OPENSTA brand name
- all entitlements and holdings associated with the registration of this brand name,
- all other intellectual and industrial property rights, and all other brands registered with the INPI (French national institute for industrial property), all logos,
- data processing solutions registered with the agency for the protection of programs: DB PACK, containing product sources for WORKBENCH, PRODUCTION and MIGRATION PACK, CLIENT PACK, containing product sources for WINSCOPE, STANDARD and INSIGHT, and SERVER PACK, containing product sources for IMPACT and VT PACK,
- all client files and contracts,
- tangible assets: data processing hardware, specifically servers which are the property of the company CYRANO, in accordance with the schedule submitted by Mr BROUARD.

Under the terms of an order of 11th December 2001, the official receiver authorised the ratification of this assignment in favour of SOFITRADE SARL; the company TECHNOLOGIES, as the supplanted prospective purchaser, filed an objection to this ruling.

Accordingly, in a judgement handed down on 13th March 2002, the Commercial Court of Paris ordered the assignment of the tangible and intangible assets of the limited company CYRANO in favour of the limited company TECHNOLOGIES, under the conditions of the offer formulated by the latter.

A meeting was organised on 15th March following at the registered offices of the limited company CYRANO, in order to complete an inventory of assets. The SCP BROUARD DAUDE, acting on the grounds that, in their opinion, the claims of the company TECHNOLOGIES related in part to assets which were not included in the scope of assignment, refused to ratify the deed of transfer proposed by the latter, in consequence whereof an instruction for the signature of the said deed was served upon the SCP BROUARD DAUDE by a bailiff on 8th April 2002.

On 10th April 2002, a claim of ownership, specifically in respect of the products CYRANO IMPACT and CYRANO TEST, was formulated by the US company TECHNOLOGIES INC which, on 21st March 2002, had acquired various assets, including the CYRANO IMPACT and CYRANO TEST softwares from the UK company CYRANO UK in the course of liquidation.

Accordingly, the SCP BROUARD DAUDE persisted in their objection to the signature required by the company TECHNOLOGIES, in consequence whereof the latter were summoned to appear on an appointed date before the presiding judge of the Court of First Instance of Paris, specifically for the instruction of the completion of the said signature. This application was rejected under the terms of a ruling of 2nd May 2002.

At a meeting of above parties held on 16th May 2002, the SCP BROUARD DAUDE, acting in its designated capacity, and the company TECHNOLOGIES SA ratified a deed of transfer in respect of certain elements of commercial goodwill held by the company CYRANO SA. In consideration of the application filed by the company CYRANO Inc, Mr FACQUES, in his capacity as receiver, impounded logiboxes containing the following source codes:

3

- 9 NOV. 2006    EDIT INTERNET & TRANSLATION
50, rue Miromesnil
75008 Paris, France
Tel. : 33 (0)1 42 68 18 14
Fax : 33 (0)1 42 68 18 16
contact@edit.fr
SARL with capital 38112 euros

- logibox deposited with the agency for the protection of programs on 12th March 1998 under the number 11015-00, containing source codes for CYRANO TEST V.5.2 (archive), CYRANO TIMER V.5.0 (archive) and CYRANO VIDEO (archive);

- logibox deposited with the agency for the protection of programs on 12th March 1998 under the number 98-11014-00, containing source codes for SERVER PACK, BRADFORD SOURCE and SAFE BACK UP (CYRANO TEST and IMPACT PC files);

- logibox deposited with the agency for the protection of programs on 10th December 1998 under the number 98-50030-00, containing source codes for CYRANO TEST V.5.4, CYRANO MILLENIUM TEST and CYRANO EUROTEST.

On 12th June 2002, the company CYRANO Inc. claimed ownership of the impounded softwares.

This claim was contested on 24th June 2002 by the company TECHNOLOGIES SA.

Under these conditions, the company CYRANO Inc. subpoenaed the above to appear before the Commercial Court of Paris on 8th July 2002, together with the SCP BROUARD DAUDE and Mr FACQUES, acting in their respective capacities, with a view to securing recognition of its ownership of the logiboxes at issue.

This Court handed down an initial ruling on 20th September 2002 for the translation into French of documents drafted in a foreign language, and thereafter a second ruling on 4th April 2003 instructing the completion of an expert appraisement by Mr Michel VILLARD.

Upon the completion of his operations, the latter filed a report on 4th November 2003, which specifically indicates that the software products CYRANO TEST and CYRANO IMPACT were wholly owned by CYRANO UK at the time of assignment of the assets of the latter to the company CYRANO Inc. on 21st March 2002; no evidence having been submitted which would allow him to formulate an opinion on the ownership of the other products, he nevertheless assumed that these would be of minor interest in comparison with CYRANO TEST and CYRANO IMPACT. The determination of any prejudice sustained in practice by the company CYRANO Inc. was left to the offices of the Court.

On this date, ruling upon the submission of the report, the Commercial Court of Paris (17th Chamber), in accordance with the judgement after trial handed down on 16th March 2004, hereby:

- validates the expert appraisement;

- exonerates the SCP BROUARD DAUDE and Mr FACQUES;

- orders that the softwares CYRANO TEST and CYRANO IMPACT, impounded by Mr FACQUES, be surrendered to the company CYRANO Inc.;

- appoints as witness to this effect Mr CHEVRIER DE ZITTER, court usher, who shall specifically undertake, in the presence of the agency for the protection of programs, to open the logiboxes, to extract copies of the TEST and IMPACT softwares, to surrender the copies thus extracted to the company CYRANO Inc., to destroy all copies of the TEST and IMPACT softwares contained in the logiboxes, to seal the latter and to return them to the said agency;

- orders the companies TECHNOLOGIES and QUOTIUM to pay:

4



- 9 NOV. 2006

EDIT
INTERNET & TRANSLATION
50, rue Miromesnil
75008 Paris, France
Tel. : 33 (0) 42 68 18 14
Fax : 33 (0) 42 68 18 16
contact@edit.fr

\* to the company CYRANO Inc. the amount of 25,000 Euros by way of compensation, and the amount of 150,000 Euros in accordance with Article 700 of the new Code of Civil Proceedings;

\* to the SCP BROUARD DAUDE, in its designated capacity and under the terms of the same text, the amount of 3,000 Euros,

together with costs.

In their final submissions of 30th June 2005, the limited companies TECHNOLOGIES and QUOTIMUM technologies, as appellants, requested that the Court:

- overturn the judgement handed down for the validation of the expert appraisement, the exoneration of the SCP BROUARD DAUDE, the instruction for the surrender to the company CYRANO Inc. of the CYRANO TEST and CYRANO IMPACT softwares impounded by Mr FACQUES in his designated capacity, the order to the appellants to pay the amounts of 25,000 Euros by way of compensation and of 150,000 Euros and 3,000 Euros under Article 700 of the new Code of Civil Proceedings, the order to pay costs and the dismissal of all other claims;

- rule that the conclusions of the expert appraisement are not consistent with the provisions of Article 238 of the new Code of Civil Proceedings;

- confirm the joint ownership of intellectual property rights in respect of the TEST and IMPACT softwares;

- confirm "the ownership by QUOTIUM of other softwares impounded";

- under the terms of the deed of transfer of 16th May 2002, authorise Mr FACQUES, in his designated capacity, to surrender to the above party the said logiboxes, in consideration of the fact that the company CYRANO Inc. is already in possession of the source codes for the softwares concerned, together with associated documentation;

- rule that, under the terms of the deed of transfer of 16th May 2002, the company QUOTIUM TECHNOLOGIES is the owner of the softwares contained in the impounded logiboxes, and shall be entitled to enjoy all entitlements pertaining thereto under the same terms as the company CYRANO Inc.;

- order the company CYRANO Inc. to pay costs, together with the sum of 900,000 Euros by way of compensation, subject to adjustment on the date of settlement, and of 30,000 Euros in accordance with Article 700 of the new Code of Civil Proceedings.

In its final submissions of 29th June 2005, CYRANO Inc., a company constituted under US law, requested that the Court dismiss all the appeals filed by the appellants and confirm the judgement at issue, excepting in respect of compensation payable, to the effect that the appellants be jointly and severally liable to pay the sum of 7,773,904.78 Euros by way of compensation, in addition to the further sum of 15,000 Euros payable under the terms of Article 700 of the new Code of Civil Proceedings.

In its final submissions of 26th July 2005, the SCP BROUARD DAUDE, in its capacity as authorised agent for the liquidation of the limited company CYRANO, requested that the Court confirm its judgement by way of the exoneration of the SCP BROUARD DAUDE, the instruction

5

- 9 NOV. 2006



to the companies TECHNOLOGIES and QUOTIUM TECHNOLOGIES to pay to the latter the amount of 3,000 Euros under the terms of Article 700 of the new Code of Civil Proceedings, to serve as required, to dismiss any claims which might be filed against the latter and, further to the original judgement, to order that the companies TECHNOLOGIES and QUOTIUM TECHNOLOGIES be jointly and severally liable to pay to the SCP BROUARD DAUDE, over and above costs, the sum of 1,525 Euros under the terms of Article 700 of the new Code of Civil Proceedings.

**In consideration whereof, the Court:**

### *Regarding the validity of the expert appraisement*

Whereas the companies TECHNOLOGIES and QUOTIUM TECHNOLOGIES have requested in the first instance that the conclusions of the expert appraisement be declared inconsistent with the provisions of Article 238 of the new Code of Civil Proceedings;

Whereas, however, it is evident from the report that the expert has given their opinion on the points which they have been requested to investigate, has not responded to questions other than those raised and has not undertaken any analysis of a legal nature;

Whereas, moreover, no declaration of the invalidity of the report has been sought;

Whereas, under these conditions, there is no justification for the censure of the original judgement handed down on the grounds of its recognition of the validity of the said report;

### *Regarding the CYRANO TEST and IMPACT softwares*

Whereas the companies TECHNOLOGIES and QUOTIUM TECHNOLOGIES have cited as grounds for complaint the fact that the original judges were content to abide by the conclusions of the expert and have wrongfully denied the entitlements of the said companies in respect of the CYRANO TEST and IMPACT softwares;

Whereas the said companies submit that the Commercial Court of Paris, under the terms of the judgement handed down on 13th March 2002, instructed the assignment of softwares held by the company CYRANO in favour of the company TECHNOLOGIES, under the terms of the offer presented by the latter, which was consistent with the offer submitted to the latter by Mr BROUARD in his designated capacity and which fell "within the scope of the takeover of assets instructed by the court"; whereas the said companies also submit that, under the terms of the deed of transfer of 16th May 2002, the ultimate destination of provisionally impounded elements, and consequently of the CYRANO TEST and IMPACT softwares, was to be subject to the provision of irrefutable evidence by the company CYRANO Inc. of their ownership of impounded assets within thirty days of the signature of the deed in the presence of Mr FACQUES, failing which the said elements were definitively to be declared the property of the transferee, on the grounds of an unequivocal commitment on the part of Mr BROUARD to complete the assignment of the said assets in full; whereas the said companies cite as grounds for complaint the unreserved acceptance by the expert of the allegations of the company CYRANO Inc. regarding the ownership of the CYRANO TEST and IMPACT softwares; whereas, in the opinion of the said companies, an analysis reveals contradictions or omissions; whereas the said companies submit that there are sound grounds for the assumption that "the softwares of Performance (specifically TEST), up to the time of its acquisition in 1996 were, in accordance with customary practice, developed by software development teams in both the UK and France"; whereas the said

6



– 9 NOV. 2006

EDIT
INTERNET & TRANSLATION
50, rue Miromesnil
75008 Paris, France
Tel. : 33 (0)1 42 68 18 14
Fax : 33 (0)1 42 68 18 16
contact@edit.fr
SARL with capital 28112 euros
VAT : FR 37 3?2 ?5? ?(0 ?7

companies submit that, in 1997, the CYRANO TEST and IMPACT softwares were one-third owned by the company CYRANO and two-thirds owned by the company CYRANO UK, with a subsequent adjustment of these percentage holdings in favour of the former, in consideration of work undertaken by their development teams, in consequence whereof the company CYRANO UK had been required to pay royalties; whereas the said companies submit that joint ownership of rights by themselves and the company CYRANO Inc. should therefore be acknowledged; whereas the said companies also submit that the former administrator and director of the companies CYRANO and CYRANO UK elected to deposit softwares with the agency for the protection of programs in the name of the company CYRANO and not in the name of the company CYRANO UK; whereas the said companies submit that the claims of the company CYRANO Inc. regarding the ownership of the TEST software have been dismissed "before the US court";

Whereas, however, the offer submitted by the company TECHNOLOGIES was not exactly identical to the offer presented to the latter by the liquidator; whereas, if the Commercial Court had authorised assignment "under the terms of the offer", such authorisation would have been subject to the limit of assets which were to be assigned; whereas the entitlements claimed by the company CYRANO Inc. cannot be prejudiced by a clause which is included in an instrument to which the said company was not party;

Whereas the expert, on the basis of a highly detailed analysis, reached the conclusion that the CYRANO TEST and IMPACT softwares were the property of the company CYRANO UK; whereas the criticisms of the work of the expert which have been formulated by the appellants are either based upon supposition or are not decisive; whereas the fact that certain depositions with the agency for the protection of programs were filed in the name of the company CYRANO and not in the name of the company CYRANO UK does not, in itself, constitute proof of ownership of the software concerned by the former; whereas the US ruling, as reported in a barrister's submission, appears to have been handed down on the grounds of insufficient evidence only and, in consequence, the definitive character of the said ruling cannot be argued;

Whereas it cannot seriously be argued that Mr DAUDE entered into an unequivocal undertaking for the assignment of all softwares, on the grounds that, under the terms of the deed of 16th May 2002, the transferee expressly acknowledged the element of risk associated with the assignment concerned, in consideration of the fact that the liquidator was not in a position to guarantee the content of elements to be assigned;

Whereas the evidence presented at these proceedings indicates that the design and development of the CYRANO TEST and IMPACT products (excepting the "GATEWAY" component in the case of the latter) were undertaken by the research and development centre of the company CYRANO UK, located in Bradford (United Kingdom); whereas ownership of the GATEWAY component was transferred to the latter on 30th June 1998; whereas no proof exists that the said company was not in full ownership of these two softwares at the time of their assignment to the company CYRANO Inc. on 21st March 2002;

Whereas, under these conditions, the applications filed by the companies TECHNOLOGIES and QUOTIUM TECHNOLOGIES concerning these softwares cannot be accepted and, in consequence, the judgement handed down should be confirmed in respect of its provisions relating to the surrender of the said softwares to the company CYRANO Inc.;

### *Regarding the ownership of impounded softwares other than CYRANO TEST and IMPACT*

7

ÉDIT
INTERNET & TRANSLATION
50, rue Miromesnil
75008 Paris, France
Tel. : 33 (0)1 42 68 18 14
Fax : 33 (0)1 42 68 18 16
contact@edit.fr
SARL with capital 20 112 euros
VAT : FR

- 9 NOV. 2006

Whereas the appellants have requested acknowledgement of the ownership by the company QUOTIUM TECHNOLOGIES of impounded softwares other than CYRANO TEST and IMPACT;

Whereas the company CYRANO Inc., notwithstanding its general application to the effect that all claims filed by its opponents should be dismissed, has, in practice, only submitted evidence in respect of the CYRANO TEST and IMPACT softwares and, with no additional evidence other than in respect of the amount of compensation and the application of Article 700 of the new Code of Civil Proceedings, has requested confirmation of the judgement handed down, which constituted a specific ruling on the status of the CYRANO TEST and IMPACT softwares, and of the rejection of all other claims of the parties whereas, in practice, the companies TECHNOLOGIES and QUOTIUM TECHNOLOGIES had filed applications in respect of all the softwares impounded;

Whereas, although the expert was not in a position to rule on the ownership of these softwares, it is evident that, in the absence of any material claim before the court in respect of ownership on the part of the company CYRANO Inc., the deed of transfer of 16th May 2002 may be brought into force, in consequence whereof the said softwares shall become the property of the transferee on a definitive basis;

Whereas the judgement handed down is, in consequence, invalidated in so far as it makes no allowance for claims in respect of the said softwares; whereas, in consequence, it is appropriate that the company QUOTIUM TECHNOLOGIES, as owners of the latter, should avail themselves of the rights pertaining to this ownership, and that the witness proceedings instructed should be modified to the effect that, following the destruction of the CYRANO TEST and IMPACT softwares contained therein, the said softwares should be surrendered to the company QUOTIUM TECHNOLOGIES, the cost of such proceedings to be shared by the parties;

### _Regarding compensation_

Whereas the company CYRANO Inc. has requested that the compensation awarded in the first instance, to the amount of 25,000 Euros, be increased to 7,773,904.78 Euros;

Whereas the said company submits that a prejudice has been sustained by way of the necessary reconstitution of an element of the source codes for the TEST software which has been improperly withheld as a result of the approach adopted by the company TECHNOLOGIES, at a cost of $22,349.34, or 20,317.58 Euros; whereas a further $1,928,946, or 1,753,587.20 Euros are claimed by the said company, corresponding to three years of income in respect of maintenance, in addition to 6,000,000 Euros for loss of earnings sustained as a result of outstanding proceedings and actions undertaken by the appellants in respect of the clientele and partners of the said company;

Whereas, however, no evidence of the existence of the alleged prejudice has been provided;

Whereas, moreover, while the objections filed by the appellants have deprived the said company of the exercise of their entitlements in respect of two of the softwares at issue for a given period, actions undertaken by the said company have, by the same token, deprived the appellants of the exercise of their entitlements in respect of the remaining softwares;

Whereas the original judges undertook a precise evaluation of the prejudice sustained by the said company, such that the judgement in respect of this point should be confirmed; whereas,

8



- 9 NOV. 2006

however, the said company should itself be ordered to pay the overall sum of 25,000 Euros to the companies TECHNOLOGIES and QUOTIUM TECHNOLOGIES by way of compensation for the prejudice sustained by the latter as a result of the prevention of their use of softwares other than CYRANO TEST and IMPACT since 16th May 2002;

### *Regarding costs and the application of Article 700 of the new Code of Civil Proceedings*

Whereas, for the purposes of the present judgement, it is appropriate that costs incurred in the first instance and costs in respect of the appeal proceedings should be combined and divided equally between the company CYRANO Inc. on the one hand, and the companies TECHNOLOGIES and QUOTIMUM TECHNOLOGIES on the other;

Whereas, in consideration of grounds of fairness, Article 700 of the new Code of Civil Proceedings shall not apply to the present case; whereas, in consequence, provisions of the judgement handed down and concerning this point shall be invalidated and any appeals filed on the same grounds shall likewise be dismissed;

**IN CONSIDERATION OF THE ABOVE GROUNDS**

**The Court:**

Confirms the judgement handed down in respect of its validation of the expert appraisement, the instruction for the surrender to the company CYRANO Inc. of the CYRANO TEST and IMPACT softwares impounded by Mr FACQUES in his designated capacity, the instruction to the companies TECHNOLOGIES and QUOTIUM TECHNOLOGIES to pay to the company CYRANO Inc. the sum of 25,000 Euros by way of compensation, and the instruction for the conduct of witness proceedings;

Modifies the said judgement to the effect that, following the destruction of all copies of the CYRANO TEST and IMPACT softwares, the logiboxes shall be surrendered to the company QUOTIUM TECHNOLOGIES and costs in respect of the conduct of witness proceedings shall be equally divided between the company CYRANO Inc. on the one hand, and the companies TECHNOLOGIES and QUOTIUM TECHNOLOGIES on the other;

Invalidates the judgement in its remaining points, subject to the addition of the following:

The company QUOTIUM TECHNOLOGIES is hereby declared the owner of impounded softwares other than the CYRANO TEST and IMPACT softwares, and shall avail themselves of the entitlements pertaining to the said ownership;

The company CYRANO Inc. is hereby ordered to pay to the companies TECHNOLOGIES and QUOTIUM TECHNOLOGIES the overall sum of 25,000 Euros by way of compensation;

In dismissal of all other claims, costs pertaining to proceedings in the first instance and appeal proceedings shall be combined and divided equally between the company CYRANO Inc. on the one hand and the companies TECHNOLOGIES and QUOTIUM TECHNOLOGIES on the other;

The SCP VARIN PETIT, and other solicitors where applicable, are hereby authorised to undertake the recovery of costs pertaining thereto, in accordance with the provisions of Article 699 of the new Code of Civil Proceedings.

THE REGISTRAR                              THE PRESIDING JUDGE

9

- 9 NOV. 2006



20040430

TEYTAUD                    M

# RÉPUBLIQUE FRANÇAISE
## AU NOM DU PEUPLE FRANÇAIS

rosses délivrées
ix parties le :

## COUR D'APPEL DE PARIS

### 4ème Chambre - Section B

### ARRÊT DU 21 OCTOBRE 2005

(n°          , 9 pages)

Numéro d'inscription au répertoire général : **04/12357**

Décision déférée à la Cour : Jugement du 16 Mars 2004 -Tribunal de Commerce de
PARIS - RG n° 2002/50224

### APPELANTES

**S.A. TECHNOLOGIES**
**agissant poursuites et diligences en la personne de ses représentants légaux**
dont le siège social est 84/88, boulevard de la Mission Marchand
92400 COURBEVOIE

représentée par la SCP MIRA - BETTAN, avoués à la Cour,
assistée de Maître Fabrice DALAT, avocat au Barreau de Paris P373
Cabinet WERNERT).

