# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| CYRANO, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | CIVIL ACTION NO. 05-CV-11558-DPW |
| QUOTIUM TECHNOLOGIES, INC., | ) | |
| QUOTIUM TECHNOLOGIES, S.A., and | ) | |
| TECHNOLOGIES, S.A., | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFF'S MEMORANDUM IN SUPPORT OF
## MOTION FOR PRELIMINARY INJUNCTION

The Plaintiff, Cyrano, Inc. ("Cyrano"), now known as Vedant Incorporated, submits this

memorandum in support of its motion for preliminary injunction, filed herewith, against the

Defendants, Quotium Technologies, Inc., Quotium Technologies, S.A., and Technologies, S.A.

(collectively, "Quotium," unless otherwise indicated).  Because there is a substantial likelihood

that Cyrano will succeed on the merits of its claims, and because it will suffer irreparable injury

in the absence of an injunction, the Court should grant the requested relief.

## I.    INTRODUCTION

The present motion concerns the intellectual property rights to the software products

known as QuotiumPRO, QTest 4.0, Test, Impact, and OpenSTA.[1]  Cyrano purchased, and owns

all of the copyrights to Test, Impact, and UK/US OpenSTA from Cyrano U.K. Limited ("Cyrano

UK"), a liquidated English company with whom Cyrano had been affiliated.  Cyrano UK had

---

[1] As explained more fully below, Cyrano owns certain portions of OpenSTA, which are referred to herein as "UK/US OpenSTA."

owned all three copyrights to Test, Impact, and UK/US OpenSTA and had never assigned these copyrights to any other entity, until it transferred the products to Cyrano.

Although Cyrano has never authorized Quotium to use Test, Impact, and UK/US OpenSTA, Quotium have begun to market and sell two products on a worldwide scale -- QuotiumPRO and QTest 4.0 -- which were created from Test, Impact, and UK/US OpenSTA. Most significantly, Quotium launched QTest 4.0 on July 11, 2005 as an "upgrade" and "major new release of its flagship product QuotiumPRO," while further pledging to provide updates for QuotiumPRO until December 31, 2006. Cyrano reasonably believes that Quotium will make enhancements to QTest 4.0, as it had done with QuotiumPRO, using, among other things, Cyrano's scripting language, imminently threatening further commingling of Cyrano's code with Quotium's new code. Thus, as time passes, it will be more difficult to prove that Quotium has infringed on Cyrano's intellectual property. At the very least, Cyrano immediately should be allowed to examine the Quotium code in its present form.

On July 25, 2005, two weeks after Quotium's release of QTest 4.0, Cyrano filed the underlying action, inter alia, to declare its rights to Test, Impact, and UK/US OpenSTA in the United States, as the courts in France previously recognized more generally, and for damages and injunctive relief for infringement of those rights. Although the present action is stayed without prejudice pending further developments in the action before Judge Tauro (Civil Action No. 02-11416), this Court expressly left open for consideration any request from either party, such as the present application for injunctive relief.[2] Cyrano did not bring the present motion sooner because the parties were engaged in negotiations that were close to resulting in cross-licensing agreements and resolving the intellectual property issues that underlie this action.

---

[2] At a November 3, 2005 scheduling conference in this action, this Court stated as follows: "I'd like to stay this proceeding pending further developments, I'll say, in the litigation before Judge Tauro. It's without prejudice to coming back to me and asking me to do something in this case. . . ." Docket No. 19 at 22:2-5.

These negotiations, however, were cut short when Judge Tauro denied a joint motion to continue the damages trial in the related action in order to conclude those negotiations.

Although the action before Judge Tauro awaits only a determination on damages as a consequence of default judgments against Cyrano,[3] Judge Tauro expressly subordinated his Order declining to remove the default judgments to any recognition of Cyrano's rights under the French judgments in a subsequent action, and against the "Cyrano trademark" in the United States Patent and Trademark Office.  Subsequently, on October 21, 2005, the Court of Appeal of Paris affirmed a decision of the Commercial Court of Paris finding that Test and Impact are the property of Cyrano.

Quotium's introduction of QTest 4.0, which is derived from Test and Impact (even the name QTest 4.0 suggests this derivation), subsequent to Cyrano's default in the action before Judge Tauro, represents new infringement that clearly would not be subject to the default.  Thus, inasmuch as the ownership of the Test and Impact code was determined in Cyrano's favor in France, Cyrano now seeks to enjoin Quotium, Inc.'s U.S. distribution of those products developed from or benefiting from access to the Test and Impact code since the default judgment.

As a result of Quotium's unfair and infringing conduct, Cyrano has lost current and prospective customers.  These losses have contributed to a 90% reduction of Cyrano's software maintenance and service business, and the reduction of its workforce from 35 to 10.  Allowing them to continue to infringe Cyrano's U.S. copyrights, and to engage in such unfair competition, will irreparably harm Cyrano's business relationships and competitive position.  Consequently,

---

[3] These are on appeal to the First Circuit, although stayed pending the damages determination.  A subsequent appeal of Judge Tauro's denial of a motion to vacate the trademark injunction upon the cancellation by the United States Patent and Trademark Office of Quotium's claimed federal trademark is proceeding.

Cyrano has suffered and will continue to suffer substantial irreparable harm in the absence of immediate injunctive relief.

II.     <u>BACKGROUND</u>

    A.    <u>Cyrano</u>

Cyrano is a Delaware corporation with its principal place of business in Newburyport, Massachusetts.  Affidavit of Scott Almeda (hereafter referred to as "Almeda Aff.") at ¶ 1. Throughout its history, Cyrano has distributed computer software products that enable users to test, monitor, and optimize their data processing and information management systems.  <u>Id.</u> at ¶ 2.  Among the products that Cyrano owns and distributes are Test and Impact, formerly called "CYRANO Test" and "CYRANO Impact," respectively.  Affidavit of Dr. Brian Bandey (hereafter referred to as "Bandey Aff.") at ¶¶ 3 and 4.  Cyrano also owns the majority of an open source software product called OpenSTA.  Almeda Aff. at ¶ 9.  Cyrano distributes Test, Impact, and other products through direct sales and licenses to customers ("license contracts") and through international distributors.  <u>Id.</u> at ¶ 17.

