UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CYRANO, INC.,<br>　　　　　　　Plaintiff,<br>v.<br>QUOTIUM TECHNOLOGIES, INC.,<br>QUOTIUM TECHNOLOGIES, S.A.,<br>and<br>TECHNOLOGIES, S.A.,<br>　　　　　　　Defendants. | **CIVIL ACTION NO. 05-CV-11558-DPW** |

**QUOTIUM'S OPPOSITION TO PLAINTIFF'S
<u>MOTION FOR PRELIMINARY INJUNCTION</u>**


DATED:  July 14, 2006

Kevin J. O'Connor (BBO# 555250)
Mayeti Gametchu (BBO# 647787)
John Pagliaro (BBO# 634483)
PARAGON LAW GROUP, LLP
184 High Street
Boston, MA 02110
Tel. (617) 399-7950




Counsel for Defendants

QUOTIUM TECHNOLOGIES, INC.,
TECHNOLOGIES, S.A., and
QUOTIUM TECHNOLOGIES, S.A.,

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................1

FACTUAL AND PROCEDURAL BACKGROUND.................................................4

    Quotium Purchased All Of CSA's Intellectual Property Rights
    In OpenSTA Through The 2002 Liquidation of CSA In France ........................4

    CI Claims To Have Purchased Some – But Not All –
    Of The Rights In OpenSTA Through The Liquidation Of CUK ........................5

    The Objective Record – Including The Pre-litigation Public
    Statements By CI's Own Affiants – Demonstrates That OpenSTA
    Is A Single Product, Fully Integrated, "UK/US" OpenSTA
    Never Existed, And OpenSTA Was Owned In Its Entirety By CSA .................7

    The Relevant Procedural History Of
    The Quotium Action: The Pre-Default Phase .................................................8

    The Relevant Procedural History Of
    The Quotium Action: The Post-Default Phase ................................................9

        CI Disappears From The Quotium Action
        For Over A Year, And Ultimately Has Liability And An Injunction
        Entered Against It And Its Counterclaims Dismissed With Prejudice ..................9

        CI's Unsuccessful Attempts To Reopen The Quotium Action,
        And Judge Tauro's Findings Of Contempt And Sanctions
        Against CI For Its Failure To Comply With The Injunction .................................9

    The Procedural History Of This Action...........................................................12

ARGUMENT ......................................................................................................12

    I.     CI Offers No Valid Grounds For Lifting The Stay Issued By This Court............12

        A.    Since Last Year, Nothing Has Occurred In The Collateral
               Litigation That Would Justify CI's Seeking To Lift The Stay Now..........12

        B.    CI Has Learned Of No New Information That
               Would Justify Its Seeking To Lift The Stay Now.....................................15

        C.    CI Is Still Seeking To Relitigate Judge Tauro's Case...............................16

D. Regardless Of Their Enforceability, The French Rulings
Do Not – As CI Claims – Establish Its Ownership Of
The Copyrights In Test And Impact, And, In Any Event,
The Products Are Largely Immaterial To CI's Motion ...........................19

II. Even If This Court Reaches The Substance Of CI's Motion, It Should
Be Denied Because It Does Not Meet The Preliminary Injunction Standard........21

A. The History Of CI's Conduct Undercuts Any Presumption That
It Will Suffer Irreparable Harm In The Absence Of An Injunction ..........21

B. The Balance of Harms Is Strongly In Favor Of Quotium..........................25

C. This Motion Should Be Denied Because CI Has Not
Shown A Likelihood Of Success On The Merits Of Its Claims ................28

i. CSA Controlled CUK And CI, Which Operated As Regional
Offices Of CSA, Until CSA's Bankruptcy In Fall 2001................29

ii. OpenSTA Was Developed By CSA's R& D
Staff In France, And Was First Announced To
The Public As A Product And Trademark Of CSA ......................32

iii. CSA's Managing Director (Also A CI Insider
And Affiant) Registered OpenSTA With The
Agency For The Protection Of Programs, Swearing
Under Oath That It Is An Original Work Of CSA........................33

iv. OpenSTA Was Licensed By CSA Pursuant
To The International Distributor Agreement ................................34

D. Under French Law, The Rights In OpenSTA Are Deemed To
Have Been Owned By CSA And, Thus, Transferred To Quotium............35

i. The Development Of OpenSTA
Was Initiated And Controlled By CSA..........................................36

ii. CSA Reproduced, Divulged, And Published
OpenSTA Under Its Own Direction And Name ..........................37

iii. The CSA And CUK Contributions To OpenSTA
Were Fused Together Into A Single, Non-Distinct Work ............38

E. CI Also Cannot Demonstrate
Ownership Of OpenSTA Under English Law ...........................................40

CONCLUSION...................................................................................................................43

## TABLE OF AUTHORITIES

**CASES**                                                                      **Page(s)**

Anderson v. City of Boston,
  244 F.3d 236 (1st Cir. 2001) .......................................................................22, 23

Carson v. American Brands,
  450 U.S. 79 (1981) ...........................................................................................23

Concrete Machinery Co., Inc. v. Classic Lawn Ornaments, Inc.,
  843 F.2d 600 (1st Cir. 1988) ...........................................................25, 27, 28

Contrast Forry, Inc. v. Neundorfer, Inc.,
  837 F.2d 259 (6th Cir. 1988) ............................................................................24

Itar-Tass Russian News Agency v. Russian Kurier, Inc.,
  153 F.3d 82 (2d Cir. 1998).............................................................................35

Keds Corp. v. Renee Int'l Trading Corp.,
  888 F.2d 215 (1st Cir. 1989).............................................................................29

Montblanc-Simplo, GMBH v. Staples, Inc.,
  172 F. Supp. 2d 231 (D. Mass. 2001) ..........................................................25

Planned Parenthood League of Mass. v. Bellotti,
  641 F.2d 1006 (1st Cir. 1981)...........................................................................21

Robert J. Fritz, DMA, Inc. v. Arthur D. Little, Inc.,
  944 F. Supp. 95 (D. Mass 1996) ...................................................................21

Semtek International, Inc. v. Lockheed Martin Corp.,
  531 U.S. 497 (2001)........................................................................................18

**STATUTES AND RULES OF COURT**

15 U.S.C. § 103...................................................................................................41

17 U.S.C. § 201(b) (2002) ..................................................................................35

28 U.S.C. § 1292(a)(1)..........................................................................12, 13, 17, 22

M.G.L. c. 235 § 23A.............................................................................................21

Fed.R.Civ.P. 12(b)(6)...........................................................................................11

## <u>OTHER</u>

<u>International Copyright in Computer Program Technologies</u> (1996).........................................42

1 Geller & Melville B. Nimmer, <u>International Copyright law and Practice,</u> § 2 (2005) ......34, 41

1 Geller & Melville B. Nimmer, <u>International Copyright law and Practice,</u> § 4............37, 38, 40

2 Geller & Melville B. Nimmer, <u>International Copyright law and Practice,</u> § 2......................41

2 Geller & Melville B. Nimmer, <u>International Copyright law and Practice,</u> § 4......................40

Restatement (Second) of Judgments § 26 cmt. B (1982)............................................18

<u>Moore's Federal Practice</u> § 131.31[3] (3d ed. 2002) ..................................................19

UK Corporations Act ...............................................................................................29

18 Wright & Miller, <u>Federal Practice and Procedure</u> § 4404 (2d ed. 1990)..............................19

18 Wright & Miller, <u>Federal Practice and Procedure</u> § 4413 (2d ed. 1990)..............................18

18 Wright & Miller, <u>Federal Practice and Procedure</u> § 4473 (2d ed. 1990)..............................21

Defendants Technologies S.A., Quotium Technologies, S.A., and Quotium Technologies, Inc. ("Quotium") respectfully submit their opposition to the motion for preliminary injunction filed by Plaintiff Cyrano, Inc. on June 20, 2006.[1]  As a result of a permanent injunction enjoining Plaintiff from using the "Cyrano" name, the company has been renamed Vedant, Inc.  For the sake of clarity Quotium refers to Cyrano, Inc. herein as "CI."

## **INTRODUCTION**

In its motion for preliminary injunction, CI seeks an order restraining Quotium from, *inter alia*, using the Quotium software products QuotiumPro and QTest because they allegedly infringe upon CI's rights in the software product OpenSTA, including those components of OpenSTA comprising source code for the software products Test and Impact.  (CI concedes that the intellectual property rights in the remaining components of OpenSTA are owned by Quotium.)  It should be noted up front that QTest and QuotiumPro are essentially identical products.  See App. Ex. 1 ¶ 8.  For marketing reasons, Quotium changed the name of QuotiumPro to QTest in 2005 in connection with an ordinary course upgrade for that product.  Id.  Thus, although CI casts the release of QTest as a claim for infringement that was not before Judge Tauro in the Quotium Action,[2] there is no such new claim.

---

[1] In support of this Memorandum, Quotium files herewith Volumes I and II of its Appendix (cited as "App. Ex. __") attaching the following documents: **App. Ex. 1** (Declaration of Hubert de Lacvivier); **App. Ex. 2** (Declaration of Elisabeth Deflers); **App. Ex. 3** (Excerpted pages from damages trial in the Quotium Action); **App. Ex. 5** (Declaration of Michel Tiberini); **App. Ex. 6** (Declaration of Olivier Cante); **App. Ex. 7** (Supplemental Declaration of Olivier Cante); **App. Ex. 8** (2002 Affidavit of Brian Bandey); **App. Ex. 9** (2002 Affidavit of Denis Bitan); **App. Ex. 10** (2002 Supplemental Affidavit of Denis Bitan); **App. Ex. 11** (Affidavit of Philippe Eyries); **App. Ex. 12** (Affidavit of Robert Ernens); **App. Ex. 13** (document entitled "CYRANO Initial Public Offering of Shares on Nouve Marché of the Paris Bourse" and document entitled "CYRANO to offer . . . Opensource model"); **App. Ex. 14** (February 2005 Affidavit of Scott Almeda); **App. Ex. 15** (April 2005 Affidavit of Scott Almeda); **App. Ex. 16** (Motion To Stay Appeal, filed by CI with the Court of Appeals on 11/14/05).

[2] The Quotium Action refers to the parallel litigation pending in the U.S. District Court for the District of Massachusetts (C. A. No. 02-cv-11416-JLT) before Judge Tauro.

CI's motion should be denied for two main reasons. First, CI has not made the requisite showing that the stay in this case, issued on November 3, 2005, should be lifted. At the time Quotium moved to dismiss or stay CI's Complaint, Quotium provided this Court with several charts comparing CI's counterclaims in the Quotium Action with its claims here. See Paper #12 (Exs. 3-5). [3] As the Court is aware, CI's counterclaims in the Quotium Action and its claims here are virtually identical. Accordingly, on Quotium's motion, this Court issued a stay of this action approximately eight months ago, pending further developments in the Quotium Action, including Judge Tauro's determination of damages against CI and the outcome of the appeal that CI had lodged in the Court of Appeals. Since this Court issued its stay, there have been absolutely no new developments, in the Quotium Action or in this case, that would justify lifting the stay now. There literally is not a shred of information before the Court today that was not before it in November 2005, including the 2005 release of QTest.

Indeed, CI's motion is almost identical to a motion for preliminary injunction filed by CI in the Quotium Action on October 11, 2002, almost *four* years ago. Judge Tauro ***denied*** that motion on December 16, 2002. The Court need look no further than to the two proposed orders in order to see the extent to which the instant motion, like the entire action, is simply an attempted "do over" of the Quotium Action. [4] See Exhibit 1 hereto.

In an apparent attempt to mask this fact, CI has not re-filed the many affidavits that it submitted in the Quotium Action in support of its 2002 motion. Instead, CI has quietly folded

---

[3] "Paper" refers to documents docketed in this Action. "QA Paper" refers to documents docketed in the Quotium Action.

[4] Other than minor rewording, the only difference between the two motions is that CI now includes QTest as an allegedly infringing product and cites two rulings from French courts regarding the software products Test and Impact. However, neither of these constitutes a material development because (i) QTest is identical to QuotiumPro, (ii) CI cannot enforce the French judgments to pursue claims dismissed with prejudice by Judge Tauro, (iii) Quotium owns the rights in the software product really at issue here -- OpenSTA -- regardless of who owns Test and Impact, and (iv) even if the French rulings are recognized by a subsequent court, they do not rule -- as CI inaccurately argues -- that CI owns the intellectual property rights in Test and Impact.

the testimony contained in those affidavits into the affidavit of its Chief Executive Officer, Scott

Almeda, who now purports to speak with encyclopedic authority concerning the many technical

and historical facts long predating his association with CI. Most of Mr. Almeda's affidavit is, on

its face, not based on first hand knowledge and lacks sufficient foundation to be credited by the

Court. Although Quotium has not re-filed all of CI's prior affidavits here, they are docketed in

the Quotium Action and are available for the Court to compare with Mr. Almeda's affidavit.

Quotium has provided the Court with the 2002 affidavit of Brian Bandey, one of CI's lawyers.

See App. Ex 8. It is almost word-for-word identical to the affidavit of Dr. Bandey that CI has

filed here.[5] See App. Ex. 8 and Paper #24 (2006 Bandey Affidavit).

The second main reason that CI's motion should fail is that CI has not met the four-part

test for the issuance of a preliminary injunction. First, CI does not enjoy the presumption of

irreparable harm associated with copyright infringement because CI has a long history, in this

action and the Quotium Action, of failing to pursue timely injunctive relief for its present claims

and, when it has sought the relief, of failing to pursue it diligently. Second, especially in light of

the CI's inability to show a likelihood of success on the merits, it is clear that the harm to

Quotium if this motion is granted will be far greater than the harm to CI if it is denied. Thus, the

balance of hardships militates strongly in favor of Quotium. Third, CI has not demonstrated a

likelihood of success on the merits of its claims because all of the intellectual property rights in

OpenSTA -- the product CI alleges QuotiumPro and QTest infringe -- are owned by Quotium.

Finally, CI has not demonstrated the allowance of this motion is in the public interest.[6]

---

[5] Dr. Bandey's current affidavit omits the references to affidavits of 2002 affiants that once provided factual foundation for many of his assertions. As a result, his current affidavit lacks adequate foundation and should be disregarded by the Court.

[6] Quotium addresses the "likelihood of success on the merits" at the end of this brief simply because of the length of the argument. It is every bit as strong and independently dispositive as the other reasons that CI has failed to satisfy the preliminary injunction standard.

## FACTUAL AND PROCEDURAL BACKGROUND

CI's present motion (and, indeed, this entire case) is duplicative of the Quotium Action. Accordingly, the facts and procedural history discussed in this section are taken largely from the docketed proceedings in the Quotium Action, some of which were recounted for this Court in Quotium's earlier Memorandum of Law in support of its Motion or Stay.  See Paper #12.

***Quotium Purchased All Of CSA's Intellectual Property Rights
In OpenSTA Through The 2002 Liquidation Of CSA In France***

In the Quotium Action, and here, Quotium and CI each claim to have purchased the intellectual property rights at issue in the instant motion through the 2002 liquidations of their respective predecessors-in-interest, Cyrano, S.A. ("CSA") and Cyrano UK ("CUK").  CSA was a publicly-traded, French company that had owned, developed, and marketed software products under its federally-registered trademark "CYRANO."  See App. Ex. 5 ¶¶ 2, 5 and Ex. B.  In addition, CSA also granted licenses to its wholly-owned subsidiaries -- including CUK, an English company, and CI (Plaintiff here) -- to market its products pursuant to an International Distributor Agreement executed with each of these companies.  Id.  See also App. Ex. 5 (Ex. Y); Paper #12 at 1-3.

CSA declared bankruptcy on June 11, 2001 and was placed in liquidation by order of the Commercial Court of Paris on October 15, 2001.  See App. Ex. 5 ¶ 2 and Ex. B.  In response to a written solicitation of bids issued by the court-appointed trustee (the "CSA Liquidator"), Quotium bid on certain assets of CSA, including, among other assets, all of CSA's rights in a software product called OpenSTA.  See App. Ex. 5 ¶ 2 and Exs. D and F.  CI's then-parent company -- Sofitrade, S.A. ("Sofitrade") -- also submitted a bid to purchase CSA's assets in liquidation.  See App. Ex. 5 ¶ 6 and Exs. B, L and BB.

The Commercial Court of Paris ultimately ordered the sale of CSA's assets to Quotium in preference to Sofitrade's offer. Among the court's reasons for doing so was its observation that Quotium was in a better "***position of being able to finance the further growth of the marketing of the software***." See App. Ex. 5 (Ex. B at 4) (emphasis added). Pursuant to that court order, on May 16, 2002, the CSA Liquidator and Quotium entered into an agreement transferring the intellectual property rights in, among other assets, the "Cyrano" trademark and all of CSA's intellectual property rights in OpenSTA, to Quotium. See App. Ex. 5 ¶ 5 and Ex. J at Art. 1.1.2.

This agreement (the "CSA Transfer Agreement") reads, in pertinent part, as follows: "The Assignor hereby sells to the Assignee ***all intellectual property rights belonging to [CSA],*** on the following IT solutions registered with the Program Protection Agency: The IT solution, ***OPENSTA***, comprising the ***OPENSTA*** software." See App. Ex. 5 (Ex. J at Art. 1.1.2) (emphasis added.)

***CI Claims To Have Purchased Some -- But Not All --***
***Of The Rights In OpenSTA Through The Liquidation Of CUK***

At the time of CSA's liquidation proceedings, its wholly-owned and controlled subsidiary, CUK was also placed in liquidation in England. See App. Ex. 5 (Ex. BB). CUK's assets were purchased by CI pursuant to a "Liquidators Sale Agreement" on or about March 21, 2002 (the "CUK Transfer Agreement"). Id. CI has since claimed that, as part of the purchase, it acquired copyright ownership of the two software products Test and Impact because the programs were assets allegedly developed and owned by CUK before its demise. See Paper #25 at 5-8. Based on CI's claimed ownership of Test and Impact, CI objected to the transfer to Quotium of the Test and Impact code that was in the possession of the CSA Liquidator in France in connection with Quotium's purchase of CSA's assets. See App. Ex. 5 (Ex. J, Art. 2). See also Paper #25 at 11 ("Before the execution of the [CSA] Transfer Contract, [CI] objected to the

transfer of Test, Impact, and OpenSTA  . . . . The Trustee then caused this contested software to be held in a "Logibox" pending proof of ownership.").  As a result, these assets were placed in escrow (a "Logibox" envelope) pending a determination in France as to which party -- CUK or CSA -- originally owned the code.  Id.

Based on its alleged purchase of Test and Impact, CI has gone on to claim that it owns all of those portions, among others, of OpenSTA that include source code taken from Test and Impact, which CI fictitiously dubs "UK/US" OpenSTA.  See Paper #25 at 5-9.   Although conceding that the rights to the remaining components of OpenSTA were owned by CSA, CI argues that CSA granted CUK an implied license to use its portion of OpenSTA and that CUK, in turn, granted CSA an implied license to use "UK/US" OpenSTA.  See Paper #25 at 5 (referencing 2006 Bandey Aff. ¶ 8).  In 2002, CI brought counterclaims against Quotium in the Quotium Action, alleging that Quotium's software product "Quotium Pro" infringes on CI's alleged partial rights in "UK/US" OpenSTA.  This is the same argument CI now makes to this Court in 2006.

The CUK Transfer Agreement is the sole means by which CI claims to have acquired any ownership rights in OpenSTA.  Yet, unlike the CSA Transfer Agreement (which names OpenSTA expressly when transferring to Quotium all intellectual property rights that were owned by CSA), the CUK Transfer Agreement makes no mention of OpenSTA, let alone acknowledges that CUK purportedly owned a copyright in all or substantially all of OpenSTA through its purported ownership of Test and Impact.  Instead, the agreement simply states that "*[CUK] hereby assigns to [CI] such right, title, and interest as it __may have__* in all the copyright, including but not limited to all future copyrights to the Software as defined . . . ."  See App. Ex. 5 (Ex. BB § 14.1) (emphasis added).   Earlier in the document, the term "Software" is defined as

meaning "***all the computer products and computer software products as may be owned by [CUK]*** . . . at the Transfer Date . . . ." Id. § 1.1 (emphasis added).  Significantly, CI also acknowledges therein "that ***the Intellectual Property Rights [assigned through the agreement] may be subject to restrictions or deficiencies as a result of which it may not be transferable to [CI]***." Id. § 14.3 (emphasis added).

***The Objective Record -- Including The Pre-litigation Public
Statements By CI's Own Affiants -- Demonstrates That OpenSTA
Is A Single Product, Fully Integrated, "UK/US" OpenSTA
Never Existed, And OpenSTA Was Owned In Its Entirety By CSA***

As noted above, CI itself does not claim that CUK owned the rights in OpenSTA in their entirety.  Instead -- neglecting to address the fact that the CUK Transfer Agreement does not even mention OpenSTA -- CI bases its infringement claim on its allegation that it owns the rights in a piece of OpenSTA that it calls "UK/US" OpenSTA.  However, the record is clear that "UK/US" OpenSTA has never existed.  OpenSTA is, and was always meant to be, a fully-integrated web load testing solution in which different technologies work together in an integrated fashion toward a common goal.  See generally App. Exs. 6, 7.  Other than in the arguments made by CI for purposes of litigation, there is no reference anywhere to "UK/US" OpenSTA or, for that matter, any evidence that any part of OpenSTA was ever owned or licensed by anyone other than CSA.

The Court need look no further than the ***pre-litigation*** public representations made by CI's own prior affiants at the time OpenSTA was announced and released to the public.  For example, Denis Bitan -- who at the time was the "Managing Director" of CSA, CUK and CI -- made the following representation to the Agency for the Protection of Programs in Paris (the

"APP")[7]: "I, the undersigned, Denis Bitan, **declare on my honor that the work for which I request a certificate of the APP [OpenSTA version 0.9.1] is an *original work* of Cyrano, S.A. [CSA]**." See App. Ex. 5 (Ex. I at 98) (translated at Ex. J at 98 and 52).  Similarly, Robert Ernens -- who served as Chairman and CEO of CSA, CUK, and CI at the time -- represented in press statements that **CSA** was introducing and releasing OpenSTA to the public.  See App. Ex. 5 (Ex. T).  And, lest there be any doubt, just prior to OpenSTA's release, Bitan and Ernens (on behalf of CSA and CI, respectively) executed a First Amendment to the International Distributor Agreement that CSA had with its subsidiaries extending the license granted by **CSA** as owner and licensor to include OpenSTA.  See App. Ex. 5 (Ex. Y, 1st Am.).

***The Relevant Procedural History Of The Quotium Action***: ***The Pre-Default Phase***

All of the forgoing facts were before Judge Tauro on the parties' submissions in connection with CI's motion for preliminary injunction.  Based upon this record, Judge Tauro denied CI's motion in December 2002.  See QA Paper # 39.  Following Judge Tauro's 2002 denial of CI's motion for preliminary injunction, CI brought a motion for partial summary judgment on June 19, 2003 in the Quotium Action.  See QA Paper #71.  In that motion, CI sought a ruling that it owned the intellectual property rights in the software product Test because CUK -- rather than CSA -- had allegedly developed the product.  See QA Paper #72.  CI brought this motion in an apparent attempt to lay the ground work for its contention that the rights to "UK/US" OpenSTA -- which CI claims contain code from Test and Impact -- belonged to CUK and were transferred to CI pursuant to the CUK Transfer Agreement.

Following Quotium's submission of an opposition with evidence that the intellectual property rights in Test belonging to CUK, if any, were transferred to CSA well before its

---

[7] The APP is a European agency that registers software for the title-holder, ensures the secure deposit, establishes the analysis of maintainability, conducts license audits, and helps members with arbitration and legal action.  See Exhibit 2 hereto.

liquidation, Judge Tauro denied this motion as well.  <u>See</u> QA Paper #81 and 1/13/04 Electronic Order.

***The Relevant Procedural History Of The Quotium Action***: ***The Post-Default Phase***

> ***CI Disappears From The Quotium Action***
> ***For Over A Year, And Ultimately Has Liability And An Injunction***
> ***Entered Against It And Its Counterclaims Dismissed With Prejudice***

After vigorously litigating the Quotium Action, CI completely disappeared from the Quotium Action beginning in February 2005 and continuing for a period of more than a year thereafter.  <u>See</u> Paper #12 at 4-7.  CI instead chose to focus exclusively on litigation with Quotium in France.  <u>See</u> Paper #12 at 5.  This litigation included a lawsuit that CI had commenced in the Commercial Court of Paris seeking to obtain, *inter alia*, the computer code for Test and Impact that had been held in Logibox in the CSA bankruptcy.  <u>See</u> Paper #25 at 11.

As a result of CI's willful neglect of the Quotium Action, Quotium filed a motion for entry of default against CI on October 6, 2004.  <u>See</u> QA Paper #100.  Judge Tauro ordered entry of default on November 8, 2004.  <u>See</u> QA 11/8/04 Electronic Order.  On January 27, 2005, Quotium filed its motion for entry of default judgment.  <u>See</u> QA Paper ##105, 106.  As a result of CI's failure to defend or prosecute in the Quotium Action and its disregard of several court orders, Judge Tauro entered default judgment on liability against CI (QA Paper #111), dismissed CI's counterclaims with prejudice (QA 2/23/05 Electronic Order), and issued a permanent injunction enjoining CI from, *inter alia*, using the Cyrano name (QA Paper #112).

> ***CI's Unsuccessful Attempts To Reopen The Quotium Action,***
> ***And Judge Tauro's Findings Of Contempt And Sanctions***
> ***Against CI For Its Failure To Comply With The Injunction***

After over a year of willful neglect, the day following default judgment, CI began filing a barrage of documents in the Quotium Action through which it attempted to undo the

consequences of its protracted disregard of the litigation.  See Paper 12 at 5 (referring to QA

Paper ##113-115, 118-123, 127, 131, 133-139).  In particular, CI offered as an excuse for its

absence the purported fact that "it had no money, owing to . . . the actions in France."  See App.

Ex. 14 ¶ 8.  CI also presented Judge Tauro -- for the first time -- with a March 16, 2004 decision

from the Commercial Court of Paris, which CI inaccurately characterizes as ruling that the

intellectual property rights in Test and Impact are owned by CI.  See Paper #25 at 15;

Declaration of Elisabeth Deflers, Ex. 2 (Exs. A, B, attaching 3/16/04 Commercial Court of Paris

ruling); QA Paper #127 (ruling attached to filing thereto)

Judge Tauro denied CI's request to reopen the Quotium Action, ultimately refusing to

permit CI to tardily raise the Commercial Court's ruling as *res judicata*, rejecting CI's "lack of

resources," and determining that CI deliberately chose to litigate in France while ceasing its

participation in the Quotium Action.  See Paper #12 at 6-7; QA Paper ## 144 and 145.  In

addition, because CI continued to be in violation of the injunction prohibiting it from, *inter alia*,

using the Cyrano name, Judge Tauro also granted Quotium's motion for contempt against CI.

See Paper #12 at 6; QA Paper ## 144, 145.

Rather than simply complying with the injunction and contempt order, on June 14, 2005,

CI filed another emergency motion with the district court, requesting reconsideration of the

Court's prior rulings, as well as an array of relief in the alternative, all of which was denied by

Judge Tauro on June 15, 2005.  See QA 6/15/05 Electronic Order.  That day, CI filed a Notice of

Appeal in the district court, followed the next day by the filing, with the U.S. Court of Appeals

for the First Circuit, of an emergency motion for a stay of the district court's injunctive orders

pending appeal.  See Paper #12 at 7.  On June 20, 2005, before Quotium could file an opposition,

the Court of Appeals denied the emergency motion, finding that CI appeared unable to establish

a substantial likelihood of success on the merits. <u>Id.</u> at 7-8. The denial was without prejudice to CI's right to attempt to make the required showing. On June 28, 2005, CI renewed its motion to the Court of Appeals. <u>Id.</u> The Court of Appeals denied the renewed motion on June 30, 2005, again without waiting for a response from Quotium. <u>Id.</u> On CI's own motion, the Court of Appeals has stayed CI's appeal pending final judgment in the Quotium Action.

Because CI remained in violation of the injunction throughout this time, Quotium filed another emergency motion for contempt on July 6, 2005. <u>See</u> Paper #12 at 8; QA Paper #160. Judge Tauro also granted this motion and imposed a fine of $1,000 a day on CI until it purged itself of the contempt. <u>See</u> Paper #12 at 8; QA Paper #166. Even after the imposition of sanctions against it, for sixty-seven days, CI failed to fully comply with the injunction. <u>See, e.g.,</u> QA Paper #171. After it finally did so on or around September 29, 2005, Judge Tauro ultimately enforced the sanctions that he had imposed upon CI and ordered CI to pay $67,000 to the Court and $14,000 to Quotium for attorneys' fees. <u>See</u> Paper #12 at 8; QA 10/26/05 Electronic Order; QA Paper #180.

Following the imposition of sanctions, in 2006 CI filed yet another motion before Judge Tauro, seeking to vacate or modify the injunction. After Judge Tauro denied this motion, CI filed a motion for reconsideration, which Judge Tauro also denied. CI then filed a second Notice of Appeal. This appeal is currently pending in the Court of Appeals. (No. 06-01782).

Finally, a trial to determine Quotium's damages has also been held. As ordered by Judge Tauro, the parties will soon be filing their respective proposed findings of fact and conclusions of law. Upon Judge Tauro's determination of damages, final judgment will enter in the Quotium Action. Presumably, CI will then take yet a third appeal, mooting the first two.

*The Procedural History Of This Action*

On July 25, 2005, CI commenced the instant lawsuit.  In it, CI seeks to enforce certain judgments rendered by the courts of France as a basis for a variety of claims against Quotium, including infringement of certain software programs CI claims to own.  On September 23, 2005, Quotium filed a motion to dismiss the complaint under Fed.R.Civ.P. 12(b)(6) or, alternatively, to stay the action, alleging that the action was impermissibly duplicative of the Quotium Action or otherwise failed to state claims on which relief could be granted.  CI filed an opposition on October 14, 2005, and Quotium filed a reply on October 27, 2005.

On November 3, 2005, the Court held a hearing on the motion.  The Court granted Quotium its alternative relief of a stay and ordered the parties to file a status report every 60 days to inform the Court of the case posture of the Quotium Action, including the appeal taken in that case by CI under 28 U.S.C. § 1292(a)(1).  The parties have filed a series of such reports.

On June 20, 2006, CI filed the present motion, in which it seeks injunctive relief on grounds that Quotium's two software products QuotiumPRO and QTest infringe on CI's alleged partial rights in OpenSTA, *i.e.* "UK/US" OpenSTA, which CI claims is comprised of code from Test and Impact.  On July 14, 2006, Quotium filed the present opposition to the motion.

## ARGUMENT

### I.    CI Offers No Valid Grounds For Lifting The Stay Issued By This Court

#### A.    Since Last Year, Nothing Has Occurred In The Collateral Litigation That Would Justify CI's Seeking To Lift The Stay Now

Last year when the Court stayed this action, the Court explained its rationale and under what circumstances it would consider lifting the stay.  First, the Court was clear that a final judgment from Judge Tauro should enter in the related action before this Court would be willing to step more deeply into the fray.

I'd like to stay this proceeding pending further developments, I'll say, in the litigation before Judge Tauro. It's without prejudice to coming back to me and asking me to do something in this case, but I'm disinclined at this point to do anything. And enforcing a judgment from France seems to me to be an invitation to simply recreating the problems that are going to be sorted out in some fashion before Judge Tauro unless there's something that needs to be done now here. See Paper #19 at 22.

Second, the Court was appropriately concerned that the Court of Appeals should have an opportunity to speak on the legal issues CI itself had put on appeal in Judge Tauro's case.[8]

While the Court did say that the stay was without prejudice to "coming back to me and asking me to do something in this case," the Court obviously did not intend to give the parties *carte blanche* in the matter. The statement was made in the context of the Court's dual concern not to get out ahead of Judge Tauro's disposition of the first case and also to have the benefit of the Court of Appeals' resolution of certain legal issues. It was out of this concern that the Court required the parties to file a status report every sixty days "with respect to the collateral litigation . . . and we'll keep this stay for that time period until we're in a position to decide exactly what the outcome is." See Paper #19 at 23.

As the status reports indicate, *nothing* relevant has changed in the collateral litigation. There has been no "outcome." Judge Tauro is presently waiting for post-trial briefs on damages (due in August). Consequently, this Court still cannot know what form the final judgment will take in that action. In addition, only a few weeks after the hearing before this Court last year, the Court of Appeals, *at CI's own request*, stayed the interlocutory review CI had taken under 28 U.S.C. § 1292(a)(1). As a result, this Court remains without the benefit of any "guidance" from the Court of Appeals in navigating the thorny legal issues that connect this action to the one

---

[8] *E.g.*, "And a whole lot of what's involved here is going to be substantially influenced by what happens in the Court of Appeals, isn't it? . . . I mean, why should I let anything happen in this case until we've got some resolution in the Court of Appeals . . . Well, I think my inclination is this: To stay this until we've gotten some assistance from the Court of Appeals. . . . " See Paper #19 at 16, 19, 20.

before Judge Tauro.  Plainly, neither concern has been allayed.  CI must explain why, suddenly, that fact should not matter to the filing of its motion.

In an attempt to explain, CI says that it deferred filing the motion until after settlement talks had been "cut short" in Judge Tauro's case.  See Paper #25 at 2-3.  This explanation cannot withstand scrutiny.  In the first place, the parties did not put in place a standstill agreement during their talks.  See Exhibit 8 hereto ¶ 7.  Secondly, in December 2005 CI's counsel offered to resume talks, and the parties did not commence substantive settlement talks until January 2006—over five months after CI filed its complaint in this action.  See id. ¶ 6.  CI had full freedom of action to file a motion like the present one.  See id.  Third, even assuming that the settlement talks did play a role in CI's supposed deferral, those talks ended on *February 24, 2006*.  See id.  In the following *four months*, CI did not bother to seek preliminary injunctive relief.  It did not do so because it knew perfectly well that nothing had altered in the *status quo* since last November, least of all anything that would address the concerns this Court expressed when it put the stay in place.

The real explanation for the timing of this motion is to be found elsewhere.  On June 9, 2006 CI received a letter from Quotium demanding payment of the €175,000 the Paris Court of Appeals has ordered CI to pay.  See Paper #24, Almeda Aff. Ex. D.  As stated in the letter, the money is unconditionally due and owing.  Id.  However, CI is withholding payment in an effort to leverage concessions from Quotium, including trying to force Quotium to adopt CI's own view as to the legal significance of the French judgments for CI's claims in this case.  See Paper #24, Almeda Aff. Ex. E.  Quotium's letter raised the possibility that Quotium would seek judicial recourse if the money were not paid.  See Paper #24, Almeda Aff. Ex. D.  Not coincidentally, *eleven days* after Quotium's letter was sent, CI's motion was filed.

This is why CI cannot justify the filing of this motion by reference to any change in the issues that were at the core of this Court's concerns last year when it put the stay in place. Under the circumstances, the rationale for the stay articulated by the Court last November remains entirely sound. The stay should remain in place and the motion should be denied.

### B.    *CI Has Learned Of No New Information That Would Justify Its Seeking To Lift The Stay Now*

CI has not identified any new information it has acquired since last November that would justify its need to file a motion at this time. CI certainly cannot cite the settlement talks to explain its failure to seek this preliminary relief *one year ago*, when it commenced the action on July 25, 2005. The infringement allegations about QuotiumPRO and QTest are pled in the complaint, and CI shows itself cognizant there of the need for preliminary relief for the alleged infringement. See, e.g., Paper # 1 ¶ 56 and Prayer for Relief 3(a). The French Commercial Court's 2004 judgment was known to CI at the time and is pled as the legal basis for CI's right to assert the infringement claim. Id. ¶¶ 36, 38. All the pieces were in place. Yet CI did not accompany the filing of the complaint with a motion for preliminary relief. The omission is all the more inexcusable in view of CI's long history of making infringement allegations, going back to CI's unsuccessful request for an injunction in *2002* in Judge Tauro's case.

At the November 3, 2005 hearing in this case, the Court showed itself willing to address a request for immediate relief before staying the action. See Paper #19 at 20 ("I don't hear anything in this case yet that requires immediate attention."), 22 ("…unless there's something that needs to be done now here.") Indeed, at the hearing CI's counsel himself raised the possibility of seeking such relief from this Court based on the Paris Court of Appeal's recent review of the Commercial Court's judgment concerning Test and Impact:

> Mr. Chow: I think one possibility in this is…the Paris Appeals Court—we might bring a motion on trying to enforce that specifically against current products.
>
> The Court: You mean enforce it here in this case?
>
> Mr. Chow: Yes. <u>See</u> Paper #19 at 19.

The motion Mr. Chow described hypothetically then is essentially the motion CI has filed only now, *eight months later*. However, at the time of the hearing, Mr. Chow did not ask for *any* relief, either when raising the possibility himself or when the Court expressed its willingness to entertain eleventh-hour requests before it put the stay in place.

In short, CI cannot provide a single plausible reason for why it should be excused for sleeping on its alleged rights for an entire year, only to be heard to complain later about irreparable harm. Under the circumstances, the stay should remain in place and the motion should be denied.[9]

### C.    *CI Is Still Seeking To Relitigate Judge Tauro's Case*

As Quotium demonstrated last year in its motion to dismiss, CI filed this action in order to relitigate the entirety of the action presently before Judge Tauro, an action in which it has suffered a default judgment and the dismissal with prejudice of all its counterclaims. <u>See</u> Paper # 12. Quotium laid out for the Court the overwhelming similarity between the allegations, claims, and prayers for relief found in this action and those found in CI's counterclaims before Judge Tauro. Quoting CI's own words, Quotium showed that, in CI's view, the French judgments it seeks to enforce here will enable it to defeat all of Quotium's claims in the related action while vindicating all of CI's own, dismissed counterclaims. <u>See</u> Paper #12 at 18. Finally, Quotium was able to demonstrate the inaccuracy of CI's assertion that Judge Tauro had

---

[9] The history of CI's highly erratic pursuit of injunctive relief for the supposed infringement of Test and Impact is set forth at greater length below, in rebuttal to the presumption of irreparable harm. <u>See infra</u> § II.A.

somehow authorized such an extraordinarily duplicative, wasteful piece of litigation.  See Paper

# 12 at 15-16, 18-20.

In order to deflect these criticisms, in its motion CI has focused on its Test and Impact

claims (Count II; old Count I of its dismissed counterclaims).  However, nothing in CI's

memorandum adequately addresses the concerns about claims-splitting and other issues raised by

this Court last year when CI first pled a right to enforce foreign judgments in support of its

claims, although the claims had been dismissed with prejudice by Judge Tauro and the *res*

*judicata* effect of the judgments lost through laches.

Last year the Court was concerned about the risks of acting before the related action in

front of Judge Tauro has achieved the repose of a final, determinative judgment:

> I'd like to stay this proceeding pending further developments...in the litigation
> before Judge Tauro….And enforcing a judgment from France seems to me to be
> an invitation to simply recreating the problems that are going to be sorted out in
> some fashion before Judge Tauro unless there's something that needs to be done
> now here.  See Paper # 19 at 22.

The Court's instinct to wait for entry of final judgment in this matter echoes Judge Tauro's own

view:

> Yet, as the French proceedings and rulings were not considered by this court
> when deciding Plaintiffs' motion for default judgment, this court's judgment does
> not reach the issue of whether Defendant may enforce its French judgments *after*
> *this litigation is ended.*  See QA Paper # 12, Ex. 9 at 14 (emphasis added).

The Court expressed also the "more global" concern that the Court of Appeals already

had jurisdiction over some issues through the § 1292(a)(1) appeal CI itself has taken and that

even after the case goes to final judgment, the whole of it was almost certain to end up on appeal.

See Paper 19# at 16, 19, 21.  When Mr. Chow pressed the Court on the issue of enforcing foreign

judgments, this "more global" concern came to the fore and the Court said:

> I don't know if I'm going to be one of those [to enforce them] or anyone else is.
> The Court of Appeals is probably going to be an "anyone else," but I'm not sure

> that I should be and I'm certainly not sure that I should be until I see what
> transpires in this case.  See Paper #19 at 22.

In short, the Court was understandably reluctant to enter orders in this case that may very well turn out to conflict with, or otherwise run afoul of, the final outcome of the first case as it leaves the hands of Judge Tauro or, later, the Court of Appeals.

CI has done nothing to allay the Court's concerns.  As Quotium demonstrated previously, no "special reasons" caused CI to be denied a "suitable opportunity" to present its Test and Impact infringement counterclaims in full in Judge Tauro's case.  See  Restatement (Second) of Judgments § 26 cmt. b (1982); 18 Wright & Miller, Federal Practice and Procedure § 4413 (2d ed. 1990).  When the brief passage from Judge Tauro on which CI relies is read *in context*, the interpretation for which CI advocates is seen to be implausible.  *See* Paper # 12 (Ex. 9 at 8-10, 11, 13).  See also Paper # 17 at 6-8.  In his decision, Judge Tauro found that CI's conduct in that action displayed willful and deliberate negligence, and he placed the responsibility squarely on CI for failing to timely inform him of the French judgments.  Judge Tauro says *nothing* about preserving *any* of CI's counterclaims, including for alleged infringement of Test and Impact (Count I).  CI quotes no finding of Judge Tauro anywhere that changes his Rule 41(b) dismissal with prejudice of CI's counterclaims to a dismissal *without* prejudice.  Finally, CI still cites no legal authorities as precedent for a party in CI's situation being allowed to litigate, in a second action against the same adversary in the same judicial district, a claim that its deliberate and willful negligence caused it to lose with prejudice in the first action.  See Semtek International Inc. v. Lockheed Martin Corp., 531 U.S. 497, 506 (2001) (Rule 41(b) dismissal with prejudice bars refiling same claim in court in same judicial district).  Yet, that is what CI continues to insist was done for its benefit by Judge Tauro.

In fact, when CI asked Judge Tauro to reconsider, *in light of the French judgments*, his dismissal of CI's counterclaims, he refused to do so, in the same opinion on which CI bases its argument.  See Paper # 12 (Ex. 9 at 12-13).  This fact alone should sound the death-knell to CI's argument that Judge Tauro intended to let CI resurrect those claims in a later action to enforce the French judgments.[10]

**D.    Regardless Of Their Enforceability, The French Rulings Do Not -- As CI Claims -- Establish Its Ownership Of The Copyrights In Test And Impact, And, In Any Event, The Products Are Largely Immaterial To CI's Motion**

Even assuming *arguendo* that CI obtains an enforcement of the French judgments in an American court, these judgments did *not* determine that CI is the owner of the intellectual property rights in Test and Impact, as CI inaccurately claims.  See Paper # 25 at 15 ("The Commercial Court had determined . . . that [CI] owns the copyrights in Test and Impact.").  CI grossly mischaracterizes the meaning and scope of the French rulings, which merely held that Test and Impact computer code placed in escrow during the CSA liquidation should be turned over to CI.   Under French law, the only portion of a French ruling that has *res judicata* effect is the *dispositif* of the decision, which is introduced by the formulaic phrase "*Par ces motifs*."  See App. Ex. 2 ¶ 11 (declaration of French Attorney Elisabeth Deflers).  Here, the *dispositif* of the Commercial Court's decision states, in pertinent part, as follows:

> As a first resort, the Court shall publicly and openly rule [as follows]: It orders that the software programs "CYRANO TEST" and "CYRANO IMPACT" that were kept under sequestration [in connection with the CSA liquidation], be returned to the company [CI].  See App. Ex. 2 ( Exs. A, B).

This ruling does not in any way determine that the intellectual property rights in Test and Impact are owned by CI, and should not therefore be given any *res judicata* effect to that end in an

---

[10] Judge Tauro's hypothetical statement about his order yielding to a later judgment, if any, merely reflects the general law of judgments, *i.e.*, of two inconsistent judgments, the later-entered controls the disposition of common claims and issues.  See 18 Wright and Miller, supra, Federal Practice & Procedure § 4404 (2nd ed. 1990); 18 Moore's Federal Practice § 131.31[3] (3d ed. 2002).  It will not bear the weight CI puts on it.

American Court.  See App. Ex. 2 ¶¶ 11-13, 15-16.  Moreover, although CI had asked the Commercial Court for a declaration that it owned the intellectual property rights in Test and Impact, the Commercial Court expressly dismissed all of CI's claims other than those granted in its *dispositif*.  See App. Ex. 2 ¶ 16.

The Commercial Court's dismissal of CI's claim of ownership of the rights in Test and Impact is final.  See App. Ex. 2 ¶ 17.  Although CI filed an appeal with the Court of Appeal in Paris in October 2005, CI did not appeal this part of the ruling.  Id.  Accordingly, far from supporting CI's claims here, the Commercial Court's dismissal of CI's claim of ownership of the rights in Test and Impact bars CI from asserting those claims elsewhere under the doctrine of *res judicata*.  Id.

CI's reliance on the October 2005 ruling by the Court of Appeal of Paris fares no better.  That ruling simply affirmed the Commercial Court's order transferring the sequestered software to CI.  See App. Ex. 2 ¶¶ 18-19, Exs. C, D.  It did not determine any intellectual property rights regarding Test and Impact.  Id.  Furthermore, the Court of Appeal also dismissed all other claims by CI other than those granted in its *dispositif*.  Id.  This ruling is final, as the time for appeal under French law has lapsed.  Id. ¶ 20.  Thus, even if CI were able to obtain enforcement of the French rulings here, these rulings would provide no *res judicata* support to CI's claim of ownership of the intellectual property rights in Test and Impact.  Id. ¶¶ 16, 19.  If anything, these decisions bar CI from asserting these claims here.  See Ex. 2 ¶ 17.

Furthermore, despite CI's lengthy discussion regarding its purported rights in Test and Impact, CI's infringement claim is really based upon its assertion of partial rights in OpenSTA, which CI claims "is based largely on Test and Impact."  See Paper # 25 at 8.  See also infra § II.C.  In particular, CI contends that Quotium products QuotiumPro and QTest derive from

OpenSTA, including the components of the product that CI claims to own. See Paper # 25 at 13-

14 ("QuotiumPRO was clearly developed by copying the source code of OpenSTA, and thereby

Test and Impact). Notwithstanding these contentions, the objective record demonstrates clearly

that OpenSTA is owned entirely by Quotium. See infra § II. Thus, regardless of CI's claimed

ownership of Test and Impact, its infringement claim cannot succeed. [11]

## II.    Even If This Court Reaches
         The Substance Of CI's Motion, It Should Be Denied
         Because It Does Not Meet The Preliminary Injunction Standard

This Court has the authority to order preliminary injunctive relief where the movant

establishes that (i) it has and will continue to suffer irreparable harm in the absence of a

preliminary injunction, (ii) is likely to succeed on the merits of its claims, (iii) the risk of

irreparable harm to the movant, in light of its chances of success, outweighs any harm that

granting injunctive relief may inflict on the non-movant, and (iv) the issuance of a preliminary

injunction is consistent with the public interest. Planned Parenthood League of Mass. V.

Bellotti, 641 F.2d 1006, 1009 (1st Cir. 1981). As demonstrated below, CI has failed to satisfy

any of the elements of this test.

### A.    The History Of CI's Conduct Undercuts Any Presumption
         That It Will Suffer Irreparable Harm In The Absence Of An Injunction

The presumption of irreparable harm that arises from alleged copyright infringement is a

rebuttable one. See, e.g., Robert J. Fritz, DMA, Inc. v. Arthur D. Little, Inc., 944 F. Supp. 95,

98-99 (D. Mass. 1996). In this case, when the presumption is tested against CI's conduct over

---

[11] CI erroneously argues that as a court sitting in diversity this Court should apply state law to determine the preclusive effect of a foreign judgment. See Paper #25 at 15. This is not a diversity action. CI and Quotium Technologies, Inc. are both citizens of Massachusetts for jurisdictional purposes. See Paper #1 ¶¶ 1 and 4. In light of the fact that this is a **federal question case**, this Court should determine the *res judicata* effect of a foreign judgment without reference to state law. See Wright & Miller § 4473 (in federal question cases, federal court routinely determine *res judicata* effect of foreign judgments without any reference to state law). In any case, the Massachusetts statute CI cites (M.G.L. c. 235 § 23A) applies only to enforcement of foreign money-judgments, not as here to enforcing a foreign judgment supposedly determining rights in personal property.

the history of its infringement allegations, it is revealed to be simply untenable. Again and again, CI has shown itself to be dilatory and erratic in seeking redress for its supposed irreparable harm.

CI first asserted its infringement claim concerning Test, Impact, and OpenSTA in the counterclaims it filed in Judge Tauro's case on August 19, 2002. QA Paper #6, ¶¶ 46, 47, 51. In the following months, CI moved for injunctive relief twice, each time alleging irreparable harm arising from the infringement. See QA Paper #12 at 19; QA Paper #25 at 15. After Judge Tauro denied both requests on December 16, 2002, CI had a right to interlocutory review of the denial under 28 U.S.C. § 1292(a)(1), but it failed to exercise the right. As the First Circuit has held, such a failure in and of itself indicates a lack of serious harm. See Anderson v. City of Boston, 244 F.3d 236, 239 (1st Cir. 2001) (failure to take § 1292(a)(1) appeal of denial of preliminary injunction "indicative of lack of serious harm"). Instead, CI filed an amended answer and counterclaims, in which it again asserted that Quotium's alleged infringement of Test and Impact were causing it irreparable harm. See Paper #38 ¶¶ 54, 58.

CI then turned its attention to trying to obtain summary judgment on the Test infringement claim. Shortly after Judge Tauro denied that request on January 13, 2004, CI simply ceased participating in the litigation and thus *abandoned its prosecution of the Test and Impact infringement claims*. Notwithstanding the supposed irreparable harm caused by the alleged infringement, CI's neglect of its claims continued for almost a year. As a result, in February 2005 Judge Tauro dismissed its counterclaims, including those regarding Test, Impact, and OpenSTA, for want of prosecution and disobedience of court orders. Around this time, CI resurfaced with new counsel and could have sought interlocutory review of the order of dismissal on the grounds that it implicated a denial of injunctive relief and caused irreparable harm. See

Carson v. American Brands, 450 U.S. 79, 84 (1981) (permitting interlocutory appeal of order having practical effect of denying injunction and causing "irreparable consequences"). But for a second time CI failed to assert its right to a § 1292(a)(1) review, again signaling a "lack of serious harm." See Anderson, supra. When, *several months later*, in June 2005, CI filed a sort of omnibus interlocutory appeal from virtually every order Judge Tauro had issued since the 2004 entry of default, including the order dismissing the Test and Impact infringement counterclaims, CI quickly nullified even this tardy remedy for its supposed irreparable harm. Instead of filing a brief in pursuit of appellate relief, in November 2005 CI *filed for a stay of the appeal*. What CI told the Court of Appeals in support of its motion is revealing:

> As grounds for this request, [CI] states that the current posture of the controversy, parts of which are pending before this and three other tribunal…as well as [CI's] change of its corporate name [to Vedant Incorporated], make it most efficient to wait for the final judgment of the district court, rather than to litigate now the interlocutory injunction . . . and later relitigate similar issues should a final judgment enter during the appeal.
>
> \*\*\*
>
> Because [CI's] compliance with Judge Tauro's interlocutory injunction has made the *immediacy of the appeal unnecessary*, [CI] believes that the more prudent course with regard to its appeal is to await a determination of damages in the matter before Judge Tauro so that the entire appeal . . . may be briefed, argued, and considered once, rather than piecemeal. See App. Ex. 16 at 1, 4 (emphasis added).

As this passage indicates, CI's real concern in taking the appeal lay in having to change its corporate name and comply in other ways with Judge Tauro's injunction forbidding it to use the Cyrano trademark. Having complied with the injunction by this time in November, CI deemed "the immediacy of the appeal unnecessary."[12] CI was therefore perfectly willing to stay the appeal, although this meant foregoing, *yet again*, interlocutory review of an order implicating

---

[12] Only ten days earlier Mr. Chow had told this Court: "Because we have changed our name, some of what we consider to be the damage from the injunction has occurred. We're not going to change our name back. So, to some extent, the appeal has—some of it has been mooted as Your Honor recognizes." See Paper #19 at 20.

a denial of injunctive relief and supposed irreparable harm (*i.e.*, the order dismissing its Test, Impact, and OpenSTA infringement counterclaims). See Anderson, supra at 238-239 (order dismissing claims is subject to interlocutory review when involving both denial of injunctive relief and serious harm). In fact, a few days earlier Mr. Chow had even expressed to this Court CI's willingness to consider the option of simply *dropping the appeal altogether*. See Paper #19 at 20-21. This is not how a party behaves when it truly believes itself to be suffering irreparable harm.

Meanwhile, CI had brought the *same* claims relating to Test, Impact, and OpenSTA into this Court on July 25, 2005, when it commenced the present action. It again pled irreparable harm caused by the alleged infringement, and it claimed an entitlement to preliminary relief. See Paper #1 ¶¶ 48, 56, and Prayer for Relief 3(a). Yet it failed to move for any preliminary relief at the time of commencing the action. In fact, shortly before moving to stay its appeal in the Court of Appeals, CI agreed to a *stay of this action too*, including of its Test, Impact, and OpenSTA claims. CI did so despite a clear invitation from the Court to speak up if CI wanted any form of immediate relief. See Paper# 19 at 20 ("I don't hear anything in this case yet that requires immediate attention."), 22 ("…unless there's something that needs to be done now here"). Although, only moments before, Mr. Chow had mentioned to the Court the possibility of CI's bringing a motion *identical to the present one*, Paper #19 at 19, Mr. Chow chose *not* to take up the Court's offer to consider anything "that needs to be done now here." As a result, this Court, too, entered a stay.

In summary, for more than *three and a half years* and in *three courts*, CI has pursued its infringement claims only in the most desultory, hit-or-miss fashion. CI failed to seek timely preliminary relief, even though fully believing in the merits of its infringement claim, at any time

from eight to twelve months ago in this Court. <u>Contrast Forry, Inc. v. Neundorfer, Inc.</u>, 837 F.2d

259, 267 (6th Cir. 1988) (delay excusable because of need to investigate alleged infringement);

<u>Montblanc-Simplo, GMBH v. Staples, Inc.</u>, 172 F. Supp. 2d 231, 248 (D. Mass. 2001) (in

trademark action, modest delay excused by good faith effort to investigate alleged infringement).

When it did seek such relief and was denied it, it failed to pursue interlocutory review, as

happened three and a half years ago before Judge Tauro. When it did seek interlocutory review,

it undermined this means of relief by asking for and obtaining a stay, as it did last year in the

Court of Appeals. And for nearly a full year it altogether abandoned the prosecution of the Test,

Impact, and OpenSTA infringement claims at a time when it still had them. Action speaks

louder than words, and CI has repeatedly failed to follow up its allegations of irreparable harm

with any sustained, concrete course of action that could secure it an actual remedy. CI has cried

wolf too often to be believed now.

### B.    The Balance of Harms Is Strongly In Favor of Quotium

"[A] court's findings regarding likelihood of success in a copyright action, as in other

actions … should be placed in the scales when it weighs the balance of the harms." <u>Concrete

Machinery Co., Inc. v. Classic Lawn Ornaments, Inc.</u>, 843 F.2d 600, 612 (1st Cir. 1988) (citation

omitted). Doing so "allows consideration of relative hardships to be a significant, and perhaps

determinative, factor when the defendant has shown it may suffer significant harm and the

plaintiff has made only a marginal showing of likelihood of success." <u>Id</u>.

As Quotium demonstrated last year and has reiterated above, there is a substantial

likelihood that CI may not even be able to maintain this action, let alone prevail on the merits of

this particular claim. In addition, Quotium has set forth below compelling reasons for

concluding that CI has little likelihood of success on the merits of the claim anyway. <u>See infra</u> §

C.  Under these circumstances, where "the plaintiff has made only a marginal showing of likelihood of success," id., the balance of harms inclines favorably to Quotium for several reasons.

First, as attested by Hubert deLacvivier, the General Manager and Director of Quotium Technologies, Inc., the QTest product not only accounts for over 80% of sales revenue for Quotium Technologies, S.A. and Quotium Technologies, Inc., but also stands as the "centerpiece" of Quotium's marketing strategy.  See App. Ex. 1 ¶ 12.  Loss of the ability to market such a product would cause, as Mr. de Lacvivier states, severe damage to Quotium's reputation that would not be easily quantifiable.  See id.  As such, the harm caused by enjoining Quotium's sale of QTest goes well beyond simple loss of profits, for which Quotium could later be compensated, and would be irreparable.

By contrast, Quotium has already shown that the irreparable harm CI would presumptively suffer in the absence of an injunction is a chimera.  Its own conduct, in this action and in the related action, belies the claimed harm.  Moreover, little credence should be given to CI's vague account of the harms it has allegedly already suffered, e.g., a decline in workforce from 35 to 10.  See Paper #24 (Ex. 2, ¶ 37).  Mr. Almeda and CI have given too many accounts of this to be credible.  At the damages trial in front of Judge Tauro, a former CI employee (Alberto Saynes) testified that he worked for CI from October 2001 to July 2002.  Within the first several weeks of his employment in 2001, layoffs reduced the workforce from 35 to 10, a number it remained at through July 2002, when he left.  See App. Ex. 3 at 19-20, Exhibit 9 hereto (attaching page 20 from damages trial transcript).  By contrast, Almeda has testified variously that product confusion caused by Quotium in 2003-2004 caused the numbers to drop from 35 to 9 and that confusion caused by Quotium in 2002-2004 caused the numbers to drop

from 35 to 9, while CI's Complaint alleges that product confusion in <u>2002-2003</u> caused the

numbers to drop from 35 to 9.  <u>See</u> App. Ex. 14 ¶¶ 13-14; <u>See</u> App. Ex. 15 ¶¶ 7-8; Paper #1 ¶ 18.

In a first attempt to get around Saynes' testimony that the numbers hit bottom by late 2001

(<u>before</u> any supposed confusion allegedly caused by Quotium), Almeda testified that after initial

losses, CI's workforce "went up to about 25 . . . near the end of 2003" and that <u>25</u> was the

highest number it went to.  <u>See</u> App. Ex. 3 at 50.  When Almeda was questioned by CI's own

lawyer, CI experienced another job spurt, with Almeda testifying that the headcount stood at a

high of <u>25-38</u> in 2003 and that the drop occurred in 2003-2004.  <u>Id</u>. at 153.  By contrast, the

Complaint alleges that Quotium had <u>reduced</u> CI to a "fraction of its former size" <u>by 2003</u>.  Paper

#1 ¶18.  We now have three start dates for the reduction (2001, 2002, 2003), two terminal dates

for the reduction (2003 and 2004), and a date (2003) which is simultaneously the date for peak

workforce size, for the nadir of workforce size, and is a mere transition date for reductions in

workforce size.  It is no wonder that in Almeda's most recent testimony, he seeks refuge in

vagueness about the dates of the supposed losses.  We also have two numbers from him for

minimum workforce size (9 and 10) and three for maximum size (35, 25, 25-38).  None of this

merits credence in weighing the harms.

    For the reasons given here, the Court should find that the balance of harms tilts decisively

against granting an injunction.[13]

---

[13] Where the moving party shows a likelihood of success on the merits, it may be presumed that granting an injunction to protect a party from alleged copyright infringement is in the public interest.  <u>See Concrete Machinery Co., Inc. v. Classic Lawn Ornaments, Inc.</u>  843 F.2d 600, 612 (1st Cir. 1988).  CI does not enjoy this presumption here because, as shown by Quotium elsewhere in this brief, CI cannot maintain an action founded on claims previously dismissed with prejudice by the district court and CI does not own the copyrights in question.  Under the circumstances, the public interest would <u>not</u> be served by enjoining the likely lawful owner of the copyrights at the request of a party still unable to set the Court's mind at peace that the party even has a right to bring the action in the first place.

**C.    This Motion Should Be Denied Because
CI Has Not Shown A Likelihood Of Success On The Merits Of Its Claims**

The main issue before the Court in regard to the merits of the instant motion is whether

CI is likely to succeed in demonstrating that QutoiumPro and QTest (essentially identical

products, App. Ex. 1 ¶ 8) infringe on the *partial* rights that CI claims to have in OpenSTA.  (CI

concedes that the remaining rights in OpenSTA are owned by Quotium.)  To be clear, Test and

Impact matter only insofar as source code from these products contained in OpenSTA is deemed

to be a discrete, copyrightable work owned by CI that is infringed by Quotium's products.  <u>See</u>

Paper # 25 at 13-14 ("QuotiumPRO was clearly developed by copying the source code of

OpenSTA, and thereby Test and Impact); App. Ex. 1 ¶ 13 (neither ***QuotiumPro nor QTest***

***compete with Test and Impact***).

Tellingly, the following discussion in regard to OpenSTA is taken largely from the

parties' submissions made in connection with CI's virtually identical motion denied by Judge

Tauro in 2002, and to a lesser extent from the summary judgment proceedings where Judge

Tauro denied CI's request for a ruling that it owns Test.  As is clear from this record, CI does not

dispute that the CSA Transfer Agreement transferred to Quotium all of the intellectual property

rights in OpenSTA that were owned by CSA.  The only material dispute is whether CSA actually

owned *all* of the intellectual property rights in OpenSTA at the time of that transaction.  The

objective evidence before the Court demonstrates that CSA did in fact own all of the rights in

OpenSTA.  Accordingly, CI cannot demonstrate ownership of any part of OpenSTA and cannot

possibly succeed on the merits of its copyright infringement claim.  <u>Concrete Mach. Co. v.</u>

<u>Classic Lawn Ornaments, Inc.</u>, 843 F.2d 600, 605 (1st Cir. 1988), <u>aff'd</u>, 867 F.2d 606 (1st Cir.

1988) (prima facie case of copyright infringement requires proof of ownership of valid copyright

and copying of the work by defendant); Keds Corp. v. Renee Int'l Trading Corp., 888 F.2d 215, 220 (1st Cir. 1989).

> ### (i)    CSA Controlled CUK And CI, Which Operated As Regional Offices Of CSA, Until CSA's Bankruptcy In Fall 2001

Although CI's affiants (both in the Quotium Action and here) repeat in a mantra like fashion that CI and CUK became "affiliated" with CSA in 1996, the truth of the matter is that, at all times from October 3, 1996 until the liquidation of CSA, CI and CUK were wholly-owned subsidiaries of, and were controlled completely, by CSA. The Cyrano name was adopted by all three entities when a French company named IMM -- founded in 1989 by Denis Bitan, among others -- acquired all of the outstanding stock in a UK company known as Performance Software, Ltd. ("Performance") and merged the operations of Performance into those of IMM (the "IMM-Performance Merger"). See App. Ex. 5 (Ex. M at 3, 6, 69 and F-8). Performance entered this transaction with its US subsidiary named Performance, Inc. Id.; see also App. Ex. 9 ¶ 3. Upon consummation of the IMM-Performance Merger, IMM changed its name to Cyrano, S.A. ("CSA"), Performance changed its name to Cyrano UK ("CUK"), and Performance, Inc. became Cyrano, Inc. ("CI"). See App. Ex. 5 (Ex. M at 3 and F-8).

Under the UK Corporations Act, a wholly-owned subsidiary is considered to be controlled by its parent and must, therefore, report not only its own financial results, but those of its parent and all other entities controlled by its parent. See Dennis Keenan, Smith and Keenan's Company Law, (7th Ed. 1989) (attached hereto at Exhibit 3). And as a matter of fact, CSA exercised substantial control over CUK and CI until its liquidation. Furthermore, regardless of whether or not CSA and CUK ever technically merged, CSA and its wholly-owned subsidiaries -- including, inter alia, CUK and CI -- operated for all intents and purposes as a single, unified entity until CSA and CUK were both placed in liquidation in Fall 2001.

CSA maintained firm control over its subsidiaries through interlocking the Boards of Directors and senior management.  For example,

- Philippe Eyries was Chairman of all three companies from October 1996 through June 2000.  See 2002 Eyr. Aff. ¶ 2.  Eyries, a co-founder of IMM, also served as Chief Technical Officer of CSA from October 1996 until 2001 and its Chief Executive Officer ("CEO") from 1997 through June 2000.  See App. Ex. 5 (Ex. M at 60); App. Ex. 13.

- Robert Ernens was Chairman of CSA, CUK and CI from July 2000 until at least September 2001, and served as CEO of both CSA and CI throughout that time as well.  See App. Ex. 12 ¶ 2; App. Ex. 13.

- CSA and CUK had the same Chief Financial Officer, Martin Greenbank, from October 1996 until at least as early as 1998.  See App. Ex. 5 (Ex. M at 60, Ex. Z).

- Denis Bitan was the Managing Director of CSA, CUK, and CI from 1998 until at least Fall 2001 and was also CSA's Chief Financial Officer throughout that time.  See App. Ex. 9 ¶¶ 2, 8;  See App. Ex. 13.

CSA's control of the strategy and operations of CUK and CI is documented in, among other objective evidence, the Registration Statement CSA filed in December 1997 with the SEC in anticipation of a possible public offering of CSA securities through NASDAQ.  Notably, one of CI's key affiants in the Quotium Action, Denis Bitan, was admittedly responsible for orchestrating that effort.  See App. Ex. 9 ¶ 8; App. Ex. 10 ¶¶ 1, 6.  In the Registration Statement, CSA stated that "*[s]ince merging the businesses of IMM and Performance Software, the Company has pursued a strategy of growth through acquisitions and expansion of its existing business*."  See App. Ex. 5 (Ex. M at 6) (emphasis added).

The *de facto* "merging" and "combination" of CUK's business and products with those of CSA is further reflected by the manner in which the Cyrano companies -- including CI itself -- routinely identified CSA, CUK and CI in press releases and other public statements.  Such documents consistently referred to CSA under its trademark "Cyrano®" and characterized CUK and CI as the company's "regional headquarters."  See, e.g., See App. Ex. 5 (Exs. T, Z).  CI's

contention that CSA and CUK were "legally independent" is also discredited by a press release

that CI itself issued on October 1, 1996 announcing the IMM-Performance Merger.  Announcing

the transaction from its offices in Newburyport, CI issued a press release that day entitled "***IMM***

***and Performance Software Merge to Form New Company, CYRANO Corp***."  (Emphasis

added.)  The text of the document states in relevant part:

> IMM and Performance Software jointly announced today that the shareholders of
> both companies have approved the full acquisition of Performance Software by
> IMM and ***the merger agreement combining the two companies to create the
> leader in the emerging client/server application performance testing market***.
>
> The newly combined company, to be called CYRANO Corp., will be the
> strongest new challenger in the fast-growing Automated Software Quality (ASQ)
> software market.  The merger is effective October 1, 1996.  <u>See</u> App. Ex. 5 (Ex.
> Z) (emphasis added).

The press release also stated that Philippe Eyries, IMM's co-founder and former CEO

and Chairman of CSA, would serve as Chief Technology Officer for the combined entity.  <u>Id.</u>

Eyries is quoted in the press release saying "[o]ur ***combined R&D resources*** will help us to

continue to offer leading ASQ products and ***provide timely and meaningful product integration***

. . . ." <u>Id.</u> (Emphasis added.)

Consistent with a business strategy of coordinated product research and development by

employees of both CSA and CUK under the direction of a single CTO, the Registration

Statement describes the "Product Strategy" of CSA and its subsidiaries as follows: "***The***

***Company's product strategy is to provide a comprehensive, integrated suite of environment-***

***specific products*** to meet a broad range of testing needs to support and secure information

system change management." <u>See</u> App. Ex. 5 (Ex. M at 46).  The same document describes the

CYRANO Suite of products being marketed by CSA and its subsidiaries at the time -- which

included Test -- as "an ***integrated set*** of ASQ tools." <u>Id.</u>  Obviously, neither historic nor future

integration of products developed by CSA and CUK employees would be achievable if CSA and CUK were independently developing their own separate software products using their own separate research and development teams, as CI asks this Court to believe.  See Paper #25 at 5.

CSA's coordination and control of CUK's product development is further established in a document dated June 10, 1998 and entitled "Initial Public Offering of shares on the Nouveau Marche of the Paris Bourse."  This document describes the research and development employees of CSA and CUK collectively as a single "*R&D department*" -- not departments -- consisting of "*21 people in France and 13 in the UK, representing a total staff of 34.*"  See App. Ex. 13 (CYR at 03545) (emphasis added).

### (ii)    *OpenSTA Was Developed By CSA's R&D Staff In France, And Was First Announced To The Public As A Product And Trademark Of CSA*

In December 1999, three years before CSA's liquidation, CSA's then-Chairman and CEO, Phillipe Eyries, directed the head of CSA's Research and Development, Phillipe Villame, to lead and direct the development of a web-server load testing tool for release by June 2000. The project was initially called "Concert," and later re-named OpenSTA.  See App. Ex. 6 ¶ 6. Villame directed a team of eight developers -- half of whom were from CSA's R&D staff in Paris, and half from CUK's R&D unit in England -- in the design and development of the Concert product.  Id. ¶ 8.  For purposes of this project, Villame reported directly to Eyries, and all CUK developers assigned to the project, including the head of CUK's R&D team, Geoff Hall, were under the direction of Mr. Villame.  Villame ran the project until September 2000, just as OpenSTA was about to be released to the public as an "Open Source" product under the General Public License ("GPL").  Id. ¶ 7.  He was succeeded as head of the project by Dale Benedict until her departure from the company in December 2000.  Id. ¶ 23.  It was only at that point that Mr. Hall, the head of CUK R&D unit, was put in charge of the product, and Mr. Hall continued to

report to CSA's senior management in regard to the strategic direction of the project, just as his two predecessors had done. Id.

Of the four major components that go into OpenSTA -- the capture, modeler, injector, and test architecture components -- the first three were developed by members of CSA's R&D staff in France. Id. ¶¶ 13-14. CSA developers also assisted in the development of the test architecture that went into OpenSTA, and CSA's head of R&D directed the development of the Graphical User Interface ("GUI") for the product. As Mr. Cante explains in his declaration and supports through reference to CI's own www.opensta.com website, the most important and valuable aspects of OpenSTA came from developers employed by CSA in France who, like the developers on the project from CUK, worked under leadership and control of Mr. Villame. Id. ¶¶ 13-17, Ex. A.

On September 12, 2000, a CSA press release announced the development of OpenSTA and its forthcoming release under the GPL. See App. Ex. 5 (Ex. T). Ernens -- who succeeded Eyries as Chairman and CEO of CSA, CUK, and CI -- is quoted therein stating: "*At Cyrano . . . we are proud to offer our brand new Web load testing technology as a free software*." (Emphasis added.) The press release also stated that "*OpenSTA is a trademark of Cyrano[.]*." Id. (Emphasis in original). The press release *defined "Cyrano" in terms applicable only to CSA, describing it as a "public company listed on the . . . Paris Bourse" that was "[f]ormed in 1989" and is "headquartered in Paris, France with regional headquarters in the UK and USA*." Id. (Emphasis added.)

### (iii) CSA's Managing Director (Also A CI Insider And Affiant) Registered OpenSTA With The Agency For The Protection Of Programs, Swearing Under Oath That It Is An Original Work Of CSA

Shortly following the September 2000 press release, Bitan registered OpenSTA with the APP in Paris, making the following sworn statement to the Agency: "*I, the undersigned, Denis*

***Bitan, declare on my honor that the work for which I request a certificate of the APP***

***[OpenSTA version 0.9.1] is an original work of Cyrano, S.A***." See App. Ex. 5 (I at 98,

translated at Ex. J at 98 and 52). Bitan expressly made this declaration on behalf of CSA as its

Secretary General. Id.

#### (iv)    *OpenSTA Was Licensed By CSA*
#### *Pursuant To The International Distributor Agreement*

As further evidence of CSA's ownership of the intellectual property rights in OpenSTA,

the only Cyrano entity (or, for that matter, party) that has ever granted a license to use OpenSTA

is CSA. CSA marketed its software through a license agreement -- the International Distributor

Agreement (the "Distributor Agreement") -- that it entered into with its wholly-owned

subsidiaries, including, *inter alia*, CUK and CI at the time. On August 31, 2000, shortly before

the announcement and release of OpenSTA, Ernens and Bitan executed the "First Amendment"

to the Distributor Agreement between CSA and CI. See App. Ex. 5 (Ex. Y, 1st Am.). Bitan --

Managing Director of CSA, CUK and CI -- executed the amendment on behalf of CSA, and

Ernens -- CEO of CSA, CUK and CI -- executed it on behalf of CI. Id. Among other things, this

amendment expanded the licensed products covered by the Distributor Agreement to also include

OpenSTA and its associated modules as they become available. Id.[14]

---

[14] Quotium has at all times held the position that the First Amendment (as well as a subsequent Second Amendment executed by Ernens and Bitan on April 9, 2001, less than two months before CSA declared bankruptcy) were a fraudulent device to siphon critical assets out of CSA, a publicly-traded parent company, and hide them in CI, its U.S. subsidiary, as CSA was spiraling toward bankruptcy. Without the provision of any consideration whatsoever to CSA -- Ernens and Bitan, CSA/CI fiduciaries and insiders acting on both sides of the transactions -- grossly expanded the scope of the purported license granted to CI and did not obtain the required approvals under French law. Nevertheless, given CI's attempts to enforce the Distributor Agreement against Quotium, in the Quotium Action and here, it is notable that the agreement itself undermines CI's claim for infringement.

### D. Under French Law, The Rights In OpenSTA Are Deemed To Have Been Owned By CSA And, Thus, Transferred To Quotium

As a piece of computer software, OpenSTA is entitled to protection under French copyright law.[15] 1 Paul E. Geller & Melville B. Nimmer, International Copyright Law and Practice, § 2[4][d] (2005) (computer programs and related documentation are subject to protection under French law).

Specifically, under French law, OpenSTA would be deemed protected as a collective work owned by CSA. Similar to the "work-for-hire" provision of the U.S. Copyright Act, 17 U.S.C. § 201(b) (2002), under French law, "[a]bsent contractual provisions to the contrary, economic rights[16] in computer programs . . . created by one or a number of employees in the exercise of their functions or pursuant to the instructions of their employer belong to the employer, who alone may exercise them." Id. § 4[1][b][ii][C] (quoting Article L.113-9 of the French I.P. Code). French law recognizes the following three types of joint works: (1) collaborative works; (2) composite works; and (3) collective works. Id. § 4[1][a]. A collective work has three requirements: (i) the work must be created at the initiative of a single principal, either a natural person or legal entity; (ii) the principal must reproduce, divulge, and publish the work under its own direction and name; and (iii) the personal contributions of diverse authors must be "fused together into the totality arising out of [the principal's] original conception,

---

[15] It is uncontested that OpenSTA was created abroad, although the parties dispute whether it was substantially created in the UK or France. It is also undisputed that, when the ownership of a copyright is at issue, the Court should apply the law of the country with the most significant relationship to the property and the parties. See Paper # 19 at 19; Itar-Tass Russian News Agency v. Russian Kurier, Inc., 153 F.3d 82, 90 (2d Cir. 1998) ("[c]opyright is a form of property, and the usual rule is that the interests of the parties in property are determined by the law of the state with the most significant relationship to the property and the parties."). Because, as set forth below, OpenSTA was created by French nationals and first published in France, ownership of OpenSTA must be determined under French law. Itar-Tass, 153 F.3d at 90 (Russian law governed copyright ownership because works at issue were created by Russian nationals and first published in Russia).

[16] In France, there is a distinction between "economic rights," which can be transferred, and "moral rights," which may continue to reside with the author. The moral rights to OpenSTA are not relevant here.

without it being possible to attribute each of said authors a distinct right in the total [work] produced." Id., § 4[1][b][i][A] (quoting Article L. 113-2 of the French I.P. Code).

As shown below, OpenSTA meets all three requirements to establish it as a collective work owned by CSA under French law.

### (i)    The Development of OpenSTA Was Initiated And Controlled By CSA

As evidenced above (see supra § __), OpenSTA was created at the initiative of, and controlled by, CSA.  At the time of creation of OpenSTA, CUK was a wholly-owned subsidiary of CSA operating under its control, and CSA was the driving force behind development of OpenSTA.  The testimony of CI's affiants that CSA's subsidiaries operated independently is thoroughly discredited by the many public documents demonstrating CSA's control over CUK and CI, and the merging of operations following the IMM-Performance Merger in 1996.  See supra § C.  Among other objective evidence of the control CSA exerted over CUK -- including press releases describing CUK and CI as CSA's regional offices and the almost complete overlap of CSA, CUK and CI management -- is a declaration filed with the Commercial Court by Ernens attaching a letter from the Bankruptcy Trustee, Regis Valliot, to Ernens.  See App. Ex. 5 (Ex. DD).  Mr. Valliot's letter recounts that Ernens himself explained that CSA "*controls*" both its US and UK affiliates.  Id. ("*You shared with me the difficulties faced by the company, CYRANO, listed on the new market*, *which controls an affiliate in the United States and an affiliate in the United Kingdom* and which you have chaired since July 2000") (emphasis added).  Furthermore, in executing this declaration -- entitled the Declaration of Cessation of Payments -- Ernens attested to the Commercial Court "that this document, as well as the documents enclosed, are sincere and true."  Id. at TECH 000304

- 36 -

It is also clear that CSA exercised direct control over the OpenSTA project and unilaterally made the most important strategic decisions during the development effort.  See supra at __.  CI's own prior affiants have conceded critical facts demonstrating this.  For instance, Eyries, CSA's Chairman and CEO, testified in the Quotium Action that "***prior to my leaving the Cyrano companies in June 2000, I decided to convert Concert into an open source product, which became OpenSTA***.  I appointed Dan Sutcliffe and Noelle Beaudin of Cyrano US project managers of OpenSTA and Geoff Hall of Cyrano UK the development manager of OpenSTA . . . ."  See App. Ex. 11 ¶ 12 (emphasis added).  Ernens also testified in the Quotium Action that the decision to convert Concert into an open source product was made by the "Directors of the Cyrano Companies," which is simply a transparent attempt to conceal the fact that CSA made this decision.  See App. Ex. 12 ¶ 3.  As noted by the Bankruptcy Declaration signed by Ernens, it was his own pre-litigation view that CSA controlled its wholly-owned subsidiary, CUK.  Finally, CI has never disputed, in the Quotium Action or here, Quotium's evidence that CSA set the timetable for the development of OpenSTA.

### (ii)    CSA Reproduced, Divulged, And Published OpenSTA Under Its Own Direction And Name

CSA first published OpenSTA in France and has, at all times, acted as the owner of all of the intellectual property rights in the product, entitling it to a presumption under French law that it organized the creation of OpenSTA.  See 1 Geller, supra, § 4[1][b][i][A] ("an enterprise exploiting a work with the traits of a collective work" is entitled to the presumption that it organized the creation of that work under French law).  This is evidenced by, *inter alia*, Bitan's sworn declaration to the APP that OpenSTA is "***an original work of Cyrano, S.A.***," as well as by

CSA's power to grant a license to CI for OpenSTA, and the other public representations and press releases by CSA officials announcing OpenSTA as a product of CSA.[17]

### (iii)    The CSA And CUK Contributions To OpenSTA Were Fused Together Into A Single, Non-Distinct Work

Because the personal contributions of diverse authors, employees of CSA and of CUK, are fused together into a single work -- OpenSTA -- conceived by CSA, OpenSTA also meets the third prong of the test used to determine whether a work is a collective work under French law. This requirement is met whenever it is seemingly impossible to disentangle various contributions. 1 Geller, supra, § 4[1][b][i][A]. OpenSTA is a fully-integrated solution in which the different technologies work together in an integrated fashion toward a common goal. See supra § II.C. As explained by Oliveir Cante, a former CSA employee, OpenSTA comprises four fully-integrated technologies -- capture, modeling, injection and test architecture -- the first three of which were created in their entirety by CSA's R&D staff in Paris and all of which are necessary for OpenSTA's operation. See supra § II.C.

CI makes several attempts to characterize OpenSTA as anything but the unified, integrated work that it is. The company's long-standing legal counsel in England -- Dr. Brian Bandey -- goes so far as to rename the product "UK/US" OpenSTA in a transparent attempt to distinguish it from the OpenSTA product acquired by Quotium in the CSA liquidation. See

---

[17] It is also important to note that Bitan cannily made no mention in his initial affidavit in the Quotium Action of the APP declaration he filed in Paris. After Quotium pointed out this omission to Judge Tauro, Bitan responded by claiming that he filed the APP Certificate in the name of CSA in error, without the advice of counsel. See App. Ex. 10 ¶ 7. Given (i) the importance of OpenSTA, (ii) Dr. Bandey's sworn statements that he has represented all of the Cyrano (and predecessor) companies since 1989 in connection with intellectual property law matters, (iii) Bitan's vast experience as founder in 1989 of CSA's predecessor, IMM, and his eleven years of experience from that time until the filing of the APP application in 2000 as an Officer, Director, and/or major shareholder of IMM, CSA, and CSA's numerous subsidiaries, (iv) the clear language of the request in the APP Certificate, and (v) Bitan's obvious incentive to undermine the unequivocal attestation in that document, his claim of naiveté in regard to the significance of his sworn declaration to the APP is simply not credible. CI fails again to mention this issue in this Court and has failed to re-file any of Bitan's affidavits.

Paper #5-9. The problem with this effort is that "UK/US" OpenSTA is a figment of Dr. Bandey's legal imagination. Never in Dr. Bandey's long representation of the Cyrano companies did he or any of his clients ever make mention of a so-called "UK/US" OpenSTA, at least not until their dispute with Quotium over CSA's assets. It also bears repeating that the CUK Transfer Agreement -- the document that supposedly confers on CI its rights in "UK/US" OpenSTA -- does not even mention OpenSTA, let alone "UK/US" OpenSTA. See supra § II.C. In stark contrast, the CSA Transfer Agreement, transfers all of CSA's intellectual property rights in OpenSTA to Quotium by naming OpenSTA expressly.

Finally, all of the objective pre-litigation evidence before the Court describe OpenSTA in terms of a single, non-distinct work of CSA. One of the many places where this is most evident is in the license for OpenSTA that *CSA* grants under the First Amendment to the Distributor Agreement executed by CI's own affiants, Bitan and Ernens, just before OpenSTA was first released. See supra § II.C. That document makes no distinction between the discrete components of OpenSTA that supposedly were owned by CUK, on the one hand, and by CSA, on the other hand. Rather, it treats OpenSTA as a single product and CSA as the owner and licensor of all of the intellectual property rights in OpenSTA. See App. Ex. 5 Ex. Y, 1st Am. Bearing in mind that CSA also marketed OpenSTA directly, if CI's litigation-version of history were true and CSA and CUK merely granted one another licenses to their respective rights in OpenSTA, then one would expect, at a minimum, the Distributor Agreement to reflect this arrangement in some fashion. It does not. One would also expect the existence of a "reciprocal" agreement licensing "UK/US" OpenSTA to CSA. Tellingly, no such license existed.[18]

---

[18] Furthermore, to the extent CI claims that only a limited, revocable implied license between CUK and CSA existed regarding the use of code from Test or Impact in the development of OpenSTA, CI has no logical basis to support its assertion. CI ignores the fact that CUK was a wholly-owned subsidiary of CSA. Given the amount of effort and initiative CSA put into the development of OpenSTA and the fact that it registered the product in its own name,

The bottom line is that the only party demonstrated to ever have the power to grant a license in OpenSTA was CSA. The explanation for this, of course, is the simple fact that -- in Bitan's own words -- OpenSTA is "***an original work" of CSA***, which owned all of the intellectual property rights in the product at the time they were transferred to Quotium. [19]

For all of the forgoing reasons, the record before the Court demonstrates that CI cannot show a likelihood of success on the merits of its claims.

### E.    CI Also Cannot Demonstrate Ownership Of OpenSTA Under English Law

Under English law, initial ownership of a work belongs to the author, and copyright in a work of joint authorship is held by all of its co-authors. See 2 Geller, supra, §§ 4[1] and 4[1][a]. A work is one of joint authorship if (1) it is produced by the collaboration of two or more co-authors; and (2) their contributions are not "distinct" from each other. Id. § 4[1][a][i]. These requirements are very similar to those of collective works under French law and OpenSTA meets both of them.

First, OpenSTA was produced by the collaboration of two or more authors -- CSA's R&D staff in France and CUK's R&D staff in England. Specifically, under English law the condition of collaboration requires that the work have been created "in prosecution of a

---

rather than as a joint work with its wholly-owned subsidiary, the most logical inference, assuming *arguendo* the accuracy of CI's argument, is that the parent company intended for the wholly-owned subsidiary to receive an *irrevocable* license to use any Test of Impact code in OpenSTA for the purpose of further developing that product.

[19] CI argued in the Quotium Action that OpenSTA only should be deemed to be a collaborative work under French law if the court determines that English law is not the correct law for determining ownership. Collaborative works are creations to which several persons have contributed together. 1 Geller, supra, § 4[1][a][i]. This is similar to a "joint work" under U.S. law. CI does not dispute that CSA contributed, even if minimally in its view, to the creation of OpenSTA. See Paper # 25 at 8-9. CI even admits that OpenSTA was a joint work. See App. Ex. 5 (Ex. EE). In fact, CSA initiated and directed this joint effort and its developers contributed substantially in all material respects to the new OpenSTA product. See generally, App. Ex. 6. Accordingly, even if the Court declines to find that OpenSTA is a collective work, owned solely by CSA (and subsequently transferred to Quotium), at a minimum OpenSTA is a collaborative work. A work of collaboration is the common property of its co-authors who exercise their rights in that work by common agreement. 1 Geller, supra, § 4[1][a][i]. Because Quotium cannot be infringing its own common property, the Court should still deny CI's motion even under this analysis.

preconcerted joint design," or on the basis of cooperation between the authors.  <u>See</u> <u>id</u>.  There is no question that the authors of OpenSTA worked toward a preconcerted joint design.  From its inception to its conclusion, OpenSTA was, and always was meant to be, a fully integrated web load testing tool.  <u>See</u> App. Exs. 6,7  ¶¶ 3-7.  Each of the technologies works together in a fully-integrated way and is necessary for the operation of OpenSTA.  As to the cooperation of the authors in its creation, even one of CI's prior affiants (Geoffrey Hall), who identifies himself as the director of the OpenSTA project, acknowledges that OpenSTA was nothing other than a joint collaborative effort, stating that its "development was carried out jointly between French and English teams."  <u>See</u> App. Ex. 5 (Ex. EE).

The second requirement of joint authorship under English law has two components: that each joint author has contributed to the work and that those contributions are not distinct.  As stated above, the parties are in agreement that employees of both CUK and CSA contributed to the creation of OpenSTA.  As to the second part of this requirement, the personal contributions of the diverse authors (employees of CSA and of CUK) are fused together into the single work; they are not "distinct" from each other.  As stated above, each of the technologies works together in a fully-integrated way and is necessary for the operation of OpenSTA.  Notwithstanding CI's attempts to characterize OpenSTA as anything but the single work that it is, its clumsy attempt to rename the product "UK/US" OpenSTA does not erase the documented statements of CI that predate this litigation.  The uselessness of the individual technologies making up OpenSTA is further evidenced by the fact that there is no option to end-users to install them on their own.

A copyrightable work need not be an entirely original creation; it can be based on earlier works.  Under U.S. Copyright Law, derivative works are protected as original works of authorship.  15 U.S.C. §103.  Under French law, there is a long-standing tradition that an

anthology, based on other works of authorship, is considered to be an original work.  See 1

Geller, supra, § 2[3][b].  And under English law, one who "exercises sufficient 'skill, judgment

and labour' upon an already existing work may himself acquire a copyright in the result.  …

Where copyright is acquired by virtue of such 'secondary' activity, it will be distinct from and

subordinate to the copyright in any prior original work which is incorporated into it."[20]  2 Geller,

supra, § 2[3][a].[21]

      The rationale is obvious: the resultant work is far greater than the sum of its parts.

Writings by CI about OpenSTA admit that it is far greater than the individual technologies

comprising it.  The list of assets in CSA's Bankruptcy Declaration calls OpenSTA a

"technological advance of 12 months over its competitors" and suggests that it is the property of

CSA.  See App. Ex. 5 (Ex. DD).  See also QA Paper # 32 (Declaration of Pascal Straatsma Ex.

C, showing statement by prior CI affiant that OpenSTA is a "great advance.").  The "advance" is

the significant contribution by full integration of OpenSTA's four technologies.  It is far greater

than the sum of its parts.  Thus, regardless of the application of French or English law, it is clear

that OpenSTA was owned by CSA and subsequently transferred to Quotium.

---

[20] While the subsequent owner may need a license in the underlying work, 2 Geller, supra, § 2[3][a], that is not an issue here; CSA was the owner outright of Test and Impact, works developed in part by its wholly-owned subsidiary CUK.  Beyond this outright ownership, there is an implied license from CUK to CSA to use those portions of Test and Impact incorporated into OpenSTA.

[21] In his book, International Copyright in Computer Program Technologies (1996), Dr. Bandey writes:  "The vast majority of commercial computer software products are made up of large numbers of independent computer programs linked or compiled.  …  [In] every commercial instance, the computer programs will not only be protected as literary works but their collection together as a computer software product will be protected as a 'compilation.'"  Bandey at 56.  Cases cited by Dr. Bandey relating to compilations of computer software programs make the following points:  [T]he copyright works include not only the individual programs but the whole package.  Moreover in every case where a program was revised or modified enough for a fresh copyright to be created, that copyright is also a relevant work . . . Whether a part is substantial must be decided by its **quality rather than its quantity**."  Id. at 56-57 (emphasis added).

## CONCLUSION

In sum, CI has offered no valid grounds for lifting the stay in this case. It also has not met the preliminary injunction test. For these primary and independent reasons, CI's motion should be denied.

Respectfully submitted,

QUOTIUM TECHNOLOGIES, INC.,
TECHNOLOGIES, S.A., and
QUOTIUM TECHNOLOGIES, S.A.,
By their attorneys,

/s/ John Pagliaro
Kevin J. O'Connor (BBO# 555250)
Mayeti Gametchu (BBO# 647787)
John Pagliaro (BBO# 634483)
PARAGON LAW GROUP, LLP
184 High Street
Boston, MA 02110
DATED: July 14, 2006          Tel. (617) 399-7950

### Certificate of Service

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and that paper copies will be sent to those indicated as non-registered participants on July 14, 2006.

  /s/ John R. Pagliaro

0004-003-103055.doc

- 43 -

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| TECHNOLOGIES, S.A., and<br>QUOTIUM TECHNOLOGIES, S.A., <br><br>  Plaintiffs and<br>  Defendants-in-Counterclaim<br><br>v.<br><br>CYRANO, INC.,<br><br>  Defendant and<br>  Plaintiff-in-Counterclaim | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    Civil Action No. 02-CV-11416-JLT |

## PROPOSED ORDER

Upon consideration of Defendant/Plaintiff-in-Counterclaim Cyrano, Inc.'s ("Cyrano US's") Motion for Preliminary Injunction dated October 11, 2002, the Court orders as follows:

a)   Defendants-in-counterclaim shall immediately cease and desist manufacturing, reproducing, copying, marketing, selling, distributing, displaying, demonstrating or otherwise using (1) Test, Impact or "UK/US OpenSTA" (OpenSTA with the exception of its HTTP Replay and Modeller components) (collectively, the "Cyrano US Software"); and (2) any software products that are substantially similar to, derivative of, or that otherwise infringe the Cyrano US Software (collectively, "Infringing Software");

b)   Defendants-in-counterclaim shall immediately cease and desist manufacturing, reproducing, copying, marketing, selling, distributing, displaying, demonstrating or otherwise using their software products Quotium Pro and Quotium Impact, as they constitute Infringing Software;

c)   Defendants-in-counterclaim shall immediately cease and desist representing, by any form of communication (including on any internet or open source code forum), that they own, created or are the source of origin of any of the Cyrano US Software, and defendants-in-counterclaim shall supplement and correct all previous representations to that effect within two (2) business days;

d)   Defendants-in-counterclaim shall immediately identify all persons (as those terms are defined in Local Rule 26.5) to whom they have distributed or sold Cyrano US Software or Infringing Software, including but not limited to Quotium Pro and

Quotium Impact, providing such information to Cyrano US within two (2) business days;

e)      Defendants-in-counterclaim shall deliver to Cyrano US within three (3) business days the originals and all copies of the Cyrano US Software and Infringing Software, and all related materials, which are within defendants-in-counterclaim's possession, custody, or control, for inspection by Cyrano US and impoundment with the Court during the pendency of this action;

f)      Defendants-in-counterclaim shall immediately recall all copies of Cyrano US Software and Infringing Software, and all portions thereof, from all distributors to which such Software has been provided by defendants-in-counterclaim;

g)      Defendants-in-counterclaim shall each file affidavits with the Court detailing the manner in which they have complied with this Order; and

h)      The attached Confidentiality Agreement shall be entered and shall take effect immediately as a binding order of the Court governing all source code and other proprietary materials produced by the parties as a result of this Order or during the litigation, and a fully executed copy of the Agreement shall be signed by all parties and filed with the Court within five (5) business days.


_____
Tauro, J.
United States District Court
District of Massachusetts


QNZG01_.DOC (876304 v. 1)

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| CYRANO, INC., | ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | |
| QUOTIUM TECHNOLOGIES, INC., QUOTIUM TECHNOLOGIES, S.A., and TECHNOLOGIES, S.A., | ) ) ) ) | CIVIL ACTION NO. 05-CV-11558-DPW |
| Defendants. | ) ) ) | |

## PROPOSED ORDER

Upon consideration of the Plaintiff's Motion for Preliminary Injunction dated June 20, 2006, the Court orders as follows:

1. The Defendants shall immediately cease and desist manufacturing, reproducing, copying, marketing, selling, distributing, displaying, demonstrating, and/or otherwise using (1) Test, Impact, and/or OpenSTA (with the exception of OpenSTA's HTTP Replay and Modeller components) (collectively, the "Cyrano Software"); and (2) any software products that are substantially similar to, derivative of, or that otherwise infringe the Plaintiff's copyright in the Cyrano Software (collectively, the "Infringing Software") in the United States and worldwide, with the exception that the Defendants may use OpenSTA non-commercially on the open-source GNU site as permitted by the GNU Public License;

2. The Defendants shall immediately cease and desist manufacturing, reproducing, copying, marketing, selling, distributing, displaying, demonstrating, and/or otherwise using their software products QuotiumPRO, QTest 4.0, and any other products that are substantially similar to the Cyrano Software as they constitute Infringing Software;

3. The Defendants shall immediately cease and desist representing, by any form of communication (including on any internet or open source code forum), that they own, created, and/or are the source of origin of any of the Cyrano Software, and the Defendants shall supplement and correct all previous representations to that effect within three (3) business days;

4.   The Defendants shall immediately identify all persons (as those terms are defined in Local Rule 26.5) to whom they have distributed and/or sold the Cyrano Software or Infringing Software, including but not limited to QuotiumPRO and QTest 4.0, providing such information to the Plaintiff within three (3) business days;

5.   The Defendants shall deliver to the Plaintiff within three (3) business days the originals and all copies of the Cyrano Software (except OpenSTA, as it is an open-source product) and Infringing Software, and all related materials that are within the Defendants' possession, custody, and/or control, for inspection by the Plaintiff and impoundment with the Court during the pendency of this action:

6.   The Defendants shall immediately recall all copies of the Cyrano Software and Infringing Software, and all portions thereof, from all distributors, resellers, and/or agents to which such Software has been provided by the Defendants;

7.   The Defendants shall each file affidavits with the Court detailing the manner in which they have complied with this Order.

Dated: _____        _____

                                  Douglas P. Woodlock
                                  United States District Court Judge

# THE APP'S RESULTS TO DATE

Since inception, the APP has now **over 8000 members**.

The APP has filed more than **1000 pleadings or statements** in connection with legal proceedings for the seizure of counterfeit software not only in France, but also in other European countries which, like France, lack a procedure for the deposit and identification of copies of source code.

More than 100 court decisions have adjudicated the rights of the APP. Such decisions include 15 in criminal courts, 5 of them after granting the APP's motions for summary judgement.

For ten years, the APP's initiative has proven successful in **protecting software**.

The APP leads the way to the future in management of rights in information technology. The APP now endeavours to set up solutions and anticipate needs with respect to the "all digital" environment for information technology, and short-lived physical embodiment of data.

This is the reason why the APP has undertaken the task of establishing an **<u>international identification system IDDN</u>**, in conjunction with **<u>INTERDEPOSIT Network</u>**, of which the APP is a founding member.

email : info@iddn.ch

# APP's Services

## 1. SOFTWARE REGISTRATION AND DEPOSIT

This very reliable procedure consists of establishing a date of creation which evidences the existence of the deposited product. It also gives an opportunity, based on information provided by the developer to review all known property rights and to qualify the work as either collective or jointly owned product, or as an adaptation of a pre-existing work.

## 2. ESCROWED ACCESS TO THE SOURCE CODE

In case of default by the developer, the user may perpetuate the use of its information system by obtaining a copy of the source code by way of a specific procedure whereby the APP acts as an escrow agent. This same service can be achieved by a three-party contract setting forth the events triggering the delivery of the source code, such as when the developer enters into liquidation whether voluntary or compulsory, has a receiver or administrator appointed, or fails to provide the contractually agreed services etc. This procedure is also useful when local law makes it mandatory for a legal entity to guarantee access to the source code of an information system.

## 3. SECURE DEPOSIT : SUPERVISED COMPILING OF THE SOURCE CODE

This procedure requires the presence of both the owner and the user at a test for compilation of the source code. Its purpose is to verify that the deposited source code corresponds to the object code attributed to the user, with all necessary upgrades, and that they are not defective.

## 4. SOFTWARE DIAGNOSTIC : ANALYSIS OF MAINTAINABILITY

The APP establishes a certificate which is the outcome of a very specific study conducted by APP technicians to evaluate the maintainability of the deposited software. This is to determine in what measures a third party professional could undertake for the long term maintenance of the software, if it were compelled to take such a step, due to the developer's default.

## 5. VOLUNTARY LICENCE AUDIT

Members can contractually assign to the APP the task of verifying that all necessary licences have been duly obtained for the software. In this case, the APP sends a group of technicians instructed to conduct an audit of the documentation relative to the software on agreed terms with the relevant

contracting party. Sample verifications are conducted to determine whether the software is used in accordance with the related licences. The mission encompasses the drafting of a report pointing out discrepancies so determined. The user undertakes to inform its employees of the content and consequences of current legislation protecting developers' rights - and licensed users rights as well - and to take steps to obtain any missing licence.

## 6. ARBITRATION AND CONCILIATION BOARDS

When a dispute involving the ownership of a computer program arises between two or more software developers who are source code depositors registered with the APP, the parties agree to submit their case to an arbitration committee set up according to the APP's arbitration rules. This procedure has always proven effective to provide settlement between licensers and users, sellers and purchasers, employees and employers, or between two developers claiming ownership on the same software.

## 7. LEGAL ACTIONS

In order to defend creators' rights, the APP is leading many judiciary proceedings, both civil and penal. Thanks to its action, numerous decisions have been given, reducing tremendously infringement attempts by employees or competitors.

Besides, the APP may, upon express request, initiate judiciary action in accordance with local law.

Smith, Kenneth, 1910-, 66.

# Smith and Keenan's Company Law

*Seventh Edition by Denis Keenan*

**Denis Keenan**
LLB(Hons), FCIS, DMA, CertEd.
of the Middle Temple, Barrister-at-Law
Formerly Head of Department
of Business Studies and Law,
Mid-Essex Technical College and School of Art
(now Chelmer Essex Institute of Higher Education)

Pitman

KD
2079
.S55x
1987

# Contents

Preface   ix

Table of statutes   xi

Table of cases   xxvii

1  The nature of a company   1
Classification of companies – Public and private companies –
Limited and unlimited companies – Companies and partnerships
compared – Lifting the corporate veil.

2  Promotion and incorporation   21
The promoter – Incorporation

3  The constitution of the company   35
The memorandum of association – The name – Company names –
Names of oversea companies – Business names – The registered
office – The objects clause – Limitation of liability – Capital –
Other clauses – Association clause – Alteration of the
memorandum generally – The articles of association – Alteration
of the articles – The legal effect of the memorandum and articles –
The rule in *Royal British Bank v Turquand*.

4  Capital and its maintenance   84
Classes of capital – Preference shares – Ordinary shares –
Variation and abrogation of class rights – Special rights:
registration of particulars – Alteration of share capital –
Maintenance of capital or protection of the creditors' fund –
Reduction of capital – Acquisition of own shares—generally –
Purchasing own shares.

5  Company flotations   111
The prospectus: generally – The prospectus: mandatory statutory
information – Subscriptions induced by misrepresentation – Civil

v

PITMAN PUBLISHING
128 Long Acre, London WC2E 9AN

© Kenneth Smith and Denis Keenan 1966
© Denis Keenan and Mrs K Smith 1970, 1975, 1976, 1981, 1983
© Denis Keenan 1986, 1987
Seventh edition first published in Great Britain 1987

British Library Cataloguing in Publication Data
Smith, Kenneth, *1910–1966*
  Smith and Keenan's company law.—7th ed.
  1. Corporation law—Great Britain
  I. Title   II. Keenan, Denis   III. Smith,
  Kenneth, *1910–1966*.   Company law
  344.106′66      KD2079

ISBN 0-273-02792-1

All rights reserved. No part of this publication may be reproduced, stored
in a retrieval system, or transmitted, in any form or by any means, electronic,
mechanical, photocopying, recording and/or otherwise without the prior
written permission of the publishers. This book may not be lent, resold, hired out
or otherwise disposed of by way of trade in any form of binding or cover other
than that in which it is published, without the prior consent of the publishers.

Printed in Great Britain at The Bath Press, Avon

adjourn the proceedings brought by dissentients in order that satisfactory arrangements may be made for the purchase of the shares of those dissentients. The purchase may obviously be by other shareholders but the company's money may also be used for this purpose and if this is the intention the court will make the necessary order to provide for the purchase by the company of its own shares and to reduce its share capital. The order may also make any necessary alterations in or additions to the memorandum and articles of the company.

*Reduction below authorized minimum of issued share capital of a public company.* Under s. 139 if the court reduces the share capital of a public company to below £50,000 it must re-register as a private company. The court may authorize re-registration without the company having followed the s. 53 procedures and the court order may specify and make the necessary changes in the company's constitution. Thus a reduction under s. 135 may now have the further consequence of changing the company's status from public to private.

## HOLDING AND SUBSIDIARY COMPANIES

Although it is a fundamental principle of company law that a company is a separate entity, the Companies Act 1985 limits this concept where companies are in association, largely to ensure that the group publishes its total financial position by means of consolidated accounts.

Thus if company H holds a controlling interest in 20 other companies, many of which are private as is often the case, the accounts of company H would, without the provisions of the Companies Act, merely show the income which company H had received from other concerns. In order to ascertain the real position, it would be necessary to look at the accounts of the other 20 concerns to try to get a composite picture of the group, and this would be made difficult by the fact that it would not be easy to find out the names of the 20 concerns in order to refer to their accounts. The Companies Act 1985 requires the publication of group or consolidated accounts showing the financial position of the group.

Under s. 736, company X is considered to be a subsidiary of company Y if, and only if—

(i) company Y is a member of company X and controls the composition of the board of directors of company X; or

(ii) company Y holds more than half in nominal value of the X company's *equity share capital*; or

(iii) company X is a subsidiary of (say) company Z which is a

subsidiary of company Y. Company X may in such circumstances be referred to as a sub-subsidiary of company Y.

The *equity share capital* mentioned above means the issued share capital of the company concerned, *excluding* shares which have a limited right to share in profits during the company's lifetime and in the capital on winding up. (S. 736.) The equity share capital is in fact its ordinary share capital and does not include preference share capital.

## Control of the composition of the board

The composition of a company's board of directors is considered to be controlled by another company if, and only if, the other company can by the exercise of some power, and without the consent of any other person, appoint or remove all or the majority of the directors; and in particular there is the necessary control when—

(a) a person cannot be appointed to the board unless some other company exercises a power in his favour; or

(b) a person becomes a director of the subsidiary automatically on appointment as director of the holding company; or

(c) the directorship is held by the holding company itself or a subsidiary of it. (S. 736(2).)

Shares held or powers exercisable by companies holding the shares as trustees, or in any fiduciary capacity, are ignored for the purpose of establishing the relationship. Furthermore, the relationship of holding and subsidiary company cannot be established by company Y exercising control of company X by virtue of powers given in the *debentures* of company X which are held by company Y. (S. 736(4).)

Thus the test of control adopted by the Act has three branches, and the necessary control exists—

(1) if company Y holds more than half of the equity share capital of company X;

(2) if company X is a sub-subsidiary and company Y is the head holding company;

(3) if company Y is a member of company X and controls the composition of company X's Board of Directors. In this case the number of shares held by company Y is irrelevant, as long as it holds some.

HARVARD LAW LIBRARY

1 of 1 DOCUMENT

International Copyright Law and Practice
Copyright 2005, Matthew Bender & Company, Inc., a member of the LexisNexis Group.

FRANCE

*1-FRA International Copyright Law and Practice § 2*

**Subject Matter**

**[1]-- Standards for Protection**

**[a]-- Formal Requirements.**

Under Article L. 111-1 of the I.P. Code, each author enjoys protection by the mere fact of creating a work. Article L. 111-2 of the I.P. Code provides that a work shall be deemed to be created, independently of any public disclosure, by the mere fact of the author's conception being implemented, even incompletely. Thus copyright arises by reason of the author's creative act, without being subject to the least formality.n1

Accordingly, a work need not be fixed in any way in order to be protected under French copyright law. Works orally expressed, such as sermons or attorneys' oral arguments, are protected even when they are not written down.n2 This observation applies, for example, to television works, which are protected, although not recorded, as well as to improvised musical and choreographic works.n3  Creation nonetheless presupposes that a work is endowed with a form sufficiently precise for its characteristics to be perceptible. Of course, there must be sufficient evidence of the existence and character of a work to prove infringement.n4

According to Article L. 113-3 of the I.P. Code, copyright constitutes intangible property in a creative work. Such property is independent of tangible property in the material object in which the creative work is embodied, such as a manuscript or book, a painting or engraving, or a film or recording. This distinction becomes a bit fluid in artistic works, such as paintings or sculptures, which are often more easily identified with their embodiments.n5

**[b]-- Substantive Criteria.**

Article L. 111-1 of the I.P. Code grants copyright protection only to the author of a "work of the mind" (*oeuvre de l'esprit*). In addition, the work must be original.

**[i]-- A Work of the Mind.**

The statute does not define the notion of a "work of the mind." Given the diversity of creative, intellectual activities, any general definition would lead to ambiguity. At the threshold of analysis, it is only possible to specify that a "work of the mind" is an individualized, intellectual creation.

As one court put it, French copyright law "only protects specific, individualized, and perfectly identifiable creations, not a genre or a family of forms linked by common characteristics simply because they all correspond to a style or a procedure derived from an idea."n6  Subsequently, in its *Mazenod* decision, the *Cour de cassation* held that "a collection of pieces of work (*ouvrages*) presenting a certain number of common characteristics does not constitute by itself a creation of a work (*oeuvre*) separate from these pieces."n7  Nor does giving an idea, for example, for a collective work, suffice to qualify a person as the author of the resulting work.n8  Nonetheless, the frontier between non-protectible ideas and original expressions is sometimes blurred, as in cases of treatments for contestsn9  and television programs.n10  Where a production does not qualify for protection under copyright, relief may still be available under the law against unfair competition.n11

It is more important to analyze the characteristics that courts have to find in their inquiry as to protectability of a given work than to try to find a general definition of a "work of the mind." In this respect, French copyright law does no more than state, in Article L. 112-1 of the I.P. Code, that "the provisions of this law shall protect the rights of authors in all works of the mind, regardless of their kind, form of expression, merit, or purpose." We will first examine the criteria

in this guideline, and then consider the requirement of originality which must in any case be met. Along the way, we will also indicate how the courts apply the fundamental distinction between ideas and the "form" or "expression" of a work.

### [ii]-- Limits of Inquiry into Protectability.

As just indicated, a court should not be influenced by "the kind, form of expression, merit, or purpose of a work" when applying the criteria of protectability.

### [A]-- The Kind of Work.

The rule that French copyright law disregards the kind (*genre*) of a work simply means that copyright is not reserved to any particular category of works or authors. Copyright protection is neither denied nor granted, as a matter of principle, to any particular type of work or author.n12

### [B]-- The Form of Expression of the Work.

A leading French commentator, Henri Desbois, explains that the form of expression of a work relates to the matter in which it is communicated to the public, including both written and oral forms of expression.n13  Form of expression can also have a different meaning, for example, allowing one to distinguish musical compositions with or without lyrics and, in the fine arts, drawings, paintings, sculptures, etc. Much like the kind of work, the concept of the form of expression of a work must be interpreted most liberally.n14  Of course, a court may take account of inevitable differences between different forms of expression. But it may not allow the finding of protectability to turn on the form of expression of a given work.

### [C]-- The Merit of the Work.

The Law of March 12, 1902, provided that "sculptors and decorative designers" enjoyed copyright "irrespective of the merit and the purpose of" their works. This provision, recodified in subsequent laws, only expressly set out a principle which had already been widely accepted: courts must refrain from assessing the merits of works.

This principle notably prevents courts from subjecting protection to the aesthetic evaluation of a work.n15  There would be no legal certainty if copyright turned on the subjective views of a judge who played the role of an artistic critic. In general, precluding merit as a ground of protection, Article L. 112-1 of the I.P. Code leaves no room for value judgments about the contents of the work either. Thus statutory protection may not be denied on the basis of moral considerations, which have nothing to do with copyright.n16  Nor may a court refuse protection just because a work elaborates a commonplace or questionable thesis.

However, a careful reading of the case law shows that judges often do, at least indirectly, take merit into account.n17  For example, assuming the traditional definition of originality as an imprint of personality,n18  a pejorative appraisal of the work itself inevitably seems implicit in a finding that it lacks originality. Similarly, a judge does not violate the prohibition against weighing artistic merits in finding that a work of the mind is exclusively functional and lacks originality, even if that finding might be considered, from the point of view of artistic criticism, as a value judgment.n19

### [D]-- The Purpose of the Work.

The rule that protection of a work is independent from its purpose (*destination*) did not arise easily. The reference to the fine arts (*beaux-arts*) in the seminal Law of 1793 first caused courts to deny copyright protection to works of applied art.n20  As the nineteenth century progressed, however, the courts increasingly granted copyright in creations fashioned to serve utilitarian purposes, and the Law of March 12, 1902, provided that protection of sculptures and decorative designs was to be independent of the purposes for which they were created. Finally, the 1957 Copyright Act generalized this approach, which Article L. 112-1 of the I.P. Code now codifies.n21

This approach corresponds to the so-called "theory of the unity of art." Simply put, it seeks to avoid fragmenting the field of art with distinctions based on the uses of works. The approach has most typically been applied to three-dimensional utilitarian works. Copyright has, for example, been extended to products as modest as a salad bowln22  or a bottle opener.n23  The question of protecting utilitarian works also arises in connection with literary productions. The courts have thus protected utilitarian compilations such as synoptic tables,n24  address books,n25  or even the text of a

patent.n26  Computer programs, which the 1985 Amendment Act added to the statutory list illustrating protected types of works, may also be considered as utilitarian works in literary or like symbolic form.n27  Caveats to this approach are considered below.n28

### [iii]-- The Requirement of Originality.

French copyright law protects only "original" works of the mind.n29  The I.P. Code expressly refers to this fundamental requirement of originality, but only in passing, notably in Article L. 112-4 on titles and in Article L. 112-3 on derivative works. It remains, however, a general standard of copyright law applicable to all works without exception.n30

In the absence of any legislative definition or guidance, it was left to the courts to define originality and to apply this standard to all categories of copyright works. The major difficulty arises from the fact that the criteria of originality are no longer as clear as they used to be, so that it is no longer an easy matter coherently to distill the case law on point. To understand current law, we shall explain the traditional view of originality and then illustrate how this view has been eroded.

### [A]-- The Traditional View of Originality.

The traditional French view is that originality arises with the "imprint of the author's personality." However, this view is not really self-explanatory; in practice, French courts tend to infer originality from the author's exercise of *creative choice* in making a work.n31  There are, of course, greater or lesser degrees of liberty in the exercise of such choice, which may be limited in at least two ways. First, an author might use a preexisting work, resulting in a derivative work with only relative originality, but one still calling for protection.n32  Second, the author might be constrained by imperatives arising out of the kind of work he is creating.

Article L. 112-2 of the I.P. Code lists scientific writings as protectible, along with "geographical maps" and "plans, sketches, and models relative to geography, topography, ... or the sciences." Although these kinds of works do not customarily lend themselves to giving free reign to one's creative imagination, an author's personality can nonetheless filter into a scientific treatise or a topographic sketch, even though its imprint may not be as readily apparent there as in other works.n33  Nor does the use of technologies, for example, in creating computer-driven works, necessarily limit creative choices and preclude protection.n34  Questions can arise concerning the choices available to a scholar or artist who restores an older work.n35

Since originality is in principle independent of the kind of work at issue, it must be determined on a case-by-case basis. In theory, the party claiming copyright protection must prove originality, but in practice this burden is not strictly applied. Normally, a plaintiff need not prove the originality of the work at issue as long as the defendant does not dispute this originality. Especially in cases involving works of imaginative literature or of fine art, the judges will proceed, rightly or not, as if they were presuming originality. For example, where a sculptor or painter reshapes or adds to preexisting materials manually,n36  there is a judicial tendency merely to require a showing that his work was not the result of slavish copying.n37  The trial court is typically satisfied with a proof by way of inferences based on circumstantial evidence. Only in marginal cases, such as those involving scientific or technical works, where self-expression is not taken for granted, does the issue of originality become critical. Then normal evidentiary rules throw the burden of proof on the copyright claimant.n38

### [B]-- Erosion of the Traditional View.

While originality is conceptually pivotal to copyright law, it is obvious in most cases and, therefore, not often put at issue. Nonetheless, a careful review of the development of French law finds the traditional view of originality increasingly put into question, thus leaving a certain gap between the language and the operation of the law. This trend is illustrated in cases of computer programs.

While adding computer programs to the list of works possibly protected by copyright, the 1985 Amendment Act failed to provide a yardstick for determining their originality. In the landmark *Pachot* decision decided in full assembly,n39  the *Cour de cassation* cryptically spoke of originality as an "intellectual input" (*apport intellectuel*), and it suggested that protection may be refused if "an automated or constraining logic" dictates how such input is given form.n40  It also pointed out that findings of originality of computer programs have to be made case by case.

Unfortunately, the lower courts were left with only empty, or at best open-ended, language that does not allow them to delineate any clear criterion of originality. For example, absent more precise guidance, most courts have not hesitated

to take the originality of computer programs for granted because these fall into a protected class of works.n41  But this reasoning violates Article L. 112-1 of the I.P. Code which, as already explained, prohibits the taking into account of the kind of work at issuen42

### [2]-- Categories or Types of Works

Article L. 112-2 of the I.P. Code sets out the following non-exhaustive enumeration of types of protected works:

"The following, among others, shall be considered works of the mind within the meaning of this Code:

"1. books, pamphlets, and other literary, artistic, and scientific writings;

"2. lectures, addresses, sermons, arguments in court, and other works of the same nature;

"3. dramatic or dramatic-musical works;

"4. choreographic works, circus acts and feats, and pantomimes, the acting form of which is fixed in writing or otherwise;

"5. musical compositions with or without words;

"6. cinematographic works and other works consisting of moving sequences of images, with or without sound, together referred to as audiovisual works;

"7. works of drawing, painting, architecture, sculpture, engraving, [and] lithography;

"8. graphic and typographic works;

"9. photographic works and other works produced by techniques analogous to photography;

"10. works of applied art;

"11. illustrations; geographical maps;

"12. plans, sketches, and models (*ouvrages plastiques*) relative to geography, topography, architecture, and the sciences;

"13. computer programs (*logiciels*);

"14. Creations of the fashion industries ... ."n43

Since, as already explained, Article L. 112-1 of the I.P. Code protects any "work of the mind," without consideration of its "kind" or "form of expression," the non-exhaustive list in Article L. 112-3 of the I.P. Code is liberally construed.n44  Further, the 1985 Amendment Act introduced neighboring rights into French copyright law to protect performances and certain works or investments --namely sound and video recordings, and broadcasts-- which are not found to constitute works of the mind under Article L. 112-1 of the Code.n45  Finally, even though not covered by copyright or neighboring rights, a production might, under certain circumstances, still obtain limited and indirect protection under general tort law, notably under the law against unfair competition (*concurrence deloyale*).n46

Although the categorization of a work is not a prerequisite for copyright protection under French law, it is sometimes necessary in order to apply the various sub-regimes established for certain types of works, for example, audiovisual works or software. We will bring the various works listed in Article 112.2 of the I.P. Code together under the traditional headings of literary, artistic, and musical works.

### [a]-- Literary Works.

Literary works are those expressed in language or like symbolic form. Article L. 112-2 of the I.P. Code includes "books, pamphlets, and other ... writings" in one common subcategory and "lectures, addresses, sermons, ... and other works of the same nature" in another subcategory. There are other subcategories, notably that including "dramatic works." It has long been settled that the texts of oral works, even when delivered without fixation, are protected in the same way as written, or otherwise fixed, works.n47  Rather brief or short works, such as verses or titles, may be protected if found to be original.n48

News reports are protected by copyright only insofar as they are expressed in an original form.n49  To that extent, a brief news dispatch is not excluded as a matter of principle from copyright protection. Further, subject to the same caveat, interviews are not any less protectible than news articles.n50  However, the information comprising the content of the news cannot be monopolized by copyright. At most, the copying of raw news, without the taking of any copyright-protected expression, may allow for remedies under general tort law.n51

Advertisements, television formats, and like productions are subject to similar remarks. Copyright protection arises only insofar as the underlying ideas are originally expressed. A protectible work might be found, for example, in the text of an advertisement, a brochure, or a slogan.n52  Although copyright may provide some form of protection for highly developed television formats, for example, for game shows, these productions are mainly protected by contract and through relief against unfair competition.n53

Scientific and other learned works are protected as works expressed in language, even though they are not works of "literature" in the narrow sense of the expression *belles-lettres*. For example, legal treatises,n54  courses in pharmacology n55  or psychoanalysis,n56  a doctoral thesis in business administration,n57  a method of teaching accounting,n58  historical works,n59  and medical works,n60  all have been afforded copyright protection. Of course, the underlying concepts, ideas, methods and theories, by themselves, would not attract protection.n61

Technical works, even works of applied art, may be cast in verbal or like symbolic form.n62  On the one hand, the text of a patent n63  and its technical documentation n64  have been found to be original works. On the other hand, a catalogue of industrial objects with merely descriptive, standard technical texts was not protected by copyright.n65  Nor were the dictionary entries for the definitions of stock-exchange and financial terms.n66

**[b]-- Artistic Works.**

In what follows, the adjective "artistic" is used as a generic term to designate works other than literary or musical works. Artistic works are commonly expressed in visually perceptible forms that are stationary or moving. The category of artistic works thus embraces creations of the traditional pictorial and sculptural arts as well as choreographic and audio-visual works.

Drawings, paintings, sculptures, engravings, lithographs, and illustrations, as a practical matter, hardly ever give rise to any controversy regarding originality. As explained above, the fact that a particular work cannot be classified by kind or *genre* is irrelevant for purposes of copyright protection.n67  For example, a court protected a work consisting of canvas wrapped, using ropes, around the old Parisian bridge, the *Pont Neuf*, to emphasize the purity of its lines.n68  Likewise, specific hairstyles may be considered original works.n69

Geographical maps--as well as plans, sketches, and models relative to geography, topography, or science--figure in the list of protected works. Of course, as just noted for literary works, the scientific or informative content of a work does not in itself exclude copyright protection.n70  For example, the road maps of a famous French guide were held to be protectible by copyright, most notably because of the choices made in indicating mileages, localities, and points of interest, as well as in the use of symbols.n71  Nonetheless, to the extent that only intrinsically functional characteristics of such a work are at issue, the traditional view of originality has to be relaxed if copyright is to be recognized.n72  Occasionally, protection is denied because a map, plan, or like product is too commonplace.n73

The 1985 Amendment Act added graphic works and typographic works to the list of protected works, but without apparently changing the law. Since copyright protection was never seriously in doubt for graphic works, the legislators displayed perhaps an excess of caution in introducing this amendment. Still, it makes plain that courts may protect, for example, the graphic presentation of the cover of a literary work n74  or a lay-out in pages,n75  even though neither strictly speaking involves any fine art such as drawing. So-called typographic works were added to comply with the Vienna Treaty of June 12, 1973, which France ratified in 1975, although this treaty did not necessarily require full copyright protection for typefaces. The *Cour de cassation* has held that the law prior to 1985 already granted copyright in typefaces if, of course, they created original works of the mind.n76

The 1985 Amendment Act expanded the coverage of "photographic works" to include all such works "and other works produced by techniques analogous to photography."n77  While this new language clearly applies the requirement of originality to all photographs, it does not tell the courts how to apply it. As mentioned, originality is traditionally thought to arise when an author exercises creative choice, irrespective of the mechanics of the art.n78  Such choice has been found in the selection of shots to optimize the impact of resulting photographs,n79  in the adjustment of camera angles and lighting to produce desired effects,n80  and in the creation of a decor to be shot.n81  A photograph of an-

other work may be original due to its own photographic features.n82  Technical photographs have been found to lack originality.n83

Choreographic works and pantomimes, which figured in the list of the 1957 Copyright Act, were supplemented by circus acts mentioned in the 1985 Amendment Act.n84  The statute specifies that the "acting form" of all such works must be "fixed in writing," for example, by special notation, or "otherwise," that is, as a practical matter, by audiovisual recording. This language, if read as a requirement of protection, contradicts Article L. 111-1 of the I.P. Code, which confirms the principle that copyright arises upon the act of creating a work, not in embodying it in tangible form. It is commonly acknowledged that this statutory language merely announces an evidentiary rule.n85

The category of "audiovisual" works designates a distinct subregime of protection in that this term appears in provisions that concern, *inter alia*, not just the copyright term, but also authorship, ownership, and contracts.n86  Audiovisual works are defined by Article L. 112-2 of the I.P. Code as "cinematographic works and other works consisting of animated sequences of images (*sequences animees d'images*), with or without sound." This broad definition, in which emphasis is placed on the animated sequences of images, does not exclude documentaries, newsreels, or other types of film works.n87  However, the rules triggered by characterizing a work as falling within this definition can prove ill-adapted to the production and exploitation of some multimedia works.n88  The courts have increasingly refused to characterize multimedia works, especially interactive works, as audiovisual works.n89

Works of architecture are treated as artistic works.n90  Works of applied art, including industrial designs, are included in the statutory list.n91  However, the protection of such works, to the extent that they display functional features, is subject to special conditions treated more specifically below.n92

The last item of the illustrative list of works mentions "creations of the fashion industries (*industries saisonnnieres*) of clothing and accessories (*parure*)," which it defines as those which, "because of the demands of fashion (*la mode*), frequently renew the form of their products." A long illustrative list includes dress-making, leather goods, fabrics, etc.n93

**[c]-- Musical Works.**

Article L. 112-2 of the I.P. Code mentions both "musical compositions with or without words" and "dramatic-musical works." Courts traditionally find their originality displayed in melody, harmony, or rhythm.n94

The use of computer technology in the creation of musical works does not in itself preclude a finding of originality, even though the computer, besides serving to process and synthesize sounds, automates certain procedures of musical composition. Since merit and purpose are irrelevant to copyright protection, unpretentious ditties or advertising jingles are as protectible as symphonies. Nor, as already observed, need the musical work be fixed in a written score or a recording, improvisations being protected from the moment they are played.

Unlike copyright law in the United States,n95  French law does not generically treat sound recordings as "works" and protect them by "copyright," but rather protects them separately from recorded musical compositions by "neighboring rights."n96  It has been held that a sound recording of bird songs does not qualify for copyright protection, notwithstanding the multiplicity of recording sessions, selection among separate recordings, elimination of interfering sounds, contrasting of certain frequencies, and sound mixing.n97

**[3]-- Derivative Works, New Versions, and Compilations**

Article L. 112-3 of the I.P. Code has two sentences, one dealing with translations, adaptations, and like works, and the other with collections of works.

**[a]-- Translations and Adaptations.**

The first sentence of Article L. 112-3 of the I.P. Code covers "translations, adaptations, transformations, or arrangements" of prior works, without prejudice to the rights of the author of any underlying work. Difficulties arise when courts have to determine at what point sufficient originality in changing the underlying work warrants protection of any resulting derivative work.

French courts tend to consider that the translator's personality is expressed in the resulting derivative work. Translations of scientific or technical works might not offer as much opportunity for the translator to leave any personal im-

print, and they are now being increasingly automated. Nonetheless, the courts usually take copyright protection of trans-lations for granted.n98

An adaptation is a derivative work that borrows from a preexisting work, but exists autonomously from it. For example, in the visual arts, individuality in executing a study of a preexisting work, say, the painting of an old master, will determine whether the study is found to have any originality of its own as a derivative work.n99  Another hard case lies in the staging (*mise-en-scene*) of a theatrical piece: the courts tend to favor protecting such stagings as derivative works.n100  There had originally been debate whether copyright could protect performances as derivative works.n101  This debate is mooted now that French copyright law grants neighboring rights to performers.n102

Article L. 112-3 of the I.P. Code mentions "arrangements" among derivative works. Arrangements of musical works, so that they may be played by a different instrument or group of instruments, might not meet the requirement of originality as often as variations, in which themes or melodies are borrowed from other works but used differently.n103

**[b]-- Collections; Compilations; Databases.**

Article L. 112-3 of the I.P. Code allows for the protection of anthologies or collections (*recueils*) of diverse works or information (*donnees*) that, "by the selection *or* arrangement (*disposition*) of contents," constitute "intellectual crea-tions."n104  The provision mentions databases as an example of protectible compilation and defines them as does the E.C. Database Directive. Copyright-related rights, as explained below, protect database contents.n105

French case law has never been stringent regarding compilations. The line of decisions dates back over a century, protecting compilations of both works and information.n106  Judges have sometimes found that the compilation at issue was sufficiently marked with the author's personality to attract copyright.n107  Judicial liberalism, however, has its lim-its, and the courts have refused to protect many compilations,n108  for example, the alphabetical listing of profession-als,n109  the graphic lay-out of annual tide tables n110  and a map of France indicating wine regions.n111

In dealing with such cases, it is important to identify the originality of a selection, as opposed to its content, which may not be protectible.n112  For example, in a case where a lower court had found an organizational chart to be original by virtue of research efforts, the *Cour de cassation* reversed, holding that a compilation of data is not protectible as such and that the finding on appeal should have specified "in what regard the text or the graphic form of the publication" con-stituted "an intellectual contribution of the author, the hallmark of an original creation."n113  Further, the *Cour de cass-ation* upheld the refusal of copyright in an "inventory and compilation" made for the purpose of elaborating a screenplay on the life and work of Niepce, the French inventor of photography: in the form at issue, this effort of "research and documentation" was properly not found to constitute a work of the mind.n114

Databases may be protected by copyright if they represent original compilations.n115  The I.P. Code does not men-tion summaries, abstracts, or indices. Note that rights in database contents, explained below,n116  would not necessarily protect any software used as an information-finding tool in a database; that software would have to be protected by copyright.n117  It may be questioned whether a simple index might satisfy the requirement of originality and, as such, attract copyright protection.n118

**[4]-- Special Problem Areas**

As a general rule, in cases where copyright protection is not granted, notably for lack of originality, tort remedies remain available. That is, depending on the circumstances of the case, the general principle of civil liability set out in Article 1382 of the Civil Code may apply. According to this principle, any action that causes damage to someone else obligates the party who caused the damage, by his fault, to set it right. Article 1382 of the Civil Code not only forms the basis for the French law on unfair competition, but also for a broader doctrine of "economic parasitism," which may apply to preclude non-competitors, as well as competitors, from reaping profits from the efforts or investments of other persons, even without misleading the public. This doctrine has been applied to the misappropriation and slavish imita-tion of productions or investments otherwise unprotected by copyright.n119

In what follows we will address specific issues at the border of copyright protection.

**[a]-- Titles.**

It is important to distinguish between protecting titles as self-standing works of the mind and protecting them as means of identifying such works for the public. However, the courts tend not to explain how to distinguish titles that are pro-

tectible as self-standing works of the mindn120 from those that are not.n121 It often remains unclear what is original, the title itself or the work it identifies.n122

Difficulties can stem from stretching the meaning of the term "work of the mind." While copyright protection does not in principle depend on the sheer size of the creation at issue, it seems out of place to protect a few syllables or words as an entire literary work. Some courts suggest that banal words used in purely descriptive fashion in a title will suffice to disqualify that title from copyright protection.n123 There is a rich case law but one difficult to distill: for example, in two infringement actions involving the borrowing of the same title *Angelique*, two courts of appeal rendered conflicting judgments as to the protectability of the title.n124

Titles without originality can still be protected against misappropriation by unfair competition law. Article L. 112-4 of the I.P. Code effectively grants a comparable type of protection to titles, whether or not they are original in themselves and whether or not they identify a work still in copyright or one with an expired term of protection. This provision precludes the use of a title of any one work "in order to individualize a work of the same kind under conditions likely to cause confusion." It was cited when an injunction issued against using the title *Les liaisons dangereuses* of an eighteenth-century novel, without distinguishing changes, to identify a modern film.n125

**[b]-- Characters.**

The courts have protected copyright in graphically drawn characters, whether they appear in simple illustrations or audiovisually.n126 The case law does not clearly indicate how general copyright criteria would apply to literary characters presented without accompanying visual images.n127 Nonetheless, in a case of the heroine of a series of novels, the *Cour de cassation* did reject an appeal based on the argument that this character lacked "sufficient consistency" to constitute an original creation, thus leaving intact the finding that she drew sufficient "relative originality" from prior works in the series.n128

**[c]-- Works of Applied Art; Design Protection.**

The category of "works of applied art" is included in the list of types of works which Article L. 112-2 of the I.P. Code sets out as protected by copyright. Further, protection afforded under copyright law may in principle be cumulative with the protection of registered designs under Articles L. 511-1 *et seq.* of the I.P. Code.n129 As already indicated, the so-called doctrine of the unity of art does not allow excluding copyright protection on the grounds of the mere purpose, notably the utility, of the work at issue.n130

There is, however, a caveat to this liberal approach. It cannot be assumed that the theory of unity of art allows the protection of all useful articles under copyright law. It is one thing not to take account of the utilitarian objective for which a work is created or to which it is put. It is quite another thing, and a necessary one, to determine whether, with regard to such an objective, the form of expression of the work is separable from its function. If it is not, protection will be denied, not because the work must be deprived of copyright because of its purpose, but rather for reasons arising out of the place of copyright in the entire body of intellectual property law, especially design law.n131

The Ordinance of July 25, 2001, amended Articles L. 511-1 *et seq.* of the I.P. Code so that those articles would fall in line with the E.C. Design Directive.n132 Article L. 511-8 of the I.P. Code now excludes from protection by registered design rights "the appearance [of a product], the characteristics of which are exclusively dictated by the technical function of the product." This provision supersedes the old Article L. 511-3 of the I.P. Code, which had codified case law excluding both copyright *and* design protection for any creation to the extent that the form of the creation fulfilled any function inseparable from its ornamental features.n133 The new law, by not mentioning copyright, seems to reformulate this exclusion more restrictively than did the old law, and it remains to be seen whether, and how, the exclusion might still be applied to copyright, as well as how it will apply to registered design rights.

Of course, a court may grant cumulative protection by both copyright and design rights for "ornamental" forms of a work that are not determined by their functions. Prior to the revision of 2001, there were a pair of distinct theories that were applied to assess whether forms of a work were so determined by their functions that protection was excluded for these forms. According to the so-called theory of "multiplicity of forms," a given form is to be found separable where it is shown that several forms could serve the functions of the work bearing the form at issue. For example, from this point of view, the form of a chair would be separable from the functions of this piece of furniture, such as cost-effective manufacture, durability, and comfort, if any number of other chair forms could fulfill these functions. According to the opposing, more restrictive theory, the protection provided by special design rights is not available where the form of the work at issue has any functional objective. There is a split of judicial authority concerning the proper criterion; some

courts apply, more or less consciously, that of the multiplicity of forms,n134 while other courts reject it.n135 The *Cour de cassation* has so far left the issue of the proper criterion unresolved, generally deferring to the lower courts' findings of fact.n136 With the revision of 2001, it remains unclear which criterion will dominate in the case law and how it will be elaborated there.

French courts apply Article 2(7) of the Berne Convention to refuse copyright, in appropriate cases, in works of applied art originating in other Berne countries.n137 They have even refused copyright in cases of designs originating in other E.C. countries, notably Germany and Italy, when the designs at issue were ostensibly refused copyright protection in these countries and were not protected by rights in registered designs in France.n138 This result is surprising, especially since the claimants invoked the *Phil Collins* argument based on Article 12 of the E.C. Treaty which, in principle, obligates France to grant full national treatment to E.C. claimants.n139 National treatment would have qualified the designs as susceptible of copyright protection in France without consideration of their status in their respective countries of origin. But the courts reasoned that Article 2(7) of the Berne Convention is not contrary to Article 12 of the E.C. Treaty, in that the Berne provision refers only to the country of origin of the work and Article 12 has no applicability where the relevant Berne provision does not mention the nationality of the work's creator as the basis for cutting back on national treatment.n140 This case law remains questionable as long as the European Court of Justice has not decided whether this reasoning suffices to avoid an impermissible discrimination against E.C. claimants.

**[d]-- Computer Software.**

The 1985 Amendment Act added "software" to the list of protectible works. This list uses the French term *logiciel*, which can be understood to include both computer programs and related documentation. In the I.P. Code, software is protected by copyright, subject to special provisions.n141

Computer programs are not necessarily addressed to other humans, but to machines. This fact leads to the difficulty of ascertaining originality, given the functional character of the languages in which computer programs are cast. Both the legislators and the *Cour de cassation* have brushed this objection aside, thus breaking with the traditional view of originality, with consequences that remain unclear.n142 Furthermore, under Article 1(3) of the E.C. Software Directive, a program is to be protected if it represents "the author's own intellectual creation."n143 French law was not modified on this point, because the legislators thought that this E.C. definition corresponded to existing law. In any case, French courts are now bound by the definition of the directive in their construction of French law.

The law does not distinguish between programs expressed in source code, that is, in a language in which programmers work, and programs formulated in object code, which is addressed only to machines. Since the program in source code remains unchanged after being compiled into object code, the same rules apply to both versions, even though object code is not made to be humanly intelligible.n144 Nor should protection turn on whether a program is written on paper, stored magnetically on a computer diskette, or in a computer memory.n145 In principle, copyright in software does not extend to functionalities.n146

**[e]-- Government Works.**

As a matter of long-standing principle, but one that is strictly construed, only legislative and administrative texts and judicial decisions, so-called official acts, fall outside the scope of copyright.n147 For example, although speeches of the President take political positions and reflect his thinking on social questions, they do not state the law of France and, accordingly, do not constitute official acts exempt from copyright.n148

The highest French administrative court, the *Conseil d'Etat*,n149 has held that French copyright law only governs relationships between private parties.n150 On that premise, copyright rules of ownership governing collective works, as well as works made on the job or on commission, would not necessarily apply to public servants.n151 The administrative courts seem to require that a Government administration be invested with an author's economic rights when the purpose of the services for which the administration engages the author is to create the work.n152 That said, outside the exempted class of legislative and administrative texts and judicial decisions, French copyright protects creations made either by public servants employed by the French State or at the command of its officials.

Regarding computer programs, Article L. 113-9 of the I.P. Code specifically extends to civil servants, public entities, and State-owned corporations the rules applicable to private employees, except that jurisdiction is reserved to the administrative courts. It follows that the French Republic or other public entity, as the case may be, is the initial owner of the rights to the computer software made by its employees or other agents on the job.n153

**FOOTNOTES:**

(n1) Footnote 1. *See also* § 5[3] *infra* (purely administrative formalities).

(n2) Footnote 2. *See, e.g.,* Lyon, 17 July 1845, D. 1845, II, 128 (protecting a live sermon which had been transcribed without the author's consent).

(n3) Footnote 3. *See also* § 2[2][a] *infra* (unfixed oral works protected) and § 2[2][b] *infra* (statutory fixation requirement for choreographic, mime, and related works generally acknowledged to be purely evidentiary).

(n4) Footnote 4. *See also* § 8[1][a] *infra* (regarding French infringement analysis).

(n5) Footnote 5. *See also* §§ 3[1][c] and 4[2][a][ii] *infra* (consequences for copyright).

(n6) Footnote 6. TGI Paris, 10e ch., 26 May 1989, D. 1988, somm. 210, obs. Colombet.

(n7) Footnote 7. Cass civ. I, 27 Feb. 1990, R.I.D.A. 1990, no. 145, 331. *See also* Paris, 4e ch., 17 March 2000, Juris-Data no. 120791 (refusing to protect the covers of publications made up of a certain format, with backgrounds of vivid and varied colors, titles in such colors, and varying fonts).

(n8) Footnote 8. Cass. civ. I, 17 Oct. 2000, J.C.P. 2000, IV, 2786, Bull. civ. I, no. 248. *See also* TGI Paris, 3e ch., 6 Dec. 2002, Legipresse 2003, I, 42 (not protecting a series of proposals suggesting a news supplement be included within a magazine). On collective works, see § 4[1][b][i] *infra*.

(n9) Footnote 9. *See, e.g.,* Versailles, 14 Jan. 2004 (*Marie Claire Album c. Hamel*), Com. com. electr. 2004, comm. no. 27, note Caron (finding originality in the organization and implementation of a competition). *But see* Paris, 29 June 1977, Ann. prop. ind. 1978, 219 (rejecting the protection under copyright law for the "Miss France" competition).

(n10) Footnote 10. *See, e.g.,* Paris, 4e ch., 19 Dec. 1997, Juris-Data no. 024538 (holding protectible a treatment for an audience-participation television program about a police investigation on an ocean liner); Paris, 4e ch., 27 March 1998, Juris-Data no. 021904 (same holding for a game, describing atmosphere, questions, rules, etc.). On characters, see § 2[4][b] *infra*.

(n11) Footnote 11. *See* § 2[4] *infra*.

(n12) Footnote 12. Nonetheless, French courts have vacillated in cases of culinary dishes and perfumes. *Compare* TGI Paris, 4 June 2004, P.I. Oct. 2004, no. 13, 907 obs. Sirinelli (doubting that originality might be found in the mere list of components of a perfume), *with* Trib. com., Paris, 15e ch., 24 Sept. 1999, Com. com. electr. 2000, comm. no. 41, note Caron (stating that "the creation of new perfumes is the result of truly artistic research"), *and* Paris, 17 Sept. 2004, P.I. Jan. 2005, no. 14, obs. Sirinelli (noting that a perfume may attract copyright if "its fragrance is perfectly distinct from all other fragrances").

(n13) Footnote 13. H. Desbois, *Le droit d'auteur en France*, no. 1 (3rd ed., Paris, 1978).

(n14) Footnote 14. On the fact that distinctions between the types of works often coalesce with distinctions between forms of expression, see § 2[2] *infra*.

(n15) Footnote 15. *See* Cass. crim., 2 May 1961, J.C.P. 1961, II, 12242; Cass. crim., 13 Feb. 1969, D. 1969, 323. *See, e.g.,* Cass., Ass. plen., 7 March 1986, R.I.D.A. 1986, no. 129, 136, note Lucas, D. 1986, 405, concl. Cabannes and note Edelman (two decisions concerning the protectability of video games).

(n16) Footnote 16. *See, e.g.,* Cass. crim. 6 May 1986, R.I.D.A. 1986, no. 130, 149 (pornographic motion pictures); Cass. crim., 28 Sept. 1999, Com. com. electr. 2000, comm. no. 4, note Caron (also accepting to protect pornographic films, irrespective of proof of their "illicit character").

(n17) Footnote 17. *See, e.g.,* Paris, 4e ch., 20 Sept. 1994, R.I.D.A. 1995, no. 164, 367 (evoking "talent" in deciding to protect photographs); TGI Paris, 31e ch., 12 Dec. 1997, Expertises 1998, 272 (noting, with regard to a video game, that "the indisputable fame of the game seems incompatible with a total absence of "originality"). For commentary on application of the general principle, see Carreau, "Merite et droit d'auteur" (*translated into English as*: "Merit and copyright"), R.I.D.A. 1981, no. 109, 13.

(n18) Footnote 18. *See* § 2[1][b][iii][A] *infra*.

(n19) Footnote 19. *See* § 2[4][c] *infra*.

1-FRA International Copyright Law and Practice § 2

(n20) Footnote 20. On the Laws of 1791 and 1793 as the basis for the development of French copyright law through the mid-20th century, see § 1[1] *supra.*

(n21) Footnote 21. *N.b.* Article L. 112-2 of the I.P. Code expressly includes works of applied art in its list of protected types of works. For the conditions of protecting such works, see § 2[4][c] *infra.*

(n22) Footnote 22. Cass. crim., 30 Oct. 1963, D. 1964, 678, note Francon.

(n23) Footnote 23. Cass. crim., 9 Oct. 1974, R.I.D.A. 1975, no. 85, 176.

(n24) Footnote 24. Cass. req., 15 May 1878, D.P. 1879, I, 20.

(n25) Footnote 25. Paris, 18 Dec. 1924, D.H. 1925, 30.

(n26) Footnote 26. Trib. corr. Paris, 10e ch., 17 Jan. 1968, Gaz. Pal. 1968, 1, 197, note R.B.

(n27) Footnote 27. *See* § 2[4][d] *infra.*

(n28) Footnote 28. *See* § 2[4][c] *infra.*

(n29) Footnote 29. For a comparative analysis of the marginally different understandings of "originality" in different copyright laws, see "Introduction," herein, at § 2[2][c][i].

(n30) Footnote 30. *See* §§ 2[1][b][i] and [ii][A] *supra.*

(n31) Footnote 31. For commentary, see A. Lucas and P. Sirinelli, "L'originalite en droit d'auteur," J.C.P. 1993, I, 3681.

(n32) Footnote 32. For further analysis, see § 2[3] *infra.*

(n33) Footnote 33. For examples, see § 2[2][a] *in fine infra. But see* Paris, 4e ch. B, 26 Sept. 2001, Petites Affiches, 22 Aug. 2002, no. 168, 12, note C. Alleaume (not protecting definitions of financial terms in a dictionary, these being found to be formulated without "any arbitrary or free choice" and, consequently, without "the imprint of the personality of [any] author").

(n34) Footnote 34. *See, e.g.,* Versailles, 13e ch., 18 Nov. 1999, Com. com. electr. 2000, comm. no. 16, note Caron (stating, in the case of a video game, "although caught within narrow limits," the task of the author "was not limited to using a simple technology, but left him enough initiatives and creative options, involving his imagination, sensitivity, artistic sense, and vision"). On originality in the field of photography, see § 2[2][b] *infra.*

(n35) Footnote 35. *See, e.g.,* Paris, 4e ch., 5 Oct. 1994, R.I.D.A. 1995, no. 166, 302, D. 1996, 53, note Edelman (restoration of old film work found not to result in new original derivative or composite work, since the restorer, constrained to make a copy strictly faithful to the images and spirit of the old work, had no creative choice and therefore could make no original contribution). *But see* TGI Paris, 3e ch., 10 May 2002, Com. com. electr. 2002, comm. no. 112, note C. Caron, P.I. Oct. 2002, no. 5, 40, obs. A. Lucas (restored garden found to constitute an original work), *affirmed,* Paris, 11 Feb. 2004, P.I. 2004 no. 12, 766 obs. Lucas. *Compare* Wilkof, "Israel," at § 2[1][b][ii] (restoration of damaged parts of Dead Sea Scrolls, calling for creativity and discretion in choosing among a variety of alternatives, attracts copyright); Musso, "Italy," at § 2[2][d] (restoration of old work of art, giving it a *quid novi*, attracts copyright).

(n36) Footnote 36. *See* H. Desbois, *Le droit d'auteur en France*, no. 60 (3rd ed., Paris, 1978).

(n37) Footnote 37. *See, e.g.,* Paris, 4e ch., 11 June 1997, D. 1998, somm., 192, obs. Colombet (holding a fresco protectible by copyright since such a work is likely to bear the mark of the artist's personality). *See also* Cass. civ. I, 9 Nov. 1993, J.C.P. 1994, IV, 80, R.I.D.A. 1994, no. 161, 273 (*Gieules*) (admitting the protection of copies of works of art).

(n38) Footnote 38. For examples of how the issue of originality arises in infringement analysis, see § 8[1][a] *infra.*

(n39) Footnote 39. For a brief explanation of the French appellate system, including cases decided in full assembly, see § 1[4] *supra.*

(n40) Footnote 40. Cass., Ass. plen., 7 March 1986, R.I.D.A. 1986, no. 129, 136, note Lucas, D. 1986, 405, note Edelman. *See also* Cass. civ. I, 2 March 1999, R.I.D.A. 1999, no. 181, 309 (applying the criterion of intellectual input and deciding that synopses for children's' programs were not original in that they displayed neither personal creation nor any particular imagination).

1-FRA International Copyright Law and Practice § 2

(n41) Footnote 41. *See* Paris, 4e ch., 27 Jan. 1987, J.C.P. E. 1987, II, no. 2, 16607, obs. Vivant and Lucas; TGI Paris, 3e ch., 27 March 1987, J.C.P. E. 1987, II, no. 5, 15297, obs. Vivant and Lucas.

(n42) Footnote 42. *See* § 2[1][b][ii][A] *supra*. On the difficulty of reconciling the traditional definition of original-ity and the protection of utilitarian compilations, see § 2[3][b] *infra*. On computer programs as a subject matter of copyright, see § 2[4][d] *infra*.

(n43) Footnote 43. On the remaining, unquoted clause in this provision on fashion industry products, see § 2[2][b] *in fine infra*.

(n44) Footnote 44. *See* § 2[1][b][ii][A] *supra*.

(n45) Footnote 45. *See* §§ 2[2][c], 2[3][a] *in fine*, and 9[1] *infra*.

(n46) Footnote 46. For examples, see §§ 2[2][a] and 2[4][a] *infra*.

(n47) Footnote 47. *See, e.g.,* Lyon, 17 July 1845, D. 1845, II, 128 (live sermon protected).

(n48) Footnote 48. *See, e.g.,* Paris, 4e ch., 18 March 2003, Com. com. electr. 2003, comm. no. 80, note Caron (verse "the sun has a *rendez-vous* with the moon," from a song, held original and protected as such). *See also* § 2[4][a] *infra* (also on the status of single words).

(n49) Footnote 49. *See* Cass. req., 8 Aug. 1861, D.P. 1862, 1, 136; Trib. civ. Seine, 3e ch., 5 Feb. 1954, Gaz. Pal. 1954, 1, 182.

(n50) Footnote 50. *See* TGI Paris, 1e ch., 24 Mar. 1982, J.C.P. 1982, II, 19901, note Bonet. *Cf.* Bordeaux, 24 May 1984, D. 1986, inf. rap. 181, obs. Colombet (book of memoirs). *See generally* Reboul, "Le regime juridique de l'inter-view" (*translated into English as*: "The legal regime of the interview"), R.I.D.A. 1987, no. 131, 55.

(n51) Footnote 51. *See* Paris, 30 Dec. 1897, *affirmed,* Cass. req. 23 May 1900, D.P. 1902, I, 405.

(n52) Footnote 52. *See* Cass. com., 16 June 1964, J.C.P. 1965, II, 14059; Paris, 15e ch., 2 May 1975, J.C.P. 1979, II 19110, note Leduc.

(n53) Footnote 53. *Compare* Paris, 27 March 1998, D. 1999, no. 28, 417 (finding a project for a television show protected by copyright insofar as it consisted of an original compilation, even though its elements were well known), *with* Paris, 4e ch. B, 21 Sept. 2001, P.I. 2002, no. 4, 49, obs. A. Lucas (refusing to protect a project for a three-minute television presentation relating to products of the French overseas territories).

(n54) Footnote 54. Paris, 4e ch., 21 Feb. 1978, Ann. prop. ind. 1979, 362.

(n55) Footnote 55. Trib. com. Seine, 16 May 1925, Gaz. Pal. 1925, 2, 402.

(n56) Footnote 56. TGI Paris, 1re ch., 11 Dec. 1985, D. 1987, inf. rap. 155, obs. Colombet.

(n57) Footnote 57. Paris, 4e ch., 17 May 1975, Gaz. Pal. 1977, 1, 15.

(n58) Footnote 58. Paris, 4e ch., 21 Feb. 1984, D. 1984, inf. rap. 285, obs. Colombet.

(n59) Footnote 59. Paris, 9e ch., 9 March 1964, Gaz. Pal. 1964, 1, 375; TGI Seine, 1 Feb. 1967, Gaz. Pal. 1967, 2, 18.

(n60) Footnote 60. Cass. civ. I, 8 Nov. 1983, Bull. civ. I, no. 260, D. 1985, inf. rap. 309, obs. Colombet; Paris, 4e ch., 20 April 1989, R.I.D.A. 1990, no. 143, 317.

(n61) Footnote 61. *See* TGI Paris, 3e ch., 30 April 2003, R.I.D.A. 2003, no. 197, 319 (holding that a "theory" on Rugby cannot be protected, notwithstanding its merit and its contribution to this sport).

(n62) Footnote 62. *See* § 2[1][b][ii][D] *supra*. On finding originality in such works, see § 2[1][b][iii] *supra*.

(n63) Footnote 63. Trib. corr., Paris, 10e ch., 17 Jan. 1968, Gaz. Pal. 1968, 1, 197, note R.B.

(n64) Footnote 64. Trib. corr. Seine, 2 Feb. 1912, Ann. prop. ind. 1912, 290; Paris, 4e ch., 17 May 1975, Gaz. Pal. 1977, 1, 15.

(n65) Footnote 65. Paris, 4e ch., 8 Nov. 1977, Gaz. Pal. 1978, 1, somm. 123. For further examples, see § 2[1][b][i][A] *supra* and §§ 2[3][b] *in fine* and 2[4][d] *infra*.

(n66) Footnote 66. Paris, 4e ch. B, 26 Sept. 2001, Petites Affiches, 22 August 2002, no. 168, 12, note C. Alleaume.

(n67) Footnote 67. *See* § 2[1][b][ii][A] *supra*.

(n68) Footnote 68. Paris, 14e ch., 13 March 1986, Gaz. Pal. 1986, 1, 238, D. 1987, inf. rap. 150, obs. Colombet.

(n69) Footnote 69. Trib. corr. Paris, 12 July 1977, Gaz. Pal. 1978, 1, 41; Aix, 11 June 1987, C.D.A., Jan. 1988, 23. *See also* CA Paris, 14e ch., 13 Oct. 1999, Expertises Jan. 2000, 434 (protecting a fashion show).

(n70) Footnote 70. *See* § 2[2][a] *in fine supra*.

(n71) Footnote 71. Paris, 4e ch., 7 Jan. 1991, D. 1991, inf. rap. 34, J.C.P. 1991, IV, 180. *See also* Cass. civ. I, 30 June 1998, J.C.P. 1998, IV, 2972, R.I.D.A. 1998, no. 178, 237 (map of hiking trails); Paris, 22 June 1999, Com. com. electr. 1999, comm. no. 36, note Caron, *affirmed*, Cass. civ. I, 8 Jan. 2002, R.I.D.A. 2002, no. 193, 321, obs. A. Kerever (map of the Pere Lachaise cemetery in Paris); Riom, 14 May 2003, D. 2003, somm. 2754, obs. Sirinelli (considering geographical maps created from satellite photographs as "the result of a personalized implementation of a complex technology by a process of transformation and improvement, of choices, in particular of colors, contrasts and of luminosity").

(n72) Footnote 72. *See* § 2[1][b][iii][B] *supra*.

(n73) Footnote 73. *See, e.g.*, Cass. crim, 18 June 1969, Bull. crim. no. 200, Gaz. Pal. 1969, 2, somm. 5 (topographical maps).

(n74) Footnote 74. Paris, 4e ch., 14 Jan. 1983, D. 1983, inf. rap. 510, obs. Colombet.

(n75) Footnote 75. *See, e.g.*, Cass. civ. I, 4 March 1986, Bull. civ. I, no. 54 (masthead and lay-out of the front page of a newspaper).

(n76) Footnote 76. Cass. civ. I, 15 July 1993, J.C.P. 1993, IV, 2392. *See also* Paris, 4e ch., 11 Oct. 2000, R.I.D.A. 2001, no. 189, 362, Com. com. electr. 2001, comm. no. 24, note Caron (admitting copyright protection for fonts reproduced and distributed on a CD-Rom).

(n77) Footnote 77. Article 3 of the 1957 Copyright Act had originally listed only "photographic works of an artistic or documentary character."

(n78) Footnote 78. For the general rules for assessing originality, see § 2[1][b][iii] *supra*.

(n79) Footnote 79. *See generally* Cass. civ. I, 14 Nov. 2000, Juris-Data no. 006895 (explaining that the trial judge has to inquire, case by case, into the creativity of photographs). *See, e.g.*, Cass. civ. I, 12 Jan. 1994, R.I.D.A. 1994, no. 162, 427 (protecting with copyright photographs of scenes of a highly suggestive film since the photographer, to capture the attention of the public, made choices of the most opportune moments and methods of getting shots). *Compare* Cass. civ. I, 1 March 1988, R.I.D.A. 1988, no. 137, 103 (refusing copyright protection for shots of a technician providing reference points during the shooting of a film), *with* Paris, 4e ch., 14 Sept. 2001, Juris-Data no. 156061 (protecting a photograph where the photographer asks the actors to take a pose which did not correspond to any scene in the film).

(n80) Footnote 80. *See* Versailles, 12e ch., 28 April 1988, R.I.D.A. 1988, no. 138, 319; Paris, 8e ch., 17 June 1988, D. 1989, somm. 44, obs. Colombet.

(n81) Footnote 81. *See, e.g.*, Paris, 8e ch., 17 June 1988, D. 1989, somm. 44, obs. Colombet (contribution of a stylist, who chooses objects, arrangement, and decoration of the set to be photographed, not necessarily technical, but possibly protectible by copyright); Dijon, 1re ch., 7 May 1996, D. 1998, somm. 189, obs. Colombet (holding photograph of painting protectible by virtue of creative choices, even in reproduction faithful to the original). *But see* Versailles, 11 Dec. 1997, D. 1999, somm. 63, obs. Colombet (finding no originality in photographs responding to unavoidable technical constraints); Bordeaux, 29 April 1997, D. 1999, somm. 64, obs. Colombet (not protecting photographs of ordinary consumer goods).

(n82) Footnote 82. *Compare* Paris, 4e ch., 5 May 2000, R.I.D.A. 2001, no. 188, 352 (finding the photograph of a mobile to be original), *with* Paris, 13 Oct. 2003, P.I. Jan.. 2004, no. 10, 539, obs. Lucas (finding some photographs of film sets to be original and others to lack originality). For commentary, see A. Latreille, "L'appropriation des photographies d'ouvres d'art: elements d'une reflexion sur un objet de droit d'auteur" (The appropriation of photographs of works of art: some reflections on the subject matter of copyright), D. 2002, chron. 299.

(n83) Footnote 83. *See, e.g.,* Aix-en-Provence, 20 Jan. 2004 (photographs of products in a commercial catalogue).

(n84) Footnote 84. *See, e.g.,* TGI Paris, 3e ch., 20 Dec. 1996, R.I.D.A. 1997, no. 173, 351 (finding infringement of the copyright in the theatrical presentation of a magician's act).

(n85) Footnote 85. Colombet, *Propriete litteraire et artistique*, no. 82 (Paris, 1994). *See* Versailles, 1re ch., 9 July 1991, R.I.D.A. 1993, no. 158, 208 (protecting a character created by a mime), and Paris, 17 Dec. 2003, P.I. Jan. 2004, no. 10, 137, obs. Sirinelli (holding a magic show original, but rejecting infringement by a second show).

(n86) Footnote 86. *See* §§ 3[1][a], 4[1][a][ii], and 4[3][c][iii] *infra*.

(n87) Footnote 87. *See, e.g.,* Paris, 4e ch., 12 Dec. 1995, D. 1997, 237, note Edelman (finding protectible a coherent audiovisual production resulting from selecting and organizing documents previously scattered throughout a large archive); TGI Strasbourg, 2e ch., 16 Nov. 2001, R.I.D.A. 2002, no. 192, 463 (protecting a television news program as an audiovisual work).

(n88) Footnote 88. *See* Lucas, *Traite de la propriete litteraire et artistique*, no. 130 (Litec, Paris, 2d ed., 2001); P. Kamina, *Film Copyright in the European Union*, no. 65 (2002).

(n89) Footnote 89. *Compare* Cass., Ass. plen., 7 March 1986 (2 cases: *Atari* and *Williams Electronics*), J.C.P. 1986, II, 20631, note J.M. Mousseron, B. Teyssie, and M. Vivant, R.I.D.A. 1986, no. 129, 136, note Lucas, D. 1986, 405, concl. Cabannes and note Edelman (holding that screen displays of videogames may be protected as audiovisual works, separately from the software that drives them), *with* Cass. civ. I, 28 Jan. 2003, Com. com. electr 2002, comm. no. 35, note C. Caron; P.I., April 2003, no.7, 159, obs. Sirinelli; Legipresse 2003, III, 79, note Varet (holding that the interactivity of a CD-Rom precludes finding it an audiovisual work); Versailles, 18 Nov. 1999, Com. com. electr 2000, comm. no. 2, note Caron (finding no audiovisual work in an interactive videogame, which did not have the sequential and linear presentation of the images of an audiovisual work); TGI Paris, 3e ch., 8 Sept. 1998, R.I.D.A. 1999, no. 181, 318 (finding no audiovisual work in a multimedia work which lacked moving sequences), *affirmed*, Paris, 4e ch., 28 April 2000, Com. com. electr. 2000, comm. no. 86, note Caron.

(n90) Footnote 90. *Compare* Cass. civ. I, 27 June 2000, R.I.D.A. 2001, no. 187, 179, obs. Kerever (refusing copyright in architect's plans for individual houses without "any personal creative input"), *with* Cass. civ. I, 2 May 2001, Juris-Data no.009409 (overturning a lower court decision for not having specified in what regards the plans and sketches made by an engineer for the building of architectural works lacked originality), *and* Paris, 4e ch., 20 Nov. 1996, J.C.P. 1997, II, 22937, note Pollaud-Dulian; R.I.D.A. 1997, no. 173, 321 (finding that renovation may constitute an architectural work). *But cf.* Versailles, 12e ch., 11 Oct. 2001, P.I. 2002, no. 3, 45, obs. Lucas, *appeal rejected*, Cass. Civ. I, 17 June 2003, Com. com. electr. 2003, comm. no. 80, note Caron (refusing to protect with copyright the overall concept for displays in retail stores, effectively an idea for "trade dress").

(n91) Footnote 91. *See* § 2[1][b][ii][D] *supra*.

(n92) Footnote 92. *See* § 2[4][c] *infra*.

(n93) Footnote 93. *N.b.* this provision subjects fashion creations in the field of clothing to the general regime of copyright, thus superseding the Law of March 12, 1952, which covered this field with specific rules. For details, see Lucas, *Traite de la propriete litteraire et artistique*, no. 126 (Litec, Paris, 2d ed., 2001). *See, e.g.,* TGI Paris, 3e ch., 30 June 2000, Expertises 2000, 394 (on protecting fashion collections shown online).

(n94) Footnote 94. *See, e.g.,* Trib. com. Nanterre, 7e ch., 25 June 1996, R.I.D.A. 1997, no. 171, 402, note Kerever (finding originality in distinctive percussive combinations).

(n95) Footnote 95. *See* Schwartz, "United States," herein, at § 2[2][g].

(n96) Footnote 96. *See* §§ 2[3][a] *in fine* and 9[1][a][ii] *infra*.

(n97) Footnote 97. Paris, 4e ch., 6 Oct. 1979, D. 1981, 190, note Plaisant, Rev. trim. dr. com. 1980, 346, obs. Francon.

(n98) Footnote 98. *See* Grenoble, 1 Dec. 1981, R.I.D.A. 1983, no. 115, 130. *See, e.g.,* Paris, 4e ch., 21 March 1989, D. 1989, inf. rap. 124 (an English-French dictionary).

(n99) Footnote 99. *See generally* Cass. civ. I, 9 Nov. 1993 (*Gieules*), J.C.P. 1994, IV, 80, R.I.D.A. 1994, no. 161, 273 (declaring that "copies of works of the visual arts" are protected by copyright as long as they are "executed by the

hand of their authors" and "bear the imprint of personality"); *also* Cass. civ. I, 5 May 1998, Bull. civ. I, no. 162 (same sense in the same matter). *Compare* TGI Paris, 3e ch., 28 May 1997, Juris-Data no. 045122 (admitting copyright in the reconstruction of a statue from the Versailles Palace), *with* Nimes, 1re ch., 27 May 1993, Juris-Data no. 030363 (no protection for an artisan who made an identical reproduction of an historic model of a vase).

(n100) Footnote 100. *See* TGI Seine, 3e ch., 2 Nov. 1965, J.C.P. 1966, II, 14577, note Boursigot, Rev. trim. dr. com. 1966, 579, obs. Desbois; TGI Paris, 27 Nov. 1985, R.I.D.A. 1986, no. 129, 166, Rev. trim. dr. com. 1986, 397, obs. Francon; TGI Paris, 6 July 1990, R.I.D.A. 1991, no. 147, 348. *Cf.* Cass. civ. I, 3 March 1992, D. 1993, 358, note Edelman (protecting a "visual creation" consisting in the play of lights intended to reveal and highlight the lines and forms of the Eiffel Tower).

(n101) Footnote 101. *Compare* Cass. civ. I, 4 Jan. 1964, D. 1964, 321, J.C.P. 64, II, 13712 (*Furtwangler* case) (protecting performances of a conductor under the law of unfair competition), *with* Cass. civ. I, 15 March 1977, R.I.D.A. 1977, no. 93, 141, Rev. trim. dr. com. 1977, 501, obs. Desbois (rejecting copyright protection for musical performers).

(n102) Footnote 102. *See* § 9[1][a][i] *infra*.

(n103) Footnote 103. *See, e.g.,* Paris, 1re ch., 10 Mar. 1970, D. 1971, 114, note P.L. (orchestration). For discussion, see H. Desbois, *Le droit d'auteur en France*, nos. 113 and 115 (3rd ed., Paris, 1978).

(n104) Footnote 104. As amended by the Law of December 16, 1996, to take account of the TRIPs Agreement, and the Law of July 1, 1998, to implement the E.C. Database Directive.

(n105) Footnote 105. On this directive, see "E.C.," herein, at § 4[2][f], with text in Appendix 6 (hereinafter "E.C."). On related rights in the contents of databases, see § 9[1][b][ii] *infra*.

(n106) Footnote 106. *See, e.g.,* Cass. crim., 27 Nov. 1869, D.P. 1870, I, 186 (almanac); Paris, 18 Dec. 1924, D.H. 1925, 30 (address book); Douai, 4 Dec. 1964, Ann. prop. ind. 1965, 218 (calendar classifying football teams); Cass. civ. I, 21 May 1975, Bull. civ. I, no. 171 (schedules of prices); Cass. civ. I, 2 Dec. 1997, R.I.D.A. 1998, no. 176, 411 (administrative guide); Cass. civ. I, 5 May 1998, J.C.P. 1998, IV, 2437, Bull. civ. I, no. 161, 108 (directory of medical laboratories); Paris, 14e ch. B, 11 Jan. 2002, Com. com. electr 2002, comm. no. 97, note Caron, P.I. 2002, no. 5, 42, obs. A. Lucas (protecting a collection of biographical information and of photos of French bishops).

(n107) Footnote 107. *See, e.g.,* Paris, 4e ch., 5 April 1994, D. 1995, somm. 54, obs. Colombet (finding a selection in a *Gaiguide* of bars, hotels, restaurants, and places for the homosexual community so marked with author's personality). *Compare* Paris, 1re ch., 2 Oct. 1997, D. 1998, 312, note Edelman; R.I.D.A. 1998, no. 176, 422 (admitting copyright in the *Musee du Cinema* as a collection of films created by Henri Langlois by virtue of his personal selection), *with* Paris, 1re ch., 25 May 1988 (*Schlumpf* case), D. 1988, 542, note Edelman (refusing copyright in a museum consisting of a collection of vintage cars) (also discussed in § 7[1] *infra*).

(n108) Footnote 108. *See, e.g.,* Cass. crim. 2 June 1982, Bull. crim. no. 138, D. 1983, inf. rap. 89, obs. Colombet (notebooks for football fans); Cass. civ. I, 8 Dec. 1987, R.I.D.A. 1988, no. 136, 140 (file cards with a commonplace layout); Versailles, chs. reunies, 20 Nov. 1991, R.I.D.A. 1992, no. 153, 170 (an auctioneer's catalog); Paris, 4e ch., 23 Sept. 1992, R.I.D.A. 1993, no. 156, 224 ("Encyclopedia of Good Stories").

(n109) Footnote 109. Paris, 4e ch., 16 Jan. 1995, Expertises 1996, 40, obs. Bertrand. *See also* Paris, 4e ch., 8 Oct. 1997, Juris-Data no. 024398 (finding that collecting, inventorying, and sorting out of the catalog of a painter's work in chronological order did not in itself qualify for copyright protection); Paris, 29 Oct. 2003, Com. com. electr 2004, comm. no. 37, note Caron (finding insufficient originality in a database, the entries of which are classified alphabetically and which copies the presentation of a previous guide).

(n110) Footnote 110. Rennes, 1re ch., 16 May 1995, Juris-Data no. 047866. *See also* Paris, 4e ch., 18 June 1999, R.I.D.A. 2000, no. 193, 316, Expertises 1999, 390, Com. com. elec. 1999, comm. no. 21, note Caron (not protecting compilation of legal notices which the publisher neither chose nor arranged with originality).

(n111) Footnote 111. Douai, 1re ch., 7 Oct. 1996, R.I.D.A. 1997, no. 172, 286, *appeal rejected*, Cass. civ. I, 5 Jan. 1999, R.I.D.A. 1999, no. 180, 353 ("graphic scheme" of such a map "is unavoidable for anyone who wishes to classify wines by years and regions of production").

(n112) Footnote 112. *See, e.g.,* Paris, 4e ch., 20 Sept. 1996, D. 1997, somm., 238, obs. Colombet (admitting protection of tables of automobile repair rates, but specifying that technical data from the tables may be freely utilized once published).

(n113) Footnote 113. Cass. civ. I, 2 May 1989, J.C.P. 1990, II, 21392, note Lucas, R.I.D.A. 1990, no. 143, 309. *See also* Paris, 4e ch., 16 Jan. 1995, D. 1995, inf. rap. 65 (no protectible work of the mind found in lists simply compiling names and addresses of specialists in musical instruments, absent any "intellectual contribution" as much to the text as to graphics).

(n114) Footnote 114. Cass. civ. I, 5 Oct. 1994, R.I.D.A. 1995, no. 163, 205.

(n115) Footnote 115. *See, e.g.,* Trib. com. Nanterre, 5e ch., 27 Jan. 1998, Expertises 1998, 157, J.C.P. E. 1998, 850, obs. Vivant et Le Stanc (protecting a database accessible on the Internet); Paris, 4e ch., 12 Sept. 2001, J.C.P. 2002, II, 10000, note Pollaud-Dulian, Com. com. electr. 2001, comm. no. 121, note Caron, *translated into English in* E.C.D.R. 2003, 206 (holding that catalogues of exhibitions or fairs, including alphabetically ordered information on each participant that corresponded to fields of activity and geographical zones, constituted protected databases).

(n116) Footnote 116. *See* § 9[1][b][ii] *infra*.

(n117) Footnote 117. *See* § 2[4][d] *infra*.

(n118) Footnote 118. *See* A. Lucas, J. Deveze, and J. Frayssinet, *Le droit de l'informatique et de l'Internet* (Computer and internet law), no. 583 (Paris, Themis, PUF, 2001).

(n119) Footnote 119. *See, e.g.,* Versailles, 13e ch., 11 March 1993 (*TF 1 c. Antenne* 2), R.I.D.A. 1993, no. 158, 219, note Gaubiac (remedy for television production company when its competitor too closely followed its concept for the program *La nuit des heros*). *Cf.* Paris, 1re ch., 25 May 1988 (*Schlumpf* case), D. 1988, 542, note Edelman (holding that a collection of vintage cars, organized as a museum, was not a work of the mind, but granting remedies to protect family memory associated with museum). *See* § 7[1] *infra*.

(n120) Footnote 120. *See, e.g.,* TGI Paris, 3e ch., 7 May 1987, C.D.A., Jan. 1988, 15 (*Paris pas cher*: Paris on the Cheap); Paris, 1re ch., 25 Sept. 1989, R.I.D.A. 1990, no. 144, 207 (*Le Chardon*: The Thistle).

(n121) Footnote 121. *See, e.g.,* TGI Paris, 3e ch., 15 June 1972, R.I.D.A. 1973, no. 75, 151 (*Doucement les basses*: Easy Does It); TGI Paris, 3e ch., 6 May 1987, R.I.D.A. 1987, no. 134, 213 (*La gagne*: The Win).

(n122) Footnote 122. *See, e.g.,* Paris, 1re ch., 18 Dec. 1990 (*de Villiers c. Soton*), D. 1993, 442, note Edelman, *appeal rejected*, Cass. civ. I, 5 May 1993, R.I.D.A. 1993, no. 158, 205 (admitting that the creator of a central character in a series of novels may claim copyright in title common to the series, *The Fantasies of the Countess Alexandra*, originality being found in the fact that the title recalled elements essential for identifying this character) (also discussed in § 2[4][b] *infra*).

(n123) Footnote 123. *Compare* Paris, 4e ch., 24 Oct. 1994, Rev. dr. prop. intell., June 1995, 47 (*Val Infos* protected since these words have no descriptive character when used to designate a newspaper in the Paris region), *with* TGI Nanterre, 28 June 1995, Rev. dr. prop. intell., Dec. 1995, 52 (*Les Maitres du temps*--Masters of Time--not protected, since these words are necessary to express the banal notion of voyages in space and time).

(n124) Footnote 124. *Compare* Paris, 4e ch., 30 June 2000, Com. com. electr. 2001, comm. no. 97, note Caron (refusing protection), *with* Versailles, 12e ch., 11 Jan. 2001, Com. com. electr. 2001, comm. no. 97, note Caron (admitting protection).

(n125) Footnote 125. Paris, 4 April 1960, R.I.D.A. 1960, no. 28, 153, D. 1960, 535, note Desbois, *reversed on standing*, Cass. civ. I, 6 Dec. 1966, R.I.D.A. 1967, no. 53, 15.

(n126) Footnote 126. *See, e.g.,* Chambery, 10 Dec. 1951, Gaz. Pal. 1952, I, 116 (Professor Nimbus); Paris, 15 Oct. 1964, Ann. prop. ind. 1965, 213 (Donald Duck); Cass. civ. I, 14 Oct. 1980, D. 1981, inf. rap. 87, obs. Colombet (Poulbot); TGI Nice, 3e ch., 24 Jan. 2000, R.I.D.A. 2000, no. 186, 305 (holding that Chaplin's character of the little tramp constitutes in itself a work protected independently of the films in which he appeared); Paris, 8 Sept. 2004, P.I. Jan. 2005, 70, obs. Sirinelli, Com. com. electr. 2004, comm. no. 136, note Caron (protecting the central character of a film from being adapted in an advertisement).

(n127) Footnote 127. *See, e.g.*, TGI Paris, 3e ch., 21 Jan. 1977, R.I.D.A. 1978, no. 95, 179 (copyright of creator of literary Tarzan vindicated, but court refers to subsequent film and television portrayals). *See also* TGI Paris, 3e ch., 6 Dec. 1989, C.D.A., May 1990, 21, *reversed*, Paris, 4e ch., 22 Nov. 1990 (discussed in § 8[1][a] *infra*) (finding of infringement, in part based on a taking of literary characters, reversed).

(n128) Footnote 128. Cass. civ. I, 5 May 1993 (*de Villiers c. Soton*), R.I.D.A. 1993, no. 158, 205, *rejecting appeal from* Paris, 1re ch., 18 Dec. 1990, D. 1993, 442, note Edelman.

(n129) Footnote 129. Applications for the registration of industrial designs are filed with the *Institut National de la Propriete Industrielle* (National Institute of Industrial Property). Under the law revised by the Ordinance of July 25, 2001, protection is granted for an initial period of five years from filing, which can be renewed for five-year periods up to a maximum of twenty-five years.

(n130) Footnote 130. On this theory, see § 2[1][b][ii][D] *supra*.

(n131) Footnote 131. For a critical overview, see E. Garnier, "La protection juridique des creations du 'design' " (*translated into English as*: "The legal protection of creations of industrial design"), R.I.D.A. 2004, no. 200, 3.

(n132) Footnote 132. On this directive, see "E.C.," herein, at § 4[3][c][i]. On the E.C.-wide rights in registered and unregistered designs, instituted by the Design Regulation, see *id.*, at § 4[3][c][ii].

(n133) Footnote 133. *See* Cass. com., 22 Jan. 1973, D. 1973, 217, note X.L.

(n134) Footnote 134. *See* Cass. com., 2 June 1964, Gaz. Pal. 1964, 2, 325; Cass. com. 23 June 1987, Bull. civ., IV, no. 156.

(n135) Footnote 135. *See* Lyon, 31 March 1943, Ann 1948, 368; Paris, 4e ch., 8 June 1982, Gaz. Pal. 1983, 2, somm. 289.

(n136) Footnote 136. *Compare* Cass. civ. I, 28 March 1995, R.I.D.A. 1995, no. 165, 327 (on ground that copyright is not precluded by the fact that form is dictated by function, trial court could properly find that set of elements composing an egg crate still had sufficient originality to constitute a work protectible by copyright), *and* Cass. com., 21 March 1995, R.I.D.A. 1995, no. 166, 279 (copyright available as long as the form at issue, although handy and functional, is not uniquely determined by technological requirements), *with* Cass. civ. I, 28 Nov. 2000, J.C.P. 2001, IV, 1144, Bull. civ., I, no. 309 (cooking utensil found to lack originality once its construction is uniquely determined by its function).

(n137) Footnote 137. *See, e.g.,* S.A. Decathlon c. Ste. Oakley, Paris, 4e ch., 24 Jan. 1997, Rev. dr. prop. ind., Oct. 1997, no. 80, 46, note H.-J. Lucas, J.C.P. E. 1999, 369 (refusing to accord copyright in U.S. designs of eyeglass frames on this basis). For further analysis, see "Introduction," herein, at § 4[1][c][i][A].

(n138) Footnote 138. *See* Cass. com., 26 March 2002, R.I.D.A. 2002, no. 193, 409, Propriete industrielle, June 2002, chron. no. 37, note Kamina; Cass. civ., 5 March 2002, R.I.D.A. 2002, no. 193, 405; Paris, 4e. ch., 16 Nov. 2001, JCP E 2002, 1334, no. 9, obs. H-J Lucas, P.I. 2002, no. 4, 65, 1st case, obs. A. Lucas.

(n139) Footnote 139. On the *Phil Collins* decision, see § 6[1][a][ii] *infra*, "E.C.," herein, at § 1[2][e], and "Introduction," herein, at § 5[1][c][i].

(n140) Footnote 140. *See, especially,* Paris, 4e. ch., 16 Nov. 2001, Propriete industrielle, June 2002, chron. no. 37.

(n141) Footnote 141. The 1985 Amendment Act had grouped these special provisions under the separate heading of its Title V. It had also, originally, granted only a term of protection of 25 years from creation, effectively that of a *sui generis* regime. The I.P. Code relocates the software provisions among other copyright provisions, eliminating any separate heading. The term of protection is now the same as works generally. On software made on the job, see § 4[1][b][ii][C] *infra*. On special provisions concerning the private copying of software, see § 8[2][d][i] *infra*. On rights in designs of integrated circuits, see § 9[1][b][iii] *infra*.

(n142) Footnote 142. Cass., Ass. plen., 7 March 1986 (*Pachot*), R.I.D.A. 1986, no. 129, 136, note Lucas, D. 1986, 405, note Edelman (further explained in § 2[1][b][iii][B] *supra*).

(n143) Footnote 143. For further details, see "E.C.," herein, at § § 4[2] and 4[2][b].

(n144) Footnote 144. *See* Nancy, 4e ch., 12 Sept. 2002, Expertises 2003, 71 ("as from the moment when the software has a physical existence, even at the stage of the writing of the "text" in high-level language, it benefits from a legal protection insofar as it is about a creation of the minds presenting an original character").

(n145) Footnote 145. *See* TGI Paris, 1re ch., 21 Sept. 1983, D. 1984, 77, note Le Stanc.

(n146) Footnote 146. *See* Versailles, 12e ch., 9 Oct. 2003, Expertises 2004, 31, Com. com. electr. 2004, comm. no. 25, note Caron.

(n147) Footnote 147. *See* H. Desbois, *Le droit d'auteur en France*, nos. 39 *et seq.* (3rd ed., Paris, 1978). *But see* Paris, 1re ch., 10 Nov. 1999, D. 2000, 322, note Boudry (holding, without expressly applying this exception, that the Bank of France could not assert copyright in its bills). In a recent communication (COM (2001) 600 final), the European Commission claims ownership of the copyright in the drawings of the side of euro coins common to all Member States and states that these rights have been transferred to each of the Member States.

(n148) Footnote 148. TGI Paris, 3e ch., 25 Oct. 1995, R.I.D.A. 1996, no. 167, 294.

(n149) Footnote 149. On this *Conseil d'Etat*, see § 1[4] *supra*.

(n150) Footnote 150. CE, 21 Nov. 1972 (unpublished).

(n151) Footnote 151. On such rules of ownership, see § 4[1][b] *infra*.

(n152) Footnote 152. *See, e.g.*, Trib. Adm. Versailles, 17 Oct. 2003, Com. com. electr. 2004, comm. no. 1, note Caron (for lectures by a teacher); TGI Paris, 1re ch., 31 March 1999, R.I.D.A. 2000, no. 180, 333, note Kerever (vesting in the State a copyright in a scientific work created by a recipient of research subsidies); CE, 10 July 1996, R.I.D.A. 1996, no. 170, 207, note Kerever (holding that a directory of French enterprises, created and exploited by the National Institute of Statistics and Economic Studies (INSEE), constituted a database in which this governmental Institute initially owned rights of "intellectual property").

(n153) Footnote 153. *See* § 4[1][b][iv][C] *infra*.

1 of 1 DOCUMENT

International Copyright Law and Practice
Copyright 2005, Matthew Bender & Company, Inc., a member of the LexisNexis Group.

FRANCE

*1-FRA International Copyright Law and Practice § 4*

## Ownership and Transfer

### [1]-- Initial Ownership

According to the fundamental principle dominating French copyright law, only the natural persons who create works may be deemed to be authors. Legal entities may hold a copyright, but generally only by virtue of express or implied transfer by the author or authors.n1  There is one clear-cut exception to this principle: it applies to collective works.n2

Article L. 113-1 of the I.P. Code provides: "Absent proof to the contrary, the status of author belongs to the person or persons under whose names the work has been divulged." This presumption benefits any natural person whose name has in any way been made public expressly as that of the author of the work in question.n3  Absent claims by natural persons as authors, the fact that a legal entity owns copies and exploits a work under its own name, however that work is characterized, raises the rebuttable presumption that the entity owns copyright in the work as against third-party infringers.n4  Furthermore, Article L. 113-5 of the I.P. Code provides: "A collective work is, in the absence of proof to the contrary, the property of the natural person or the legal entity under whose name it is disclosed."n5  Thus legal entities like corporations, seeking standing to sue for infringement, need not always initially trace their chain of title back to the natural persons creating the work at issue.n6

As long as an author chooses to remain unknown,n7 Article L. 113-6 of the I.P. Code authorizes the original publisher of any given anonymous or pseudonymous work to represent him in the exercise of his rights in that work.n8  It further sets out the rule that the rights of an author of such a work are subject to those acquired by third parties by contract. As explained below, Article L. 121-2 determines who, after the author's death, may disclose or publish a posthumous work.n9

#### [a]-- Joint Works.

Article L. 113-2 of the I.P. Code distinguishes between collaborative, composite, and collective works, all authored by more than one person. Collaborative works, including audiovisual works, and composite works are treated immediately below, and collective works after that.n10

#### [i]-- Collaborative Works.

The first paragraph of Article L. 113-2 of the I.P. Code defines a "collaborative work" as one "to the creation of which several natural persons have contributed together." According to the *Cour de cassation,* such a work should result from the "creative, concerted work (*travail*), conducted in common by a number of authors."n11  It is not critical to this characterization that the contributions of these authors be "inseparable" or "separable" from each other, although different rules may apply to works with different kinds of contributions.

To qualify as a coauthor, each participant in making a collaborative work must bring a creative contribution to the work. A classic case concerns the painter Renoir, who was paralyzed when he participated in creating sculptural works: Renoir gave spoken recommendations to a sculptor who, exercising "creative freedom" in working, was found to be a coauthor of the sculptures.n12  By contrast, someone who merely gives general directions about what to photograph may not be treated as a coauthor, unless that person collaborates with the photographer on such creative choices as composition, lighting, angles of shots, framing, etc.n13  The respective contributions of the coauthors may, of course, be of different kinds, for example, words and music in a song, and of differing importance.n14  However, parties may

not contractually attribute the status of coauthor, since that characterization has consequences for the term of copyright.n15

A collaborative work is the common property of its coauthors who, under Article L. 113-3 of the I.P. Code, may exercise their rights in that work by common agreement. These coauthors are free to contract among themselves concerning the conditions that are to govern the exploitation of their collaborative work, as well as the allocation of economic rights in that work.n16  Absent any prior agreement to the contrary, any act of exploitation of the collaborative work requires the consent of all its coauthors.n17  Article L. 113-3 of the I.P. Code codifies the rule that bars any coauthor from exploiting a collaborative work without the authorization of the other coauthors; at the same time, it allows each coauthor to petition the court to resolve any disputes with any other coauthor.n18  The same provision reserves each coauthor's right to exploit, for his own account, any separable contribution of a different genre than the others' contributions. However, such separate exploitation is subject to any prior agreement between the coauthors and must not prejudice the exploitation of their common work.n19  Further, if contributions are interdependent, there may be effects on contracts.n20

Lastly, from a procedural point of view, a coauthor whose contribution to a collaborative work cannot be separated from that of any other coauthor, and who sues on his economic rights in that work, must call his other coauthors into the suit or risk having it dismissed.n21  One court of appeal has ruled that the author of a contribution of a distinct genre to a collaborative work may sue alone on his own behalf as long as he can separately exploit that contribution.n22

**[ii]-- Audiovisual and Radio Works.**

As explained above, Article L. 112-2(6) of the I.P. Code defines "audiovisual works."n23  Furthermore, a number of subsequent provisions apply to the initial vesting of rights in audiovisual works and, in some cases, to rights in radio works.

To start, Article L. 113-7 of the I.P. Code governs who may be deemed an author of an audiovisual work, as follows:

"The status of author of an audiovisual work belongs to the natural persons who brought about the intellectual creation of the work.

"Absent proof to the contrary, the following are presumed to be coauthors of an audiovisual work made in collaboration:

"1. The author of the scenario;

"2. The author of the adaptation;

"3. The author of the dialogue (*texte parle*);

"4. The author of the musical compositions, with or without words, specially composed for the work;n24

"5. The director (*realisateur*).

"When an audiovisual work is adapted from a preexisting work or script which is still protected, the authors of the original work shall be considered as authors of the new work."

The first paragraph of Article L. 113-7 is consistent with the principle of French copyright law that only natural persons may be authors. The second paragraph of Article L. 113-7, by speaking of "coauthors," confirms that audiovisual works are collaborative works rather than, for example, "collective works."n25  The provision only presumptively identifies each coauthor, whose status may be rebutted by showing that he made no creative contribution to the work, as in the case of a film director who rendered mere technical services or closely followed the producer's specific and detailed instructions.n26  Exceptionally, the third paragraph of Article L. 113-7 fictively and irrebuttably extends authorship, in a audiovisual work, to the author of any preexisting work adapted into the cinematographic or other audiovisual work. Conversely, participants in the production of an audiovisual work, although not named in this provision, may prove that they are coauthors by virtue of their respective creative contributions.n27  However, persons merely partici-

pating in the production of the work, such as technicians or even the producer, are not coauthors absent proof of creative input;n28 nor is a person who is the subject matter of the work at issue, for example, of an interview a coauthor.n29

All the copyright provisions of the I.P. Code concerning audiovisual works--and, for entirely French productions at least, all the provisions concerning audiovisual production contracts--apply to audiovisual coauthors. As explained in detail below, Articles L. 132-24 through L. 132-30 regulate the overall contractual relationship between these authors and the producer, imposing *inter alia* a presumptive transfer of all audiovisual exploitation rights from the authors to the producer.n30 Article L. 132-23 of the I.P. Code defines the producer of an audiovisual work as "the natural person or legal entity who takes the initiative and responsibility in making the work."n31 The first paragraph of Article L. 121-5 defines the "definitive version" of an audiovisual work as that "... established by common accord between the director or, where appropriate, all the coauthors, on the one hand, and the producer, on the other."n32 The fourth paragraph of Article L. 121-5 states that their moral rights "... may only be exercised by them with respect to the completed audiovisual work."

Like coauthors of other collaborative works,n33 those of an audiovisual work may, under Article L. 132-29, exploit their respective contributions individually as long as these are separable and of different genres and such separate exploitation does not prejudice that of the whole work.n34 However, unlike coauthors of other collaborative works, a coauthor of an audiovisual work who refuses to complete his contribution to this work may not, according to Article L. 121-6, invoke his rights to preclude other coauthors from using his contribution without his agreement, even his moral right to control disclosure of his contribution.n35 The third paragraph of Article L. 121-5 implements the right to respect for the integrity of an audiovisual work by providing that "... modification of [the definitive] version by adding, deleting, or changing any element whatsoever shall require the accord of the persons mentioned in the first paragraph."n36 Of course, relief against the abusive assertion of moral rights also remains available as a matter of general law (*droit commun*).n37

Article L. 113-8 of the I.P. Code further specifies that the authors of a "radiophonic work," that is, a work made for purely sound broadcasts or cablecasts, are those natural persons who assure the "creation" of the work. It then applies Articles L. 113-7 and L. 121-6 of the I.P. Code to such radio works in appropriate cases. That is, these provisions will apply to such a radio work if the presumed collaboration of a number of authors to create it is not rebutted by evidence at trial. However, even if the presumption of collaboration applies, the other provisions applicable to audiovisual works need not necessarily apply to radio works. A radio work, if it is found not to be collaborative, may constitute a composite work.n38

**[iii]-- Composite Works.**

The second paragraph of Article L. 113-2 of the I.P. Code defines a "composite work" as "a new work into which a preexisting work is incorporated without the collaboration of the author of said prior work."

A seminal case on point involved the opera *Prince Igor*, where one author died and his work was taken without change and completed by others: a composite work was held to result from this succession of contributions.n39 A composite work may be contrasted with a collaborative work in that there is no concerted effort by coauthors to create one unique work, but rather one or more later authors create a work on the basis of an earlier work. Composite works thus appear as a variety of derivative works, with the caveat that a composite work does not result in a clear transformation or adaptation of a preexisting work, but merely overlays a new work upon an old one.n40

Pursuant to Article L. 113-4, "[a] composite work shall be the property of the author who has brought it into existence, subject to the rights of the author of the preexisting work." The consent of the author of the preexisting work, as in the case of a derivative work, has to be obtained to exploit the composite work based upon it.n41 However, the authors of any subsequent composite work based on a preexisting work may not preclude the author of the preexisting work from freely exploiting his rights in that prior work.n42

**[b]-- Works Made for Hire.**

As noted above, it is a dominant principle of French copyright law that only a natural person may be an author.n43 This principle altogether precludes the existence, under French law, of doctrines of works for hire that vest not only the initial ownership of copyright, but also the status of author, in the employer. Nonetheless, collective works and those made in the course of employment, and to a lesser extent works made on commission, share some, but not all, of the legal features of works for hire and are therefore discussed below. Characterizing a work as falling into one of these categories will have consequences, not only on the vesting of rights, but also on the remuneration scheme of the author.

[i]-- **Collective Works.**

Cases involving dictionaries occasioned the development of the elusive category of collective works in French law. The gist of the category lies in a double condition. First, several authors contribute to a collective work, but it is impossible to identify the part contributed by each of them. Second, an entrepreneur directs the creation of the collective work and then brings the work to the public under his name. This entrepreneur is then considered as the initial owner of copyright in the work. This approximate characterization calls for a number of observations and caveats.

[A]-- **Definition.**

The first paragraph of Article L. 113-2 defines a collective work as a special case. However, the fact that a work has been created by more than one author does not automatically convert it into a collective work. It is important to keep in mind that, under French law, the general rule is that works created through the pooled efforts of a team of several authors are treated as collaborative works.n44  Collective works arise under a definition which, because it represents an exception to the general rule, should be construed restrictively. This definition sets out the following three sets of elements of a collective work:

> - *Initiative of Principal:* First, the work must be "created on the initiative" of a single principal, who may be a legal entity or a natural person.n45  This requirement not only means coming forward with the very idea of the work, but also providing a constant impetus and guidance to its development from beginning to end.n46

> - *Release under Name of Principal:* Second, this principal must be the one who "reproduces," "divulges," and "publishes" the work under its own "direction and name." The literal wording of Article L. 113-2 seems to make all the elements of reproduction, divulgation, and publication quite cumulative.n47

> - *Fusion of Individual Contributions:* Third, "the personal contribution[s]" of diverse authors must be "fused together into the totality arising out of [the principal's] original conception, without it being possible to attribute to each of said authors a distinct right in the total [work] produced." On this point there has been sharp controversy, and it suffices to point out that the majority of decisions has found this requirement satisfied whenever it seemed impossible to disentangle various contributions.n48

The case law facilitates the recognition of collective works in allowing the presumption that an enterprise exploiting a work with the traits of a collective work indeed organized its creation.n49  This case law may be compared with that which, as explained above, dispenses a claimant exploiting a work with colorable title from proving full chain of title to sue an infringer.n50

[B]-- **Ownership of Rights.**

The effect of finding a collective work, as specified by Article L. 113-5, is to vest copyright directly in the principal under whose name the work is made public. This principal, therefore, need not establish its status as the transferee of the rights arising out of authorship, as must any legal entity claiming copyright in other cases.

The category of collective works is thus particularly advantageous to employers. It allows them to achieve immediate ownership of copyright in the collective works of employees.n51  The principal under whose name the collective work is made public owns the copyright in the work as an initial vestee of rights rather than as a transferee.n52  The contributing authors do not by law have any claim to any share of the receipts from sales, either of the first edition or of any subsequent editions; their remuneration may lie exclusively in lump-sum compensation.n53  Nor are the contributing authors authorized to prevent commercial exploitation of the collective work under a form not covered by their contracts.

The principal under whose direction the work is made public exercises whatever moral rights there might be in the collective work as a whole. It is, however, unclear whether moral rights are as effective for protecting the interests of legal entities as they are for the personal interests of individual authors. Strictly speaking, under French law, a legal entity cannot itself have the status of an author, and Desbois has compared the legal entity's role as the principal developing a collective work to that of a producer helping in the creative process.n54  Any theoretical argument precluding legal entities from exercising moral rights to protect their own interests, however, is not convincing in light of the broad wording of Article L. 112-2 of the I.P. Code, which does not distinguish between economic and moral rights.n55  As a

practical matter, though, courts may be less vigilant in safeguarding the moral rights asserted by a legal entity on its own behalf compared to those of a flesh-and-blood author.

Authors still have separate rights in their respective contributions to a collective work. French copyright law mentions such rights only in connection with works published in newspaper and periodicals.n56  It is nonetheless generally accepted that authors may also assert them in such individual works as are found within other types of collective works.n57  Of course, those separate rights, arising out of the contributions alone, may not be exercised so as to compete with the rights in the collective work as a whole. Thus for example, authors do have moral rights in their contributions to a collective work, but the courts limit the exercise of these rights by the need to preserve the overall harmony of the collective work as a whole.n58

### [C]-- Works Made for the Press.

Newspapers have been cited as a traditionally recognized example of collective work.n59  Of course, works may be separately contributed to newspapers or periodicals or through press agencies. Article L. 121-8 and the last paragraph of Article L. 132-6 of the I.P. Code deal with such works when they are subject to a service or employment contract.n60  Article L. 121-8 generally states that, in cases of newspapers and periodicals, the author retains, "absent agreement to the contrary," all rights to reproduce and otherwise exploit his own work separately, provided that he not thus "compete with the newspaper or periodical" in question.n61  It also confirms that the author retains the exclusive right to bring his works together in anthologies and to control their exploitation in that form.n62

### [ii]-- Works Made in the Course of Employment.

In traditional creative activities, such as writing a novel or a symphony, the problem of copyright for employed authors arises in marginal cases. The problem, however, takes on new dimensions with the rise of the cultural industries, for example, in the audiovisual field, as well as the extension of the scope of copyright protection, notably to applied art in general, computer programs specifically, and to advertisements. Special provisions have been devised for many of these fields and are treated elsewhere.n63  Absent such provisions, general principles of law apply and are considered below.

### [A]-- The Initial Vesting of Rights.

Employers see copyright as a legal device to profit from investments. Quite naturally, they seek its benefit for works created by employees whose salaries they pay. They must nonetheless reckon with Article L. 111-1 of the I.P. Code which seems to lay an obstacle in their path. Article L. 111-1 of the I.P. Code provides that the existence of a "service contract"--conceptually the same as an employment contract--"shall imply no exception to the enjoyment of the right recognized in the first paragraph." This first paragraph accords to "[t]he author of a work of the mind ... an exclusive and incorporeal property right in that work as against all persons."

Thus, clearly, the general rule is that copyright vests initially in an employed author, even if the work was created on the instructions of the employer. Of course, the notion of originality required for any authorship presupposes that these instructions leave the employee some margin in which to exercise at least minimal creative choice.n64  Furthermore, the rule for collective works may apply if the elements of such a work are present, including the fact that the employee's contributions to the work were made pursuant to the employer's instructions which limited the employee's authorship to specific tasks within an overall scheme.n65  Absent that exceptional case, the majority of courts abide by the principle set out in Article L. 111-1 of the I.P. Code and hold that, absent proof by the employer of a transfer, the employed author retains copyright.n66

### [B]-- Preassignments of Economic Rights.

While the case law pays homage to the principle vesting copyright in the author, whether employed or not, it sometimes circumvents it by reading into the employment agreement what might be called a "preassignment" (*cession anticipee*) of the author's rights to the employer. That is, on finding an employment agreement, some decisions then hold that agreement implicitly to include the employee's transfer of rights in all works he is to create on the job, at least to the extent the employer needs these rights to conduct its business.n67

While this pragmatic notion of implicit, advance transfers of rights is seductive, it contradicts the letter and spirit of Article L. 111-1 of the I.P. Code which, as explained in the forgoing subsection, sets forth a cardinal principle of French copyright law. Here the legislators took pains to specify that the mere existence of an employment contract "implies" no exception to an author's rights, thus stressing that an employee could not be stripped of these rights except by *express*

provisions, not by *implicit* transfers. Further, French law requires that the transfer of copyright be express and comply with specific formal requisites which the I.P. Code now sets forth.n68  There are, however, inconsistencies in the case law applying such requisites to employment agreements purported to convey the rights of authors to employers.n69  Finally, Article L. 131-1 of the I.P. Code provides yet another safeguard by outlawing wholesale transfers of copyright to future works.n70

**[C]-- Exceptional Provisions for Software.**

Given the silence of the law on point, economic rights vest in computer programsn71  pursuant to the general rules on the vesting of copyright,n72  except in cases of programs created by employees on the job. Article L. 113-9 of the I.P. Coden73  governs these cases as follows: "Absent contractual provisions to the contrary, economic rights in computer programs or their documentation created by one or a number of employees in the exercise of their functions or pursuant to the instructions of their employer belong to this employer, who alone may exercise them." The third paragraph of this provision applies this rule in favor of State agencies, public organizations, and public administrative establishments.n74

These provisions, absent contractual terms to the contrary, clearly make the employer not an original vestee, but a transferee who retains economic rights even after the employee leaves his job. The core issue lies in understanding the phrase "in the exercise of their functions or pursuant to the instructions of their employer." The case law varies in interpreting the presumptive transfer more or less broadly in favor of the employer.n75  Since only economic rights are mentioned, the employee retains limited moral rights in software.n76

**[iii]-- Works Made on Commission.**

Pursuant to the basic principle set forth in Article L. 111-1 of the I.P. Code, the author of a commissioned work is originally vested with all author's rights.n77  Articles 1787 *et seq.* of the French Civil Code generally govern agreements for personal services, including those commissioning an author to create a work. The content of the agreement under which an author renders his creative services would then determine whether he transfers exploitation rights to the commissioning party, for example, to publish or otherwise exploit any resulting work. There are exceptional provisions, discussed below, which govern the transfer of rights in, and payment for, works created on commission for use in advertising.n78

**[2]-- Transfers**

French courts will tend to adjudicate contracts, insofar as they transfer economic rights, by the law freely chosen by the parties, absent fraud and provided that public policy and express provisions on purely French copyright conveyances are not contravened.n79

It is with great reluctance that a French court is likely to apply French rules limiting the validity of terms that appear in contracts freely concluded abroad.n80  It will normally govern the form of a contract either by applying the law of the place where the contract was executed or the law which governs performance under the contract.n81  Contracts, however, cannot change the substance of the economic rights they transfer, nor related points such as initial vesting.n82  Contracts made abroad purporting to affect moral rights exercisable in France are subject to special analysis, as explained below.n83

**[a]-- Interests Subject to Transfer.**

According to French law, copyright includes two distinct types of rights.n84  Copyright transfers only convey economic rights, while each author retains his moral rights that are in principle inalienable.n85  The I.P. Code regroups and recodifies provisions that govern the transfers of economic rights, while the Civil Code provides a framework for these specific contractual provisions.

**[i]-- Contractual Transfer of Copyright.**

Economic rights may, according to Article L. 122-7 of the I.P. Code, be wholly or partially transferred by contract. The first paragraph declares: "Performance rights and reproduction rights may be transferred gratuitously or for compensation."n86

The following provisions of Article L. 122-7 set the stage for rules of formal specificity and restrictive construction that are explained in greater detail below.n87  The second and third paragraphs provide that the transfer of either the performance right or the reproduction right "shall not imply transfer of" the other type of right. The fourth paragraph then limits "the total transfer" of either of these types of rights "to the methods of exploitation provided for in the con-

tract." For example, transfer of the right of reproduction may be limited to a specified review, and transfer of the right to screen films may not be construed to extend to television.n88

### [ii]-- Transfer of Copyright and of Rights to Tangible Property.

Article L. 111-3 of the I.P. Code declares that copyright "shall be independent of property rights in the material object." Thus the transfer of rights in a piece of tangible property, such as a manuscript or a painting or a film embodying a work, does not in itself give the transferee any rights in the nature of copyright relative to the work.n89  The only exception concerns cases of posthumous works where ownership of the embodiment may imply ownership of the copyright, as discussed above.n90

Conversely, ownership of the copyright in a work does not result in ownership of any rights of tangible property in the embodiment of the work.n91  Furthermore, the second sentence in Article L. 111-3(2) of the I.P. Code precludes "the author or his successors" from requiring "the proprietor of the material object to place this object at their disposal for the exercise of their rights." In cases where a manifest abuse of the right of tangible property precludes the exercise of the author's right of divulgation, however, a court may grant such injunctive relief as it would grant under Article L. 121-3 of the I.P. Code, the provision empowering it to provide appropriate remedies in cases where heirs of the author abusively refuse to disclose a work.n92

### [iii]-- Transfer Causa Mortis and in the Marital Community.

French copyright law has developed special rules for the succession of both the economic and moral components of copyright. Moral rights devolve upon heirs and successors according to rules to be treated below.n93

Article L. 123-6 of the I.P. Code grants a surviving spouse a special right (*usufruit*), in effect a conditional life interest, in proceeds from the exploitation of the works of a deceased spouse on the following two conditions: first, that on the day of the author's death, he or she was not legally separated from the surviving spouse; and, second, that the author had not previously disposed of such rights in favor of a third party. This special right to proceeds and profits is terminated upon the remarriage of the surviving spouse who benefits from it. Otherwise, for French authors, the French Civil Code governs the disposition of economic rights after death.n94

More generally, because of the personal character of copyright, French copyright law applies special rules to the allocation of copyright interests within the marital community. According to Article L. 123-9 of the I.P. Code, which codifies previous case law, moral rights always belong to the married author alone.n95  This provision particularly concerns the rights to "disclose a work" and to "fix the conditions of its exploitation." Economic proceeds resulting from the exploitation of works or from the transfer of exploitation rights, however, fall within the marital community as long as the proceeds were earned during the marriage, but they may be subject to a differing result pursuant to contracts between the parties. More generally, the economic value of every work, even if it is unfinished or undisclosed, is subject to division among joint claimants.n96

The law thus has the "products" of copyright exploitation fall into the marital community, although the copyright itself, it seems, does not. Even if this solution is accepted, a serious difficulty remains for works of the visual arts, for which by far the most important method of exploitation is the transfer of tangible property rights in such objects as paintings or statues. Article L. 123-9 of the I.P. Code does not provide a clear and precise solution in such cases. Case law does exist on the point. In principle, such tangible property does fall into the marital community.

### [b]-- Formal Requisites for Transfers.

The copyright provisions of the I.P. Code generally require that transfers of copyright be evidenced in writing and that contracts specifically mention the rights to be transferred. Formalities to assure the priority of transfers are discussed elsewhere.n97

Article L. 131-2 of the I.P. Code recodifies prior statute by providing that "contracts for performance (*representation*), publication (*edition*), and audiovisual production,"n98  as well as "authorizations for gratuitous performances," have to "be established (*constates*) in writing." The penultimate paragraph of Article L. 131-3 of the I.P. Code requires a separate writing for conveyances of rights to adapt a work audiovisually.n99

Such a written agreement is subject to the rules of general law (*droit commun*) that Articles 1322 *et seq*. of the Civil Code set forth.n100  Article L. 131-2 of the I.P. Code also clarifies that, for the agreements it does not cover, the subsequent and substantially similar provisions of Articles 1341 through 1348 of the Civil Code apply when proving contrac-

tual terms.n101  The case law does not construe the requirement of a writing symmetrically: without invoking a written agreement, the author may prove the obligations of a transferee, for example, of a publisher, who exploits his work, while the transferee may only prove the author's obligations by reference to a written agreement.n102

Article L. 131-3(1) of the I.P. Code requires "that each of the rights conveyed be specifically mentioned in the instrument of conveyance and that the field of exploitation of the rights conveyed shall be limited as to extent and purpose, as well as to place and duration."n103  The clause "extent and purpose," using the French notion of *destination*, means that copyright comes into play each time a work is communicated to a new public. The writing should specify the uses to be made of the work, for example, in the case of a novel, whether it is to be used in a paperback edition or a translation, etc.n104  To the extent that the contract does not thus specify rights, it does not have effect.n105  Broadly formulated standard-form contracts may then prove to be unenforceable.n106  However, for reasons apparently equitable rather than strictly legal in nature, courts sometimes set aside this requirement.n107

Can these I.P. Code provisions, restricting grants to formally specified rights, be invoked all along a chain of title, not only by authors but by subsequent owners of the copyright? Case law responds in the negative, deciding that these provisions only govern contracts concluded by the author insofar as the author seeks to exercise his exploitation rights.n108

**[c]-- Contractual and Related Presumptions.**

We will list here the main presumptions implemented in the I.P. Code in relation to the allocation and transfer of rights. These presumptions are treated in greater detail elsewhere in this chapter. While some presumptions affect the parties initially holding copyright, others constitute exceptions to the general rule that contracts must expressly and specifically mention the rights they transfer.

To begin with, there are those presumptions which govern the initial attribution of authorship, both generally and specifically in the cases of collective, anonymous, and pseudonymous works.n109  Presumptions applicable to collaborative works generally, in the absence of agreement to the contrary among coauthors,n110  are supplemented by special presumptions governing the authorship of audiovisual works,n111  as well as presumptions allocating exploitation rights in such works to producers.n112

The fact that a work is created on the job or on commission should not in principle trigger any presumptive transfer of rights at all, although the courts sometimes circumvent this principle.n113  Special presumptions, however, do affect the transfer of rights in works made for the press,n114  software made in the course of employment,n115  and works commissioned for advertising.n116

**[d]-- Recordation; Priority of Transfers.**

There are no special provisions in the I.P. Code with regard to recording contractual transfers of copyright.n117  Generally, in France, Articles 1328 *et seq.* of the Civil Code provide for means of assuring the priority of any contract against third parties.n118  However, there are special rules for contracts affecting ownership of rights and security interests in cinematographic works and other audiovisual productions, as well as security interests in computer programs.

The National Center of Cinema (C.N.C.) maintains a public register for audiovisual works and productions, as explained below.n119  Articles 32 and 33 of the Code of the Cinematographic Industry enumerate contractual transactions recordable at the C.N.C., notably transfers and security interests in copyright relative to production, distribution, and exploitation in France.n120  Such a contractual transaction, if it is valid and if it is first recorded at the C.N.C., will have priority over any such transaction subsequently concluded or recorded there by the same party with regard to the same production or work.

More generally, the failure to record such a contractual transaction at the C.N.C. precludes asserting the transaction against third parties with valid contractual claims. For example, where rights in a film were transferred from parties X to Y to Z, and excerpts of the relevant transfers recorded at the C.N.C., but X rescinded its transfer to Y, it was held that this rescission, if not recorded, was not effective against Z to the extent that the latter's interests were recorded at the C.N.C.n121  However, a claimant's failure to record may not be invoked as a defense by a third-party infringer, notably one who records first in bad faith.n122

Article L. 132-34 of the I.P. Coden123  governs contracts that create security interests in exploitation rights in computer programs. Such a contract is invalid unless established in writing; further, to perfect a security interest relative to third parties, the contract creating it must be recorded in a special register maintained by the National Institute of In-

dustrial Property (INPI), which also takes French patent filings. The creditor holding the security interest may not only thus obtain priority over other creditors but, in appropriate cases, may petition a court to liquidate the exploitation rights subject to his interest.n124

**[3]-- Limitations of Transfer**

As explained in this section, many rules set out in French copyright law apply to copyright contracts. In addition, rules of E.C. and domestic antitrust laws may also apply to such contracts, notably to the royalty rates that these contracts impose.n125

**[a]-- Basic Rules of Construction.**

The following basic rules apply to contractual transfers of copyright.n126

**[i]-- The Principle of Narrow Construction.**

The 1957 Copyright Act introduced, and the I.P. Code now codifies, the principle of narrow construction of contractual transfers.

Article L. 122-7 of the I.P. Code, in its second and third paragraphs, specifies that the transfer of either the performance right or the reproduction right does not imply the transfer of the other right.n127  For example, the author of a logo who transfers only the right to reproduce the logo does not thereby transfer the right to use the logo in an advertising film.n128

The last paragraph of this provision further provides that, when a contract requires a "total transfer" of the performance right or the reproduction right, the "effect of this transfer shall be limited to the means of exploitation provided in the contract." For example, a grant of rights to exploit musical works "by all means (other than graphic or in sound recordings) now known or to be developed in the future, whatever the purpose," was construed to exclude the grant of advertising rights because an express clause to this effect was lacking.n129  Generally, no matter what the object of the contract may be, the transfer of rights will be limited to that which is clearly agreed to.n130

This approach follows logically from Article L. 131-3(1) of the I.P. Code, which requires the parties to a contract to set forth the extent of the transfer.n131  Of course, the courts are not prohibited from interpreting ambiguous clauses in light of evidence of the parties' intent; however, in a case of doubt, the transfer may not be broadened to include rights beyond the wording of the contract. The case law therefore tends to leave the transferor free to sue the transferee for using the work in ways not expressly authorized.n132  A particularly rich case law concerns the unauthorized uses of works in connection with advertising.n133  Judges may also take into account the requirements of remuneration for transfers in limiting their scope.n134

It is important to note that the principle of narrow construction may not apply to subsequent transfers between the assignee of the author and third parties.n135

**[ii]-- The Prohibition of Total Transfer of Future Works.**

Article L. 131-1 of the I.P. Code prohibits total transfers of all rights in future works. The rationale behind this provision is to protect authors against the temptation to overburden their future creation contractually. The provision would seem not to apply to transfers made by authors' transferees,n136  but it does not say as much.n137

It is generally admitted that this provision is not to be taken literally. To start, it is subject to a specific statutory exception for publishing agreements, explained in the following subsection.n138  Further, courts often reconstrue contracts concerning future works so that, rather than transferring all rights in all such works, these contracts affect rights in future works identified with fair precision.n139  Finally, courts sometimes find other means to deprive the prohibition against total transfers regarding future works of much of its impact.n140

**[iii]-- Preferential Rights in Publishing Contracts.**

Article L. 132-4 of the I.P. Code permits publishing contracts to grant so-called preferential rights, that is, options to publish an author's future works. This provision constitutes an exception to the rule against the total transfer of future worksn141  but is allowed to encourage publishers to risk taking on unknown authors by obtaining options exercisable

after their initial success. Nonetheless, the French legislators have enacted several safeguards to prevent such options from excessively limiting any author's freedom.

On the one hand, under the first paragraph of Article L. 132-4 of the I.P. Code, the preferential right is strictly limited to future works in "clearly delineated genres."n142  On the other hand, the second paragraph sets a maximum either of five new works "for each genre" after signing the contractn143  or of those works which the author produces within five years after signing the contract.n144  The succeeding paragraphs of this provision set out further safeguards: the publisher must give written notice to exercise the right anew within three months from the author's delivery of each work, and the right lapses for a genre after the publisher successively refuses two new works in that genre, conditionally on the author's returning any advances for the works.n145

The courts tend to invalidate clauses purporting to grant preferential rights beyond the restrictions of this provision.n146  Nonetheless, a publisher may apply to the judge to "salvage" such a clause by reducing its scope to make it comply with the legal requirements.n147  Understandably, however, a publisher cannot sidestep these requirements by way of subsequent agreements.n148

### [iv]-- Transfer for Unforeseeable Means of Exploitation.

Article L. 131-6 of the I.P. Code allows an express clause to confer the right to exploit a work in media not foreseeable or not foreseen at the time of the contract if it provides for a "correlative participation in profits of exploitation." In one case, journalists were held to have granted only the right of "first publication" of their articles, excluding Internet dissemination which represented an unforeseeable "means of communication."n149

### [b]-- Remuneration of Authors.

The 1957 Act introduced a system of mandatory proportional remuneration of authors in the form of a statutory royalty right.n150  The rationale behind this reform was to protect authors who might otherwise be tempted to alienate valuable rights for the illusory bait of lump-sum payment. This rationale is not always compelling, since the law does not prevent authors from agreeing to negligible rates of remuneration. Furthermore, lump-sum payment is allowed in a significant number of specifically enumerated cases outlined below, including foreign contracts.n151

### [i]-- Proportional Remuneration.

In its first paragraph, Article L. 131-4 of the I.P. Code enunciates the principle that the author's transfer of rights to his work, whether "total or partial," must entitle the author to participate proportionally "in the receipts resulting from the sale or exploitation of the work." The goal is to allow the author to share in the commercial success of the work, no matter what the media, and the author's share is generally to be calculated on the basis of the sales price to the public.n152  Exceptionally, Article L. 132-25 of the I.P. Code allows for adjusting the rates of authors' proportional shares relative to sliding-scale royalties paid to film distributors by theater owners. In any event, the law leaves it up to the discretion of the parties, within rather broad limits, to determine the percentage of remuneration to be paid.n153

Lump-sum agreements are void except in those cases specifically provided by law.n154  A contract, or at least the relevant clause of the contract, can be declared void if it contemplates proportional remuneration without filling out the terms of such remuneration. Absent a specific agreement fixing the rate of remuneration, a transfer is void for lack of due consideration.n155  Only the author may have a contract voided for the absence of proportional remuneration. Contracts providing for lump-sum payments in addition to proportional remuneration are valid.n156

### [ii]-- Lump-Sum Payment in Some Cases.

The law sets out two lists of cases in which the author, exceptionally, need not receive proportional shares, but may be remunerated by way of lump-sum payment (*forfait*).n157  One provision lists five exceptional cases in general terms; the other deals with special cases in the field of publishing, including foreign contracts.

The second paragraph of Article L. 131-4 of the I.P. Code sets out the list of five exceptional cases in general terms, some so broad that they threaten to swallow the rule. The first two cases involve the impossibility of determining the basis for calculating proportional remuneration, that is, receipts from exploitation, and of monitoring the application of the rule.n158  In the third case, the costs of calculating and monitoring proportional remuneration are out of proportion with the expected receipts. The fourth exception specifies two subcases: in one, the contribution of the author does not constitute an essential element of the work;n159  in the other, the use of the work is only ancillary to the value of its

embodiment.n160  The fifth case is that of transfers of rights in computer programs. The list then ends with a final reference to "the other cases" provided by law.

The first paragraph of Article L. 132-6 of the I.P. Code lists the following nine exceptions particular to publishing: (1) scientific and technical works; (2) anthologies and encyclopedias; (3) prefaces, annotations, introductions, and presentations; (4) illustrations of a work; (5) luxury editions with limited printings; (6) prayer books; (7) translations; (8) low-cost, mass editions; and (9) low-cost children's albums. The statute conditions all these cases on the author's express written assent, and the case of translations specifically on the translator's prior request. The third paragraph of Article L. 132-6 allows for lump-sum payments in cases where authors are employed to write works for press agencies or newspapers or periodicals of all types.n161

Finally, an exception applies to foreign contracts. Article L. 132-6 of the I.P. Code, in its second paragraph, provides that transfers of rights, whether to or by a person or enterprise established abroad, may provide for compensation in the form of lump-sum payments. This exception seems difficult to justify in both of the cases it contemplates. In the case of a foreign transferee, it seems to avoid conflicts of law when a work is marketed in countries with more liberal contract rules. However, in just such a case, its scope leaves open a wide loophole, since it permits the foreign transferee to exploit the work in France while escaping the French rule of proportional remuneration.n162 In the case of a foreign transferor, there seems to be no reason for the exception. It is in effect not necessary if the law governing the foreign contract is that of a country which does not compel proportional remuneration.n163

### [iii]-- Additional Remuneration in Case of Success of the Work.

Article L. 131-4 of the I.P. Code allows authors to have proportional remuneration converted into lump-sum annuities for a definite period in cases of contracts on which royalties have begun to be paid. However, in order to prevent abuses, Article L. 131-5 of the I.P. Code allows an action for reformation when the author has suffered a loss exceeding seven-twelfths of the compensation to which he is entitled, said loss resulting from either a burdensome contract (*lesion*) or insufficient provision regarding exploitation (*produits de l'oeuvre*).n164  In any event, such judicial reformation presupposes that, upon concluding the contract, the parties failed to estimate accurately the revenues of commercial exploitation.n165

### [c]-- Specific contracts Governed by Law.

In France, contracts governing major forms of copyright exploitation must, by law, contain certain provisions or have certain effects.

### [i]-- Publishing Contracts.

The publishing contract is the oldest contract which the law regulates. Publishing agreements are not restricted to the book-publishing industry. They cover all agreements by which authors convey rights to reproduce their works, including literary, artistic, or musical works, for the distribution of copies to the public. The rules governing such contracts, along with the case law on point, may also bear on interpreting other kinds of contracts.

### [A]-- Definition and General Rules.

The publishing contract is a civil one for the author who has his own works published and a commercial one for the publisher in business. Article L. 132-1 of the I.P. Code defines it as a contract under which an author grants the publisher the right to manufacture copies of his work, usually but not always books,n166  on the condition that the transferee assure publication of the work.

The publishing contract is, for the author, *intuitu personae*. Under Article L. 132-17 of the I.P. Code, the contract is canceled on the author's death with regard to any of his works or inseparable parts of his works that have not been completed. Article L. 132-16 of the I.P. Code prevents a publisher who contracts with an author from transferring the contract to a third party without the author's consent, except in the case where the entire publishing business is transferred.n167  Also, according to Article L. 132-15 of the I.P. Code, if a receiver or third party who has purchased the publishing business continues to exploit the work commercially, the publishing contract still remains in force. If the receiver does not continue the business or such exploitation, the author may request a cancellation of the contract.

Under Articles L. 132-2 and L. 132-3 of the I.P. Code, there is no publishing contract when an author pays all the costs of publication, acquiring rights to profits, or when the author and publisher share profits and losses. The Civil Code applies to such contracts.

**[B]-- Concluding the Contract.**

Some of the formalities applicable to publishing contracts are special. Article L. 132-7 of the I.P. Code establishes a special rule of capacity for publishing contracts. Personal consent, even of an author without the capacity to contract, is necessary unless he is physically unable to give his consent. If the author is a member of an authors' society for the collection of royalties, the society negotiates in the name of the author, subject to his moral rights. In the case of collaboration, the contract should be entered into by all the coauthors, and this same condition applies to composite works. For a collective work, only the editor-publisher can negotiate, since each of the participants has waived having his name appear on the work. As explained above, formal requisites apply to publishing contracts.n168

**[C]-- The Author's Obligations.**

The author transfers his copyright to the extent and under the conditions set forth in the contract and, pursuant to Article L. 132-8 of the I.P. Code, makes certain guarantees to the editor.

To begin with, the author has to guarantee to the publisher the free and quiet enjoyment of his copyright to the extent that it is conveyed. There would be interference with that quiet enjoyment either in the event the author had previously transferred the right in question to a third party or in the event he subsequently transfers to a third party the right previously transferred to the publisher. In the first case, he shall compensate the publisher for damages incurred because the publication cannot go forward. In the second case, the author has to compensate the publisher for the expenses the publisher incurs in defending the right previously transferred to him.

More generally, the author has to guarantee the publisher against third-party claims.n169  Further, the author should abstain from any act likely to impede the success of the publication, for example, authorizing a second edition before the first edition is sold out. Finally, the author should guarantee that the publisher will be free from any disturbance arising out of his own personal affairs. The remedies for breach of the author's guarantees consist of damages and cancellation of the contract.

Finally, according to Article L. 132-9 of the I.P. Code, the author shall "make it possible for the publisher to manufacture and disseminate copies of the work." For this reason, among his other duties, he has to deliver the manuscript within the term provided in the contract, correct the page proofs, and sign the order slip.n170

**[D]-- The Publisher's Obligations.**

Articles L. 132-11 through 132-14 of the I.P. Code strictly determine a publisher's obligations to the author.n171  The principal obligations are to publish, to insure permanent and continuous exploitation of the work published, to pay royalties for copyright in the work, and to provide an accounting. It should be recalled that the author in principle has the right to proportional remuneration, that is, to a fraction of the publisher's gross sales.n172

Article L. 132-11 of the I.P. Code, in particular, treats many of the principal conditions of publication, such as the term of publication, format and assembly, number of copies,n173  price, reprints, complimentary and press copies, and publicity. The first paragraph obligates the publisher to "manufacture the edition in the form agreed to in the contract"; the second prevents him from modifying the work "in any way without the author's written consent"; and the third, absent contrary agreement, requires that he place "on each copy of the work the name, pseudonym, or symbol of the author." The fourth paragraph of Article L. 132-11 of the I.P. Code states: "In the absence of a special agreement, the publisher shall complete the publication within the term customary in the profession." Absent such agreement, it is up to the judge to decide if the publication has taken place within a term consistent with the custom of the profession.

Under Article L. 132-12 of the I.P. Code, the publisher must not only publish the work, both printing it and placing copies on sale, but he must also assure sustained commercial exploitation of the work, with promotion consistent with the custom of the trade. This obligation was a subject matter of numerous judicial decisions several years ago concerning the publication of musical works. For instance, publishers had entered into a contract with an author, published sheet music, but did not proceed with recording and sales of his work on records or cassettes, measures which would have assured the work some commercial value under favorable circumstances.n174  The decisions have been consistently against the publisher, allowing cancellation of the contract and often making him liable for damages. To avoid these

consequences, the publisher must prove both that he has taken the necessary measures for going forward with the recording and that he has not been successful. Finally, because it only concerns reproduction rights, the publishing contract will not in itself grant rights in the performance and other uses of the recording.

The publisher should pay remuneration as agreed, that is, in principle, a proportional share of receipts.n175  Article L. 131-8 of the I.P. Code provides as follows: "With regard to payment of remuneration due them three years following the time of transfer, exploitation or use of their works, as defined in Article 3 of this law, authors, composers and artists shall benefit from the priority set forth in Article 2101(4) and Article 2104 of the Civil Code." These provisions of the Civil Code grant the author a position of priority over general creditors relative to the furnishings and buildings of the publisher to secure such payment.n176

According to Articles L. 132-13 and L. 132-14 of the I.P. Code, the publisher is obligated to provide the author with accountings regarding the exploitation of the work. The author can, absent contractual terms to the contrary, require, at least once a year, these accountings and the information appropriate to confirm their accuracy.n177

**[E]-- Termination of the Contract.**

General contract law is applicable to termination of publishing contracts, subject to two provisions.n178

Article L. 132-11 of the I.P. Code in effect states that, if the contract is of a specified term, whether defined by a date or whether concluded for one edition or for a specified number of editions, the contract expires on the date thereby provided, "the rights of the transferee" being "automatically extinguished at the expiration of the term, without need of any formal notice." Once the contract has lapsed, the publisher can no longer manufacture or sell under penalty of infringement; however, when the contract is for a specified term and the expiration date has passed, the publisher may sell copies in stock for the next three years, subject to the author's option to buy these copies back at a negotiated price or one established by expert appraisers.

Article L. 132-17 of the I.P. Code provides for the following options. "A publishing contract shall lapse, regardless of the cases provided for by the common law of contracts or by the preceding articles, when a publisher proceeds to destroy all copies." Or "[c]ancellation shall take place automatically when, upon formal notice by the author fixing a suitable period, the publisher has not proceeded with publication of the work or, in a case where a printing has not been exhausted, upon republication."

**[ii]-- Performance Contracts.**

French copyright law regulates performance contracts much more summarily than publishing contracts. This is no doubt the case because performance contracts are almost always entered into on behalf of the author by authors' societies.

Article L. 132-18 of the I.P. Code defines a performance contract as "... that whereby an author of a work of the mind or his successors authorize a natural or legal person to perform (*representer*) that work in public on specified conditions." Performance, especially in the significantly expanded sense which Article L. 122-2 of the I.P. Code gives to this notion, including telecommunication, is the principal means of exploitation for musical, theatrical, audiovisual, and radio works.n179

The second and third paragraphs of Article L. 132-18 of the I.P. Code treat the "general performance" contract. This is the blanket license into which a collecting society, such as the SACEM, that is, the Society of Authors, Composers, and Music Publishers, enters on behalf of authors.n180  Under such a contract, users have the right to utilize all the works in the repertory of the society in question. The rules and forms for concluding a performance contract are the same as those set forth for the publishing contract.n181  Moral rights, of course, should be respected.

Article L. 132-19 of the I.P. Code states: "Unless exclusive rights are expressly stipulated, the contract shall confer no monopoly in the exploitation of the work by a producer of the show." It also provides that "[a] performance contract shall be concluded for a limited term or for a specified number of communications to the public." Thus performance rights cannot be conveyed for the whole duration of a copyright, as in the case of reproduction rights under publishing contracts.n182

An author entering into a performance contract makes guarantees to the producer under much the same conditions as those applicable in publishing contracts.n183  The essential obligation of the producer, like that of the editor under the publishing contract, is to insure normal commercial exploitation, that is, to bring about the performances which have been agreed upon. Of course, the producer should pay the remuneration upon which he has agreed in any event and, also

under Article L. 132-21 of the I.P. Code, should render an accounting. The remedies for breach of these obligations consist of the cancellation of the contract, with or without damages.

The fourth paragraph of Article L. 132-19 of the I.P. Code provides that "the producer of the show shall not transfer the benefits of his contract without the formal and written assent of the author or his representative." It would appear that such transfer is allowed when it occurs in the context of the sale of the business, as in the case of a publishing contract.n184 As to termination, the fourth paragraph of Article L. 132-19 of the I.P. Code states: "The validity of exclusive right accorded by a dramatic author may not exceed five years; the interruption of the performances for two consecutive years shall automatically terminate these rights." Otherwise no special rule applies.

Lastly, the Code also contains specific presumptions relating to broadcasting. Article L. 132-20 of the I.P. Code provides that, absent agreement to the contrary, an authorization to broadcast (*telediffuser*) a work includes none of the following: (1) the right to distribute it by cable, except simultaneously by the authorized broadcasting organization but without geographically extending the contractually anticipated zone of reception; (2) the right to communicate any broadcast into any space or locale that is publicly accessible; (3) the right to transmit it to a satellite to be retransmitted by a third party. This last clause, though, allows satellite retransmission if communication to the public at large has been duly authorized beforehand.

### [iii]-- Audiovisual Contracts.

Audiovisual works, now covering a broad range of media products in addition to films, give rise to many important contracts.n185

### [A]-- Production Contracts.

Article L. 132-24 of the I.P. Code provides that, absent agreement to the contrary, the contract between the producer and the coauthors of an audiovisual work,n186 aside from musical composers, grants the producer the authors' exclusive exploitation rights in the audiovisual work. It has been held that, absent a written contract such as Article L. 131-2 requires, this presumptive transfer does not apply at all.n187 Once applicable, the presumption seems to extend to reproduction and performance rights in the audiovisual work generally.n188 However, express contractual language could transfer, for example, graphic or live theatrical rights in the work.n189

Article L. 132-25 of the I.P. Code sets out the following rules: (1) The coauthors' remuneration is due for each mode of exploitation of their audiovisual work, such as theatrical film display, television broadcast, cassette sales, etc. (2) Such remuneration must be proportional to the price paid by the public to have a discrete work communicated to them, for instance, in a movie theater or over pay-per-view television, with due account taken of digressive rates paid by the distributor to the exploiting party. (3) This last rule applies subject to the exceptions set forth in Article L. 131-4 of the I.P. Code for cases where proportional remuneration becomes difficult to calculate or administer, as in free public broadcasting.n190 (4) All remuneration is to be paid to the coauthors by the producer of the work being exploited.

Articles L. 131-8 and L. 132-26 *et seq.* of the I.P. Code have adapted the now-classic rules of the publishing contractn191 to audiovisual production contracts. These rules result, *inter alia*, in the following: (1) the producer's duty to provide to the coauthors at least annual accountings of receipts from each mode of exploitation; (2) the coauthors' duty to guarantee the producer's peaceful enjoyment of the rights conveyed to him; (3) the producer's duty to exploit the audiovisual work in conformity with the practices of the profession;n192 (4) the coauthors' privileges otherwise accorded by the Civil Code to salaried employees, notably a priority among creditors; (5) the coauthors' rights to special treatment in the event of the producer's bankruptcy, liquidation, going into receivership, or being reorganized.n193

### [B]-- Audiovisual Adaptation Clauses.

Articles L. 131-2 and L. 131-3 of the I.P. Code apply rules of publication contracts to any contract in which an author conveys rights to adapt a work audiovisually.n194 Most notably, the transferee of these rights must exploit them in conformity with the practices of the profession and pay the author a remuneration proportional to resulting receipts. To bring the author's attention to the importance of the transfer, such a contract to adapt a work audiovisually must be contained in an instrument separate from any related publication contract.n195 Non-compliance with this rule subjects the clause transferring the audiovisual adaptation rights to invalidation.n196

### [iv]-- Contracts for Works in Advertising.

Articles L. 132-31 through L. 132-33 of the I.P. Code codify the statutory provisions on commissioning contracts for advertising. These provisions have given rise to numerous commentaries.n197

Articles L. 132-31 through L. 132-33 of the I.P. Code apply to cases where an advertising producer commissions a work from an author.n198  The majority of commentators agree that "producer" means the party financing the advertising campaign, not the advertising agency which controls the creative process.n199  Articles L. 132-31 through L. 132-33 apply without regard to whether a legal entity, such as a graphics-design company, or an individual author, accepts and carries out the order.n200  Thus "author" may arguably be an advertising agency whose rights are based on a collective work, to which "authors" in the strict sense of the word could have contributed, for example, as employees.n201 While Articles L. 132-31 through L. 132-33 apply irrespective of the nature of the work, the commission established pursuant to these provisions, in its order of February 23, 1987,n202  contemplates bases of authors' compensation only for graphic, plastic, photographic, and audiovisual works. The bases of compensation for literary and musical works in advertising remain in limbo.n203

The first paragraph of Article L. 132-31 provides that, absent a contrary clause, all the author's exploitation rights in the subject work are transferred to the producer who has commissioned it. We have seen that Article L. 131-4 of the I.P. Code provides that an author under a French contract should, as a general rule, share proportionally in "the receipts resulting from the sale or exploitation" of the work.n204  The author may be paid by a flat fee for the commissioned work, subject to some safeguards: the contract must specify distinct remunerations that correspond to each mode of exploitation defined in terms of geographical zone and period of exploitation, as well as to the importance of the number of copies made and the nature of the medium used.n205

Articles L. 132-31 through L. 132-33 may be disregarded by parties to international private agreements, for example, where the work is commissioned from a foreign author or a French author residing outside France, or in the case of a multinational, global advertising campaign.

**[d]-- Attaching or Foreclosing on Copyright.**

Article L. 333-1 of the I.P. Code provides as follows:n206

> "When the proceeds of exploitation due to the author of an work of the mind have been made subject to an attachment, the president of the civil court may order support payments to the author of a certain sum or of a specified proportion of the amounts attached."

It would seem that copyright, as it arises in the hands of an author, may not itself be attached or foreclosed upon. Only liquidatable interests, such as profits and proceeds, arising out of the exploitation of copyright may be subject to such procedures. A forced sale of all the author's rights, especially in an unpublished work, would be contrary to moral right.n207

As explained above, special provisions govern security interests relative to copyright in computer programs and in audiovisual works,n208  as well as the fate of a publishing and other such contract upon the sale or liquidation of the business which had undertaken the contract.n209

**[e]-- Resale Right: Droit de Suite.**

This right entitles an author, while his copyright in a work is in effect, to collect a sum upon the sale of that work from one buyer to another. The *droit de suite* only applies to works of fine art, that is, only to drawings, paintings, sculptures, and other art objects in which such works protected by copyright are embodied. The E.C. Resale-Right Directive obligates France to modify its law on several important points.n210

*Droit de suite* exists only in a very limited number of countries, and France only grants it to foreign authors on special conditions.n211  In France it regularly generates substantial revenues which benefit a large number of authors or artists. Its rationale is based on the fact that often an unknown artist must initially sell his work for a low price. Upon his eventually attaining public recognition, the same work might be resold for increasingly higher prices. It seems fair that the artist should participate in the increased market value of his work, as *droit de suite* allows him to do. The rationale for granting this right particularly applies in the case of graphic or plastic works such as drawings, paintings, and sculptures. The right to reproduce such works in photographs, books, and exhibits often yields very low returns, while such reproduction rights for literary or musical works often yield high profits. *Droit de suite* corrects this imbalance.

Article L. 122-8 of the I.P. Code governs this right as follows:

> "Authors of graphic and plastic works shall have, notwithstanding any conveyance of the original work, an inalienable right to participate in the proceeds of any sale of this work by public auction or through a dealer.

> "The rate for levying upon this right shall be uniformly fixed at 3 percent, applicable starting at a sales price established by regulation.

> "The levy shall be based on the sales price of each work and on the total sales price without any deduction. Executive regulation (*decret en Conseil d'Etat*) shall determine the conditions under which authors shall assert their claims to the right recognized by the provisions of the present Article in the event of sales referred to in the first paragraph."

Articles R.122-1 *et seq.* of the I.P. Code represent the executive regulations governing the application of this provision.n212  Agreements adopted between authors' societies for the collection of royalties and auctioneers may supplement these regulations. Indeed, although claimants may collect royalties accruing from *droit de suite* individually by means of certain formalities, authors' societies most often collect these royalties as intermediaries between claimants and sellers. The most important is the Society for the Distribution of Graphic and Plastic Arts (A.D.A.G.P.).n213

*Droit de suite* applies to art objects in which works were initially embodied. In addition, the *Cour de cassation* has ruled that payment is due upon the resale of art objects reproduced by means of engravings, castings, etc., that the author crafted.n214  These embodiments, usually reproduced in limited, numbered series, are deemed to emanate from the author's hand. This ruling has been extended to art objects made under the artist's supervision.n215

*Droit de suite* benefits the author. *Droit de suite* is subject to the general law of inheritance, except for certain special legal rules.n216  *Droit de suite* is inalienable and may not be contractually transferred.

**FOOTNOTES:**

(n1) Footnote 1. For discussion of this principle as applied to works made in employment relationships, see § 4[1][b][ii][A] *infra*.

(n2) Footnote 2. For discussion of the exceptional category of collective works, see § 4[1][b][i] *infra*. On presumed transfers of rights in audiovisual works, see § 4[3][c][iii] *infra*; in computer programs, § 4[b][ii][C] *infra*; and, in works commissioned for advertising, § 4[3][c][iv] *infra*.

(n3) Footnote 3. *See* Cass. civ., I, 17 March 1982, J.C.P. 1983, II, 20054, note Plaisant, D. 1983, inf. rap. 89, obs. Colombet; Cass. com., 5 Nov. 1985, R.I.D.A. 1986, no. 130, 140; Cass. civ. I, 3 July 1990; R.I.D.A. 1991, no. 148, 116, Rev. trim. dr. com. 1991, 48, obs. Francon. *But cf.* TGI Paris, 3e ch., 17 Feb. 1999, Com. com. electr. 2000, comm. no. 62, note Caron (holding that a person whose name is preceded by the formula "with the help of" may not invoke this presumption).

(n4) Footnote 4. *See* Cass. civ. I, 31 Jan. 1995, J.C.P. 1995, IV, 796; Cass. civ. I, 28 March 1995, R.I.D.A. 1995, no. 165, 327; Cass. civ. I, 9 Jan. 1996, R.I.D.A. 1996, no. 169, 341; Cass. com., 7 April 1998, J.C.P. 1998, IV, 2275, Bull. civ. IV, no. 132; Cass. civ. I, 13 Oct. 1998, J.C.P. 1998, IV, 3316. *See also* Cass. civ. I, 22 Feb. 2000, J.C.P. 2000, IV, 1626, Com. com. electr. 2000, comm. no. 42, note Caron (admitting that a corporation may invoke the presumption regarding a work created in the 1930s by a sole author). *See generally* J.-L. Goutal, "Presomption de titularite des droits d'exploitation au profit des personnes morales: la Cour de cassation maintient sa jurisprudence" (Eng. trans: "Presumption of ownership of the exploitation rights in favor of legal entities: the Court of Cassation maintains its case law"), R.I.D.A. 1998, no. 175, 65.

(n5) Footnote 5. *See, e.g.,* Paris, 4e ch., 22 Dec. 2000, Juris-Data no. 140998 (holding that the presumption of ownership of the rights in a collective work cannot be rebutted by the mention inside a text of the name of a natural person as author/contributor or by the payment to this person by the publisher of sums characterized as royalties for a work as "writer/conceptualizer"). On collective works, see § 4[1][b][i] *infra*.

(n6) Footnote 6. *But cf.* Paris, 4e ch., 23 Feb. 2000, Juris-Data no. 127899 (not allowing a legal entity using a photograph for advertising purposes under its own name to benefit from the presumption). *Quaere* what stops an alleged

infringer, itself using the work at issue commercially under its own name, from invoking the presumption? For a critical analysis, see A. Francon, RTD com. 2000, 363. On the application of this presumption to foreign claimants, see § 6[1][b][i] *in fine infra*.

(n7) Footnote 7. On the right of the author to remain unknown, see § § 7[1][a]-[b] and 7[4][b] *infra*.

(n8) Footnote 8. On the term of protection of such works, see § 3[1][b] *supra*.

(n9) Footnote 9. *See* § 7[3][a] *infra*.

(n10) Footnote 10. *See* § 4[1][b][i] *infra*.

(n11) Footnote 11. Cass. civ. I, 18 Oct. 1994, R.I.D.A. 1995, no. 164, 305.

(n12) Footnote 12. Cass. civ. I, 13 Nov. 1973, D. 1974, 533, note Colombet, J.C.P. 1975, 18029, R.I.D.A. 1973, no. 80, 62. *See also* Paris, 1e ch., 14 June 2001, P.I. 2001, no. 1, 58, obs. Sirinelli (finding coauthorship of an interview by both the interviewer and the interviewee).

(n13) Footnote 13. Paris, 4e ch., 26 March 1992, R.I.D.A. 1993, no. 156, 218. *See also* Paris, 4e ch., 20 Nov. 1996, R.I.D.A. 1997, no. 173, 321, J.C.P. 1997, II, 22937, note Pollaud-Dulian (a client commissioning a house from an architect could only be a coauthor if he drew the plans or gave specific directions for doing so); Cass. civ. I, 22 Feb. 2000, J.C.P. 2000, IV, 1627, Com. com. electr. 2000, comm. no. 62, note Caron (once an art catalog was disclosed under the name of one purported author, any other claimed coauthor had to show, not just preliminary research and clerical work, but creative collaboration, for example, in elaborating the form of the work, choosing its components, writing its text, etc.).

(n14) Footnote 14. Cass. civ. I, 2 Dec. 1997, R.I.D.A. 1998, no. 176, 409, D. 1998, 507, note Edelman. *See, e.g.,* Versailles, 14e ch., 12 May 1995, Rev. dr. prop. intell., June 1995, 60 (dialogue writer, giving characters personality, is collaborative coauthor with the graphic artist giving them form); Paris, 4e ch., 21 Nov. 1994, R.I.D.A. 1995, no. 164, 381 (crucial role of one author in directing a collection does not preclude collaboration with another); Cass. Civ. I, 2 April 1996, J.C.P. 1996, IV, 1283, Bull. civ. I, no. 165, 116, D. 1996, inf. rap. 122 (no need to take account of the importance or merit of the coauthors' respective contributions).

(n15) Footnote 15. *See, e.g.,* TGI Paris, 3e ch., 5 May 1999, R.I.D.A. 2000, no. 185, 422 (invalidating a clause in a publisher's standard contract which imputed *a priori* the role of coauthors to proof-readers). On the term of copyright in collaborative works, see § 3[1][a] *supra*.

(n16) Footnote 16. *See* § 4[2][b] *infra*.

(n17) Footnote 17. Cass. civ., 22 Dec. 1959, Bull. civ. I, no. 406; Cass. civ. I, 19 May 1976, Bull. civ. I, no. 185. *N.b.* this rule of unanimity does not apply to performing artists: TGI Paris, 3e ch., 13 May 1994, R.I.D.A. 1994, no. 162, 499. On their rights, see § 9[1][a][i] *infra*.

(n18) Footnote 18. Cass. civ. I, 30 Jan. 1985, Bull. civ. I, no. 45, R.I.D.A. 1985, no. 126, 143.

(n19) Footnote 19. *See, e.g.,* Cass. civ. I, 6 May 1997, J.C.P. 1997, IV, 1357, R.I.D.A. 1997, no. 174, 2379 (once cartoonist draws a character, he may exploit this graphic rendering alone, as long as he does not prejudice any joint work in the comic strip as a whole).

(n20) Footnote 20. *See, e.g.,* Cass. civ. I, 3 April 2001, J.C.P. 2001, IV, 2021, Bull. civ. I, no. 92 (holding that, in the case of separate agreements entered into by the writer and the composer of songs, the rescission of the agreement with the composer carries with it the rescission of the contract with his coauthor).

(n21) Footnote 21. Cass. civ. I, 10 May 1995, R.I.D.A. 1995, no. 166, 285. The suit may then be prosecuted if the other coauthors, whether appearing or not, do not object. *See* Cass. civ. I, 5 Dec. 1995, J.C.P. 1996, IV, 254; Cass. Civ. I, 5 Dec. 1995, Bull. civ. I, no. 450, 14, Rev. trim. dr. com. 1996, 460, obs. Francon. A single coauthor may still become a civil party to a criminal action and thereby obtain civil damages from the criminal court for himself. *See* Cass. crim., 13 Dec. 1995, R.I.D.A. 1996, no. 169, 279, Rev. trim. dr. civ. 1996, 462, obs. Francon. On this procedural possibility, see § 8[3] *infra*.

(n22) Footnote 22. Paris, 4e ch., 10 May 1993, Juris-Data no. 022063.

(n23) Footnote 23. For treatment of the category of audiovisual works as such, see § 2[2][b] *supra*.

(n24) Footnote 24. Accordingly, this excludes the author of preexisting music, whatever its importance in the film. *See, e.g.,* Paris, 4e ch., 12 June 2002, R.I.D.A. 2003, no. 196, 459 (holding that the incorporation of works of Rachmaninoff into the soundtrack of a cinematographic work on the life of Rachmanioff does not make Rachmaninoff a coauthor of that work).

(n25) Footnote 25. *N.b.* the rare decisions characterizing audiovisual works as collective works have, on appeal, typically been overturned. *See, e.g.,* Paris, 4e ch., 6 July 1989 (*Huston* case), J.C.P. 1990, II, 21410, note Francon, *reversed*, Cass. civ. I, 28 May 1991, R.I.D.A. 1991, no. 149, 197, J.C.P. 1991, II, 21731, note Francon (discussed in § 7[4][a] *infra*), *on remand*, Versailles, chs. reunies, 19 Dec. 1994, R.I.D.A. 1995, no. 164, 389. The controversy on point may now be considered closed. *See* Paris, 4e ch., 17 Jan. 1995, R.I.D.A. 1995, no. 165, 332.

(n26) Footnote 26. Paris, 4 March 1987, R.I.D.A. 1987, 71, D. 1988, Somm, 204, note Colombet; Cass. civ. I, 29 March 1989, R.I.D.A. 1989, 262; Poitiers, 3e ch., 7 Dec. 1999, J.C.P. E. 2000, 1375, obs. Brochard, Com. com. electr. 2001, comm. no. 72, note Caron; Cass. civ. I, 30 Sept. 2003, Legipresse 2003, III, 35.

(n27) Footnote 27. But this situation is likely to be rare. In theory, one could think of the main graphic designer in the case of animated films as an example of a possible coauthor not designated in the statute. In practice these contributors are not members of the collecting societies of film authors, namely the SACD and SACEM.

(n28) Footnote 28. *See* Paris, 4e ch., 4 Mar. 1987, R.I.D.A. 1987, no. 132, 71, D. 1988, somm. 204, obs. Colombet. *See also* Paris, 4e ch., 9 Oct. 1995, R.I.D.A. 1996, no. 168, 311 (refusing to grant coauthor status to the only actor in a film dealing with his own life who, interviewed by the narrator who is named as the director in the credits, failed to produce evidence showing his own contribution, for example, to the creation of the film, to precise instructions on the set, or to writing any script). For general commentary, see F. Pollaud-Dulian, "Les auteurs de l'oeuvre audiovisuelle" (*translated into English as*: The authors of the audiovisual work), R.I.D.A. 1996, no. 169, 51.

(n29) Footnote 29. *See, e.g.,* Cass. civ. I., 5 Feb. 2002, R.I.D.A. 2002, no. 193, 373, Com. com. electr 2002, comm. no. 35, note C. Caron (in a case in which a cook claimed to be a coauthor of a documentary film about himself, remanding for a determination as to whether he had contributed to the "intellectual operations of design, filming, and editing of the audiovisual work itself"); Paris, 4e ch., 18 June 2003, D. 2003, somm. 2757, obs. Sirinelli (no joint authorship for a sports champion interviewed in a film and responding according to instructions).

(n30) Footnote 30. *See* § 4[3][c][iii] *infra*.

(n31) Footnote 31. *N.b.* the term "producer" applies, in this context, to one or many enterprises, effectively coproducers. *See, e.g.,* Paris, 4e ch., 31 Jan. 1995, R.I.D.A. 1995, no. 165, 339 (producer as enterprise or enterprises with direct or delegated control over the production process). *But see* Paris, 25 June 1999, R.I.D.A. 2000, no. 183, 263, obs. Kerever (holding that mere financial participation in a film does not suffice to make one a producer).

(n32) Footnote 32. *N.b.* the producer owns, but may not destroy, the final embodiment, such as the video recording or film, of the definitive version of an audiovisual work, previously called the "first master copy" (*copie standard*). *See* Paris, 24 Jan. 1974, Ann. prop. ind., 1976, 277.

(n33) Footnote 33. *See* § 4[1][a][i] *supra*.

(n34) Footnote 34. *See, e.g.,* Cass. civ. I, 14 Jan. 2003, Bull. civ. I no. 10, 6, Com. comm. electr. 2003, comm. no. 36, note Caron; D. 2003, 1088, note Becquet; Legipresse 2003, III, 117, note Singh and Corman (holding that the author of film music may exploit his work without requesting the authorization, for example, of the authors of an underlying novel which had provided the basis for the film and, in addition, that, in the absence of any clause to the contrary in the adaptation agreement, the composer may use the title of the film and names of characters on the jacket of the corresponding recordings).

(n35) Footnote 35. *See, e.g.,* TGI Paris, 3e ch., 23 March 2001, R.I.D.A. 2001, no. 189, 381, Com. comm. electr. 2001, comm. no.73, note Caron (allowing the director who refused to complete a film to be replaced by another). For further details, see § 7[1][a] *in fine infra*.

(n36) Footnote 36. For further details, see § 7[1][c][ii] *in fine infra*.

(n37) Footnote 37. *See* § 7[2] *infra*.

(n38) Footnote 38. On composite works, see § 4[1][a][iii] *infra*.

(n39) Footnote 39. Cass. civ. I, 14 Nov. 1973, J.C.P. 74, II, 17653, R.I.D.A. 1974, no. 80, 66.

(n40) Footnote 40. *See, e.g.,* Cass. civ. I, 24 Oct. 1995, R.I.D.A. 1996, no. 168, 277 (composite work found where an original guide book is later revised, without change in its overall composition, in a new edition by another author); Paris, 4e ch., 29 April 1998, R.I.D.A. 1998, no. 178, 278 (finding composite work in the floral decoration placed on the *Pont-Neuf* in Paris).

(n41) Footnote 41. *See, e.g.,* TGI Paris, 3e ch., 23 Sept. 1992, R.I.D.A. 1993, no. 158, 257 (holding that prior authors of characters may claim rights in episodes of television series held to be composite works incorporating these characters); Cass. civ. I, 9 Feb. 1994, D.S. 1994, 405 (2d case), note Edelman (holding that the author of a novel may preclude the exploitation of a telefilm as a composite work based upon his novel). *See also* Paris, 4e ch., 5 May 2000, R.I.D.A. 2001, no. 188, 352 (holding that only the author of the preexisting work, to the exclusion of the defendant in an infringement action, can claim that his agreement was not given for the making of the work).

(n42) Footnote 42. *See* Cass. civ. I, 10 March 1993, R.I.D.A. 1993, no. 157, 320, note Pollaud-Dulian; Paris, 1re ch., 25 Jan. 1995, D. 1995, inf. rap. 55.

(n43) Footnote 43. *See* § 4[1] *supra*. For further details, see § 4[1][b][ii][A] *infra*.

(n44) Footnote 44. On such works generally, see § 2[1][a][i] *supra*. On audiovisual works, which are deemed to be collaborative, see § 2[1][a][ii] *supra*.

(n45) Footnote 45. *See, e.g.,* Cass. civ. I, 3 July 1996, J.C.P. 1996, IV, 2008, Bull. civ. I, no. 294 (finding a collective work in software created on the initiative of a natural person). *But see* TGI Paris, 3e ch., 6 March 2001, Expertises 2001, 306, J.C.P. E. 2001, 1952, note Raynard (finding a joint work in software, rather than a collective work, on the ground that it is possible to distinguish between the programming by one or more authors and the definition of functionalities by others).

(n46) Footnote 46. *See, e.g.,* Paris, 15e ch., 6 March 1981, D. 1982, inf. rap. 46, obs. Colombet, Rev. trim. dr. com. 1982, 429, obs. Francon (finding a collective work where the publisher produced a history of France in cartoon form, following a general conception and assuring a particular cultural and pedagogical character); Paris, 4e ch., 25 June 1992, Juris-Data no. 022354 (collective work where publisher chose different writers contributing to guide book, entrusted the rewrite to still another writer, and determined the final edit). *But see* Paris, 25 Feb. 2004, P.I. July 2004, no. 12, 766, obs. Lucas (finding that a lexicon of international relations written by scholars was a collaborative work, not a collective work); Paris, 2 April 2004, P.I. July 2004 no. 12, 766, obs. Lucas (finding that a videogame created by two individuals was a collaborative work, since the production companies did not have a role of direction over their work).

(n47) Footnote 47. *Compare* TGI Paris, 3e ch., 22 Feb. 1993, Rev. dr. prop. intell., April 1993, 64 (finding no collective work in an encyclopedia published under the name of diverse writers, illustrators, and photographers, although the publisher defined the spirit, editorial scheme, and presentation of the work, but gave no specific directive for illustrating it), *with* Lyon, 1re ch., 9 Dec. 1999, R.I.D.A. 2000, no. 184, 357, note Varet, J.C.P. 2000, II, 10280, note Derieux ("this publishing company, in elaborating a paper composed of several issues and in editing it to appeal to a certain type of reader, had enough control to be deemed the originator of a self-standing collective work").

(n48) Footnote 48. *See, e.g.,* TGI Nanterre, 1re ch., 26 Nov. 1997, J.C.P. E. 1998, 805, obs. Vivant and Le Stanc (finding a videogame to be a collective work when it resulted from the fusion of contributions from distinct fields); Paris, 4e ch., 12 Jan. 2000, R.I.D.A. 2000, no. 186, 280, *appeal rejected*, 1re ch., 3 April 2002, J.C.P. G. 2002, IV, 1867 (finding a dictionary to be a collective work, even where an employee's name appeared as the director of the team creating the dictionary, to the extent that the employer was responsible for producing the work as a whole). For further analysis, see Lucas, *Traite de la propriete litteraire et artistique*, nos. 205-206 (Litec, Paris, 2d ed., 2001); B. Edelman, "L'oeuvre collective: une definition introuvable" (The collective work: an unworkable definition), D. 1998, chr. 141.

(n49) Footnote 49. *See* Cass. civ. I, 3 July 1996, R.I.D.A. 1997, no. 171, 315, D. 1997, 328, note Francon; Paris, 4e ch. B, 2 July 1999, Juris-Data no. 024708.

(n50) Footnote 50. *See* § 4[1] *supra*.

(n51) Footnote 51. On the general rule vesting copyright in employed authors, see § 4[1][b][ii][A] *infra*.

(n52) Footnote 52. But this ownership applies only to the collective work itself and not to separable component works included in it. *See, e.g.,* TGI, 1re ch., 13 Sept. 1999, Com. com. electr. 2000, comm. no.74, note Caron, J.C.P. E.

2001, no. 2, 1380, obs. Laporte-Legeais (vesting copyright in photographs included in collective work separately from copyright in that work).

(n53) Footnote 53. *See* Cass. civ. I, 24 May 1976, D. 1978, 223, note Plaisant. On the general rule entitling the author to share in the receipt of exploitation, see § 4[3][b] *infra*.

(n54) Footnote 54. H. Desbois, *Le droit d'auteur en France*, no. 691 (3rd ed., Paris, 1978).

(n55) Footnote 55. For a similar issue concerning computer programs, see § 4[1][b][ii][C] *infra*.

(n56) Footnote 56. *See* § 4[1][b][i][C] *infra. See, e.g.,* TGI Paris, 1re ch., 14 April 1999, J.C.P. E. 1999, 1481, obs. Gregoire, Expertises 1999, 95, *affirmed* Paris, 1re ch., 10 May 2000, J.C.P. 2000, II, 10430, note Derieux, Com. com. electr. 2000, comm. no. 73, note Caron (confirming the principle of journalists' rights in their contributions).

(n57) Footnote 57. *See* Paris, 15e ch., 6 March 1981, D. 1982, inf. rap. 46, obs. Colombet, Rev. trim. dr. com. 1982, 429, obs. Francon. For commentary, see H. Desbois, *Le droit d'auteur en France*, no. 704 (3rd ed., Paris, 1978).

(n58) Footnote 58. Cass. civ. I, 8 Oct. 1980, R.I.D.A. 1981, no. 108, 156; Cass. civ. I, 16 Dec. 1986, R.I.D.A. 1987, no. 133, 183. However, a publisher who asserted that writers of an encyclopedia enjoy absolute freedom of creation, notwithstanding the publisher's having changed a work as he saw fit, was held liable under civil tort law: Paris, 4e ch., 6 Nov. 1986, R.I.D.A. 1988, no. 136, 149.

(n59) Footnote 59. *See* § 4[1][b][i][A] *supra*.

(n60) Footnote 60. On the overall effect of Article L. 132-6--that of setting out exceptions to the general rule entitling the author to share in the receipts of exploitation--see § 4[3][b][ii] *infra*.

(n61) Footnote 61. Rights to press exploitation may be retained even after the author's employment is terminated: Cass. civ. I, 27 May 1986, R.I.D.A. 1987, no. 132, 62.

(n62) Footnote 62. A journalist has the right to additional remuneration distinct from his salary for the reproduction of his articles in another journal after these are first published: Cass. civ. I, 23 Jan. 2001, J.C.P. E. 2001, 1050, note Caron; Com. com. electr. 2001, comm. no.44, 1re esp., note Caron; Cass. civ. I, 12 June 2001, Com. com. electr. 2001, comm. no.74, note Caron, P.I. 2001, no. 1, 56, obs. Lucas.

(n63) Footnote 63. On audiovisual works, see § 4[1][a][ii] *supra*; on works made for the press, see § 4[1][b][i][C] *supra*; and, on computer programs, see § 4[1][b][ii][C] *infra*. On works created by employees of the French State, or commissioned by the French State, see § 2[4][e] *supra*.

(n64) Footnote 64. *See* § 2[1][b][iii][A] *supra*.

(n65) Footnote 65. *See* § 4[1][b][i] *supra*.

(n66) Footnote 66. *See, e.g.,* Cass. civ. I, 16 Dec. 1992, R.I.D.A. 1993, no. 156, 193, note Sirinelli ("the existence of an employment contract concluded by the author of a work of the mind does not imply any derogation from the enjoyment of his rights of intellectual property that are transferred to others, subject to the condition that the field of exploitation of the transferred rights is limited as to its scope, purpose, geographical extent, and duration"). *See also* Cass. civ. I, 21 Oct. 1997, Bull. civ. I, no. 285, 192; Cass. civ. I, 12 June 2001, 12 June 2001, Com. com. electr. 2001, comm. no.74, note Caron; P.I. 2001, no. 1, 56, obs. Lucas (employed photographer).

(n67) Footnote 67. *See* TGI Paris, 1re ch., 20 March 1974, J.C.P. 1975, IV, 43; Paris, 4e ch., 20 April 1989, R.I.D.A 1990, no. 143, 317.

(n68) Footnote 68. *See* § 4[2][b] *infra*.

(n69) Footnote 69. *Compare* Cass. crim., 30 Jan. 1978, R.I.D.A. 1979, no. 99, 156 (employer needs written transfer of employed author's rights), *with* Cass. civ. I, 27 May 1986, R.I.D.A 1987, no. 132, 61 (in special cases, notwithstanding the lack of a written contract, an employer's repeated payment over a long period for the creation of works may result in a transfer of rights in them).

(n70) Footnote 70. *See* § 4[3][a][ii] *infra*.

(n71) Footnote 71. For further details on the software provisions, see § 2[4][d] *supra*.

(n72) Footnote 72. For these general rules, see § 4[1] *supra*; on collective works, § 4[1][b][i] *supra*; on commissioned works, § 4[1][b][iii] *infra*.

(n73) Footnote 73. The Law of May 10, 1994, implementing the E.C. Software Directive, introduced this text of Article L. 113-9 of the I.P. Code, replacing prior text which had incorporated that of Article 45(1) of the 1985 Amendment Act. The 1985 Act, however, did not govern entitlements in software created by employees before this Act went into effect on January 1, 1986, and the general French rule, vesting copyright in the natural person authoring a work, prevailed before that date. Since subsequent law could not retroactively divest parties of rights already obtained by law or contract, it seems inevitable that Article L. 113-9 of the I.P. Code could only apply to software created after January 1, 1986. Thus, with regard to a program created before that date on the job, an employer could only have only acquired copyright as it did in cases of any other types of work, notably by contract. *See* Cass. civ. I, 16 Dec. 1992, R.I.D.A. 1993, no. 156, 193, note Sirinelli; Paris, 4e ch., 13 July 1988, J.C.P. E. 1990, II, 15698, no. 6, obs. Burst and Mousseron.

(n74) Footnote 74. The second paragraph of Article L. 113-9 of the I.P. Code, regarding programs made by employees on the job, submits all disputes on point to the jurisdiction of the *tribunal de grande instance* where the corporate headquarters of the employer is located, while the third paragraph of the same provision submits disputes with public agencies to the jurisdiction of the administrative courts. On the French court system, see § 1[4] *supra* and § 8[3] *infra*.

(n75) Footnote 75. *Compare* Paris, 14e ch., 29 Oct. 1987, J.C.P. E. 1988, II, no. 6, 15297, obs. Vivant and Lucas (holding that rights in software belong to the employer if the employee was paid an overall salary for all his work, even for that done at home), *with* TGI Paris, 3e ch., 6 March 2001, Expertises 2001, 306, J.C.P. E. 2001, 1952, note Raynard (holding that the employer has no right in that part of software made by a programmer who worked as independent contractor).

(n76) Footnote 76. For the limitations to moral rights in software, see § 7[2] *in fine infra*.

(n77) Footnote 77. On this principle, see § 4[1][b][ii][A] *supra*.

(n78) Footnote 78. *See* § 4[3][c][iv] *infra*.

(n79) Footnote 79. *See also* § 3[3] *in fine supra* (suggesting that, exceptionally, a French judge might apply the French principle of narrow construction to a foreign contract; and indicating the state of the law on the transferability of interests in extended terms of rights); § 4[3][b][ii] *in fine infra* (rule requiring proportional remuneration for a copyright conveyance made expressly inapplicable to foreign transfers).

(n80) Footnote 80. *See, e.g.,* Paris, 1re ch., 1 Feb. 1989, R.I.D.A. 1989, no. 142, 301 (U.S. contract enforced concerning terms of payment); Lyon, 16 March 1989, R.I.D.A. 1990, no. 144, 227 (British contract enforced, pursuant to British approach, transferring more economic rights than a French construction would have allowed).

(n81) Footnote 81. *See, e.g.,* Cass. civ. I, 28 May 1963, R.I.D.A. 1963, no. 41, 134, D. 1963, 677, note (unsigned), Clunet 1963, 1004, note Goldman, J.C.P. 1963, II, 13347, note Malaurie (*The Kid*) (form of assignment of copyright in United States subject to U.S. law).

(n82) Footnote 82. For general French conflicts analysis disentangling such issues in copyright matters, § 6[1][b] *infra*.

(n83) Footnote 83. *See* § 7[4][a] *infra*.

(n84) Footnote 84. *See* § 1[3] *supra*.

(n85) Footnote 85. *See* § 7[4] *infra*.

(n86) Footnote 86. On the critical distinction in French law between reproduction and performance rights, see § 8[1][b] *infra*.

(n87) Footnote 87. *See* §§ 4[2][b] and 4[3][a] *infra*.

(n88) Footnote 88. *See* Cass. civ. I, 9 Feb. 1994, R.I.D.A. 1994, no. 162, 443; Cass. civ. I, 29 June 1994, R.I.D.A. 1995, no. 163, 197.

(n89) Footnote 89. *See, e.g.*, Cass. civ. I, 11 Oct. 1983, R.I.D.A. 1984, no. 119, 196 (client ordering film from advertising agency may not use copies beyond term of contract without proving further rights); TGI Paris, 3e ch., 13 Oct. 1994, Rev. dr. prop. intell., June 1995, 52 (where contract silent on point, museum does not obtain right of reproduction from author); Paris, 4e ch., 26 Jan. 2000, Com. com. electr. 2000, comm. no. 53, note Caron (possession of a photograph does not imply any transfer of reproduction rights).

(n90) Footnote 90. *See* § 3[1][c] *supra*.

(n91) Footnote 91. *See, e.g.,* Paris, 4e ch., 18 Oct. 1988, C.D.A. Nov. 1988, 26, D. 1988, inf. rap. 265 (costume designer who transfers copyright in costumes retains tangible property rights in models); Paris, 4e ch., 26 March 1992, D. 1993, somm. 84, obs. Colombet; Versailles, 1e ch., 24 Jan. 2002, Legipresse 2002, I, 55, P.I., Oct. 2002, no. 5, 50, 1, obs. A. Lucas (photographers who transfer reproduction rights in photographs for given uses retain property in the negatives); Cass. civ. I, 14 May 1996, J.C.P. 1996, IV, 1490 (contract commissioning work for advertising does not, absent express term, convey property in embodiment of work).

(n92) Footnote 92. On the right of divulgation, see § 7[1][a] *infra*; on court action where heirs abusively exercise this right, § 7[3][a] *infra*. *Compare* TGI Paris, 3e ch., 10 Sept. 1992, R.I.D.A. 1993, no. 155, 211; Paris, 4e ch., 29 Sept. 1995, R.I.D.A. 1996, no. 168, 293; Paris, 4e ch.,17 March 2004, P.I. July 2004, no. 12, 773 obs. Lucas (finding abusive the refusals of owners of film negatives to allow film authors access to the negatives), *and* TGI Paris, ref., 16 July 2002, D. 2003, 198, note B. Edelman (granting joint authors of audiovisual works a right to access the negative of the film), *with* Paris, 4e ch. A, 6 Feb. 1995, Juris-Data no. 024997 (holding that the owner of a film negative was justified in refusing use by film authors).

(n93) Footnote 93. *See* § 7[3] *infra.*

(n94) Footnote 94. *Cf.* Cass. civ. I, 4 April 1991, R.I.D.A. 1991, no. 150, 127 (substantively, Civil Code governs how Picasso's economic rights devolve on heirs; procedurally, it empowers judge to name administrator to determine which collecting society will administer these rights, if the heirs disagree on this point).

(n95) Footnote 95. *Cf.* Cass. civ. I, 3 Dec. 2002, Com. com. electr. 2003, comm. no. 67, note Caron; P.I., 2003, no. 7, 161, obs. Lucas (in the case of spouses married before the entry into force of the law of 1957, all rights under copyright belong to the married author alone, but only for the works disclosed after this entry into force).

(n96) Footnote 96. *See* Cass. civ. I, 4 Dec. 1956, Gaz. Pal. 1957, I, 56; Orleans, 18 Feb. 1959, J.C.P. 1959, II, 11141, note Weill; Cass. civ. I, 4 June 1971, D.S. 1971, 585.

(n97) Footnote 97. *See* § 4[2][d] *infra*.

(n98) Footnote 98. For more detailed treatments of publication, performance, and audiovisual production contracts, see § 4[3][c] *infra*.

(n99) Footnote 99. *See* § 4[3][c][iii][B] *infra*.

(n100) Footnote 100. Also, in appropriate cases, Article L. 110-3 of the French Commercial Code may apply: it provides that any type of evidence is admissible to prove a contract against a commercial entity or person. *See* Cass. civ. I, 19 Feb. 2002, R.I.D.A. no. 193, 399, P.I. Oct.. 2002, no. 5, 53, obs. A. Lucas.

(n101) Footnote 101. On proving the priority of a contract against a third party, see § 4[2][d] *infra*.

(n102) Footnote 102. *See* Paris, 4e ch., 31 Oct. 2000, R.I.D.A. 2001, no. 188, 289, obs. Kerever (holding that, in the absence of a writing, the author's proof of the publishing contract can only consist in precise and circumstantial elements leaving no doubt as to the existence of the agreement).

(n103) Footnote 103. This formality has been held to apply even in gratuitous transfers: Paris, 4e ch., 1 July 1998, R.I.D.A. 1999, no. 179, 390.

(n104) Footnote 104. *See* Cass. civ. I, 20 Nov. 1970, Bull. civ. I, no. 289.

(n105) Footnote 105. *See, e.g.,* Cass. civ. I, 28 Nov. 2000, J.C.P. 2001, IV, 1145, Bull. civ., I, no. 308, R.I.D.A. 2001, no. 188, 315 (holding that, even if the author has agreed in principle to reproduction and received royalties on some sales of copies, the right is not transferred without being specifically mentioned); Cass. civ. I, 1 Dec. 1999, R.I.D.A. 2000, no. 185, 397, Com. com. electr. 2000, comm. no. 55, note Galloux (holding that specific transfers of rights to adapt and exploit software may not be presumed); Cass. civ. I, 23 Jan. 2001, Com. com. electr. 2001, comm.

no. 34, note Caron, R.I.D.A. 2001, no. 189, 327 (invalidating a contract entitled "assignment of copyright" which did not specify the duration and scope of the assigned rights)

(n106) Footnote 106. *See, e.g.,* Cass. civ. I, 9 Oct. 1991 (*Joker*), J.C.P. 1991, IV, 429, R.I.D.A. 1992, no. 151, 292 (holding standard clause, which granted client "all rights" of advertising agency in its creations, to be "too general to be valid"). *See also* § 4[3][a][i] *infra* (indicating case law sometimes voiding boilerplate provisions formerly included in publishing contracts, granting publishers "full and complete ownership of the work").

(n107) Footnote 107. *See, e.g.,* Cass. civ. I, 27 May 1986, Bull. civ. I, no. 143, R.I.D.A. 1987, no. 132, 61 (no writing needed for transfer of rights in technical designs for which an author received payment over 15 years knowing that they had to be reproduced); Cass. com., 1 Dec. 1986, D. 1987, inf. rap. 220 (implied right for seller of product to reproduce instructions in catalogues where such instructions were necessary for sale); Paris, 4e ch., 20 Jan. 1999, R.I.D.A. 1999, no. 180, 374 (admitting the transfer of rights by a translator on the sole grounds that the publisher had paid her a fixed sum).

(n108) Footnote 108. *See* Cass. com., 5 Nov. 2002, Com. com. electr. 2003, comm. no. 1 (2nd case), note C. Caron; Cass. civ. I, 13 Oct. 1993, J.C.P. 1993, IV, 2627, D. 1994, 166, note Gautier, R.I.D.A. 1994, no. 160, 210; Paris, 1re ch., 23 Oct. 1990, R.I.D.A. 1991, no. 150, 134, note Lucas; Paris, 4e ch., 13 Dec. 1990, C.D.A. May 1991, 22.

(n109) Footnote 109. *See* § 4[1] *supra.*

(n110) Footnote 110. *See* § 4[1][b][ii][B] *supra.*

(n111) Footnote 111. *See* § 4[1][a][ii] *supra.*

(n112) Footnote 112. *See* § 4[3][c][iii] *infra.*

(n113) Footnote 113. For works of employed authors, *see* § 4[1][b][ii] *supra;* for commissioned works, see 4[1][b][iii] *supra.* Courts may also refer to the uses and customs of the industry to discover an implied assignment or to extend the scope of the written assignment. *See, e.g.,* Paris, 1e ch., 29 Oct. 2001, R.I.D.A. 2002, no. 192, 441 (granting performers rights in commissioned photographs representing their performances and referring to the customs of the trade at the time at which photographs were taken); Cass. civ. I, 15 May 2002, J.C.P. G. 2002, IV, 2086, I.P. 2002, no. 4, 58 (2nd case), obs. Sirinelli (extending the assignment of rights, in a photograph to a company, to encompass a limited advertising use of the photograph).

(n114) Footnote 114. *See* § 4[1][b][i][C] *supra.*

(n115) Footnote 115. *See* § 4[1][b][ii][C] *supra.*

(n116) Footnote 116. *See* § 4[3][c][iv] *infra.*

(n117) Footnote 117. On chain of title to worldwide rights, see "Introduction," herein, at § 6[3]. *N.b.* transfers of rights in industrial designs and trademarks, respectively, have to be recorded in appropriate national registries to be assured of priority against third parties: I.P. Code, Arts. L. 512-4 (Ord. 2001) and L. 714-7.

(n118) Footnote 118. *N.b.* there is, in France, a public record (*service de l'enregistrement*) generally available for transfers of rights in personal property, but it is rarely used to secure dates of priority for copyright conveyances since other means of proof are available.

(n119) Footnote 119. *See* § 5[3] *in fine infra.*

(n120) Footnote 120. *See, e.g.,* Cass. soc., 30 March 1999, J.C.P. 1999, IV, 1977 (holding that a contract with a clause granting a royalty share to an actress, in this case Jeanne Moreau, must be recorded at the C.N.C.).

(n121) Footnote 121. Cass. Civ. I, 18 Nov. 1997, J.C.P. 1998, IV, 1026; Bull. civ. I, no. 316, 215 (*Canal Plus*), *on remand*, Versailles, 20 June 2000; R.I.D.A. 2001, no. 187, 231, obs. Kerever (holding that the provisions of the license agreement not mentioned in the excerpts remitted by the C.N.C. were enforceable against the sublicensee).

(n122) Footnote 122. Cass. civ. I, 28 May 1963, R.I.D.A. 1963, no. 41, 134, J.C.P. 1963, II, 13347, note Malaurie (*The Kid*). *See also* Paris, 9e ch., 5 March 1999, Com. com. electr. 1999, comm. no. 26, note Galloux (holding that a transferee, exploiting a work beyond the term of a contract, may not plead the failure to record the work at the C.N.C. as a defense to an infringement suit).

(n123) Footnote 123. Introduced by the Law of May 10, 1994, implementing the E.C. Software Directive.

(n124) Footnote 124. On foreclosing on copyright generally, see § 4[3][d] *infra*.

(n125) Footnote 125. *See e.g.* Cass. com., 4 Dec. 2001, J.C.P. G. 2002, IV, 1122, P.I. 2002, no. 3, 62, obs. A. Lucas (holding that excessive fees may not be charged for access to a database found to be essential resource for competitors); Conseil d'Etat, 10th and 9th sections, 29 July 2002, J.C.P. E. 2002, 1447, P.I. Jan. 2003, no. 6, 57, obs. Lucas (canceling a decree of the Minister of the Economy as fixing excessive royalties for access to the database of businesses managed by the National Institute of Statistics, which was found to occupy a dominant market position).

(n126) Footnote 126. On contracts predating the 1957 Act, see H. Desbois, *Le droit d'auteur en France*, no. 506 (3rd ed., Paris, 1978). In cases of such older contracts, often purporting to transfer all rights, courts logically look to whether a given type of use could have been foreseeable at the time the contract was concluded. *See, e.g.,* Paris, 1re ch., 26 June 1989, Juris-Data no. 022829, *cited by* A. Kerever, R.I.D.A. 1990, no. 144, 136 (oral contract purporting to transfer all of screenwriter's rights for a lump-sum in 1939, held to include television rights, which existed since 1938, but not videocassette rights); Paris, 4e ch. B, 12 April 2002, R.I.D.A. 2002, no. 194, 315, P.I. Oct., 2002, no. 5, 54 (2nd case), obs. Lucas (holding that a transfer ratified by the novelist Colette in 1909 excluded television and video rights, even if the heirs collected royalties and other revenues for such exploitation, but included phonographic exploitation, given that the phonograph was invented in 1877).

(n127) Footnote 127. *See* Cass. civ. I, 26 Jan. 1994, R.I.D.A. 1994, no. 161, 309.

(n128) Footnote 128. Cass. civ. I, 18 Dec. 1979, J.C.P. 1980, II, 19307, concl. Gulphe. *See also* TGI Paris, 3e ch., 23 Feb. 1999, D. 1999, 580, note Kamina, *translated into English in* E.C.D.R. 2002, 128 (holding that the authorization given to a museum to show the paintings of Utrillo, as well as to sell post cards and posters of the paintings, "may not be construed as authorization to film the paintings in the course of a television report"). *But see* Cass. civ. I, 14 June 2000, R.I.D.A. 2001, no. 187, 265 (concerning the use of paintings in an advertising film: "The trial judges could decide, in the circumstances of the case, that the right of reproduction was included with the right of representation").

(n129) Footnote 129. TGI Paris, 3e ch., 5 Feb. 1992, R.I.D.A. 1992, no. 153, 205. But, on transfers of rights in unforeseen media, see § 4[3][a][iv] *infra.*

(n130) Footnote 130. *See, e.g.*, Cass. civ. I, 2 Dec. 1992, Juris-Data no. 002695 (transfer of right to reproduce recorded music on compact disc does not convey right to reproduce liner notes accompanying the original recording).

(n131) Footnote 131. On this provision requiring the specification of contract terms, see § 4[2][b] *in fine supra.*

(n132) Footnote 132. *See, e.g.*, Paris, 14e ch., 13 Feb. 1991, D. 1991, inf. rap. 84, obs. Colombet (agreement to publish cartoons as a serial does not imply consent to publication in an album); Cass. civ. I, 21 Nov. 1995, J.C.P. 1996, IV, 77; Bull. civ. I, no. 421, 294 (authorization of reproduction of shots in "posters and folders" does not extend to advertising inserts).

(n133) Footnote 133. *See, e.g.*, Cass. civ. I, 15 Oct. 1985, R.I.D.A. 1986, no. 129, 124 (precluding use of a poster in the decor of a publicity film without consent of the painter whose work it reproduced); Paris, 4e ch., 31 May 1989, C.D.A. Jan. 1990, 14, D. 1989, inf. rap. 199 (precluding use of a sculpture in press campaign and a filmed commercial). These cases are to be distinguished from those involving uses beyond the scope of authorization for advertising. *See, e.g.,* Paris, 8 July 1974, Ann. prop. ind. 1975, 214, and Cass. civ. I, 5 May 1976, R.I.D.A. 1976, no. 90, 168 (precluding journalistic use of photographs only authorized for use in ad campaign); Paris, 4e ch., 18 March 1987, R.I.D.A. 1987, no. 134, 208 (precluding marketing of a publicity poster created to promote a film).

(n134) Footnote 134. On such rules, see § 4[3][b] *infra. See, e.g.*, Cass. civ. I, 21 Feb. 1989, Bull. civ. I, no. 90, J.C.P. 1989, IV, 150 (photographer, who had merely granted rights to illustrate a special edition of a magazine, authorized to seek supplemental remuneration for the use of his photographs in an encyclopedia); Cass. civ. I, 13 Dec. 1989 (*Lepretre c. Bovida*), R.I.D.A. 1990, no. 144, 199 (overturning a finding of a total transfer of rights in photographs only intended to be used to illustrate a catalog for two years, without remuneration for the reuse of the negatives).

(n135) Footnote 135. *See, e.g.* Cass 13 Oct 1993, D. 1994, 166 note Gautier (provisions of Article L. 131-3 of the I.P. Code only applicable to agreements entered into by the author).

(n136) Footnote 136. *See* P.Y. Gautier, *Propriete litteraire et artistique,* no. 275, 479, note 1 (Paris, 4th ed., 2001).

(n137) Footnote 137. *See* Paris, 4e ch., 6 May 1980, R.I.D.A. 1981, no. 107, 157.

(n138) Footnote 138. *See* § 4[3][a][iii] *infra.*

(n139) Footnote 139. *See, e.g.,* Cass. civ. I, 6 Nov. 1979, R.I.D.A. 1980, no. 105, 167 (holding it possible to transfer rights in future stories including the same protagonist where the writer was free to terminate his relationship with the transferee, a newspaper, upon delivering the last episode in progress).

(n140) Footnote 140. *See, e.g.,* Cass. civ. I, 4 Feb. 1986, R.I.D.A. 1986, no. 129, 128, J.C.P. 1987, II, 20872, note Plaisant (upholding the validity of a boilerplate clause automatically transferring all rights of reproduction in future advertising creations); Lyon, 1re ch., 28 Nov. 1991, Gaz. Pal. 1992, 1, 275, note Forgeron (holding that an automatic transfer of rights, triggered as works were created one after another, did not constitute a total transfer relative to future works).

(n141) Footnote 141. *See §  4[1][a][ii] supra.*

(n142) Footnote 142. *See, e.g.,* Cass. civ. I, 5 Feb. 1980, Bull. civ. I, no. 45, Rev. trim. dr. com. 1980, 244, obs. Francon (genre "human sciences" insufficiently delineated); TGI Paris, 3e ch., 7 March 1986, R.I.D.A. 1987, no. 131, 252; D. 1988, somm. 208, obs. Colombet, (*Prost*) (title and activities of the author not sufficient to specify genre); Paris, 1re ch., 27 March 1998, R.I.D.A. 1998, no. 178, 259 (reference to fictive novels and stories does not suffice). *But see* TGI Paris, 3e ch., 23 April 1971, R.I.D.A. 1972, no. 74, 157, D. 1972, 17, note R.L. (the genre "essay" sufficiently described); Paris, 1re ch., 6 Sept. 1999, R.I.D.A 2000, no. 184, 344 (popular music corresponds to a "genre," notably one including rock and roll and hard rock as subcategories).

(n143) Footnote 143. *See, e.g.,* Paris, 4e ch., 5 July 1979, D. 1980, 580, concl. Levy, Rev. trim. dr. com. 1980, 345, obs. Francon (validating a cumulative preferential transfer of rights to five poetry collections, five novels, and five essays). While the text literally allows this result, it does not seem to correspond to the intention which can be inferred from the legislative record. *See* H. Desbois, *Le droit d'auteur en France*, no. 540 (3rd ed., Paris, 1978).

(n144) Footnote 144. *See, e.g.,* Paris, 1re ch., 29 Jan. 1991, R.I.D.A. 1991, no. 149, 219, note Gautier (*Michel Jonasz*) (parties may not, after the fact, change the beginning date of the period by excluding the first work from the scope of the option agreement).

(n145) Footnote 145. *See, e.g.,* Cass. civ. I, 15 Dec. 1975, R.I.D.A. 1976, no. 89, 129 (clause attempting to grant publisher right to make more than two consecutive refusals is unenforceable).

(n146) Footnote 146. *See, e.g.,* Paris, 4e ch., 17 May 1989, D. 1989, inf. rap. 143, C.D.A. Feb. 1990, 21 (*Alain Souchon*) (clause contained in a management contract for a catalogue, purporting to grant manager preferential rights, held invalid for lack of definition of genre); Paris, 1re ch., 29 Jan. 1991, R.I.D.A. 1991, no. 149, 219, note Gautier (*Michel Jonasz*) (execution of two separate contracts disallowed as stratagem to sidestep the five-year time limit).

(n147) Footnote 147. *See* H. Desbois, *Le droit d'auteur en France*, nos. 543, 655 (3rd ed., Paris, 1978).

(n148) Footnote 148. *See* Cass. civ. I, 13 April 1972, D. 1972, 440. *See also* TGI Paris, 3e ch., 12 Jan. 1988, R.I.D.A. 1988, no. 137, 16, note Gautier (invalid preferential clause implies invalid subsequent transfers where author consented only in the belief that the original agreement validly bound him).

(n149) Footnote 149. TGI Strasbourg, ref., 3 Feb. 1998 (*Les dernieres nouvelles d'Alsace*), J.C.P. 1998, II, 10044, note Derieux, R.I.D.A. 1998, no. 176, 466, *affirmed on this issue*, Colmar, 1re ch., 15 Sept. 1998, R.I.D.A. 1999, no. 179, 410, note Kerever. *See also* TGI Paris, 1re ch., 14 April 1999, J.C.P. E. 1999, 1481, obs. Gregoire, Expertises 1999, 195 (specifying that, though contributing to collective works, journalists were not precluded from being entitled to supplementary remuneration for utilizing their contributions).

(n150) Footnote 150. Remuneration agreements remain valid if they were freely concluded before the 1957 Act went into effect. *See* Cass. civ. I, 30 Oct. 1967, Gaz. Pal. 1968, 1, 23.

(n151) Footnote 151. *See §  4[3][b][ii]-[iii] infra.*

(n152) Footnote 152. *See, e.g.,* Cass. civ. I, 15 July 1999, J.C.P. 1999, IV, 2707, Com. com. electr. 1999, comm. no. 25, note Caron (holding, in a case of a multimedia product including, for example, a booklet, cassette, etc., that the authors of illustrations are entitled to remuneration based on that part of the price to the public corresponding to their respective contributions). *Cf.* Cass. civ. I, 15 Oct. 1996, J.C.P. 1996, IV, 2398, D. 1996, inf. rap. 250 (overturning decision in favor of remuneration based on gross revenues).

(n153) Footnote 153. *Compare* Paris, 1re ch., 23 Nov. 1970, R.I.D.A. 1971, no. 69, 74 (a rate of 0.5% permitted for motion pictures), *with* TGI Seine, 3e ch., 16 May 1969, R.I.D.A. 1970, no. 63, 213, note Schmidt (a rate of 2.5% held inadequate in publishing).

(n154) Footnote 154. For these exceptions, see § 4[3][b][ii] *infra*.

(n155) Footnote 155. *See* TGI Paris, 3e ch., 9 May 1990, R.I.D.A. 1991, no. 147, 355.

(n156) Footnote 156. *See* Versailles, 1re ch., 27 Jan. 1988, D. 1988, somm. 223, obs. Hassler; Cass. civ I, 8 Nov. 1989, C.D.A. Sept. 1990, 20.

(n157) Footnote 157. In all cases, the lump-sum only applies to the first edition, in order to allow the author to share in long-term profits accruing from subsequent editions. *See* Cass. civ. I, 13 Dec. 1989 (*Lepretre c. Bovida*), R.I.D.A. 1990, no. 144, 199. *But see* Cass. civ. I, 18 May 1976, Bull. civ. I, no. 176, J.C.P. 1976, IV, 230 (lump-sum payment valid for the republication of photographs).

(n158) Footnote 158. *See, e.g.*, Cass. civ. I, 10 March 1987, Bull. civ. I, no. 89, R.I.D.A. 1987, no. 133, 188 (*SACEM*) (lump-sum payment for discotheques given the difficulty of identifying receipts attributable to specific works). This is not the case when the receipts are known, for example, from jukeboxes and pay-per-view television.

(n159) Footnote 159. *See, e.g.,* TGI Annecy, 10 Sept. 1998, R.I.D.A. 1999, no. 179, 431 (setting aside proportional shares where the court found the design of a label for cheese not essential).

(n160) Footnote 160. For a hypothetical example, see H. Desbois, *Le droit d'auteur en France*, no. 572 (3rd ed., Paris, 1978): a craftsman creates a piece of jewelry which is sold at a high price, principally because its materials, such as rare metals or gems, are expensive.

(n161) Footnote 161. *See* § 4[3][b][ii] *supra*.

(n162) Footnote 162. *See, e.g.*, Paris, 1re ch., 1 Feb. 1989, R.I.D.A. 1989, no. 142, 301 (U.S. contract, transferring French author's rights to a Greek national for a lump sum, enforced in France as to terms of payment).

(n163) Footnote 163. *See* H. Desbois, *Le droit d'auteur en France*, no. 580 (3rd ed., Paris, 1978). On the general approach of French courts to foreign contracts, see start of § 4[2] *supra*.

(n164) Footnote 164. *See* Versailles, 1re ch., 9 June 1986, R.I.D.A. 1987, no. 131, 243, note Oberthur; Paris, 4e ch., 3 April 1990, D. 1991, somm. 98, obs. Colombet.

(n165) Footnote 165. For commentary, see J. Matthyssens, "Sanction de la lesion dans les contrats relatifs aux droits d'auteur" (*translated into English as*: Sanction of the injury in contracts connected with copyright), R.I.D.A. 1959, no. 25, 73; Lucas, *Traite de la propriete litteraire et artistique*, nos. 539 *et seq.* (Litec, Paris, 2d ed., 2001).

(n166) Footnote 166. *See, e.g.,* Cass. civ. I, 18 Oct. 1994, Bull. civ. I, no. 296, 216, R.I.D.A. 1995, no. 166, 271 (publishing contract found in case of contract in which composer-performer transfers right to make copies of work to publisher who assumes duty to assure publication and commercial distribution).

(n167) Footnote 167. *Cf.* Paris, 4e ch., 17 June 1993, R.I.D.A. 1993, no. 158, 252 (holding that only the author may authorize subcontracting publication to another publishing house); Paris, 4e ch., 15 Dec. 1999, R.I.D.A. 2000, no. 185, 415 (finding a French publisher liable for purporting to transfer rights in photographs to a sub-publisher without informing the author).

(n168) Footnote 168. *See* § 4[2][b] *supra*. On preferential rights in publishing contracts, see § 4[3][a][iii] *supra*.

(n169) Footnote 169. *See, e.g.*, Cass. civ. I, 27 May 1986, Bull. civ. I, no. 144, R.I.D.A. 1987, no. 132, 58; Paris, 12 Nov. 1986, D. 1987, somm. 389, note Hassler, R.I.D.A. 1987, no. 131, 247.

(n170) Footnote 170. Cass. civ. I, 12 Oct. 1977, Bull. civ. I, no. 363. *See also* Paris, 25 Feb. 1987, D. 1988, somm. 208, obs. Colombet (sufficient delay in delivery of manuscript by the author is grounds for terminating the contract).

(n171) Footnote 171. *See, e.g.*, Paris, 1re ch., 9 Sept. 1998, J.C.P. 1999, II, 10181, note A. Lucas; R.I.D.A. 1999, no. 179, 396 (disallowing publisher's cutting into the basis for authors' royalty shares by misleading accounting practices, such as taking editorial fees and expenses through foreign subsidiaries that did not render any effective services), *appeal rejected*, Cass. civ. I, 11 Jan. 2000, J.C.P. 2000, IV, 1321: Bull. civ. I, no. 6 (expressly mentioning the failure to perform under the publishing contract in good faith).

(n172) Footnote 172. *See* § 4[3][b][i] *supra*.

(n173) Footnote 173. Paris, 4e ch., 17 Sept. 1997, D. 1999, somm. 68, obs. Colombet (invalidating a musical publishing contract which did not specify the minimum number of recordings for the first pressing).

(n174) Footnote 174. Cass. civ. I, 29 June 1971, Bull. civ. I, no. 219. *See also* TGI Paris, 3e ch., 29 April 1988, R.I.D.A. 1988, no. 138, 324 (invalidating music publishing contracts entered into in 1952 and awarding composer compensatory damages after determining that the publisher's legal duty to maintain continued commercial exploitation of musical works preexisted the 1957 Act). *But cf.* Cass. civ. I, 4 Dec. 2001, Juris-Data no. 011977 (deciding that publishing agreements entered into before the Copyright Act of 1957 remain subject to the law in force as of their conclusion and rejecting a claim that was based on a breach of the duty to exploit the work).

(n175) Footnote 175. On this obligation in transfers of rights to adapt the published work into an audiovisual one, see § 4[3][c][iii][B] *infra. See, e.g.*, TGI Paris, 3e ch., 30 Nov. 1999, R.I.D.A. 2000, no. 185, 435 (holding that an author may only transfer his rights gratuitously if he gives his unambiguous consent, which was found not to be given where purportedly agreed proportional shares were negligible).

(n176) Footnote 176. *But cf.* Cass. civ. I, 24 March 1993, R.I.D.A. 1993, no. 157, 334 (entitlement under Article L. 131-8 of the I.P. Code applies only to royalties and other remuneration that publisher owes author, not to infringement damages).

(n177) Footnote 177. *See, e.g.*, Cass. civ. I, 9 Feb. 1994, Bull. civ. I, no. 56, 43 (publisher who transferred rights of exploitation of a work for publication outside France remains obligated to inform the author of the conditions under which his work is exploited abroad). Failure to comply with this obligation may result in the rescission of the agreement: Paris, 14 Feb. 1994, Juris-data no. 020595; TGI Paris, 3e ch., 4 Feb. 2003, Legipresse 2003, I, 79.

(n178) Footnote 178. *See, e.g.*, Paris, 24 Nov. 1987, R.I.D.A. 1988, no. 135, 96 (termination on grounds of publisher's failure in performance concerning preference); Paris, 21 March 1988, D. 1988, inf. rap. 126 (unauthorized assignment of the contract to a third party).

(n179) Footnote 179. *See* § 8[1][b][ii] *infra*.

(n180) Footnote 180. *See* § 9[2] *infra*.

(n181) Footnote 181. *See* § 4[3][c][i][A] *supra*.

(n182) Footnote 182. *But see* § 4[3][c][iii][a] *infra* (producer of an audiovisual work benefits from presumed transfer of all exploitation rights, including the performance right in the broad sense, for full term).

(n183) Footnote 183. *See* § 4[3][c][i][C] *supra*.

(n184) Footnote 184. *See* § 4[3][c][i][A] *supra*.

(n185) Footnote 185. For the definition of "audiovisual work," see § 2[2][b] *supra*.

(n186) Footnote 186. For the definition of audiovisual "producer" and "coauthors," see § 4[1][a][ii] *supra*.

(n187) Footnote 187. Paris, 4e ch., 17 Jan. 1995, R.I.D.A. 1995, no. 165, 332. It has, however, been held that, absent express agreement to the contrary, the term of the presumed transfer of audiovisual exploitation rights is coextensive with the duration of the rights themselves. *See* Cass. civ. I, 5 Nov. 1991, R.I.D.A. 1992, no. 152, 186, Bull. civ. I, no. 291. This holding appears to conflict with Article L. 131-3 of the I.P. Code which requires that a transfer of authors' rights, among other things, specify its term *See* § 4[2][b] *supra*.

(n188) Footnote 188. *But see* Paris, 4e ch., 19 Dec. 1991, R.I.D.A. 1993, no. 156, 206 (while refusing to apply presumption to events predating the 1985 Act which introduced it, court suggests that it might transfer the right to publish a book, despite a reservation of rights in graphic reproduction).

(n189) Footnote 189. *See, e.g.*, TGI Paris, 1re ch., 17 Feb. 1999, R.I.D.A. 1999, no. 181, 331 (holding that, by virtue of an express clause recorded at the C.N.C., the producer obtained exclusive rights in a graphic edition of the scenario, dialogues, and photographs of a film).

(n190) Footnote 190. *See* § 4[3][b][ii] *supra*.

(n191) Footnote 191. *See* § 4[3][c][i] *supra*.

(n192) Footnote 192. But this duty is less stringent than in publishing, as it does not include a duty to produce the work contracted for.

(n193) Footnote 193. *See* New Commercial Code of 2000, Arts. L. 621-22 *et seq.* In the case of transfer of part or all of the enterprise of the producer or of its liquidation, Article L. 132-30(3) provides that each audiovisual work possibly subject to a transfer of rights, or to the sale of same by auction, must be subject to a distinct transaction and that each of the authors and coproducers must be given notice of such transaction. The intent is to avoid allowing the failure of the enterprise to threaten the production and exploitation of each particular audiovisual work. The copyrights are to be allocated to parties ready and willing to keep production and exploitation going. *See also* § 4[2][d] *supra* (requirement of recording production contracts, as well as security interests, at the C.N.C.).

(n194) Footnote 194. *See* § 4[3][c][i] *supra.*

(n195) Footnote 195. *See* Paris, 4e ch., 14 May 1997, D. 1998, somm. 194, obs. Colombet (holding this requirement to be unwaivable as a matter of public policy).

(n196) Footnote 196. *See* Paris, 4e ch., 14 May 1997, Juris-data no. 23248.

(n197) Footnote 197. *See Publicite et droit d'auteur* (Colloque I.R.P.I., Paris, 1990).

(n198) Footnote 198. On works made on commission generally, see § 2[1][b][iii] *supra.*

(n199) Footnote 199. *See* Bonet and Desjeux, "Le droit de la publicite dans l'article 14 de la loi du 3 juillet 1985," 1987/I J.C.P. 3283; Durrande, "La cession du droit d'exploitation des oeuvres publicitaires de commande," D. 1986, Ch. 280; Oberthur, "L'article 14 (de la loi de 3 juillet 1985) et les oeuvres de commande utilisees pour la publicite" (*translated into English as*: "Article 14 concerning commissioned works for advertising"), R.I.D.A. 1986, no. 128, 7.

(n200) Footnote 200. *See* Paris, 4e ch., 18 April 1991, R.I.D.A. 1992, no. 153, 166.

(n201) Footnote 201. On collective works generally, see § 4[1][b][i] *supra.* Articles L. 132-31 through L. 132-33 of the I.P. Code, however, do not include works created in the performance of an employment agreement, whether the employer is a producer or an advertising agency. Nor do they apply to a work preexisting its use for the advertising campaign, even if the work was commissioned. On works made in an employment relationship generally, see § 4[1][b][iii] *supra.*

(n202) Footnote 202. J.O., 2 May 1987.

(n203) Footnote 203. *See* Parent, *Le droit d'auteur sur les creations publicitaires*, 91-92 (Paris, 1989).

(n204) Footnote 204. *See* § 4[3][b] *supra.*

(n205) Footnote 205. It remains to be seen whether courts will enforce this requirement. *Compare* Cass. civ. I, 22 March 1988, R.I.D.A. 1988, no. 137, 106. *See* Paris, 4e ch., 24 May 2000, Juris-Data no. 120011 (invalidating the commissioning contract for failure to refer to the remuneration for each mode of exploitation), *with* Cass. civ. I, 20 March 2001, R.I.D.A. 2001, no. 189, 351, Com. com. electr. 2001, comm. no. 101, note Le Stanc, P.I. 2001, no. 1, 69, obs. Lucas (only observing that the decision on appeal mentioned that the lump-sum payment to the author of advertising photographs "included [payment for] the exploitation of the shots").

(n206) Footnote 206. *See also* § 8[4][a] *infra* (remedy of confiscation, sometimes of receipts from alleged infringement).

(n207) Footnote 207. *See also* § 4[2][a][iii] *supra* (limits to transfer by law in the marital community) and § 7[1][a] *infra* (moral right to control disclosure).

(n208) Footnote 208. *See* §§ 4[2][d] *supra.*

(n209) Footnote 209. *See* §§ 4[3][c][i][A] and 4[3][c][iii][A] *supra.*

(n210) Footnote 210. On this directive, see "E.C.," at § 4(2)(h). Most importantly, under the Directive, the resale royalty right will apply "to all acts of resale," rather than only to public auctions, and French rate structures will also have to be changed.

(n211) Footnote 211. *See* § 6[1][a][ii][D] *infra.*

(n212) Footnote 212. *See* § 5[2] *infra.*

(n213) Footnote 213. On collecting societies generally, see § 9[2] *infra*.

(n214) Footnote 214. Cass. civ. I, 18 March 1986, R.I.D.A. 1986, no. 129, 138, concl. Gulphe, Rev. trim. dr. com. 1987, 56, note Francon (resale of Rodin bronzes).

(n215) Footnote 215. Cass. civ. I, 13 Oct. 1993 (*Durand c. Audap*), J.C.P. 1993, IV, 2628, R.I.D.A. 1994, no. 161, 267, D. 1994, 138, note Edelman (allowing *droit de suite* on decorative objects and furniture fabricated by workers on artist's orders if they display the mark of his personality and, as such, are distinguishable from simple reproductions).

(n216) Footnote 216. *See* Cass. civ. I, 11 Jan. 1989, D. 1989, 308, note Edelman, R.I.D.A. 1989, no. 141, 252, note Durrande; TGI Paris, 2e ch., 10 Sept. 1998, R.I.D.A. 1999, no. 182, 210. *See also* Cass. civ. I, 3 Dec. 2002, Com. com. Electr. 2003, comm. no. 12, note Caron; P.I. Jan. 2003, no. 6, 45, obs. Sirinelli (holding that only statutory heirs of the artist, and those who succeed these heirs pursuant to statute, obtain title to the resale-royalty right of an author deceased before the entry into force of the 1957 Copyright Act).

1 of 1 DOCUMENT

International Copyright Law and Practice
Copyright 2005, Matthew Bender & Company, Inc., a member of the LexisNexis Group.

UNITED KINGDOM

*2-UK International Copyright Law and Practice § 4*

**Ownership and Transfer**

**[1]-- Initial Ownership**

Section 11(1) of the 1988 Act states the principle that initial ownership belongs to the author. The term "author" here refers to any flesh-and-blood creator of any work in the traditional categories of literary, dramatic, musical, and artistic works.n1  However, if it is computer-generated, and therefore without any human author, such a work obtains as its author "the person by whom the arrangements necessary for the creation of the work are undertaken."n2

While film authorship is treated as a special type of joint authorship between directors and producers,n3  other provisions initially vest copyrights for sound recordings, broadcasts, and published editions in the "authors," that is, in the entities making or disseminating these media productions, as explained below.n4  As already seen, the Act, pursuant to special provisions, also allocates the ownership of Crown and Parliamentary copyright.n5

In certain circumstances where no author, whether live or fictive, can be identified, the 1988 Act allocates authorship through the use of statutory presumptions, as explained below.n6

**[a]-- Joint Works.**

Copyright in a "work of joint authorship" is held by all of its coauthors, and this concept now applies to "films" pursuant to special rules.n7

**[i]-- In General.**

The term "work of joint authorship" normally applies to literary, dramatic, musical, and artistic works. It is specially extended to a broadcast "where more than one person is taken as making the broadcast."n8  No special provisions apply to sound recordings, or published editions, as they do to films.n9  A work is one "of joint authorship" if it meets two conditions: it must be produced by the "collaboration" of two or more coauthors, and their contributions must not be "distinct" from each other.n10

The first condition of collaboration of a joint work requires that the work have been made "in prosecution of a preconcerted joint design" or at least on the basis of cooperation between the authors.n11  Long-distance collaborative efforts or cooperation would seem to qualify.n12  Separately elaborating a pre-existing work after it is generated does not. That may rather generate a derivative work in which a separate copyright arises.n13  For example, where a musician arranges a prior musical work, there may be separate copyrights.n14

The second condition is a double one: that each of the joint authors has contributed to the work and that those contributions are not distinct. The contribution must be the sort protected by copyright, that is, expression rather than mere ideas, although it need not be in the act of fixation.n15  It will suffice if the contribution is a "significant and original" one, even if it is not equivalent in terms of quantity or quality to that of the other contributors.n16  The requirement that the contributions are not "distinct" excludes from joint authorship the situation where one person writes certain parts and another the others, for example, where one writes the words and the other the music of an opera or a song.n17

Assignments of joint copyright have to be made by each of its joint owners if they are to effect a transfer of his interest. Equally a license requires the assent of each.n18  One joint owner may not exploit the work without the license of the other or others.n19

**[ii]-- Films.**

Films made on or after July 1, 1994, are treated as works of joint authorship and are subject to the general rules applicable to joint copyright.n20  Under Sections 9(2)(ab) and 10(1A) of the Act, the principal director and producer are now treated as joint authors of such films, save where they are the same person.

There is no further explanation of what is meant by "principal director," but the term "producer" is defined as "the person by whom the arrangements necessary for the making of the film are undertaken."n21  The identification of this person is treated as a question of fact,n22  but the courts have emphasized aspects such as initiation of the project, organization, arrangement of location, over and above the doing of the filming, assisting with such organization, or merely providing finance.n23

Where a film is made by an employee in the course of employment, Section 11(2) of the 1988 Act now applies: in the absence of agreement to the contrary, copyright vests initially in the employer.n24  No such exception to the basic principle that the author is the first owner is made in relation to commissioned films: in such cases it is likely that the commissioner will be treated as the producer, and coauthor, with the principal director.n25

The producer is rebuttably presumed to have been assigned the rental rights in works and performances included in a film.n26  Authors and performers, however, retain unwaivable rights to remuneration for rentals made after April 1, 1997.n27  No such transfer is presumed to be made by the principal director; however, if it has been voluntarily made, that director also benefits from the same unwaivable right to remuneration.n28

**[b]-- Works Made for Hire.**

In the United Kingdom, there is no specific category of "works made for hire" but rather diverse rules applicable to diverse materials that, in some systems, might fall into such a category. While the 1988 Act introduced changes on point, effective August 1, 1989, the initial ownership of copyright continues generally to be determined by the law in effect when the materials in question were made.n29

**[i]-- Employees' Works and Films.**

Copyright in a literary, dramatic, musical, or artistic work, or film, under the 1988 Act, initially belongs to the author or coauthors unless the work is made in the course of employment.n30  Section 11(2) of the Act restates the rule that, in the absence of agreement to the contrary, copyright in such a work or film made in the course of employment vests initially in the employer.n31

In determining whether there is an employment relationship, the courts tend to focus first on whether there is the so-called "irreducible minimum" necessary to give rise to an employment relationship: namely "mutuality of obligation" and "control."n32  There is sufficient "mutuality" only where the employer is bound to provide work and pay, and the employee to provide his labor. Moreover, for the employment relationship to exist, one party (the employer) must be able to exercise control over the other (the employee). In those professions where a worker has a considerable amount of freedom, the control requirement is met if there is a "sufficient framework of control." If the two factors of mutuality and control are present the relationship might be one of employment: if they are not present, it is not. However, these factors are not of themselves conclusive. The court will examine all other relevant aspects and provisions to establish whether they are consistent with a contract of service. The courts pay considerable attention to whether typical attributes of employment are present: whether regular sums are paid as wages or salary; whether income tax deductions are made on the "pay-as-you-earn" basis used for employees; whether there is a joint contribution to a pension scheme; and whether national insurance contributions are paid by both parties as for an employee.n33

Even if an employment relationship exists, it is not every work created during its subsistence that belongs presumptively to the employer, but only those made in "the course of the employment." This requires an examination of the employee's duties, to determine whether the making of the work fell within the scope of those duties. The starting point of this analysis should be the written contract, if one exists. Whether the work was created during office hours, or using materials provided by the employer, may also be useful evidential pointers, but they are not in themselves determinative. Equally, the fact that the work was created outside of office hours may point towards it being made outside the course of employment, but that fact will not be determinative.n34

Finally, copyright in works made by employees in the course of employment will not be treated as belonging to the employer where there is an agreement to the contrary. Such an agreement must be one concerning title to copyright and must be legally enforceable, so that a mere recital in a contract between the parties will not necessarily suffice.n35 Such an agreement has been implied from custom: where an epidemiologist wrote a skin-piercing guide, the court held

that even if the guide had been written in the course of the epidemiologist's employment, past practice of the employer in allowing its employees to assign copyright to journals, indicated the existence of an understanding that copyright was to be retained by its employees.n36

**[ii]-- Commissioned Works and Films.**

A party commissioning a workn37 can ensure that he obtains copyright in that future work if, while complying with the formal requirements of Section 91,n38 he has the author assign rights to him even in advance of creation.n39 Even where there is no express assignment, the courts may infer that the author, effectively acting as an independent contractor, is subject to an implied obligation to assign the copyright to the commissioner: this inference may give rise to a trust of the copyright and render the commissioner its equitable owner.n40 Such implied agreements to assign have been found in diverse circumstances.n41 It also seems that copyright in works created in breach of fiduciary duties, or even simply in breach of confidence, is held on constructive trust for the person to whom the duty was owed.n42

**[iii]-- Recordings, Broadcasts, Editions.**

Copyrights in sound recordings, broadcasts, and certain editions, generally speaking, vest initially in the entrepreneurs who undertake the making of the relevant media productions--as follows:n43

- *Sound recordings:* Subject to prior assignment, copyright in a sound recording vests in the producer, that is, the person by whom the arrangements necessary for making it are undertaken.n44

- *Broadcasts:* Copyright in a sound or television broadcast belongs to the person making the broadcast. If a person relays another's broadcast by reception and immediate retransmission, the author is the maker of the original broadcast rather than the person who relays it.n45

- *Published editions:* Copyright in the typographical format of the published edition of a work belongs to the publisher.n46 The ownership of the "publication right," which arises where a person publishes a previously unpublished work in which copyright has expired, vests in the publisher.n47

The ownership of rights in films now receives the special treatment discussed above.n48

**[2]-- Transfers**

Courts in the United Kingdom, in dealing with a copyright contract, have distinguished between the foreign law governing the assignability of a foreign right purportedly subject to the contract and the proper law of the contract itself, for example, finding that it "was a purely English contract and must be interpreted according to English law."n49

**[a]-- Interests Subject to Transfer.**

Section 90(1) of the 1988 Act declares: "Copyright is transmissible by assignment, by testamentary disposition or by operation of law, as personal or moveable property." Thus copyright may be assigned; interests may be licensed exclusively or non-exclusively; rights may be mortgaged or made the subject of a charge by means of a conditional assignment; and they may pass to the trustee in bankruptcy.n50

Copyright in a work must be distinguished from ownership of the physical embodiment of the work, for example, the manuscript of a text.n51 On death, copyright will pass under any will covering it generally or specifically; otherwise it will pass under the general principles of intestacy. However, where an owner dies after July 1, 1957, copyright in an unpublished work passes to the legatee of the manuscript unless the will indicates a contrary intention.n52

**[b]-- Formal Requisites for Transfers.**

Assignments of legal interests in copyright have to be in writing and signed by or on behalf of the assignor.n53 The same rule applies to assignments of future copyrightn54 and to licenses if the licensee wishes to take advantage of his entitlement to sue for infringement.n55 In other circumstances, licenses do not have to be in any particular form and may indeed be implied from surrounding circumstances.n56

**[c]-- Contractual and Related Presumptions.**

Presumptions concerning the initial ownership of copyright have already been indicated.n57  The presumption that the author of a work included in a film transfers the rental right to the film producer has already been discussed.n58  A further presumption exists that where a work is unpublished, and a bequest is made of a document or other material thing containing the work, then the bequest is to be construed as including the copyright in the work, in so far as the testator was the owner of the copyright immediately before his death.n59

In actions for infringement of copyright, the Act creates a number of evidentiary presumptions which may assist the plaintiff.

- The *person named as author* on a publication of a literary, dramatic, or musical work, or upon an artistic work when it is made, is rebuttably presumed to be the author; and it is also thus presumed that he is not in an employment or any other situation which would deprive him of the copyright initially.n60

- Absent which, if the *publisher* of such a work is identified and the work is first published in the United Kingdom or a convention country, copyright is rebuttably presumed to subsist and be owned by the person named as the publisher at first publication.n61

- Where *the author is dead*, it is rebuttably presumed that the work is original and first published where and when the plaintiff alleges.n62

- As regards *sound recordings*, *films*, and *computer programs*, statements naming the copyright owner, or giving the date or place of first publication, are rebuttably presumed to be true.n63

- As regards a *film* issued, or communicated to the public, persons are presumed to be the producer or director if they are named as such, and the named director to be the principal director.n64

**[d]-- Recordation; Priority of Transfers.**

There is no requirement in copyright legislation that any transaction be publicly recorded. But a mortgage by a company of its copyright or a copyright license must be registered within 21 days of its creation with the Registrar of Companies if it is not to be void against the liquidator or a creditor of the company.n65  Otherwise, the first transfer in time of specific rights has priority over claims deriving from subsequent purported transfers of the same rights with one exception: a prior license will not bind a subsequent *bona fide* purchaser of the copyright who, without actual or constructive notice of the prior license, gives valuable consideration for the copyright.n66  One court applied, to transfers of copyrights worldwide, the English equity rule that a purported transferee with notice of a prior transfer does not acquire the rights subject to the prior transfer.n67

**[3]-- Limitations of Transfer**

**[a]-- Equity and Public Policy.**

The terms of assignments, licenses, and other dealings are normally a matter for free negotiation. The courts, however, have subjected some copyright contracts to scrutiny.

**[i]-- Equity Between Parties.**

Courts may occasionally set aside or reform copyright contracts on the ground either that the contract is an unreasonable restraint of trade or that it was made in circumstances of "undue influence."

The courts will set aside contracts which are in restraint of trade where they are unreasonable, having regard to the interests of the parties and the public interest. For example, a contract between a composer and music publisher was found to display an excessive disparity of obligation. The composer was bound to submit all the songs he wrote, but the publisher was under no obligation to publish the songs, nor to pay royalties absent publication. Further, the author was bound for a period of ten years, while the publisher was bound for a period terminable upon a month's notice.n68

Subsequent cases have applied the doctrine of restraint of trade to performers as regards recording agreements.n69  However, where an established artist renegotiated an earlier agreement on the grounds that it was unduly burdensome, the fact that the renegotiated contract might have lasted for twelve years did not justify setting it aside as a restraint of trade, given the generous remuneration which was promised to the artist.n70

2-UK International Copyright Law and Practice § 4

A contract may also be invalidated on grounds of undue influence. For example, undue influence may be presumed to have been exerted by a manager over an unknown protege.n71  On such a finding, the contract may be voidable, not only for the future, but *ab initio*.n72  Remedies may include assigning copyright to the author in works produced during the relationship and an accounting for profits, but subject to deduction for contributions to the author's success.n73

**[ii]-- Public Policy; Competition.**

Copyright transactions may also be subject to considerations of public policy arising from principles that favor free competition or commerce. Two distinct types of laws may apply: one binding on the United Kingdom as a member of the European Community; the other, purely domestic.

The Treaty of Rome of 1957, which governs the European Community, is of more immediate concern in the United Kingdom.n74  Both the E.C. Court of Justice and Commission have begun to determine when, in order to avoid contravening Treaty provisions favoring the free flow of goods and services in the Common Market, the exercise or conditions on the transfer of copyright and related rights have to be limited in certain cases.n75  Since the Treaty affects the scope of rights arising under the domestic law of an E.C. member state, it is open to national courts to decide that a breach of one of the pertinent Treaty provisions constitutes a defense to an action based upon national rights. The British courts have indicated that such "Euro-defenses" will rarely be successful.n76

Under legislation in the United Kingdom, anticompetitive practices are regulated in a variety of ways that could, in principle, apply to certain copyright dealings.n77  The Competition Act 1998, in force from March 1, 2000,n78  introduced into the domestic environment, provisions equivalent to Articles 81 and 82 of the E.C. Treaty of Rome: a so-called "Part I" prohibition of anti-competitive agreements or practices, and "Part II" prohibition of abuses by an undertaking of a dominant position in the market place. The impact of these provisions is, in principle, more telling than the equivalent Treaty articles, because in domestic law there is no requirement that the agreement, conduct, or abuse affect trade between Member States of the Community. Consequently, the two prohibitions might catch a variety of previously exempted, individual copyright licenses, refusals to license, and collective licensing arrangements. However, a domestic exemption has been introduced as regards many vertical agreements which is broader than its E.C. counterpart.n79

In addition, under Part IV of the Enterprise Act 2002, the Office of Fair Trading (OFT), after conducting a preliminary informal investigation, may make a "market investigation reference" to the Competition Commission when that Office has grounds for suspecting that a market situation prevents, restricts, or distorts competition.n80  The Competition Commission must investigate, assess whether there is an adverse effect on competition, and report. If the Competition Commission finds there is an adverse effect on competition, it may require that action be taken to remedy the adverse affect, and make orders or require undertakings to bring about appropriate changes.n81  In a previous investigation, under powers similar to those now granted by the Enterprise Act, the Monopoly and Mergers Commission (the predecessor of the Competition Commission) held that certain practices of the Performing Right Society were unsatisfactory and the Society agreed to amend its rules.n82

**[b]-- Unwaivable Rental-Remuneration Rights.**n83

A significant exception to the freedom of copyright contracts has been introduced in relation to transfers of rental rights.n84  Where a person transfers the rental right "concerning" a film or sound recording to the producer of the film or sound recording, Section 93B states that "he retains the right to equitable remuneration for rental."n85  The potential beneficiaries of the retained right are the authors of literary, dramatic, musical, or artistic works, as well as the principal directors of films, of which copies are subject to rentals.n86

The right applies if the transfer is presumed under Section 93A, or with performers Section 191F, or if it is voluntary.n87  The right is contractually unwaivable and unassignable, other than to a collecting society or by testamentary disposition or operation of law, for example, in bankruptcy.n88  The remuneration is to be claimed from the person "for the time being entitled to the rental right," and the relevant time is presumably the time of rental rather than of claim.n89  The amount deemed equitable is to be determined by agreement; otherwise, by the Copyright Tribunal, based on the importance of the contribution of the author or performer to the film or sound recording.n90  Remuneration is not to be considered inequitable merely because it was paid by way of a single payment or at the time of transfer of the rental right.

**[c]-- Scope of Transfers; Attachment.**

The Act takes a liberal view of what may be transferred, permitting partial assignments or licenses by reference to one or more of the acts within the exclusive rights. Transfers may be made for a period less than the full duration of the right: for example, there may be an assignment of the serial rights of a novel for a term of five years. Nor is there any requirement, in the absence of agreed terms, that licenses be exercised within any given period or at all. Furthermore, there is no general prohibition on the assignment of rights in respect of modes of exploitation not developed at the time of the agreement, and whether a transfer covers such modes is a matter of construction.n91  If formally sufficient, assignments may be made of rights in works to be created in the future.n92  Finally, the Act imposes no limits on general principles of involuntary assignment of assets upon bankruptcy or liquidation, nor does it affect the garnishing of copyright, otherwise subject to the provisions of British bankruptcy law.n93

**[d]-- Reversionary Rights.**

The current legislation contains no provision under which rights may revert to the author or his estate. But it preserves the right given by the Copyright Act 1911, Section 5(2), in respect of works created before June 1, 1957, which were assigned between the passing of that Act and June 1, 1957.n94  This provision renders the assignment void as against the author's personal representatives in so far as it extends to the period of copyright that commences 25 years from the author's death. This reversionary right has achieved enhanced significance as a result of the extension of the copyright term to life plus 70 years.n95  The reversionary right does not arise either (i) where the author was not the initial owner of the copyrightn96  or (ii) in the case of a collective work. But a song, in which there are separate copyrights in lyrics and music, is not a collective work.n97

**[e]-- Resale Right: Droit de Suite.**

No such artists' resale right is recognized in British copyright law.n98  The E.C. Directive on the matter has yet to be implemented.n99

**FOOTNOTES:**

 (n1) Footnote 1. For consideration of the question of whether an amanuensis is an author, see § 2[1][a] *supra*. But a spiritual medium who transcribed messages from the spiritual world was author of the work: *Cummins v. Bond (1927) 1 Ch. 167* (Eve J.) (holding that the medium "had exercised sufficient skill, labour and effort to justify being treated as author").

(n2) Footnote 2. C.D.P.A., Secs. 9(4), 178.

(n3) Footnote 3. *See* § 4[1][a][ii] *infra.*

(n4) Footnote 4. *See* § 4[1][b][iii] *infra.*

(n5) Footnote 5. *See* § 2[4][e] *supra.*

(n6) Footnote 6. *See* § 4[2][c] *infra.*

(n7) Footnote 7. *See* § 4[1][a][ii] *infra*. Joint authorship will usually be presumed to lead to equal shares. But this split may be varied by the court, where it feels comfortable evaluating the contributions: Bamgboye v. Reed [2004] E.M.L.R.61. Or it may be varied according to the agreement of the parties: Beckingham v. Hodgens *[2003] F.S.R. 238, 249* (equal shares); Peter Hayes v. Phonogram Ltd. [2003] E.C.D.R. 110 (agreement as to size of share).

(n8) Footnote 8. C.D.P.A., Sec. 10(2), cross-referenced to Sec. 6(3), which identified these persons as those "providing," or taking "responsibility" for the contents of the program and those making the "arrangements necessary for its transmission."

(n9) Footnote 9. On films as joint works, see § 4[1][a][ii] *infra.*

(n10) Footnote 10. C.D.P.A., Sec. 10(1). There is no additional requirement that the parties must have intended to create a work of joint authorship: Beckingham v. Hodgens *(2003) F.S.R. 238, 249*. On the term of copyright in such works, see § 3[1][b] *supra.*

(n11) Footnote 11. Levy v. Rutley (1871) L.R. 6 C.B. 583; Cala Homes (South) Ltd. v. Alfred McAlpine Homes East Ltd. *(1995) F.S.R. 818.*

(n12) Footnote 12. Cala Homes (South) Ltd. v. Alfred McAlpine Homes East Ltd. *(1995) F.S.R. 818, 835.*

(n13) Footnote 13. On derivative works, see § 2[3][a] *supra*.

(n14) Footnote 14. *Chappell v. Redwood Music (1981) R.P.C. 337;* Beckingham v. Hodgens *(2003) F.S.R. 238.*

(n15) Footnote 15. *See, e.g.,* Cala Homes (South) Ltd. v. Alfred McAlpine Homes East Ltd. *[1995] F.S.R. 818* (finding joint authorship in explaining the idea for a house design in detail, both verbally and through sketches, to a technical draftsman who then produced drawings of elevations and floor plans). *But cf.* Robin Ray v. Classic FM Ltd. *[1998] F.S.R. 622* (Lightman J.) ("what is required is ... a direct responsibility for what actually appears on the paper"). A contribution to the words of a song will normally give rise to joint authorship of the literary work, but not of the music: Peter Hayes v. Phonogram Ltd. et. al. [2003] E.C.D.R. (11) 110, 128.

(n16) Footnote 16. Stuart v. Barrett (1994) E.M.L.R. 448. *See also* Godfrey v. Lees [1995] E.M.L.R. 307, 325-8 (finding that a classically-trained musician who acted as orchestral arranger for a rock band was a joint author of a number of arrangements which included orchestral passages linking the verses and choruses). *But see* Fylde Microsystems Ltd. v. Key Radio Systems Ltd. *[1998] F.S.R. 449,* (1998) 39 I.P.R. 481 (Laddie J.) (finding that suggestions, comparable to proof-reader's help, made by a customer to the producer of software were insufficient to constitute customer a coauthor); Brighton v. Jones [2004] E.M.L.R. (26) 507 (holding that suggestions made by a director to a playwright, prompted by problems with the script encountered during rehearsals, did not support the director's claim to co-authorship, because the director had failed to establish that her contributions were "to the creation of the dramatic work rather than" to "interpretation and theatrical presentation of the dramatic work").

(n17) Footnote 17. *Chappell & Co. Ltd. v. Redwood Music, Ltd. (1981) R.P.C. 337.* But it has been held that, where one person added an introduction to the music of a song, this introduction was not "distinct" because it was "heavily dependent" on the rest of the tune and because, by itself, it would "sound odd and lose meaning": Beckingham v. Hodgens *(2003) F.S.R. 238, 248.*

(n18) Footnote 18. *Powell v. Head (1879) 12 Ch. D. 686.*

(n19) Footnote 19. C.D.P.A., Sec. 173(2). *See Cescinsky v. Routledge [1916] 2 K.B. 325;* Robin Ray v. Classic FM Ltd. *[1998] F.S.R. 449* (Lightman J.).

(n20) Footnote 20. Prior to July 1, 1994, for the purposes of determining authorship, films were treated in a similar fashion to sound recordings: the author was statutorily defined as "the person by whom the arrangements necessary for the making of the film are undertaken." For further explanation, see § 4[1][b][iii] *infra.* However, films begun before July 1, 1994, but completed thereafter are treated as made when completed: Related Rights Reg. 25(2). Furthermore, it is not an infringement of any right which the principal director has by virtue of these Regulations to do anything after commencement in pursuance of arrangements for the exploitation of a film made before November 19, 1992: Related Right Reg. 36(2).

(n21) Footnote 21. C.D.P.A., Sec. 178. *See* Laddie, *et al., The Modern Law of Copyright,* para. 7.41, p. 391 (suggesting a definition of the director as "the person who had creative control of the making of the film"). On presumptions regarding who is the director, producer, or author of underlying material in a film, see § 4[2][c] *in fine infra.* However, it is unclear whether the term "principal director" will be treated as narrower than the term "director" when used in relation to moral rights. *See* § 7[1] *infra.*

(n22) Footnote 22. Beggars Banquet Records v. Carlton TV (1993) E.M.L.R. 349, 361; A & M Records v. Video Collection (1995) E.M.L.R. 25, 29.

(n23) Footnote 23. Adventure Films v. Tully (1993) E.M.L.R. 376. *See also* Century Communications v. Mayfair Entertainment [1993] E.M.L.R. 335 (film made under restrictive conditions in China was produced by organizer outside of China); Beggars Banquet Records v. Carlton TV [1993] E.M.L.R. 349 (arguable claim that person who provided finance and arranged access to venue where event was filmed was a person who made arrangements).

(n24) Footnote 24. On works by employees generally, see § 4[1][b][i] *infra.* This provision may not be consistent with the Rental Directive. *See* G. Reinbothe and S. von Lewinski, *The EC Directive on Rental and Lending Rights and on Piracy,* 179 (1993).

(n25) Footnote 25. On commissioned works generally, see § 4[1][b][ii] *infra.*

(n26) Footnote 26. C.D.P.A., Secs. 93A and 191F. These apply in relation to the authors of literary, dramatic, musical, or artistic works but, except in relation to agreements concluded before December 1, 1996, not to any rental right in relation to the inclusion in the film of the screenplay, the dialog, or music specifically created for and used in the film.

(n27) Footnote 27. For further analysis, see § § 4[3][b] and 5[3][b][ii] *infra*.

(n28) Footnote 28. This rule will not apply if the director was an employee who made the film in the course of employment, as there is no "transfer" of the rental right. There does not appear to be any justification in the Rental Directive for this exception. *See* G. Reinbothe and S. von Lewinski, *The EC Directive on Rental and Lending Rights and on Piracy*, 61 (1993). On this Directive, see "E.C.," herein, at § 4[2][c], with text in Appendix 3.

(n29) Footnote 29. C.D.P.A., Sched. 1, para. 11. Most notably, the 1988 Act no longer includes certain presumptions found in the 1956 Act. First, under the previous law, copyright in a work made by an author in the course of employment by the daily or periodical press presumptively vested in the employer for purposes of its publication in the newspaper or periodical: C.A. 1956, Sec. 4(2); for pre-1957 works see Sched. 8, para. 1(b). Second, under the 1956 Act, a party commissioning a photograph, portrait, or engraving for value presumptively acquired copyright in that work: C.A. 1956, Sec. 4(3), Sched. 8, para. 1(a). Third, there is no longer any special provision attributing the authorship of a photograph to the person owning the material on which it was taken: C.A. 1956, Sec. 48(1). Rather, a photographic work is now treated like any other artistic work, so that the photographer is the author: C.D.P.A., Sec. 4(2).

(n30) Footnote 30. C.D.P.A., Sec. 11. For further details on films, see § 4[1][a][ii] *supra*.

(n31) Footnote 31. If the employee is a director of a company, fiduciary duties which require him not to enter into transactions which conflict with the interests of the company may render such a person a trustee of any copyright acquired by him individually, for example, through assignment. *See* Charly Acquisitions & ors. v. Immediate Records Inc. (2002, *to be reported*) (paras. 78-79).

(n32) Footnote 32. *See Carmichael v. National Power Plc. [1999] 4 All E.R. 897* (House of Lords); Montgomery v. Johnson Underwood [2001] I.C.R. 819; *Ultraframe (UK) Ltd. v. Fielding [2004] R.P.C. (24) 479* (Court of Appeal).

(n33) Footnote 33. *See, e.g.,* Robin Ray v. Classic FM Ltd. *[1998] F.S.R. 622* (Lightman J.) (holding consultant not to be employee where agreement described him as independent contractor and contemplated that he would have other business commitments, and he operated for short period).

(n34) Footnote 34. *See* Intercase UK Ltd. v. Time Computers Ltd. [2004] E.C.D.R. (8) 78 (para. 11). *Compare Beloff v. Pressdram [1973] 1 All E.R. 241* (a journalist who wrote a confidential memorandum to colleagues about a possible article was acting in the course of her employment), *with* Noah v. Shuba *[1991] F.S.R. 15* (a consultant epidemiologist who drafted a guide to skin piercing at home in the evenings and on weekends was held to own copyright in the guide, despite the fact that he had researched the contents at his employer's library and the manuscript had been typed by his secretary).

(n35) Footnote 35. *See, e.g.,* Robin Ray v. Classic FM Ltd. *[1998] F.S.R. 622* (Lightman J.) (holding that statement in agreement to the effect that relationship is one of employment does not amount to "an agreement to the contrary" if real relationship is not one of service).

(n36) Footnote 36. Noah v. Shuba *(1991) F.S.R. 15.*

(n37) Footnote 37. *See generally* Gabrin v. Universal Music Operators Ltd. [2004] E.C.D.R. 18; *Ultraframe (UK) Ltd. v. Fielding [2004] R.P.C. (24) 479* (Court of Appeal) (on what amounts to commissioning).

(n38) Footnote 38. On formal requirements, see § 4[2][b] *infra*.

(n39) Footnote 39. Under the 1956 Act, a party commissioning a photograph, portrait, or engraving for value presumptively acquired copyright in that work: C.A. 1956, Sec. 4(3), Sched. 8, para. 1(a). Commissioners are treated as first owners of unregistered design rights and registered designs. On these rights, see § 2[4][c] *supra*.

(n40) Footnote 40. *See, e.g.,* Robin Ray v. Classic FM Ltd. *[1998] F.S.R. 622* (Lightman J.) (terms to be implied only where and insofar as they are necessary), *approved*, R. Griggs Group v. Raben Footwear [2005] EWCA Civ. 11 (Court of Appeal).

(n41) Footnote 41. *See, e.g.,* John Richardson Computers v. Flanders & Chemtech Ltd. *[1993] F.S.R. 497* (computer program upgraded); A & M Records v. Video Collection [1995] E.M.L.R. 25 (sound recording made); Pasterfield

v. Denham *[1999] F.S.R. 168* (preparation of advertising leaflet); R. Griggs Group v. Raben Footwear [2005] EWCA Civ. 11 (Court of Appeal) (logo belonged to commissioner, even though author was freelance artist for company which was commissioned).

(n42) Footnote 42. A.-G. v. Guardian (No.2) (1990) A.C. 259, 263, 276. This was a case of obligations owed to the Crown, but there is no obvious reason why the analysis should be restricted to such breaches. *Cf. Ultraframe (UK) Ltd v. Fielding [2004] R.P.C. (24) 479* (Court of Appeal) (holding that, where the managing director and 100% shareholder created works for the company, to wit, designs subject to the unregistered design right, he held them on trust for the company).

(n43) Footnote 43. On these copyrights, see § 2[2][c] *supra* and § 9[1][b] *infra*.

(n44) Footnote 44. A & M Records v. Video Collection (1995) E.M.L.R. 25 (distinguishing person who created arrangements from person who made the recording); Bamgboye v. Reed (2004) E.M.L.R. 61. On performances, see § 9[1][a] *infra*.

(n45) Footnote 45. C.D.P.A., Sec. 9(2)(b). Under the 1956 Act the author of a broadcast was either the British Broadcasting Corporation, the Independent Broadcasting Authority, or the broadcasting organizations of countries to which the Act has been applied, each in respect of its own broadcasts

(n46) Footnote 46. C.D.P.A., Sec. 9(2)(e).

(n47) Footnote 47. Related Rights Reg. 16.

(n48) Footnote 48. On such ownership, see § 4[1][a][ii] *supra*.

(n49) Footnote 49. *Campbell Connelly & Co. Ltd. v. Noble (1963) 1 W.L.R. 252, 254. See also* Griggs Group Ltd. v. Evans (No. 2) *[2004] F.S.R. (48) 939* (noted in § 4[2][d] *infra*), *affirmed*, Griggs Group v. Raben Footwear [2005] EWCA Civ. 11 (Court of Appeal). For further analysis, see "Introduction," herein, at § 6[2]. For a point on which the Copyright Act 1911 may residually affect the assignability of U.K. rights, see § 4[3][d] *infra*.

(n50) Footnote 50. C.D.P.A., Sec. 90(4). For the rules applicable to the priority of transfers, see § 4[2][d] *infra*. On attachment, see § 4[3][c] *in fine infra*.

(n51) Footnote 51. *See, e.g., Philip v. Pennell [1907] 2 Ch. 577* (when a letter is sent, the implication is that ownership of the paper is being transferred to the recipient; not so the copyright).

(n52) Footnote 52. C.D.P.A., Sec. 93, and Sched. 1, para. 30. *See Re Dickens [1935] 1 Ch. 267.*

(n53) Footnote 53. C.D.P.A., Sec. 90(3). Secondary evidence may be allowed to prove the existence and content of such an assignment unless the party relying on the document has the document in his possession or could produce it in court without difficulty: Springsteen v. Flute International Ltd. & ors. (1999) E.M.L.R. 180, *affirmed on appeal, sub. nom.* Masquerade Music Ltd. v. Springsteen [2001] E.M.L.R. 654 (rejecting so-called "best evidence" rule and stating that court has discretion as to what weight to afford secondary evidence and will require party seeking to adduce such evidence to account for absence of documentary evidence).

(n54) Footnote 54. C.D.P.A., Sec. 91(1). The presumptive transfer of rental rights need not satisfy C.D.P.A. Sec. 91(1): C.D.P.A. Sec. 93A(4).

(n55) Footnote 55. C.D.P.A., Secs. 92, 101 (exclusive license must be in writing, but automatically confers right to sue). A license, even if non-exclusive, may (if the parties so choose) grant the licensee a right of action against infringers: C.D.P.A. Sec. 101A (added by Information Society Reg. 28).

(n56) Footnote 56. Robin Ray v. Classic FM Ltd. *(1998) F.S.R. 622* (Lightman J.); Godfrey v. Lees (1995) E.M.L.R. 307. *See, e.g.,* Nelson v. Rye and Cocteau Records Ltd. *[1996] F.S.R. 313, 339-40* (Laddie J.) (acknowledging that issuing was a right separate and distinct from the reproduction right, but holding that a license to manufacture for the purposes of sale carried with it "by necessary implication" a license to release the copies to the public).

(n57) Footnote 57. *See* § 4[1] *supra*.

(n58) Footnote 58. *See* § 4[1][a][ii] *supra*.

(n59) Footnote 59. C.D.P.A., Sec. 93.

(n60) Footnote 60. C.D.P.A., Sec. 104(2) and, for joint authors, Sec. 104(3).

(n61) Footnote 61. C.D.P.A., Sec. 104(4). *See* Waterlow Publishers Ltd. v. Rose *[1995] F.S.R. 207, 218.* These presumptions do not operate for the purposes of the "publication right": Related Rights Reg. 17(2)(b). On this right, see § 9[1][b] *infra.*

(n62) Footnote 62. C.D.P.A., Sec. 104(5).

(n63) Footnote 63. C.D.P.A., Sec. 105(1), (2), (3). *See, e.g.,* Microsoft Corporation v. Electro-wide Ltd. *[1997] F.S.R. 580, 594* (presuming Microsoft to be owner of copyright in computer program for purposes of summary judgment).

(n64) Footnote 64. C.D.P.A., Sec. 105(2)(a), (5), and (6) (as amended by Information Society Regs., Sched. 1, para. 8(1)(c)).

(n65) Footnote 65. Companies Act 1985, Secs. 395 and 396.

(n66) Footnote 66. C.D.P.A., Sec. 90(4). Although good faith and absence of notice are treated as separate requirements, it is difficult to imagine a situation where the good faith requirement adds anything to the notice requirement.

(n67) Footnote 67. Griggs Group Ltd. v. Evans (No. 2) *(2004) F.S.R. (48) 939* (where an implied agreement by author E to assign copyright throughout the world to G gave G an equitable interest in the copyright which bound D, a purchaser with notice, the court ordered D to assign worldwide copyrights to G), *affirmed,* Griggs Group v. Raben Footwear [2005] EWCA Civ. 11 (Court of Appeal).

(n68) Footnote 68. *Schroeder v. Macaulay (1974) 3 All E.R. 616.* In Lord Diplock's view the terms demonstrated an inequality of bargaining power, but subsequent decisions have been reluctant to develop any general principles of this sort. *See Clifford Davis v. WEA Records [1975] 1 All E.R. 237.*

(n69) Footnote 69. *See, e.g.,* Zang Tumb Tuum v. Johnson [1993] E.M.L.R. 61 (recording agreement binding young group individually and collectively to the record company for up to nine years, while the record company could terminate its obligations at any time, was invalid).

(n70) Footnote 70. Panayiotou v. Sony Music Entertainment (1994) E.M.L.R. 229. The main ground for rejecting the artist's claim was that it was contrary to public policy to seek to re-open a previously compromised action.

(n71) Footnote 71. *O'Sullivan v. Management Agency and Music (1985) Q.B. 428.*

(n72) Footnote 72. The contract will not be voidable if, aware of its voidability, the relevant party has continued to act as if the contract was valid: Ryder v. Nicholls (2000) E.M.L.R. 632.

(n73) Footnote 73. Elton John v. James *(1991) F.S.R. 397.* Since the contract is only voidable, contractual dealings with *bona fide* purchasers will remain binding. *See* Cornish, *Intellectual Property*, paras. 12-31, pp. 484; Laddie, *et al.*, *The Modern Law of Copyright*, paras. 23.51-23.55, pp. 896-900.

(n74) Footnote 74. For overviews, see R. Whish, *Competition Law*, Chaps. 2-8, 19 (5th ed., 2003); D. Goyder, *EC Competition Law* (4th ed., 2003); Cornish, *Intellectual Property*, Chap. 18.

(n75) Footnote 75. On this case law, see "E.C.," herein, at §§ 2-3.

(n76) Footnote 76. *See* Chiron Corporation v. Ogon Teknika *[1994] F.S.R. 187.*

(n77) Footnote 77. For overviews, see P. Freeman and R. Whish, *Butterworths' Competition Law* (1999, updated); R. Whish, *Competition Law*, Chaps. 2, 9-10, 19 (4th ed., 2001).

(n78) Footnote 78. The Competition Act 1998 (Commencement No. 1) Order 1998, S.I. 1998/2750; the Competition Act 1998 (Commencement No. 2) Order 1998 S.I. 1998/3166 (bringing specified sections, dealing with exclusions and general rule-making powers, into force from January 11, 1999). The Restrictive Trade Practices Act 1976, which has been repealed, provided for scrutiny by the Monopolies and Mergers Commission of refusals to grant copyright licenses or anticompetitive terms in such licenses, but it had only a restricted application to agreements over copyright and other intellectual property.

(n79) Footnote 79. *See* Competition Act (Land and Vertical Restraints Exclusion) Order 2000 (S.I. 2000/310).

(n80) Footnote 80. Enterprise Act 2002, s. 131. *See* OFT, Market Investigation References, OFT 511 (March 2003). When making a reference, the OFT must have reasonable grounds for suspecting that one or more features of a market prevents, restricts or distorts competition in relation to the supply or acquisition of goods or services in the UK (or part of the UK). Previously, Part IV of the Fair Trading Act 1973 made equivalent powers available, for example, allowing the Monopolies and Mergers Commission to investigate PRS and PPL.

(n81) Footnote 81. Enterprise Act 2002 s. 134(4). These powers may include making licenses available as of right or carrying the terms on which licenses are made available. See C.D.P.A., Sec. 144. Recourse may be had to the Copyright Tribunal to settle appropriate license terms. On the Tribunal, see § 5[2] *infra*. A finding of anticompetitive conduct may be raised as a defense when seeking mitigation in an infringement suit. *See* § 8[4][a][iv] *infra*.

(n82) Footnote 82. *Report on the Supply in the UK of the Services of Administering Performing Rights and Film Synchronization Rights* (1996) (Cmnd. 3147).

(n83) Footnote 83. For commentary, see Laddie, *et al.*, *The Modern Law of Copyright*, Chap. 27.

(n84) Footnote 84. Related Rights Reg. 33, giving effect to Rental Rights Directive, Art. 4. On this Directive, see "E.C.," herein, at § 4[2][c], with text in Appendix 3.

(n85) Footnote 85. If the film or sound recording was made in pursuance of an agreement entered into before July 1, 1994, the author or performer may only claim equitable remuneration for rentals if he had notified the person before January 1, 1997, of his intention to exercise the right. *See* § 5[3][b][ii] *infra*.

(n86) Footnote 86. C.D.P.A., Sec. 191G, has the same effect as regards performers. It seems that Sec. 93B applies not just to circumstances where the work is incorporated in a film or sound recording, for example, the music used in a film, but also where the work is to be rented with the sound recording or film, such as might occur with art work on a record sleeve. This conclusion is consistent with the expansive definition of author in C.D.P.A., Sec 93B(1)(a) as covering authors of artistic works and the use in Sec 93B(1) of "concerning."

(n87) Footnote 87. On these presumptions, see § 4[1][a][ii] *supra* and § 9[1][a][ii] *infra*. The language of Sections 93A and 191F(4), as compared with that of Section 93B is not altogether consistent, either internally or with Article 2(6) of the Rental Directive. For further analysis, see Laddie, *et al.*, *The Modern Law of Copyright*, paras. 27.12-27.19, pp. 1021-1024.

(n88) Footnote 88. C.D.P.A., Sec 93B(5).

(n89) Footnote 89. The right of remuneration does not apply to any rentals made before April 1, 1997: Related Rights Reg. 33(a).

(n90) Footnote 90. C.D.P.A., Sec. 93C and 191H. *See* § 5[2] *infra*.

(n91) Footnote 91. *See* Laddie, *et al.*, *The Modern Law of Copyright*, para. 23.16, pp. 877-878.

(n92) Footnote 92. *See* § 4[2][b] *supra*.

(n93) Footnote 93. *See* § 4[2][d] *supra*.

(n94) Footnote 94. C.D.P.A., Sched. 1, para. 27. The 1988 Act also preserves the reversionary interests under the 1911 Act which substituted, for subsisting terms in pre-1912 works, longer terms of copyright and declared that prior transfers conveyed neither the "windfall" of copyrights for the additional duration of the new terms, nor that of newly instituted "mechanical" rights: C.D.P.A., Sched. 1, para. 28. *See, e.g.,* Novello & Co. Ltd. v. Keith Prowse Music Publishing Co. Ltd. (2004, *to be reported*) (Court of Appeal) (applying reversion provisions in the 1911 Act, as subject to the transitional provisions in the 1988 Act, to hold valid a 1973 assignment of a reversionary interest in a 1911 Act work, where the initial assignment had occurred in the 1940s). For further analysis, see *Copinger and Skone James on Copyright*, paras. 5-23-5-33, pp. 112-118; Laddie, *et al.*, *The Modern Law of Copyright*, paras. 23.28-23.47, pp. 882-894; "Australia," herein, at § 4[3][e] (but note the different time frame for parallel reversion provisions in Australia).

(n95) Footnote 95. *See* § 3[2][b] *supra*.

(n96) Footnote 96. On transitional provisions preserving initial ownership status as of the date of making of a work, see § 4[1][b] *supra*.

(n97) Footnote 97. *Chappell v. Redwood Music (1981) R.P.C. 337.*

2-UK International Copyright Law and Practice § 4

(n98) Footnote 98. For previous British views, see the Report of the Committee on Copyright and Designs Law, Chap. 17 (Cmnd. 6732, 1977).

(n99) Footnote 99. Implementation is not required until January 1, 2006, with possible extensions. On this directive, see "E.C.," herein, at § 4[2][h].

1 of 1 DOCUMENT

International Copyright Law and Practice
Copyright 2005, Matthew Bender & Company, Inc., a member of the LexisNexis Group.

UNITED KINGDOM

*2-UK International Copyright Law and Practice § 2*

**Subject Matter**

**[1]-- Standards for Protection**

    **[a]-- Formal Requirements.**

The 1988 Act specifies that a literary, dramatic, or musical work is not the subject of copyright unless and until it is "recorded, in writing or otherwise."n1  For instance, a work may be fixed by tape-recording or filming it, assuming sufficient fidelity in the process.n2  Section 3(3) then states that it is immaterial whether the author gave permission for the act of recording or not.

    A person who arranges for a stenographer to take down his speech is the author of the resulting work, for it has merely been transcribed by an amanuensis.n3  Even if the transcription, recording, or other such fixation is independently arranged, the Act treats the person whose thoughts are fixed as the author of the work, although there may be a distinct copyright in the resulting transcription, recording, or other fixation. If a work was made in writing, the person who reduces it to this form also acquires a distinct literary copyright if he himself brings sufficient skill and judgment to the task.n4

    Fixation or recording are, more properly speaking, elements in the definition of certain other types of protected subject matters. For example, artistic works have traditionally existed as physical art objects and are normally protected as such, although somewhat transient artistic works have also been protected.n5  Fixation is an essential component of sound recordings, films, and published editions, but sound and television broadcasts, broadly defined to include cable programs, are protected whether or not a permanent version of them is made by the broadcasting authority.n6

    In appropriate cases, creative effort expended prior to fixation may be protected by an action for breach of confidence.n7

    **[b]-- Substantive Criteria.**n8

The 1988 Act specifies that, to attract copyright, a literary, dramatic, musical, or artistic work must be "original."n9  In a much-quoted passage construing this notion, Mr. Justice Peterson said:

        "The word 'original' does not in this connection mean that the work must be the expression of original or inventive thought. Copyright Acts are not concerned with the originality of ideas, but with the expression of thought, and, in the case of 'literary work', with the expression of thought in print or writing. The originality which is required relates to the expression of the thought. But the Act does not require that the expression must be in an original or novel form, but that the work must not be copied from another work--that it should originate from the author."n10

    Origination is frequently equated with the exercise of labor, skill, or judgment in the production of the work. How much must be exercised, according to Lord Atkinson, "cannot be defined in precise terms," but "[i]n every case it must depend largely on the special facts of that case and must in each case be very much a question of degree."n11  According to one statement, the work must be the result of a "substantial degree" of skill, industry or experience; according to another statement in the same case, the amount need only be "more than negligible."n12

    **[i]-- Cases Meeting the Criteria.**

Effort involved in the pre-expressive stage, for example, generating ideas or collecting information, is capable of rendering the resulting work original.n13  For example, the construction of a chronological list of matches between ninety-two clubs in four divisions took considerable time, ingenuity, and skill, so that copyright existed in resulting lists.n14  Even if the expressive form is a consequence of function, the work is protected: thus there is copyright in a drawing of a design of an exhaust pipe, though the features might express some engineering principle,n15  or in a computer program though the program might achieve a function.n16  As regards artistic works, it has been said that there is copyright even in "the coarsest, or the most commonplace, or the most mechanical representation of the commonest object," but that copyright might be confined to that which is special to the individual drawing over and above the object.n17

**[ii]-- Cases Not Meeting the Criteria.**

In the absence of sufficient effort, there will be, in principle, no protection. For example, sufficient originality was not found in the following cases: make-up comprised of three lines of grease paint;n18  the drawing of a circle or straight line;n19  short slogans or titles;n20  the routine application of a formula to produce forecasts in greyhound races;n21  a list of odds on horses running in a particular race.n22  Furthermore, even if a copy is a product of labor, skill, and judgment, originality is lacking where it is wholly copied from an existing work, without any significant addition, alteration, transformation, or combination with other material.n23

**[iii]-- Works Subject to Special Criteria.**

This general understanding of "originality" is subject to a pair of rather different caveats.

First, under the 1988 Act, "a literary, dramatic, musical or artistic work ... generated by computer in circumstances such that there is no human author of the work" attracts copyright.n24  It is difficult to see how the existing criteria of originality, in particular that the work should be the product of "labour, skill or judgment," much less the alternative criterion that the work "originate from the author," can be applied to such works. One commentary has suggested that such works should be treated as original in circumstances where, had the work been generated by a human author, it would have been regarded as original.n25

Second, E.C. directives have introduced a different concept of originality in some of the areas where they attempt to harmonize protection. Both the Software and the Database Directives require that a program or database only be protected by copyright where such program or database is the "author's own intellectual creation."n26  In implementing the Software Directive, the Government did not consider it necessary to amend the 1988 Act, but the language of the Act should be construed as far as possible to be consistent with European obligations. Thus it would be appropriate for the courts to develop a modified understanding of "originality" when considering the protection of computer programs. By contrast, the Database Regulations, in implementing the Database Directive, explicitly amend the originality requirement of the 1988 Act, though just for copyright-protected databases, to include the criterion of the "author's own intellectual creation."n27

It has been widely assumed that the E.C. standard--"the author's own intellectual creation"--is higher than the prior British standard of originality.n28  However, a common lawyer might find it difficult to see how the phrase materially differs from the words used in the seminal case *University of London Press*.n29  Moreover, in another context, U.K. courts have ignored assumptions held by commentators over the intention of vague terminology contained in a E.C. directive.n30  It thus seems foolhardy to speculate whether a U.K. court would, for the sake of simplicity and convenience, read the changes as justifying any significant reformulation of the originality requirement in British copyright law.n31  Indeed a government spokesman has confirmed that the legislative intention, motivating the amendment in line with the E.C. standard, was that it be applied only to databases.n32

For copyright in a sound recording, broadcast, or published edition to subsist, the media production at issue need not be "original" in the sense just described. However, copyright does not subsist in a sound recording or published edition to the extent that the recording or edition is itself copied from a previous production of the same kind.n33  For broadcasts, the rule is somewhat different: rebroadcasts have a term of rights running from the first broadcast.n34  In addition, copyright does not subsist in a broadcast to the extent that the broadcast infringes the copyright in another broadcast.n35

As yet, for these purposes, the "hybrid" copyright in films is treated in the same way as sound recordings: there is no express statutory requirement that the work be "original" but instead an exclusion from copyright protection of a film "to the extent that it is itself copied from a previous film."n36  The introduction of a provision to the effect that the creators of a film are the "producer and principal director" might be taken to imply that the only films protected are those

with a director, which in turn might suggest a requirement that there be some originality. However, it is clear from the provisions dealing with duration that a copyright film may lack a director.n37

**[2]-- Categories or Types of Works**

Many copyright systems accord copyright protection to works in general, enumerating specific categories as examples. By contrast, the 1988 Act exhaustively lists eight specific types of protected subject matter, all of which are termed "works."

These eight types of work can be divided into three general categories: first, authors' copyrights in literary, dramatic, musical, and artistic works; second, the "hybrid" copyright in films;n38 third, copyrights in other media productions, namely, sound recordings, sound and television broadcasts, and published editions.n39 Performances, as well as databases not meeting copyright criteria, as explained below, fall outside this scheme.n40

One effect of such an exhaustive definition is that there is no opportunity for the courts to recognize new forms of subject matters, otherwise than through the generous interpretation of the existing designations.n41 Moreover, since the eight different types of work do not necessarily receive identical treatment, for example, as to the rights conferred or duration of copyright, important issues can arise in determining whether a particular work is within one category or another. The courts may decline "to say that a single piece of work by an author gives rise to two or more copyrights in respect of the same creative effort," and in such circumstances "there are compelling arguments that the author must be confined to one or the other of the possible categories."n42

**[a]-- Original Works**

**[i]-- Literary Works.**

This is defined to mean "any work, other than a dramatic or musical work, which is written, spoken or sung, and accordingly includes (a) a table or compilation, (b) a computer program, (c) preparatory design material for a computer program and (d) a database."n43

A literary work has been said to cover any "work which is expressed in print or writing, irrespective of the question whether the quality or style is high. The word literary seems to be used in a sense somewhat similar to the use of the word 'literature' in political or electioneering literature, and refers to written or printed matter."n44 Thus copyright has been allowed, not only in novels, poetry, learned treatises, and the like, but also in examination papersn45 and circuit diagrams.n46 Difficulty has been encountered in differentiating between literary and artistic works in circumstances where ideas can be expressed by either pictures or words.n47

Under this category, copyright protection has also been conferred on various compilations of information, such as a timetable index,n48 trade catalogs,n49 street and professional directories,n50 football fixture lists,n51 a racing information service,n52 and radio and television program listings,n53 though not to the collection of command names employed in an airline's ticketless booking system.n54 It appears that, after January 1, 1998, many such "compilations" may be protected by copyright as "databases," which fall under the rubric of "literary works" as well.n55 The definition of "database" is so broad that it is difficult to conceive what might constitute a compilation but not a database: much may turn on notions explained at greater length below.n56

The 1988 Act, by including computer programs within the definition of "literary work," brings about a complete assimilation. The earlier statute of 1985 only required programs to be treated *as* literary works, a modulated approach which left rather more scope for differentiation in dealing with this highly distinctive subject matter.n57 To bring the law into conformity with the E.C. Software Directive, preparatory design material for computer programs now falls within the definition of literary works, though not of computer programs.n58

**[ii]-- Dramatic Works.**

The 1988 Act only defines this term as including a work of dance or mime,n59 but the courts have imposed a pair of requirements on a "dramatic work": it must be a "work of action," and it must be "capable of being performed."n60 What is encompassed within the notion of a "work of action" is yet to be explained: it includes dance, but probably not sport;n61 nor will it include static objects, scenic effects, and costumes,n62 though these may be protected as artistic works.n63

The second requirement has been interpreted liberally to include "performance" by artificial means, such as the playing of a film.n64 Consequently a cartoon may be a dramatic work, as may an edited film of a person dancing, even though the dance itself could not be performed by a human being. However, in previous case law, a television format was held to be unprotected on the basis that it lacked sufficient "unity" to be capable of being performed, even though the actual program for which the format was the guide was fixed on film and shown.n65 It is not easy to see how these holdings can be reconciled.

The fixation of such a work does not have to be in writing and may accordingly be, for instance, on film.n66 Indeed, it has been held that, in certain circumstances, films created under the 1988 Act do not merely record works but themselves are dramatic works, notably where there is a "cinematographic work" on the film.n67 In such cases, probably, the editor, director, and scriptwriters are coauthors.n68

**[iii]-- Musical Works.**

This term is defined to mean "a work consisting of music, exclusive of any words or action intended to be sung, spoken or performed with the music."n69 Thus, the words and the music of songs and similar works are treated as the subject matter of distinct copyrights. One court stated that a "musical work is a combination of melody and harmonies," but observed that "notes are obviously essential, but they are not the sole determinants" of the musical work.n70

**[iv]-- Artistic Works.**

The Act distinguishes three categories of such works: (a) "irrespective of artistic quality," a graphic work (including painting, drawing, diagram, map, chart or plan, engraving, etching, lithograph, wood-cut, or similar work), a photograph (excluding a film), a sculpture, or a collage; (b) a work of architecture, being a building or fixed structure or a model therefor;n71 or (c) a work of artistic craftsmanship.n72

This is a complex differentiation.n73 Although the general requirement of originality does no more than insist that the work should not be copied, the phrase "irrespective of artistic quality" in the first of these categories implies that the measure of attainment may be slight. Protection has been accorded, for example, to the drawing of a hand on a voter's card,n74 typeface design,n75 label designs,n76 as well as computer screen icons and graphic-user interfaces.n77 Architects' plans, as distinct from actual buildings, fall under this head as "drawings," and it may be possible to characterize an industrially produced article as a "sculpture" or an "engraving."n78 As explained below, however, complex legal effects follow from the fact that a purely functional drawing or a model for industry might attract copyright.n79

If, however, the work can only be protected under categories (b) or (c), it will be more difficult to show sufficient "artistic quality."n80 In the leading case on the meaning of "works of artistic craftsmanship," the House of Lords refused to accord copyright to a suite of furniture distinctive in design but "popular" in taste. There is little uniformity in approach to the question, and it appears that any of the following factors may be influential: whether the creator's aim was to produce something artistic; whether the public would perceive it to have artistic quality; whether experts would so view it; and whether a judge would.n81

**[b]-- Hybrid Category: Films.**n82

"Film" means a recording on any medium from which a moving image may be produced by any means.n83 This broad definition clearly encompasses both the old celluloid films and newer video recordings or disks.n84

Films now have a hybrid status under Section 9(2)(ab) which gives the principal director joint authorship with the producer of films made on or after July 1, 1994.n85 The E.C. directives, which compelled recognizing directors as "authors," premise a distinction between rights in cinematographic works and related rights in mere fixations, so-called "films" or videograms.n86 U.K. implementation eschews this distinction, since the Act acknowledges only one copyright work, a film, and specifically makes provision for circumstances where there is no principal director, nor any author of screenplay, dialog, or music.n87 However, it has now been accepted that some films, especially those which are cinematographic works, are dramatic works.n88

The soundtrack "accompanying" a film is treated as part of the film, so that showing a film including a soundtrack does not involve playing the soundtrack, and it would be only necessary to obtain rights clearances from the owner of copyright in the film.n89 If a film sound track is developed from a pre-existing sound recording, there will be both copyright in the film soundtrack and pre-existing sound recording. Playing the soundtrack music alone, without the moving images, would require the consent of the holder of rights in any separate sound recording of the soundtrack.n90

2-UK International Copyright Law and Practice § 2

**[c]-- Other Media Productions.**

British copyright law protects some of the subject matters, such as sound recordings and broadcasts, that are protected by neighboring rights in Continental European copyright systems. These productions shall here be treated under the designation of "other media productions."n91  This copyright, however, does not extend to cover performances as such, which are protected by a separate set of rights in Part II, explained below.n92

**[i]-- Sound Recordings.**

"Sound recording" is defined to mean "(a) a recording of sounds, from which the sounds may be reproduced," or "(b) a recording of the whole or any part of a literary, dramatic or musical work, from which sounds reproducing the work or part may be produced, regardless of the medium on which the recording is made or the method by which the sounds are reproduced or produced."n93  The soundtrack of a film is no longer, as previously, excluded from this definition, except in so far as it "accompanies" the film.n94

**[ii]-- Sound and Television Broadcasts.**

A broadly defined concept of "broadcast" now includes cable programs.n95  A broadcast is defined as an "electronic transmission of visual images, sounds, or other information which (a) is transmitted for simultaneous reception by members of the public and is capable of being lawfully received by them, or (b) is transmitted at a time determined solely by the person making the transmission for presentation to members of the public."n96

This definition merely requires that the transmission be "electronic."n97  It is otherwise indifferent as to the content, the means of transmission, the route taken, or the form of the signals. The definition therefore covers sound and television broadcasts, transmissions both by wire and wireless means, terrestrial and satellite transmission, and analog and digital broadcasts. The definition also takes into account the forms of broadcasting that may be directly received by individuals or may be received by subscribers who obtain a decoder.n98  However, this broad definition excludes both on-demand transmissions and Internet transmissions.

A broadcast, by definition, must be either be "for simultaneous reception by members of the public," while being capable of lawful reception, or be made "at a time determined solely by the person making the transmission for presentation to members of the public." This limitation excludes, from protection, transmissions between individuals, such as telephone calls, faxes or e-mails, as well as transmissions on private networks, such as company "intranets": these are not for reception by members of the public.n99  The requirement that the transmission be "capable of lawful reception" reinforces the exclusion of private communications from the definition of broadcast because the interception of such a transmission would be illegal under the Interception of Communications Act 1985.n100  The requirement of "simultaneous reception" also excludes transmissions where the individual recipient decides the time of the transmission, as with on demand services, or interactive database services. The alternative criteria, that the transmission be at a time determined solely by the person making the transmission "for presentation to members of the public" is designed to cover transmissions for playing or showing, for example, images of a live event relayed for display at a venue to which the public is admitted.n101  It also covers what is sometimes referred to as "narrow-casting": such as a transmission to a shop for presentation to the public.

Section 6(1A) generally excludes from broadcasts "any internet transmission." No definition is provided for an "internet transmission," but the better view is that the Internet is not confined to the "world-wide web." The contents of e-mails to news groups and websites are therefore, generally, excluded from protection as "broadcasts," as are on-line services.n102  In contrast, an information service through telecommunications networks to subscribers to certain mobile phone services is probably a broadcast. The exclusion from broadcasts for "any internet transmission" is not a blanket exclusion: it encompasses the following three exceptions, which attempt to leave protected as broadcasts "internet transmissions of a conventional broadcast character."

- First, the exclusion of "internet transmissions" does not encompass "a transmission taking place simultaneously on the Internet and by other means." This means that sounds and images transmitted over a website simultaneously with a broadcast remain part of that protected broadcast.

- Second, broadcasts still include any Internet transmission which is a "concurrent transmission of a live event," for example, presumably, an Internet transmission of a cricket match or a pop concert. There is no definition of "live event."

- Third, broadcasts include any "transmission of recorded moving images or sounds forming part of a programme service offered by the person responsible for making the transmission ... at scheduled times determined by that person."

**[iii]-- Published Editions.**

A "published edition," in the typographical arrangement of which there may be copyright, means "a published edition of the whole or any part of one or more literary, dramatic or musical works."n103  The "edition" is "the product, generally between covers, which the publisher offers to the public."n104  In contrast with so-called publication rights, there is no requirement that the "published edition" be of a previously unpublished work.n105

**[3]-- Derivative Works, New Versions, and Compilations**

The 1988 Act makes no use of the terms "derivative work" or "compilation" as technical categories with statutorily defined meanings. Even "collective work," which had a place in the Act of 1911, is no longer a term of art.n106  "Adaptation" may, however, constitute an act of infringement.n107  "Database" now receives a definition extending to many compilations.

**[a]-- Adaptations; Translations; New Editions.**

A person who exercises sufficient "skill, judgment and labour" upon an already existing work may himself acquire a copyright in the result. It does not matter, for purposes of subsistence of copyright, that such a person may be infringing copyright in the existing work.n108

Where copyright is acquired by virtue of such "secondary" activity, it will be distinct from and subordinate to the copyright in any prior original work which is incorporated into it. The license of the owner of copyright in the underlying work will be needed by the maker of the derivative version or any third-party copier, if either intends to exploit the new version, to the extent that the prior work is still apparent in the new one in the sense of being substantially reproduced in it.n109

Protection of a derivative work turns on whether the "skill, judgment and labour" transforms the underlying work in a relevant way.n110  A good example would be translation of a work from one language to another or the reduction of an opera to pianon111  or the making of an engraving or a photograph from a picture.n112  However, the courts have applied this concept of adaptation to much simpler changes of form, most notoriously, the making of a written report of a speech.n113  Another way to produce an original derivative work is through the selection of already existing materials or the addition of new materials, for example, comments or explanations in editing.n114  Alternatively a derivative work may be original through abridgment, deletion, or simplification.n115  For example, copyright has been held to subsist in yachting chartlets simplified from admiralty maps.n116

However, effort, skill, and judgment expended in producing a derivative work will only confer originality where some overall difference in effect is achieved. It is clear from the decision of the Privy Council in *Interlego A.G. v. Tyco Industries Inc.*,n117  that the necessary effect is absent in circumstances of wholesale copying in the same materials and form. There it was held that a drawing was not original merely because it took skill and labor to produce, but that "[t]here must in addition be some element of material alteration or embellishment which suffices to make the totality of the work an original work."n118  Otherwise, a tracing or casting would be an original drawing or sculpture above and beyond the traced image or initial mold.n119  Furthermore, changing the written specification which accompanies a drawing is not an alteration of visual significance.n120  However, this requirement of variation does not apply to a series of drawings produced by the same author.n121

**[b]-- Compilations and Databases.**

The collection, selection, or arrangement of pre-existing material can also produce an original derivative work. Copyright would exist in the resulting compilation if "labour, skill and capital" had been sufficiently expended "to impart to the product some quality or character which the raw material did not possess, and which differentiates the product from the raw material."n122

The Act defines the term "database" in broad terms to constitute "a collection of independent works, data or other materials which (a) are arranged in a systematic or methodical way, and (b) are individually accessible by electronic or other means."n123  Ostensibly, the drafters did not consider whether this term overlapped with the generic notion of a "compilation," and these criteria are loose enough that it might be asked, for example, whether poems brought together in an anthology by reference to authors are "independent" or whether the elements of data on a map are "independent" or "individually accessible." To be protected by copyright, the database must be original in that "the selection or arrangement of the contents of the database constitutes the author's own intellectual creation."n124  It may also be asked whether a quantitative criterion as well as this qualitative criterion of originality should apply.n125  As explained below, absent fulfillment of the criterion of originality, database contents may be protected by *sui generis* rights.n126

In any event, prior case law on compilations must be consulted with this new definition of "database" in mind.n127 Copyright protection has been granted even if the arrangement of the compilation lacked any creativity, for example, if the work is a chronological list of television programs or an alphabetically ordered list of solicitors.n128  Moreover, the relevant skill and judgment can arise from prior commercial decisions rather than the skill or effort in transforming those decisions into expressive form. In a celebrated case, copyright was held to exist in coupons for football pools despite the fact that the form of the coupon followed logically from the commercially motivated decisions about which wagers to include: the selection of wagers and their presentation was so inter-connected as to be inseparable.n129

However, where the process of compilation involves little effort or judgment and the effect is commonplace, the work will not be treated as original. Thus no copyright was accorded in seven tables at the front of a diary, these tables consisting of days and dates of the year, weights and measures, postal information, etc.n130  Nor was there copyright in a local timetable made from the official timetables of the railway companies and showing a selection of trains to and from a particular town.n131  We can be fairly confident that, applying the criterion of the "author's own intellectual creation," the results in these scenarios would be no different.

**[4]-- Special Problem Areas**

As already mentioned, to provide some relief for the takings of materials that do not clearly attract copyright, British judges have developed equitable actions for passing-off and for the unauthorized disclosure or other use of confidential information.n132  For example, under the last heading, relief was granted for taking the concept for a television program, which had not been expressed in sufficiently concrete form to attract copyright.n133

**[a]-- Titles.**n134

Single invented words are not protected as literary works because, it has been explained, single words do not provide information, instruction, or literary pleasure.n135  Similarly, the titles of works of any kind do not normally attract copyright because they are not considered to embody a sufficient quantum of effort.n136  When a title exists only as part of a work, it is unlikely to be treated as a sufficiently substantial part for there to be infringement if it alone is copied. However, where the title of a celebrated review sketch was given without license to a film embodying different material, the owner of the copyright in the sketch was held entitled to sue for passing-off, even though he himself had made no arrangements to exploit the true sketch in a film.n137

**[b]-- Characters.**

Borrowing the identifying features of a literary character, such as name, details of appearance, characteristic actions and phrases, typical surroundings, and so on, but without also taking details of plot or dialog, makes it unlikely that there has been substantial copying of any copyright material. But a Hong Kong court accepted in principle that the distributors of films concerning the adventures of the "One-Armed Swordsman" could prevent a competitor from passing off a different story as a further film in the series featuring the same character.n138  Further, taking ideas for characters communicated in confidence might give rise to an action for breach of confidence if the ideas are clearly identifiable, original, of potential commercial attractiveness, and capable of reaching fruition.n139

**[c]-- Works of Applied Art; Design Protection.**

The 1988 Act revised a very complex body of partially statutory and partially judge-made law concerning the interplay of copyright and design rights, and a 2001 amendment brought new changes to the registered designs laws contained in the Registered Designs Act 1949. British law now provides that protection of a design may arise under three regimes: (i) copyright in artistic works, (ii) unregistered design rights, or (iii) registered design rights. Complex provisions attempt to minimize overlap between these regimes, with occasionally different results for foreign designs, and only a brief in-

troduction is given here.n140  A full appreciation of this complex topic would also require that account be taken of the Community design regime.n141

**[i]-- Copyright in Artistic Works.**

Designs may be protected by copyright in artistic works, for example, when the designs are expressed in graphic works, such as drawings, or in three-dimensional objects, such as models. Copyright in a drawing and in most three-dimensional objects arises if there is sufficient labor, skill, and judgment to give the work originality, but models for architecture and works of artistic craftsmanship may call for "artistic quality."n142  To minimize the overlap of copyright with rights in unregistered and registered designs, the copyright regime is subject to a number of limitations, notably when articles are made from a design.n143

To start, there is a limitation to the principle that artistic copyright may be infringed by reproducing a drawing or a model, either directly or indirectly, in producing a three-dimensional article.n144  Section 51 of the Act provides the exception that the act of making an article from a "design document or model" which records or embodies a design does not constitute *copyright* infringement where the design is for "anything other than an artistic work or a typeface." "Design" has a particular and restricted meaning in this context: it is defined as "the design of any aspect of the shape or configuration (whether internal or external) of the whole or part of an article, other than surface decoration."

Thus the exception set out in Section 51 does not affect copyright in any decorative feature which will be applied to industrial articles, but it does affect applications embodying the "shape or configuration" of an article depicted in a drawing or model, such as a blueprint for a functional apparatus like a pump, car exhaust, or circuit board,n145  as well as both two- and three-dimensional copies of such articles.n146  Subject to complex transitional provisions,n147  protection for these latter designs arises chiefly under the regime of unregistered design rights, and Section 51 can be seen as marking the boundary between copyright and that system.n148  Given the limited scope of the unregistered design right, pressure could be brought to bear on the ambiguities of the notion of "artistic works," including "sculptures" and "engravings," found in Section 51.n149  There are, however, suggestions that U.K. courts will interpret this notion rather narrowly in this context.n150

Further, where an artistic work is reproduced on "articles" which are manufactured "by an industrial process," that is, in numbers of 50 or more, Section 52 operates to reduce the duration of copyright in this work to 25 years from the year of first legitimate marketing.n151  Suppose, for example, that a photograph is applied to a pillow case in numbers exceeding 50 and sold: after 25 years from the year of first marketing of the pillow case, the same image may then be legitimately applied by anyone to pillow cases or to other "articles." However, this shortening of the copyright term does not occur where an artistic work has only been reproduced on works of sculpture, wall-plaques, or medals or, more generally, on articles "primarily of an artistic or literary character," such as postcards, stamps, and book jackets: in these cases, the copyright owner retains the full 70-year *post mortem* term.n152

Finally, the Copyright, Designs and Patents Act also provides that the copyright in an artistic work is not infringed by anything done in pursuance of an assignment or license made or granted by a person registered under the Registered Designs Act as the proprietor of a corresponding design.n153  The term "corresponding design" means a design which, if applied to a particular article, would produce something which would be treated as a copy of the artistic work.

**[ii]-- Unregistered Design Right.n154**

Protection may also arise by virtue of an unregistered design right in the shape or configuration of an object.n155  Such protection arises without formality if the design is "original" and "not commonplace": originality has the same meaning as in copyright, but the term "not commonplace" does not mean "novel."n156  A range of features of shape are excluded from the scope of unregistered design right,n157  of which the most important are: "surface decoration";n158  "must fit" features, which enable one article to connect to another;n159  and "must match" features, which are dependent on the features of another article with which the article in question is to be integrated.n160

The unregistered design right lasts normally for 10 years from first legitimate marketing, subject to licenses of right in the last 5 years of the term.n161  The owner of design right is the creator, or the creator's commissioner or employer.n162  The owner of design right in a design has the exclusive right to reproduce the design for commercial purposes, *inter alia*, by making articles to that design.n163  Such reproduction would involve "copying the design so as to produce articles exactly or substantially to that design" or by making a design document recording the design for the purpose of enabling such articles to be made.n164  Furthermore, the copying must produce articles "substantially" to that design, and it has been suggested that this finding may involve a visual assessment, similar to that employed in the

registered designs context.n165  Moreover, the courts have explained that regard must be taken of the extent to which the claimant's design differs from existing designs.n166  While unregistered design rights cover many functional designs lacking visual attractiveness, restrictive judicial interpretations have often deprived them of much value.n167

Section 236 of the 1988 Act states that "it is not an infringement of design right in the design to do anything which is an infringement of copyright in that work."n168  Consequently, as far as there is theoretically dual protection, copyright preempts the unregistered design right. However, as we have seen, Section 51 limits copyright severely:n169 where both copyright and unregistered design right exist, in many cases this provision provides a defense so that making an article according to the design does not infringe the copyright, but it may well nevertheless infringe the unregistered design right. For example, an exhaust pipe produced indirectly from design drawings would not infringe the copyright in those drawings, but would infringe the unregistered design right as regards features of the exhaust pipe which are not excluded as "surface decoration" or as "must fit" or "must match" features.

The unregistered design right is available only in a designn170  which meets one of the following criteria:n171  (1) the designer is a "qualifying person," namely a citizen or subject of, or an individual habitually resident in, a "qualifying country," that is, the United Kingdom, the E.C., a country to which the relevant Part of the 1988 Act "extends" or a "designated country"; (2) the designer has been commissioned by or is employed by such a "qualifying person";n172  or (3) the design has been first marketed by a "qualifying person" in the United Kingdom, the E.C., or a country to which the Part "extends." Section 255 of the 1988 Act allows for orders "extending" the Part of the Act to the Channel Islands, the Isle of Man, or any colony, while Section 256 allows for orders to be made "designating" countries as enjoying reciprocal protection.n173

### [iii]-- Registered Design Right.n174

A designer may also seek protection under the Registered Designs Act, most recently amended in 2001.n175  Such protection extends only to a new "design," where "design" is defined to mean "the appearance of the whole or a part of a product resulting from the features of, in particular, the lines, contours, colours, shape, texture or materials of the product or its ornamentation."n176  Features of appearance are excluded from consideration if they are solely dictated by the technical function of the product or depend on the features of another article with which the article in question is to be connected.n177  Registrations are possible as regards the appearance of part of a product, as well as parts intended to be assembled into a complex product.n178

The rights under this regime may last, with renewals, up to 25 years from the year of registration. Application to register or renew should be made to the Design Registry in the Patent Office pursuant to its rules.n179  In theory, a registration is only valid if the design both is "new" and has "individual character."n180  In practice, since the Registry does not conduct a search, registration is usually a mere formality.n181

A design is "new" if no identical design, or no design with features that differ only in immaterial details, has been made available to the public before the date of the application. A broad definition as to when a design is made available to the public is specified,n182  but this definition is limited by excluding, most importantly, the designer's own disclosures and his or others' disclosures that could not reasonably have become known to specialists in the design sector operating in the E.E.A.n183  A design has "individual character" if the overall impression it produces on the informed user differs from the overall impression produced on such users by designs which have previously been made available to the public.n184

Registration gives the proprietor the exclusive right to use the registered design and any other design which does not produce on the informed user a different overall impression. A person "uses" a design if, with regard to a product in which the design is incorporated or to which it is applied, that person engages in any of the following acts: making the product, offering it, placing it on the market, importing or exporting it, using it, or stocking it for purposes of such exploitation.n185  A finding of infringement is not dependent on the proof that the defendant has copied the design, and therein lies the chief advantage of a design registration over both copyright and the unregistered design right. However, the scope of the protection is limited to the situation where a defendant employs an identical design or one which does not produce on the informed user a different overall impression.n186  In assessing this scope, the tribunal is directed to take account of the "degree of freedom of the author in creating the design." A few minor defenses are available: for example, no infringement occurs where a person uses a component part of a complex product to repair that product.n187

As a result of the 2001 amendment, which considerably expands the scope of subject matter for registered designs, there is now considerable scope for the cumulative protection of two-dimensional design features by copyright and by

rights in registered designs.n188  Because copyright and the registered design right may be vested in different persons, the Registered Designs Act states that a registration may be invalidated where the registration of the design is an unauthorized use of a work protected by copyright and the copyright owner objects to its registration.n189

It might also be possible to have protection for three-dimensional designs through registration and, automatically, through unregistered design right. There is a concern that the two rights might vest in different persons, and an attempt has been made to avoid this conflict by requiring that any applicant for registration also be the owner of the corresponding unregistered design right.n190

**[d]-- Computer Software.**

The 1988 Act places computer programs into the category of literary works.n191  Amendments were introduced into the 1988 Act to bring the law into conformity with the E.C. Software Directive, effective January 1, 1993.n192  For example, for the avoidance of doubt, not only programs, but also preparatory design material for them, now fall within the definition of literary works.n193  Other consequences of the British implementation of the Software Directive are referred to at various points below.n194  The interplay of these provisions with the Database Regulations remain to be explored.n195  A separate right has been created in the topographies of semiconductor chips.n196

Despite the special language which the Software Directive includes on point, the originality requirement developed in British case law was not reformulated for programs.n197  Although the threshold required by the Directive is widely considered to be higher than that generally applied in British copyright law, the Government did not consider it necessary to amend the 1988 Act in implementing the Directive.n198  Because the language of the Act should be construed as far as possible to be consistent with European obligations, it would be appropriate for a court to employ a modified understanding of "originality" when considering the protection of computer programs.n199  The courts have indeed acknowledged that it is not always appropriate to treat generally applicable statements concerning "originality" made in one context as being applicable to other contexts.n200  As explained below, more recent case law has explored the scope of protection in the context of infringement analysis.n201

**[e]-- Government Works.**

Crown copyright now arises where a work is made by an officer or servant of the Crown in the course of his or her duties.n202  Parliamentary copyright is, in the main, given to whichever House of Parliament has, by its direction or control, had the work made, or it is given to both if they are jointly responsible.n203  In circumstances other than those covered by these provisions, the government will acquire copyright only by assignment from the initial author or other owner, as ascertained under the general rules.n204

The Crown, in principle, claims copyright in public materials such as statutes and Parliamentary debates.n205  The administration of these copyrights is, for the most part,n206  in the hands of the residual Her Majesty's Stationery Office (H.M.S.O.).n207  Following a review of practices, a policy of encouraging wide dissemination of official material is pursued. H.M.S.O. has declared that copyright is "waived" as regards certain material and has made available "click-use" licenses for other materials.n208

So-called "guidance notes" elaborate upon the policy of waiver. For example, as regards the reproduction of Bills and Acts, as well as of delegated legislation largely available on the Internet, the waiver allows for reproduction and publication by any means, subject only to the requirements that the text be "official," not altered or distorted, and that the source is acknowledged.n209

H.M.S.O's policy as regards specified residual matters is described in three categories of notices: namely, the Dear Publishers, Dear Librarian, and Dear Establishment Officer letters.n210  Administration of copyright in some matters, such as Ordinance surveys and Hydrographic Office charts is handled separately by so-called Trading Funds.n211

**FOOTNOTES:**

 (n1) Footnote 1. C.D.P.A., Sec. 3(2).

(n2) Footnote 2. *See, e.g.,* Norowzian v. Arks (No.2) [2000] E.M.L.R. 67, 73 (holding that, where a work of dance was filmed and the film edited drastically, but no claim made in the original unedited film, the edited film "is not a recording of" the dance) (also glossed under § 2[2][a][ii] *infra*).

(n3) Footnote 3. *See, e.g.,* Cala Homes (South) Ltd. v. Alfred McAlpine Homes East Ltd. *[1995] F.S.R. 818, 835* (to say that the person who pushes the pen is the creator is "too narrow a view of authorship"; rather "[i]t is both the

words or lines and the skill and effort involved in creating, selecting or gathering together the detailed concepts, data or emotions which those words or lines have fixed in some tangible form which is protected"). On joint authorship, see § 4[1][a] *infra.*

(n4) Footnote 4. *See* Walter v. Lane [1900] A.C. 539; Express Newspapers v. News (UK) *[1990] F.S.R. 359. See also* Hadley & Ors. v. Kemp [1999] E.M.L.R. 589, 643 (considering that the input of a "performer" is not relevant). For discussion, see Arnold, "Are Performers Authors?" [1999] E.I.P.R. 464.

(n5) Footnote 5. *See, e.g.,* Merchandising Corp. of America v. Harpbond *[1983] F.S.R. 32* (no copyright in pop star's make-up); Creation Records Ltd. v. News Group Ltd. [1997] E.M.L.R. 444 (collection of *objets trouves* not a work of artistic craftsmanship or collage since it existed only for a few hours and its continued existence was to be in the form of a photographic image). *But cf.* Metix UK Ltd. v. G.H. Maughan *[1997] F.S.R. 718* (something with transient existence such as ice sculpture could be protected).

(n6) Footnote 6. *Compare* C.D.P.A., Secs. 5A(1), 8(1), *with id.,* Sec. 6 (as amended).

(n7) Footnote 7. *See, e.g.,* Creation Records Ltd. v. News Group Ltd. [1997] E.M.L.R. 444 (arrangement of objects in preparation of photograph not protected by copyright, but arranger was protected from others photographing the scene and exploiting those photographs by an implied obligation of confidentiality).

(n8) Footnote 8. For further analysis, see *Copinger and Skone James on Copyright,* paras. 3-85-3-107, pp. 105-119; Laddie, *et al., The Modern Law of Copyright,* paras. 3.21-3.76, pp. 61-97; Cornish, *Intellectual Property,* paras. 10-04-10-10, pp. 388-393.

(n9) Footnote 9. C.D.P.A., Sec. 1(1)(a).

(n10) Footnote 10. *University of London Press v. University Tutorial Press (1916) 2 Ch. 601, at 608.*

(n11) Footnote 11. Macmillan & Co. Ltd. v. K. & J. Cooper (1923) 93 L.J.P.C. 113.

(n12) Footnote 12. *Ladbroke v. William Hill (1964) 1 All E.R. 465, 478* (Lord Devlin) and 476 (Lord Hodson). *See also Football League v. Littlewoods [1959] Ch. 637* (Upjohn J.) ("some labour, skill, judgment or ingenuity"); *"Karo Step" Trade Mark [1977] R.P.C. 273* (Whitford J.) ("some degree of skill and labour.").

(n13) Footnote 13. Walter v. Lane (1900) A.C. 539, 546 (Earl of Halsbury L.C.).

(n14) Footnote 14. *Football League v. Littlewoods (1959) Ch. 637, approved, Ladbroke v. William Hill [1964] 1 All E.R. 465.*

(n15) Footnote 15. *British Leyland v. Armstrong (1986) R.P.C. 279, 296* (Oliver L.J.) (also discussed in § 8[2][a][i] *infra*). On protecting designs by copyright or other rights, see § 2[4][c] *infra.*

(n16) Footnote 16. Ibcos Computers Ltd. v. Barclays Mercantile Highland Finance Ltd. *(1994) F.S.R. 275.* On a special criterion for computer programs, see § 2[1][b][iii] and 2[4][d] *infra.*

(n17) Footnote 17. *Kenrick & Co. v. Lawrence & Co. 25 Q.B.D. at 102* (Wills J.). *See also* IPC Magazines Ltd. v. MGN Ltd. *[1998] F.S.R. 431* (copyright in magazine logo designed using well-known techniques); Antiques Portfolio.com Plc. v. Rodney Fitch & Co. Ltd. *[2001] F.S.R. 345* (copyright in simple photographs of antiques protected because they involved judgment in the positioning of the object, the choice of angle, lighting, and focus). On "works of artistic craftsmanship," sometimes subject to a criterion of "artistic quality," see § 2[2][a][iv] *in fine infra.*

(n18) Footnote 18. Merchandising Corp. of America v. Harpbond *(1983) F.S.R. 32.*

(n19) Footnote 19. *"Karo Step" Trade Mark (1977) R.P.C. 273* (Whitford J.). *See also* Guild v. Eskander *[2003] F.S.R. 23, 39-40* (Court of Appeal) (overturning a first-instance finding that the combination of various features of clothes, such as a cross-over, V-neck, and ribbed cuffs, was original). On protecting designs, see § 2[4][c] *infra.*

(n20) Footnote 20. *See, e.g., Sinanide v. La Maison Kosmeo (1924) L.T.R. 365* (holding that there was no copyright in the advertising slogan "Beauty is a social necessity not a Luxury," ostensibly on the basis of the principle *de minimis non curat lex*); Rose v. Information Services Ltd. *[1981] F.S.R. 254* (Hoffmann J.) (denying copyright in the title "The Lawyer's Diary" because there was too slight a degree of skill and labor); Scottish Daily Record and Sunday Mail v. News Group Newspapers Ltd. [1998] S.L.T. 1411 (Court of Session, Inner House) (denying copyright in "Money Bags ... Is there real money inside?"). On titles, see § 2[4][a] *infra.*

(n21) Footnote 21. Greyhound Services Ltd. v. Wilf Gilbert (Staffs) Ltd. *(1994) F.S.R. 723. See also* Greyhound Racing Assn. v. Shallis [1923-28] MacG. C.C. 370 (competitors in a greyhound race).

(n22) Footnote 22. *Oldham Press Ltd. v. London and Provincial News Agency Ltd. (1935) Ch. 672. See also* Cramp v. Smythson [1944] AC 329, 336 (Viscount Simon L.C.) (suggesting that originality would be lacking in a table of times when the sun rises and the moon sets).

(n23) Footnote 23. For further analysis, see § 2[3][a] *infra.*

(n24) Footnote 24. C.D.P.A., Secs. 9(3), 178 (under "computer-generated").

(n25) Footnote 25. Laddie, *et al.*, *The Modern Law of Copyright*, para. 34.70, pp. 1649-1650. But where the computer generated work is a computer program or database, this fiction could not be employed, because of the more restrictive European requirement that the work be the author's own intellectual creation, that is, emanate from the author's "own intellect."

(n26) Footnote 26. On such "horizontal" provisions, see "E.C.," herein, at § 4[2]. It is arguable that this E.C. standard is also required of photographs by Article 6 of the Term Directive. However, the derogation in Article 6(2) to the effect that Member states may protect non-original photographs, may be interpreted as permitting the U.K. to maintain its existing standard.

(n27) Footnote 27. Database Reg. 6, introducing C.D.P.A., Sec. 3A (2). On possible interplay with prior case law concerning compilations, see § 2[3][b] *infra.* On new case law construing the border between copyright and the *sui generis* right in databases, see § 9[1][c] *infra.*

(n28) Footnote 28. There is some ambivalence in the E.C. standard itself. For example, Recital 17 of the Term Directive explains that a photograph is to be found original "if it is the author's own intellectual creation reflecting his personality." On this formulation of the standard, it would seem to exclude databases which were merely alphabetically or chronologically arranged. It would also be unlikely to be satisfied by elements of a computer program dictated by functions the program was to perform. Nor would it seem met in commonplace programming routines.

(n29) Footnote 29. *University of London Press v. University Tutorial Press (1916) 2 Ch. 601, at 608* (Peterson J.) (quoted in § 2[1][b] *supra).*

(n30) Footnote 30. *See, e.g.,* Wagamama Ltd. v. City Centre Restaurants Plc. *[1995] F.S.R. 713* (in context of Trade Marks Act 1994, Sec. 10(2)) (questioning whether statutory phrase "confusion including likelihood of association" encompasses association where no confusion exists).

(n31) Footnote 31. For a similar argument in the German context, see Schricker, "Farewell to the "Level of Creativity" in German Copyright Law?," 26 I.I.C. 41, 46 (1995). While in the United Kingdom the European provisions are seen as raising the standard, in Germany they require a lowering in relation to works perceived as being on the margin of copyright. But for an argument in favor of minimal creativity for core cases, see S. Ricketson, "The Concept of Originality in Anglo-Australian Copyright Law" (1991) 9(2) Copyright Reporter 1, 16.

(n32) Footnote 32. Fourth Standing Committee on Delegated Legislation, December 3, 1997, The Minister of State, Department of Trade and Industry (Mr. Ian McCartney) ("The criteria apply to databases for the reasons I have given and apply only to databases. There is currently no definition of originality and it has been a matter for interpretation by the courts, just as the new regulations will be.").

(n33) Footnote 33. C.D.P.A., Secs. 5A(2), 8(2).

(n34) Footnote 34. C.D.P.A., Secs. 14(2), (5).

(n35) Footnote 35. C.D.P.A., Sec. 6(6).

(n36) Footnote 36. C.D.P.A., Sec. 5B(4). For further analysis, see Laddie, *et al.*, *The Modern Law of Copyright*, paras. 7.29-7.30, pp. 382-384.

(n37) Footnote 37. C.D.P.A. Sec 13B(9). *See* § § 3[1][b] and 4[1][a][ii] *infra.*

(n38) Footnote 38. For reasons explained below, E.C. developments are giving films characteristics of both the first and third categories. *See* § § 2[2][b][ii] and 3[1][b] *infra.*

(n39) Footnote 39. *See* § 1[1][c] *in fine supra.*

(n40) Footnote 40. *See* §§ 9[1][a] and 9[1][c] *supra.*

(n41) Footnote 41. *See generally C.B.S. v. Ames Records [1981] R.P.C. 407, 417* (Whitford J.) (explaining that the fact that the United Kingdom has no law of unfair competition has resulted in copyright being "stretched to give protection to creative talents and activities the protection of which was never in the contemplation ... of those who from time to time have been responsible for the framing of the successive statutes").

(n42) Footnote 42. Electronic Techniques (Anglia) Ltd. v. Critchley Components *(1997) F.S.R. 401* (Laddie J.). *But cf. Mackie Designs Inc. v. Behringer Specialised Studio Equipment (UK) Ltd. & Ors. [1999] R.P.C. 717, 719-20* (Pumfrey J.) (preferring the view that a single piece of work can give rise to two or more copyrights); Norowzian v. Arks (No.2) [2000] E.M.L.R. 67 (classifying an edited film of dance both as a dramatic work protected by Section 1(1)(a) and as a film protected under Section 1(1)(b)).

(n43) Footnote 43. C.D.P.A., Sec. 3(1), as amended by Database Reg. 5.

(n44) Footnote 44. *University of London Press v. University Tutorial Press (1916) 2 Ch. 601* (Peterson J.).

(n45) Footnote 45. *Id.*

(n46) Footnote 46. Anacon Corp. Ltd. v. Environmental Research Technology *(1994) F.S.R. 659.*

(n47) Footnote 47. Electronic Techniques (Anglia) Ltd. v. Critchley Components *(1997) F.S.R. 401.*

(n48) Footnote 48. *Blacklock v. Pearson (1915) 2 Ch. 376.*

(n49) Footnote 49. *Purefoy v. Sykes Boxall (1955) 72 R.P.C. 89.*

(n50) Footnote 50. Kelly v. Morris (1866) L.R. 1 Eq. 697. *See also* Waterlow Directories v. Reed Information *[1992] F.S.R. 409* (material in computerized form); Waterlow Publishers Ltd. v. Rose *[1995] F.S.R. 207* (suggesting that such a work might be protected even though it has no identifiable author).

(n51) Footnote 51. *Football League v. Littlewoods (1959) Ch. 637.*

(n52) Footnote 52. *Portway Press v. Hague (1957) R.P.C. 426. See also* Greyhound Services Ltd. v. Wilf Gilbert (Staffs) Ltd. *[1994] F.S.R. 723* (advance program of greyhound races).

(n53) Footnote 53. Independent Television Publications v. Time Out *(1984) F.S.R. 64.*

(n54) Footnote 54. *See, e.g.,* Navitaire Inc. v. Easy Jet Airline Co & BulletProof Technologies Inc. (2004, *to be reported*) (para. 92) (distinguishing between unprotected "accretion" of commands and protected "compilation," the latter involving "an overall design").

(n55) Footnote 55. Database Reg. 6, adding new Sec. 3A (1). *Cf.* Football Association Premier League Ltd. v. Panini UK Ltd. *[2004] F.S.R. 1* (paras. 25, 29) (Chadwick L.J. and Mummery L.J.) (suggesting that an album for stickers of football players was a compilation). *Quaere* whether it may be considered as a database.

(n56) Footnote 56. *See* § 2[3][b] *infra.*

(n57) Footnote 57. *See* § 2[4][d] *infra.*

(n58) Footnote 58. Software Reg., Sec. 3. *See* Laddie, *et al.*, *The Modern Law of Copyright,* paras 34.20-34.23, pp. 1611-1613.

(n59) Footnote 59. C.D.P.A., Sec. 3(1).

(n60) Footnote 60. Norowzian v. Arks (No.2) (2000) E.M.L.R. 67, 73 (Court of Appeal).

(n61) Footnote 61. *See generally* Laddie, *et al.*, *The Modern Law of Copyright,* para. 3.117, p. 133 (suggesting that a dramatic work must also be a "work of entertainment," thus excluding newsreels and recordings of football matches).

(n62) Footnote 62. *See, e.g.,* Creation Records Ltd. v. News Group Ltd. [1997] E.M.L.R. 444 (finding no arguable case that a photo shoot is a dramatic work, since the scene was inherently static, having no movement, story, or action).

(n63) Footnote 63. *See, e.g.,* Shelley Films v. Rex Features [1994] E.M.L.R. 134 (seriously arguable that film set prepared for film "Mary Shelley's Frankenstein" was a work of artistic craftsmanship). *But cf.* Creation Records Ltd. v. News Group Ltd. [1997] E.M.L.R. 444 (no arguable cause of action that arranging objects for film shoot for record

sleeve was a work of artistic craftsmanship or collage because the composition was intrinsically ephemeral and its continued existence was to be in the form of a photographic image). For titles and characters, see § § 2[4][a] and 2[4][b] *infra*.

(n64) Footnote 64. Norowzian v. Arks (No.2) (2000) E.M.L.R. 67, 73.

(n65) Footnote 65. *Green v. Broadcasting Corporation of New Zealand (1989) 2 All E.R. 1056* (Privy Council).

(n66) Footnote 66. But it seems that where a dramatic work is recorded on a film, the film must contain the whole of the dramatic work in an unmodified state: Norowzian v. Arks (No 2) (2000) E.M.L.R. 63 (dance recorded on film, which was then edited, could not be protected because the film had been drastically edited and was not therefore a recording of the dance) (also glossed under § 2[1][a] *supra*).

(n67) Footnote 67. Norowzian v. Arks (No.2) (2000) E.M.L.R. 63 (finding that the edited film of a dance was, rather than merely a recording, a dramatic work).

(n68) Footnote 68. *See* Laddie, *et al.*, *The Modern Law of Copyright*, para. 3.120, p. 134; P. Kamina, *Film Copyright in the European Union*, paras. 123-133, pp. 144-153 (2002).

(n69) Footnote 69. C.D.P.A., Sec. 3(1). On derivative musical works, see § 2[3][a] *infra*; separate copyrights in words and music of songs, etc., § 4[1][a][i] *infra*.

(n70) Footnote 70. *Sawkins v. Hyperion Records (2005) R.P.C. 4* (Patten J.) (holding that parts of the "performing editions" reconstructing four works of a seventeenth-century composer, including the "figuring of the bass," additions of "ornamentation," and performance directions, counted as music attracting copyright).

(n71) Footnote 71. *See, e.g.,* Darwin Fibreglass v. Kruhse Enterprises Pty. Ltd. (1998) 41 I.P.R. 649 (Supreme Court of the Northern Territory, Australia) (Mildren J.) (applying a multi-factor test for what is a building, including the size of the structure, its proposed use, whether it is fixed, whether it is portable, and its degree of permanence).

(n72) Footnote 72. C.D.P.A., Sec. 4(1).

(n73) Footnote 73. *See also* § 2[1][b][i] *in fine supra* (criteria of originality relative to artistic works); § 2[4][c][i] *infra* (issues in protecting designs by copyright).

(n74) Footnote 74. *Kenrick v. Lawrence (1890) 25 Q.B.D. 99.*

(n75) Footnote 75. *Stephenson Blake & Co. v. Grant., Legros & Co. (1916) 33 R.P.C. 406.*

(n76) Footnote 76. *See, e.g., Tavener Rutledge v. Specters [1959] R.P.C. 355* (label on candy tin); *Walker v. British Picker [1961] R.P.C. 57* (few decorative lines on a parcel label). *See also* IPC Magazines Ltd. v. MGN Ltd. *[1998] F.S.R. 431* (treating layout of the front page of a women's magazine as an artistic work).

(n77) Footnote 77. Navitaire Inc. v. Easy Jet Airline Co & BulletProof Technologies Inc. (2004, *to be reported*) (para. 96).

(n78) Footnote 78. *See, e.g.,* Hi-Tech Autoparts Ltd. v. Towergate Two Ltd. *[2002] F.S.R. 254* (treating plates for the production of rubber mats as engravings); Hi-Tech Autoparts Ltd. v. Towergate Two Ltd. (No. 2) *[2002] F.S.R. 270* (treating rubber mats stamped from plates as engravings). *But cf.* Metix UK Ltd. v. G.H. Maughan *[1997] F.S.R. 718, 722* (Laddie J.) (rejecting argument that molds for making functional cartridges were protected as sculptures, because ordinary usage of the term "sculpture" requires the maker to be concerned with shape and appearance rather than just with achieving a precise functional effect).

(n79) Footnote 79. *See* § 2[4][c] *infra*.

(n80) Footnote 80. It is unclear whether there is a requirement of artistic quality for works of architecture: the requirement, which existed under the CA 1911 was removed under the CA 1956, but in contrast with Section 4 there is no explicit statement that such works are protected "irrespective of artistic quality."

(n81) Footnote 81. *See* Hensher v. Restawile [1976] A.C. 64; *Burke v. Spicers Dress Designs [1936] 1 Ch. 400;* Merlet v. Mothercare *[1984] F.S.R. 358;* Vermaat v. Boncrest *[2001] F.S.R. 131.* The fact that a design is created without using traditional "craftsmanship techniques," or is intended to be mass-produced, may be a factor. *See, e.g.,* Guild v. Eskander *[2001] F.S.R. 645, 700* (finding sample garments, made both by machine and as prototypes for mass production, not to be works of craftsmanship) (not considered on appeal at *[2003] F.S.R. 23).*

(n82) Footnote 82. For further analysis, see P. Kamina, *Film Copyright in the European Union* (2002).

(n83) Footnote 83. C.D.P.A., Sec. 5B(1).

(n84) Footnote 84. Television New Zealand Ltd. (1994) 2 N.Z.L.R. 91 (High Court of Auckland, New Zealand) (holding that videotape is a species of "cinematographic film").

(n85) Footnote 85. Previously, before the relevant amendment in 1996, copyright in films was treated in a similar manner to that in sound recordings and broadcasts, with the producer being designated as the sole "author." *See also* § 2[1][b][iii] *in fine supra* (question of what originality criteria apply to films); § 3[1][b] *infra* (duration of copyright in a film lengthened, so that it runs from the death of any of a group of designated human creators including the principal director); § 4[1][b][ii] *infra* (authorship status of director and producer, as well as other contributors).

(n86) Footnote 86. For further details, see "E.C.," herein, at § § 4[2][c] and 4[2][e], with texts in Appendices 3 and 5.

(n87) Footnote 87. C.D.P.A. Sec. 13B(9). For an argument that this fails to implement the Directives, see Kamina, "British Film Copyright and the Incorrect Implementation of the E.C. Copyright Directives" (1998) Ent. L. R. 109.

(n88) Footnote 88. *See* Norowzian v. Arks (No.2) [2000] E.M.L.R. 67. For further analysis, see § 2[2][a][ii] *supra*.

(n89) Footnote 89. *See also* Kamina, "The Protection of Film Soundtracks under British Copyright after the Copyright Regulations 1995 and 1996" [1998] Ent. L.R. 153; and § 2[2][c][i] *infra* (further explaining transitional provisions).

(n90) Footnote 90. C.D.P.A., Sec. 5B(2)-(3).

(n91) Footnote 91. A previous distinction between "broadcasts" and "cable programme services," the former being characterized by the absence of wires, has been removed. *See* Information Society Regs. 4-5, effective Oct. 31, 2003.

(n92) Footnote 92. *See* § 9[1][a] *infra*.

(n93) Footnote 93. C.D.P.A., Sec. 5B(1).

(n94) Footnote 94. C.D.P.A., Sec. 5B(2), (3). The history here is complex. Under the Copyright Act 1956, a film was taken to include sounds embodied in any soundtrack "associated" with the film. Then, under the 1988 Act, existing sound tracks were removed from film copyright and reclassified as sound recordings, and the categories of film and of sound recording were mutually exclusive. The transitional provisions now giving effect to provisions in the Duration Regulations state that these provisions apply to existing sound tracks as from commencement, so that once again immediate reclassification occurs. However, this change is "without prejudice to the owner of copyright in the sound track as a sound recording," notably relative to a film created between August 1, 1989, and January 1, 1996. Thus, permission to show such films may require the consent of holders of rights in both the film and the sound recording even after January 1, 1996.

(n95) Footnote 95. Effective October 31, 2003, this new definition supersedes the distinction which the 1988 Act, as enacted, drew between a "broadcast," which the 1988 Act had referred to as a wireless transmission, and cable programs. Information Society Reg. 4 (amending C.D.P.A., Sec. 6(1), redefining broadcast) and 5 (declaring that C.D.P.A., Sec. 7, which gave copyright to cable programs, shall cease to have effect).

(n96) Footnote 96. C.D.P.A., Sec. 6(1) (as amended by SI 2003/2498, reg. 4).

(n97) Footnote 97. Defined in C.D.P.A., Sec. 178, as "actuated by electric, magnetic electro-magnetic, electro-chemical or electro-mechanical energy."

(n98) Footnote 98. That is, any encrypted broadcast, whether terrestrial or by satellite relay, is "lawfully" received if decoding equipment has been made available through the person transmitting it in encrypted form. C.D.P.A., Sec. 6(2).

(n99) Footnote 99. *Cf.* Copyright Directorate, *Consultation on UK Implementation of Directive 2001/29/EC: An Analysis of Responses and Government Conclusion,* para. 3.6 (explaining its attempt to exclude on-demand services from the definition of broadcast on the basis that the subject matter transmitted is usually protected under other headings).

(n100) Footnote 100. Rather surprisingly, this might mean that foreign encrypted broadcasts, such as satellite broadcasts, for which there is no authorized distribution of decoders in the UK, are unprotected because they are not

capable of lawful reception in the UK. This would be a breach of Article 6(1)(b) of the Rome Convention. Such a conclusion might be avoided by treating the definition as covering broadcasts which are capable of lawful reception in the country at which the signals are primarily targeted.

(n101) Footnote 101. Copyright Directorate, *Consultation on UK Implementation of Directive 2001/29/EC: An Analysis of Responses and Government Conclusion* para 3.9 (explaining that the requirement that timing be determined by the person making the transmission was designed to exclude on-demand services from the definition of broadcast).

(n102) Footnote 102. This seems to overrule precedents protecting such contents under the rubric of cable programs: Shetland Times v. Dr Jonathan Wills *(1997) F.S.R. 604* (website); Dun & Bradstreet v. Typesetting Facilities *(1992) FSR 320* (on-line service).

(n103) Footnote 103. C.D.P.A., Sec. 8(1).

(n104) Footnote 104. *The Newspaper Licensing Agency Ltd. v. Marks and Spencer Plc. (2001) 3 W.L.R. 390* (Lord Hoffmann) (holding that whole newspaper was the "edition").

(n105) Footnote 105. *See also* § 3[1][d] *infra* (explaining the duration of rights); § 9[1][b] *infra* (explaining the different "publication" rights).

(n106) Footnote 106. *See Chappell v. Redwood Music [1981] R.P.C. 337.*

(n107) Footnote 107. *See* § 8[1][b][ii] *infra.*

(n108) Footnote 108. *See Chappell v. Redwood Music [1981] R.P.C. 337; ZYX Music GmbH v. King [1995] 3 All E.R. 1, 9-11.* If the compilation is entirely piratical, protection may be denied on public policy grounds: A-One Accessory Imports Pty. Ltd. v. Off Road Imports Pty. Ltd. (1996) 34 I.P.R. 332, 334 (Federal Court of Australia, Drummond J.).

(n109) Footnote 109. *See* § 8[1][a] *infra.* Such a situation must be distinguished from an original creation which is the work of joint collaborators. *See* § 4[1][a] *infra.*

(n110) Footnote 110. *See* Laddie, *et al.*, *The Modern Law of Copyright*, paras. 4.38-4.39, pp. 205-208.

(n111) Footnote 111. Wood v. Boosey (1868) L.R. 3 Q.B. 223; *Redwood Music Ltd. v. Chappell & Co. Ltd. (1982) R.P.C., 109, 115-116.*

(n112) Footnote 112. Graves' case (1869) L.R. 4 Q.B. 715; Martin v. Polyplas (1969) N.Z.L.R. 1046.

(n113) Footnote 113. *Express Newspapers v. News UK (1990) 3 All E.R. 376* (Browne-Wilkinson V.-C.).

(n114) Footnote 114. *See, e.g., Warwick Films v. Eisinger [1969] 1 Ch. 608* (finding a book comprised of large extracts from court transcripts to be original because of editorial work, including the omission and addition of materials, etc.).

(n115) Footnote 115. Sweet v. Benning *(1855) 16 C.B. 459.*

(n116) Footnote 116. MacMillan v. Reed *(1993) F.S.R. 455.*

(n117) Footnote 117. *(1988) R.P.C. 343.*

(n118) Footnote 118. *Id. at 372* (Lord Oliver). This reasoning leads to the rather bizarre conclusion that good reproductions are denied copyright but poor ones have sufficient visually significant variation. *Id. at 371.* For further discussion, see Laddie, *et al.*, *The Modern Law of Copyright*, para. 4.39, pp. 206-208.

(n119) Footnote 119. *See, e.g., British Northrop Ltd. v. Texteam (Blackburn) Ltd. [1974] R.P.C. 57, 68* (a drawing simply traced from another drawing is not an original artistic work); Rexnold v. Ancon Ltd. *[1983] F.S.R. 662, 664* (improbable that copyright would be given to a mere tracing); *Davis (Holdings) Ltd. v. Wright Health Group Ltd. [1988] R.P.C. 403, 409* (cast made from models not original) and 412 (tracing not original).

(n120) Footnote 120. Interlego A.G. v. Tyco Industries Inc. (1989) A.C. 217, 268 (Lord Oliver). Visually significant variations have been held to include changes of shape but not mere changes of scale: Drayton Controls Ltd. v. Honeywell Control Systems *(1992) F.S.R. 245, 260.*

(n121) Footnote 121. "Each drawing, having been made by him, each is his original work." L.A. Gear v. Hi Tec *(1992) F.S.R. 121,* esp. at 136 (Nourse L.J.). Moreover, it has been held that, where a drawing was made from a three-dimensional functional design, such a drawing would be original if there was a continuous design process between the creation of the functional object and the subsequent creation of the drawing copying the object: W.J. Murray Engineering v. Nicholas Cesare (Knox J.) (1997, unreported). But where a designer made a drawing and enlarged the drawing by 10% on a photocopying machine, the photocopy was held to lack originality: The Reject Shop Plc. v. Robert Manners *(1995) F.S.R. 870.*

(n122) Footnote 122. *Macmillan & Co. Ltd. v. K. & J. Cooper (1924) 40 T.L.R. 186, 188;* (1923) 93 L.J.P.C. 113 (described in *Interlego,* discussed in § 2[3][a] *supra,* as "perhaps the most useful exegesis" on the issue of originality in this context).

(n123) Footnote 123. C.D.P.A., Sec. 3A(1) (as inserted by Database Reg. 6). Computer programs used in the making or operation of databases accessible by electronic means are ostensibly excluded, although a compilation of such programs, including software elements, is presumably covered. *But cf.* Total Information Processing Systems Ltd. v. Daman Ltd. *[1992] F.S.R. 171* (linking of three application programs not found to constitute a copyright-protected compilation). For further analysis, see J.H. Reichman and P. Samuelson, "Intellectual Property Rights in Data?," 50 Vanderbilt Law Rev. 51, 132 (1997). On protecting computer programs themselves, see § 2[4][d] *infra.*

(n124) Footnote 124. C.D.P.A., Sec. 3A (2) (as introduced by Database Reg. 6). Transitional provisions make it clear that databases which are already protected by copyright on March 27, 1996, but which would not reach the standards required under the Directive, continue to enjoy protection until the end of the copyright term: Database Reg. 29 (1).

(n125) Footnote 125. *See* British Horseracing Board v. William Hill [2001] E.C.D.R. 257, 269 (Laddie J.) (discussed in § 9[1][c] *infra*).

(n126) Footnote 126. *See* § 9[1][c] *infra.*

(n127) Footnote 127. For analysis in connection with the "originality" criterion, see § 2[1][b][iii] *supra;* relative to categorization under the rubric of "literary works," § 2[2][a][i] *supra.*

(n128) Footnote 128. *B.B.C. v. Wireless League Gazette Publishing Co. (1926) Ch. 433;* Independent Television Publications v. Time Out *(1984) F.S.R. 64;* Waterlow v. Reed *(1992) F.S.R. 409;* Dun & Bradstreet Ltd. v. Typesetting Facilities Ltd. *(1992) F.S.R. 320.*

(n129) Footnote 129. *Ladbroke v. William Hill (1964) 1 All E.R. 465; 1 W.L.R. 273, 469* (Lord Reid). *But cf. id.* at 481 (Lord Pearce) (apparently making the interdependence of preparatory work and actual transcription a matter of intention). *See* Greyhound Services Ltd. v. Wilf Gilbert (Staffs) Ltd. *[1994] F.S.R. 724.*

(n130) Footnote 130. Cramp v. Smythson (1944) A.C. 329 (Viscount Simon L.C.) ("commonplace information which is ordinarily useful and is ... commonly found prefixed to diaries"). *See also* Waylite Diary CC v. First National Bank [1993] E.I.P.R. D-242 (no copyright in diary pages which lacked quality of individuality sufficient to distinguish the work from the merely commonplace).

(n131) Footnote 131. Leslie v. Young (1894) A.C. 335.

(n132) Footnote 132. *See* § 1[1][b] *supra.*

(n133) Footnote 133. *Fraser v. Thames Television (1983) 2 All E.R. 101.*

(n134) Footnote 134. For a survey, see Stone, "Copyright Protection for Titles, Character Names and Catch-Phrases in the Film and TV Industry" (1996) Ent. L.R. 178.

(n135) Footnote 135. *See, e.g., Exxon v. Exxon Insurance Consultants [1982] R.P.C. 69* (holding that a word trademark is not protectible as a literary work). *But cf.* Navitaire Inc. v. Easy Jet Airline Co & BulletProof Technologies Inc. (2004, *to be reported*) (paras. 79-80) (Pumfrey J.) (rejecting this explanation and asserting that, "[i]n the end, the question is merely whether a written artefact is to be accorded the status of a copyright work having regard to the kind of skill and labour expended, the nature of copyright protection and its underlying policy").

(n136) Footnote 136. *See, e.g.,* Rose v. Information Services Ltd. *[1981] F.S.R. 254* (Hoffmann J.) (denying copyright in the title "The Lawyer's Diary" because there was too slight a degree of skill and labor); Re Animated Music

Ltd.'s Trade Mark [2004] E.C.D.R. 27 (finding no substantial taking of copyright material, from the song "Nellie the Elephant," by defendant who used title as trademark). *But cf.* Shetland Times Ltd. v. Dr. Jonathan Wills *[1997] F.S.R. 604* (arguable that newspaper headline of eight words was protected because it was designedly put together for the purpose of imparting information).

(n137) Footnote 137. *Samuelson v. Producers' Distributing (1931) 48 R.P.C. 580. See also* Games Workshop Ltd. v. Transworld Publishers Ltd. *[1993] F.S.R. 705* (ready to enjoin imitative series titles on a showing of imminent loss of goodwill).

(n138) Footnote 138. *Shaw Bros. v. Golden Harvest (1972) R.P.C. 559.*

(n139) Footnote 139. *Fraser v. Thames Television (1983) 2 All E.R. 101* (ideas for a television program).

(n140) Footnote 140. For further, pre-2001 analysis, see C. Fellner, *Industrial Design Law* (1995); Laddie, *et al.*, *The Modern Law of Copyright*, Chaps. 42-60; R. Spavin, "The Absence of Effective U.K. Protection for Non-European Designs under the Copyright, Designs and Patents Act 1988," [2000] 1 E.I.P.R. 30.

(n141) Footnote 141. On this regime, established under the E.C. Design Regulation, see "E.C.," herein, at § 4[3][c][ii].

(n142) Footnote 142. *See* § 2[2][a][iv] *supra.*

(n143) Footnote 143. Between 1968 and 1989, artistic copyright extended to industrial design in three main ways: (1) for a full copyright term, to the design of articles of a primarily literary or artistic character, such as greeting cards, advertisements, sculptures, etc.; (2) for 15 years from first marketing, to decorative designs that could also be registered under the Registered Designs Act 1949; (3) for a full copyright term, to functional designs, provided that they were initially expressed in a drawing. This scheme also included the defense, not retained in the 1988 Act, that excused copying if, in the eye of the non-expert, the article did not appear to be reproduced from a technical drawing: C.A. 1956, Sec. 9(8). For further analysis, see Laddie, *et al.*, *The Modern Law of Copyright*, paras 59.1-59.31, pp. 2249-2266. For the transitional provisions affecting existing works, see C.D.P.A. 1988, Sched. 1, paras. 6, 19, 20.

(n144) Footnote 144. C.D.P.A., Secs. 16(3), 17(3).

(n145) Footnote 145. *See, e.g.,* Lambretta Clothing Co. Ltd. v. Teddy Smith (UK) Ltd. *[2005] R.P.C. (6) 88* (Court of Appeal) (holding, by majority, that C.D.P.A., Sec. 51 operates in relation to the entire "design document," so that copyright in an arrangement of colors on a tracksuit top could not be enforced against a person making an article according to the design, at least in a case where the colors could not exist conceptually or physically apart from the shapes). *See also* Mackie Designs Inc. v. Behringer Specialised Studio Equipment (UK) Ltd. & Ors. *[1999] R.P.C. 717, 719-720* (Pumfrey J.) ("configuration" being a concept distinct from three-dimensional "shape"); Hi-Tech Autoparts Ltd. v. Towergate Two Ltd. (No. 2) *[2002] F.S.R. 270* (finding that the design of rubber non-slip mats was not a "surface decoration").

(n146) Footnote 146. *Cf.* BBC Worldwide Ltd. v. Pally Screen Printing Ltd. *[1998] F.S.R. 665* (Laddie J.) (accepting as an arguable defense that T-shirts bearing pictures of children's television characters were copies of articles made to design drawings, because they were copies from broadcast of three-dimensional characters which were in turn made to the drawings); *Mackie Designs Inc. v. Behringer Specialised Studio Equipment (UK) Ltd. & Ors. [1999] R.P.C. 717, 719-20* (Pumfrey J.) (affirming Justice Laddie's reasoning).

(n147) Footnote 147. Most importantly, where a work protected by copyright is a document embodying a design and that work existed on January 1, 1989, it is not subject to Section 51 until August 1, 1999. However, copyright in that work is subject to compulsory licenses from August 1, 1994, until August 1, 1999: C.D.P.A., Sched. 1, para. 19. Such licenses are available on the same conditions as they would be in relation to unregistered designs. *See* § 2[4][c][ii] *infra.* The copyright through August 1, 1994, was subject to the "spare part" defense. *See British Leyland v. Armstrong [1986] R.P.C. 279* (also discussed in § 8[2][a][ii] *infra*). *Cf.* Flogates Ltd. v. Refco Ltd. *[1996] F.S.R. 935, 939* (limiting the defense).

(n148) Footnote 148. *See* § 2[4][c][ii] *infra.* Some protection for such designs might be available under the regime of registered designs, especially in the light of the expansion of registrable subject matter by the 2001 amendment. *See* § 2[4][c][iii] *infra.*

(n149) Footnote 149. *See, e.g.,* Hi-Tech Autoparts Ltd. v. Towergate Two Ltd. (No. 2) [2002] F.S.R.270 (finding that rubber mats stamped from plates were engravings, so that the defense did not apply).

(n150) Footnote 150. *See, e.g.,* Metix UK Ltd. v. G.H. Maughan *[1997] F.S.R. 718, 722* (Laddie J.) (rejecting the argument for protecting, as "sculptures," molds for making cartridges in shape of double-barreled syringe); Breville Europe Plc. v. Thorn EMI Domestic Appliances Ltd. (1985) *[1995] F.S.R. 77, 94* (giving "sculpture" ordinary dictionary meaning). This restrictive British case law shies away from the New Zealand holding that products like "frisbees" may be "engravings" and the models and molds for making them also "sculptures": *Wham-O Manufacturing v. Lincoln [1985] R.P.C. 127* (New Zealand Court of Appeal).

(n151) Footnote 151. The shortening of term is produced by way of a defense. That is, where copies of an artistic work, with due authorization, have been industrially made and then marketed after August 1, 1989, acts after the end of the twenty-fifth year in which the licensed copies were first marketed, and in relation to further copies, will not infringe the copyright: C.D.P.A., Sec. 52(2). Where Section 10 of the Copyright Act 1956 applied to the artistic work before August 1, 1989, that is, the artistic work was a decorative design subject to the Registered Designs Act 1949, this 25-year term was shortened to 15 years: C.D.P.A., Sched. 1, para. 20(1).

(n152) Footnote 152. Copyright (Industrial Process and Excluded Articles) (No. 2) Order 1989, S.I. 1989/1070. Although the scope of the provision has never been clear, the logic behind it was that designs for such articles were excluded from the registration system. After the amendments of the registered design system, this is no longer the case, but the provision persists.

(n153) Footnote 153. C.D.P.A., Sec. 53(1).

(n154) Footnote 154. On the E.C.-wide right in unregistered designs, instituted by the Design Regulation, see "E.C.," herein, at § 4[3][c][ii].

(n155) Footnote 155. C.D.P.A., Sec. 213. "Configuration" does not cover coloring: *Lambretta Clothing Co. Ltd. v. Teddy Smith (UK) Ltd. (2005) R.P.C. (6) 88* (Court of Appeal). *But cf. id.* at paras. 88-89 (Sedley L.J.) (differing on point). For general discussion, see Bently and Sherman, *Intellectual Property Law,* Chap. 30. *N.b.* the separation of systems of protection for three-dimensional aspects by the unregistered design right from protection of two-dimensional features by copyright. *Cf.* Jo Y Jo v. Matalan Retail Ltd. [2001] E.C.D.R. 178 (critical of this separation).

(n156) Footnote 156. *Compare Farmers Build Ltd v. Carier Bulk Materials Handling Ltd. [1999] R.P.C. 461* (Court of Appeal) (suggesting that, to the extent that similarities of a design with others result from common design constraints, the design can be "fairly and reasonably described as commonplace"), *applied in* Scholes Windows Ltd. v. Magnet *[2002] F.S.R. 172* (Court of Appeal) (affirming first-instance finding that designs for window frames were commonplace), *with A. Fulton Co. Ltd. v. Grant Barnett & Co. Ltd. [2001] R.P.C. 257* (holding that design of flat folding umbrella with rectangular handle was not commonplace).

(n157) Footnote 157. S*ee Christopher Tasker's Design Right References [2001] R.P.C. 39.*

(n158) Footnote 158. S*ee, e.g.,* Mark Wilkinson Furniture Ltd. v. Woodcraft Designs (Radcliffe) Ltd. *[1998] F.S.R. 63, 72-73* (finding that grooves and beading on kitchen furniture were surface decoration); Jo Y Jo v. Matalan Retail Ltd. [2001] E.C.D.R. 178 (embroidery on garments was surface decoration). *Cf. A. Fulton Co. Ltd. v. Grant Barnett & Co. Ltd. [2001] R.P.C. 257* (question requires a value judgment by the court: not every feature which existed "to a small extent" in third dimension was necessarily surface decoration); Dyson v. Qualtex (2004, *to be reported*) (features which possess a functional purpose unlikely to be regarded as surface decoration).

(n159) Footnote 159. *Compare Ocular Sciences Ltd. v. Aspect Vision Care Ltd. & Ors. [1997] R.P.C. 289, 424-8* (holding the "must fit" exclusion to apply to features of contact lenses which enable them to connect to a wearer's eye), *with* Amoena v. Trulife (1995, unreported) (Sumption Q.C.) (but not features of a breast prosthesis which corresponded loosely to the shape of the brassiere to hold it). *See also A. Fulton Co. Ltd. v. Grant Barnett & Co. Ltd. [2001] R.P.C. 257* (not excluding design of case for umbrella because excluded features must be specifically designed to enable interconnection).

(n160) Footnote 160. Dyson v. Qualtex (2004, *to be reported*).

(n161) Footnote 161. C.D.P.A., Part III.

(n162) Footnote 162. C.D.P.A, Sec. 215. There is no provision for "agreements to the contrary." *See, e.g., A. Fulton Co. Ltd. v. Grant Barnett & Co. Ltd. [2001] R.P.C. 257* (holding that the managing director, rather than mold-makers or sewers working pursuant to instructions, was the designer). The rules on ownership of rights in commissioned designs are different from those in copyright law, so that copyright in design drawings may vest in one person (the designer) and the unregistered design right in the design embodied therein in another (the commissioner): APPS v. Weldtite Products Ltd. *[2001] F.S.R. 703, 730.* On the copyright rules, see § 4[1][b][i] *infra.*

(n163) Footnote 163. C.D.P.A., Sec. 226(1).

(n164) Footnote 164. *N.b.*, not only must similarity be shown, but also the fact that defendant had access to, and indeed copied, claimant's design must be shown. *Compare A. Fulton Co. Ltd. v. Grant Barnett & Co. Ltd. [2001] R.P.C. 257* (inference of copying drawn from multiplicity of similarities), *with* Guild v. Eskander [2003] F.S.R.23 (no copying proven).

(n165) Footnote 165. C & H Engineering v. F. Klucznik & Sons *(1992) F.S.R. 421.* It is a somewhat different test from that of copyright infringement: L. Woolley Jewellers Ltd. v. A. & A. Jewellery Ltd. *(2003) F.S.R. 255, 261.*

(n166) Footnote 166. *See, e.g., Ocular Sciences Ltd. v. Aspect Vision Care Ltd. & Ors. [1997] R.P.C. 289* (where a claimant's design lies in detail, rather than general shape, infringement requires the defendants' design to be extremely close).

(n167) Footnote 167. *But see* Parker v. Tidball *[1997] F.S.R. 680* (Englehart Q.C.) (granting success to an infringement claim relative to designs for leather cases for mobile telephones); Mark Wilkinson Furniture Ltd. v. Woodcraft Designs (Radcliffe) Ltd. *[1998] F.S.R. 63* (infringement of unregistered design right in kitchen range); Baby Dan v. Brevi and Trend Europa *[1999] F.S.R. 377* (infringement of design right in child safety barriers); *Farmers Build Ltd. v. Carier Bulk Materials Handling Ltd. [1999] R.P.C. 461* (Court of Appeal) (infringement in the case of a slurry separator); *A. Fulton Co. Ltd. v. Grant Barnett & Co. Ltd. [2001] R.P.C. 257* (infringement in relation to an umbrella design).

(n168) Footnote 168. C.D.P.A., Sec. 236.

(n169) Footnote 169. *See* § 2[4][c][i] *supra.*

(n170) Footnote 170. For further, pre-2001 analysis, see R. Spavin, "The Absence of Effective U.K. Protection for Non-European Designs under the Copyright, Designs and Patents Act 1988," (2000) 1 E.I.P.R. 30. For a general analysis of protecting foreign claims, see § 6[1] *infra.*

(n171) Footnote 171. C.D.P.A., Sec. 218. However, if the design was created in pursuance of a commission or in the course of employment, then it must qualify by that route or by first marketing. *See* Laddie, *et al.*, *The Modern Law of Copyright*, Chap. 54.

(n172) Footnote 172. C.D.P.A., Sec. 219. A design which was commissioned or made in the course of employment cannot qualify via the Sec. 218 route (designer a "qualifying individual").

(n173) Footnote 173. *See* Design Right (Reciprocal Protection) Order 1989, S.I. 1989/1294 (designating countries such as Anguilla, Bermuda, Hong Kong, and New Zealand).

(n174) Footnote 174. On the E.C.-wide right in registered designs, instituted by the Design Regulation and secured by registering in the OHIM in Alicante, see § 4[3][c][ii].

(n175) Footnote 175. *See* C.D.P.A., Part IV (substantially amending the Registered Designs Act); Designs Regulations S.I. 2001/3949 (amending it further, effective December 9, 2001). On the E.C. Design Directive implemented by the 2001 amendment, see "E.C.," herein, at § 4[3][c][i]. The amended law applies to any registration which results from an application made after December 9, 2001, or pending at that stage. The Registered Designs Act "as it had effect immediately before" December 9, 2001, applies to existing registrations as regards their cancellation or invalidation. The amended law applies to designs subject to existing registrations, for example, in relation to infringement. *See* Designs Regulations, Regs. 10-14. Because this amendment represents a considerable expansion in relation to the rights of proprietors of existing registrations, the positions of third parties are given some protection. *See id.*, Reg. 14. For more detailed explanations of the amended law, see Cornish, *Intellectual Property*, Ch. 14; Bently and Sherman, *Intellectual Property Law*, Chaps. 25-29. For analysis of prior law, see C. Fellner, *Industrial Design Law* (1995) 2.01-2.119, 3.109-3.310, 4.60-4.75, 5.149-5.191; Laddie, *et al.*, *The Modern Law of Copyright*, Chaps. 42-50.

(n176) Footnote 176. Registered Designs Act, Sec 1(2). The 2001 amendment removed previous restrictions confining protection to features that have eye appeal, as well as to articles with appearances that matter to consumers.

(n177) Footnote 177. Registered Designs Act, Secs. 1A(1)(b), 1C(1)-(2).

(n178) Footnote 178. Registered Designs Act, Secs. 1(2), (3). This provision overturns the former position taken in the case law: *R. v. Registered Designs Appeal Tribunal ex. p. Ford. (1995) R.P.C. 167.* Even before the 2001 amendment, the case law had already been expanding the range of registrable matters: Apple Computer Inc. v. Design Registry (2002) E.C.D.R. 191 (Jacob J.) (holding that icons on a computer screen were registrable designs as a feature, pattern, or ornament applied to an article, here "inherently built" into the Apple computer, by an industrial process, as distinct from icons that a program might temporarily generate).

(n179) Footnote 179. *See* Registered Designs Act, Secs. 1(1), 3(1); Registered Designs Rules 1995 S.I. 1995/2912 (as amended by the Registered Designs (Fees) (Amendment) Rules 2001, S.I. 2001/3950), Rules, 14, 15, 1; Registered Designs (Fees) Rules 1998, S.I. 1998/1777 (as amended by the Registered Designs (Fees) (Amendment) Rules 2001, S.I. 2001/3951). In contrast with the previous law, the statement as to the product to which the design relates now has no significance when it comes to deciding the scope of protection: Registered Designs Rules, Rule 14.

(n180) Footnote 180. Registered Designs Act, Secs. 1A(1)(a), 1A(2).

(n181) Footnote 181. Registered Designs Act, Sec. 3(4) (searches); Sec 3A (grounds of refusal); Sec 3C (registration).

(n182) Footnote 182. Registered Designs Act, Sec. 1B(5). The previous regime compared the applicant's design with those previously registered or published in the United Kingdom.

(n183) Footnote 183. Registered Designs Act, Sec. 1B(6)(a) (the so-called "safeguard clause") and (c) (the twelve-month grace period as regards disclosures by the designer or any successor in title). The other disclosures which are ignored under Section 1B(6)(b), (d) and (e), relate to disclo- sures which are in breach of confidence or otherwise abusive.

(n184) Footnote 184. Registered Designs Act, Sec. 1B(3). In deciding whether this requirement is satisfied, the court is to take account of the "degree of freedom of the author in creating the design."

(n185) Footnote 185. Registered Designs Act, Sec. 7(2).

(n186) Footnote 186. If the designed article can take a number of formats, for example, folded and unfolded, the comparison should depend largely on the format which the customer would treat as more significant: Isaac Oren & Anor v. Red Box Toy Factory Ltd. *(1999) F.S.R. 785, 795.*

(n187) Footnote 187. Registered Designs Act, Sec. 7A.

(n188) Footnote 188. On limitations on copyright put in place to reduce the attractiveness of copyright over registered designs, see § 2[4][c][i] *supra.*

(n189) Footnote 189. Registered Designs Act, Sec. 11ZA(4) (as amended).

(n190) Footnote 190. C.D.P.A., Sec. 224; Registered Designs Act, Secs. 3(3), 19(3A) (as amended). For problems, see Laddie, *et al.*, *The Modern Law of Copyright*, para. 34.11, pp. 1177-1178.

(n191) Footnote 191. The Copyright (Computer Software) Act 1985 had declared only that computer programs were to be considered *as* literary works. It has recently been asserted that "computer languages" are not protected, though the court acknowledged that the point would ultimately need the confirmation of the European Court of Justice: Navitaire Inc. v. Easy Jet Airline Co & BulletProof Technologies Inc. (2004, *to be reported*) (para. 88).

(n192) Footnote 192. S.I. 1992/3233. On the Directive itself, see "E.C." herein, at § 4[2][b], with text in Appendix 2. For commentary, see Chalton, "Implementation of the Software Directive in the U.K.: The Effect of the Copyright (Computer Programs) Regulations 1992" (1993) E.I.P.R. 138, 140; Meijboom, "The E.C. Directive on Software Copyright Protection," in A.P. Meijboom and H.D.J. Jongen (eds.), *Copyright Software Protection in the EC*, 8 (1993) (arguing in support of the British mode of implementation).

(n193) Footnote 193. Software Reg. 3. *See also* § 2[2][a][i] *supra* (issues of categorization).

(n194) Footnote 194. *See* § 8[1][a] *infra* (infringement analysis), § 8[1][b][iii][B] *infra* (rental and lending rights), and § 8[2][d][iii] *infra* (exceptions).

(n195) Footnote 195. *See, e.g.,* Navitaire Inc. v. Easy Jet Airline Co & BulletProof Technologies Inc. (2004, *to be reported*) (para. 274) (treating metadata defining field and dataset as computer program rather than part of database, in part because such elements were not part of the contents of the database). On the requirements for protecting databases by copyright, see § 2[3][b] *supra*; by *sui generis* rights, § 9[1][c] *infra*.

(n196) Footnote 196. *See* § 9[1][d] *infra*.

(n197) Footnote 197. On this requirement, see § 2[1][b][iii] *supra*. On the E.C. provision, see "E.C.," herein, at § 4[2][b][i], with text in Appendix 2. On changes made to German law on point, see Dietz, "Germany," herein, at § 2[4][d].

(n198) Footnote 198. Laddie, *et al.*, *The Modern Law of Copyright*, paras 34.27, p. 1615 (the criterion requires some "subjective contribution").

(n199) Footnote 199. *Cf.* Total Information Processing Systems Ltd. v. Daman Ltd. *[1992] F.S.R. 171* (linking three application programs not found to constitute a copyright-protected compilation); Computers v. Rosentein *[1982] F.S.R. 124* (Supreme Ct. South Africa) (not protecting a computer program by copyright which did no more than produce the multiplication tables or the alphabet, because the effort was too trivial to render the resulting work new and original).

(n200) Footnote 200. *See, e.g.,* Interlego A.G. v. Tyco Industries Inc. [1989] A.C. 217 (Privy Council) (declining to apply such language in the context of derivative artistic works) (also discussed in § 2[3][a] *supra*).

(n201) Footnote 201. *See* § 8[1][a] *infra*.

(n202) Footnote 202. C.D.P.A., Secs. 163, 164. The Government of Wales Act 1998, Sched. 12, has added to this list: "any sound recording, film, or live broadcast of the National Assembly for Wales which is made by or under the direction or control of the Assembly": C.D.P.A., Sec. 163A (as amended by Information Society Regs., Sched. 1, para. 11(a)). Under the 1988 Act, the scope of Crown and Parliamentary copyright is more limited than under previous law. *See* Laddie, *et al.,* *The Modern Law of Copyright*, Chap. 36.

(n203) Footnote 203. C.D.P.A., Secs. 165-167.

(n204) Footnote 204. *See* §§ 4[1][b] and 4[2][c] *infra*.

(n205) Footnote 205. Crown copyright has been extended to Acts of the Scottish Parliament and Northern Ireland Assembly: Scotland Act 1998, Sched. 8, para. 25(5); Northern Ireland Act 1998, Sched. 13, para. 8(1).

(n206) Footnote 206. The Northern Ireland Assembly Commission and Scottish Parliamentary Corporate Body, respectively, hold copyright in Bills of the Northern Ireland Assembly and Scottish Parliaments: D.D.P.A., Secs. 166A and 166B, as added by the Scotland Act 1998, Sched. 8, para. 25(6); Northern Ireland Act 1998, Sched. 13, para. 8 (6). For guidance by the Queen's Printer for Scotland, see: www.scotland-legislation.hmso.gov.uk/guidance/repro.htm.

(n207) Footnote 207. Information, relevant guidance notes, and license forms, are available from H.M.S.O., St. Clements House, 2-16 Colegate, Norwich NR3 1BQ, and its Internet pages at http://www.hmso.gov.uk./copyright/hmso/copy/html1.

(n208) Footnote 208. The Future Management of Crown Copyright, Cm 4300, 1999.

(n209) Footnote 209. Guidance Note. Reproduction of United Kingdom, England and Wales, Northern Ireland Primary and Secondary Legislation.

(n210) Footnote 210. The notices do not cover law reports. Most other aspects of H.M.S.O.'s activities were privatized in 1996 and are now in the hands of The Stationary Office Ltd.

(n211) Footnote 211. The question of how best to regulate the licensing activities of Trading Funds by H.M.S.O. was the subject of a review in 2001 which resulted in the establishment of the Information Fair Trading Scheme, under which the licensing practices of the trading funds are themselves subject to investigation by H.M.S.O. Consultation is currently being carried out on whether reform is required in the light of Directive 2003/98/EC of the European Parliament and of the Council of 17 November 2003 on Re-Use of Public Sector Information O.J. L345/90.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CYRANO, INC.
                    Plaintiff,

v.

TECHNOLOGIES, S.A.,
QUOTIUM TECHNOLOGIES, S.A.,

and

QUOTIUM TECHNOLOGIES, INC.,
                    Defendants.

**CIV. A. NO. 05-CV-11558-DPW**

## DECLARATION OF KEVIN J. O'CONNOR, ESQ.

I, Kevin J. O'Connor, Esq., declare and state as follows:

1.      I am a member in good standing of the bar of Massachusetts and of this Court.  I am managing partner of Paragon Law Group LLP, and am counsel of record for the Defendants.

2.      I make this affidavit on my own personal knowledge in support of the Opposition of Defendants Technologies, S.A., Quotium Technologies, S.A., and Quotium Technologies, Inc. (together "Quotium") to the Motion for Preliminary Injunction filed by Plaintiff Vedant Incorporated, formerly known as Cyrano, Inc. ("CI") on June 20, 2006.

3.      I am aware that in moving for an injunction CI has sought to excuse its failure to seek a timely injunction earlier in this action (commenced on July 25, 2005) by citing settlement talks that took place between the parties.  The following is the chronology of such talks.

4.      As a result of CI's taking an interlocutory appeal in the related action before Judge Tauro in June 2005, the parties were required by the rules of the Court of Appeals to attend a mandatory settlement conference held by the Office of Settlement

Counsel. That conference was held on September 12, 2005. Nothing was resolved by it, and talks did not continue.

5.     After the November 3, 2005 hearing held by the Court in this action had concluded, I stated to CI's counsel, Mr. Chow, and its President, Mr. Almeda, that Quotium remained willing to discuss settlement.

6.     On or about December 12, 2005, CI's counsel offered by letter to resume such talks. Substantive settlement talks began in January 2006 and continued until February 24, 2006, at which time the talks broke off.

7.     At no time did the parties put in place a standstill agreement that would have precluded CI from seeking injunctive relief in this case.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on July 14, 2006          /s/ Kevin J. O'Connor
                                   Kevin J. O'Connor




**Certificate of Service**
    I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and that paper copies will be sent to those indicated as non-registered participants on July 14, 2006.

                                    /s/ John R. Pagliaro
                                   John R. Pagliaro


0004-003-103063.DOC

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
* * * * * * * * * * * * * *
                              *
TECHNOLOGIES, S.A.,           *
et al                         *
         Plaintiffs,          *
                              *
            vs.               *      CIVIL ACTION
                              *      No. 02-11416-JLT
CYRANO, INC.                  *
         Defendant.           *
* * * * * * * * * * * * * *
```

BEFORE THE HONORABLE JOSEPH L. TAURO
UNITED STATES DISTRICT JUDGE
**DAY TWO NONJURY TRIAL**

A P P E A R A N C E S

        PARAGON LAW GROUP LLP
        184 High Street
        Boston, Massachusetts 02110
        for the plaintiffs
        By:  Kevin J. O'Connor, Esq.
             Mayeti Gametchu, Esq.


        BURNS & LEVINSON LLP
        One Beacon Street, 30th Floor
        Boston, Massachusetts 02108
        for the defendant
        By: Stephen Y. Chow, Esq.
            Michael K. Sugrue, Esq.
            Joan M. Griffin, Esq.


                         Courtroom No. 20
                         John J. Moakley Courthouse
                         1 Courthouse Way
                         Boston, Massachusetts 02210
                         April 3, 2006
                         10:20 a.m.

                CAROL LYNN SCOTT, CSR, RMR
                   Official Court Reporter
                One Courthouse Way, Suite 7204
                Boston, Massachusetts 02210
                      (617) 330-1377

# I N D E X

| WITNESS: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|

ALBERTO SAYNES

  By Mr. O'Connor    6                    42
  By Ms. Griffin              33

SCOTT ALMEDA

  By Mr. O'Connor   43                   165
  By Ms. Griffin              83                    200

PHILLIP GREEN

  By Mr. Chow      211                   245
  By Mr. O'Connor            233                    249

* * * * * * * *

# E X H I B I T S

| PLAINTIFF'S: | | FOR ID. | IN EVID. |
|---|---|---|---|
| No. 6 | International Distributor Agreement...................... | 47 47 | 49 |
| No. 7 | Document dated 10/5/02......... | 52 | 55 |
| No. 8 | Email dated 1/27/03............ | 56 | 57 |
| No. 9 | Email dated 2/18/03............ | 58 | 60 |
| No. 10 | Forecasts...................... | 59 | 63 |
| No. 11 | Email dated 10/30/02........... | 63 | 65 |
| No. 12 | Email dated 11/29/02........... | 65 | 67 |

Q. So a group of the employees walked out of the company a few weeks after you started?

A. Yes.

Q. So you had twenty people after the layoff. And then approximately how many employees did the company have after that group walked out?

A. Around ten.

Q. And approximately what time frame is this, sir?

A. Maybe three weeks after I came back to Cyrano, Inc.

Q. Okay. And how long did you continue to work at the company, sir?

A. Until July 2002.

Q. At any time from the date when the head count went down to ten to the time that you left, did the head count ever go back up to substantially more than ten?

A. No.

Q. All right. Sir, I want to direct your attention now to a meeting in or about February of 2002.

Do you recall that meeting?

A. Yes.

Q. The meeting at Sybase -- strike that.

A meeting at Cyrano, Inc.?

A. Yes.

Q. Okay. And who was present at that meeting?

A. Well, the whole company. Ten people basically.

## C E R T I F I C A T E

      I, Carol Lynn Scott, Official Court Reporter for the United States District Court for the District of Massachusetts, do hereby certify that the foregoing pages are a true and accurate transcription of my shorthand notes taken in the aforementioned matter to the best of my skill and ability.


_____

       CAROL LYNN SCOTT
      Official Court Reporter
    John J. Moakley Courthouse
  1 Courthouse Way, Suite 7204
  Boston, Massachusetts 02210
      (617) 330-1377