**S.A. QUOTIUM TECHNOLOGIES**
**agissant poursuites et diligences en la personne de ses représentants légaux**
dont le siège social est 84/88, avenue de la Mission Marchand
92400 COURBEVOIE

représentée par la SCP MIRA - BETTAN, avoués à la Cour,
assistée de Maître Olivier ITEANU, avocat au Barreau de Paris, D1380.

### INTIMEES

**Société CYRANO INC**
**société de droit américain,**
**prise en la personne de ses représentants légaux**
ayant son siège 26, Parker Street
NEWBURY PORT
70950 4010 MASSACHUSSETS
ETATS UNIS

représentés par Maître François TEYTAUD, avoué à la Cour,
ayant pour avocat Maître Marc DUJARDIN, avocat .

- 9 NOV. 2006

EDIT
INTERNET & TRANSLATION
50, rue Miromesnil
75008 Paris, France
Tel. : 33 (0) 42 68 18 14
Fax : 33 (0) 42 68 18 16
contact@edit.fr
SARL with capital 38112 euros
VAT : FR 37 392 231 250 000 27

**S.C.P. BROUARD DAUDE**
ès qualités de liquidateur judiciaire de la société CYRANO
demeurant 34, rue Sainte-Anne
75001 PARIS

~~défaillante~~ *Representée par la scp d'avoués VARIN*
*ayant pour avocat Me DUJARDIN, avocat —*

**Maître Denis FACQUES**
ès qualités de séquestre
demeurant 22, avenue Victoria
75001 PARIS

défaillante

**COMPOSITION DE LA COUR :**
L'affaire a été retenue le 2 septembre 2005 en audience publique, devant la cour
composée de :
Madame PEZARD, président,
Madame REGNIEZ, conseiller,
Monsieur MARCUS, conseiller,
            qui en ont délibéré.

**GREFFIER,** lors des débats : L. MALTERRE-PAYARD

**ARRÊT :**

            - réputé contradictoire.

            - prononcé en audience publique par Madame PEZARD,
président.

            - signé par Madame PEZARD , président et par
L.MALTERRE- PAYARD, greffier présent lors du prononcé.

Par jugement du 11 juin 2001, le tribunal de commerce de Paris a ouvert à l'égard de la
société anonyme CYRANO une procédure de redressement judiciaire, qui a été convertie
le 15 octobre suivant en liquidation judiciaire, la SCP BROUARD DAUDE étant nommée
liquidateur.

Le 10 novembre 2001 Me BROUARD ès qualités a invité la société anonyme
TECHNOLOGIES à formuler une offre d'acquisition des éléments corporels et incorporels
de divers produits faisant partie des actifs de la société anonyme CYRANO à savoir "la
solution OPENSTA", les droits et actions résultant du dépôt de la marque OPENSTA, tous
droits de propriété intellectuelle dont la société CYRANO FRANCE est propriétaire sur
les solutions informatiques suivantes déposées à l'agence de protection des programmes :
DB PACK qui contient les sources des produits WORKBENCH, PRODUCTION et
MIGRATION PACK; CLIENT PACK qui contient les sources des produits WINSCOPE,
STANDARD et INSIGHT (ROBOT et MANAGER qui n'appartiennent pas à CYRANO
étant exclus de l'offre), SERVER PACK qui contient les sources des produits IMPACT
(étant précisé que le produit LOADTEST qui n'appartient pas à CYRANO est exclu de

Cour d'Appel de Paris
4ème Chambre, section B

— 9 NOV. 2006



l'offre et que les développements récents sur IMPACT ont été assumés par la société CYRANO UK Ltd, et VT PACK"(étant précisé que les sources du produit "TEST" appartiennent à CYRANO UK Ltd)

La société TECHNOLOGIES, qui a chargé sa filiale la société anonyme QUOTIUM TECHNOLOGIES de s'occuper de ces questions, a alors formulé son offre relativement à :
- la solution OPENSTA,
- la marque OPENSTA,
- tous droits et actions résultant du dépôt de cette marque,
- tous autres droits de propriété intellectuelle et industrielle, et toutes autres marques déposées à l'INPI, tous logos,
- les solutions informatiques déposées par l'Agence de protection des programmes : DBPACK contenant les sources des produits WORKBENCH, PRODUCTION et MIGRATION PACK, CLIENT PACK contenant les sources des produits WINSCOPE, STANDART, INSIGHT, SERVER PACK contenant les sources des produits IMPACT, VTPACK,
- tous fichiers et contrats clients,
- les éléments corporels : les matériels informatiques, et notamment les serveurs appartenant à la société CYRANO, selon liste adressée par Me BROUARD.

Par ordonnance du 11 décembre 2001, le juge commissaire a autorisé la régularisation de la cession au profit de la SARL SOFITRADE, mais la société TECHNOLOGIES, candidat acquéreur évincé, a formé opposition à l'encontre de cette décision.

C'est ainsi que par jugement rendu le 13 mars 2002, le tribunal de commerce de Paris a ordonné la cession des éléments corporels et incorporels de la société anonyme CYRANO, au profit de la société anonyme TECHNOLOGIES, aux conditions de son offre.

Un rendez-vous a alors été organisé le 15 mars suivant au siège de la société anonyme CYRANO, afin d'en inventorier les actifs. La SCP BROUARD DAUDE, estimant que les prétentions de la société TECHNOLOGIES portaient pour partie sur des actifs non compris dans la cession a refusé de régulariser l'acte de cession proposé par cette dernière, qui lui a fait alors délivrer par huissier, le 8 avril 2002, sommation de signer ledit acte.

Le 10 avril 2002, une revendication de propriété, portant notamment sur les produits CYRANO IMPACT et CYRANO TEST a été formulée par la société de droit américain CYRANO Inc qui, le 21 mars 2002, a acquis de la société de droit anglais CYRANO UK, en liquidation, divers actifs, dont les logiciels CYRANO IMPACT et CYRANO TEST.

La SCP BROUARD et DAUDE a en conséquence persisté à s'opposer à la signature exigée par la société TECHNOLOGIES, laquelle l'a fait assigner à jour fixe devant le juge de l'exécution du tribunal de grande instance de Paris, notamment afin que cette signature soit ordonnée. Elle a été déboutée de cette demande par décision du 2 mai 2002.

Ces parties se sont rapprochées et 16 mai 2002, la SCP BROUARD DAUDE ès qualités et la société TECHNOLOGIES SA ont régularisé un acte de cession de certains des éléments du fonds de commerce de la société CYRANO SA. Compte tenu de la revendication émanant de la société CYRANO Inc ont constitué Me FACQUES, administrateur judiciaire, séquestre des logibox contenant les codes-sources suivants :

- logibox déposé à l'Agence de protection des programmes le 12 mars 1998 sous le n° 11015-00, composé des sources CYRANO TEST V.5.2.(archive), CYRANO TIMER V.5.0.(archive) et CYRANO VIDEO (archive),

- logibox déposé à l'Agence de protection des programmes le 12 mars 1998 sous le n° 98-11014-00 composé des sources SERVER PACK, BRADFORD SOURCE et SAFEBACK UP (CYRANO TEST et IMPACT PC FILES),

Cour d'Appel de Paris
4ème Chambre, section B

ARRET DU
RG n°2004/

- logibox déposé à l'Agence de protection des programmes le 10 décembre 1998 sous le n° 98-50030-00 composé des sources CYRANO TEST V.5.4., CYRANO MILLENIUM TEST et CYRANO EUROTEST.

Le 12 juin 2002, la société CYRANO Inc a revendiqué la propriété des logiciels ainsi séquestrés.

Cette revendication a été contestée le 24 juin 2002 par la société TECHNOLOGIES SA.

C'est dans ces conditions que le 8 juillet 2002, la société CYRANO Inc a fait assigner cette dernière, ainsi que la SCP BROUARD DAUDE et Me FACQUES, ès qualités, devant le tribunal de commerce de Paris, afin de se voir reconnaître la propriété des logibox litigieux.

Cette juridiction a rendu un premier jugement, le 20 septembre 2002, afin d'obtenir la traduction en français des pièces rédigées en langue étrangère, puis un deuxième, le 4 avril 2003, confiant une mission d'expertise à M. Michel VILLARD.

Celui-ci a procédé à ses opérations et déposé un rapport daté du 4 novembre 2003, aux termes duquel il a notamment indiqué que la société CYRANO UK possédait 100% des produits logiciels CYRANO TEST et CYRANO IMPACT lorsque ses actifs ont été cédés à la société CYRANO Inc le 21 mars 2002 et que, par ailleurs, il ne lui avait pas été fourni d'élément lui permettant d'émettre un avis sur la propriété des autres produits, mais qu'il supposait que ceux-ci présentaient un intérêt mineur par rapport à CYRANO TEST et à CYRANO IMPACT. Il a laissé au tribunal le soin d'apprécier le préjudice susceptible d'avoir été en l'espèce subi par la société CYRANO Inc.

Statuant en ouverture de rapport, le tribunal de commerce de Paris (17e chambre) a, aux termes du jugement contradictoire rendu le 16 mars 2004, aujourd'hui entrepris :

- validé le rapport d'expertise,

- mis hors de cause la SCP BROUARD DAUDE et Me FACQUES,

- ordonné la remise à la société CYRANO Inc des logiciels CYRANO TEST et CYRANO IMPACT séquestrés auprès de Me FACQUES,

- désigné en qualité de constatant Me CHEVRIER DE ZITTER, huissier audiencier, avec mission notamment, en présence de l'Agence pour la protection des programmes, d'ouvrir les logibox, d'extraire par voie de copies les logiciels TEST et IMPACT, de remettre à la société CYRANO Inc les copies ainsi effectuées, de détruire tous exemplaires des logiciels TEST et IMPACT figurant dans les logibox, de sceller à nouveau les logibox et de les remettre à ladite agence,

- condamné les sociétés TECHNOLOGIES et QUOTIUM TECHNOLOGIES à payer :

* à la société CYRANO Inc la somme de 25.000 euros à titre de dommages-intérêts et celle de 150.000 euros sur le fondement de l'article 700 du nouveau Code de procédure civile,

* à la SCP BROUARD DAUDE ès qualités, en vertu de ce même texte, la somme de 3.000 euros,

ainsi qu'aux dépens.

Dans leurs dernières conclusions, signifiées le 30 juin 2005, les sociétés anonymes TECHNOLOGIES et QUOTIUM TECHNOLOGIES, appelantes, invitent la cour à :

Cour d'Appel de Paris
4ème Chambre, section B

- 9 NOV. 2006



ARRET DU 27/10/2005
RG n°2004/12357 - 13e chambre
INTERNATIONAL TRANSLATION
50, rue du Faubourg Montmesnil
75008 Paris, France
Tél.: 33 (0) 1 42 68 18 14
Fax: 33 (0) 1 42 68 18 15
contact@iteradit.fr

- infirmer le jugement déféré en ce qu'il a validé le rapport d'expertise, mis hors de cause la SCP BROUARD DAUDE, ordonné la remise à la société CYRANO Inc des logiciels CYRANO TEST et CYRANO IMPCT séquestrés auprès de Me FAQUES ès qualités, prononcé contre elles des condamnations au paiement des sommes de 25.000 euros à titre de dommages-intérêts, 150.000 euros et 3.000 euros sur le fondement de l'article 700 du nouveau Code de procédure civile, les a condamnées aux dépens et a rejeté toute autre prétention ;

- dire que les conclusions du rapport d'expertise ne sont pas conformes aux dispositions de l'article 238 du nouveau Code de procédure civile,

- constater la co-titularité des droits de propriété intellectuelle des logiciels TEST et IMPACT,

- constater " la propriété de QUOTIUM des autres logiciels séquestrés",

- en conséquence de l'acte de cession du 16 mai 2002, autoriser Me FACQUES, ès qualités, à remettre à cette dernière lesdits logibox, la société CYRANO inc étant déjà en possession des codes-sources de ces logiciels et de la documentation y afférente,

- dire que conformément à l'acte de cession du 16 mai 2002 la société QUOTIUM TECHNOLOGIES est propriétaire des logiciels inclus dans les logibox séquestrés et qu'elle pourra jouir de tous les droits attachés à ces logiciels au même titre que la société CYRANO Inc,

- condamner la société CYRANO Inc aux dépens, ainsi qu'au paiement des sommes de 900.000 euros à titre de dommages-intérêts, sous réserve d'actualisation au jour du paiement, et de 30.000 euros en application de l'article 700 du nouveau Code de procédure civile.

Selon ses dernières conclusions, du 29 juin 2005, la société de droit américain CYRANO Inc demande à la cour de débouter les appelantes de toutes leurs prétentions, et confirmant le jugement attaqué, sauf en ce qui concerne les dommages-intérêts, de condamner solidairement celles-ci à lui payer à ce titre la somme de 7.773.904,78 euros, outre la somme complémentaire de 15.000 euros en application de l'article 700 du nouveau Code de procédure civile.

Suivant ses dernières conclusions, en date du 26 juillet 2005, la SCP BROUARD DAUDE, agissant en qualité de mandataire judiciaire à la liquidation de la société anonyme CYRANO prie la cour de confirmer la décision entreprise en ce qu'elle a prononcé sa mise hors de cause et condamné les sociétés TECHNOLOGIES et QUOTIUM TECHNOLOGIES à lui verser la somme de 3.000 euros au titre de l'article 700 du nouveau Code de procédure civile, en tant que de besoin, de débouter les parties des demandes qu'elles pourraient former à son encontre et, ajoutant au jugement, de condamner in solidum les sociétés TECHNOLOGIES et QUOTIUM TECHNOLOGIES à lui payer, en sus des dépens, la somme de 1.525 euros sur le fondement de l'article 700 du nouveau Code de procédure civile.

Ceci étant exposé, la cour :

### *Sur la validité du rapport d'expertise*

Considérant que les sociétés TECHNOLOGIES et QUOTIUM TECHNOLOGIES demandent en premier lieu qu'il soit dit que les conclusions du rapport d'expertise ne sont

ARRET DU 21/10/2005
RG n°2004/12345 TRANSLATE
50, rue d'Airomesnil
75008 Paris, France
Tel. : 33 (0) 1 42 68 18 18
Fax : 33 (0) 1 42 68 18 19
contact@...fr
SARL with capital...

pas conformes aux dispositions de l'article 238 du nouveau Code de procédure civile ;

Considérant toutefois qu'il ressort de la lecture de ce rapport que l'expert a donné son avis sur les points pour l'examen desquels il avait été commis ; qu'il n'a pas répondu à d'autres questions que celles qui lui étaient posées et n'a pas porté d'appréciation d'ordre juridique ;

Que, d'ailleurs, la nullité du rapport n'est pas sollicitée ;

Que, dans ces conditions, rien ne commande de censurer le jugement déféré en ce qu'il a reconnu valable ce rapport ;

### *Sur les logiciels CYRANO TEST et IMPACT*

Considérant que les sociétés TECHNOLOGIES et QUOTIUM TECHNOLOGIES font grief aux premiers juges de s'être bornés à suivre les conclusions de l'expert déniant à tort leurs droits sur les logiciels CYRANO TEST et IMPACT ;

Qu'elles font valoir que le tribunal de commerce de Paris a, aux termes de son jugement rendu le 13 mars 2002, ordonné la cession des logiciels de la société CYRANO au profit de la société TECHNOLOGIES, aux conditions de l'offre de celle-ci, qui répondait à l'offre qui lui avait été faite par Me BROUARD ès qualités et s'inscrivait "dans le périmètre de reprise ordonné par le tribunal" ; qu'elles ajoutent que dans l'acte de cession du 16 mai 2002, le sort des éléments provisoirement séquestrés, et donc des logiciels CYRANO TEST et IMPACT a été subordonné à la justification, de manière irrévocable, par la société CYRANO Inc de sa propriété sur les biens séquestrés, dans les trente jours de la signature de l'acte auprès de Me FACQUES, à défaut de quoi ces éléments devaient devenir la propriété définitive du cessionnaire, en sorte que Me BROUARD s'est bien engagé sans équivoque à céder l'ensemble desdits biens ; qu'elles reprochent à l'expert d'avoir admis sans réserve les allégations de la société CYRANO Inc relatives à la propriété des logiciels CYRANO TEST et IMPACT ; qu'elles relèvent dans son analyse ce qu'elles tiennent pour des contradictions ou des lacunes ; qu'elles exposent qu'il y a tout lieu de penser que "les logiciels de Performance (notamment TEST) jusqu'à son acquisition en 1996, ont été comme c'est l'usage, développés par les équipes de développement se trouvant aussi bien en Angleterre qu'en France" ; qu'elles soutiennent que les logiciels CYRANO TEST et IMPACT appartenaient en 1997, pour un tiers à la société CYRANO et deux tiers à la société CYRANO UK, ce pourcentage ayant ensuite évolué en faveur de la première, compte tenu des développements réalisés par ses équipes, ce qui l'a conduite à facturer des royalties à la société CYRANO UK ; qu'elles estiment donc que doit être reconnue une co-titularité des droits entre elles et la société CYRANO Inc ; qu'elles indiquent aussi que l'ancien administrateur et dirigeant des sociétés CYRANO et CYRANO UK, a choisi de procéder au dépôt des logiciels auprès de l'Agence de protection des programmes au nom de la société CYRANO et non de la société CYRANO UK ; qu'elles relèvent enfin que la société CYRANO Inc a été "devant la Cour américaine" déboutée de ses demandes concernant la revendication de propriété du logiciel TEST ;

Considérant toutefois que l'offre faite par la société TECHNOLOGIES n'était pas exactement identique à celle qui lui avait été faite par le liquidateur ; que si le tribunal de commerce a autorisé la cession "aux conditions de son offre", il n'a pu le faire que dans les limites des actifs susceptibles d'être cédés ; que les droits que la société CYRANO Inc revendique ne sont pas susceptibles de se trouver atteints par l'effet d'une clause figurant dans un acte auquel elle n'était pas partie ;

Que l'expert, au terme d'une analyse minutieuse, est arrivé à la conclusion que les logiciels CYRANO TEST et IMPACT étaient la propriété de la société CYRANO UK ; que les

Cour d'Appel de Paris
4ème Chambre, section B

— 9 NOV. 2006



critiques de son travail faites par les appelantes reposent sur des suppositions ou ne sont pas déterminantes ; que le fait que certains dépôts aient été effectués auprès de l'Agence de protection des programmes au nom de la société CYRANO et non à celui de la société CYRANO UK ne suffit pas à démontrer que la première était propriétaire du logiciel ; que la décision américaine dont il est fait état au travers d'une attestation émanant d'un avocat apparaît n'avoir été rendue qu'en raison d'une insuffisance de preuve et qu'il n'est pas prétendu qu'elle soit définitive ;

Qu'il ne peut être sérieusement affirmé que Me DAUDE s'est engagé sans équivoque à céder l'ensemble des logiciels, alors que le cessionnaire a expressément reconnu aux termes de l'acte du 16 mai 2002 que la cession revêtait un caractère aléatoire, le liquidateur n'étant pas en mesure de lui garantir la consistance des éléments cédés ;

Qu'il ressort des éléments produits aux débats que la conception et le développement des produits CYRANO TEST et IMPACT (exception faite pour ce dernier du composant "GATEWAY") ont été réalisés par le centre de recherche et de développement situé à Bradford (Royaume-Uni) de la société CYRANO UK ; que la propriété du composant GATEWAY a été transféré à cette dernière le 30 juin 1998 ; que rien ne prouve qu'elle n'aurait plus été en totalité propriétaire de ces deux logiciels lorsqu'elle les a cédés à la société CYRANO Inc le 21 mars 2002 ;

Que, dans ces conditions, les demandes des sociétés TECHNOLOGIES et QUOTIUM TECHNOLOGIES les concernant ne peuvent être admises et que le jugement entrepris doit être confirmé en ses dispositions relatives à leur remise à la société CYRANO Inc ;

### *Sur la propriété des logiciels séquestrés autres que CYRANO TEST et IMPACT*

Considérant que les appelantes demandent que soit reconnue la propriété de la société QUOTIUM TECHNOLOGIES sur les logiciels séquestrés, autres que CYRANO TEST et IMPACT ;

Que la société CYRANO Inc, si elle a sollicité, d'une manière générale, que ses contradictrices soient déboutées de l'ensemble de leurs prétentions, n'a en réalité fourni d'explications que relativement aux logiciels CYRANO TEST et IMPACT, et réclamé, sans qu'il y soit apporté d'ajouts autres qu'au titre du montant des dommages-intérêts et de l'application de l'article 700 du nouveau Code de procédure civile, la confirmation du jugement entrepris, lequel n'a statué expressément que sur le sort des logiciels CYRANO TEST et IMPACT, en rejetant les autres prétentions des parties, alors que les sociétés TECHNOLOGIES et QUOTIUM TECHNOLOGIES avaient présenté des demandes portant sur l'ensemble des logiciels séquestrés ;

Considérant que si l'expert n'a pas été mis à même de se prononcer sur la propriété de ces logiciels, il apparaît que, dès lors que devant la cour la société CYRANO Inc ne la revendique en réalité pas, l'acte de cession du 16 mai 2002 peut produire ses effets et qu'ils deviennent la propriété définitive du cessionnaire ;

Que le jugement déféré doit partant être infirmé en ce qu'il n'a pas admis les prétentions relatives auxdits logiciels ; qu'il convient de dire que la société QUOTIUM TECHNOLOGIE, propriétaire de ceux-ci, pourra jouir des droits attachés à cette propriété, et de modifier la mesure de constat ordonnée, en ce sens qu'après destruction des logiciels CYRANO TEST et IMPACT qui y figurent, elles seront remises à la société QUOTIUM TECHNOLOGIES, les frais de la mesure étant partagés ;

Cour d'Appel de Paris
4ème Chambre, section B

**- 9 NOV. 2006**

ARRET DU 21...
RG n°2004...