From October 1996 through 2001, Cyrano was affiliated with two legally independent foreign software companies:  Cyrano UK, an English company formed in 1986, and Cyrano, S.A. ("Cyrano SA"), a French company, formerly known as IMM, that also developed its own performance software applications.  Almeda Aff. at ¶ 4.  Both foreign companies were liquidated in 2001.  <u>Id.</u> at ¶ 13.  Prior to October 1996, Cyrano UK had been named Performance Software Limited ("Performance") and designed its software testing products from its offices in Bradford, England.  <u>Id.</u> at ¶ 5.  Performance also had a subsidiary in the United States named Performance Software, Inc.  <u>Id.</u>  In October 1996, Performance became affiliated with Cyrano SA, then known as IMM.  <u>Id.</u>  At that time, all three companies changed their names as follows:  IMM became

known as Cyrano SA; Performance became known as Cyrano UK; and Performance Software, Inc. became known as Cyrano, Inc.  Id.

Cyrano UK and Cyrano SA each retained their separate ownership rights to their own assets and intellectual property, including all copyrights to software products.  Almeda Aff. at ¶ 5; Bandey Aff. at ¶ 2.  Neither Cyrano UK, Cyrano SA, nor their predecessors, Performance and IMM, respectively, ever merged.  Bandey Aff. at ¶ 2.  Rather, IMM purchased the shares of Performance.  Id.  After the acquisition, Cyrano UK became the wholly-owned, yet independent, subsidiary of Cyrano SA.  Id.  Cyrano UK separately retained its assets, intellectual property rights, and copyrights, including its copyright to OpenSTA, despite any subsidiary relationship to Cyrano SA.[4]  Id.  Further, Cyrano UK and Cyrano SA each maintained separate research and development teams, and each developed its own software products.  Almeda Aff. at ¶ 5.  After a product was fully developed, either by Cyrano UK or Cyrano SA, the developing company retained ownership of the product's copyright and did not transfer any ownership rights to the other.  Id.  Instead, the developing company would grant the other a license to use the product, as well as subsequent versions, premised on the companies' continued affiliation.  Id.

During the affiliation between Cyrano UK and Cyrano SA, and prior to their liquidations in 2001, each company granted the other an implied license to its respective parts in OpenSTA. Almeda Aff. at ¶ 14.  Thus, Cyrano SA granted Cyrano UK an implied license to use HTTP Replay and its parts of Modeller, and Cyrano UK granted Cyrano SA an implied license to use UK/US OpenSTA.  Bandey Aff. at ¶ 8.  These cross-licenses were premised on the continued business relationship between the Cyrano companies.  Almeda Aff. at ¶ 14.  Further, as a matter of English law, the cross-licenses were terminable at will or on cessation of the business

---

[4] Under English law, the assets and intellectual property of a parent company and its affiliates or subsidiaries are independent and legally distinct.  Bandey Aff. ¶ 6.2.2.

relationship between the companies.[5]  Bandey Aff. at ¶ 6.  In 2001, these implied licenses terminated on the liquidation of both Cyrano UK and Cyrano SA.  Almeda Aff. at ¶ 14; Bandey Aff. at ¶ 6.

      B.      <u>Cyrano's Ownership of Test, Impact, and UK/US OpenSTA</u>

Cyrano UK never transferred or assigned its copyrights to Test, Impact, or UK/US OpenSTA.  Almeda Aff. at ¶ 13.  Accordingly, when Cyrano UK was liquidated, the English liquidator had the legal capacity to transfer all copyright ownership in Test, Impact, and UK/US OpenSTA.  <u>Id.</u>  Thus, in March 2002, when the liquidator transferred all of the assets and intellectual property of Cyrano UK to Cyrano, Cyrano UK's copyright ownership of Test, Impact, and OpenSTA were included and Cyrano has been the sole proprietor of all copyrights to these products since that time..  <u>Id.</u> at ¶ 15; Bandey Aff. at ¶ 8.

      1.      <u>Test</u>

Cyrano UK created the source code for the first version of Test (at that time called V-Test), which was first published in 1990 in the United Kingdom.  Almeda Aff. at ¶ 6; Bandey Aff. at ¶ 3.1.1.  Test is a computer software application that performs all aspects of load, regression, and application stress testing on computer systems.  Almeda Aff. at ¶ 6.  This product can perform such testing on an entire network simultaneously, essentially running real

---

[5]  As discussed herein, Cyrano UK developed and designed OpenSTA, which was first published in the United Kingdom, in its offices in Bradford, England.  Because the United Kingdom has the most significant relationship to OpenSTA, English law governs the existence and term of cross-licenses between Cyrano SA and Cyrano UK to use portions of OpenSTA (and particularly UK/US OpenSTA).  <u>See</u> <u>Stathis v. Nat'l Car Rental Sys., Inc.</u>, 109 F.Supp.2d 55, 56 (D.Mass. 2000) (under Massachusetts' functional choice-of-law approach, Massachusetts courts apply law of state or foreign country with most significant relationship to parties and underlying circumstances); <u>Dunfey v. Roger Williams Univ.</u>, 824 F.Supp. 18, 20 (D.Mass. 1993) (under Massachusetts' choice-of-law rules, law of place with most significant relationship to parties and underlying circumstances is applied to determine contract rights); <u>Foad Consulting Group v. Musil Govan Azzalino</u>, 270 F.3d 821, 824 (9th Cir. 2001) (question of whether copyright holder granted license is issue of contract law governed by relevant state's law); <u>see also</u> <u>Freedman v. Select Information Sys., Inc.</u>, 221 U.S.P.Q. 848, 851 (N.D. Cal. 1983) (court must look to relevant state law to determine revocability of nonexclusive copyright license); <u>I.A.E., Inc. v. Shaver</u>, 74 F.3d 768, 774 n.4 (7th Cir. 1996) (relevant state law governs validity and scope of copyright license).

applications using hundreds to thousands of simulated users.  Id.  Cyrano UK subsequently developed additional versions of Test without assistance from any other entities.  Bandey Aff. at ¶ 3.1.  Each version of Test exhibited a high degree of originality and creativity.  Id. at 3.1.2. Test is protected under the copyright law of the signatories of the Berne Convention, including the United States.  Id. at ¶ 3.3.1.  Prior to its liquidation, Cyrano UK owned all copyrights to all versions of Test under English law.  Id. at ¶ 3.1.