*Sur les dommages-intérêts*

Considérant que la société CYRANO Inc demande que le montant des dommages-intérêts qui lui ont été accordés en première instance à hauteur de 25.000 euros, soit porté à 7.773.904,78 euros ;

Qu'elle fait valoir que son préjudice a été constitué par la nécessité de reconstituer une partie des sources du logiciel TEST abusivement retenu du fait de l'attitude de la société TECHNOLOGIES, le coût de cette opération s'étant élevé à 22.349,34 $, soit 20.317,58 euros ; qu'elle ajoute à cette somme celle de 1.928.946 $, soit 1.753.587,20 euros correspondant selon elle à trois années de revenus au titre de la maintenance, outre celle de 6.000.000 d'euros pour le manque à gagner pendant trois ans, eu égard aux procédures en cours et aux interventions des appelantes auprès de la clientèle et de ses partenaires ;

Mais considérant qu'elle ne justifie pas de l'existence des dommages qu'ainsi elle allègue ;

Considérant par ailleurs que si les contestations des appelantes l'ont un temps privée de l'exercice de ses droits par rapport à deux des logiciels, les siennes ont privée celles-ci du bénéfice des leurs par rapport aux autres ;

Que les premiers juges ont procédé à une exacte appréciation du dommage qu'elle a subi, en sorte que le jugement doit être sur ce point confirmé, mais qu'il convient de la condamner elle-même à payer globalement aux sociétés TECHNOLOGIES et QUOTIUM TECHNOLOGIES la somme de 25.000 euros à titre de dommages-intérêts, en réparation du préjudice qu'elle leur a causé en les empêchant, depuis le 16 mai 2002, d'exploiter les logiciels autres que CYRANO TEST et IMPACT ;

*Sur les dépens et l'application de l'article 700 du nouveau Code de procédure civile*

Considérant que, eu égard aux sens du présent arrêt, il convient de faire masse des dépens de première instance et d'appel et de les partager par moitié entre la société CYRANO Inc, d'une part, les sociétés TECHNOLOGIES et QUOTIUM TECHNOLOGIES, d'autre part ;

Considérant que des raisons tirées de considérations d'équité conduisent à écarter en l'espèce l'application de l'article 700 du nouveau Code de procédure civile ; que le jugement déféré doit être infirmé en ses dispositions sur ce point et que les demandes formées en cause d'appel sur ce même fondement doivent être rejetées ;

**PAR CES MOTIFS,**

La cour :

Confirme le jugement déféré en ce qu'il a admis la validité du rapport d'expertise, ordonné la remise à la société CYRANO Inc des logiciels CYRANO TEST et IMPACT séquestrés auprès de Me FACQUES, ès qualités, condamné les sociétés TECHNOLOGIES et QUOTIUM TECHNOLOGIE à payer à la société CYRANO Inc la somme de 25.000 euros à titre de dommages-intérêts et ordonné une mesure de constat ;

Modifiant celle-ci, dit qu'après destruction de tous les exemplaires des logiciels CYRANO TEST et IMPACT les logibox seront remises à la société QUOTIUM TECHNOLOGIES et que les frais de la mesure de constat seront partagés par moitié entre la société CYRANO Inc, d'une part, les sociétés TECHNOLOGIES et QUOTIUM TECHNOLOGIES, d'autre part ;

Cour d'Appel de Paris
4ème Chambre, section B                    – 9 NOV. 2006

Infirmant le jugement pour le surplus et y ajoutant ;

Dit que la société QUOTIUM TECHNOLOGIES est propriétaire des logiciels séquestrés autres que les logiciels CYRANO TEST et IMPACT, et pourra jouir des droits attachés à cette propriété ;

Condamne la société CYRANO Inc à payer globalement aux société TECHNOLOGIES et QUOTIUM TECHNOLOGIES la somme de 25.000 euros à titre de dommages-intérêts ;

Rejetant toute autre demande, fait masse des dépens de première instance et d'appel qui seront partagés par moitié par la société CYRANO Inc, d'une part, et les sociétés TECHNOLOGIES et QUOTIUM TECHNOLOGIES d'autre part ;

Autorise la SCP VARIN PETIT, et les autres avoués s'il y a lieu, à procéder au recouvrement des dépens les concernant conformément aux dispositions de l'article 699 du nouveau Code de procédure civile.

LE GREFFIER                                                    LE PRESIDENT

Cour d'Appel de Paris
4ème Chambre, section B                — 9 NOV. 2006

ARRET DU 21/09/2006
RG n°2004/12287



## CERTIFIED TRANSLATION

We, EDIT, on the grounds of the evidence submitted to us for translation, hereby certify that the attached document:

a print copy of a legal document ("ARRET DU 21 OCTOBRE 2005") issued by the COUR D'APPEL DE PARIS (France) on Oct. 21, 2005,

has been faithfully translated from French into English and is true to the original French. The translated document is entitled "COURT OF APPEAL OF PARIS, JUDGEMENT OF 21 OCTOBER 2005"

Both documents include respectively 9 pages and are dated and bear our embossed stamp and signature

Paris, France
Novembre 9, 2005

Jean-Pierre Jumez
Translation Dept. Manager

– 9 NOV. 2006

EDIT
INTERNET & TRANSLATION
50, rue Miromesnil
75008 Paris, France
Tel. : 33 (0)1 42 68 18 14
Fax : 33 (0)1 42 68 18 16
contact@edit.fr
SARL with capital 38.112 euros
VAT : FR 37 392 233 250 000 27

### Internet & Translation

🔺 GUILD OF EUROPEAN TRANSLATORS

Edit sarl · 50, rue de Miromesnil - 75008 Paris, France ☎ 33 (0)1 42 68 18 14 - Fax: 01 42 68 18 16 - Mobile 06 14 20 75 73 - E-mail: contact@edit.fr
Web: http://www.web-translator.com • www.edit-fr • www.ubersetzung.com • www.web-honyaku.com • www.internet-traducciones.com • www.chinese-translations.org
Sarl with capital of 150,000.00 FRF - RC Paris B392233250 - EU identification Nr.: FR 37 392 233 250 000 19 - NAF : 741 G

2.28 05

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

TECHNOLOGIES, S.A. and            )
QUOTIUM TECHNOLOGIES, S.A.,       )
        Plaintiffs,               )
                                  )
v.                                )        CIVIL ACTION NO. 02-11416-JLT
                                  )
CYRANO, INC.,                     )
        Defendant.                )
                                  )

## AFFIDAVIT OF OLIVIER ITEANU

I, Olivier Iteanu, declare and state as follows upon personal knowledge:

1.    I am one of the French attorneys for Cyrano, Inc., Defendant/Plaintiff-in-Counterclaim in
      the above-encaptioned lawsuit (referred to herein as "Cyrano USA"). I have practiced
      sixteen years before the French courts.

2.    The court system in France, as it relates to this case, includes the Commercial Court of
      Paris, the court of first instance for companies, the Judge in charge of the execution, the
      First Chairman of the Court of Appeal of Paris, the Appeal Court of Paris.

3.    In my practice experience, French courts will recognize judgments of the courts of the
      United States of America upon proper authentication.

4.    The dispute in France between the parties involves the rights in intellectual property of
      Cyrano S.A. ("Cyrano France") that were purchased from its liquidator by
      Plaintiffs/Defendants-in-Counterclaim in the above-captioned lawsuit (collectively
      referred to herein as "Quotium"). I represent Cyrano USA in an action that determined
      that certain software belonged to its predecessor, Cyrano U.K., an affiliate of Cyrano
      France, and thus was not purchased by Quotium.

5.    On or about 8 and 9 July 2002, Cyrano USA sued Quotium in the Commercial Court of
      Paris to declare that CYRANO INC. was the owner of all the intellectual property rights
      over the software applications,

            CYRANO TEST V 5.2 (archive)
            CYRANO TIMER V 5.0 (archive)
            CYRANO VIDEO (archive)
            SOURCES SERVER PACK
            BRADFORD SOURCE

SAFE BACK UP (CYRANO TEST and IMPACT PV FILES)
CYRANO TEST V 5.4 (archive)
CYRANO MILLENIUM TEST
CYRANO EUROTEST;

and to order the trustee bailee of Cyrano France assets to deliver to Cyrano USA three "logiboxes" containing escrowed source code versions of these programs.

6.    On or about 4 April 2003, the Commercial Court of Paris appointed an expert to make determinations regarding the rights of the parties.

7.    On or about 4 November 2003, the expert submitted his report, which, among other things, found that Cyrano U.K. owned most of the software and gave no opinion as to the remainder. Exhibit A hereto is an English translation of the report that I have read and believe to be substantially accurate.

8.    On or about 16 March 2004, the Commercial Court of Paris ruled, among other things, that:

        The expert's report filed on 4 November 2003 is valid;

        The software programs "CYRANO TEST" and "CYRANO IMPACT" held by the trustee bailee are to be returned to the company CYRANO INC;

        The companies TECHNOLOGIES and QUOTIUM TECHNOLOGIES are to pay to the company CYRANO INC the sum of 25 000 euros as compensation for all the prejudice suffered;

        The companies TECHNOLOGIES and QUOTIUM TECHNOLOGIES are to pay to the company CYRANO INC the sum of 150 000 euros pursuant to article 700 of the French New Code of Civil Procedure for attorneys' fees;

        The companies TECHNOLOGIES and QUOTIUM TECHNOLOGIES are to pay to the Court its costs because of the frivolousness of their opposition.

9.    On or about 23 April 2004, Quotium appealed to the Appeal Court of Paris.

10.   On or about 14 September 2004, the Commercial Court of Paris corrected its order to make it executable pending appeal.

11.   On or about 18 November 2004, the Judge in charge of the Execution by the Court of First Instance of Nanterre dismissed Quotium's challenge to execution and ordered Quotium to pay 1000 euros cost to Cyrano USA.

12.   On or about 15 December 2004, the Court of Appeal of Paris essentially affirmed 18 November 2004 ruling.

13.   On or about 17 December 2004, Quotium paid 176 000 euros to Cyrano USA.

2

14.    On or about 17 February 2005, Quotium was taxed 4 865 67 euros for miscellaneous costs. This sum of money has now been paid.

15.    Argument on the main case is set for 2nd of September 2005.

16.    My understanding of the resulting rights is that Cyrano, Inc. has the exclusive rights to distribute, maintain, modify and distribute world-wide the "CYRANO TEST" and "CYRANO IMPACT" products.

Signed under the pains and penalties of perjury, this 28th day of February, 2005,

Paris 28 February

Olivier Iteanu

Michel VILLARD
Information System Consultant
« Ecole Polytechnique » former student
Computer Judiciary Expert

---

# EXPERT REPORT

---

## COMMERCIAL COURT

Judgement of April 4th, 2003
15th Chamber

The litigants are :

**THE PLAINTIFF**

CYRANO INC Company

**THE DEFENDANTS**

TECHNOLOGIES SA
SCP BROUARD DAUDE
Denis FALQUES

**THE VOLUNTARY INTERVENOR**

QUOTIUM TECHNOLOGIES SA Company

**2. Answers to questions of expertise assignment**

**2.2. Transfer of assets from CYRANO SA to TECHNOLOGIES and QUOTIUM TECHNOLOGIES**

- *To give an opinion on the extent of assets in escrow according to the terms of the assets' assignment agreement of CYRANO SA Company dated May, 16th, 2002, by Me BROUARD, in his capacity as official receiver of CYRANO SA to QUOTIUM TECHNOLOGIES Company and to TECHNOLOGIES Company, after having compared it to the software claimed by CYRANO INC and on validity of this agreement in particular in view of the addition in its appendix, of the property certificate concerning these logibox,*

According to the terms of assets' assignment agreement of CYRANO SA Company, dated May, 16th, 2002, the following logibox have been put in escrow at Me Denis FACQUES's office:

- Logibox n°98-11014-00 registered at APP the March, 12th, 1998
- Logibox n°98-11015-00 registered at APP the March, 12th, 1998
- Logibox n°98-500030-00 registered at APP the December, 10th, 1998

Debates gave the opportunity to compare their content with the software « Cyrano Impact » and « Cyrano Test ».

My analysis and investigations are described in the following chapters:
- Description of CYRANO SA software (§4.1)
- Description of logibox's contents (§4.2)
- List of software products in litigation (§4.3.1).

As regards to the « Cyrano Test » software, both the invitation to tender of Me BROUARD, ex officio (*document 1, page2*), and the assignment agreement of May, 16th, 2002 (*document n°10, §1.1.2.1 page7*) are mentioning:

*« The source codes of the product « TEST » belong to CYRANO UK Ltd ».*

It emerges clearly that the « Cyrano Test » product was not included in the extent of the assignment.

**2.3. Property of claimed software**

- *To give an opinion, accordingly, on the property of claimed software…*

My reasoning leads me to the following conclusions:

CYRANO UK Ltd's Research and Development Centre , based in Bradford, England, realised the conception and the development of:
- « Cyrano Test » product

- « Cyrano Impact » product, except for a software component called « Gateway », developed by CYRANO SA Paris.

The assets, the R&D teams and the intellectual property rights of CYRANO UK and CYRANO SA have never been merged.

The Gateway module's property has been assigned to CYRANO UK in June, 30th, 1998.

CYRANO UK Company owned therefore 100% of the « Cyrano Test » and « Cyrano Impact » software, when its assets were assigned to CYRANO Inc. according to the terms of the assignment agreement dated March, 21st, 2002.

My analysis and investigations are described in the following chapters:
- Who created the contentious software ? (§ 4.3.2)
- Concerning contentious software property (§ 4.3.3)
- Complementary answers to statements (§5)


## 2.4 Reality and nature of the contentious facts and of the alleged damages

- *(to give an opinion, accordingly, on...) and generally on the reality and the nature of the contentious facts and of the alleged damages.*

The legal proceedings lead by TECHNOLOGIES SA and QUOTIUM TECHNOLOGIES have generated cost for CYRANO Inc.

It is likely that interventions of TECHNOLOGIES SA and QUOTIUM TECHNOLOGIES on the market, as well as the knowledge of the dispute by customers, lead to a loss of earnings for CYRANO Inc.:

- non renewal of maintenance contracts,
- decline of Licences and services sales.

In the absence of actual evidence, I cannot give my conviction on the real nature of the loss of earnings. CYRANO Inc. has to bring proof of it (see §4.4 Damages suffered by CYRANO Inc.).

I leave to the discretionary assessment of the Court the determination of damage.


## 4.3.2. Who created the contentious software ?

During the second meeting, I have reminded that the registration of a logibox does not attest the property of the registrant on its content, contrary to the allegations of TECHNOLOGIES SA and QUOTIUM TECHNOLOGIES in their Statement (Dire) n°1: « *the registration certificate of software attesting their property by CYRANO INC* » *(page 6, §1, paragraph 4).*

TECHNOLOGIES SA and QUOTIUM Companies made some changes in their statement (Dire) n°2 : « *it is not contested that the registration of the software  by the APP is not sufficient to demonstrate the property of the software* ». *(page 2, §1, paragraph 4)*

The factual question is to know who created the contentious software.

Clear answers are provided to this question through three affidavits of:

- Malcolm Charles GREEN, one of the founder members of the Performance Software Ltd (in 1986), Software Development Manager from 1995 to 2000 (*document n°30, statement CYRANO INC n°3, Appendix 4*);
- Richard Arthur CLARKE, one of the founder members of Performance Software Ltd (in 1986), the Senior Software Engineer, up to the liquidation in October 2001 (*Document n°31, statement CYRANO INC n°3, Appendix 5*);
- Stuart GREENBANK, ex Chief Financial Officer and Director of CYRANO UK and Director of the CYRANO Companies (i.e. CYRANO SA, CYRANO UK, CYRANO INC and other affiliates), employee of Performance Software Ltd between the beginning of 1992 and April 1999 (*Document n°32, Statement CYRANO INC, Appendix 6*).

On the basis of these documents (*Document n°30, page 2, paragraph 4 and 5, page 3, paragraph 7, page 5, paragraph 1 ; document n°31, paragraph 6, page 2 ; document n°32, page 3, paragraph 6*), here is the genesis of the software:

| | |
|---|---|
| April 1990 : | First version of « V-TEST »[1] (v2.1), exclusively on VMS, released in the United Kingdom; |
| April 1992 : | Performance Software Ltd won « the United Kingdom Design Council Award » for the software « V-TEST »; |
| 1993 : | Beginning of adaptation of « V-TEST » on UNIX; |
| 1995 : | First version of « V-TEST » on UNIX (on SUN hardware only); |
| 1996 : | First version of « V-TEST » on Windows, complete and stable version de « V-TEST » (v5.0), available on a large range of UNIX platforms; |
| 1996 : | Decision to develop on « CYRANO TEST » some functions to test databases ; the product resulting from this new development will be renamed « CYRANO IMPACT »; |
| 1997 : | First version of « CYRANO IMPACT », released in the United Kingdom ; |
| 2000 : | Version 3 of « CYRANO IMPACT » under development; |
| 11/2000 : | Last version of « CYRANO IMPACT » (v2.2.4), released in the United Kingdom before the liquidation of CYRANO UK in October 31st, 2001. |

All the versions of « CYRANO IMPACT » were first released in the United Kingdom (*Document n°30, page 5, paragraph 12*).

The conception and the development of the product « CYRANO TEST » were exclusively realised by the R&D centre of CYRANO UK, in Bradford, England (*Document n°30, page 3, paragraph 6 ; Document n°31, page 2, paragraph 5*).

---

[1] « V-TEST » will be renamed « CYRANO TEST » after the acquisition in October 1996, of Performance Software Ltd by IMM

It is the same for the product « CYRANO IMPACT », except for a software component named « SQL Capture (Gateway) », developed by CYRANO SA in Paris (*Document n°30, page 4, paragraph 10, page 6, paragraph 16 iii).*

Around 1996, Performance Software Ltd's Research and Development team consisted of more than twenty United Kingdom nationals based in Bradford, England,. Performance Software Ltd also had three subsidiaries : (1) Performance Software Inc. in the United States, (2) Performance Software France SARL and Performance Software Europe NV incorporated in Belgium (*Document n°32, upper part of page 3, paragraph 5).*

Prior to the acquisition of the shares of Performance Software Ltd in 1996, Performance Software Ltd had entirely created, through its employees, and released in and from the United Kingdom, all versions of V-TEST (from version 2.1, the original version, through version 5.0) (*Document n°32, page 3, paragraph 8).*

The Companies did not merge their assets or their intellectual property rights as a result of the acquisition (*Document n°32, page 5, paragraph 13).*

The companies did not merge their research and development teams. Performance Software limited/CYRANO UK maintained its own research and development team, composed of United Kingdom nationals, in Bradford, England, while CYRANO SA maintained two research and development teams in France. After the acquisition, CYRANO UK continued to independently develop new products and subsequent versions of its existing products such as V-TEST, which was renamed CYRANO TEST (« TEST »). (*Document n°32, upper part of page 6, paragraph 14).*

However, TECHNOLOGIES SA and QUOTIUM TECHNOLOGIES Companies, in their statement n°2, express reservations concerning the affidavit of Mr. Martin GREENBANK (*Statement n°2, page 3, section 3, the last two paragraphs):*

*« It is asked Mr. the Judiciary Expert to express the utmost reservations on the affidavit of Mr. Martin Greenback provided by CYRANO INC (Document n°32) which its content is totally contradicting the letter dated August, 8th, 1998 ».*

As a matter of fact, by letter dated August, 8th, 1998 to KPMG, Mr. Martin Greenbank states (*Document n°08):*

*« ServerPack : the royalty agreements established between the various sales divisions of Cyrano and the two entities holding Intellectual Property rights required the 30 % royalty to be split between Cyrano SA and Cyrano UK in the proportion 1/3rd to Cyrano SA and 2/3rd to Cyrano UK. ».*

However, in the affidavit signed by Mr. Martin Greenbank, he states clearly that not only a part of IMPACT was developed by CYRANO SA (*Document n°32, page 6, paragraph 15):*

*« however, solely in the case of Impact whilst this was predominantly comprised of software developed by UK personnel, there was a small component (a pre-existing gateway to link Impact to other product modules) that was provided on a commercial basis by Cyrano SA development staff. »*

And also that consequently, CYRANO SA has been granted royalties up to 1/3rd (*Document n°32, page 7, paragraph 18*):

*« Cyrano SA's licensed products were limited to 33 1/3 % of the modules of ServerPack because CYRANO UK developed and owned Impact ».*

Would TECHNOLOGIES SA and QUOTIUM TECHNOLOGIES have forgotten to read these lines ? Under what documents, should it be appropriate to have reservations ?