### 2.    Impact

In 1996, Cyrano UK expanded Test to databases -- an endeavor that resulted in the computer software product called Impact.  Almeda Aff. at ¶ 7.  Cyrano UK had begun developing a windows version of Test, which included the Test Commander Graphical User Interface ("GUI"), and this GUI was used in the development of Impact.  Id.  Indeed, Cyrano UK created Impact from Test, and the majority of Test code remained unchanged as the company integrated it into Impact.  Id.  Impact is a database server load and stress testing tool.  Id.  Using a graphical modeling tool to simulate, manage, and measure complex dynamic transactions by users, Impact pinpoints potential performance bottlenecks.  Id.  When Impact detects unacceptable performance, it helps to identify the transactions that are the source of the anomaly. Id.  Cyrano UK developed Impact in its offices in Bradford, England, with the exception of a small amount of computer code called "SQL Capture" ("Gateway"), which Cyrano UK commissioned Cyrano SA to produce in exchange for 1,403,188 francs.  Id. at ¶ 8; Bandey Aff. at ¶ 4.2.  Twenty-five percent of this amount represented Cyrano SA's profit.  Id.  Because Cyrano UK commissioned the production of Gateway to complete its larger work, Impact, Cyrano UK is the equitable and beneficial owner of the copyright to Gateway under English law. Bandey Affid. at ¶ 4.2.

Cyrano UK first published Impact in 1997, and subsequently created and published other versions in the United Kingdom that are complex works exhibiting a high degree of originality and creativity. Almeda Aff. at ¶ 7; Bandey Aff. at ¶ 4.1.2. Under English law, Cyrano UK owned the copyrights to all versions of Impact prior to its liquidation. Bandey Aff. at ¶ 4.1. Like Test, Impact is also protected under the copyright laws of the United States pursuant to the Berne Convention. Id. at ¶ 4.4.1.

       3.    <u>OpenSTA</u>

In 1998, Cyrano UK began working on a series of projects -- Cormorant, Impact 3, and Concert -- that resulted in the creation of a new software product that became known as OpenSTA, an automated software tool for testing web applications. Almeda Aff. at ¶ 9. As well as its use in the development of Impact, Test Commander GIU became the basis for the project management and test control features in OpenSTA. Id. OpenSTA is an open-source web performance testing tool based largely on Test and Impact. Id. OpenSTA enables users to perform realistic heavy load or stress tests on web-based applications with performance measurements. Id. Cyrano UK's Research and Development Team in Bradford, England developed the highly original and complex source code for OpenSTA, partly by incorporating very substantial portions of both Test and Impact. Id. at ¶ 10. Indeed, Cyrano UK authored the source code for all of the most vital components of OpenSTA. Id.

Cyrano SA provided three lesser components of OpenSTA: HTTP, HTTP Replay, and Script Modeller ("Modeller"). Almeda Aff. at ¶ 10. Cyrano UK incorporated into OpenSTA the HTTP equivalent of the Gateway that it had commissioned from Cyrano SA for Impact, and to which it owns the copyright under English law. Bandey Aff. at ¶ 5.1. Next, Cyrano SA supplied HTTP Replay, a small portion of computer code that executes specific commands produced by

OpenSTA's Script Compiler, which is a vital portion of OpenSTA that Cyrano UK created and owned. Almeda Aff. at ¶ 10. Finally, Cyrano SA provided Modeller, an independent software module that, although able to work with OpenSTA, is not a required component of OpenSTA. Id. Because Modeller was and is an add-on feature, OpenSTA can still operate without it. Id.

By early 2000, Cyrano UK had completed a wholly functional version of OpenSTA, which included these three discrete components that Cyrano SA provided. Almeda Aff. at ¶ 11. Cyrano UK did not collaborate with Cyrano SA with respect to any of these three components. Id. at ¶ 10. Rather, Cyrano SA provided these components to Cyrano UK at Cyrano UK's request. Id. Further, Cyrano UK decided if and how the components would be integrated into OpenSTA. Id. at ¶ 11. OpenSTA's entire scripting language is based upon Test and Impact. Id. at ¶ 9. On May 22, 2001, OpenSTA was registered as a trademark of Cyrano, Inc. and Cyrano, Inc. paid the registration fee. Id. at ¶ 9.

Cyrano then decided to launch OpenSTA as an open-source product. Almeda Aff. at ¶ 12. To that end, from June to September 2000, OpenSTA was extensively modified for its first public release as OpenSTA 0.9.0. Id. Thereafter, Cyrano UK developed subsequent versions of OpenSTA, first publishing them in the United Kingdom. Id. All of the OpenSTA versions are highly complex works that exhibit a high degree of originality and creativity. Id. Under English law, OpenSTA is not a joint work, but, rather, is comprised of independent works of separate authorship and copyright ownership. Bandey Aff. at ¶ 5.3. Therefore, Cyrano UK owned the copyrights to all of OpenSTA, except HTTP, HTTP Replay, and parts of Modeller (UK/US OpenSTA). Bandey Aff. at ¶ 5.1

B.    Quotium

Quotium also develop and sell computer software products and are competitors of Cyrano. Almeda Aff. at ¶ 20. In January 2002, Technologies, S.A. formed Quotium Technologies, S.A. as a wholly-owned subsidiary to pursue opportunities in the testing software market. Id. Quotium manufacture, distribute, promote, and sell QuotiumPRO, QTest, and other products created from Test, Impact, and OpenSTA worldwide, including the United States, the United Kingdom, and Latin America, in violation of Cyrano's copyrights. Id. at ¶¶ 20-33.