Moreover, CYRANO INC produces, with its statement n°4, an affidavit of Mr. Philippe EYRIES who was President of the CYRANO Companies (i.e. CYRANO SA, CYRANO UK, CYRANO INC, and the other subsidiaries) from 1996 to 2000 (*Document n°35, statement CYRANO INC n°4, Appendix 1*).

Mister Philippe EYRIES confirms the statements of Mr. Martin GREENBANK:

- After the acquisition of Performance Software Ltd by IMM, each company maintained their separate research and development teams and continued to develop their own separate software products. (*page 2, paragraph 4*);
- The assets, research and development teams, and intellectual property rights of CYRANO UK and CYRANO SA were never merged (*page 2, paragraph 5*).

### 4.3.3. Concerning the property of the contentious software products

### 4.3.3.1. « CYRANO TEST » and « CYRANO IMPACT »

The Research and Development centre of CYRANO UK Ltd, based in Bradford in England created and developed:

- the product « CYRANO TEST »
- the product « CYRANO IMPACT », except the component « Gateway » which was developed by CYRANO SA PARIS.

The assets, research and development teams, and intellectual property rights of CYRANO UK and CYRANO SA were never merged.

The module Gateway was charged by CYRANO SA to CYRANO UK the 30 of June, 1998, as it results of KPMG report[2] dated September, 4th, 2002 (*document n°T09, page 7*):

*« In performance of three different agreements by which CYRANO UK Company designated the Company (CYRANO SA) as a consultant for some developments up to their marketing stage, the Company has invoiced on June, 30th, 1998 these developments to CYRANO UK at a price corresponding to salaries and costs of personnel of the Company affected to these works, increased by 25%.*
*Three projects are invoiced to CYRANO UK :*
*Cyrano Evolution                    FF 323.538*
*Cyrano Universal Gateway            FF 1.403.188*

---

[2] This document is the appendix n°4 of the statement of TECHNOLOGIES SA and QUOTIUM TECHNOLOGIES

*Cyrano White and Cyrano Select    FF 919.006 »*

This shows that the property of the module Gateway has been assigned to CYRANO UK the 30th, of June, 1998.

Therefore, CYRANO UK Company owned 100% of the software products « CYRANO TEST » and « CYRANO IMPACT » when its assets were assigned to CYRANO INC by the assignment agreement dated March, 21st, 2002.

### 4.3.3.2. The other products

During the debates, no element was provided allowing me to give an opinion on the property of the following products:
- Cyrano Timer
- Cyrano TestStream
- Cyrano Video
- Cyrano MilleniumTest
- Cyrano VMS DateWarp
- Cyrano DataAge
- Cyrano EuroTest

I suppose that they represent a minor interest compared to « CYRANO TEST » and « CYRANO IMPACT ».

### 4.4. Damages inflicted to CYRANO INC

Some elements are produced by CYRANO INC (Statement n°4, section 5).

The legal proceedings lead by TECHNOLOGIES SA and QUOTIUM TECHNOLOGIES have generated costs for CYRANO INC.

It is likely that interventions of TECHNOLOGIES SA and QUOTIUM TECHNOLOGIES on the market, as well as the knowledge of the dispute by customers, lead a loss of earnings for CYRANO Inc.:

- non renewal of maintenance contracts,
- decline of Licences and services sales.

CYRANO Inc. has to bring proof of its loss of earnings.

Three examples of these interventions are provided:

- E-mail of April, 23rd, 2002, sent by Pascal STRAATSMA to « openstadevel@lists.sourceforge.net » *(Document n°41, page 3)* : *« It is with great pleasure that I wish to announce that Quotium technologies has now picked up Cyrano's mantle as sponsor of the OpenSTA project. While development may have seemed dormant over the last few months following the death of the French software company, it has in fact not been the case, ... »*

- E-mail of July, 30th, 2002, signed « Bastien » (*Document n°41, page 2*) : « *unfortunately, you won't find any contact for Cyrano, in France, UK or US. Cyrano doesn't exist anymore and our company, QUOTIUM TECHNOLOGIES, just bought the asset of Cyrano. We won't be able to provide you any document concerning your Cyrano activity. If you are interested to continue working with Cyrano's tools, we are looking for competencies in UK. You can call Pascal STRAATSMA at +33 1 49 04 71 40 or at* pstraatsma@quotium.com*. Best regards, Bastien »*;
- E-mail of october 2nd, 2002, sent bu Pascal STRAATSMA to « opensta-users@lists.sourceforge.net » (*Document n°41, page3*) : « *the situation is actually crystal clear. Quotium acquired the assets of Cyrano SA (mother company of Cyrano Inc and Cyrano Ltd) among which the intellectual property of this company's range of products, including OpenSTA and its related developments* ».

The address of the addressees lets us think that the messages of Mr. Pascal STRAATSMA have been sent to a list of developers OpenSTA for one of them and to a list of OpenSTA users for the other.

The product OpenSTA is a free product, released as open source. It is not part of the contentious software products.

**5.4. Concerning the possible merger between IMM and Performance Software**

The question of the merger between IMM and Performance Software is a legal matter upon which I do not have to give my opinion:

« *As a result of the acquisition, Performance Software Ltd became a fully owned independent subsidiary of IMM but it was not dissolved. Nor was it merged with IMM. (Document n°32, page 5, paragraph 12).*

« *the companies IMM and Performance Software have merged in 1996 (Appendix 1 :* « *merger agreement combining the two companies* ») (*statement technologies n°2, page 2, §2, paragraph 1*).

The answer to this question does not have any impact on the question of who created the software.

Mr. Philippe EYRIES (*Document n°35, statement CYRANO INC n°4, Appendix 1*) states that after the acquisition:

- each company maintained their separate research and development teams and continued to develop their own separate software products. (*page 2, paragraph 4*) ;
- The assets, research and development teams, and intellectual property rights of CYRANO UK and CYRANO SA were never merged (*page 2, paragraph 5*).

**Quotium**

The Ideal
Web Performance Solution

HOME | COMPANY | SOLUTIONS | SERVICES | NEWS | PARTNERS | SUPPORT

Search :

# Press Releases: Launch of QTest 4.0

**QUOTIUM BRINGS PROFESSIONAL WEB TESTING TOOLS TO A WIDER AUDIENCE WITH LAUNCH OF QTEST 4.0**

PRESS RELEASES
EVENTS
TESTIMONIALS
CASE STUDY

**Sets new industry standard for price, performance and functionality**

**Paris, 11th July 2005** - Quotium Technologies, a specialist provider of web performance solutions, has announced the launch of QTest 4.0, a major new release of its flagship product QuotiumPRO. QTest 4.0 offers the most advanced technical features on the market, increased performance and additional automated test functionality. At the same time the company has reaffirmed its commitment to bringing professional testing and performance solutions, traditionally reserved for large enterprises, to a wider audience by offering the most competitive pricing in the industry.

Today web applications sit at the heart of many companies' business strategy and have become increasingly challenging to develop and maintain. These applications often need to be deployed quickly and within limited budgets, yet are required to withstand ever more demanding performance loads, and meet stringent quality standards. In such an environment it is imperative to be able to measure and predict the behaviour of applications.

To address these challenges QTest 4.0 brings together an established product with a five-year track record, and Quotium's significant technical expertise, to set a new industry standard for price, performance and functionality.

"To date, major players in the performance tools market have only offered hard-to-implement, hard-to-operate and expensive solutions," said Jean-Paul Hadjadj, general manager, Quotium Technologies. "The only alternative for many companies has been inexpensive software tools that perform poorly and fail to deliver the diagnostic functionality their development staff critically need. Quotium recognises that in today's competitive commercial market, web application performance is an issue for companies in all sectors. We have answered the market demand for a professional-standard, highly functional product at an affordable price."

QTest 4.0 further extends the environment in which load tests and web performance optimisation can be carried out. Particular improvements have been made in the area of automated modelling of users' transactions, which accelerates the recording of scripts for complex tests. Quotium has also extended the ability of QTest 4.0 to handle extremely high load simulation by using its innovative 'Thread Pool' technology.

IIn addition, QTest 4.0 now monitors a wider range of applications with improved support for .Net and J2EE platforms. Combining an automatic detection and localisation system for performance failure with a fully customisable reporting engine, QTest 4.0 is the perfect solution for companies who need to optimise the performance of their business critical web applications. QTest 4.0 is ideally suited to architecture benchmarking, the evaluation of infrastructure requirements, performance testing prior to deployment and application migration project.

Quotium's commitment to development, and attention to user requirements, has ensured that QTest 4.0 is the markets' most comprehensive and robust testing solution for web environments, delivered at an unbeatable price.

**Pricing and availability**

QTest 4.0 is available from July 2005 directly from Quotium or from specialist resellers.

QTest 4.0 is available in three modes:

- A standard licence mode
- A three month rental mode
- A project 'pay per test' mode
(For example, for a campaign including a load of 500 virtual users the entry price for a project mode is approximately € 5,000

### ###

**About Quotium Technologies**

Quotium Technologies is a global provider of performance testing solutions for web applications. Quotium Technologies' products give medium to large enterprises the web performance tools they need to optimize the performance of web applications.

Quotium provides an affordable solution dedicated to IT performance management and is a must-have tool for IT-Directors, QA engineers, development and production teams. Deployed on a global scale with customers such as Société Générale, BNP Paribas, JP Morgan, L'Oreal, France Telecom and DaimlerChrysler, Quotium ensures quality, lowered IT development cost and operational efficiency.

Founded in 2002, in Courbevoie, France, Quotium Technologies North American headquarters are located in Beverly, Massachusetts. Quotium Technologies is a subsidiary of Groupe Technologies. For more information, visit quotium.com

---------------------------------------------

If you currently use QuotiumPro and wishes to upgrade to QTest, a special "Upgrade" offer will be proposed through

existing sales contracts.

In the interest of fulfilling our contractual commitments to our users, Quotium pledges to honor service contracts purchased with Quotium Pro until December 31, 2006. Until that date, minor updates will be regularly released for Quotium Pro.

If you have any questions, feel free to contact our technical support.

**QUOTIUM Technologies**
201 Edgewater Dr.
Suite 280
Wakefield, MA 01880 (USA)
Phone : +1 781 213 9200
Fax : +1 781 213 9282
E-mail : usinfo@quotium.com

**Quotium Technologies**
84-88, Boulevard de la Mission Marchand
92411 Courbevoie - FRANCE
Phone : +33 (0)1 49 04 70 70
Fax : +33 (0)1 43 33 92 00
E-mail : info@quotium.com

Search in the archives

Français | Careers | Contact Us | Site Map | Legal | **TECHNOLOGIES**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CYRANO, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| QUOTIUM TECHNOLOGIES, INC., | ) |
| QUOTIUM TECHNOLOGIES, S.A., and | ) |
| TECHNOLOGIES, S.A., | ) |
| | ) |
| Defendants. | ) |

CIVIL ACTION NO. 05-CV-11558-DPW

**AFFIDAVIT OF DR. BRIAN BANDEY**
**IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

I, Dr. Brian Bandey, declare and state as follows:

1. **Qualifications**

I am a Doctor of Law, receiving my PhD in Law in 1996 from the University of Exeter in England. My Thesis was entitled, "The application of the Law of Copyright to Computer Programming Technologies." I am published throughout the world on this subject. My book, which is a legal practitioners textbook, is entitled "International Copyright in Computer Program Technology" (International ISBN Number: 1 85811 098 X). My legal opinions on computer software and the law of copyright have been published in legal journals and other publications throughout the world. In addition, "International Copyright in Computer Program Technology" is a work cited by others publishing in my field. For example, it is cited by William R. Cornish, QC (who is a Barrister, a Queen's Counsel and Herschel Smith Professor of Intellectual Property Law at the University of Cambridge, England) in his work on Intellectual Property Law entitled, "Intellectual Property: Patents, Copyright, Trade Marks and Allied Rights" (4th Edition, International ISBN Number: 0-421-635304). I also hold a Bachelors Degree in Law with Honours awarded in 1979.

2. **Connection with Cyrano, Inc.**

In 1989, as an independent legal advisor, I began advising Performance Software Limited (which was later to be renamed Cyrano (UK) Limited (hereafter referred to as "Cyrano UK") in 1996). I advised Performance Software Limited on issues of intellectual property and contract law on a regular basis. They became a retained client of my law

practice in about 1992 and remained so until 1996 when the name was changed to Cyrano UK. After this name change I continued to advise Cyrano UK on intellectual property and contract law issues on a regular basis and also began advising Cyrano S.A., formerly IMM, a French company to which Cyrano UK became affiliated in 1996. From 1989 until 2001, when Cyrano UK and Cyrano S.A. were liquidated, I serviced the management teams of Cyrano UK, Cyrano S.A., and Cyrano, Inc. with their requirements for legal advice and support with respect to copyright and contract law in the context of their commercial operations worldwide. I continue to represent Cyrano, Inc. and provided advice to it at times during the liquidation of its corporate affiliates, Cyrano UK and Cyrano S.A.

Cyrano UK and Cyrano S.A. each retained separate ownership rights to their own assets and intellectual property, including all copyrights to software products. Neither Cyrano UK, Cyrano S.A., nor their predecessors, Performance Software Limited and IMM, respectively, ever merged. Rather, IMM purchased the shares of Performance. After the acquisition, Cyrano UK became the wholly-owned, yet independent, subsidiary of Cyrano SA. Cyrano UK owned its own assets, intellectual property rights, and copyrights, including its copyright to OpenSTA, despite any subsidiary relationship to Cyrano SA.

**3.      Ownership of Test**

3.1      Authorship

3.1.1   The computer software product known as "Test" (formerly known first as "V-Test" and later as "Cyrano Test") was authored by United Kingdom nationals, who were employed at all material times by the legal person Cyrano UK. As a matter of English law, the copyright in all of the works they produced that became Test vested in Cyrano UK as author. All and every version and iteration of Test was first published by Cyrano UK in the United Kingdom after the effective date of the Berne Copyright Convention (Paris Revision, 1971) (to which I will refer to as the "Berne Convention").

3.1.2   In my legal opinion, Test (including all of its versions and iterations without exception) is a substantial and complex copyright work exhibiting a high degree of originality expressing a significant degree of creativity, programming skill, judgment and taste.

3.1.3   As a matter of English law (principally section 90. of the United Kingdom Copyright, Designs and Patents Act 1988, section 53(1)(c) of the United Kingdom Law of Property Act 1925 and decided cases associated therewith) it is impossible to move (assign) the copyright in a copyright work from one person to another without a copyright assignment having been made in writing. There is neither evidence of any assignment of copyright between Cyrano UK and Cyrano S.A. with regard to Test nor

2

was such an assignment ever contemplated or effected, from my personal experience of dealing with Cyrano UK and Cyrano S.A. management on an almost daily basis for a significant number of years.

3.2  Transfer of Test to Cyrano, Inc.

By virtue of an Agreement dated March 21, 2002, the Joint Liquidators of Cyrano UK transferred all of the intellectual property of every legal kind (including the copyright) owned by it to Cyrano, Inc.  Further, I am satisfied in every respect that such transfer and assignment to Cyrano, Inc. was lawful, valid, and effective in every manner.  Since my involvement as legal adviser to the developer of all versions of Test, I am satisfied that the copyright and other intellectual property in all versions of Test (including V-TEST and all subsequent versions), at all material times, were properly vested, under English and international copyright law (including, but without limitation, the Berne Convention), in Cyrano UK, which first published all versions of this computer software product in the United Kingdom.  Accordingly, in my legal opinion, Cyrano UK had all of the legal capacity necessary to transfer the ownership of all versions of Test to Cyrano, Inc., and did so.

3.3  International Protection of Test.

3.3.1  In my opinion, Test (in all of its versions and including all of its source code, object code, intermediate code, preparatory design material and associated design, user, technical and instruction documentation) is a copyright work protected by Article 2(1) of the Berne Convention (where (under Article 3 of the Berne Convention) the author was (at all material times) a national of one of the countries of the Union.

3.3.2  In addition, in my opinion, the publication of Test (in the manner I describe it in Paragraph 3.3.1 above) in the United Kingdom satisfies the requirements of Article 5 of the Berne Convention in that copies were made available for sale in the United Kingdom (a member country of the Berne Convention Union), with the consent of the copyright owner, and sufficient to satisfy the reasonable requirements of the public there, having regard to the nature of the work.

3.3.3  In my opinion, the protection afforded to copyright works under the Berne Convention is provided for in Article 5 as follows:

"(1)  Authors shall enjoy, in respect of works for which they are protected under this Convention, in countries of the Union other than the country of origin, the rights which their respective laws do now or may hereafter grant to their nationals, as well as the rights specially granted by this Convention. . . .

3

(3)    Protection in the country of origin is governed by domestic law.  However, when the author is not a national of the country of origin of the work for which he is protected under this Convention, he shall enjoy in that country the same rights as national authors."

In my legal opinion, a distinction is made between the extent of protection in the country of origin and in other countries of the Union, since protection in the country of origin is governed by the domestic law but, in countries other than the country of origin, the author is given not only the rights which are given under their domestic law, but also the rights granted by the Convention.  Consequently, Cyrano, Inc., as the copyright owner of Test (in the manner I describe in Paragraph 3.3.1 above) which is a copyright work protected by the Berne Convention (to which the United States of America is a signatory) is entitled to the protection afforded by that convention (as I have briefly described it in this Paragraph 3.3) and, therefore, has sufficient legal right and capacity to bring suit in the United States of America in connection therewith.

## 4.    Ownership of Impact

4.1    Authorship

4.1.1    The computer software product known as "Impact" (formerly known as "Cyrano Impact") was heavily based on an included the copyright material of Test as a literal level and other levels of abstraction.  In my legal opinion, sufficient programming knowledge, skill, and taste was expended to produce new copyright works in Impact.  Except for the computer program module known as the "Gateway," this computer software product was authored by United Kingdom nationals, who were employed at all material times by the legal person Cyrano UK and, therefore, the copyright in all of the works they produced that became Impact in all of its versions vested in Cyrano UK as author.  Cyrano UK also first published all versions of Impact in the United Kingdom prior to its liquidation.

4.1.2    In my legal opinion, Impact (including all of its versions and iterations without exception) is a substantial and complex copyright work exhibiting a high degree of originality expressing a significant degree of creativity.  In addition, it contains significant portions of Test, which are also substantial copyright works and property.

4.2    Copyright Structure of Impact and Ownership of the "Gateway"

In considering the copyright structure of Impact, it is necessary to consider the

4

copyright status of the Gateway computer program module. The Gateway was authored by the employees of Cyrano S.A. and the evidence given is that there was no collaboration between the developers of Cyrano UK and the developers of Cyrano S.A. in the design, development, writing, or authorship of the Gateway. To produce a work of joint authorship where title to a copyright work vests in more than one individual, it is necessary in English law for two or more authors to collaborate so that the contribution of each author is not distinct from that of the other author or authors (Section 10(1) of the United Kingdom Copyright, Designs and Patents Act 1988 and decided cases associated therewith).

In the absence of such collaboration, Gateway is a copyright work owned by a single author. The evidence from the KPMG Report, attached hereto as Exhibit A, shows that Gateway was a work commissioned by Cyrano UK, which paid one million, four hundred and three thousand, one hundred and eighty-eight French francs to Cyrano S.A. for it, which includes a profit element for Cyrano S.A. of 25% of the man-development cost price. However, there is no other evidence of a written assignment of copyright between Cyrano UK and Cyrano S.A. with regard to the Gateway. In such a circumstance, and especially in a circumstance where a work has been commissioned that is necessary for the completeness of a larger work, under English law the commissioning/paying party will be the owner in equity of the copyright in the work produced and would be entitled to have the rights assigned to it. In my legal opinion, therefore, I am satisfied that Cyrano UK is the equitable and beneficial owner of the Gateway. The assignment mechanism of the UK Transfer Agreement expressly included a reference to computer software that was owned by Cyrano UK beneficially, and I am satisfied that the equitable and beneficial ownership of the Gateway was effectively vested in Cyrano, Inc. (See Liquidators Sale Agreement attached hereto as Exhibit B.)

4.3     Transfer to Cyrano, Inc.

There is no evidence of any assignment of copyright between Cyrano UK and Cyrano S.A. with regard to Impact and, as in the case of Test, from my personal experience of dealing with Cyrano UK and Cyrano S.A. management on an almost daily basis for a significant number of years, such an assignment was neither contemplated nor effected. The ownership of the totality of Impact as expressed in all of its versions has, therefore, been vested in Cyrano.

4.4     International Protection of Impact

4.4.1   With regard to the Berne Convention, without repeating my comments as stated in paragraph 3.3.3 above, my opinion is that Impact (in all of its versions and including all of its source code, object code, intermediate code, preparatory design material and associated design, user, technical, and instruction documentation) is a copyright work protected by Article 2(1) of the Berne Convention where (under Article 3 of the Berne Convention) the author was (at all material times) a national of one of the

5

countries of the Union.

4.4.2   In addition, in my opinion, the publication of Impact in the United Kingdom satisfies the requirements of Article 5 of the Berne Convention, inasmuch as copies were made available for sale in the United Kingdom (a member country of the Berne Convention Union), with the consent of the copyright owner, and sufficient to satisfy the reasonable requirements of the public there, with regard to the nature of the work.