In June 2001, the Commercial Court of Paris ("Commercial Court") declared Cyrano SA bankrupt and, in October 2001, ordered its liquidation. Almeda Aff. at ¶ 13. In March 2002, the Commercial Court ordered the sale of Cyrano, SA's assets to Technologies, S.A. Id. at ¶ 15. On May 16, 2002, Technologies, S.A., Quotium Technologies, S.A., and the Trustee of Cyrano SA's liquidation entered into a Contract of Transfer of Business Components (the "Transfer Contract"), pursuant to which Quotium was granted intellectual property rights to certain software products believed to be the property of Cyrano SA. Id. at ¶ 21. A significant portion of the assets Quotium obtained pursuant to the Transfer Contract included Test, Impact, and OpenSTA. Id. During negotiations between Quotium and the Trustee, Quotium obtained access to source code for Test, Impact, and OpenSTA that belonged to Cyrano. Id. at ¶ 23.

Prior to Quotium's acquisition of Cyrano, SA's assets, Cyrano's specialist of law in the United Kingdom, Dr. Brian Bandey, sent written notice to Michel Tiberini, the President of Quotium, stating that Cyrano owned the copyrights to Test, Impact, and "constituent parts of OpenSTA." Almeda Aff. at ¶ 22. Dr. Bandey's letter to Mr. Tiberini was included as an exhibit to the French Transfer Contract and both Quotium and the French liquidator were also otherwise aware of Cyrano US's rights to Test, Impact, and portions of OpenSTA. Id. Accordingly, the

French liquidator made clear in the Transfer Contract that competing claims existed with respect to Test, Impact, and OpenSTA, and that this software was sold subject to such limitations. <u>Id.</u> Indeed, the liquidation trustee was further informed about Cyrano UK's rights to OpenSTA and, subsequently, Cyrano, Inc.'s rights to the same:

> "OpenSTA was not developed from scratch. Its core code is based on Cyrano Impact version 3 code and the language allowing the description of the test cases is from the language used in Cyrano Test. The heart of OpenSTA is more than 60% based on the code from the intellectual property belonging to Cyrano (UK) Limited. . . . The core of OpenSTA was primarily developed in England."

Affidavit of Robert Ernens dated Nov. 10, 2002, at ¶ 15, attached as Exhibit A to Almeda Aff., previously filed in United States District Court for the District of Massachusetts, Civil Action No. 02-CV-11416-JLT, Docket No. 142, Exhibit 4.

Quotium maintain that, pursuant to the Transfer Contract, they were granted Cyrano SA's intellectual property rights, including the related materials, in the software products DBPack, ClientPack, ServerPack, and VT Pack. Almeda Aff. at ¶ 24. Test and Impact are modules in the ServerPack and VT Pack software suites, respectively. <u>Id.</u> Quotium have admitted that they obtained the source code to Test and Impact. <u>Id.</u> Further, Quotium admit that they obtained "one or more copies of the source code of OpenSTA." <u>Id.</u>

      1.    <u>The French "Logibox" Case</u>

Before the execution of the Transfer Contract, Cyrano objected to the transfer of Test, Impact, and OpenSTA to Quotium and submitted a claim of ownership to the Trustee. Almeda Aff. at ¶ 25. The Trustee then caused this contested software to be held in a "Logibox" pending proof of ownership. <u>Id.</u> In July 2002, Cyrano filed suit in the Commercial Court to recover its Test, Impact, and OpenSTA code that was being held in escrow in the Logibox (<u>Cyrano, Inc. v. Technologies, S.A. et al.</u>, No. RG 2002050224 (the "Logibox Case")). <u>Id.</u> On March 16, 2004,

the Commercial Court ruled in favor of Cyrano, finding Cyrano's ownership of Test and Impact. Id. (See Official translation of ruling of Commercial Court attached as Exhibit 3 to the Complaint in the present action.)

Quotium appealed the Commercial Court's decision.  (See Court of Appeal of Paris Judgment of October 21, 2005, attached as Exhibit B to Almeda Affid.)  On October 21, 2005, the Court of Appeal of Paris, inter alia, determined that Cyrano UK's research and development teams in Bradford, England created the design and development of Test and Impact (excepting Impact's Gateway component, which was transferred to Cyrano UK in 1998).  Id. at 9. Accordingly, the appeals court affirmed the lower court's decision that the transfer of Test and Impact to Cyrano was proper.

2.    Quotium's Action in the United States District Court

On July 12, 2002, within one week of Cyrano's filing suit in the Logibox case, Quotium filed a Complaint against Cyrano in the U.S. District Court for the District of Massachusetts, alleging that they had acquired certain intellectual property rights from Cyrano SA. Technologies, S.A. et al. v. Cyrano, Inc., Civil Action No. 02-CV-11416-JLT (D.Mass.) (hereafter referred to as C.A. No. 02-11416) .  Their Complaint neither asserted ownership of the "Logibox" contents nor the invalidity of the Distributor Agreement.  See generally C.A. No. 02-11416, at Docket No. 1.  After it had participated in the litigation for nearly three years, default judgment entered against Cyrano on February 24, 2005, and Cyrano's counterclaims were dismissed.  Id. at Docket No. 111.

In a Memorandum dated June 8, 2005 on an accompanying order concerning cross-motions for relief from judgment and contempt, Judge Tauro recognized that he did not have the benefit of considering any of the French judgments at the time he ordered default judgment to

enter against Cyrano.  C.A. No. 02-11416, at Docket No. 144 at 14.  Accordingly, Judge Tauro, while expressly considering the ordinary res judicata effects of a default judgment, expressly subordinated his ruling to a future decision of the United States Patent and Trademark Office or "a court in the United States," respectively, on the issue of the recognition of decisions of the French courts on the issues of ownership of the copyrights in the challenged software and the exclusive rights of Cyrano to sell certain other software in the United States under the "Cyrano" name.  Id.