## 5.    Ownership of OpenSTA

5.1   Authorship

The computer software product known as "OpenSTA," in my legal opinion, is a copyright work into which a high degree of originality, creativity, and protectable expression has been injected (such property (protectable expression) being realized in terms of its source and object code, as well as its non-literal elements). OpenSTA, as a copyright work, includes the property in Test and Impact (together with other copyright works from "Cormorant," "Concert," and "Impact 3"), expressed at various levels of protectable abstraction.  In my legal opinion and as a matter of English law, sufficient programming knowledge, skill, and taste was expended to produce new copyright works in OpenSTA.  This computer software product and architecture was authored by United Kingdom nationals, who were employed at all material times by the legal person Cyrano UK.  Therefore, the copyright in all of the works they produced that became OpenSTA vested in Cyrano UK as author; except for:

(i)    the computer program module known as the "Gateway."  This was, both from a technical programming perspective and, in my legal opinion, as a copyright work, materially the same as that included in Impact, Impact 3, and Concert and the ownership of which vested in Cyrano UK under English law in the manner I addressed in Paragraph 4.2 above;

(ii)   certain "HTTP Replay Code"; and

(iii)  a computer program module known as the "Modeller."

Cyrano UK also first published all versions of Open STA (which includes, without limitation, Version 0.9.1) in the United Kingdom prior to being liquidated.

5.2   Copyright Structure of OpenSTA and Ownership of "HTTP Replay Code" and "Modeller"

In considering the copyright structure of OpenSTA, it is necessary to consider the copyright status of the HTTP Replay Code and the Modeller computer program module.

    (i)    <u>HTTP Replay Code:</u>

In my opinion, the size of this code is sufficient to be highly suggestive that, as a work of authorship under French law, it is a copyright work. This work was authored by the employees of Cyrano S.A. in France and the evidence given is that there was no collaboration between the developers of Cyrano UK and the developers of Cyrano S.A. in the design, development, writing, or authorship of the HTTP Replay Code. As with other component parts authored by Cyrano S.A., there was only a mere 'provision' of it to Cyrano UK. As a matter of English law, this authoring methodology precludes any argument that the HTTP Replay Code is the fruit of collaboration and, therefore, HTTP Reply Code was owned by Cyrano S.A.. I am aware of no evidence to suggest that it was assigned to Cyrano UK or that any claim of ownership can be sustained by Cyrano, Inc. with respect to it.

    (ii)    <u>Modeller:</u>

In my opinion, the size of this computer program module is sufficient to be highly suggestive that it is a copyrightable work. There is no evidence of collaboration with respect to it, but, rather, the passing of one completed work from one person to another and further authoring effort then being expended on it by Cyrano UK. It should be always be borne in mind that sections of Modeller are, in fact, the open-source computer software product known as "CodeMax," which, in my legal opinion, militates against any conclusion that Modeller is one cohesive, original, and contiguous copyright work capable of being owned by any one person. With the evidence at hand at this time, I feel unable to make a definitive determination on the copyright ownership of Modeller, except to to say that, in my legal opinion, it is highly unlikely that either Cyrano UK, Cyrano S.A., or the owners of CodeMax own the totality of the copyrights subsisting in it or own Modeller as one copyright work.

5.3    <u>Copyright Ownership of the Component Make-Up of OpenSTA</u>

In my legal opinion, as a matter of English law, considering the copyright structure of OpenSTA, and the fact that the contributions made to it are quite distinct, OpenSTA cannot be, in law, a work of joint authorship. In addition, taking into account the quantitative and qualitative make-up of OpenSTA, it is not, as a mater of English law, a "compilation" (being a type of copyright work where a new copyright arises in a work as a whole by virtue of a sufficiency of originality being expended in bringing together a number of individual copyright

works).  In my legal opinion, OpenSTA is comprised of independent works of separate authorship and copyright ownership.  Those parts are:

(i)     HTTP Replay Code -- a copyright work owned by Cyrano S.A.;

(ii)    Modeller - a composite of copyright works of undetermined ownership, the whole being unlikely to be owned by any one person; and

(iii)   the remainder of all of what can be referred to as "OpenSTA" (which I will refer to as "UK OpenSTA") -- a copyright work owned by Cyrano UK.

5.4     Transfer to Cyrano, Inc.

There is no evidence of any assignment of copyright between Cyrano UK Limited and Cyrano S.A. with regard to UK OpenSTA and, as in the case of Test and Impact, from my personal experience of dealing with Cyrano UK and Cyrano S.A. management as indicated above, no such assignment was ever contemplated or effected.  By virtue of the UK Transfer Contract, the Joint Liquidators of Cyrano UK transferred all of the intellectual property of every legal kind (including the copyright) owned by it to Cyrano, Inc.  As I have indicated above, I am satisfied in every respect that such assignment to Cyrano, Inc. was lawful, valid, and effective in every manner.  Accordingly, in my certain legal opinion, Cyrano UK had all of the legal capacity necessary to transfer the ownership of all versions of UK OpenSTA to Cyrano, Inc., and did so.

5.5     International Protection of UK OpenSTA.

5.5.1   With regard to the Berne Convention, without repeating my comments as stated in paragraph 3.3.3 above, my opinion is that UK OpenSTA (in all of its versions and including all of its source code, object code, intermediate code, preparatory design material and associated design, user, technical, and instruction documentation) is a copyright work protected by Article 2(1) of the Berne Convention where (under Article 3 of the Berne Convention) the author was (at all material times) a national of one of the countries of the Union.

5.5.2   In addition, in my opinion, the publication of UK OpenSTA, in the manner I describe UK OpenSTA in Paragraph 5.5.1 above, in the United Kingdom satisfies the requirements of Article 5 of the Berne Convention in that copies were made available for sale in the United Kingdom (a member country of the Berne Convention Union), with the consent of the copyright owner, and sufficient to satisfy the reasonable requirements of the public there having regard to the nature of the work.

5.5.3   Cyrano, Inc. as the copyright owner of UK OpenSTA, in the manner I

8

describe it in Paragraph 5.5.1 above, which is a copyright work protected by the Berne Convention (to which the United States of America is a signatory) is entitled to the protection afforded by that Convention and, therefore, has sufficient legal right and capacity to bring suit in the United States of America in connection therewith.

6.    **The Licensing of OpenSTA Components "HTTP Replay Code", "Modeller" and "UK OpenSTA"**

6.1    As Cyrano UK Limited was the first publisher of the totality of OpenSTA (i.e. UK OpenSTA, the HTTP Replay Code, and the Modeller) and legal persons affiliated to Cyrano UK such as Cyrano, Inc. and Cyrano S.A. dealt in OpenSTA, it is, in my opinion, necessary to examine the licensing of the OpenSTA components to complete the copyright 'picture' of OpenSTA. As the components HTTP Replay Code, Modeller, and UK OpenSTA have different copyright structures, I will address the licensing issues concerning them separately.

6.2    HTTP Replay Code

6.2.1    Absence of Written License

As I indicated in Paragraph 5.3 above, the HTTP Code as a copyright work is owned by Cyrano S.A.. There is no evidence of any formal or written licensing regime flowing from Cyrano S.A. to Cyrano UK Limited with regard to the HTTP Reply Code, but, in my legal opinion, and my personal knowledge of the relationship between the parties involved, there was an intention that Cyrano UK should have vested in it the legal capacity it needed commercially with respect to the HTTP Replay Code.

6.2.2    Presence of an Implied License to Cyrano UK

As a matter of English law, a license will not be implied merely because it would be reasonable between the parties: rather, the test is whether it is necessary to give effect to the intention of the parties and, most importantly, to give business efficacy to their relationship; and the test overall of an implied license is an objective one. Further, under English law, a license may be personal to the licensee, unless the circumstances of the granting of the license and the terms of the license justify the conclusion that it was intended to be assignable. A license is not assignable where it appears that the license was granted to the licensee because of the licensee's personal reputation and, in my legal opinion, where we have implied licenses arising between associated or affiliated companies, those licenses, too, are personal due to the special relationship between the legal persons involved. In my legal opinion therefore:

(i)     an implied license for the exploitation of the HTTP Replay
        Code was granted by Cyrano S.A. to Cyrano UK;

(ii)    due to the fact that Cyrano S.A. and Cyrano UK were
        affiliated companies working cooperatively (but not
        collaboratively) on the OpenSTA product, such implied
        license was personal to Cyrano UK and was a license that
        was neither transferable nor assignable;

(iii)   this implied license terminated automatically on the
        liquidation of Cyrano S.A. or Cyrano UK, whichever event
        was the earlier.

## 6.3    Modeller

### 6.3.1    Absence of Written License

As indicated in Paragraph 5.3 above, the ownership of the Modeller as a
copyright work is indeterminate for the purposes of this Affidavit.
Certainly, the Modeller in some of its versions or iterations contained
copyright works authored and owned by Cyrano UK (I will refer to this
part of Modeller as the "UK Modeller Component"). Other parts of
Modeller were owned by the owner(s) of CodeMax, with the remainder
being owned by Cyrano S.A. (and I will refer to this part of Modeller as
the "SA Modeller Component"). There is no evidence of any formal or
written licensing regime flowing from Cyrano S.A. to Cyrano UK Limited
with regard to the initial supply of Modeller or SA Modeller Component,
but, in my legal opinion and my personal knowledge of the relationship
between the parties, there was an intention that Cyrano UK should have
vested in it the legal capacity it needed commercially with respect to the
SA Modeller Component.

### 6.3.2    Presence of an Implied License to Cyrano UK

For the same reasons given in Paragraph 6.2.2 above, in my legal opinion:

(i)     an implied license for the exploitation of the SA Modeller
        Component was granted by Cyrano S.A. to Cyrano UK;

(ii)    due to the fact that Cyrano S.A. and Cyrano UK were affiliated
        companies working cooperatively (but not collaboratively) on the
        OpenSTA product, such implied license was personal to Cyrano
        UK and was a license that was neither transferable nor assignable;

(iii)   this implied license terminated automatically on the liquidation of
        Cyrano S.A. or Cyrano UK, whichever event was the earlier.

6.4    UK OpenSTA

    6.4.1    Absence of Written License

        As indicated in Paragraphs 5.3 and 5.4 above, UK Open STA as a
        copyright work was owned by Cyrano UK and is now owned by Cyrano,
        Inc.  There is no evidence of any formal or written licensing regime
        flowing from Cyrano UK to Cyrano S.A. with regard to UK OpenSTA,
        but, in my legal opinion, there was an intention that Cyrano S.A. should
        have vested in it the legal capacity it needed with regard to UK OpenSTA.

    6.4.2    Presence of an Implied License to Cyrano S.A.

        For the same reasons given in Paragraph 6.2.2 above, in my legal opinion:

        (i)     an implied license for the exploitation of UK OpenSTA was
             granted by Cyrano UK to Cyrano S.A.;

        (ii)    due to the fact that Cyrano S.A. and Cyrano UK were affiliated
             companies working cooperatively (but not collaboratively) on the
             OpenSTA product, such implied license was personal to Cyrano
             S.A. and was a license that was neither transferable nor assignable;

        (iii)   this implied license terminated automatically on the liquidation of
             Cyrano S.A. or Cyrano UK, whichever event was the earlier.

## 7.    QTest 4.0

7.1    Derivation of QTest 4.0

    I am familiar with the product that the Defendants, Quotium Technologies, Inc.,
    Quotium Technologies, S.A., and Technologies, S.A. (collectively, "Quotium"),
    named QTest 4.0 and launched in July 2005.

    For 22 years, I have been studying the real-life development of software with
    regard to derivation, or use by software developers or programmers of previously
    developed code.  In my experience, even when developers have been instructed
    by their managers not to use the existing code, the developers use the code -- not
    just to avoid the programming effort, but because (1) they believe the code is
    available for use, notwithstanding the instructions of their managers; and (2) to
    write the code without reference to the existing code would likely result in a need
    for extended debugging that may have taken man years for the existing code.

    For at least these reasons, it is my opinion that it is highly unlikely that, even if
    Quotium had instructed their developers not to use Cyrano's Test, Impact, and the

proprietary scripting language used in both, the developers likely would have used the preexisting code. Thus, it is my belief that:

    (i)    QTest 4.0 was derived in substantial, and probably major, part from Test and Impact; and

    (ii)    the recent enhancements to QTest 4.0, even if for a different platform, used Cyrano's proprietary information without license from Cyrano.

7.2    <u>QTest 4.0's Infringement of Cyrano's Test and Impact</u>

In my opinion, QTest 4.0 represents an infringement of Cyrano's Test and Impact. In addition to QTest 4.0's use of Test and Impact scripting language, any enhancements to QTest 4.0 imminently threaten further commingling of Cyrano's code with Quotium's new code. Thus, as time passes, it will be harder to show that Quotium commingled Cyrano's code and that QTest 4.0, and any enhancements thereto, are a derivation of that code.

## 8.    <u>General Conclusion Summary</u>

In conclusion, in my legal opinion under English law:

    (i)    Cyrano, Inc. is and has at all times since March 2002 been the sole owner of all right, title, and interest in and to all copyrights to Test and Impact as expressed in all of their versions without exception;

    (ii)    Cyrano, Inc. is and has at all times since March 2002 been the sole owner of UK OpenSTA (OpenSTA except two components - HTTP Replay Code and Modeller) as expressed in all of their versions without exception;

    (iii)    Test, Impact, and OpenSTA (as expressed in all of their versions without exception) were all first published in the United Kingdom, which was a member of the Berne Convention at the time of such publication and, therefore, qualify as Berne Convention works; and

    (iv)    implied licenses flowed between Cyrano UK and Cyrano S.A. on a reciprocal basis with respect to the copyright works making up OpenSTA (UK OpenSTA, HTTP Replay Code, and Modeller) and such implied licenses are no longer in force.

    (v)    QTest 4.0 represents an infringement of Cyrano's Test and Impact. In addition to QTest 4.0's use of Test and Impact scripting language, any enhancements to QTest 4.0 imminently threaten further commingling of Cyrano's code with Quotium's new code.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed this 20th day of June 2006.



Brian  Bandey

*Cyrano S.A.*
*Special report of the auditors*
*on regulated conventions*

## 3.3 Invoicing of the development costs

*Administrators concerned*

▪ The common administrators to Cyrano S.A. and Cyrano (UK) Limited are as follows:
Philippe Eyries, Trevor Read (until its resignation March 26 1998), Martin Greenbank and Oliver Protard

*Nature, object and methods:*

Pursuant to three various contracts, under the terms of which the company Cyrano UK indicated the company in the capacity as consultant for certain developments until the Commercialization stage, the company has on 30 June 1998, invoiced these developments with Cyrano UK at the price of the wages plus contributions of the affected personnel of the company to this work, raised of 25%

Three projects were thus invoiced with Cyrano the U.K.:

| | |
|---|---|
| Cyrano Evolution: | FF. 323 538 |
| Cyrano Universal Gateway: | FF. 1 403 188 |
| Cyrano While and Cyrano Select: | FF. 919 006 |

Paris La Défense, October 20 1998

KPMG Audit
*Fiduciary of France*

MBV & Associés

[Signature]

[Signature]

Frédéric Quélin
Associate Director

Régis Bizien
Associate

 Audit

MBV Associés

Fiduciaire de France

1, cours Valmy
F-92923
Paris La Défense Cedex

91, avenue de Wagram
75 017 Paris

**Cyrano S.A.**

Siège social : 123, rue de Tocqueville - 75017 Paris
Capital social : F.82 836 870.

**Rapport spécial des commissaires aux comptes
sur les conventions réglementées**
Exercice clos le 30 juin 1998

Mesdames, Messieurs,

En application de l'article 103 de la loi du 24 juillet 1966, nous portons à votre connaissance les conventions visées à l'article 101 de cette loi, et préalablement autorisées par votre Conseil d'Administration.

**1      Conventions conclues au cours de l'exercice et préalablement**

**autorisées par votre Conseil d'Administration**

**1.1     *Facturation de frais de siège***

*Administrateurs concernés :*

Les administrateurs communs à Cyrano S.A. et aux autres sociétés du Groupe Cyrano concernées par cette convention sont les suivants :

- Cyrano Inc. : Trevor Read (jusqu'à sa démission le 26 mars 1998) et Martin Greenbank

- Cyrano Switzerland S.A. : Philippe Eyries

- Cyrano Sàrl : Martin Greenbank

- Cyrano (UK) Limited : Philippe Eyries, Trevor Read (jusqu'à sa démission le 26 mars 1998), Martin Greenbank et Olivier Protard

C00075

*Cyrano S.A.*
*Rapport spécial des commissaires aux comptes*
*sur les conventions réglementées*

*Nature, objet et modalités :*

Par délibération du Conseil d'Administration du 18 mai 1998, il a été décidé que la société Cyrano S.A. refacture, aux sociétés du groupe Cyrano qui en bénéficient, les frais liés à la commercialisation, au marketing, aux services généraux et administratifs.

Les prestations facturées à ce titre au cours de l'exercice du 1ᵉʳ juillet 1997 au 30 juin 1998, concernent les sociétés suivantes :

- Cyrano Switzerland S.A.          FF.473 813

- Cyrano (UK) Limited             FF.1 343 272

- Cyrano Inc.                     FF.1 343 272

- Cyrano Sàrl                     FF.1 734 739

### 1.2    Facturation de frais de support

*Administrateurs concernés :*

Les administrateurs communs à Cyrano S.A. et aux autres sociétés du Groupe Cyrano concernées par cette convention sont les suivants :

- Cyrano Switzerland S.A. : Philippe Eyries

- Cyrano Sàrl : Martin Greenbank

*Nature, objet et modalités :*

Par délibération du Conseil d'Administration du 18 mai 1998, il a été décidé que la société Cyrano S.A. facture à ses filiales Cyrano Sàrl et Cyrano Switzerland, l'ensemble des frais dits "frais de support" qui englobent les rémunérations, charges sociales et frais professionnels versés aux salariés de la société du département "support".

Aucune prestation n'a été facturée à ce titre au cours de l'exercice du 1er juillet 1997 au 30 juin 1998.

600076

*Cyrano S.A.*
*Rapport spécial des commissaires aux comptes*
*sur les conventions réglementées*

### 1.3 Facturation des frais de direction financière

*Administrateurs concernés :*

Les administrateurs communs à Cyrano S.A. et à Cyrano (UK) Limited sont les suivants :

■ Philippe Eyries. Trevor Read (jusqu'à sa démission le 26 mars 1998). Martin Greenbank et Olivier Protard

*Nature, objet et modalités :*

Par délibération du Conseil d'Administration du 18 mai 1998. il a été décidé que la société Cyrano UK refacture aux sociétés du Groupe, incluant Cyrano S.A.. les frais de direction financière.

Aucune prestation n'a été facturée à ce titre au cours de l'exercice du 1er juillet 1997 au 30 juin 1998.

## 2 Conventions conclues au cours d'exercices antérieurs et dont l'exécution s'est poursuivie durant l'exercice

### 2.1 Facturation de royalties aux sociétés du Groupe Cyrano

*Nature, objet et modalités :*

Par délibération du Conseil d'Administration du 24 novembre 1995. il a été décidé que la société Cyrano S.A. facture à ses filiales des royalties calculées sur les ventes de logiciels et de maintenance à un taux compris entre 10 et 30%.

Les sommes facturées au titre de l'exercice du 1er juillet 1997 au 30 juin 1998 sont les suivantes :

■ Cyrano (UK) Limited       FF.4 104 432

■ Cyrano Inc.       FF.4 381 308

■ Cyrano Sàrl       FF.2 696 486

■ Cyrano Switzerland S.A.       FF.954 396

■ Cyrano (Asia) Pte Limited       FF.465 185

■ IMM Corp       FF.3 749 617

000077

*Cyrano S.A.*
*Rapport spécial des commissaires aux comptes*
*sur les conventions réglementées*

**2.2      *Garantie consentie au profit de la société Cyrano S.A.***

*Nature, objet et modalités :*

Par délibération du Conseil d'Administration du 16 avril 1997, il a été convenu que la fusion de la société Novalog serait assortie d'une garantie de passif et d'actif consentie au profit de Cyrano S.A. par les actionnaires de Novalog.

**2.3      *Facturation de prestations réalisées auprès des sociétés du Groupe Cyrano***

*Nature, objet et modalités :*

Par délibération du Conseil d'Administration du 27 juin 1997, il a été décidé que la société Cyrano S.A. facture les prestations réalisées par ses collaborateurs auprès d'autres sociétés du Groupe Cyrano dans le cadre du développement de la commercialisation des produits Cyrano.

Ces prestations sont facturées aux sociétés en ayant bénéficié sur la base d'un tarif forfaitaire de FF.3 000 (hors taxes et hors frais de déplacement) par jour et par collaborateur.