        3.    QuotiumPRO

After obtaining the source code of OpenSTA, Quotium announced an intent to capitalize on OpenSTA:  "Cyrano also developed a product line called "OPENSTA," marketed in the form of an 'Open Source.' . . . Technologies intends to reconsider this open source strategy, while pursuing the development and marketing of the OPENSTA technology."  C.A. No. 02-11416, Docket No. 21, at Exhibit 1(F), Declaration of Michel Tiberini at 3; Almeda Aff. at ¶¶ 26.  In June 2002, Quotium began to promote, distribute, and sell a commercial and substantially similar "load testing" software product called QuotiumPRO.  Almeda Aff. at ¶ 27.  Quotium could not have developed such a similar, non-infringing product with the same capabilities as OpenSTA in a period of a couple of months, where it had taken Cyrano UK three years to develop OpenSTA from Test and Impact.  Almeda Aff. at ¶ 28.

QuotiumPRO is substantially similar to Test, Impact, and OpenSTA in its underlying purpose, logic, structure, organization, sequence, and literal source code form.  Almeda Aff. at ¶ 27.  Additionally, Quotium have claimed that they solely own all Cyrano software products including Test, Impact, and OpenSTA.  Id. at ¶¶ 26-27.  Based on the timing of QuotiumPRO's release and Quotium's representations, QuotiumPRO was clearly developed by copying the

source code of OpenSTA, and thereby Test and Impact.  Id. at ¶ 28.  QuotiumPRO would have taken many years to develop, as Test, Impact, and OpenSTA had, if Quotium had not simply copied the source code from these products that Cyrano owned.  Id.; Bandey Aff. at ¶ 7.1

4.      QTest

On July 11, 2005, several months after default judgment entered against Cyrano in C.A. No. 02-11416, Quotium announced the release of QTest 4.0 as a major new release of QuotiumPRO.  Almeda Aff. at ¶ 33, and Exhibit D attached thereto.  Inasmuch as QuotiumPRO is a derivative work of Test, Impact and OpenSTA, and QTest 4.0 is a derivative work of QuotiumPRO, QTest 4.0 is a derivative work of Test, Impact and OpenSTA, the derivation, reproduction and distribution being infringements of Cyrano's copyrights in Test, Impact and OpenSTA.  Almeda Aff. at ¶ 33; Bandey Aff. at ¶ 7.2.  Because QTest directly evolved from OpenSTA, it is clear that Quotium infringed on Cyrano's ownership of the core property within OpenSTA.[6]  Almeda Aff. at ¶ 33.  Although QTest is an upgrade of QuotiumPRO, Qutoium intends to fulfill contractual commitments to its QuotiumPRO users through the end of 2006.  Id.

On June 19, 2006, Technologies, S.A. and Quotium Technologies, S.A. demanded that Cyrano repay fees allegedly due to them under the Arret of the Court of Appeal of Paris -- under the threat of a new action -- without acknowledging the effect of the Arret in determining Cyrano's ownership of the copyrights in Test and Impact.  Almeda Aff. at ¶ 35; see also Letter from Kevin J. O'Connor, Esq., attached to Cyrano's Motion for Preliminary Injunction as Exhibit D.  On June 19, 2006, Cyrano responded that any such enforcement in the United States should be moved in the present action, in which, at the November 3, 2005 hearing, Quotium argued against the effect of the Arret.  Almeda Aff. at ¶ 35; see also Letter from Stephen Y. Chow, Esq.,

---

[6] This infringement raises the issue of Quotium's illegal transformation of an open source GPL-licensed product for their own use to one of their commercial products.

attached to Cyrano's Motion for Preliminary Injunction as Exhibit E.  Cyrano's response

demanded the immediate cessation of Quotium's U.S marketing and distribution of QTest 4.0

and enhancements thereto.  Exhibit E.

III.    ARGUMENT

    A.    Effect of the Judgment of the Court of Appeal of Paris

Judge Tauro's June 8, 2005 Memorandum expressly considered the <u>res judicata</u> effects of

a default judgment when subordinating his own determination to a future decision of another

tribunal.  The Commercial Court had determined on March 16, 2004 that Cyrano owns the

copyrights in Test and Impact," and, on October 21, 2005, the Court of Appeal of Paris, <u>inter</u>

<u>alia</u>, affirmed the lower court's decision regarding this ownership.  "Under a generally accepted

exception to the <u>res judicata</u> doctrine, a litigant's claims are not precluded if the court in an

earlier action expressly reserves the litigant's right to bring those claims in a later action."

<u>Apparel Art Int'l v. Amertex Enters.</u>, 48 F.3d 576, 586 (1st Cir. 1995) (citing <u>Kale v. Combined</u>

<u>Ins. Co. of Amer.</u>, 924 F.2d 1161, 1167 (1st Cir. 1991).  Because Judge Tauro expressly reserved

Cyrano's rights to pursue the present claims before this Court, Cyrano is not precluded here from

enforcing the French judgment regarding Test and Impact.

Indeed, this Court should give effect to the judgment of the Court of Appeal of Paris

recognizing Cyrano's ownership of the Test and Impact copyrights.  "[F]ederal courts sitting in

diversity should use state law to measure the preclusive effect of a foreign country's judgment.