Les prestations facturées à ce titre au cours de l'exercice du 1er juillet 1997 au 30 juin 1998, concernent les sociétés suivantes :

- Cyrano Inc.                          FF.10 500

- Cyrano Switzerland S.A.       FF.270 000

- Cyrano Sàrl                          FF.447 000

- Cyrano (UK) Limited            FF.3 000

000078

Cyrano S.A.
Rapport spécial des commissaires aux comptes
sur les conventions réglementées

2.4    Avances financières sans intérêt aux sociétés du groupe Cyrano

*Nature, objet et modalités :*

Des avances financières ont été consenties à différentes sociétés du Groupe Cyrano, Ces avances n'ont généré aucun calcul d'intérêt sur l'exercice. Au 30 juin 1998, ces avances s'élèvent aux sommes suivantes:

- Cyrano Inc.                          FF.3 455 738
- Cyrano (UK) Limited                  FF.23 272 351
- Cyrano Sàrl                          FF.3 826 805
- Cyrano Switzerland S.A.              FF.423 056
- Cyrano (Asia) Pte Limited            FF.1 691 056
- IMM Limited                          FF.59 251
- IMM Corp                             FF.5 534 502

C00079

5

*Cyrano S.A.*
*Rapport spécial des commissaires aux comptes*
*sur les conventions réglementées*

En application de l'article 105 et de l'article 233 de la loi du 24 juillet 1966, nous portons à votre connaissance les conventions suivantes qui ont été conclues sans autorisation préalable de votre Conseil d'Administration, suite à une omission.

Ces conventions ont été autorisées a posteriori par le Conseil d'Administration du 14 septembre 1998.

## 3   Conventions conclues sans autorisation préalable

### 3.1   *Cession de licence*

*Administrateurs concernés :*

Les administrateurs communs à Cyrano S.A. et à Cyrano (UK) Limited sont les suivants :

- Philippe Eyries, Trevor Read (jusqu'à sa démission le 26 mars 1998), Martin Greenbank et Olivier Protard

*Nature, objet et modalités :*

Le 1er juillet 1997, la société a consenti à Cyrano UK une licence non exclusive de distribution sur tous territoires et à durée indéterminée, de Server Pack 1.0 pour un montant forfaitaire de FF.4 000 000.

### 3.2   *Cession de Copyright et de marques*

*Administrateurs concernés :*

Les administrateurs communs à Cyrano S.A. et à Cyrano (UK) Limited sont les suivants :

- Philippe Eyries, Trevor Read (jusqu'à sa démission le 26 mars 1998), Martin Greenbank et Olivier Protard

*Nature, objet et modalités :*

Le 1er octobre 1997, la société a concédé à Cyrano UK pour une durée indéterminée le copyright Bounce Software et les marques Bounce et Cyrano Evolution qu'elle avait acquis pour FF.3 900 000 le 19 septembre 1997. Cette concession s'est faite pour le montant forfaitaire de FF.3 978 000.

Cyrano S.A.
*Rapport spécial des commissaires aux comptes
sur les conventions réglementées*

### 3.3    Facturation de coûts de développement

*Administrateurs concernés :*

Les administrateurs communs à Cyrano S.A. et à Cyrano (UK) Limited sont les suivants :

* Philippe Eyries, Trevor Read (jusqu'à sa démission le 26 mars 1998), Martin Greenbank et Olivier Protard

*Nature, objet et modalités :*

En application de trois différents contrats, aux termes desquels la société Cyrano UK a désigné la société en qualité de consultant pour certains développements jusqu'au stade de la commercialisation, la société a le 30 juin 1998, facturé ces développements à Cyrano UK au prix des salaires et charges du personnel de la société affecté à ces travaux, majoré de 25%.

Trois projets ont ainsi été facturés à Cyrano UK :

| | |
|---|---|
| Cyrano Evolution : | FF.323 538 |
| Cyrano Universal Gateway : | FF.1 403 188 |
| Cyrano While et Cyrano Select : | FF.919 006 |

Paris La Défense, le 20 octobre 1998

KPMG Audit
*Fiduciaire de France*

MBV & Associés

Frédéric Quélin
*Directeur Associé*

Régis Bidien
*Associé*

7

000081

DATED 21 MARCH 2002

CYRANO (UK) LIMITED (1)

and

CYRANO INCORPORATED (2)

and

SOFITRADE SARL (3)

---

## LIQUIDATORS SALE AGREEMENT

---

WALKER MORRIS

Kings Court

12 King Street

LEEDS

Tel: 0113 2832500

Fax: 0113 2459412

Certain Portions © 1989-2002 Dr. Brian Bandey. All Rights Reserved

A38C0161

# TABLE OF CONTENTS

**DOCUMENT**                                                    Page No.

1    DEFINITIONS.................................................................3

2    THE SALE AND PURCHASE.........................................6

3    PRICE.............................................................................7

4    AGREEMENT TO SELL AND PURCHASE THE SHARES.....8

5    FURTHER ASSURANCES...............................................9

6    REPRODUCING THE RECONSTRUCTED SYSTEMS........9

7    THIRD PARTY ITEMS ETC..........................................13

8    RISK............................................................................14

9    EXCLUSIONS...............................................................14

10    THE CONTRACTS......................................................16

11    NAME.......................................................................17

12    DEBTS, REPAYMENTS, EXPENSES ETC.....................18

13    LICENCES, CONSENTS ETC.......................................19

14    INTELLECTUAL PROPERTY......................................19

15   WAIVER OF CLAIMS ...................................................................................20

16   GUARANTEE BY SOFITRADE .....................................................................20

17   DELIVERY AND COLLECTION....................................................................21

18   GENERAL ........................................................................................................22

19   CONFIDENTIALITY AND THE CONTENT OF THIS AGREEMENT ............24

20   COSTS ...............................................................................................................25

21   ASSIGNMENT...................................................................................................25

22   PARTNERSHIP.................................................................................................25

23   NOTICES ...........................................................................................................25

24   CHOICE OF LAW .............................................................................................25

SCHEDULES:

SCHEDULE 1 – THE ASSETS

SCHEDULE 2 – THE EXCLUDED ASSETS

SCHEDULE 3 - CONSIDERATION

A38C016I

**THIS AGREEMENT** is made the 21st day of March 2002

**BETWEEN:**

1      **CYRANO (UK) LIMITED** whose registered office is at Kroll Buchler Phillips, 5th Floor, Airedale House, 77 Albion Street, Leeds  LS1 5AP, the Vendor ("Cyrano UK"), acting by its Liquidators Neil Brackenbury and Michael Joseph Moore of 5th Floor, Airedale House, 77 Albion Street, Leeds  LS1 5AP.

2      **CYRANO INCORPORATED** of 26 Parker Street, Newburyport, Massachusetts 10950-4010, USA, Cyrano Inc ("Cyrano Inc").

3      **SOFITRADE SARL** of 14 rue des Saint Pères, 75006 Paris, France, the Guarantor ("Sofitrade").

4      **NEIL ANDREW BRACKENBURY** and **MICHAEL JOSEPH MOORE** aforesaid ("the Liquidators").

**WHEREAS:**

Cyrano UK was in the business of, inter alia, the development of computer software products and the licensing and support thereof.

The Liquidators were appointed Liquidators of Cyrano UK on 14 November 2001 pursuant to meetings of members and creditors held on 14 November 2001.

Sofitrade is desirous of guaranteeing the payment to be made by Cyrano Inc to Cyrano UK hereunder.

Cyrano UK has agreed to sell to Cyrano Inc whatever right title and interest it may have in the Assets.

Cyrano Inc has agreed to buy such right title and interest on and subject to the terms and conditions of this Agreement.

Cyrano Inc is entering into this Agreement on the condition that Cyrano UK will restore the Software and its associated computer software environments to a state and condition set out in a technical and functional specification to be agreed between Cyrano UK and Cyrano Inc.

Cyrano Inc is entering into this Agreement in full knowledge and acceptance of the terms and conditions of this Agreement and in particular (but without limitation) of the fact that the risk of good title to all or any of the Assets not passing hereunder to Cyrano Inc or at all is Cyrano Inc's alone.

The Liquidators are parties to this Agreement in their own right for the purpose only of taking the benefit of the exclusions from liability and the indemnities set out herein.

**NOW IT IS HEREBY AGREED** and declared as follows:

**1      DEFINITIONS**

1.1          In this Agreement and the recitals hereto the following terms shall have the following meanings:

**the Acceptance Tests:**     shall mean those activities carried out by Cyrano UK (at Cyrano UK's sole and exclusive expense) in accordance with the procedures set out in Clause 6. hereinbelow.

**the Assets:**  shall mean the property, assets and rights to be purchased by Cyrano Inc as described in Schedule 1 and the Intellectual Property Rights and Software;

**the Business:** shall mean the business of developing computer software products and the distribution, licensing and support thereof carried on by Cyrano (UK) at the Premises.

**Commission:** shall mean that the Reconstructed Systems are ready for commercial use and have been tested, checked and verified in the presence of Cyrano UK that the Reconstructed Systems comply with the requirements of the Deliverable Specification.

**Completion:**  shall mean completion of the sale and purchase in accordance with the terms and conditions of this Agreement pursuant to Clause 6.5;

**the Completion Date:**      shall mean the date upon which Completion takes place.

**the Contracts:**  shall mean the current contracts and engagements of Cyrano UK in relation to the Assets as set forth in Part A of Schedule 1;

**Cyrano Inc's Accountants:**  shall mean an accountant to be nominated by Cyrano Inc;

**Cyrano UK's Accountants:**  shall mean an accountant to be nominated by Cyrano UK;

**Cyrano UK's Solicitors:**  shall mean Walker Morris of Kings Court, 12 King Street, Leeds LS1 2HL;

**the Deliverable Specification:** shall mean the specification which describes the functionality, technical make-up and performance criteria of the Reconstructed Systems as set forth in Appendix A.

**the Equipment:** shall mean the computer hardware, computer equipment and other things as set forth in Part B of Schedule 1;

**the Excluded Assets:** shall mean the contracts listed in Schedule 2 and the assets at Clause 2.2 which are excluded from the sale to Cyrano Inc.

**the Independent Accountant:** shall mean a single chartered accountant or firm of chartered accountants agreed upon by Cyrano UK and Cyrano Inc or, in default of agreement within seven days of a request to appoint one, by the President for the time being of the Institute of Chartered Accountants in England and Wales;

**the Intellectual Property Rights:** shall mean all copyright, know-how, expertise and methods, confidential information, technical information, goodwill, trade secrets, business names, trade marks, service marks, business names, domain names, patents, petty patents, utility models, design rights (whether registerable or otherwise), semi-conductor topography rights, database rights, all rights in the nature of unfair competition rights or rights to sue for passing-off and any other intellectual property rights whether registered or unregistered or any application therefor subsisting anywhere in the world from time to time owned by Cyrano UK (whether legally and/or beneficially) at the Transfer Date;

**Non-Compliance:** shall mean a mismatch or variance between the Reconstructed Systems and/or any part thereof and the Deliverable Specification and/or any tolerances provided for in the Deliverable Specification.

**the Object Code:** shall mean the computer executable binary code derived from compiled Source Code for execution on a computer hardware system;

**the Premises:** shall mean the premises presently occupied by Cyrano UK at 20-26 Campus Road Listerhills Science Park, Bradford, BD7 1HR. and 19 Thatcham Business Village, Colthrop Way, Thatcham, Berkshire, RG19 4LW.

**the Reconstructed Systems:** shall mean the Software restored, organised and operating in and to a fashion functionally and technically equivalent to the state, order and condition that existed in the software development and support department(s) of Cyrano UK at the Premises on 14 November 2001.

**the Reconstruction Team:** shall mean a group of computer software programming professionals including ex-employees of Cyrano UK assembled by Cyrano UK and approved, in writing, by Cyrano Inc.

**the Restoration Process:** shall mean the process by which the Deliverable Specification is written and agreed, the Reconstructed Systems are developed, restored, Commissioned and Acceptance Tests conducted.

**the Schedule:** shall mean the provisions set out in any schedule attached hereto and made part hereof;

**the Shares:** shall mean such issued share capital of Cyrano Inc as may be owned by Cyrano UK (whether legally and/or beneficially) at the Transfer Date, details of which are given in Part C of Schedule 1;

**the Software:** shall mean all the computer programs and computer software products as may be owned by Cyrano UK (whether legally and/or beneficially) at the Transfer Date including (but without derogation from the generality of the foregoing) software products known as "Cyrano Impact" and "Cyrano Test" (whether existing in Source Code, Object Code or any other form) including, but not limited to:

i)      all and any additions, alterations, adaptations, modifications, enhancements and/or changes made thereto by Cyrano UK;

ii)     all technical and user documentation preparatory design material, programming components, subroutines, algorithms, structure, prototypes and support documentation associated therewith; and

iii)    all and any instructional and promotional literature associated therewith.

**the Source Code:** shall mean any computer program, whether stored or in any way magnetic or optical medium, in any computer memory of whatsoever kind or in eye-readable form, from which it is possible to discern the logic, algorithms, internal structure, operating features and any other design characteristics of such computer program.

**the Transfer Date:** shall mean 21st March 2002.

1.2     Words denoting the singular shall include the plural and vice versa. Words denoting natural persons shall include corporations and vice versa.

1.3  References herein to a clause, sub clause, paragraph, subparagraph or schedule are, unless otherwise stated, references to a clause, sub clause, paragraph, subparagraph or schedule to this Agreement.

1.4  Clause headings are inserted for convenience only and are to be ignored in construing this Agreement.

1.5  Where a party agrees to indemnify another party in connection with any matter, or any claim in respect of, relating to or arising out of any matter, that indemnity will extend to all actions, proceedings, liabilities, outgoings, costs, claims, demands, damages, losses and expenses whatsoever directly or indirectly in respect of, relating to or arising out of that matter.

1.6  In construing this Agreement general words introduced by the words 'other' shall not be given a restrictive meaning by reason of the fact that they are preceded by words indicating a particular class of acts matters or things and general words shall not be given a restrictive meaning by reason of the fact that they are followed by particular examples intended to be embraced by the general words.

1.7  The Schedules to this Agreement are and shall be construed as part of this Agreement. All references to Clauses, Sub-clauses, Schedules and Appendices are to Clauses, Sub-clauses, Schedules and Appendices of this Agreement.

1.8  References to accounts, records and/or information shall include any means or modes of storage or retrieval of the same including (but without limiting the generality of the foregoing) computer disk, tape, cassette, microfiche, internet, intranet and the like.

## 2  THE SALE AND PURCHASE

2.1  Subject to the other provisions of this Agreement, Cyrano UK shall sell and Cyrano Inc shall purchase as from close of business on the Transfer Date whatever right title and interest (if any) Cyrano UK may have at the time in the assets described below:

2.1.1  the Intellectual Property Rights;

2.1.2  the Software;

2.1.3  the Equipment;

2.1.4  the Contracts.

2.2     Subject to the other provisions of this Agreement, Cyrano UK shall sell and Sofitrade shall purchase as from close of business on the Transfer Date whatever right title and interest (if any) Cyrano UK may have at the time in the assets described below:

2.2.1     the Shares.

2.3     Notwithstanding any other provision of this Agreement (but so that the absence of any items from the following list shall not because of that fact, be used as evidence that it was intended to be sold under this Agreement) the following items are not included in the sale under this Agreement:

2.3.1     the Excluded Assets;

2.3.2     the Premises;

2.3.3     the book or other debts of Cyrano UK and all cheques, bills, notes, bills receivable and securities therefor and all cash in hand or at bank;

2.3.4     any actual or potential claim of Cyrano UK or any right of action against a third party and under any policies of insurance except as defined in this Agreement;

2.3.5     any items in the possession of Cyrano UK which are subject to leasing or hire purchase agreements;

2.3.6     any goods which have left Cyrano UK's premises or those of its carriers or agents in the course of delivery to customers on or prior to the Transfer Date;

2.3.7     any deposit of a third party paid or delivered to Cyrano UK or any prepayments made by or to any third party to or by Cyrano UK including, without limitation any advance payments received by Cyrano UK in respect of any of the Contracts prior to close of business on the Transfer Date;

2.3.8     the statutory and other books and records of Cyrano UK.

**3     PRICE**

3.1     The price ("the Price") (exclusive of VAT) to be paid by Cyrano Inc shall be a sum equal to the aggregate of the values set forth in Schedule 3.

3.2     The consideration set forth in Part A of Schedule 3 shall be paid on the Transfer Date (such consideration being hereinafter referred to as the "Initial Consideration").

3.3     The consideration set forth in Part B of Schedule 3 (the "Further Consideration") shall be payable in accordance with the terms set forth therein.

3.4     If notwithstanding the provisions of Clause 3.1, Customs shall determine that VAT is chargeable in respect of the supply of all or any part of the Assets under this agreement, Cyrano UK shall forthwith notify Cyrano Inc of that determination and Cyrano Inc shall pay to Cyrano UK by way of additional purchase consideration a sum equal to the amount of VAT determined by Customs to be so chargeable within fourteen days of Cyrano UK notifying Cyrano Inc of that determination ( against delivery by Cyrano UK of an appropriate and valid tax invoice for VAT purposes).

## 4    AGREEMENT TO SELL AND PURCHASE THE SHARES

4.1     Sofitrade shall not be obliged to complete the purchase of any of the Shares unless the purchase of all the Assets is completed simultaneously.

4.2     Cyrano UK hereby irrevocably waives all rights of pre-emption over the Shares conferred on it either by the Articles of Association of the Company or in any other way whatsoever.

4.3     On the Transfer Date Cyrano UK shall deliver to Sofitrade:

4.3.1     duly executed share transfers in respect of the Shares in favour of Sofitrade, or as it may direct,

4.3.2     an irrevocable power of attorney (in such form as Sofitrade may reasonably require) executed by Cyrano UK in favour of Sofitrade, or its nominees, enabling Sofitrade, or its nominees, to take a transfer of rights of Cyrano UK and so as to give effect to the provisions of Clause 4.1 and pending registration of the transfers of any shares, to exercise all voting and other rights attaching to such shares and to appoint proxies for such purpose; and

4.3.3     any other documents reasonably required by this Agreement to be supplied by Cyrano UK to Sofitrade Inc after the Transfer Date.

**5     FURTHER ASSURANCES**

Cyrano UK will within a reasonable time of being requested so to do by Cyrano Inc up to six weeks from the date hereof (and insofar as it may be reasonably able and empowered so to do) and at the sole cost and expense of Cyrano Inc execute such further assurances and do such further acts and things as shall be reasonably necessary for the purpose of transferring to Cyrano Inc all of Cyrano UK's right title and interest in the Assets.

**6     REPRODUCING THE RECONSTRUCTED SYSTEMS**

6.1     Deliverable Specification Phase

6.1.1   Cyrano UK shall (at Cyrano UK's sole and exclusive expense) cause the Reconstruction Team to write and prepare the Deliverable Specification which shall describe the functionality, organisation, content, technical make-up and performance criteria of the Software and all and any constituent parts thereof.

6.1.2   Cyrano UK shall cause the Reconstruction Team to prepare the Deliverable Specification in a wholly documentary form and deliver one (1) copy thereof to Cyrano Inc no later than noon (local United Kingdom time) on Friday 19th April 2002.

6.1.3   Cyrano UK and Cyrano Inc shall signify their joint acceptance of the Deliverable Specification by setting forth their respective signatures thereupon and causing the Deliverable Specification to be attached hereto and made part hereof as Appendix A.

6.2     Writing and Development Phase

6.2.1   Upon the production and acceptance of the Deliverable Specification in accordance with Clause 6.1 hereinabove; Cyrano UK shall (at Cyrano UK's sole and exclusive expense) cause the Reconstruction Team to commence upon the writing and development of the Reconstructed Systems so that:

(i)     the Reconstructed Systems will operate in accordance with Deliverable Specification and in all respects comply with, have the attributes and have the capacity and performance capability described in Deliverable Specification;

(ii)    the Reconstructed Systems are got into Commission in accordance with the times set out in the Deliverable Specification (hereinafter referred to as the "Time-Table").

6.3    <u>Testing Phase</u>

6.3.1  Cyrano UK shall at all times be free, up until the testing of the Reconstructed Systems as more specifically defined hereinbelow, to conduct such tests, examinations, reviews and trials of the Reconstructed Systems as Cyrano UK, in its sole opinion, shall deem to be necessary and/or desirable.

6.3.2  When Cyrano UK considers that the Reconstructed Systems are ready for Commissioning (and in any event, by the date specified in the Time-Table), it shall give reasonable notice to Cyrano Inc (who may attend, check and verify but not participate in such Commissioning) and carry out a test (or as necessary a re-test) by:

   *(i)*    running and demonstrating the Reconstructed Systems in accordance with the Deliverable Specification;

   *(ii)*   taking the results of such running and demonstration (hereinafter referred to as the "Test Results"); and

   *(iii)*  comparing the Test Results with the performance and other criteria set out in the Deliverable Specification.

6.3.3  When the Test Results comply with the performance and other criteria set out in the Deliverable Specification, then the Reconstructed Systems shall be deemed to be Commissioned and Cyrano Inc shall accept the Reconstructed Systems and evidence such acceptance by issuing a Certificate of Acceptance in the form set forth in Appendix B hereto.

6.3.4  Upon the Commissioning of the Reconstructed Systems, Cyrano UK shall deliver all of the Reconstructed Systems in its possession and in the possession of the Reconstruction Team to Cyrano Inc in the form and using the mode described in the Deliverable Specification.

6.3.5  In the case of a Non-Compliance, Cyrano Inc may (in its sole and exclusive discretion):

   *(i)*    postpone Completion to such date reasonably specified by Cyrano Inc so as to give Cyrano UK a reasonable opportunity to carry out further Acceptance Tests in accordance with Clause 6.3.2 hereinabove; or

     (*ii*)    proceed to Completion of this Agreement without any amendment of the Price; or

     (*iii*)   terminate this Agreement in which case the rights and obligations of each party to this Agreement shall immediately cease (for the avoidance of doubt, such termination not occasioning any liability on the part of the Liquidators but giving rise to an obligation on Cyrano UK to refund the Initial Consideration forthwith) and upon Cyrano Inc and Sofitrade to return the Assets to Cyrano UK.