<u>Hernandez v. Dominicana de Aviacion, C. Por A.</u>, 556 F.2d 611, 614 (1st Cir. 1977); <u>see</u> <u>also</u>

<u>McCord v. Jet Spray Int'l Corp.</u>, 874 F.Supp. 436, 438 (D.Mass. 1994) (measuring the effect of a

Belgian judgment by Massachusetts law).  Thus, this Court should measure the effect of the

judgment of the Court of Appeal of Paris by Massachusetts' version of the Uniform Foreign

Money-Judgments Recognition Act, as codified in M.G.L. c. 235, § 23A, which provides as follows:

> ". . . any foreign judgment that is final and conclusive and enforceable where rendered even though an appeal therefrom is pending or it is subject to appeal shall be conclusive between the parties to the extent that it grants or denies recovery of a sum of money. The foreign judgment shall be enforceable in the same manner as the judgment of a sister state which is entitled to full faith and credit. . . .
>
> "A foreign judgment shall not be recognized if (1) the defendant in the proceedings in the foreign court did not receive notice of the proceedings in sufficient time to enable him to defend; (2) the judgment was obtained by fraud; (3) the cause of action on which the judgment is based is repugnant to the public policy of this state; (4) the judgment conflicts with another final and conclusive judgment; (5) the proceedings in the foreign court were contrary to an agreement between the parties under which the dispute in question was to be settled otherwise than by proceedings in that court; (6) in the case of jurisdiction based only on personal service, the foreign court was a seriously inconvenient forum for the trial of the action; or (7) judgments of this state are not recognized in the courts of the foreign state."

Thus, § 23A first establishes a general rule of enforceability and then lists the limited instances in which a judgment rendered in a foreign country should not be recognized. McCord, 874 F.Supp. at 438.

Here, there has been no dispute between the parties regarding the first six items enumerated in § 23A that would preclude this Court from enforcing the judgment of the Court of Appeal of Paris. This Court, however, must determine whether France recognizes the judgments of Massachusetts within the meaning of § 23A. See McCord, 874 F.Supp. at 440 (holding Belgian judgment entitled to enforcement in U.S district court under § 23A after concluding American and Massachusetts judgments are recognized in Belgium); Restatement (Third) of Foreign Relations Law of the United States § 481(1) ("a final judgment of a court of a foreign state . . . is conclusive between the parties, and is entitled to recognition in courts in the United States"). The Affidavit of Olivier Iteanu, attached as Exhibit C to the Almeda Aff., and previously filed in C.A. No. 02-11416, Docket No. 115, Exh. 1, suggests that the French courts

would officially recognize the judgments of state and federal courts in the United States. See

Cambridge Biotech Corp. v. Pasteur Sanofi Diagnostics, 433 Mass. 122, 131 n.10, 740 N.E.2d

195, 202 (2000) (recognizing appropriateness of filing affidavits of experts in the law of the

foreign jurisdiction). As his affidavit indicates, Mr. Iteanu's opinion is that Cyrano owns the

intellectual property rights to Test and Impact.

    In addition to the concept of reciprocity, comity suggests the full recognition of the

French judgment. Where the Court of Appeal of Paris has spoken with regard to Cyrano's

ownership of Test and Impact, this Court should consider the strong public policy factors that

favor the recognition of that earlier foreign judgment. See LinkCo, Inc. v. Nichimen Corp., 164

F.Supp.2d 203, 213-214 (D.Mass. 2001) (acknowledging "strong policy considerations" for

maintaining comity among courts).

    As explained more fully in the affidavits of Scott Almeda and Dr. Brian Bandey,

OpenSTA's scripting language is based on Test and Impact, and, thus, OpenSTA is a work

derivative of Test and Impact. Because QTest 4.0 is derived from OpenSTA, which in turn is

derived from Test and Impact, any claim splitting argument Quotium may make in opposition to

the present motion would be without merit. Quotium introduced QTest 4.0 in July 2005, several

months after the default judgment in the action before Tauro and the dismissal of Cyrano's

counterclaims against Quotium. Even though default judgment has entered against Cyrano in the

action before Judge Tauro, Quotium's publication of the new product QTest 4.0 represents a

separate act of infringement. Thus, Quotium's continuing course of conduct after the default

judgment and the dismissal of Cyrano's claims does not preclude Cyrano's claims of

infringement relating to QTest 4.0 and updates to QuotiumPRO. See Zenith Radio Corp. v.

Hazeltine Research, Inc., 401 U.S. 321, 338 (1971) (explaining that a cause of action accrues each time defendant injures plaintiff).

B.     Standard of Review

To obtain a preliminary injunction, the moving party must establish that "(1) it is substantially likely to succeed on the merits of its claim; (2) absent the injunction there is a significant risk of irreparable harm; (3) the balance of hardships weighs in its favor; and (4) the injunction will not harm the public interest." I.P. Lund Trading ApS v. Kohler Co., 163 F.3d 27, 33 (1st Cir. 1998). "Likelihood of success is the main bearing wall of the four-factor framework." Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12, 16 (1st Cir. 1996).

"Computer programs receive copyright protection as 'literary works.'" Lotus Dev. Corp. v. Borland Int'l, 49 F.3d 807, 813 n.5 (1st Cir. 1995) (citing 17 U.S.C. §§ 101 and 102(a)(1)). In copyright infringement cases, if the copyright holder shows a likelihood of success on the merits, the court presumes that the copyright holder will suffer irreparable harm and that an injunction prohibiting the infringement will serve the public interest. Concrete Machinery Co. v. Classic Lawn Ornaments, Inc., 843 F.2d 600, 611-612 (1st Cir. 1988) (citations omitted).

C.     Cyrano is Likely to Succeed on the Merits of its Copyright Claims

To succeed on a claim for copyright infringement, a plaintiff must prove "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." Johnson v. Gordon, 409 F.3d 12, 17 (1st Cir. 2005) (citing Feist Publications, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 361 (1991)). Here, Cyrano has demonstrated a substantial likelihood of success on the merits of its claim that Quotium are infringing Test, Impact, and UK/US OpenSTA through the marketing, distributing, and selling of QuotimPRO and QTest.

a.    Cyrano owns the copyrights to the products

Like the United States, the United Kingdom is a member of the Berne Convention. 17 U.S.C. § 104. Under the Berne Convention, the copyright laws of member states protect the works created in other member states. 17 U.S.C. § 104(b)(2) and (4). Section 3(1) of the United Kingdom Copyright, Design, and Patents Act of 1988 ("UK Copyright Act") provides that computer programs and prepatory design materials for a computer program constitute copyrightable works. Similarly, computer programs such as Test, Impact, and OpenSTA are copyrightable as "literary works" under the United States Copyright Act. See Lotus Dev. Corp., 49 F.3d at 813 n.5.