6.3.6  **IF** Cyrano UK:

     (*i*)    throughout all of the Restoration Process has caused the Reconstruction Team to exercise the fullest reasonable commercial endeavours to produce the Reconstructed Systems in accordance with the Time-Table; and

     (*ii*)   throughout all of the Restoration Process has caused the Reconstruction Team to exercise the fullest reasonable commercial endeavours to get the Reconstructed Systems Commissioned in accordance with the Time-Table; and

     (*iii*)  throughout all of the Restoration Process has caused the Reconstruction Team to exercise the fullest reasonable commercial endeavours to correct all and any Non-Compliances as soon as reasonably possible; and

     (*iv*)  throughout all of the Restoration Process has not, whether by act or omission, interrupted, delayed or frustrated the Restoration Process; and

     (*v*)   (notwithstanding (*i*) to (*iv*)) cannot get the Reconstructed Systems into Commission in accordance with Clause 6.3.3 and has given Cyrano Inc written notice thereof (hereinafter referred to as the "Failure Notice");

**THEN** if Cyrano Inc has not exercised either of its options under Clauses 6.3.5(*ii*) or 6.3.5(*iii*) hereinabove within three (3) months of its receipt of the Failure Notice, Cyrano UK may terminate this Agreement in which case the rights and obligations of each party to this Agreement shall immediately cease (for the avoidance of doubt, such termination not occasioning any liability on the part of the Liquidators but giving rise to an obligation on Cyrano UK to refund the Initial Consideration forthwith) and upon Cyrano Inc and Sofitrade to return the Assets to Cyrano UK.

6.4    The Change Control Process

6.4.1    The parties hereto acknowledge that at some time or times during the development of the Reconstructed Systems the Deliverable Specification and/or Time-Table may become inappropriate and need amending so as to be more germane to the actual performance that the parties hereto desire to take place.

6.4.2    Concomitant upon the acknowledgement made in Clause 6.4.1 hereinabove; either Cyrano UK or Cyrano Inc may recommend to the other party that a change be made to the Deliverable Specification and/or Time-Table in question by forwarding to the other a completed change control form (hereinafter referred to as the "Change Control Form") in the form set forth in Appendix C.

6.5.3    On the signature by Cyrano UK and Cyrano Inc of a Change Control Form, the Deliverable Specification and/or Time-Table in question shall be amended accordingly.

6.5    Completion

Completion of the sale and purchase of the Assets shall take place on the Commissioning of the Reconstructed Systems and when Cyrano UK insofar as it is able to do so shall give to Cyrano Inc possession of the Assets (which are tangible) in exchange for the Further Consideration payable in accordance with the terms set forth in Part B Schedule 3. Such title as Cyrano UK is able to transfer to Cyrano Inc in the Assets (if any) including the Intellectual Property Rights and the Software shall pass to Cyrano Inc upon the Transfer Date.

6.6    Exclusivity

In consideration of Cyrano Inc incurring professional and other expenses, the Liquidators undertake that, during the term of this Agreement, neither Cyrano UK, the Liquidators nor their professional advisers will discuss or negotiate with any other potential purchaser or entertain or consider any enquiries or proposals relating to, or make available any information for the purposes of, the possible sale of a direct or indirect interest in the Assets or of any material part of the Assets.

### 6.7    Non-Completion and Liquidator's Rights

For the avoidance of doubt, in the event that Cyrano Inc does decide not to proceed with Completion of this Agreement, under the terms of Clause 6.3 the Liquidators shall be permitted at their absolute discretion to sell the Assets to any other potential purchaser should they so desire.

### 6.8    Licence to conduct the Restoration Process

For the period commencing on the Transfer Date and determining upon the Completion Date, Cyrano Inc hereby grants to Cyrano UK a fixed-term, non-exclusive, personal and non-transferable licence to copy, adapt, modify and change the Software (including, but without limitation, the Source Code to the Software) solely for the purpose of conducting the Restoration Process. For the avoidance, the foregoing licence shall include the right of Cyrano UK to authorise the Reconstruction Team to carry out the Restoration Process.

## 7    THIRD PARTY ITEMS ETC

7.1    Cyrano Inc may be given possession of assets hereunder which are found not to be owned by Cyrano UK. In respect of such assets Cyrano Inc undertakes that it will not hold itself out as the owner of such assets, nor sell, offer for sale, assign, charge, pledge, create or permit the creation of a lien on or otherwise deal with such assets and it will keep such assets in its own possession, at its own expense and in as good repair and condition as they are in as at the date of this Agreement. Cyrano Inc further undertakes that during such time as Cyrano Inc is not the owner of such assets it will deliver possession of such assets to the Liquidators or the owner or owners of such assets (at the Liquidators' discretion) forthwith on demand and Cyrano Inc agrees to indemnify and keep indemnified on demand Cyrano UK the Liquidators and each of them against any claim or claims arising out of the giving of possession of such assets to Cyrano Inc.

7.2    Without prejudice to the generality of clause 7.1 Cyrano Inc agrees to indemnify and keep indemnified on demand Cyrano UK, the Liquidators and each of them against any claim or claims that title to any of the Assets has been reserved by a third party or that a third party may have rights in respect of any goods into which any of the Assets may have been incorporated or mixed or which have been incorporated or mixed into any of the Assets

7.3    Insofar as any of the Assets are on credit sale lease or hire purchase Cyrano Inc shall be responsible for discharging any liability thereunder and shall indemnify the Liquidators against any claim in respect thereof.

## 8    RISK

The insurance risk and all other risk in all of the Assets shall pass to Cyrano Inc at the time of the delivery thereof to Cyrano Inc or its agents.

## 9    EXCLUSIONS

9.1    All representations, warranties and conditions express or implied statutory or otherwise in respect of any of the Assets and/or any of the rights title and interests sold hereunder are expressly excluded (including, without limitation, warranties and conditions as to title, quiet possession, satisfactory quality, fitness for purpose and description and any other warranty or representation as to the condition or existence of any or all of the Assets).

9.2    It is hereby agreed by Cyrano Inc and Sofitrade that the terms and conditions of this Agreement (and in particular, but without limitation, this clause 9) are fair and reasonable in the context of a sale by a company in receivership bearing in mind:

9.2.1    that the Liquidators have specifically told Cyrano Inc and Sofitrade that Cyrano Inc and Sofitrade must rely absolutely on Cyrano Inc's and Sofitrade's own opinion and/or professional advice concerning the Assets the existence quality state and condition of the same, their fitness and/or suitability for any purpose, the possibility that some or all of them may have defects not apparent on inspection and examination (which could even render it inappropriate that they should be described as they are in fact described in this Agreement or in any Schedule to this Agreement) and (in the case of the Contracts), their enforceability, or the reasons Cyrano Inc and Sofitrade has or should have for purchasing the Assets and the use Cyrano Inc and Sofitrade intends or should intend to put them to;

9.2.2   that Cyrano Inc or Sofitrade has available to them (either internally or externally) skilled professional advice concerning the Assets and the matters referred to in 9.2.1 above that it is on the basis of this advice that Cyrano Inc and Sofitrade has agreed to purchase the Assets for a consideration calculated to take account (inter alia) the risk to Cyrano Inc and Sofitrade represented by this Agreement, Cyrano UK and the Liquidators making it clear that on any other basis they would not have agreed to sell the same except for a much higher consideration; and

9.2.3   that, **ALWAYS EXCEPTING** the Reconstruction Process, Cyrano Inc and Sofitrade, their servants, employees, agents, representatives and advisers have been given every opportunity it or they may wish to examine and inspect all or any of the Assets and the premises and all or any books, records and documents relating thereto.

9.3   Cyrano Inc acknowledges for the avoidance of any doubt that if it shall be found that the Company does not have title or unencumbered title to any of the Assets this shall not be a ground for rescinding avoiding or varying any or all of the provisions of this Agreement or for making any claim against the Liquidators or for reducing the Price.

9.4   Cyrano Inc makes no representations or warranties, express or implied, of any kind whatsoever and there shall be excluded from this Agreement any warranties or conditions, either express or implied, statutory or otherwise. Without prejudice to the generality of the foregoing, no implied warranties of quality, merchantability or fitness for a particular purpose are given hereunder, and no implied warranty arising by usage or trade, course of dealing, or course of performance is made by Cyrano Inc nor shall any such implied warranty arise by this Agreement and/or Cyrano Inc's and/or Cyrano UK's and/or Sofitrade's conduct in relation hereto or to each other.

9.5   Always excluding the liability of Cyrano Inc for personal injury or death and Cyrano Inc's liability to Cyrano UK under Clause 3. and the indemnities given by Cyrano Inc herein in no event shall Cyrano Inc be liable to Cyrano UK (and/or Sofitrade hereunder) for:

(i)   any direct damages or loss (whether arising in contract, tort, by statute or otherwise) being loss which is reasonably foreseeable by the parties hereto at the time of entering into this Agreement; nor

(ii)   any other form of loss or damage of whatsoever kind (whether arising in contract, tort, by statute or otherwise), including, but without limiting the generality of the

foregoing, indirect, special, idiosyncratic or consequential damages or loss, loss of anticipated profits, loss of business opportunity or loss of contracts by either or any third party or claims or demands against either by any third party or other like economic loss in connection with or arising out of this Agreement.

9.6    Sofitrade makes no representations or warranties, express or implied, of any kind whatsoever and there shall be excluded from this Agreement any warranties or conditions, either express or implied, statutory or otherwise. Without prejudice to the generality of the foregoing, no implied warranties of quality, merchantability or fitness for a particular purpose are given hereunder, and no implied warranty arising by usage or trade, course of dealing, or course of performance is made by Sofitrade nor shall any such implied warranty arise by this Agreement and/or Cyrano Inc's and/or Cyrano UK's and/or Sofitrade's conduct in relation hereto or to each other.

9.7    Always excluding the liability of Sofitrade for personal injury or death and Sofitrade's liability to Cyrano UK under Clause 16. and the indemnities given by Sofitrade herein in no event shall Sofitrade be liable to Cyrano UK (and/or Cyrano Inc hereunder) for:

   (i)    any direct damages or loss (whether arising in contract, tort, by statute or otherwise) being loss which is reasonably foreseeable by the parties hereto at the time of entering into this Agreement; nor

   (ii)   any other form of loss or damage of whatsoever kind (whether arising in contract, tort, by statute or otherwise), including, but without limiting the generality of the foregoing, indirect, special, idiosyncratic or consequential damages or loss, loss of anticipated profits, loss of business opportunity or loss of contracts by either or any third party or claims or demands against either by any third party or other like economic loss in connection with or arising out of this Agreement.

## 10    THE CONTRACTS

10.1    Cyrano UK hereby assigns and transfers to Cyrano Inc all of its rights, titles, duties, obligations, burdens and benefits in the Contracts.

10.2    Notwithstanding any other clause of this agreement Cyrano Inc recognises that Cyrano UK may not be entitled to assign or novate any or all of the Contracts without the consent of the other parties thereto, and that Cyrano UK and the Liquidators are under no obligation to Cyrano Inc to carry out Cyrano UK's obligations under the Contracts. Cyrano Inc also recognises that such Contracts may already have been breached.

10.3    In the event that any particular Contract contains a provision (whether expressly or impliedly) that prevents the assignment contemplated in Clause 10.1 hereinabove, Cyrano UK shall act as trustee for Cyrano Inc with Cyrano Inc being the beneficiary of such agreements hereinafter referred to as the "Non-Assignable Contracts") until such times as each Non-Assignable Contract is transferred (if at all) to Cyrano Inc pursuant to Clause 10.1.

10.4    Cyrano Inc agrees to observe and perform the obligations on the part of Cyrano UK under or in connection with the Contracts including (without limitation) the obligation to accept and pay for all the goods and services ordered by Cyrano UK but not delivered or provided by the Transfer Date and to fulfil in accordance with their terms those of the Contracts made by Cyrano UK for the supply of goods or services by Cyrano UK which are uncompleted at the Transfer Date.

10.5    Cyrano Inc shall at all times indemnify and keep indemnified on demand Cyrano UK and the Liquidators (and each of them) against any claim or claims at any time arising in relation to each of the Contracts or in connection therewith, or out of Cyrano Inc's failure to observe and perform the same or the provisions of Clause 10.

10.6    Insofar as the Assets comprise the benefit of contracts which cannot effectively be assigned to Cyrano Inc without the consent of a third party or except by an agreement of novation, Cyrano UK and Cyrano Inc shall use all reasonable endeavours to obtain consent or to procure a novation.

## 11    NAME

11.1    Cyrano Inc accepts that the risk of any third party objecting to the use of the words Cyrano (UK) Limited or any name incorporating any of those words is entirely with Cyrano Inc and Cyrano Inc agrees to indemnify and keep indemnified on demand Cyrano UK and the Liquidators (and each of them) against any claim or claims arising out of the use thereof by Cyrano Inc or its successors or assigns.

11.2    Cyrano UK shall exercise its reasonable endeavours to cease the use of the words Cyrano (UK) Limited or any name incorporating any of those words at the Transfer Date.

11.3    Notwithstanding the provisions of this Agreement relating to the Intellectual Property and the terms of Clauses 13.1 and 11.2 Cyrano Inc hereby consents to the continued use by Cyrano UK and the Liquidators of the name Cyrano (UK) Limited and any other rights comprised in the Intellectual Property for the purpose only of:

11.3.1    complying with any statutory duties upon them; and

11.3.2    enabling Cyrano UK to collect and get in any book or other debts due owing or incurred to Cyrano UK

and Cyrano Inc hereby grants to Cyrano UK and the Liquidators a non-exclusive, non-transferable, revocable, personal license to use the same for those sole purposes.

## 12    DEBTS, REPAYMENTS, EXPENSES ETC

12.1    All rights to receive payment of and to recover all sums relating to the Business in respect of the period up to the Transfer Date shall continue to belong to Cyrano UK and:

12.1.1    Cyrano Inc shall account to the Liquidators forthwith in the event that it shall receive any such sums and pending such accounting, shall hold the same in trust for the Liquidators;

12.1.2    Cyrano UK shall account to Cyrano Inc forthwith in the event that it or either or both of the Liquidators shall receive any sums relating to the Contracts and/or the Business in respect of the period after the Transfer Date and pending such accounting shall hold the same in trust for Cyrano Inc.

12.2    Cyrano Inc shall be responsible and shall indemnify and keep indemnified on demand Cyrano UK and the Liquidators (and each of them) against any claim or claims relating to the Assets and any of them in respect of the period from the Transfer Date, and, if Cyrano UK has made any payment in respect of any such outgoings or expenses for a period covering both before and after the Transfer Date, then Cyrano Inc shall pay to the Liquidators, on behalf of Cyrano UK, on demand the amount thereof apportioned to the period after the Transfer Date.

**13    LICENCES, CONSENTS ETC**

For the avoidance of doubt any and all licenses consents and permissions necessary or desirable for the purpose of carrying on any activities for which Cyrano Inc may wish to use the Assets are for Cyrano Inc alone to arrange and/or obtain and any claims arising from the absence of such licenses consents and permissions shall be for Cyrano Inc's sole account. Neither Cyrano UK nor the Liquidators shall be liable in any way as a result of any failure by Cyrano Inc in this regard or be obliged to take any action in this respect and Cyrano Inc shall indemnify and keep indemnified each of Cyrano UK and the Liquidators against any claim or claims in this connection.

**14    INTELLECTUAL PROPERTY**

14.1    <u>Assignment of Copyright in the Software</u>

Cyrano UK hereby assigns to Cyrano Inc such right, title and interest as it may have in all the copyright, including but not limited to all future copyrights to the Software as defined, mentioned and made reference to in the Copyright, Designs and Patents Act 1988, throughout the territory to which that or any other Act may at any time hereinafter extend, together with the copyright and all other rights of a like nature as are conferred by the laws in force in all other territories and lands throughout the world and such other rights as may hereafter be conferred or created by law or international agreement or convention in any part of the world, whether by way of new or additional rights not now comprised in copyright or by way of extension of the period of then or now existing rights or and in the Software; all for the full period thereof, including any renewals and extensions, and including all rights of action accrued at the Transfer Date.

14.2    <u>Transfer of Title in the Intellectual Property Rights</u>

Cyrano UK hereby assigns Cyrano Inc such right, title and interest as it may have in all of the Intellectual Property Rights (other than the copyright as contemplated in Clause 14.1 hereinabove) all for the full period thereof, including any renewals and extensions, and including all rights of action accrued at the Transfer Date.

14.3    Cyrano Inc acknowledges that the Intellectual Property Rights may be subject to restrictions or deficiencies as a result of which  it may not be transferable to Cyrano Inc.

14.4    Cyrano Inc undertakes with each of Cyrano UK and the Liquidators as a separate and distinct covenant that if there is a requirement in law upon Cyrano Inc to obtain the consent of any third party in order for Cyrano Inc to in any way use or exploit the Intellectual Property Rights then it shall exercise its reasonable endeavours to obtain such consent. Cyrano Inc shall indemnify Cyrano UK and the Liquidators from and against any claim or liability arising by reason directly or indirectly of any failure by Cyrano Inc to obtain such aforementioned consent.

14.4    Cyrano UK shall, at the expense of Cyrano Inc, take all necessary steps and co-operate fully with Cyrano Inc to ensure that it obtains the full benefit of the Intellectual Property Rights and the Software and shall, at the expense of Cyrano Inc, execute such documents and take such other steps (or procure other necessary parties so to do) as are necessary or appropriate for vesting in Cyrano Inc all its rights and interests in the Intellectual Property Rights and the Software.

## 15    WAIVER OF CLAIMS

Cyrano UK hereby irrevocably waives all of its rights, powers, prerogatives, privileges and causes of action of whatsoever kind arising out of, with respect to and/or in connection with any debt, obligation (whether contractual or otherwise) act or omission of any kind whatsoever in respect of Cyrano Inc arising prior to the Transfer Date.

## 16    GUARANTEE BY SOFITRADE

16.1    In consideration of Cyrano UK entering into this agreement, Sofitrade unconditionally and irrevocably guarantees to Cyrano UK the payment to Cyrano UK by Cyrano Inc of the Price and will indemnify Cyrano UK against all losses, damages, costs and expenses which may be incurred by Cyrano UK by reason of such default on the part of Cyrano Inc only.

16.2    If any payment received by Cyrano (UK) pursuant to this agreement shall on the subsequent winding up of the Cyrano Inc be set aside or avoided under any laws relating to insolvency, that payment shall not be considered as discharging or diminishing the liability of the Cyrano Inc or Sofitrade and the guarantee set out in Clause 16.1 shall apply as if the relevant payment had at all times remained owing by Cyrano Inc.

16.3    The guarantee and indemnity set out in clause 16.1 shall remain in force (regardless of any change in shareholding or control of the Cyrano Inc) for so long as the Cyrano Inc shall have any liability or obligation to the Cyrano (UK) pursuant to this agreement and until such liabilities and obligations have been discharged in full.

16.4    The guarantee and indemnity set out in Clause 16.1 is in addition to and shall not merge with or be discharged or prejudiced by any other security or other right or remedy of Cyrano (UK) and  may be enforced by Cyrano (UK) without Cyrano (UK) being required to pursue or exhaust any other security, right or remedy against Cyrano Inc or any other person.

16.5    It is further agreed as a separate and independent stipulation that any sums of money which may not be recoverable from Sofitrade on the footing of the  guarantee set out in clause 16.1 whether by reason of any legal limitation, disability, incapacity or any other fact or circumstance and whether or not known to the Cyrano (UK) shall nevertheless be recoverable from Sofitrade as principal debtor in respect of the relevant liability and shall be paid by Sofitrade to Cyrano (UK).

16.6    Sofitrade shall not be discharged from the guarantee or indemnity referred to in clause 16.1 by any arrangement made between Cyrano Inc and Cyrano (UK) or by any alteration in the obligations undertaken by Cyrano Inc or by any forbearance or indulgence given by Cyrano (UK).

## 17    DELIVERY AND COLLECTION

Immediately subsequent to the Transfer Date Cyrano UK shall for a period of ninety days extend its reasonable co-operation to Cyrano Inc in facilitating:

17.1    the collection by Cyrano Inc (or its agent) of all copies of the Software in Cyrano UK's possession;

17.2    the collection by Cyrano Inc (or its agent) of all copies of the Contracts together with all or any documentation associated therewith (in Cyrano UK's possession) that would reasonably assist Cyrano Inc in its performance and understanding thereof;

17.3    the collection by Cyrano Inc (or its agent) of the Equipment; and

17.4    the collection by Cyrano Inc (or its agent) of all documentation (in Cyrano UK's possession) relating to or associated with the Intellectual Property Rights.

## 18    GENERAL

18.1    The terms and conditions of this Agreement represent the entire agreement between the parties relating to the disposal of the Assets and supersede all earlier meetings discussions correspondence facsimile transmissions telexes letters and communications undertakings and arrangements of any kind.  There are no collateral, contemporaneous or supplemental agreements in existence at the time this Agreement is signed and no variation of the terms of this Agreement shall be valid unless it is made in writing and signed by or on behalf of all of the parties to this Agreement.