The law of the country with "the most significant relationship to the [intellectual] property and the parties" determines ownership of a copyright. Itar-Tass Russian News Agency v. Russian Kurier, Inc., 153 F.3d 82, 90-91 (2d Cir. 1998). Here, English law determines ownership of Test, Impact, and UK/US OpenSTA because these copyrights were created and published in the United Kingdom by United Kingdom nationals while employed by a United Kingdom company. See Id. (Russian law determined ownership rights to works where they were created by Russian nationals and first published in Russia).

Cyrano owns the copyrights to Test, Impact, and UK/US OpenSTA under English law. Cyrano UK and its predecessor, Performance, authored Test and all of its subsequent versions. Consequently, Cyrano UK owned all of the copyrights to all Test versions. With the exception of a small amount of the Gateway computer code, which Cyrano UK commissioned Cyrano SA to produce in exchange for monetary compensation, Cyrano UK also authored Impact and all of its subsequent versions. Because Cyrano UK commissioned the production of Gateway to complete the larger work -- Impact -- Cyrano UK is the equitable and beneficial owner of the

copyright to Gateway under English law. Therefore, Cyrano UK owns the copyrights to all versions of Impact and Test -- in their entirety.

Cyrano UK also created all OpenSTA versions, with the exception of the discrete components that Cyrano SA supplied that are not critical parts of OpenSTA. HTTP Replay is a small portion of computer code that executes specific commands that the Script compiler produced; Modeller is an independent software module that works with OpenSTA but is not a required part of it. Although OpenSTA also contained the HTTP equivalent of the Gateway used in Impact and commissioned from Cyrano SA, the copyright vested in Cyrano UK. Cyrano UK did not collaborate with Cyrano SA with respect to any of the components that Cyrano SA provided. Rather, Cyrano UK commissioned the components from Cyrano SA and then decided if and how to integrate the components into OpenSTA.

Accordingly, under English law, OpenSTA is comprised of independent works of separate authorship and copyright ownership and is not a joint work. See UK Copyright Act § 10(1). Therefore, Cyrano UK owned the copyrights to UK/US OpenSTA. Moreover, the implied cross-licenses to their constituent parts that Cyrano UK and Cyrano SA had granted to each ended at the time those companies were liquidated.

In the United Kingdom, as in the United States, any assignment of a legal interest in copyright must be in writing and signed by the assignor to be effective. UK Copyright Act § 90. In March 2002, Cyrano UK transferred, in writing, all of its intellectual property to Cyrano, including its copyright ownership in Test, Impact, and OpenSTA. Therefore, the transfer to Cyrano satisfied the requirements under English law for a copyright transfer, and Cyrano owns all copyrights to Test, Impact, and UK/US OpenSTA.

b.    Quotium copied the constituent elements of the products

To satisfy the second prong of this analysis, a plaintiff must show that "the alleged infringer copied plaintiff's copyrighted work as a factual matter." Lotus Dev. Corp., 49 F.3d at 813.  To make this showing, the plaintiff "may either present direct evidence of factual copying or, if that is unavailable, evidence that the alleged infringer had access to the copyrighted work and that the offending and copyrighted works are so similar that the court may infer that there was factual copying (i.e., probative similarity)." Id.  "The plaintiff must then prove that the copying of copyrighted material was so extensive that it rendered the offending and copyrighted works substantially similar.  Id.

Whether Quotium have copied Test, Impact, and UK/US OpenSTA in violation of Cyrano's copyrights is governed by the law of the United States, that is, the place where the infringement is occurring.  See Itar-Tass Russian News Agency, 153 F.3d at 91.  To establish actionable copying, a plaintiff is required to prove two sub-elements:  (1) that the defendant copied the copyrighted work, either through direct proof or indirect evidence; and (2) that the copying was so extensive that it rendered the infringing and copyrighted works "substantially similar." Yankee Candle Co. v. Bridgewater Candle Co., 259 F.3d 25, 33 (1st Cir. 2001).  Here, Quotium have directly copied Test, Impact, and UK/US OpenSTA, and this copying has rendered the infringing works substantially similar.

Quotium have admitted that by May 2002 they obtained copies of the source code to Test, Impact, and OpenSTA.  Quotium began marketing a newer commercial version of OpenSTA, called QuotiumPRO.  In June 2002, Quotium began selling QuotiumPRO -- a "load testing" product -- immediately after gaining and allegedly purchasing copies of Cyrano's load testing software.  Based on the timing of QuotiumPRO's release, and the years required to

develop and write load testing software such as Test, Impact, and OpenSTA, it is clear that

QuotiumPRO includes a direct copy of most, if not all, of OpenSTA and the portions of Test and

Impact therein.

To be actionable, the copying must also be so extensive as to render the infringing and

copyrighted works "substantially similar."  Here, Quotium are reproducing and selling programs

that are closely derivative of, if not identical to, OpenSTA, Test, and Impact because (1)

immediately after gaining access to the source code of Test, Impact, and OpenSTA, Quotium

began selling QuotiumPRO, the substantially similar load testing program that Quotium admit

incorporates significant and core portions of OpenSTA and, therefore, Test and Impact; and (2)

Quotium have begun selling QTest 4.0, which is based on QuotiumPRO.

Clearly, then, Quotium are reproducing and selling programs that are substantially similar

to Test, Impact, and OpenSTA.  Even if Quotium were to identify slight variations between its

products and Cyrano's, a finding of infringement would not be precluded.  See Concrete Mach.

Co., 843 F.2d at 608; Cybermedia, Inc. v. Symantec Corp., 19 F.Supp.2d 1070, 1077-78 (N.D.

Cal. 1998) (even if the copied portion is relatively small in proportion to the entire work, the

accused work will be found substantially similar and infringing if qualitatively important).  The

core engine and parts of OpenSTA are contained within UK/US OpenSTA, which Cyrano owns.