18.2    Cyrano Inc and Sofitrade acknowledge that they place and have placed no reliance whatsoever on any representations, agreements statements or undertakings (oral or in writing) made or alleged to have been made by or on behalf of Cyrano UK or the Liquidators or any of their respective employees, agents or representatives on or prior to the date of execution and delivery of this Agreement.

18.3    **ALWAYS EXCEPTING** the Reconstruction Process, Cyrano Inc Sofitrade acknowledge that they have been given every opportunity which it might reasonably require to inspect the Assets and that it is accordingly deemed to acquire such right title and interest as Cyrano UK is able to transfer in the same as and where they are now and in the full knowledge of the state and condition in which they now are.

18.4    All sums payable by Cyrano Inc to Cyrano UK or to the Liquidators under or in respect of this Agreement shall be paid in full without any deduction counter-claim or set off whatsoever or howsoever arising.

18.5    The sale and transfer of the Assets is subject to such consents (if any) of any third party as may be required and the failure to obtain such consent shall not be a ground for annulling rescinding avoiding or varying this Agreement or any of its terms or for making any claim against the Liquidators or reducing the Price.

18.6    This Agreement shall remain in full force and effect after Completion in respect of any matters agreements or conditions which have not been done, observed or performed before or at Completion and all obligations undertakings and indemnities shall (except for obligations fully performed on Completion) continue in full force and effect notwithstanding Completion and where such obligations undertakings and/or indemnities are for the benefit of the receivers personally shall survive the discharge, release or other removal of the Liquidators from their office as Liquidators of Cyrano UK.

18.7    No waiver by for or on behalf of any of the parties to this Agreement in respect of any of the requirements hereof or any of their rights hereunder shall release any other party from full performance of the remaining obligations stated herein nor shall any waiver granted by any of them in respect of any breach of this Agreement operate as a waiver of any subsequent breach thereof nor shall any delay by any of them in enforcing any of the terms of this Agreement nor any time or indulgence granted by any of them to another party impair or discharge the rights and remedies  hereunder of the party granting such waiver or indulgence.

18.8    Cyrano Inc and Sofitrade hereby acknowledges to and agrees with the Liquidators and each of them that any personal liability upon either or both of them under this Agreement or arising directly or indirectly in connection herewith statutory or otherwise and whether arising in contract or tort or both or by reference to any other remedy or right and in whatever jurisdiction or forum  is hereby expressly excluded.

18.9    No announcement regarding the transaction contemplated by this Agreement or the terms of this Agreement shall be made by Cyrano Inc (whether to the public, the trade or otherwise) without the prior written consent of the Liquidators, such consent not to be unreasonably withheld or delayed).

18.10    Cyrano Inc shall pay any stamp duties payable in respect of this Agreement or any agreement or document entered into or executed in connection with or pursuant to this Agreement.

18.11 Each party undertakes to keep and treat as confidential and not to disclose to any third party (save as is necessary for the Liquidators in carrying out their proper functions and duties), any information relating to the business or trade secrets of the other nor make use of such information for any purpose whatsoever, except for the purposes of this Agreement, provided that the foregoing obligation shall not extend to information which is:

(a)    in or comes into the public domain other than by breach of this Agreement;

(b)    in the possession of one party prior to receipt from the other party;

(c)    received bona fide by one party from a third party not receiving the information directly or indirectly from the other party.

This Clause is binding on all parties during the Agreement and for a period of fifteen (15) years after termination and each party shall so bind its directors and employees.

18.12 Cyrano Inc shall be under no liability to Cyrano UK, the Liquidators nor Sofitrade in respect of anything which, apart from this provision, may constitute a breach of this Agreement arising by reason of force majeure, namely, circumstances beyond the control of Cyrano Inc which shall include (but not be limited to) acts of God, perils of the sea or air, fire, flood, drought, explosion, sabotage, accident, embargo, riot, civil commotion, including acts of local government and parliamentary authority; breakdown of equipment and labour disputes of whatever nature and whatever cause arising, including (but without prejudice to the generality of the foregoing) work to rule, overtime bars, strikes and lockouts and whether between either of the parties and any or all of its employees and/or any other employer and any or all of its employees and/or between any two or more groups of employees (and whether of either of the parties hereto and any other employer).

18.13 It is hereby declared and acknowledged by the parties hereto that neither party has made any representations to the other and neither party has acted on or relied upon any representation made by the other except as is expressly provided and set forth herein.

18.14 If any term or provision or part of this Agreement, not being of a fundamental nature, shall be held illegal or unenforceable, it is to that extent deemed omitted; the validity and enforceability of the remainder of this Agreement shall not be affected.

## 19     CONFIDENTIALITY AND THE CONTENT OF THIS AGREEMENT

Each party shall keep confidential any information about the content of this Agreement and shall keep confidential and not use for its own purposes any information about the respective business affairs of the other party which may come within its knowledge in consequence of this Agreement.

**20    COSTS**

All expenses incurred by or on behalf of the parties, including all fees of agents, solicitors, accountants, employed by either of the parties in connection with the negotiation, preparation and execution of this Agreement shall be borne solely by the party which incurred them.

**21    ASSIGNMENT**

This Agreement may not be assigned or transferred, in whole or in part, by Cyrano UK, or by operation of law, or otherwise; without the prior, written and specific consent to Cyrano Inc, such consent not to be unreasonably withheld or delayed.

**22    PARTNERSHIP**

It is hereby declared and acknowledged by the parties hereto that nothing herein shall constitute them partners or agents one for the other.  No party shall have any authority to bind the other legally or equitably by contract, admission, acknowledgement, undertaking or estoppel, nor may any party claim from any other losses suffered by him out of the operation of this Agreement otherwise than is expressly provided herein.

**23    NOTICES**

Notices given pursuant to this Agreement will be in writing and will be given to Cyrano Inc at its registered office for the time being and to Cyrano UK and the Liquidators at 5th Floor, Airedale House, 77 Albion Street, Leeds  LS1 5AP and Sofitrade at 14 rue des Saint Peres, 75006 Paris, France.  Such notices shall be effective upon their receipt.

**24    CHOICE OF LAW**

This Agreement shall be construed and governed in all respects in accordance with English law and shall be subject to the exclusive jurisdiction of the English Courts.

AS WITNESS the hands of the parties the day and year first above written.

SIGNED by

for and on behalf of

CYRANO UK LIMITED

in the presence of:- LOUISE WALKER, WALKER MORRIS SOLICITORS

SIGNED by  Scott Almeda

for and on behalf of

CYRANO INCORPORATED

in the presence of:- Robert Ceneri, 1e av. Jeancourt Gavignani, 91450 Etiolles (F)

SIGNED by  (Jean-Jacques Alphandéry)

for and on behalf of

SOFITRADE SARL

in the presence of:  Denis Bitan  114, Rue Lauriston  F5116 Paris

SIGNED by

for himself and for and on

behalf of CYRANO (UK) LIMITED

in the presence of:  LOUISE WALKER, WALKER MORRIS SOLICITORS

## SCHEDULE 1

## THE ASSETS

### Part A - Contracts

(i)    All of the contracts to which Cyrano UK is a party which include, relate to, are associated and/or connected with the Intellectual Property Rights.

(ii)    All of the contracts to which Cyrano UK is a party which include, relate to, are associated and/or connected with the Software.

### Part B - Equipment

(i)    All of the computer hardware, equipment, cabling, apparatus, machinery, tools, tackle, kit, and any other tangible thing associated or connected with the licensing, development, support and maintenance of the Intellectual Property Rights and all data stored thereon and/or therein owned by Cyrano UK at the Transfer Date.

(ii)    All of the computer hardware, equipment, cabling, apparatus, machinery, tools, tackle, kit, and any other tangible thing associated or connected with the licensing, development, support and maintenance of the Software and all data stored thereon and/or therein owned by Cyrano UK at the Transfer Date.

(iii)    All of the computer hardware, equipment, cabling, apparatus, machinery, tools, tackle, kit, and any other tangible thing associated or connected with the performance by Cyrano UK of the Contracts and all data stored thereon and/or therein owned by Cyrano UK at the Transfer Date.

### Part C – Shares

All of the issued share capital (of whatsoever type or class) of Cyrano Inc.

**SCHEDULE 2**

**THE EXCLUDED ASSETS**

(i)    All of the contracts to which Cyrano UK is a party which include, relate to, are associated and/or connected with a party whose name included the word "Gresham" (including, but without derogation of the generality of the foregoing, 'Gresham Computing plc').

(ii)    All of the contracts to which Cyrano UK is a party which include, relate to, are associated and/or connected with a party whose name included the word "Anite" (including, but without derogation of the generality of the foregoing, 'Anite Business Systems Limited').

(iii)    All of the contracts to which Cyrano UK is a party which include, relate to, are associated and/or connected with a party whose name included the word "Telgen" or "TelGen" (including, but without derogation of the generality of the foregoing, 'Telgen Limited').

(iv)    All of the contracts to which Cyrano UK is a party with Malcolm Charles Green of 11 Langford Lane, Burley-in-Wharfedale, Ilkley, West Yorkshire, LS29 7ER, United Kingdom.

(v)    All of the contracts to which Cyrano UK is a party with Cyrano TP Systems Limited of 20-26 Campus Road, Listerhills Science Park, Bradford, BD7 1HR, United Kingdom.

(vi)    All of the contracts to which Cyrano UK is a party with any person who is or was part of the 'Cyrano' group of companies.

(vii)    All of the contracts to which Cyrano UK is a party with any person which gives rise to any debt (actual or contingent) on Cyrano UK.

**SCHEDULE 3**

**CONSIDERATION**

**Part A - Initial Consideration**

On the Transfer Date Cyrano Inc shall deliver to Cyrano UK the sum of $100,000.00 (One Hundred Thousand United States of America Dollars)  by way of a telegraphic transfer to Cyrano UK's Solicitors' client account (in respect of which such delivery shall constitute a valid discharge of Cyrano's obligation to make such payment to the Cyrano UK).

**Part B - Further Consideration**

(i)    <u>Generally</u>

For a period of two (2) years following the Transfer Date, Cyrano Inc will pay to Cyrano UK royalties at the rate of 25% (twenty five per centum) of the total amount received by Cyrano Inc from its licensing and its support of the computer software products known as 'Cyrano Impact' and 'Cyrano Test' (such revenue being derived from agreements with customers excluding sales and other taxes received thereby hereinafter referred to as "Licence & Support Agreement"). During such two (2) year period, Cyrano UK shall remit a minimum of such royalties of $400,000.00 (Four Hundred Thousand United States of America Dollars).

(ii)    <u>Royalties</u>

For the purposes of computing when a royalty payment is to be made and to what calendar quarter a royalty belongs, regard shall be made to the date of the relevant Licence & Support Agreement.

(iii)    <u>Payment</u>

Cyrano Inc shall make payment of all royalties in the following manner:

(a)   all royalties shall be paid in United States of America Dollars;

(b)    not later than the thirtieth day following the last Massachusetts business day of March, June, September and December for the two years following the Transfer Date, Cyrano Inc shall submit to Cyrano UK a royalty report detailing all of royalties arising with respect to the licensing and support of the computer software products known as 'Cyrano Impact' and 'Cyrano Test' from Licence & Support Agreements for the previous calendar quarter (hereinafter referred to as the "Royalty Report");

(c)  the royalties identified in a Royalty Report shall be paid by Cyrano Inc to Cyrano UK within thirty (30) days of the last Massachusetts business day of March, June, September and December for the two years following the Transfer Date;

(d)  Cyrano Inc shall prepare a final Royalty Report in respect of the period beginning on 1 January 2004 and ending on the 2nd anniversary of the Transfer Date;

(e)  if Cyrano UK has not within 7 days of the relevant date of receipt of the Royalty Report as aforesaid made any objection in writing to the amount of the royalties contained in the Royalty Report as so stated, then they shall be deemed to have been accepted by Cyrano UK.  If Cyrano UK's Accountants notify Cyrano Inc's Accountants that they do not agree with the Royalty Report within the period of 7 days referred to above, Cyrano UK's Accountants shall specify as soon as probably possible thereafter the matters with which they do not agree and then Cyrano Inc's Accountants and Cyrano UK's Accountants shall use their best endeavours to resolve the same.  If they are able to resolve all differences, Cyrano Inc's Accountants and Cyrano UK's Accountants shall jointly issue in writing to the parties a certificate ("the Joint Certificate") stating the royalties, which statement shall be final and binding (save in the case of manifest error);

(f)  in performing their roles under this Schedule Cyrano UK's Accountants and Cyrano Inc's Accountants shall act as experts and not as arbitrators;

(g)  any dispute with respect to the Royalty Report which remains unresolved 28 days after receipt by Cyrano UK, may be referred for final settlement to the Independent Accountant.  The Independent Accountant shall act as expert and note as arbitrator and his decision ("the Independent Accountant's Certificate") shall (in the absence of manifest error) be final and binding on the parties;

(h)  the costs incurred by Cyrano UK's Accountants pursuant to this Agreement shall be borne by Cyrano UK and the costs incurred by Cyrano Inc's Accountants shall be borne by Cyrano Inc.  The fees of the Independent Accountant shall be payable by the Cyrano Inc and Cyrano UK in such proportions as the Independent Accountant determines or (failing such determination) in equal shares; and

(i)  Cyrano Inc shall provide such reasonable assistance and access to information or documents as Cyrano UK or Cyrano UK's Accountants may reasonably request relating to the Royalty Report or the royalties payable under this agreement.

(j)    all and any royalties paid by Cyrano Inc to Cyrano UK in respect of any Licence & Support Agreement which is terminated before payment by the end-user in respect thereto is made shall be refunded by Cyrano UK within thirty (30) days of receipt of a written demand in respect thereto or may, upon written notification thereof by Cyrano Inc to Cyrano UK, be credited by Cyrano Inc against future royalties.

## APPENDIX A

### DELIVERABLE SPECIFICATION

Cyrano UK and Cyrano Inc will attach the Deliverable Specification hereto in accordance with Clause 6.

**APPENDIX B**

**EXAMPLE CERTIFICATE OF ACCEPTANCE**

**T**O THE AGREEMENT dated the Twenty-First day of March 2002 (reference: A33C015H) made by and between **CYRANO (UK) LIMITED** whose registered office is at Kroll Buchler Phillips, 5th Floor, Airedale House, 77 Albion Street, Leeds  LS1 5AP, the Vendor ("Cyrano UK"), acting by its Liquidators Neil Brackenbury and Michael Joseph Moore of 5th Floor, Airedale House, 77 Albion Street, Leeds  LS1 5AP, **CYRANO INCORPORATED** of 26 Parker Street, Newburyport, Massachusetts 10950-4010, USA, Cyrano Inc ("Cyrano Inc"), **SOFITRADE SARL** of 14 rue des Saint Pères, 75006 Paris, France, the Guarantor ("Sofitrade"), and **NEIL ANDREW BRACKENBURY** and **MICHAEL JOSEPH MOORE** aforesaid ("the Liquidators").

PURSUANT to Clause 6.3.3 of the aforementioned Agreement, Cyrano Inc hereby Accepts the Reconstructed Systems as Commissioned.

**I**N WITNESS WHEREOF, the Cyrano Inc has executed this Certificate of Acceptance

Signed:       _____

Name:        _____

Title:         _____

Date:         _____

For and on behalf of

Cyrano, Incorporated.

(Cyrano UK)

## APPENDIX C

### EXAMPLE CHANGE CONTROL FORM

**T**O THE AGREEMENT dated the Twenty-First day of March 2002 (reference: A33C015H) made by and between **CYRANO (UK) LIMITED** whose registered office is at Kroll Buchler Phillips, 5th Floor, Airedale House, 77 Albion Street, Leeds  LS1 5AP, the Vendor ("Cyrano UK"), acting by its Liquidators Neil Brackenbury and Michael Joseph Moore of 5th Floor, Airedale House, 77 Albion Street, Leeds  LS1 5AP, **CYRANO INCORPORATED** of 26 Parker Street, Newburyport, Massachusetts 10950-4010, USA, Cyrano Inc ("Cyrano Inc"), **SOFITRADE SARL** of 14 rue des Saint Pères, 75006 Paris, France, the Guarantor ("Sofitrade"), and **NEIL ANDREW BRACKENBURY** and **MICHAEL JOSEPH MOORE** aforesaid ("the Liquidators").   The parties hereto hereby amend the Deliverable Specification (as defined therein) in the following manner (The additions and amended parts (amended parts replacing in entirety parts so referenced in the afore-mentioned Deliverable Specification) set forth herein shall be incorporated into the Deliverable Specification and all other provisions of the Deliverable Specification shall remain in full force and effect.:

SIGNED by

for and on behalf of

CYRANO UK LIMITED

in the presence of:-




SIGNED by

for and on behalf of

CYRANO INCORPORATED

in the presence of:-

Change Control Form Reference Number:    ....................

Date:                                    ....................

# PARAGON

**BY FAX AND FIRST CLASS MAIL**                          June 9, 2006
Stephen Y. Chow, Esq.
Burns and Levinson, LLP
1 Beacon Street
Boston, MA 02108

RE:    *S.A. Technologies and S.A. Quotium Technologies v. Cyrano, Inc.,*
       Paris Appeals Court No. 04/12357

Dear Stephen:

This is a demand letter, and not an offer of settlement, concerning the €175,000 your client Vedant, Inc. ("Vedant"), formerly known as Cyrano, Inc., owes my clients Technologies, S.A. and Quotium Technologies, S.A. (together, "Technologies") per order of the Paris Court of Appeals.

As you know, on October 21, 2005, the Paris Court of Appeals issued a ruling in the above-named matter. It reversed several parts of the March 16, 2004 judgment of the lower court, the Commercial Court of Paris. The Commercial Court had ordered Technologies to pay Vedant €150,000 in attorney fees under Article 700 of the French New Civil Procedure Code. Pursuant to the order, Technologies paid Vedant in full. The Court of Appeals reversed this portion of the lower court's order. It ruled that "for considerations of fairness, the application of Article 700 of the New Civil Procedure Code should be excluded in this instance; and that the appealed ruling must be overturned in regard to its stipulations on this point, and that the requests made in the appeal based on said article must be rejected" (emphasis added). In addition, the Court of Appeals found Vedant liable for damages and "order[ed] Cyrano, Inc. to pay an overall sum to Technologies and Quotium Technologies of 25,000 euros in damages."

It is now more than seven months since the Court of Appeals' ruling, and your client has yet to return the €150,000 or pay the €25,000. Although Vedant and Technologies hold differing views as to what legal bearing the French appellate decision has on certain substantive issues in dispute between them in the United States, there is no dispute that this decision of the Court of Appeals is valid and final. The decision clearly and unambiguously overturned the Commercial Court's award of €150,000 in attorney fees to Vedant and made a new award to Technologies of €25,000 in damages. It sets no conditions on Vedant's obligation to pay these sums, and it entitles Vedant to set no such conditions. Payment should therefore have been made months ago.

In light of these facts, Technologies now demands that Vedant unconditionally pay Technologies €175,000 within ten (10) days of the date of this letter. Should Vedant fail to do so, Technologies intends to enforce its rights in court.

Very truly yours,

Kevin J. O'Connor

cc:    Michael Sugrue, Esq.
       Hubert deLacvivier
0004-004-102833.DOC

JUN 1 3 2006

---

184 High Street, Boston, Massachusetts 02110    ·    Tel. (617) 399-7950    ·    Fax (617) 399-7955

# BURNS & LEVINSON LLP

STEPHEN Y. CHOW
617.345.3263
schow@burnslev.com

ONE BEACON STREET · 30th FLOOR
BOSTON, MA 02108
T 617.854.4000  F 617.854.4040
WWW.BURNSLEV.COM

June 19, 2006

**VIA FACSIMILE AND REGULAR MAIL**

Kevin J. O'Connor, Esq.
Paragon Law Group
184 High Street
Boston, MA  02110

    Re:  Cyrano, Inc. v. Quotium Technologies, Inc., Civ. No. 05-cv-11558-DPW (D. Mass.)

Dear Kevin:

We have your June 9, 2006 demand to comply with the October 21, 2005 Arret of the Court of Appeal of Paris, but we have no commitment from your client to recognize the Arret as Vedant requested in my letter to you of December 12, 2005.

You have argued before both Judge Tauro and Judge Woodlock that the French judgments were not to be recognized in their courts. In the past few weeks, however, Technologies SA and Quotium Technologies SA have argued to the Commercial Court of Nantierre that the matter of their infringement of Vedant's rights in Test and Impact are in litigation in the United States.

We had advised Judge Woodlock of the Arret at the November 3, 2005 hearing and invite you to raise the issue of its recognition there. Vedant demands that Technologies SA, Quotium Technologies SA, and Quotium Technologies, Inc. immediately cease marketing and distributing in the United States QTest 4.0 and enhancements thereto.

If we do not receive from your clients immediate commitment to such cessation, we will move for an injunction against that marketing and distribution in the pending action before Judge Woodlock, and to have all disputes about the Arret addressed in that action. As this matter has been discussed between us on multiple occasions and you have now pressed to implement only one portion of the Arret, we believe due discussion has been conducted.

        Very truly yours,

        Stephen Y. Chow/mks

        Stephen Y. Chow

31610-4-ltrOConnor061906.doc