Based on the evidence that Quotium's products incorporate core and substantial portions of

Cyrano's software, Cyrano has met its burden of establishing a substantial likelihood of success

on the merits.  See Accusoft Corp. v. Mattel, Inc., 117 F.Supp.2d 99, 102 (D.Mass. 2000)

(enjoining defendants' use of plaintiff's copyrighted computer software product in its software

products); Accusoft Corp. v. Palo, 923 F.Supp. 290, 295 (D. Mass. 1996) (enjoining parties from

reproducing and selling virtually identical computer programs); Triad Sys. Corp. v. Southeastern

Express Co., 64 F.3d 1330, 1335 (9th Cir. 1995) (enjoining accused infringer where "no doubt that protected elements of the software were copied").

       D.    <u>Risk of Irreparable Harm.</u>

Irreparable harm is presumed in copyright and infringement cases if the copyright holder demonstrates a likelihood of success on the merits of its infringement claims.  <u>Concrete Mach. Co.</u>, 843 F.2d at 611; <u>Accusoft Corp.</u>, 117 F. Supp.2d at 102; <u>Camel Hair and Cashmere Inst. of Amer. v. Associated Dry Goods Corp.</u>, 799 F.2d 6, 14-15 (1st Cir. 1986).  Because Cyrano has established a substantial likelihood of success on the merits, this Court should presume Cyrano will suffer irreparable harm if an injunction does not issue.  Moreover, Cyrano has established through affidavit testimony that it already has suffered irreparable harm and will continue to suffer if Quotium are allowed to continue to advertise, distribute, and sell QuotiumPRO and QTest 4.0.  <u>See</u> Almeda Aff. at ¶¶ 35-37.

Cyrano is and has at all times since March 2002 been the sole owner of all right, title, and interest in and to all copyrights in Test and Impact.   Cyrano is and has at all times since March 2002 been the copyright owner of the UK/US OpenSTA and the owner or exclusive licensee of its Gateway, Modeller, and HTTP Replay modules.  Cyrano has not authorized Quotium to reproduce, distribute, manufacture, advertise, or sell Test, Impact, OpenSTA and its modules or any product containing portions thereof.

On July 11, 2005, Quotium announced the release of QTest 4.0 as a major new release of QuotiumPRO, thus a derivative work of Test, Impact and OpenSTA, the derivation, reproduction, and distribution being infringements of Cyrano's copyrights in Test, Impact and OpenSTA.  Quotium's infringing activities are continuing, willful, and intentional in total disregard of Cyrano's rights.  As a result of Quotium's infringing activities, Cyrano has suffered

and will continue to suffer, substantial and irreparable damage to its business reputations, goodwill, market share, and customer and distributor relationships. Cyrano has no adequate remedy at law and is therefore entitled to preliminary and permanent injunctive relief pursuant to 17 U.S.C. § 502.

  E.  The Balance Of Hardships Weighs In Favor Of Cyrano

  The First Circuit has concluded that "where the only hardship that [a non-moving party] will suffer is lost profits from an activity which has been shown likely to be infringing, [that hardship] merits little equitable consideration." Concrete Mach. Co., 843 F.2d at 612. Through the present motion, Cyrano seeks to protect its rights in its intellectual property and to enjoin Quotium from further infringing its copyrights. There can be no discernible harm to Quotium if made to cease such unlawful conduct.

  Cyrano, on the other hand, because of Quotium's infringing conduct, has lost current and prospective customers. This cut into Cyrano's customer base has contributed to a 90% reduction of Cyrano's software maintenance and service business. Consequently, Cyrano has had to reduce its workforce from 35 employees to 10. Thus, this Court should grant an injunction despite any harmful effect on Quotium. See Concrete Mach. Co., 843 F.2d at 612. This result "is true even when the non-moving party's business is exclusively based upon the infringing activity and would be virtually destroyed by a preliminary injunction." Accusoft Corp., 923 F. Supp. at 295 (citing Concrete Mach. Co., 843 F.2d at 612).

  F.  The Public Interest Will Be Harmed If Injunctive Relief Is Denied

  Like irreparable harm, courts ordinarily presume that an injunction will serve the public's interest if the copyright holder shows a likelihood of success on the merits. Concrete Mach. Co., 843 F.2d at 612; Green Book Int'l Corp. v. Inunity Corp., 2 F.Supp.2d 112, 124 (D.Mass. 1998).

Further, the public interest almost always favors the granting of appropriate injunctions in copyright and trademark cases in order to prevent consumers from being confused or deceived. Boustany v. Boston Dental Group, Inc., 42 F.Supp.2d 100, 113 (D. Mass. 1999).  Because Cyrano has established a substantial likelihood of success on the merits, this Court should presume that the issuance of a preliminary injunction is in the public interest.

IV.    CONCLUSION

For the foregoing reasons, this Court should grant Cyrano's Motion for Preliminary Injunction and enjoin Quotium from infringing its copyrights, as well as from further selling, marketing, and/or distributing the works derivative of these products, namely, QuotiumPro and QTest 4.0, as set forth more fully in the Proposed Order attached to the motion.

Respectfully submitted,

Plaintiff,
**CYRANO, INC.,**
By its attorneys,

/s/ Stephen Y. Chow
Stephen Y. Chow, BBO #082990
Michael K. Sugrue, BBO #655878
BURNS & LEVINSON LLP
125 Summer Street
Boston, Massachusetts 02110
Dated:  June 20, 2006                      (617) 345-3000

## <u>CERTIFICATE OF SERVICE</u>

I, Michael K. Sugrue, hereby certify that a true copy of the foregoing Memorandum in Support of Motion for Preliminary Injunction was served upon the following counsel by regular mail on this the 20th day of June, 2006:

Kevin J. O'Connor, Esq.
Mayeti Gametchu, Esq.
Paragon Law Group LLP
184 High Street
Boston, MA 02110

/s/ Michael K. Sugrue_____
Michael K. Sugrue