UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CYRANO, INC.,<br><br>　　　Plaintiff,<br><br>v.<br><br>QUOTIUM TECHNOLOGIES, INC.,<br>QUOTIUM TECHNOLOGIES, S.A., and<br>TECHNOLOGIES, S.A.,<br><br>　　　Defendants. | CIVIL ACTION NO. 05-CV-11558-DPW |

## MEMORANDUM IN REPLY TO QUOTIUM'S OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

The Plaintiff, Cyrano, Inc. ("Cyrano" or "Cyrano Inc."), filed a motion for preliminary injunction against the Defendants, Quotium Technologies, Inc., Quotium Technologies, S.A., and Technologies, S.A. (collectively, "Quotium"), to which Quotium responded with a memorandum in opposition ("Opposition" or "Opp. at __"). This Court allowed Cyrano leave to file this memorandum in reply to Quotium's Opposition. For the reasons stated below, as well as in Cyrano's memorandum in support of its motion, which is incorporated herein by reference, the Court should grant Cyrano's request for injunctive relief.

## INTRODUCTION

Quotium has deliberately mischaracterized Cyrano's motion for preliminary injunction as a motion to lift the stay. See Docket No. 30, at 12-21. Cyrano, however, neither has filed a motion to lift the stay nor stated that its "Motion for Preliminary Injunction and Request for Oral Argument," Docket No. 24, should be considered as a motion to lift the stay. On the contrary, while this Court imposed a stay here to avoid concerns over potentially duplicative litigation of

matters that would "be sorted out in some fashion before Judge Tauro," Docket No. 19,
Transcript of Nov. 3, 2005 Hearing, at 22:8-9, the issue before this Court mainly concerns
QTest4.0, which was not before Judge Tauro. Therefore, there is no additional burden on
Cyrano to meet any requirement to lift the stay.

As demonstrated throughout their Opposition, Quotium essentially argue that this matter
has been fully litigated before Judge Tauro in the action that Quotium filed in 2002 (C.A. No.
02-cv-11416) (hereafter, the "Quotium Action"). The events that concern this Court, however,
post-date a default judgment that entered in that earlier action. Quotium introduced QTest4.0 in
July 2005, after that default, as an "upgrade" and "major new release of its flagship product
QuotiumPRO." Quotium now attempt to circumvent this reality by contradicting themselves in
the claim that "QTest[4.0] and QuotiumPRO are essentially identical products." Nonetheless,
Quotium's creation, testing, archiving and distribution of the "major new release" known as
QTest4.0, as well as any subsequent versions, are new and actionable infringements of Cyrano's
copyrights in Test and Impact.

Even were the Court to stay action against pre-default versions of QuotiumPRO pending
the outcome of Cyrano's appeal of that default, Cyrano has a statutory right to prevent
infringements of its property by Quotium's unlicensed use (reproduction) of, preparation of
derivative works from, and distribution of Test and Impact through distribution of post-default
versions of QuotiumPRO, particularly versions of QTest4.0. There can be no dispute that
Quotium had access to the source code of Test and Impact and that at least the scripting language
and the embedded help files of QTest4.0 contain language that is substantially similar -- indeed,
almost completely identical -- to that of Test. Thus, even without referring to the detailed
ancestry of QTest4.0, on the currently available documentation, QTest4.0 unquestionably

2

infringes at least Cyrano's copyrights in those Test components. On the currently available documentation, it is also indisputable that QTest4.0 uses other important components of Test and Impact. Cyrano thus shows a likelihood of success on the merits of its claims of copyright infringement by Quotium's release and continued distribution of versions of QTest4.0. Therefore, the requested preliminary injunction should issue.

<div align="center">ARGUMENT</div>

Quotium's continued distribution of QTest4.0 violates the property interests of Cyrano in Test and Impact, which form two-thirds of OpenSTA and thus, by Quotium's own argument that the versions are "essentially identical," of QuotiumPRO and QTest4.0. The owner of a copyrighted work has the exclusive rights, inter alia, to reproduce the work; to prepare derivative works based on the work; and to distribute copies of the work to the public. 17 U.S.C. § 106 (West 2005). "Anyone who violates *any* of the exclusive rights of the copyright owner as provided by sections 106 through 122 . . . is an infringer of the copyright. . . ." 17 U.S.C. § 501(a) (emphasis added).

I.      Cyrano Has Met the Standard for a Preliminary Injunction To Protect Its Property
        Interests.

The First Circuit emphasizes the likelihood of success on the merits of a claim over the other elements that must be established to obtain a preliminary injunction. Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12, 16 (1st Cir. 1996). This emphasis is particularly relevant in copyright infringement cases because if the copyright holder shows a likelihood of success, then the court will presume that the copyright holder will suffer irreparable harm and that an injunction will serve the public interest. Concrete Machinery Co. v. Classic Lawn Ornaments, Inc., 843 F.2d 600, 611-612 (1st Cir. 1988).

<div align="center">3</div>

Cyrano has demonstrated ownership the copyrights in Test and Impact both by affidavit and by the ruling of the Court of Appeal of Paris. It has demonstrated further that its property interests in those copyrights have been violated by Quotium and will continue to be violated by Quotium unless the requested preliminary injunction issues.

A.    Cyrano Indisputably Owns the Copyrights in Test and Impact

1.    The Court of Appeal of Paris Adopted the Expert's Opinion Regarding Cyrano's Ownership of the Copyrights in Test and Impact

Quotium advances an ultra-selective reading of the ruling of the Court of Appeal of Paris ("Court of Appeal") that affirmed Cyrano's ownership of the software products, Test and Impact to argue that the ruling actually found that Cyrano does not own the copyrights.[1] Such a selective reading not surprisingly is belied by the ruling as a whole as well as the proceedings leading to the ruling, as attested to by the French attorney who represented Cyrano in those proceedings.

By adopting the report and findings of the court-appointed expert, Michel Villard, that Cyrano UK owned the copyrights in Test and Impact, which were then assigned to Cyrano, the judgment of the Court of Appeal affirmed Cyrano's ownership of those copyrights. Affidavit of Olivier Iteanu (hereafter "Iteanu Aff. at __"), attached hereto as Exhibit A, at ¶ 5. The Court of Appeal's adoption of that report, which found that the source code of Test and Impact belonged to Cyrano because Cyrano UK had done the work on Test and Impact, establishes Cyrano's ownership of Test and Impact. Id. Although Quotium argue that the judgment addressed only the rights to possession of the Test and Impact source code, rather than the copyrights in them, the Court of Appeal's order that Test and Impact source code be returned to Cyrano necessarily

---

[1] It is Quotium's attempt to selectively enforce another portion of the judgment of the Court of Appeal of Paris that occasioned this motion, which seeks to give full effect to the judgment. Quotium demanded €175,000 from Cyrano that Quotium claim is due them as a result of that same judgment, Docket No. 24, at Exh. D, while refusing to acknowledge Cyrano's ownership of the copyrights in Test and Impact.

4

meant that the Court had determined that Cyrano UK had created those two products and that Cyrano UK owned the copyrights in them. Id. Thus, as Mr. Villard determined, and the Court of Appeal adopted, Quotium had no privilege to possess or use the source code, but, rather, those rights vested in Cyrano as the assignee of Cyrano UK. Id.

The *dispositif* that Quotium's French attorney (who did not represent them in the proceedings) selectively reads as only giving possession of certain copies of Test and Impact to Cyrano, expressly validated Mr. Villard's report. Iteanu Aff. at ¶ 6. The Court of Appeal "[c]onfirm[ed] the judgment handed down in respect of its validation of the expert appraisement [and] the instruction for the surrender to the company CYRANO Inc. of CYRANO TEST and IMPACT softwares. . . ." Id.

In both France and the United Kingdom, as in other Berne [Copyright] Convention signatory countries,[2] the creator of a product is the initial owner of the copyright. Iteanu Aff. at ¶ 7. Here, Mr. Villard found that Cyrano UK's research and development team, based in Bradford, England, was responsible for designing and developing Test and Impact (with the exception of Impact's Gateway component, which, nonetheless, was subsequently transferred to Cyrano UK in 1998). Id. Mr. Villard also found that the respective assets, research and development teams, and intellectual property rights of Cyrano UK and Cyrano SA never merged. Id. Mr. Villard thus concluded that Cyrano UK owned 100% of Test and Impact at the time that Cyrano UK's assets were transferred to Cyrano under the March 21, 2002 contract of sale. Id.

Moreover, and despite Quotium's absurd and self-serving interpretation of the judgment that adopted Mr. Villard's expert report, Cyrano's ownership rights vested not merely in the copies of Test and Impact contained in the Logibox, but in the copyrights in those two products.

---

[2] The United States is also a signatory to the Berne Convention and thus recognizes the same property rights.

Iteanu Aff. at ¶ 7. This result is consistent with the Tribunal of Commerce of Paris's ("Tribunal of Commerce") framing of the underlying issue as whether "to declare that CYRANO Inc. is the owner of all intellectual property rights in [Test and Impact]," id. at ¶ 8, and the Court of Appeal's confirmation of the Tribunal of Commerce's judgment ". . . handed down in respect of its validation of the expert appraisement." Id. at ¶ 9. Indeed, nothing in the Court of Appeal's judgment of October 21, 2005 indicates that Cyrano's ownership of Test and Impact was restricted to the Logibox copies. Id. at ¶ 11. Such a result would be inconsistent with the *dispositif*, in which the Court of Appeal confirmed that the copies of Test and Impact deposited in Quotium's name in the Logibox must be destroyed before the remainder of the escrowed material was remitted to Quotium. Id. at ¶ 12.

It is inconsequential that the *dispositifs*, while affirming Cyrano's ownership of Test and Impact, did not include the words "copyright" or "intellectual property." Iteanu Aff. at ¶ 10. Under French copyright law, Mr. Villard's expert finding that Cyrano UK created Test and Impact (with the exception of the Gateway component as noted above) is necessarily a finding that Cyrano UK was the sole owner of the copyrights in Test and Impact. Id. Both the Tribunal of Commerce and Court of Appeal adopted that finding, as well as the finding that Cyrano succeeded Cyrano UK as the sole owner of those copyrights. Id. Therefore, the argument of Quotium's affiant, Attorney Deflers, that the dismissal of "all other claims" in the *dispositif* meant that Cyrano's underlying claim of ownership of the copyrights in Test and Impact was dismissed is wholly without merit. Id. at ¶ 11. Rather, the dismissal of "all other claims" obviously is the dismissal of Quotium's claim of ownership to Test and Impact. Id. at ¶ 13.

2.    <u>Quotium's Late Claim to All the Copyrights in OpenSTA Is Preposterous.</u>

While having their French attorney make an inconsistent reading of the judgment of the Court of Appeal, Quotium's American attorneys "go it alone" in postulating that French law would find that Quotium own all the copyrights in OpenSTA as a collective work commissioned by its predecessor in interest. Opp. at 35.[3] The argument is a preposterous re-hashing of Quotium's joint development argument rejected by the French expert, the Tribunal of Commerce and the Court of Appeal. Test and Impact pre-existed OpenSTA, which was a derivative work.

Under French law, rather than being a collective work,[4] OpenSTA is a derivative work based on the preexisting works, Test and Impact.[5] Iteanu Aff. at ¶ 15. Any use of a work that is derived from a preexisting work, under French law, is subject to the rights of the copyright owner of the initial work, who must consent or authorize such use. Id. Additionally, if the copyright owner of the preexisting work initially grants permission to use the work, but later withdraws that consent for the derivative use, any subsequent use of the preexisting work constitutes infringement. Id. Thus, even assuming that Quotium at one time may have enjoyed

---

[3] Quotium produces no testimony for this position other than Cyrano's affiants as discussed below. Their claim, however, contradicts their own Complaint in the Quotium Action. In their Complaint, Quotium did not claim ownership of Test and Impact -- the key components of OpenSTA -- but, rather, acknowledged that Cyrano had submitted a claim of ownership of these two products, which the Court of Appeal determined with finality in Cyrano's favor, as discussed <u>supra</u>. Quotium Action, Docket No. 1, at ¶ 17, attached hereto as Exhibit C for ease of reference. Also, Quotium did not claim ownership of OpenSTA. In fact, Quotium's Complaint acknowledged that it did not own the entirety of OpenSTA, but only those rights that Cyrano SA owned. Id. at ¶ 15 n.1. Indeed, OpenSTA is registered as a trademark of Cyrano. Docket No. 24, Exh. B at ¶ 9. If the Complaint is deemed true by virtue of Cyrano's default, as Quotium claim, then they did not own OpenSTA. Moreover, Quotium's failure to claim ownership when they filed their Complaint then, despite the fact that they claimed to have been granted "all intellectual property rights owned by Cyrano, S.A." in OpenSTA, contradicts their position now.

[4] Even if it were a collective work, Cyrano UK was found to be the owner by authorship of the Test and Impact components. Without an express assignment – and there was none -- Cyrano UK and thus Cyrano continue to own the copyrights in the Test and Impact components. <u>See</u> New York Times Co. v. Tasini, 533 U.S. 483, 121 S. Ct. 2381, 150 L. Ed. 2d 500 (1991)

[5] Test and Impact components comprise approximately two-thirds of OpenSTA. Supplemental Affidavit of Scott Almeda, attached hereto as Exhibit B, (hereafter "Supp. Almeda Aff. at __"), at ¶ 6(b). Moreover, OpenSTA's entire scripting language is based on Test and Impact. Docket No. 24, Exh. B, at ¶ 9.

an implied or an "open source" license to use OpenSTA, which contains Test and Impact code, any such consent from the owner of Test and Impact has been withdrawn, and Quotium's subsequent use or distribution of software incorporating Test or Impact components constitutes infringements of Cyrano's copyrights in Test and Impact. Id. at ¶¶ 15 and 16.

The French expert report considered the testimony of the same Cyrano witnesses that Quotium now cite and rejected Quotium's argument that Quotium and Cyrano jointly owned the rights to Test and Impact because of purported joint development at Cyrano SA. Iteanu Aff. at ¶ 13. Both the Tribunal of Commerce and the Court of Appeal have determined, by validating the expert's report, that Cyrano UK developed and held copyrights independently of Cyrano S.A. Id. at ¶ 14.

The Affidavit of Philippe Eyries, which Quotium have introduced into the record, affirms that Performance Software Limited, later renamed Cyrano UK, "became a wholly-owned but independent subsidiary of IMM," which was later renamed Cyrano SA. Docket No. 30, App. Exh. 11, at ¶ 2. Although these two companies sold "the software products of both companies jointly as a suite" and marketed each other's software, both companies "separately retained their assets and intellectual property rights. Id. at ¶ 4. Consequently, "Cyrano UK retained its copyright ownership to V-Test [later renamed "Cyrano Test" and then "Test"]." Id. Further, each company maintained separate research and development teams and continued to develop their own separate software products. Id. Contrary to Quotium's position, "[t]he assets, research and development teams, and intellectual property rights of Cyrano UK and Cyrano SA were never merged." Id at ¶ 5. Eyries, the Chairman of all three Cyrano entities, attested to the fact that Cyrano SA did not control Cyrano UK. Id. at ¶ 7. Rather, Cyrano UK -- not Cyrano SA -- paid the Cyrano UK staff, including its research and development team. Id. Indeed, Cyrano UK

had its own Board of Directors, separate and apart from Cyrano SA, and kept separate books and financial records. Id.  The French expert accepted the same testimony as did the Tribunal of Commerce and the Court of Appeal.

Quotium argue that because the May 12, 2002 Transfer Agreement with Cyrano S.A. states that "[t]he Assignor hereby sells to the Assignee all intellectual property rights belonging to . . ." Cyrano S.A. in OpenSTA means that all copyrights in OpenSTA were thus transferred to Quotium. That is a reversal of their position as stated two months later in their Complaint in the Quotium Action.  See supra note 3.  As found by the French courts, that Transfer Agreement only transferred those rights that belonged to Cyrano SA, which did not include Test and Impact. Thus, at best, Quotium holds rights in OpenSTA other than the Test and Impact components and the trademark.

Quotium cunningly report that Denis Bitan, who served "as the Managing Director of the Cyrano Companies (i.e., managing director of both Cyrano UK and Cyrano SA and other affiliates)," registered OpenSTA with the Agency for the Protection of Programs in Paris (the "APP"), declaring that it was an original work of Cyrano SA, in an attempt to demonstrate that OpenSTA was an original work of Cyrano SA.  Opp. at 33-34.  However, Bitan subsequently submitted an affidavit declaring that the APP is simply a method of protecting software from copying, and that when he indicated that OpenSTA was an original work of Cyrano SA, he was referring to the group of Cyrano companies and not indicating which of the Cyrano companies owned OpenSTA.  Quotium Action, Docket No. 26, Supp. Bitan Aff. at ¶ 7, attached hereto as Exhibit D for ease of reference.  Indeed, Bitan repeated a declaration he made in an earlier affidavit to clarify that "Cyrano UK developed and owned the majority of OpenSTA with the exception of minor components and some commercial modules and, after its liquidation, [Cyrano

Inc] acquired Cyrano UK's copyright to OpenSTA." Id. at ¶ 8.  This same registration argument had been made to the French expert, the Tribunal of Commerce and the Court of Appeal, all of whom rejected it.  Iteanu Aff. ¶ 13.

B.    Quotium's Continued Distribution of QTest4.0 Infringes Multiple Strands of Cyrano's Copyrights in Test and Impact.

With only a perverted reading of the French court decisions and a re-hashing of rejected arguments of joint development to challenge Cyrano's ownership of the copyrights in Test and Impact, Quotium attempt to avoid liability for their use of Test and Impact by arguing that their post-default products, notably QTest4.0, are "essentially identical" to their pre-default products and therefore shielded by a rule against "claim-splitting."[6]  This argument fails not only because Quotium had announced to the public that QTest4.0 was a "major new release" with new functionality, but because even small modifications using an unlicensed copy of a Test or Impact component constitute distinct and separately actionable infringements of multiple strands of Cyrano's copyrights in Test and Impact:

1.    Quotium infringes Cyrano's exclusive rights to reproduce Test and Impact components by:

(a)    loading Test or Impact source or object code into a computer memory[7] to produce new versions of OpenSTA/QuotiumPRO in source or object code;

---

[6] Quotium disingenuously states that Cyrano did not address this issue, Opp. at 17, while characterizing -- actually re-characterizing -- their QTest4.0 product to rebut Cyrano's position that the claim against QTest4.0 could not have been made pre-default.

[7] "'Source code' refers to an annotated text, written in a programming language intelligible to humans, that represents the set of instructions comprising a particular computer program. 'Object code' refers to the text of the same set of instructions, translated into binary form (a sequence of zeros and ones) intelligible to the computer itself." Data General Corp. v. Grumman Systems Support Corp., 36 F.3d 1147, 1157 n.14 (1st Cir. 1994) (citations omitted). Unlicensed loading into memory is an infringement: "The district court's grant of summary judgment on MAI's claims of copyright infringement reflects its conclusion that a 'copying' for purposes of copyright law occurs when a computer program is transferred from a permanent storage device to a computer's RAM. This conclusion is consistent with its finding, in granting the preliminary injunction, that: "the loading of copyrighted computer software from a storage medium (hard disk, floppy disk, or read only memory) into the memory of a central processing unit ("CPU") causes a copy to be made. In the absence of ownership of the copyright or express permission by license, such acts constitute copyright infringement.' We find that this conclusion is supported by the

      (b)      loading of Test or Impact components into memory to test new versions of OpenSTA/QuotiumPRO;

      (c)      reproducing Test or Impact source or object code as components of new versions of OpenSTA/QuotiumPRO for archival purposes; and

      (d)      reproducing Test or Impact object code as components of new versions of OpenSTA/QuotiumPRO for distribution to customers;

2.      Quotium infringes Cyrano's exclusive rights to prepare derivative works from Test and Impact by using Test and Impact components, either in source or object form to produce new versions of OpenSTA/QuotiumPRO in source or object; and

3.      Quotium infringes Cyrano's exclusive rights to distribute Test and Impact components by distributing object code of new versions of OpenSTA/QuotiumPRO that incorporate components of Test or Impact.

That each of these infringements are distinct and separately actionable is clear from the language of the Copyright Act, which underwent a revision in 1976 eliminating the former indivisibility of rights in favor of a "bundle of rights."[8]  Remedies also reflect the divisibility of rights:

(a) Anyone who violates *any* of the exclusive rights of the copyright owner . . . is an infringer of the copyright. . . .

(b) The legal or beneficial owner of an exclusive right under a copyright is entitled . . . to institute an action for any infringement of that particular right committed while he or she is the owner of it. . . .

17 U.S.C. § 501 (emphasis added).  Thus each exclusive right is a copyright.

(a) Any court having jurisdiction of a civil action under this title may . . . grant temporary and final injunctions on such terms as it may deem reasonable to prevent or restrain infringement of a copyright.

---

record and by the law." <u>MAI Systems Corp. v. PEAK Computer, Inc.</u>, 991 F.2d 511, 518 (9th Cir. 1993), cert. dismissed, 510 U.S. 1033, 114 S. Ct. 671, 126 L. Ed. 2d 640 (1994).

[8] <u>See</u> <u>New York Times Co. v. Tasini</u>, 533 U.S. 483, 495-96, 121 S. Ct. 2381, 2388-89, 150 L. Ed. 2d 500, 513 (1991) ("The 1976 Act rejected the doctrine of indivisibility, recasting the copyright as a bundle of discrete 'exclusive rights,' 17 U.S.C. § 106 (1994 ed. and Supp. V), each of which 'may be transferred . . . and owned separately,' § 201(d)(2).").

17 U.S.C. § 502. Injunctions are thus authorized for addressing each exclusive right, as are

actual damages:

> (b) . . . The copyright owner is entitled to recover the actual damages suffered by him or her as a result of the infringement, and any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages. . . .

17 U.S.C. § 504. Contrast the different rule for statutory damages:

> (c) (1) . . . the copyright owner may elect . . . to recover, instead of actual damages and profits, an award of statutory damages for *all* infringements *involved in the action.* . . .

17 U.S.C. § 504 (emphasis added). Because Quotium's post-default infringements did not occur

by definition until after default, claims for those infringements could not have been made pre-

default, and thus they are not barred by any doctrine against "claim-splitting."[9]

This result is all the more appropriate here where Quotium announced to the public post-

default in July 2005, they represented to the public that the QTest4.0 product was a "major new

release of its flagship product QuotiumPRO." Docket No. 24, Exh. B, Attach. 4. In the software

publishing business, a "new release" means at least a new version of the software, as there are

often internal versions that are not released to the public, and a "major new release" signifies that

there is more than just "bug fixes" or "patches." Supp. Almeda Aff. at ¶ 7. The "major new

release" of QTest4.0 was announced with new functionality. Id. New functionality must be

tested with the prior code, using documentation for the prior code. Id. Thus, the "new release,"

in addition to being a distinct public distribution (infringement type 3 supra) admittedly

---

[9] Note, too, that it is not the particular product that infringes, but the infringer's violation of the copyright holder's exclusive rights by reproduction of, preparation of a derivative work from, or distribution of a product that includes a substantial portion of the copyrighted work. Thus, even if the default judgment ultimately is upheld, that extinguishes the original counterclaim for infringements at the time and possibly those infringements that could have been claimed prior to default, but that does not extinguish Cyrano's property interests recognized internationally under the Berne Convention which may be and have been infringed again by Quotium's post-default actions.

significant from a marketing viewpoint,[10] likely involved a distinct unlicensed use of Test and Impact components to test (infringement type 1(b) supra) the "major new release" with new functionality.

Testimony as to the history of the development of OpenSTA and Quotium's admissions, reviewed in Cyrano's opening memorandum show that OpenSTA is derived from Test and Impact. In the Quotium Action, Quotium admitted that they obtained the source code to Test and Impact; that they obtained copies of the source code of OpenSTA; and that they developed the load testing tool they named QuotiumPRO. See Quotium Action, Docket No. 7, at ¶¶ 25, 26, and 28. Erroneously included among the assets Quotium obtained pursuant to the Transfer Contract after Cyrano SA's liquidation were Test, Impact, and OpenSTA. Docket No. 24, Exh. B at ¶ 21. Quotium obtained access to source code for Test, Impact, and OpenSTA -- although that code belonged to Cyrano -- during negotiations between Cyrano SA's Trustee and Quotium. Id. at ¶¶ 23 and 24. Not coincidentally, Quotium introduced QuotiumPRO into the marketplace within weeks after acquiring the assets of Cyrano SA, which was identical in appearance and functionality to OpenSTA. Supp. Almeda Aff. at ¶ 6(b). Cyrano UK developed OpenSTA from Test and Impact over three years, so Quotium could not have developed such a similar, non-infringing product in that short of a time period without copying the source code of Test and Impact. Docket No. 24, Exh. B at ¶ 28.

A fresh examination of the available documentation from a current object code version of QTest4.0 independently establishes how QTest4.0 derives from Test. Supp. Almeda Aff. at ¶ 6. An examination of QTest4.0, in comparison with Test, reveals that the "core of QTest4.0 is derived from Test and Impact because of the substantial similarity of the visible components and

---

[10] Otherwise, Quotium should have no difficulty accepting a return to the status quo ante of calling the product QuotiumPRO, instead of the "QTest" reference to Test and V-Test (the prior name for Test).

functionality and the access that Quotium had to Test and Impact when they bought the assets of Cyrano S.A."[11] Id. Moreover, OpenSTA, QuotiumPRO, and QTest4.0 have common core components with Test. Id. at ¶ 6(b).

When Cyrano UK created Test, it created a Script Control Language ("SCL"), which became an integral part of Test. Supp. Almeda Aff. at ¶ 6(a). Cyrano owns this SCL as a result of its 2002 purchase of Cyrano UK's assets, and the October 21, 2005 judgment of the Court of Appeal of Paris has determined with finality Cyrano's ownership of that intellectual property. Id. The SCL that is common to OpenSTA, QuotiumPRO, and QTest4.0 requires a script compiler that, for OpenSTA, was taken from Test, which Cyrano UK had developed. Id. at 6(b). Assuming as true Quotium's statement that QTest4.0 and QuotiumPRO are "essentially identical products," then all of the Test and Impact components in OpenSTA -- representing approximately two-thirds of the OpenSTA code -- have been carried over into QTest4.0. Id.

Despite Quotium's significant efforts to conceal the origins of QTest4.0 and its predecessor products, inter alia, by changing file names,[12] Quotium has not altered QTest4.0's documentation, which contains language that is almost completely identical as that contained in Test, but for the addition of Quotium's claim of ownership. Supp. Almeda Aff. at ¶ 6(c). These similarities are demonstrated in several examples, attached as Attachment 1 to Exhibit B, which compare the embedded help files of a distributed (non-source) copy of Quotium's QTest4.0 to

---

[11] Thus, even without the history of the development of OpenSTA from Test and Impact, the change of name of that product to "QuotiumPRO" and Quotium's current claim that QTest4.0 is "essentially identical," copying of Test by Quotium in QTest4.0 is established by inspection of the available documentation. "Plagiarists rarely work in the open and direct proof of actual copying is seldom available. To fill that void, the plaintiff may satisfy his obligation indirectly by adducing evidence that the alleged infringer enjoyed access to the copyrighted work and that a sufficient degree of similarity exists between the copyrighted work and the allegedly infringing work to give rise to an inference of actual copying." Johnson v. Gordon, 409 F.3d 12, 13 (1st Cir. 2005). Here, there is also direct proof of copying from the history of development of OpenSTA.

[12] Such deception further distinguishes this infringement from prior infringements.

the embedded help files from Cyrano's Test. Id. The Test files have not changed since Cyrano UK first introduced Test. Id.

In the case of QTest4.0, which was launched as a "major new release," Cyrano was entitled to bring the present action to protect its exclusive rights to Test and Impact. This Court should not countenance the fact that Quotium have stated one thing to the public and then stated the opposite to the Court. A "new release" of a software product is a new version of that product because internal versions are often not released to the public, and a "major new release" signifies more than mere "bug fixes" or "patches." Supp. Almeda Aff. at ¶ 7. The July 2005 release of QTest4.0, and their publication and distribution of this derivative product, necessarily constituted infringements of Cyrano's copyrights in Test because QTest4.0 was announced with new functionality. Id. New functionality must be tested with the prior code, using the documentation for the prior code. Id. In the case of QTest4.0, therefore, Quotium's use of the SCL, the script compiler, and documentation from Test -- all of which Cyrano UK created, and which Cyrano acquired -- constitute an infringement of Cyrano's copyright. Id.

II.    The Balance of Harms Is Strongly in Favor of Cyrano

Contrary to Quotium's claims, loss of the ability to market QTest4.0 would not severely damage them. Assuming arguendo the truth of Quotium's claims that (1) QTest4.0 accounts for the majority of its sales revenues and "stands as the 'centerpiece' of Quotium's marketing strategy," Opp. at 26, and (2) QTest4.0 is "essentially identical" to QuotiumPRO, Opp. at 1, Quotium need not be harmed at all if this Court were to enjoin them from distributing QTest4.0. "Any court having jurisdiction of a civil action under this title may . . . grant temporary and final injunctions on such terms as it may deem reasonable to prevent or restrain infringement of a copyright." 17 U.S.C. § 502. If Quotium were forced, by the terms of an injunction that would

restrain them from further distribution of QTest4.0, to distribute -- under the changed name -- a version of QuotiumPRO that pre-dates the default in the action before Judge Tauro, then they would not be harmed. If Quotium suffered any harm as a result of being forced to distribute an earlier version, it could not equal the harm that Cyrano experiences as the party whose copyrights have been infringed.

III.    Recent Developments Necessitated Cyrano's Motion for a Preliminary Injunction

Quotium expressly stated that they would seek to selectively enforce the Court of Appeal's October 21, 2005 judgment. Supp. Almeda Aff. at ¶ 9. Therefore, Cyrano filed its motion for preliminary injunction to protect its rights amid the threat of a new Quotium action to partially enforce that judgment. Id. Quotium now argue that Cyrano's position with regard to the present motion is somehow weakened because it did not move earlier, but Cyrano had been engaged in good faith negotiations with Quotium that abruptly would have terminated once such a motion was filed. Id. Although the parties did not execute a standstill agreement, Cyrano, for its part, restrained itself during a good faith effort for a global settlement. In any event, those negotiations were cut short abruptly when Judge Tauro denied a joint motion to continue the damages hearing. Id. Consequently, the damages hearing consumed Cyrano's efforts and available resources. Id. After the damages hearing concluded, it was Quotium who struck the next blow, demanding to partially enforce a money judgment without recognizing the full import of that judgment on the litigation. Id. Despite Quotium's attempts to disregard these events and their impact on the present action, they have substantially altered Cyrano's posture.

Quotium's recent claim that they changed the name of QuotiumPRO to QTest4.0 for "marketing reasons," further demonstrates Cyrano's present need for injunctive relief prior to trial. Supp. Almeda Aff. at ¶ 10. Although they had announced QTest4.0 as a "major new

16

release," their most recent claim, along with their incomplete change of file names, betray an intent to commingle Cyrano's intellectual property in Test and Impact into new releases of OpenSTA. Id. Any further commingling of this intellectual property threatens Cyrano's ability to demonstrate infringement. Id. Anticipating the possible need for the relief Cyrano now requests, Cyrano's counsel expressly indicated to this Court at the time it stayed the present action that Cyrano might bring a motion to enforce the judgment of the Court of Appeal "against current products." Docket No. 19, at 19:11-15. This Court did not preclude such a motion, but, rather, kept that possibility open. Id. at 22:2-5.

    Finally, to the extent that Cyrano has not responded specifically to anything raised in Quotium's Opposition, it is not intended to be conceded or undisputed.[13]

## CONCLUSION

    For the foregoing reasons, this Court should grant Cyrano's Motion for Preliminary Injunction and enjoin Quotium from infringing Cyrano's copyrights in Test and Impact, as well as from further selling, marketing, and/or distributing the works derivative of these products, namely, QuotiumPro and QTest4.0, as set forth more fully in the Proposed Order attached to the motion.

---

[13] For example, Quotium spends many pages giving a skewed view of Cyrano's allegedly willful abandonment of the Quotium Action. With an order to compel discovery outstanding against Quotium and having won in the French courts, Cyrano had no reason to abandon the case except for the real reason -- it had no resources. See Supp. Almeda Aff. at ¶ 8. That the activity in the dispute between the parties had shifted to France in the late 2003 time frame is shown by the November 26, 2003 letter of Quotium's American counsel for presentation in another French proceeding in which Quotium attempted to extinguish the exclusive rights of Cyrano to distribute Cyrano SA products. See Exhibit E attached hereto. In that letter, it is represented that "[a] timely appellate court ruling in the French action would likely resolve the issues in the U.S. action of whether Cyrano, Inc.'s post-Liquidation sale and marketing of Workbench and Production constitute copyright infringement." As stated in the Complaint before this Court, despite Quotium's representation in that letter, when the decision was held against them, they both failed to advise Judge Tauro of the disposition and later misrepresented that it was addressed "to a narrow legal issue not dispositive of the legal issues in this case." Docket No. 1, at ¶ 33.

Respectfully submitted,

Plaintiff,
**CYRANO, INC.,**
By its attorneys,

/s/ Stephen Y. Chow_____
Stephen Y. Chow, BBO #082990
Michael K. Sugrue, BBO #655878
BURNS & LEVINSON LLP
125 Summer Street
Boston, Massachusetts 02110
(617) 345-3000

Dated:  August 4, 2006

## CERTIFICATE OF SERVICE

I, Michael K. Sugrue, hereby certify that a true copy of the foregoing Memorandum in Reply to Quotium's Opposition to Plaintiff's Motion for Preliminary Injunction was served upon the following counsel by regular mail on this the 4th day of August, 2006:

Kevin J. O'Connor, Esq.
Mayeti Gametchu, Esq.
John R. Pagliaro, Esq.
Paragon Law Group LLP
184 High Street
Boston, MA 02110

/s/ Michael K. Sugrue_____
Michael K. Sugrue

J:\Docs\82165\00004\01041252.DOC

18

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| CYRANO, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| QUOTIUM TECHNOLOGIES, INC., | ) |
| QUOTIUM TECHNOLOGIES, S.A., and | ) |
| TECHNOLOGIES, S.A., | ) |
| | ) |
| Defendants. | ) |

CIVIL ACTION NO. 05-CV-11558-DPW

## AFFIDAVIT OF OLIVIER ITEANU

I, Olivier Iteanu, declare and state as follows:

1.    My name is Olivier Iteanu. I am a citizen of the Republic of France and an attorney in France having graduated from the University of Paris II (Assas) with a degree in Law. I have been a member of the Bar of Paris since December 1988. As a member of the Paris Bar, I am admitted to practice French law before the Courts of the Republic of France and all member countries of the European Union. I represent national and international clients in intellectual property disputes and counsel clients throughout the world on various issues involving intellectual property law, the internet, and telecommunications.

2.    In addition to practicing law, I currently hold, or have held, the following positions: Professor (Chargé d'enseignement) at the University of Paris XI in computer and software Law, responsible of the training of the members of the Bar of Paris in the same matter, Chairman of the French Chapter of the Internet Society (ISOC-FRANCE) from June 2000 until February 2003; Chairman of the European Co-ordination of the Chapters of the Internet Society from June

1

2000 until June 2001; Expert at the domain name administrative panel of the World Intellectual

Property Organization; Arbitrator of the National Arbitration Forum (USA) since 1998. I have

also been nominated to serve on several committees including the At Large Study Committee by

the board of the Internet Corporation for Assigned Names And Numbers (ICANN), the

worldwide regulator for domain names and internet addresses, the Internet Protocol Version 6

(IPV6) Task Force, and the selecting committee of the Internet Review Panel of ICANN.

3.      I have authored numerous articles, books, and treatises on issues involving intellectual

property law and the internet. Each year since 1995, I have published more than 30 contributions

in professional magazines such as "Informatiques Magazine", "Computer Reseller News",

"Telecom Business Life." I am an approved Representative and Adviser of Agence pour la

Protection des Programmes, translated in English as the Agency for Program Protection (the

"APP") since 1989 and a member of the Editorial Committee of "Expertises des systèmes

d'informations", the sole monthly magazine treating Information Technology and Law in France.

I also teach courses on Information Technology at the French School for Bar of Paris (Ecole

Française des Barreaux).

4.      The opinions set forth in this affidavit are based upon my legal expertise, my review of

the Declaration of Elisabeth Deflers filed in this case ("Deflers Decl."), and my familiarity as

counsel for Cyrano, Inc. in its litigation with defendants Technologies S.A. and Quotium

Technologies S.A. (referred to here as "Quotium") resulting in a ruling of the Tribunal of

Commerce of Paris of March 16, 2004. and a ruling of the Court of Appeal of Paris of October

21, 2005, English translations of which are attached as Exhibits B and D, respectively to the

Deflers Declaration. I note that Attorney Deflers was not involved in that litigation which

involved extensive investigation and findings by the expert appointed by the Tribunal (or Court)

2

of Commerce, Mr. Michel Villard (filed Nov. 4, 2003, Exhibit 1 hereto, true English translation

attached as Exhibit 2 hereto) that were expressly affirmed by both the Tribunal of Commerce and

by the Court of Appeal.

5.      Contrary to the argument of Attorney Deflers, the Court of Appeal ruling established

Cyrano, Inc.'s ownership of the copyrights in the computer programs Test and Impact – which

was the subject matter of the proceeding. The courts' ordering of the return of the Test and

Impact source code to Cyrano, Inc. necessarily reflected the determination by the courts that Test

and Impact were created by, and the copyrights in them owned by Cyrano (UK) Ltd, the assignor

to Cyrano, Inc. – as found by the expert, Mr. Villard.

6.      The *dispositif* distinguished by Attorney Deflers expressly validated that expert's report.

The Tribunal of Commerce expressly ruled: "The expert's report filed on November 4, 2003 is

valid." (Deflers Decl. Ex. B at "Page 15".) The Court of Appeal expressly: "Confirms the

judgment handed down in respect of its validation of the expert appraisement [and] the

instruction for the surrender to the company CYRANO Inc. of CYRANO TEST and IMPACT

softwares . . . ." (Deflers Decl. Ex. D at 9.)

7.      The expert, after receiving and reviewing documentation from the parties and conducting

interviews framed the issue: "The question is, who then actually created the disputed software?"

(Exhibit 2 at "Page 21 of 32".) In France, as in other Berne [Copyright] Convention signatory

countries, such as the United Kingdom, the creator is the initial owner of the copyright. After

examining the written depositions of both parties, Mr. Villard found:

> The Research and Development centre of CYRANO UK Ltd, based in Bradford,
> England, was responsible for designing and developing
>
> -   the "CYRANO Test" application,
>
> -   the "CYRANO Impact" application, with the exception of a software module known
>     as the "Gateway" which was developed by CYRANO SA in Paris

3

> The respective assets, R&D teams and intellectual property rights of CYRANO UK and CYRANO SA were never merged.
>
> . . . .
>
> [Documentation of a transaction showed] that ownership of the Gateway module was transferred to CYRANO UK on June 30, 1998.
>
> CYRANO UK therefore owned 100% of the "CYRANO Test" and "CYRANO Impact" software applications at the time when its assets were transferred to CYRANO INC under the contract of sale dated March 21, 2002.

(Exhibit 2 at "Page 24 of 32".) The referenced ownership clearly was not the particular copies of the applications that were sequestered, but of the copyrights in the Test and Impact computer programs.

8.      The March 26, 2004, ruling of the Tribunal of Commerce of Paris expressly noted that Cyrano, Inc. requested the Tribunal "to declare that CYRANO Inc. is the owner of all intellectual property rights in [CYRANO TEST and IMPACT Software]" (Deflers Decl. Ex. B at "Page 2"), relying on the expert's conclusion, "'CYRANO UK owned 100% of the CYRANO TEST and CYRANO IMPACT software applications at the time when these assets were transferred to CYRANO INC pursuant to the contract of sale dated March 21, 2002.'" (Deflers Decl. Ex. B at "Page 8"). "With regard to the ownership of the software programs and the extent of the assignment," the Tribunal reasoned:

> Whereas it appears on the basis of the analysis of the expert's report
>
> - that CYRANO owned the "CYRANO TEST" and "CYRANO IMPACT" products in their entirety at the time when these assets were assigned to CYRANO INC in accordance with the assignment document on March 21, 2002",
>
> Therefore, the claim made by CYRANO INC on these software programs seems to be justified, and the said elements are not part of the contents of the transfer of assets that took place on the basis of the assignment document of May 16, 2002 between [the liquidator of Cyrano S.A.] and TECHNOLOGIES ET QUOTIUM TECHNOLOGIES.

4

> Therefore the Court rules that CYRANO INC is justified in its claim and it dismisses the claims made by TECHNOLOGIES ET QUOTIUM TECHNOLOGIES with regard to this matter.

(Deflers Decl. Ex. B at "Page 12" to "Page 13").

9.      The October 21, 2005 ruling of the Court of Appeal of Paris reached the same conclusion

on the reasoning:

> Whereas the expert, on the basis of a highly detailed analysis reached the conclusion that the CYRANO TEST and IMPACT softwares were the property of the company CYRANO UK; . . .
>
> . . . .
>
> Whereas the evidence presented at these proceedings indicates that the design and development of the CYRANO TEST and IMPACT products (excepting the "GATEWAY" component in the case of the latter) were undertaken by the research and development centre of the company CYRANO UK, located in Bradford (United Kingdom); whereas ownership of the GATEWAY component was transferred to the latter on 30th June 1998; whereas no proof exists that the said company was not in full ownership of these two softwares at the time of their assignment to the company CYRANO Inc. on 21st March 2002;
>
> Whereas under these conditions, the applications filed by the companies TECHNOLOGIES and QUOTIUM TECHNOLOGIES concerning these softwares cannot be accepted and, in consequence, the judgement handed down should be confirmed in respect of provisions relating to the surrender of said softwares to the company CYRANO, Inc;

(Deflers Decl. Ex. D at  7), "[t]he Court: Confirms the judgment handed down in respect of its

validation of the expert appraisement" (Deflers Decl. Ex. D at 9) – which was the creation and

therefore the ownership of Test and Impact.

10.     Although the *dispositif*, in explicitly affirming Cyrano Inc.'s ownership of Test and

Impact, did not explicitly include the words, "copyright" or "intellectual property", that inclusion

is obvious in the context of the litigation as well as the *dispositif* and reasons.  As a matter of

French copyright law, the expert's finding of Cyrano UK as the creator of Test and Impact

subject only to the claim of Cyrano S.A. for the Gateway module, which was transferred to

Cyrano Inc., necessarily was a finding that Cyrano UK was the sole owner of the copyrights in Test and Impact. That finding and the finding that Cyrano, Inc. succeeded Cyrano UK as the sole owner of the copyrights in Test and Impact were adopted by both the Tribunal of Commerce and the Court of Appeal.

11.    Attorney Deflers's argument that by dismissing "all other claims", the Court of Appeal dismissed Cyrano, Inc.'s underlying claim of ownership of the copyrights in Test and Impact is spurious because it is contrary to the reasoning adopted by the expert and both courts that creation of Test and Impact entitled Cyrano UK and thus Cyrano, Inc. to those products to the exclusion of Cyrano S.A. and thus Quotium. There is no suggestion in any part of the October 21, 2005 ruling of the Court of Appeal that Cyrano, Inc.'s ownership of the Test and Impact products was restricted to the sequestered copies; we would have appealed the ruling if it had.

12.    This is absolutely incompatible with the fact that, in the *dispositif*, the Court confirmed that all specimens of the software TEST and IMPACT deposited in the name of Quotium which are present in the escrowed material shall be destroyed before the rest of the escrowed material is remitted to Quotium.

13.    Also, the dismissal of "other claims" in the *dispositif* clearly and consistently is the dismissal of *Quotium 's* claim of ownership to Test and Impact based on Quotium's arguments expressly considered by the Court of Appeal, namely:

> that there are sound grounds for the assumption that "the softwares of Performance (specifically TEST), up to the time of its acquisition in 1996 were, in accordance with customary practice, developed by software development in both the UK and France";

> that, in 1997 the CYRANO TEST and IMPACT softwares were one-third owned by the company CYRANO and two-thirds owned by the company CYRANO UK, with subsequent adjustment of these percentage holdings in favour of the former, in consideration of work undertaken by their development teams, in consequence whereof the company CYRANO UK had been required to pay royalties;

6

that joint ownership of rights by [Quotium] and the company CYRANO Inc. should therefore be acknowledged;

that the former administrator and director of the companies CYRANO and CYRANO UK elected to deposit softwares with the agency for the protection of programs in the name of the company CYRANO and not in the name of the company CYRANO UK;

that the claims of the company CYRANO Inc. regarding the ownership of the TEST software have been dismissed "before the US court".

(Deflers Decl. Ex. D at 6-7.)   In face of the rejection of these arguments by the expert, the Tribunal of Commerce and the Court of Appeal, Quotium did not appeal. Yet Quotium raise essentially the same arguments to support their claim that they may distribute without license from Cyrano, Inc. the software products QuotiumPro and QTest 4.0 that Quotium admit incorporate portions of Test and Impact by way of development through the OpenSTA product.

14.    Contrary to the argument made by Quotium's American attorneys that OpenSTA was a "collective work" commissioned by Cyrano S.A. under French law – a position on which Attorney Deflers was silent -- it has been determined by the French courts in validating the expert's report that Cyrano UK developed and held copyrights independently of Cyrano S.A. and that the copyrights in Test and Impact now belong to Cyrano, Inc.

15.    In my opinion, under French copyright law, OpenSTA was not a collective work, but a derivative work based on the preexisting works, Test and Impact. Under French law, any use of a work derived from a pre-existing work is subject to the rights of the copyright owner of the initial work (Article L. 113-2 § 2 of the French Intellectual Property Code), who must consent or authorize such use (Article L. 113-4 of the French Intellectual Property Code). If the copyright owner of the pre-existing work initially grants permission to use his work – for example by any prior implied or "open source" license of OpenSTA -- but later withdraws his consent for the derivative use, any subsequent use of the pre-existing work constitutes infringement.

7

16.    In summary, it is indisputable that the French courts have ruled that Cyrano, Inc. owns

the entire intellectual property of Test and Impact. Quotium's distribution of any software that

incorporates components of either Test or Impact without current permission from Cyrano, Inc.

constitutes an infringement of Cyrano, Inc.'s copyrights.

I declare under the penalty of perjury under the laws of the United States of America that
the foregoing is true and correct. Signed this 3rd day of August 2006 at Paris, France.



Olivier Iteanu

8

Michel VILLARD
Consultant en Systemes d'Information
Ancien eleve de l'Ecole Polytechnique
Expert près la Cour d'appel et la Cour administrative d'appel de Paris, en informatique



# RAPPORT D'EXPERTISE

## TRIBUNAL DE COMMERCE DE PARIS

**Jugement prononcé le 4 AVRIL 2003**

**15ᵉᵐᵉ CHAMBRE**

**Présidence assurée par Monsieur SEVRAY**

**Monsieur LUCQUIN, Juge rapporteur**

**Madame CHARLIER-BONATTI, Juge**

**Monsieur PERRAUD, Juge**

**Monsieur LASSALLE, Juge**

assistés de
**Monsieur DURAFOUR, Greffier**

N° R G   2002050224 (17/07/2002)

34, rue Jules Ferry - 94100 SAINT-MAUR          Tel   01 43 97 15 03 ou 06 72 93 85 92
michel villard@m4x org

Dans un litige entre

## DEMANDERESSE

### SOCIETE CYRANO INC
dont le siège social se trouve 26 Parker Street, NEWBURY PORT (MASSACHUSSETS)
70950 – 4010 ETATS-UNIS,
représentee par ITEANU & Associés, 106, rue du Faubourg Saint Honoré – 75008 PARIS,
TOQUE D1380

## DEFENDERESSES

### SOCIETE TECHNOLOGIES SA
dont le siège social se trouve 84/88 bd Mission Marchand – 92400 COURBEVOIE,
représentée par WERNERT & ASSOCIES, 45 av Victor Hugo – 75008 PARIS,
TOQUE P0373

### SCP BROUARD-DAUDE
dont le siège social se trouve 34, rue Sainte-Anne – 75001 PARIS,
es-qualité de mandataire liquidateur de la société CYRANO SA,
et
### Maître Denis FACQUES
demeurant 22, avenue Victoria – 75001 PARIS,
es-qualite de séquestre,
représentés par Maître Marc DUJARDIN, 91, rue du Faubourg Saint Honoré – 75008 PARIS
TOQUE P22

## INTERVENANTS VOLONTAIRES

### SOCIETE QUOTIUM TECHNOLOGIES SA,
dont le siège social se trouve 84/88 bd Mission Marchand – 92400 COURBEVOIE,
et
### SOCIETE TECHNOLOGIES SA
dont le siège social se trouve 84/88 bd Mission Marchand – 92400 COURBEVOIE,

representées par WERNERT & ASSOCIES, 45 av Victor Hugo – 75008 PARIS,
TOQUE P0373

Michel VILLARD
Rapport d'expertise 04/11/2003   Cyrano Inc c/ Technologies SA, SCP Brouard-Daude et Me Facques

## Table des matières

| | | |
|---|---|---|
| 1 | Introduction | 5 |
| | 1 1 Rappel des faits | 5 |
| | 1 2 Rappel de la mission d'expertise | 6 |
| | 1 3 Déroulement de l'expertise | 7 |
| 2 | Reponses aux questions de la mission d'expertise | 8 |
| | 2 1 Cession des actifs de CYRANO UK à CYRANO Inc | 8 |
| | 2 2 Cession des actifs de CYRANO SA à Technologies et Quotium Technologies | 8 |
| | 2 3 Propriété des logiciels revendiqués | 9 |
| | 2 4 Réalité et nature des faits litigeux et des dommages allégués | 9 |
| 3 | Contenu des annexes du rapport d'expertise | 10 |
| | 3 1 Annexe I   Documents de suivi d'expertise echangés avec le Tribunal | 10 |
| | 3 2 Annexe II   Convocations aux réunions et notes aux parties | 10 |
| | 3 3 Annexe III   Dires soumis par les parties | 10 |
| | 3 3 1 Dires soumis par CYRANO Inc | 10 |
| | 3 3 2 Dires soumis par Technologies SA et Quotium Technologies SA | 11 |
| | 3 3 3 Dires soumis par SCP Brouard-Daude et Me Facques | 11 |
| | 3 4 Annexe IV   Pièces soumises par les parties | 12 |
| | 3 4 1 Liste des pièces par ordre de numérotation | 13 |
| | 3 4 2 Liste des pièces par ordre chronologique | 15 |
| 4 | Investigations et analyses des faits | 18 |
| | 4 1 Description des produits logiciels CYRANO SA | 18 |
| | 4 2 Description des contenus des logibox | 19 |
| | 4 3 Produits logiciels en litige | 21 |
| | 4 3 1 Liste des produits logiciels en litige | 21 |
| | 4 3 2 Qui a fait acte de création sur les logiciels en litige ? | 21 |
| | 4 3 3 Sur la propriete des produits logiciels en litige | 24 |
| | 4 4 Dommages subis par CYRANO Inc | 25 |
| 5 | Reponses complementaires aux dires | 27 |
| | 5 1 Sur des affirmations gratuites | 27 |
| | 5 2 Sur les quatre attestations des ex-salariés de CYRANO SA | 27 |
| | 5 3 Sur le paiement des royalties | 29 |
| | 5 4 Sur la fusion éventuelle entre IMM et Performance Software | 30 |
| | 5 5 Sur l'organisation du contrôle-qualité des produits | 30 |
| | 5 6 Sur le "Technical White Paper on Open STA" | 30 |

Rapport d'expertise 04/11/2003  Cyrano Inc c/ Technologies SA, SCP Brouard-Daude et Me Facques

Glossaire

| Gateway | Passerelle materielle et/ou logicielle |
|---|---|
| **HTTP** | "HyperText Transmission Protocol"  Protocole de communication Internet entre un client et un serveur Web, basé sur le transfert de fichiers hypertextes |
| Internet | Réseau informatique mondial constitué d'un ensemble de reseaux nationaux, régionaux et prives qui cooperent dans le but d'offrir une interface unique a leurs utilisateurs<br>Anglais  internetwork, pour "Interconnexion (inter) de reseaux (network)" |
| Logiciel (1) | Ensemble des programmes, procédés et règles, et eventuellement de la documentation, relatifs au fonctionnement d'un ensemble de traitement de données<br>Anglais   software |
| Logibox (1)<br>(n féminin) | Enveloppe scellée utilisée dans les depôts aupres de l'APP (Agence pour la Protection des Programmes) , site Web de l'APP   app legalis net/ |
| Open source | Se dit de logiciels qui peuvent être modifiés et redistribués librement, pas forcément gratuits  Nouvelle tendance de l'industrie du logiciel |
| Progiciel (1) | Ensemble complet et documenté de programmes conçu pour être fourni à plusieurs utilisateurs, en vue d'une même application ou d'une même fonction<br>Anglais   package |
| Serveur Web | Programme qui tourne sur un ordinateur (serveur) dans le seul but de répondre à des requêtes de logiciels clients Web (navigateur), exécutées sur le même ordinateur ou sur d'autres ordinateurs |
| SQL | Structured Query Language   Langage normalisé ANSI qui permet de définir des bases de données et d'y accéder |
| VMS | Systeme d'exploitation spécifique aux ordinateurs fabriqués par la Digital Equipment Company (DEC) |
| **WWW**<br>(ou W3) | World Wide Web    Litteralement "Toile d'araignée à l'échelle mondiale"  Initiative dont le but est de retrouver de l'information hypermedia au niveau mondial pour permettre l'accès à une grande quantite de documents |

(1) Définition d'apres le glossaire en ligne  www celog fr/cpi/

Michel PIVARD
Rapport d'expertise 04/11/2003   Cyrano Inc c/ Technologies SA, SCP Brouard-Daude et Me Facques

---

## 1   INTRODUCTION

### 1 1   RAPPEL DES FAITS

| | |
|---|---|
| __/__/1986 | Création de la societe Performance Software Ltd |
| 03/10/1996 | IMM, société de droit français, fait l'acquisition de 100% du capital social de la societe Performance Software Ltd |
| __/02/1997 | IMM est renommée CYRANO SA<br>Performance Software Ltd est renommée CYRANO UK |
| 12/03/1998 | Depôt aupres de l'APP, par Monsieur Denis BITAN, au nom de la societe CYRANO SA, des logibox n°98-11014-00 (ServerPack) et n°98-11015-00 (VTPack) |
| 10/12/1998 | Depôt aupres de l'APP, par Monsieur Denis BITAN, au nom de la société CYRANO SA, du logibox n°98-500030-00 (VT Pack2) |
| 11/06/2003 | Le Tribunal de Commerce de Paris ouvre une procédure de redressement judiciaire à l'egard de la société CYRANO SA |
| 15/10/2001 | Le Tribunal de Commerce de Paris prononce la liquidation judiciaire de la société CYRANO SA et designe la SCP BROUARD DAUDE aux fonctions de liquidateur |
| __/10/2001 | Mise en liquidation de CYRANO UK |
| 10/11/2001 | Maître BROUARD ès-qualité lance un appel d'offre d'acquisition de certains elements corporels et incorporels du fonds de commerce de CYRANO SA |
| 30/11/2001 | La societe TECHNOLOGIES SA presente une offre d'acquisition |
| 11/12/2001 | Monsieur le Juge-Commissaire rend une ordonnance autorisant la cession de l'activité OpenSTA de la société CYRANO SA a la société SOFITRADE |
| 20/12/2001 | La societe TECHNOLOGIES SA, candidat acquéreur évincé, forme opposition à l'ordonnance du 11 décembre 2001 |
| 13/03/2002 | Le Tribunal de Commerce de Paris met à néant l'ordonnance du 11 decembre 2001 et ordonne la vente des actifs en cause à la société TECHNOLOGIES SA, aux conditions de l'offre de celle-ci |
| 21/03/2002 | Cession à CYRANO Inc[1] de certains actifs de CYRANO UK |
| 10/04/2002 | Revendication de propriété formulée par Maître LEGER, avocat de CYRANO Inc, auprès de Maître BROUARD |
| 16/05/2002 | Contrat de cession entre la SCP BROUARD DAUDE et les sociétés TECHNOLOGIES et QUOTIUM TECHNOLOGIES[2] (en cours de formation)<br>Les parties conviennent de constituer Maître Denis FACQUES, Administrateur Judiciaire, en qualité de séquestre des logibox n°98-11014-00, 98-11015-00 et 98-500030-00 |
| 08/07/2002 | CYRANO Inc assigne a bref delai la societe TECHNOLOGIES SA, Maître Denis FACQUES et la SCP BROUARD DAUDE devant le Tribunal de Commerce de Paris |
| 20/09/2002 | Par jugement, le Tribunal renvoie la cause à la requête des parties pour traduction en français des pieces en langue anglaise par traducteur assermente |
| 04/04/2003 | Jugement du Tribunal de Commerce de Paris ordonnant l'expertise |

---

[1] La société CYRANO Inc est une filiale a 100% de SOFITRADE (piece 12)

[2] La société QUOTIUM TECHNOLOGIES est une filiale du groupe TECHNOLOGIES (www.quotium.com/)

Michel VEILARD
Rapport d'expertise 04/11/2003   Cyrano Inc c/ Technologies SA, SCP Brouard-Daudé et Me Facques

## 1 2   RAPPEL DE LA MISSION D'EXPERTISE

Par jugement prononcé le 4 avril 2003, le Tribunal de Commerce de Paris a défini la mission d'expertise en ces termes

- *se faire communiquer par les parties tous les documents et pièces qu'il estimera utile à sa mission,*

- *donner son avis sur la validité de la cession des actifs de la société CYRANO UK à la société CYRANO INC aux termes du contrat du 21 mars 2002 et sur celle de l'attestation du liquidateur britannique de la société CYRANO UK, particulièrement en considération de ce qu'en annexe de ce contrat ne figuraient pas les certificats de propriété des logiciels cédés*

- *donner son avis sur le périmètre des actifs séquestrés aux termes du contrat de cession du 16 mai 2002 des actifs de la société CYRANO SA par Me BROUARD, es-qualité de liquidateur judiciaire de la société CYRANO SA, à la société QUOTIUM TECHNOLOGIES et à la société TECHNOLOGIES, ce, après l'avoir rapproché des logiciels revendiqués par la société CYRANO INC et sur la validité de ce contrat particulièrement en considération de l'ajout en son annexe des certificats de propriété concernant les logibox en cause,*

- *donner son avis, en conséquence, sur la propriété des logiciels revendiqués et généralement sur la réalité et la nature des faits litigieux et des dommages allégués,*

- *entendre tous sachants qu'il estimera utiles,*

- *mener contradictoirement ses opérations d'expertise et, dans la mesure où il l'estimerait nécessaire, faire connaître aux parties son avis, oralement ou par écrit, en vue de recueillir leurs dernières observations avant le dépôt de son rapport*

Rappel de l'article 238 du NCPC

*"Le technicien doit donner son avis sur les points pour l'examen desquels il a été commis*
*Il ne peut répondre à d'autres questions, sauf accord écrit des parties*
*Il ne doit jamais porter d'appréciations d'ordre juridique "*

Michel VILLARD
Rapport d'expertise 04/11/2003  Cyrano Inc c/ Technologies SA, SCP Brouard-Daudé et Me Facques

---

1.3   DEROULEMENT DE L'EXPERTISE

Le jugement du 4 avril 2003 avait fixé un délai de trois mois a compter de la consignation pour le dépôt du rapport au greffe  Comme la provision a ete consignee le 30 avril, la date pour le dépôt du rapport ressortait donc le 30 juillet 2003

Par décision en date du 21 juillet, faisant suite à ma demande, le Tribunal a prorogé ce délai au 30 octobre 2003

L'expertise s'est déroulée comme suit

| | |
|---|---|
| 04/04/2003 | Jugement du Tribunal de Commerce de Paris ordonnant l'expertise |
| 30/04/2003 | Consignation de la provision par CYRANO Inc |
| 18/06/2003 | Réunion d'expertise n°1 |
| 24/06/2003 | Note d'information expert n°1 suite à la réunion |
| 25/06/2003 | Relevé des étiquettes des logibox séquestrés chez Maître Denis FACQUES |
| 02/09/2003 | Réunion d'expertise n°2 |
| 12/09/2003 | Note d'information expert n°2suite a la réunion |
| 24/10/2003 | Clôture des communications de pièces ou dires |
| 30/10/2003 | Rapport d'expertise |

---

## 2    REPONSES AUX QUESTIONS DE LA MISSION D'EXPERTISE

### 2 1.    CESSION DES ACTIFS DE CYRANO UK A CYRANO INC

- *donner son avis sur la validité de la cession des actifs de la société CYRANO UK a la société CYRANO INC aux termes du contrat du 21 mars 2002 et sur celle de l'attestation du liquidateur britannique de la société CYRANO UK, particulierement en considération de ce qu'en annexe de ce contrat ne figuraient pas les certificats de propriété des logiciels cédes,*

Le contrat du 21 mars 2002 precise que la vente des actifs désignes par "les logiciels" comprend les produits logiciels connus sous le nom de "Cyrano Impact" et "Cyrano Test"

La lecture du contrat, dont l'appendice A intitulée "Specification des produits a livrer" ne comporte pas les dites specifications, ne permet pas de se prononcer sur la propriete des logiciels cedes

L'attestation du liquidateur britannique est une appreciation d'ordre juridique

### 2 2.    CESSION DES ACTIFS DE CYRANO SA A TECHNOLOGIES ET QUOTIUM TECHNOLOGIES

- *donner son avis sur le périmètre des actifs séquestrés aux termes du contrat de cession du 16 mai 2002 des actifs de la société CYRANO SA par Me BROUARD, es-qualite de liquidateur judiciaire de la societe CYRANO SA, à la société QUOTIUM TECHNOLOGIES et à la société TECHNOLOGIES, ce, après l'avoir rapproché des logiciels revendiqués par la société CYRANO INC et sur la validité de ce contrat particulièrement en considération de l'ajout en son annexe des certificats de propriete concernant les logibox en cause,*

Aux termes du contrat de cession des actifs de la société CYRANO SA, le 16 mai 2002, les logibox suivantes ont eté mises sous sequestre chez Maître Denis FACQUES

- Logibox n°98-11014-00 depose à l'APP le 12/03/98
- Logibox n°98-11015-00 déposé a l'APP le 12/03/98
- Logibox n°98-500030-00 déposé à l'APP le 10/12/98

Les debats ont permis une comparaison de leur contenu avec les produits logiciels "Cyrano Impact" et "Cyrano Test"

Mes analyses et investigations sont décrites aux chapitres suivants

- Description des produits logiciels CYRANO SA (§ 4 1)
- Description des contenus des logibox (§ 4 2)
- Liste des produits logiciels en litige (§ 4 3 1)

En ce qui concerne le produit "Cyrano Test", aussi bien l'appel d'offres de Me BROUARD, es-qualite *(piece n°1, page 2)* que l'acte de cession en date du 16 mai 2002 *(pièce n°10,§1 1 2 1 page 7)* mentionnent

*" les sources du produit "TEST" appartiennent a CYRANO UK Ltd "*

Il en ressort clairement que le produit "Cyrano Test" n'etait pas compris dans le perimètre de cession

## 2.3.   PROPRIETE DES LOGICIELS REVENDIQUES

- *donner son avis, en conséquence, sur la propriété des logiciels revendiques*

Les conclusions auxquelles mon raisonnement m'a conduit sont les suivantes

Le centre de Recherche & Developpement de CYRANO UK Ltd, base à Bradford en Angleterre, a réalisé la conception et le developpement

- du produit "Cyrano Test"

- du produit "Cyrano Impact", à l'exception d'un composant logiciel désigne "Gateway" qui a été développé par CYRANO SA à Paris

Les actifs, les équipes R&D et les droits de propriete intellectuelle de CYRANO UK et CYRANO SA n'ont jamais ete fusionnés

La propriété du module Gateway a ete transférée à CYRANO UK le 30 juin 1998

La société CYRANO UK possédait donc 100% des produits logiciels "Cyrano Test" et "Cyrano Impact" lorsque ses actifs ont été cédés à la société CYRANO Inc  aux termes de l'acte de cession du 21 mars 2002

Mes analyses et investigations sont decrites aux chapitres suivants

- Qui a fait acte de création sur les logiciels en litige ? (§ 4 3 2)

- Sur la propriete des produits logiciels en litige (§ 4 3 3)

- Réponses complementaires aux dires (§ 5)

## 2.4   REALITE ET NATURE DES FAITS LITIGIEUX ET DES DOMMAGES ALLEGUES

- *(donner son avis, en consequence, sur  ) et genéralement sur la realite et la nature des faits litigieux et des dommages allégués,*

Les procédures engagees par TECHNOLOGIES SA et QUOTIUM TECHNOLOGIES ont entraîné des coûts pour CYRANO Inc

Il est vraisemblable que des interventions de la part de TECHNOLOGIES SA et QUOTIUM TECHNOLOGIES aupres du marché, ainsi que la connaissance du litige par les clients, aient entraîne un manque à gagner pour CYRANO Inc

- Non-renouvellement de contrats de maintenance

- Baisse des ventes de licences et de services

En l'absence de pièces, je ne peux pas me prononcer avec certitude sur la réalité du manque a gagner  A charge de CYRANO Inc  d'en apporter la preuve (voir (§ 4 4 Dommages subis par CYRANO Inc )

Je laisse a l'appréciation souveraine du Tribunal le fait de juger le préjudice

Michel VILLARD
Rapport d'expertise 04/11/2003 Cyrano Inc c/ Technologies SA, SCP Brouard-Daudé et Me Facques

3.      CONTENU DES ANNEXES DU RAPPORT D'EXPERTISE

3 1     ANNEXE I  DOCUMENTS DE SUIVI D'EXPERTISE ECHANGES AVEC LE TRIBUNAL

-   Jugement prononce le 4 avril 2003 (9 pages)

-   Avis de la décision de nomination d'expert, date 7 avril et reçu le 25 avril 2003 (2 pages)

-   Acceptation de la mission par l'expert, datée 30 avril 2003 (1 page)

-   Demande de prolongation de délai au 30 octobre 2003, datée 7 juillet 2003 (1 page)

-   Décision de prorogation de délai au 30 octobre 2003, datée 21 juillet 2003 (1 page)

3 2.    ANNEXE II · CONVOCATIONS AUX REUNIONS ET NOTES AUX PARTIES

-   Convocation du 23 mai 2003 à la réunion d'expertise n°1 (4 pages)

-   Feuille de présence aux 2 reunions d'expertise des 18 juin et 1er septembre 2003 (1 page)

-   Note d'information aux parties n° 1 du 24 juin 2003 (5 pages)

-   Note d'information aux parties n° 2 du 12 septembre 2003 (6 pages)

-   2 e-mails de l'expert, dates 8 et 15 octobre 2003, en réponse au courriel de Me Dalat, conseil de TECHNOLOGIES SA et QUOTIUM TECHNOLOGIES, du 7 octobre 2003 (2 pages)

-   E-mail de l'expert du 21 octobre 2003, en reponse au dire n°3 de TECHNOLOGIES SA et QUOTIUM TECHNOLOGIES du 17 octobre 2003 (2 pages)

3.3     ANNEXE III : DIRES SOUMIS PAR LES PARTIES

3.3.1   Dires soumis par CYRANO Inc

-   Lettre du 12 mai 2003 (2 pages) accompagnant l'envoi du dossier de plaidoirie, avec 19 pièces numerotées de 1 à 19 suivant bordereau du 13 mai 2003

-   Dire n°1, par courriel, du 12 juin 2003 (1 page), avec 2 documents joints

    o   Liste des logiciels dont la propriété revient à CYRANO Inc (4 pages)

    o   Lettre d'invitation à l'APP du 12 juin 2003 (2 pages)

-   Dire n°2 du 25 juin 2003 (2 pages), avec 10 pièces numérotees de 20 à 29 suivant bordereau du 25 juin 2003

-   Dire n°3 du 17 juillet 2003 (5 pages), avec 8 annexes, dont les annexes 4 à 8 constituent 5 nouvelles pieces numérotées de 30 à 34

-   Dire n°4 du 2 octobre 2003 (11 pages), avec annexes 1 à 10 constituant 10 pieces numérotées 35 a 44

-   Dire n°4 bis du 2 octobre 2003 (5 pages) – Dire sur questions hors sujet

-   Dire n°5, par courriel, du 23 octobre 2003 (3 pages), avec 3 pièces numérotées 45 à 47

    o   Attestation de Madame Noelle Beaudin (4 pages)

    o   Attestation supplémentaire de Monsieur Geoffrey Hall (7 pages)

    o   Attestation de Monsieur Lee-Daniel Sutcliffe (4 pages)

Michel VILLARD

Rapport d'expertise 04/11/2003   Cyrano Inc c/ Technologies SA, SCP Brouard-Daudé et Me Facques

Les pièces n° 1 à 29, qui ont été communiquées suivant bordereaux, sont classées dans l'Annexe IV. Pièces soumises par les parties

Les pièces n° 30 à 47, qui ont été communiquées en annexe à des dires, sont classées dans l'Annexe III. Dires soumis par les parties

### 3.3.2.  Dires soumis par Technologies SA et Quotium Technologies SA

Lettres et dires communiqués par TECHNOLOGIES SA et QUOTIUM TECHNOLOGIES

- Lettre du 21 mai 2003 (1 page) accompagnant l'envoi du dossier de plaidoirie, dont 5 pièces[3] numérotées T01 à T05
- Lettre du 25 juin 2003 (1 page)
- Dire n°1 du 23 juillet 2003 (13 pages)
- Dire n°2 du 19 septembre 2003 (6 pages) avec 6 pièces annexées, numérotées T06 à T11
- Dire n°3 du 17 octobre 2003 (3 pages) avec une pièce jointe de 7 pages, numérotée T12
- "Réponse à la demande d'informations suite au dire n°3", en date du 22 octobre 2003, avec 3 pièces annexées qui sont numérotées T13 à T15

Les pièces n° T01 à T05, qui ont été communiquées avec le dossier de plaidoirie, sont classées dans l'Annexe IV. Pièces soumises par les parties

Les pièces n° T06 à T15, qui ont été communiquées en annexe à des dires, sont classées dans l'Annexe III. Dires soumis par les parties

### 3.3.3.  Dires soumis par SCP Brouard-Daudé et Me Facques

Lettres et dires communiqués par SCP BROUARD-DAUDE et Maître FACQUES

- Lettre du 27 mai 2003 accompagnant l'envoi du dossier de plaidoirie, dont 4 pièces[4] numérotées B04, B05, B08 et B13
- Lettre du 7 octobre 2003 (4 pages) avec copie de la lettre à Me Facques du 7 octobre 2003
- Lettre du 15 octobre 2003 (1 page) avec copie de la lettre de Me Facques du 13 octobre 2003

Les pièces n° B04, B05, B08 et B13, qui ont été communiquées avec le dossier de plaidoirie, sont classées dans l'Annexe IV. Pièces soumises par les parties

---

[3] Il n'a pas été tenu compte des pièces déjà comptabilisées comme pièces communiquées par CYRANO Inc

[4] Il n'a pas été tenu compte des pièces déjà comptabilisées comme pièces communiquées par CYRANO Inc

3 4.   ANNEXE IV : PIECES SOUMISES PAR LES PARTIES

En résumé, nous avons comptabilise 67 pièces

CYRANO Inc a communiqué 47 pièces

- 19 pieces numérotees 1 à 19 suivant bordereau du 13 mai 2003 joint à la lettre du 12 mai 2003 ,

- 10 pièces numérotées 20 à 29 suivant bordereau du 25 juin 2003 joint au dire n°2 ,

- 5 pieces numerotées 30 a 34 suivant annexe au dire n°3 du 17 juillet 2003 ,

- 10 pièces numérotées 35 à 44 suivant liste des annexes jointe au dire n°4 du 2 octobre 2003

- 3 pièces numerotées 45 à 47, jointes au dire n° 5 du 23 octobre 2003

L'expert a ajouté 1 pièce

- 1 pièce 4a   fax de Maître Brian BANDEY à TECHNOLOGIES, joint à la pièce 4

TECHNOLOGIES SA et QUOTIUM TECHNOLOGIES ont communiqué 15 pièces, en plus des pièces déjà comptabilisees comme pièces communiquées par CYRANO Inc

- 5 pièces numerotées T01 a T05, communiquées avec le dossier de plaidoirie

- 6 pièces numérotées T06 à T11, annexées au dire n°2 du 19 septembre 2003

- 1 pièce numérotée T12, annexée au dire n°3 du 17 octobre 2003

- 3 pièces numérotées T13 à T15, annexées au complement du 22 octobre 2003

SCP BROUARD DAUDE a communiqué des pièces suivant bordereau, dont 4 pièces en plus des pieces déjà comptabilisées comme pièces communiquees par CYRANO Inc

- 4 pieces numérotées B04, B05, B08 et B13

Michel VILLARD
Rapport d'expertise 04/11/2003   Cyrano Inc c/ Technologies SA, SCP Brouard-Daudé et Me Facques

___

3 4.1.  Liste des pièces par ordre de numérotation

| N° | Date | Désignation |
|---|---|---|
| 1 | 12/11/2001 | Appel d'offre de Maître BROUARD du 12 novembre 2001 |
| 2 | 11/12/2001 | Ordonnance de cession partielle du fonds de commerce CYRANO SA en date du 11 décembre 2001 |
| 3 | 13/03/2002 | Jugement Tribunal de Commerce de Paris du 13 mars 2002 |
| 4 | 10/04/2002 | Courrier Maître LEGER à Maître BROUARD du 10 avril 2002 |
| 4a | 03/04/2002 | Fax du Dr Brian Bandey a TECHNOLOGIES SA du 3 avril 2003 |
| 5 | 17/05/2002 | Courrier Cabinet ATK à Maître LEGER du 17 mai 2002 |
| 6 | 24/05/2002 | Courrier Cabinet ATK à Maître LEGER du 24 mai 2002 |
| 7 | 12/06/2002 | Courrier Maître LEGER à Maître FACQUES du 12 juin 2002 |
| 8 | 14/06/2002 | Courrier Maître LEGER a Maître FACQUES du 14 juin 2002 |
| 9 | __/__/2001 | Liste des logiciels en possession de la SCP BROUARD DAUDE |
| 10 | 16/05/2002 | Contrat de cession d'éléments du fonds de commerce par Maître BROUARD à TECHNOLOGIES du 16 mai 2002 |
| 11 | 21/03/2002 | Acte de cession par CYRANO UK a CYRANO Inc des actifs, en date du 21 mars 2002, et sa traduction |
| 12 | 14/06/2002 | Lettre Maître BRACKENBURY du 14 juin 2002 et sa traduction |
| 13 | 12/06/2002 | Lettre Docteur BANDEY du 12 juin 2002 et sa traduction |
| 14 | __/__/1998 | Document de référence CYRANO 1997 / 1998 |
| 15 | __/__/1999 | Document de référence rapport annuel CYRANO 1998 / 1999 |
| 16 | 11/09/1997 | Prospectus préliminaire COB |
| 17 | 30/08/1996 | Délibération du Conseil d'Administration IMAGE MULTI MEDIAS du 30 août 1996 |
| 18 | 03/10/1996 | Pacte d'actionnaires pour la reprise de PERFORMANCE SOFTWARE Ltd ancienne désignation CYRANO UK |
| 19 | 12/09/2002 | Attestation de Monsieur Régis BIZIEN, Commissaire aux comptes de CYRANO |
| 20 | Non daté | Présentation du CYRANO DBPack |
| 21 | Non daté | Présentation du CYRANO ClientPack |
| 22 | Non daté | Listes des Packs CYRANO |
| 23 | Non date | Brochure commerciale CYRANO DBPack |
| 24 | Non date | Présentation du CYRANO ServerPack |
| 25 | Non daté | Brochure commerciale CYRANO ServerPack |
| 26 | Non daté | Brochure commerciale CYRANO VTPack |
| 27 | Non daté | Brochure commerciale CYRANO Millenium Test |
| 28 | Non daté | Brochure commerciale client PACK |
| 29 | Non date | Liste des tarifs des logiciels CYRANO |
| 30 | 09/10/2002 | Dire 3 Annexe 4   Attestation de Monsieur Malcom GREEN |
| 31 | 09/10/2002 | Dire 3 Annexe 5   Attestation de Monsieur Richard CLARKE |
| 32 | 16/06/2003 | Dire 3 Annexe 6   Attestation de Monsieur Martin GREENBANK |
| 33 | 01/04/1997 | Dire 3 Annexe 7   Contrat de Distribution entre CYRANO UK et CYRANO SUISSE en date du 1er avril 1997 |

Rapport d'expertise 04/11/2003   Cyrano Inc c/ Technologies SA, SCP Brouard-Daude et Me Facques

| N° | Date | Designation |
|---|---|---|
| 34 | 30/06/1998 | Dire 3 Annexe 8   Facture de CYRANO UK sur CYRANO SUISSE datee du 30 Juin 1998 |
| 35 | 08/11/2002 | Dire 4 Annexe 1   Attestation de Philippe EYRIES |
| 36 | 21/06/2000 | Dire 4 Annexe 2   Email de Monsieur Phil STEPHENSEN-PAYNE du 21 juin 2000 |
| 37 | 24/09/2003 | Dire 4 Annexe 3   Attestation de Monsieur Denis BITAN |
| 38 | 02/11/2000 | Dire 4 Annexe 4   Email de Madame Noelle BEAUDIN du 2 nov 2000 |
| 39 | 01/11/2000 | Dire 4 Annexe 5   Email de Monsieur Christopher Jones du 1er nov 2000 |
| 40 | 02/10/2003 | Dire 4 Annexe 6   dire 4   Liste des Factures d'honoraires acquittees par CYRANO Inc |
| 41 | 31/07/2002 | Dire 4 Annexe 7   Email de la Société TECHNOLOGIES |
| 42 | 19/09/2003 | Dire 4 Annexe 8   Jugement du Tribunal de Commerce de Paris du 19 Septembre 2003 |
| 43 | 14/09/2003 | Dire 4 Annexe 9   Calcul des dommages consécutifs a la perte des contrats de maintenance |
| 44 | 02/10/2003 | Dire 4 Annexe 10   Calcul déficit 2002 au titre des ventes de licences et services non realises |
| 45 | 11/11/2002 | Annexe 1 dire 5   Attestation de Madame Noelle BEAUDIN |
| 46 | 12/11/2002 | Annexe 2 dire 5   Attestation supplémentaire de Monsieur Geoffrey HALL |
| 47 | 08/11/2002 | Dire 5 Annexe 3   Attestation de Monsieur Lee-Daniel SUTCLIFFE |
| T01 | 08/07/2002 | Assignation CYRANO Inc devant le Tribunal de Commerce de Paris en date du 8 juillet 2002 |
| T02 | 17/07/2002 | Conclusions TECHNOLOGIES SA en date du 17 juillet 2002 |
| T03 | 21/02/2003 | Conclusions CYRANO INC en date du 21 fevrier 2003 |
| T04 | 07/06/2002 | Extrait KBIS société CYRANO SA en date du 7 juin 2002 |
| T05 | 30/11/2001 | Offre d'acquisition par TECHNOLOGIES SA |
| T06 | 01/10/1996 | Dire T2 Annexe 1   Fusion IMM et Performance |
| T07 | 01/04/1997 | Dire T2 Annexe 2 dire T2   Contrat de Distribution - Annexe D - entre CYRANO UK et CYRANO SUISSE en date du 1er avril 1997 |
| T08 | 26/08/1998 | Dire T2 Annexe 3   Fax de Martin GREENBANK du 26 août 1998 |
| T09 | 04/09/2002 | Dire T2 Annexe 4   Rapport de KPMG du 4 septembre 2002 |
| T10 | 16/09/2003 | Dire T2 Annexe 5   Temoignages de quatre ex-salariés de CYRANO SA |
| T11 | 26/11/2002 | Dire T2 Annexe 5   Attestation de Monsieur François WATINE et de Monsieur Olivier COLLARD |
| T12 | 15/02/2001 | OpenSTA   Technical White Paper - version 1 2 du 15 fevrier 2001 (extrait de 7 pages) |
| T13 | 15/02/2001 | OpenSTA   Technical White Paper - version 1 2 du 15 fevrier 2001 (23 pages) |
| T14 | 15/03/2001 | OpenSTA   Technical White Paper - version 1 0 du 15 mars 2001 (32 pages) |
| T15 | 15/03/2001 | OpenSTA   Livre blanc technique - version 1 0 du 15 mars 2001 (traduction française de 34 pages) |

Michel OYVARD

Rapport d'expertise 04/11/2003  Cyrano Inc c/ Technologies SA, SCP Brouard-Daude et Me Facques

| N° | Date | Designation |
|---|---|---|
| B04 | 16/04/2002 | Assignation TECHNOLOGIES SA devant le Tribunal de Grande Instance de Paris en date du 16 avril 2002 |
| B05 | 28/03/2003 | Conclusions SCP BROUARD DAUDE en date du 28 mars 2003 |
| B08 | 02/05/2002 | Jugement Tribunal de Grande Instance de Paris du 02 mai 2002 |
| B13 | 24/06/2002 | Lettre RAR de Me WERNERT à Me FACQUES du 24 juin 2002 |

## 3 4.2   Liste des pièces par ordre chronologique

| N° | Date | Designation |
|---|---|---|
| 17 | 30/08/1996 | Délibération du Conseil d'Administration IMAGE MULTI MEDIAS du 30 août 1996 |
| T06 | 01/10/1996 | Annexe 1 dire T2  Fusion IMM et Performance |
| 18 | 03/10/1996 | Pacte d'actionnaires pour la reprise de PERFORMANCE SOFTWARE Ltd ancienne désignation CYRANO UK |
| 33 | 01/04/1997 | Annexe 7 dire 3  Contrat de Distribution entre CYRANO UK et CYRANO SUISSE en date du 1er avril 1997 |
| T07 | 01/04/1997 | Annexe 2 dire T2  Contrat de Distribution - Annexe D - entre CYRANO UK et CYRANO SUISSE en date du 1er avril 1997 |
| 16 | 11/09/1997 | Prospectus préliminaire COB |
| 34 | 30/06/1998 | Annexe 8 dire 3  Facture de CYRANO UK sur CYRANO SUISSE datée du 30 Juin 1998 |
| T08 | 26/08/1998 | Annexe 3 dire T2  Fax de Martin GREENBANK du 26 août 1998 |
| 14 | __/__/1998 | Document de référence CYRANO 1997 / 1998 |
| 15 | __/__/1999 | Document de référence rapport annuel CYRANO 1998 / 1999 |
| 36 | 21/06/2000 | Annexe 2 dire 4  Email de Monsieur Phil STEPHENSEN-PAYNE du 21 juin 2000 |
| 39 | 01/11/2000 | Annexe 5 dire 4  Email de Monsieur Christopher Jones du 1er nov 2000 |
| 38 | 02/11/2000 | Annexe 4 dire 4  Email de Madame Noëlle BEAUDIN du 2 nov 2000 |
| T12 | 15/02/2001 | OpenSTA  Technical White Paper - version 1 2 du 15 février 2001 (extrait de 7 pages) |
| T13 | 15/02/2001 | OpenSTA  Technical White Paper - version 1 2 du 15 février 2001 (23 pages) |
| T14 | 15/03/2001 | OpenSTA  Technical White Paper - version 1 0 du 15 mars 2001 (32 pages) |
| T15 | 15/03/2001 | OpenSTA  Livre blanc technique - version 1 0 du 15 mars 2001 (traduction française de 34 pages) |
| 1 | 12/11/2001 | Appel d'offre de Maître BROUARD du 12 novembre 2001 |
| T05 | 30/11/2001 | Offre d'acquisition par TECHNOLOGIES SA |
| 2 | 11/12/2001 | Ordonnance de cession partielle du fonds de commerce CYRANO SA en date du 11 décembre 2001 |
| 9 | __/__/2001 | Liste des logiciels en possession de la SCP BROUARD DAUDE |

Michel OLLARD
Rapport d'expertise 04/11/2003   Cyrano Inc c/ Technologies SA, SCP Brouard-Daude et Me Facques

| N° | Date | Designation |
|---|---|---|
| 3 | 13/03/2002 | Jugement Tribunal de Commerce de Paris du 13 mars 2002 |
| 11 | 21/03/2002 | Acte de cession par CYRANO UK a CYRANO Inc des actifs, en date du 21 mars 2002, et sa traduction |
| 4a | 03/04/2002 | Fax du Dr Brian Bandey à TECHNOLOGIES SA du 3 avril 2003 |
| 4 | 10/04/2002 | Courrier Maître LEGER à Maître BROUARD du 10 avril 2002 |
| B04 | 16/04/2002 | Assignation TECHNOLOGIES SA devant le Tribunal de Grande Instance de Paris en date du 16 avril 2002 |
| B08 | 02/05/2002 | Jugement Tribunal de Grande Instance de Paris du 02 mai 2002 |
| 10 | 16/05/2002 | Contrat de cession d'elements du fonds de commerce par Maître BROUARD a TECHNOLOGIES, en date du 16 mai 2002 |
| 5 | 17/05/2002 | Courrier Cabinet ATK à Maître LEGER du 17 mai 2002 |
| 6 | 24/05/2002 | Courrier Cabinet ATK à Maître LEGER du 24 mai 2002 |
| T04 | 07/06/2002 | Extrait KBIS société CYRANO SA en date du 7 juin 2002 |
| 7 | 12/06/2002 | Courrier Maître LEGER à Maître FACQUES du 12 juin 2002 |
| 13 | 12/06/2002 | Lettre Docteur BANDEY du 12 juin 2002 et sa traduction |
| 8 | 14/06/2002 | Courrier Maître LEGER à Maître FACQUES du 14 juin 2002 |
| 12 | 14/06/2002 | Lettre Maître BRACKENBURY du 14 juin 2002 et sa traduction |
| B13 | 24/06/2002 | Lettre RAR de Me WERNERT à Me FACQUES du 24 juin 2002 |
| T01 | 08/07/2002 | Assignation CYRANO Inc devant le Tribunal de Commerce de Paris en date du 8 juillet 2002 |
| T02 | 17/07/2002 | Conclusions TECHNOLOGIES SA en date du 17 juillet 2002 |
| 41 | 31/07/2002 | Annexe 7 dire 4   Email de la Société TECHNOLOGIES |
| T09 | 04/09/2002 | Annexe 4 dire T2   Rapport de KPMG du 4 septembre 2002 |
| 19 | 12/09/2002 | Attestation de Monsieur Regis BIZIEN, Commissaire aux comptes de CYRANO |
| 30 | 09/10/2002 | Annexe 4 dire 3   Attestation de Monsieur Malcom GREEN |
| 31 | 09/10/2002 | Annexe 5 dire 3   Attestation de Monsieur Richard CLARKE |
| 35 | 08/11/2002 | Annexe 1 dire 4   Attestation de Philippe EYRIES |
| 47 | 08/11/2002 | Annexe 3 dire 5   Attestation de Monsieur Lee-Daniel SUTCLIFFE |
| 45 | 11/11/2002 | Annexe 1 dire 5   Attestation de Madame Noelle BEAUDIN |
| 46 | 12/11/2002 | Annexe 2 dire 5   Attestation supplementaire de Monsieur Geoffrey HALL |
| T11 | 26/11/2002 | Annexe 5 dire T2   Attestation de Monsieur François WATINE et de Monsieur Olivier COLLARD |
| T03 | 21/02/2003 | Conclusions CYRANO INC en date du 21 fevrier 2003 |
| B05 | 28/03/2003 | Conclusions SCP BROUARD DAUDE en date du 28 mars 2003 |
| 32 | 16/06/2003 | Annexe 6 dire 3   Attestation de Monsieur Martin GREENBANK |
| 43 | 14/09/2003 | Annexe 9 dire 4   Calcul des dommages consécutifs à la perte des contrats de maintenance |
| T10 | 16/09/2003 | Annexe 5 dire T2   Temoignages de quatre ex-salaries de CYRANO SA |

Rapport d'expertise 04/11/2003   Cyrano Inc c/ Technologies SA, SCP Brouard-Daude et Me Facques

| N° | Date | Désignation |
|---|---|---|
| 42 | 19/09/2003 | Annexe 8 dire 4   Jugement du Tribunal de Commerce de Paris du 19 Septembre 2003 |
| 37 | 24/09/2003 | Annexe 3 dire 4   Attestation de Monsieur Denis BITAN |
| 40 | 02/10/2003 | Annexe 6 dire 4   dire 4   Liste des Factures d'honoraires acquittees par CYRANO Inc |
| 44 | 02/10/2003 | Annexe 10 dire 4   Calcul déficit 2002 au titre des ventes de licences et services non réalisés |
| 20 | Non daté | Présentation du CYRANO DBPack |
| 21 | Non daté | Présentation du CYRANO ClientPack |
| 22 | Non daté | Listes des Packs CYRANO |
| 23 | Non daté | Brochure commerciale CYRANO DBPack |
| 24 | Non daté | Présentation du CYRANO ServerPack |
| 25 | Non daté | Brochure commerciale CYRANO ServerPack |
| 26 | Non daté | Brochure commerciale CYRANO VTPack |
| 27 | Non daté | Brochure commerciale CYRANO Millenium Test |
| 28 | Non daté | Brochure commerciale client PACK |
| 29 | Non daté | Liste des tarifs des logiciels CYRANO |

## 4    INVESTIGATIONS ET ANALYSES DES FAITS

### 4.1.   DESCRIPTION DES PRODUITS LOGICIELS CYRANO SA

Les brochures commerciales fournies par CYRANO Inc (pièces n°20 a 28) apportent un éclairage bienvenu sur les produits logiciels au catalogue de CYRANO SA Le tableau suivant en présente une liste abrégée et un descriptif résumé

| Packs | Produit logiciel | Descriptif resume du produit logiciel |
|---|---|---|
| **CYRANO ClientPack (sous Windows)** | **Cyrano Standards** | Permet de définir des conventions et des règles pour assurer la qualité et la performance du développement des applications client-serveur Windows |
| | **Cyrano Winscope** | Optimiseur de développement des applications client-serveur Windows |
| | **Cyrano Insight** | Analyseur d'appels clients aux bases de données, qui permet une optimisation dynamique des appels |
| | **Cyrano Manager** | Permet de planifier les tests, de contrôler l'avancement de la campagne de tests avec gestion des anomalies |
| | **Cyrano Robot** | Permet de creer, modifier et jouer des tests automatisés sur des applications client-serveur Windows |
| **CYRANO DBPack** | **Cyrano Workbench** | Analyse les requêtes et les transactions qui sont exécutées entre l'application cliente et les serveurs SQL, pour identifier les goulots d'étranglement |
| | **Cyrano Production** | Analyseur des performances de la base de données qui fournit une analyse complète des transactions du serveur SQL qui excèdent les seuils critiques ou limites |
| | **Cyrano Watcher** | Module indépendant destiné à alimenter une base de données statistiques |
| **CYRANO VTPack** | **Cyrano Test** | Outil de test et certification des applications |
| | **Cyrano Timer** | Outil de mesure des temps de réponse |
| | **Cyrano TestStream** | Processus automatisés de certification d'application |
| | **Cyrano Video** | Permet d'enregistrer des sessions d'un terminal pour analyse ou démonstration/formation |
| **CYRANO ServerPack** | **Cyrano Impact** | Permet de construire et d'exécuter des simulations de montee en charge sur le serveur de bases de données |
| | **Cyrano LoadTest** | Permet de tester les applications client-serveur sous Windows |
| Produits individuels (hors Pack) | | . |
| **Cyrano MilleniumTest** | | Outil de validation An 2000 |
| **Cyrano EuroTest** | | Outil de validation Euro |
| **Cyrano VMS DateWarp** | | |
| **Cyrano DataAge** | | |
| **OpenSTA[5]** | | Permet de realiser des tests de serveurs Web avec mesures des performances |

**Tableau 1**

---

[5] Open STA  "Open Systems Testing Architecture", produit libre, distribue en "open source"

Rapport d'expertise 04/11/2003   Cyrano Inc c/ Technologies SA, SCP Brouard-Daudé et Me Facques

## 4 2.   DESCRIPTION DES CONTENUS DES LOGIBOX

Aux termes du contrat de cession des actifs de la société CYRANO SA, le 16 mai 2002, les logibox suivantes ont ete mises sous sequestre chez Maître Denis FACQUES

- Logibox n°98-11014-00 déposé à l'APP le 12/03/98

- Logibox n°98-11015-00 déposé a l'APP le 12/03/98

- Logibox n°98-500030-00 déposé à l'APP le 10/12/98

Suite aux debats entre les parties pendant l'expertise, la SCP BROUARD DAUDE a transmis à Maître Denis FACQUES, le 7 octobre 2003, les deux autres logibox identifiées dans le perimètre de l'expertise, aux fins de le constituer séquestre de ces dernières

- Logibox n°99-45008-00 dépose à l'APP le 03/11/99

- Logibox n°99-45009-00 deposé à l'APP le 03/11/99

Par lettre du 13 octobre, Maître FACQUES a indiqué qu'il n'avait pas d'objection pour sequestrer ces deux logibox (lettre jointe au courrier de la SCP BROUARD DAUDE en date du 15 octobre 2003)

La tableau page suivante présente les produits logiciels qui sont contenus dans les logibox

Michel VILLARD

Rapport d'expertise 04/11/2003   Cyrano Inc c/ Technologies SA  SCP Brouard-Daude et Me Facques

| Legende | Produit logiciel dont Cyrano Inc et Technologies SA revendiquent la propriete | |
|---|---|---|
| | Produit logiciel dont la propriete est acquise a Technologies SA | |
| | Produit logiciel qui appartient a la societe Rational Software | Blanc |

| N° logibox | Date depôt | Intitulé logibox | Produits (= logiciels) contenus dans le logibox | Grief |
|---|---|---|---|---|
| 98-11014-00 | 12/03/98 | **ServerPack** | Cyrano Impact | |
| | | | Cyrano LoadTest (propriete Rational Software) | Blanc |
| | | | Source safe back up (Cyrano test+impact PC files) | |
| 98-11015-00 | 12/03/98 | **VTPack** | Cyrano Test v 5 2 Archive | |
| | | | Cyrano TestStream | |
| | | | Cyrano Timer v 5 0 Archive | |
| | | | Cyrano Video v4 0 Archive | |
| | | | Cyrano MilleniumTest | |
| | | | Cyrano DateWarp VMS | |
| | | | Cyrano DataAge | |
| 98-500030-00 | 10/12/98 | **VTPack 2** | Cyrano Test v 5 4 | |
| | | | Cyrano TestStream | |
| | | | Cyrano Timer | |
| | | | Cyrano Video | |
| | | | Cyrano MilleniumTest | |
| | | | Cyrano EuroTest | |
| | | | Cyrano DateWarp VMS | |
| | | | Cyrano DataAge | |
| 99-450008-00 | 03/11/99 | **Client Server Suite** | Cyrano Defect Tracker 1 1 **(1)** | |
| | | | Cyrano Winscope for Developer 2000 2 1 beta **(1)** | |
| | | | Cyrano Winscope for Powerbuilder 3 0 beta **(1)** | |
| | | | Cyrano Standards for Powerbuilder 2 4 beta **(1)** | |
| | | | Cyrano Workbench for Sybase 3 1 3 beta **(1)** | |
| | | | Cyrano Workbench for Microsoft 3 1 3 beta **(1)** | |
| | | | Cyrano Workbench for Oracle 1 5 1 beta **(1)** | |
| | | | Cyrano Production for Sybase 2 5 **(1)** | |
| | | | Cyrano Impact for Corba | |
| | | | Cyrano Impact for Java | |
| | | | Cyrano Impact 2 2 3 | |
| 99-450009-00 | 03/11/99 | **Legacy Server Suite** | CyranoTest 5 4 | |
| | | | CyranoTest 5 5 | |
| | | | Cyrano Timer 5 1 | |
| | | | Cyrano Video 5 0 | |
| | | | Cyrano Impact 2 2 3 | |
| | | | Cyrano Impact 3 0 | |

**(1)** Céde a Technologies SA

**Tableau 2**

Michel VIELARD

Rapport d'expertise 04/11/2003   Cyrano Inc c/ Technologies SA, SCP Brouard-Daude et Me Facques

---

4 3    PRODUITS LOGICIELS EN LITIGE

4 3 1    Liste des produits logiciels en litige

Dans le Tableau 2 ci-dessus, les produits logiciels dont la propriété est revendiquée à la fois par le demandeur et le defendeur sont marqués d'une couleur "Rouge"

En voici une liste synthétique

| Packs | Produit logiciel | Descriptif résume du produit logiciel |
|---|---|---|
| **Cyrano VTPack** | **Cyrano Test** | Outil de test et certification des applications |
| | **Cyrano Timer** | Outil de mesure des temps de réponse |
| | **Cyrano TestStream** | Processus automatisés de certification d'application |
| | **Cyrano Video** | Permet d'enregistrer des sessions d'un terminal pour analyse ou démonstration/formation |
| **Cyrano ServerPack (1)** | **Cyrano Impact** | Permet de construire et d'exécuter des simulations de montée en charge sur le serveur de bases de données |
| **Cyrano MilleniumTest** | | Outil de validation An 2000 |
| **Cyrano VMS DateWarp** | | |
| **Cyrano DataAge** | | |
| **Cyrano EuroTest** | | Outil de validation Euro |

1    (1) Cyrano ServerPack comprend aussi Cyrano LoadTest, produit logiciel qui est la propriété de la société Rational Software

**Tableau 3**

**4.3 2    Qui a fait acte de création sur les logiciels en litige ?**

Lors de la seconde réunion, j'ai rappelé, que le dépôt d'un logibox n'atteste pas la propriété du contenu au déposant, contrairement à ce qu'affirmaient TECHNOLOGIES SA et QUOTIUM TECHNOLOGIES dans leur dire n°1    " *les certificats de dépôt des logiciels attestant leur propriété par Cyrano SA* " *(page 6, §1 1, alinéa 4)*

Les sociétés TECHNOLOGIES SA et QUOTIUM TECHNOLOGIES ont ensuite évolué dans leur dire n°2    " *il n'est pas contesté que le seul dépôt du logiciel auprès de l'APP ne suffise à démontrer la propriété du logiciel* " *(page 2, §1, alinea 4)*

La question factuelle est de savoir qui a fait acte de création sur les logiciels en litige

Des réponses claires sont apportées à cette question par les trois attestations de Messieurs

- Malcom Charles GREEN, un des fondateurs de la société Performance Software Ltd (en 1986), Directeur en charge des développements de logiciels de 1995 à 2000 *(pièce n°30, dire Cyrano Inc n°3 Annexe 4)*

- Richard Arthur CLARKE, un des fondateurs de la société Performance Software Ltd (en 1986), Ingénieur et chef de projet (Senior Software Engineer) jusqu'à la liquidation en octobre 2001 *(piece n°31, dire Cyrano Inc n°3 Annexe 5)*

- Martin Stuart GREENBANK, ancien Directeur financier de CYRANO UK et Directeur des compagnies CYRANO (c'est à dire CYRANO SA, CYRANO UK, CYRANO Inc et d'autres filiales), salarié de Performance Software Ltd entre début 1992 et avril 1999 *(piece n°32, dire Cyrano Inc n°3 Annexe 6)*

Michel VILLARD
Rapport d'expertise 04/11/2003  Cyrano Inc c/ Technologies SA, SCP Brouard-Daude et Me Facques

Sur la base de ces pièces *(pièce n°30, page 2 alinéa 4 et 5, page 3 alinéa 7, page 5 alinéa 1 , pièce n° 31 alinéa 6 page 2 , pièce n°32, page 3 alinea 6)*, voici la genèse des produits logiciels

| | |
|---|---|
| Avril 1990 | Première version de "V-TEST"[6] (v2 1), exclusivement sur VMS, lancée au Royaume-Uni , |
| Avril 1992 | Performance Software Ltd est récompensée du "United Kingdom Design Council Award" pour le produit "V-TEST" , |
| 1993 | Début du portage de "V-TEST" sur UNIX , |
| 1995 | Première version de "V-TEST" sur UNIX (sur machines SUN uniquement) , |
| 1996 | Première version de "V-TEST" sur Windows, version complète et stable de "V-TEST" (v5 0), disponible sur une large gamme de plates formes UNIX , |
| 1996 | Décision de développer sur "Cyrano Test" des fonctions pour tester des bases de données , le produit résultant de ce nouveau développement sera nommé "Cyrano Impact" , |
| 1997 | Première version de "Cyrano Impact", lancée au Royaume-Uni , |
| 2000 | Version 3 de "Cyrano Impact" en cours de développement , |
| 11/2000 *(pièce n°39)* | Dernière version de "Cyrano Impact" (v2 2 4), lancée au Royaume-Uni avant la mise en liquidation de CYRANO UK le 31 octobre 2001 |

Toutes les versions de "Cyrano Impact" ont d'abord été lancées au Royaume-Uni *(pièce n°30 page 5, alinéa 12)*

La conception et le développement du produit "Cyrano Test" ont été réalisés exclusivement dans le centre R&D de CYRANO UK, à Bradford, Angleterre *(pièce n° 30 page 3 alinéa 6 , pièce n°31 page 2 alinéa 5)*

Il en est de même pour le produit "Cyrano Impact", à l'exception d'un composant logiciel désigné "SQL Capture (Gateway)", développé par CYRANO SA à Paris *(pièce n° 30 page 4 alinéa 10, page 6 alinéa 16 iii)*

Vers 1996, l'équipe R&D de Performance Software Ltd était composée de plus de vingt nationaux du Royaume-Uni basés à Bradford, Angleterre  Performance Software Ltd avait aussi trois filiales    (1) Performance Software Inc aux Etats-Unis, (2) Performance Software France SARL et Performance Software Europe NV en Belgique *(pièce n° 32, page 3 en haut, alinéa 5)*

Avant l'acquisition des actions de Performance Software Ltd en 1996, Performance Software Ltd avait entièrement créé, a travers ses employés, et lancé au Royaume-Uni et depuis le Royaume-Uni, toutes les versions de V-TEST (de la version 2 1, version originale, à la version 5 0) *(pièce n° 32, page 3, alinéa 8)*

A travers l'acquisition, les compagnies n'ont pas fusionné leurs actifs ni leurs droits de propriété intellectuelle *(pièce n° 32, page 5, alinéa 13)*

---

[6] "V-TEST" sera renommé "Cyrano Test" après l'acquisition, en octobre 1996, de Performance Software Ltd par IMM

Michel VILLARD
Rapport d'expertise 04/11/2003  Cyrano Inc c/ Technologies SA, SCP Brouard-Daudé et Me Facques

Les compagnies n'ont pas fusionné leurs équipes R&D  Performance Software Ltd / CYRANO UK a conservé sa propre équipe R&D, composée des nationaux du Royaume-Uni, à Bradford, tandis que CYRANO SA maintenait deux équipes R&D en France  Après l'acquisition, CYRANO UK a continué le développement, de manière indépendante, des nouveaux produits et des nouvelles versions de ses produits existants, notamment "V-TEST", renommé "Cyrano Test" *(pièce n° 32, page 6 en haut, alinéa 14)*

Toutefois, les sociétés TECHNOLOGIES SA et QUOTIUM TECHNOLOGIES, dans leur dire n°2, ont émis des réserves sur l'attestation de Monsieur Martin Greenbank *(dire n°2, page 3, section 3, 2 derniers alinéas)*

*" contrairement à ce qu'affirme dans son attestation Monsieur Martin Greenbank[7], CYRANO SA est en 1998 co-propriétaire d'Impact "*

*"Il est donc demandé à Monsieur l'Expert d'émettre les plus grandes réserves sur l'attestation de Monsieur Martin Greenbank produite par CYRANO Inc [ndlr  pièce n°32], dont le contenu est en totale contradiction avec la lettre du 26/08/98 "*

De fait, par courrier du 26/08/98 à KPMG, Monsieur Martin GREENBANK précise *(pièce T08)*

*"ServerPack  les contrats de royalties établis entre les différentes divisions commerciales de CYRANO, et les deux entités détenant le Droit de Propriété, précise que les 30% de royalties doivent être partagés entre CYRANO SA et CYRANO UK dans la proportion de un tiers pour CYRANO SA et deux tiers pour CYRANO UK"*

Or, dans l'attestation signée de sa main, Monsieur Martin GREENBANK expose avec clarté non seulement qu'une partie d'Impact a été développée par CYRANO SA *(pièce n°32, page 6, alinéa 15)*

*"Toutefois, dans le seul cas d'Impact, tandis qu'il était en majorité constitué de logiciel développé par du personnel UK, il y avait un petit composant (un gateway pour lier Impact à d'autres modules) qui était fourni, sur une base commerciale, par le personnel de développement de CYRANO SA[8] "*

mais aussi qu'en conséquence, CYRANO SA se voit attribuer des royalties à hauteur de un tiers *(pièce n°32, page 7, alinéa 18)* .

*"Les produits licenciés de CYRANO SA étaient limités à 33 1/3 % des modules de ServerPack, car CYRANO UK avait développé et possédait Impact[9] "*

TECHNOLOGIES SA et QUOTIUM TECHNOLOGIES auraient-ils par extraordinaire omis de lire ces phrases sibyllines ? Sur quels écrits serait-il opportun d'émettre des réserves ?

---

[7] Souligné par l'expert
[8] Traduction libre par les soins de l'expert et souligné par l'expert
[9] Traduction libre par les soins de l'expert

En outre, CYRANO Inc soumet, avec son dire n°4, une attestation de Monsieur Philippe EYRES qui a été Président des compagnies CYRANO (c'est à dire CYRANO SA, CYRANO UK, CYRANO Inc et d'autres filiales) de 1996 a juin 2000 *(pièce n°35, dire CYRANO Inc n°4 Annexe 1)*

Monsieur Philippe EYRES confirme les propos de Monsieur Martin GREENBANK

- apres l'acquisition de Performance Software Ltd par IMM, chaque société a conservé ses équipes R&D et a continué le développement, de manière independant, de ses produits propres *(page 2, alinea 4)* ,

- les actifs, les équipes R&D et les droits de propriete intellectuelle de CYRANO UK et CYRANO SA n'ont jamais été fusionnés *(page 2, alinéa 5)*

### 4.3 3.  Sur la propriété des produits logiciels en litige

### 4.3.3.1  "Cyrano Test" et "Cyrano Impact"

Le centre de Recherche & Développement de CYRANO UK Ltd, basé à Bradford en Angleterre, a réalisé la conception et le développement

- du produit "Cyrano Test"

- du produit "Cyrano Impact", a l'exception d'un composant logiciel désigné "Gateway" qui a été développé par CYRANO SA à Paris

Les actifs, les équipes R&D et les droits de propriété intellectuelle de CYRANO UK et CYRANO SA n'ont jamais été fusionnés

Le module Gateway a fait l'objet d'une facturation de CYRANO SA à CYRANO UK en date du 30 juin 1998, comme il ressort du rapport KPMG[10] du 4 septembre 2002 *(piece n°T09, page 7)*

*'"En application de trois differents contrats aux termes desquels la société CYRANO UK a désigne la societe [ndlr   CYRANO SA] en qualité de consultant pour certains développements jusqu'au stade de la commercialisation, la société a le 30 juin 1998, facturé ces développements à CYRANO UK au prix des salaires et charges du personnel de la société affecté à ces travaux, majoré de 25%*
*Trois projets ont ainsi été facturés à CYRANO UK*
*Cyrano Evolution              FF 323 538*
*Cyrano Universal Gateway      FF 1 403 188*
*Cyrano White et Cyrano Select FF 919 006"*

Ceci demontre que la propriete du module Gateway a été transférée a CYRANO UK le 30 juin 1998

La societe CYRANO UK possedait donc 100% des produits logiciels "Cyrano Test" et "Cyrano Impact" lorsque ses actifs ont été cédes a la société CYRANO Inc aux termes de l'acte de cession du 21 mars 2002

---

[10] Cette piece est l'annexe 4 du dire n°2 de TECHNOLOGIES SA et QUOTIUM TECHNOLOGIES

### 4 3.3 2   Les autres produits

Lors des debats, aucun element n'a eté fourni ma permettant d'emettre un avis sur la propriéte des produits suivants

- Cyrano Timer
- Cyrano TestStream
- Cyrano Video
- Cyrano MilleniumTest
- Cyrano VMS DateWarp
- Cyrano DataAge
- Cyrano EuroTest

Je suppose qu'ils présentent un intérêt mineur face à "Cyrano Test" et "Cyrano Impact"

### 4.4.   DOMMAGES SUBIS PAR CYRANO INC.

Des élements sont soumis par la société CYRANO Inc  (dire n°4, section 5)

Les procédures engagées par TECHNOLOGIES SA et QUOTIUM TECHNOLOGIES ont entraîné des coûts pour CYRANO Inc

Il est vraisemblable que des interventions de la part de TECHNOLOGIES SA et QUOTIUM TECHNOLOGIES auprès du marche, ainsi que la connaissance du litige par les clients, aient entraîne un manque à gagner pour CYRANO Inc

- Non-renouvellement de contrats de maintenance
- Baisse des ventes de licences et de services

A charge de CYRANO Inc  d'apporter la preuve de son manque à gagner

Trois exemples de ces interventions sont versés au dossier

- E-mail du  23/04/2002  envoyé par Pascal  STRAATSMA  à  "opensta-devel@lists sourceforge net" *(pièce n°41, page 3)*  *"It is with great pleasure that I wish to announce that Quotium technologies has now picked up Cyrano's mantle as sponsor of the OpenSTA project  While development may have seemed dormant over the last few months following the death of the French software company, it has in fact not been the case.  "*

- E-mail du 30/07/2002 signé "Bastien" *(pièce n°41, page 2)*  *"Unfortunately, you won't find any contact for Cyrano, in France, UK or US  Cyrano doesn't exist anymore and our company, QUOTIUM TECHNOLOGIES, just bought the asset of Cyrano  We won't be able to provide you any document concerning your Cyrano activity  If you are interested to continue working with Cyrano's Tools, we are looking for competencies in UK  You can call Pascal STRAATSMA at +33 1 49 04 71 40 or at pstraatsma@quotium com  Best regards, Bastien"*

Michel PIOVANI
Rapport d'expertise 04/11/2003   Cyrano Inc c/ Technologies SA, SCP Brouard-Daude et Me Facques

---

- E-mail du 02/10/2002 envoyé par Pascal STRAATSMA à "opensta-users@lists sourceforge net" *(piece n°41, page 3)* *"The situation is actually crystal clear Quotium acquired the assets of Cyrano SA (mother company of Cyrano Inc and Cyrano Ltd) among which the intellectual property of this company's range of products, including OpenSTA and its related developments "*

L'adresse des destinataires laisse à penser que les messages de Monsieur Pascal STRAATSMA ont été adressés l'un a une liste de developpeurs OpenSTA et l'autre à une liste d'utilisateurs OpenSTA

Le produit OpenSTA est un produit libre, distribué en "open source" (voir plus haut Tableau 1) Il ne fait pas partie des produits logiciels en litige

Rapport d'expertise 04/11/2003   Cyrano Inc c/ Technologies SA, SCP Brouard-Daude et Me Facques

## 5.   REPONSES COMPLEMENTAIRES AUX DIRES

J'ai organisé deux réunions d'expertises, à la suite desquelles j'ai rédigé des notes d'information

Les réponses aux dires des parties sont implicitement ou explicitement données dans les notes d'information et dans le présent rapport

Voici, de surcroît, ma position sur certains points développés dans les dires

### 5.1   SUR DES AFFIRMATIONS GRATUITES

Certaines affirmations de TECHNOLOGIES SA et QUOTIUM TECHNOLOGIES ne sont fondées sur aucune pièce justificative, notamment

- *"CYRANO SA a assuré la direction de tous les développements des logiciels et les a fait exécuter par ses équipes basées à Paris en utilisant certaines compétences des ingénieurs de ses filiales "* (dire n°1, page 1, dernier alinéa) ,

- *"A partir de cette acquisition [ndlr  acquisition de la société Performance Software], les équipes de CYRANO SA ont poursuivi le travail entrepris pour développer et finaliser V-TEST devenu CYRANO Test et Impact et les ont intégrés dans la suite de logiciel de la société "* (dire n°1, page 2, alinéa 3) ,

- *"  des dizaines de développeurs ont travaillé au même titre que lui [ndlr   Monsieur Malcom Charles Green] sur ce produit [ndlr   CYRAÑO Test] au sein de CYRANO UK et CYRANO SA pendant plusieurs années "* (dire n°2, page 2, §1, alinéa 3) ,

Les attestations de Messieurs Malcom Charles GREEN, Richard Arthur CLARKE et Martin Stuart GREENBANK (pièces n°30-32) apportent un démenti formel à ces affirmations non fondées

### 5.2.   SUR LES QUATRE ATTESTATIONS DES EX-SALARIES DE CYRANO SA

Les sociétés TECHNOLOGIES SA et QUOTIUM TECHNOLOGIES versent au débat quatre témoignages d'anciens salariés de la société CYRANO SA *(pièce n°T10, dire Technologies n°2, annexe 5)*

- Monsieur Pascal STRAATSMA, salarié du 2 octobre 2000 au 30 octobre 2001 en qualité d'ingénieur d'affaires,

- Monsieur François WATINE, salarié du 5 juillet 1999 au 30 octobre 2001 en qualité d'ingénieur support puis de responsable support,

- Monsieur Olivier CANTE, salarié du 20 mai 1996 à octobre 2001 en qualité de chef de projet,

- Monsieur Christophe L'HARIDON, salarié de septembre 1999 à octobre 2001 en qualité d'ingénieur logiciel

Chaque attestation comporte a l'identique les 5 phrases suivantes, sur environ ½ page

1   *La société CYRANO SA developpait et commercialisait les logiciels Test, Impact, Workbench Production, OpenSTA*

2   *Le developpement et le marketing de chacun de ces logiciels etaient dirigés et organisés à partir des bureaux de la société CYRANO SA*

3   *La société CYRANO SA faisait appel aux compétences techniques ou commerciales qui pouvaient se trouver dans chacune de ses filiales, notamment CYRANO UK et CYRANO Inc*

4   *Le developpement des logiciels était dirigé par CYRANO SA qui en assurait la réalisation à Paris et qui pouvait faire appel, pour le développement de certaines parties de codes, à des salariés se trouvant dans certaines filiales*

5   *L'interaction et la fusion entre les logiciels developpés, par CYRANO SA, les technologies acquises et les développements realisés rendent à mon sens impossible l'attribution complète d'un logiciel de CYRANO à une entité autre que la maison mère CYRANO SA*

L'attestation de Monsieur Olivier CANTE comporte une phrase supplémentaire

*"J'ai personnellement travaillé au développement des logiciels Impact, Workbench, Production, OpenSTA "*

Voici mes remarques objectives

-   Exception faite de la phrase ajoutée par Monsieur CANTE, les quatre attestations sont identiques mot pour mot, ce qui laisse à penser qu'elles ont été dictées pour les besoins de l'expertise, d'autant plus qu'elles sont datees du 16 septembre 2003

-   Comment des salaries ne faisant pas partie de la Direction d'une société X, éditeur de logiciels Y, peuvent-ils être aussi bien informes des <u>decisions de la Direction</u> sur l'organisation du marketing et du developpement des logiciels, organisation qui dans le cas de CYRANO est transnationale ? Cette question concerne notamment la 2<sup>ème</sup> phrase *"Le développement et le marketing de chacun de ces logiciels <u>étaient dirigés et organisés</u>[11] à partir des bureaux de la société CYRANO SA* et le début de la 4<sup>ème</sup> phrase *"Le développement des logiciels <u>était dirigé</u>[12] par CYRANO SA"*

-   La 3<sup>ème</sup> phrase est une évidence sans intérêt pour l'expertise

-   La 5<sup>ème</sup> phrase est une appreciation juridique sur la propriété des logiciels qu'il ne m'appartient pas de commenter

-   Dans la 1<sup>ère</sup> phrase, parmi les logiciels cités, seuls "Test" et "Impact" sont sur la liste des produits logiciels en litige (voir § 4 3 1) , en effet, CYRANO SA participait au développement d'OpenSTA[13] (produit Open Source) et avait la propriété de Workbench et Production (voir plus haut § **Erreur ! Source du renvoi introuvable** )

---

[11] Souligne par l'expert
[12] Souligne par l'expert
[13] Richard Arthur CLARKE atteste *(piece n°31)* que CYRANO SA a livre des composants integres dans "OpenSTA"
-   une version HTTP de "SQL Capture (Gateway)" *(page4 alinea 5i)*,
-   une partie de code d'execution HTTP et un module separe "Script Modeller" *(page4 alinéa 5ii)*

- Il est révélateur que Monsieur Olivier CANTE n'ait pas cité "Test" parmi les logiciels sur lesquels il déclare avoir travaillé personnellement, alors qu'il a cité "Impact"

- Hormis les noms des produits (Test, Impact, etc) il n'est nulle part mentionné une quelconque information de nature technique sur les travaux de développement de CYRANO SA, alors que parmi les quatre personnes, deux occupent des fonctions proches des produits (ingénieur d'affaires, ingénieur support) et deux sont impliquées dans le développement logiciel (chef de projet, ingénieur logiciel)

- Les quatre attestations du 16 septembre 2003 ne font pas référence, non plus, a une quelconque pièce justificative

- En comparaison, les attestations de Monsieur Malcom Charles GREEN *(pièce n°30)* (6 pages ½ ) ou de Monsieur Richard Arthur CLARKE *(pièce n°31)* (4 pages ½ ) sont riches en informations techniques   historique des versions successives (V-Test depuis 1989, Impact depuis 1996), migration de Test à Impact, architecture logicielle d'Impact et volumes des codes source, etc

Au vu de ces remarques objectives, je me suis forgé mon "intime conviction" que ces quatre attestations manquent de crédibilité et ne me permettent pas de remettre en cause ce que j'ai écrit plus haut au §4 3 2 Qui a fait acte de création sur les logiciels en litige ?


### 5 3.   SUR LE PAIEMENT DES ROYALTIES

On peut lire, dans leur dire n°2 des sociétés TECHNOLOGIES SA et QUOTIUM TECHNOLOGIES (page 3, § 3, alinéa 4)

*"Ainsi, il est clairement établi que concernant le logiciel ServerPack, c'est a dire en fait le logiciel Impact[14], un tiers des royalties est payé à CYRANO SA des 1997 "*

*"CYRANO SA a consenti à CYRANO UK une licence de distribution du logiciel ServerPack, c'est à dire d'Impact[15], pour un montant forfaitaire de 4 millions de Francs "*

Dire que "ServerPack = Impact", c'est occulter/oublier "LoadTest", produit logiciel composant de ServerPack qui est la propriété de la société Rational Software (voir plus haut § 4 3 1)

Dans son dire n°4bis[16], CYRANO Inc développe une argumentation dans laquelle il est question de royalties reversées par CYRANO SA à la société Rational Software

Ce sujet est hors du périmètre de la mission d'expertise

---

[14] Souligné par l'expert
[15] Souligné par l'expert
[16] Le dire 4bis, qui est désigné par Cyrano Inc "dire sur questions hors sujet", est joint en annexe

**5.4.   SUR LA FUSION EVENTUELLE ENTRE IMM ET PERFORMANCE SOFTWARE**

La question de la fusion entre IMM et Performance Software est une appréciation juridique sur laquelle je n'ai pas à me prononcer (article 238 du NCPC)

- *"As a result of the acquisition, Performance SoftwareLtd became a fully owned independent subsidiary of IMM but it was not dissolved Nor was it merged with IMM (pièce n° 32, page 5, alinéa 12)*

- *"Les sociétes IMM et Performance Software ont fusionné en 1996 (annexe 1   "merger agreement combining the two companies") (dire Technologies n°2, page 2, §2, alinea 1)*

La réponse à cette question n'a pas d'impact sur la question de savoir qui a créé les logiciels

Monsieur Philippe EYRES *(piece n°35, dire CYRANO Inc  n°4 Annexe 1)* a attesté qu'après l'acquisition

- chaque société a conserve ses équipes R&D et a continué le développement, de maniere indépendante, de ses produits propres *(page 2, alinéa 4)*

- les actifs, les équipes R&D et les droits de propriete intellectuelle de CYRANO UK et CYRANO SA n'ont jamais été fusionnés

**5.5.   SUR L'ORGANISATION DU CONTROLE-QUALITE DES PRODUITS**

Dans leur dire n°2, les sociétés TECHNOLOGIES SA et QUOTIUM TECHNOLOGIES écrivent (§ 5, dernier alinea page 4)

*"Le contrôle-qualité lui-même était également centralisé à Paris     "*

Ce sujet est hors du périmètre de la mission d'expertise   la localisation du contrôle-qualité n'a pas de lien de causalité avec la question de savoir qui a créé les logiciels

**5.6.   SUR LE "TECHNICAL WHITE PAPER ON OPEN STA"**

Dans leur "Reponse à la demande d'informations suite au dire n°3", en date du 22 octobre 2003, les sociétes TECHNOLOGIES SA et QUOTIUM TECHNOLOGIES joignent en annexe un document intitulé "Technical White Paper on Open STA (version 1 0)" *(pièce n°T14)* et la traduction française *(pièce n°T15)*, datées 15 mars 2001

Elles declarent que cette version est destinée aux clients OpenSTA et que les signataires en sont

- nkb, pour Madame Noelle Kristen Beaudin, VP Marketing et développement de l'activite,

- gh, pour Monsieur Geoffrey Hall, Directeur du service développement logiciel,

- lds, pour Madame Lee-Daniel Sutcliffe, Responsable Technique production OpenSTA

En preliminaire, je constate, dans cette réponse, qu'une erreur s'est glissee à l'alinéa 1 de la page 2

Rapport d'expertise 04/11/2003   Cyrano Inc c/ Technologies SA, SCP Brouard-Daudé et Me Facques

*"Il ressort de la traduction française etablie par CYRANO SA en même temps que le document anglais que "performance R&D group in CYRANO" signifie "le groupe R&D en performance de <u>CYRANO SA</u>[17]"*

Or, dans la traduction française, on peut lire *(pièce n°T15, annexée au dire n°3, page 10, § 3 2)*

*"Le groupe R&D en performance de <u>CYRANO</u>[18], qui est a l'origine du projet OpenSTA,    "*

L'erreur est d'avoir écrit "CYRANO SA" à la place de "CYRANO"

Le *"Performance R&D group"* est présente comme le créateur du projet OpenSTA *(version anglaise §3 2 Background, page 8, alinéa 1)*

*"The Performance R&D group in CYRANO created the OpenSTA Project"*

Il est vraisemblable que le terme "Performance" provienne de l'ancienne dénomination de la société anglaise "Performance Software" et/ou des produits logiciels dits de "performance", car dédiés aux tests de performance des applications

Au demeurant, il peut arriver qu'un editeur de logiciels, pour renforcer son image marketing, affiche une vision externe de son organisation R&D qui ne soit pas le reflet de son organisation interne, par exemple de présenter un groupe R&D homogène, alors que les projets de développement des logiciels seraient en fait repartis dans des "business unit" indépendantes, delocalises en partie, etc

Cet exemple fictif illustre le fait qu'a partir d'un document marketing tel que le White Paper", il est delicat d'extrapoler des informations fiables sur l'organisation interne reelle de la R&D

A ce sujet, les attestations des trois auteurs du White Paper *(pièces n° 45-47)*, qui sont fournies avec le dire n° 5 de la société CYRANO SA, apportent des précisions

Madame Noelle Beaudin affirme que le rôle de l'équipe R&D France etait limité au développement de deux modules d'OpenSTA   Gateway et Modeler *(pièce n°45, §6 page 2)*

Quant à Monsieur Geoffrey Hall, il déclare

*"Les developpeurs français n'ont jamais produit d'outil de test de charge, mais ont produit des outils de diagnostic comme Workbench Le centre de développement de Bradford était reconnu pour son expertise dans le développement de produits de tests de charge (Test, Impact et plus tard OpenSTA[19]) " (pièce n° 46, §8 page 3)*

Les éléments developpés plus haut dans ce rapport (voir § 4 3 2) s'en trouvent donc confirmes

---

[17] Souligne par l'expert
[18] Souligne par l'expert
[19] Traduction libre par les soins de l'expert

Rapport d'expertise 04/11/2003   Cyrano Inc c/ Technologies SA, SCP Brouard-Daudé et Me Facques

---

AINSI FAIT, CLOS ET SIGNE
En notre Cabinet, le 4 novembre 2003,

Original des pièces et dires des parties en annexe du rapport

Copie du présent rapport, sans les annexes, a été transmise à

ITEANU & Associés
106, rue du Faubourg Saint Honoré – 75008 PARIS
Conseil de la SOCIETE CYRANO INC
TOQUE D1380

WERNERT & ASSOCIES
Me Fabrice DALAT
45 av  Victor Hugo – 75008 PARIS
Conseil de la SOCIETE TECHNOLOGIES SA
TOQUE P0373

Maître Marc DUJARDIN
91, rue du Faubourg Saint Honore – 75008 PARIS
Conseil de SCP BROUARD-DAUDE et de Maître Denis FACQUES
TOQUE P22

Michel VILLARD

Monsieur VILLARD Michel
34 rue Jules Ferry
94100 SAINT MAUR DES FOSSES

GREFFE DU TRIBUNAL DE COMMERCE DE PARIS
SERVICE DES EXPERTISES
1, Quai de Corse
75181 PARIS CEDEX 04

### COMPLEMENT D'HONORAIRE ET TAXATION
### après dépôt de rapport de l'expert

A Monsieur le Juge chargé du contrôle des mesures d'instruction
------------------------------------------------------------------

**DECISION DU : 04/04/2003 - NUMERO DE ROLE : 2002050224**

j'ai été nommé en qualité d'expert dans une affaire :

SOCIETE CYRANO INC
C/ SA TECHNOLOGIES

En raison de l'importance et de la nature du litige, la provision
fixée s'est avérée insuffisante pour couvrir mes frais (justifications au
dos).

C'est pourquoi, j'ai l'honneur de solliciter, après dépôt de mon
rapport dans cette affaire .

1/ La fixation d'une provision complémentaire d'un montant

de : ... 1.962,76 Euros à la charge de .SOCIETE. CYRANO.INC.

et de . . . .... Euros à la charge de .. .... .. ... .... .

2/ La taxe de ma rémunération à la somme de ...9.962,76 . Euros,

frais inclus .

Facture établie hors TVA en vertu de l'article 293-B du C.G.I.

Le  4 novembre 2003
L'expert    Michel VILLARD

Michel Villard
Expert en informatique
34, rue Jules Ferry
94100 SAINT MAUR

Monsieur VILLARD Michel
34 rue Jules Ferry
94100 SAINT MAUR DES FOSSES

GREFFE DU TRIBUNAL DE COMMERCE DE PARIS
SERVICE DES EXPERTISES
1, Quai de Corse
75181 PARIS CEDEX 4

DEMANDE D'EVALUATION DE REMUNERATION

DECISION DU : 04/04/2003 — NUMERO DE ROLE : 2002050224

SOCIETE CYRANO INC
C/ SA TECHNOLOGIES

RAPPORT DEPOSE LE : 04/11/2003

J'ai l'honneur de solliciter l'évaluation de ma remunération selon
le décompte suivant

Frais de déplacement et de séjour (1) .... 30,00
Frais de secrétariat pour frappe de la
correspondance et du rapport .. 1051,50
Frais de timbres et de téléphone .. 37,96
Honoraires ou frais du technicien
ayant donné son avis ou exécuté un travail (2) .. 0,00
Autres frais : Reprographie .. 203,30

2/ HONORAIRES (3) – a) ...... . ...... 0,00
b) .... 6 vacations : ...... 540,00
c) .. 37,50 vacations ...... 3375,00
d) ... 52,50 vacations ...... 4725,00

soit . 96 vacations à .. 90 Euros . .. 8 640,00

TOTAL H T. .... .... : Euros 9962,76
T.V.A. . ... .....
TOTAL T.T.C.
FACTURATION ETABLIE HORS T.V.A. EN VER
Fait à Saint-Maur, le DE L'ARTICLE 293 B DU C.G.I.
le 4 novembre 2003,

(1) Donner le détail des frais de déplacement et de séjour
(2) Joindre la note dudit technicien  – (3) Donner le détail des
vacations a) visite des lieux , b) réunions au bureau .
c) étude des dossiers et recherches   d) rédaction de la correspondance
et du rapport

Michel Villard
Expert en Informatique
34, rue Jules Ferry
94100 SAINT MAUR

Michel VILLARD
Consultant in Information Systems
Former student of the Polytechnical School
Expert in computer science to the Court of Appeals and
the Paris Administrative Court of Appeals

[stamp ]
COPY

<div style="border:1px solid">

# EXPERT REPORT

</div>

# PARIS COURT OF COMMERCE

### Order issued April 4, 2003

### 15th DIVISION

### Presided over by Mr. SEVRAY

### Mr. LUCQUIN, Official Referee

### Mrs. CHARLIER-BONATTI, Judge

### Mr. PERRAUD, Judge

### Mr. LASSALLE, Judge

### assisted by
### Mr. DURAFOUR, Clerk of Court

R G No 2002050224 (07/17/2002)

34 rue Jules Ferry – 94100 SAINT MAUR
michel villard@m4x org

Tel 01 43 97 15 03 or 06 72 93 85 92

Case 1:03-cv-11558-DPW    Document 35-4    Filed 08/04/2006    Page 2 of 35
Michel PILLARD
Expert Report 11/04/2005 Cyrano Inc  vs  Technologies SA  SCP Brouard-Daude and Attorney Facques

In litigation between

**PLAINTIFF**

**CYRANO INC**
with registered offices at 26 Parker Street, NEWBURY PORT, MASSACHUSETTS 70950-4010, UNITED STATES,
represented by ITEANU & Associes, rue du Faubourg Saint Honore – 75008 PARIS,
LOCKER D1380


**DEFENDANTS**

**TECHNOLOGIES SA**
with registered offices at 84/88 bd Mission Marchand – 92400 COURBEVOIE,
represented by WERNERT & ASSOCIÉS, 45 av  Victor Hugo – 75008 PARIS,
LOCKER P0373

**SCP BROUARD-DAUDE**
with registered offices at 34, rue Sainte-Anne – 75001 Paris,
in the capacity of liquidating agent of CYRANO SA,
and
**Attorney Denis FACQUES**
residing at 22, avenue Victoria – 75001 PARIS,
in his capacity as receiver,
represented by Attorney Marc DUJARDIN, 91, rue du Faubourg Saint Honoré – 75008 PARIS
LOCKER P22


**VOLUNTARY INTERVENERS**

**QUOTIUM TECHNOLOGIES SA,**
with registered offices at 84/88 bd Mission Marchand – 92400 COURBEVOIE,
and
**TECHNOLOGIES SA,**
with registered offices at 84/88 bd Mission Marchand – 92400 COURBEVOIE,

represented by WERNERT & ASSOCIES, 45 av  Victor Hugo – 75008 PARIS,
LOCKER P0373

Michel BILLARD
Expert Report 11/04/2005 Cyrano Inc vs Technologies SA SCP Brouard Daude and Attorney Facques

## Table of Contents

| | | |
|---|---|---|
| 1 | Introduction | 5 |
| | 1 1 Review of the facts | 5 |
| | 1 2 Review of the expert report assignment | 6 |
| | 1 3 Conduct of the expert investigation | 7 |
| 2 | Responses to the questions of the expert report assignment | 8 |
| | 2 1 Sale of CYRANO UK assets to CYRANO Inc | 8 |
| | 2 2 Sale of CYRANO SA assets to Technologies and Quotium Technologies | 8 |
| | 2 3 Ownership of the claimed software | 9 |
| | 2 4 Reality and nature of the disputed facts and alleged damages | 9 |
| 3 | Contents of the appendices to the expert report | 10 |
| | 3 1 Appendix I  Follow-up expert documents exchanged with the Court | 10 |
| | 3 2 Appendix II  Notices of meetings and memos to the parties | 10 |
| | 3 3 Appendix III  Statements submitted by the parties | 10 |
| | 3 3 1 Statements submitted by CYRANO Inc | 10 |
| | 3 3 2 Statements submitted by TECHNOLOGIES SA and Quotium TECHNOLOGIES SA | 11 |
| | 3 3 3 Statements submitted by SCP BROUARD-DAUDE and Attorney FACQUES | 11 |
| | 3 4 Appendix IV  Exhibits submitted by the parties | 11 |
| | 3 4 1 List of exhibits in numerical order | 13 |
| | 3 4 2 List of exhibits in chronological order | 15 |
| 4 | Investigations and analysis of the facts | 18 |
| | 4 1 Description of CYRANO SA software products | 18 |
| | 4 2 Description of the contents of the Logiboxes | 19 |
| | 4 3 The disputed Software applications | 21 |
| | 4 3 1 List of the disputed software applications | 21 |
| | 4 3 2 Who created the disputed software? | 21 |
| | 4 3 3 Ownership of the disputed software products | 24 |
| | 4 4 Damage suffered by CYRANO Inc | 25 |
| 5 | Additional responses to the depositions | 27 |
| | 5 1 Unwarranted assertions | 27 |
| | 5 2 The four attestations of former employees of CYRANO SA | 27 |
| | 5 3 Payment of royalties | 29 |
| | 5 4 Possible merger of IMM and Performance Software | 30 |
| | 5 5 Quality control organization for the products | 30 |
| | 5 6 Technical White Paper on Open STA | 30 |

Michel AILLAUD,
Expert Report V1/04/2005 Cyrhid Int. vs Technologies Sft SLP Brouard Daude and Attorney Facques

## Glossary

| | |
|---|---|
| Gateway | Hardware and/or software gateway |
| **HTTP** | Hypertext Transmission Protocol  Internet communication protocol between a client and a Web server, based on the transfer of hypertext files |
| **Internet** | World-wide computer network composed of national, regional and private networks that cooperate for the purpose of offering a unique interface to their users<br><br>English  Internetwork, for "Interconnection (inter) of networks (network) " |
| **Software[1]** | Set of programs, procedures and rules, and possibly documentation, related to the operation of a data processing package<br>English  software |
| **Logibox[1]** | Sealed envelope used in deposits to the APP (Program Protection Agency), APP's Web site  app legalis net/ |
| **Open source** | Said of software that can be freely modified and redistributed, not necessarily free of charge  New trend in the software industry |
| **Software package[1]** | Complete, documented set of programs designed to be furnished to multiple users, for the same application of the same function<br>English  package |
| **Web server** | Program that runs on a computer (server) for the sole purpose of responding to Web client (browser) software requests, executed on the same computer or other computers |
| **SQL** | Structured Query Language  ANSI standardized language that allows databases to be defined and accessed |
| **VMS** | Specific operating system for computers manufactured by Digital Equipment Company (DEC) |
| **WWW (or W3)** | World Wide Web  (Literally "world-scale spider web")  Initiative the purpose of which is to retrieve hypermedia information world wide to allow access to a large number of documents |

[1]Definition according to the www celog fr/cpi/ on-line glossary

Case 4:04-cv-01558-DPW   Document 35-4   Filed 08/04/2006   Page 5 of 35
MichuARD LARD/
Expert Report · 1/04/2003 Cyrano Inc vs Technologies SA SCP Brouard Daude and Attorney Facques

# 1   INTRODUCTION

## 1.1 REVIEW OF THE FACTS

__/__/1986   Creation of the Performance Software Ltd company

10/03/1996   IMM, company under French law, acquires 100% of the capital stock of Performance Software Ltd

02/__/1997   IMM is renamed CYRANO SA  Performance Software Ltd is renamed CYRANO UK

03/12/1998   Mr  Denis BITAN, on behalf of CYRANO SA, deposits logibox No  98-11014-00 (ServerPack) and No  98-11015-00 (VTPack)

12/10/1998   Mr  Denis BITAN, on behalf of CYRANO SA, deposits logibox No  98-500030-00 (VTPack2)

06/11/2003 [sic] The Paris Court of Commerce opens legal redress proceedings against CYRANO SA

10/15/2001   The Paris Court of Commerce orders the compulsory liquidation of CYRANO SA and appoints SCP BROUARD DAUDE as liquidator

10/__/2001   CYRANO UK is placed in liquidation

11/10/2001   Attorney BROUARD, in his capacity, issues a call for bids to acquire certain tangible and intangible elements of CYRANO SA's business

11/30/2001   TECHNOLOGIES SA submits a buy-out proposal

12/11/2001   The Official Receiver issues an order authorizing the sale of CYRANO SA's OpenSTA's activity to the company SOFITRADE

12/20/2001   TECHNOLOGIES SA, the unsuccessful buyer candidate, lodged an objection to the order of December 11, 2001

03/13/2002   The Paris Court of Commerce vacates the order of December 11, 2001 and orders the sale of the assets in question to TECHNOLOGIES SA, under its terms of offer

03/21/2002   Sale to CYRANO Inc [1] of certain assets of CYRANO UK

04/10/2002   Claim of ownership made to Attorney BROUARD by Attorney LÉGER, Attorney for CYRANO Inc

05/16/2002   Sale contract between SCP BROUARD DAUDE and the companies Technologies and Quotium Technologies [2] (in process of being established)  The parties agree to make Attorney Denis FACQUES, the official receiver, receiver of logiboxes 98-11014-00, 98-11015-00, and 98-500030-00

07/08/2002   CYRANO Inc  summons TECHNOLOGIES SA, Attorney Denis FACQUES and SCP BROUARD DAUDE to appear before the Paris Court of Commerce

09/20/2002   By ruling, the Court continues the case at the request of the parties for translation into French of the documents in the English language by a certified translator

04/04/2003   Ruling by the Paris Court of Commerce ordering the expert report

---

[1] CYRANO Inc  is a wholly owned subsidiary of SOFITRADE (exhibit 12)
[2] QUOTIUM TECHNOLOGIES is a subsidiary of the TECHNOLOGIES group (www quotium com)

Case 05-cv-1558-DPW   Document 35-4   Filed 08/04/2006   Page 6 of 35
Michel AILLARD
Expert Report - M70v/2003 Cyrano inc vs Technologies SA SCP Brouard-Daude and Attorney Pacques

## 1 2 REVIEW OF THE EXPERT REPORT ASSIGNMENT

In an order issued on April 4, 2003, the Paris Court of Commerce defined the expert report assignment in these terms

- *have the parties furnish him with all documents and exhibits he deems useful to his assignment,*
- *give his opinion on the validity of the sale of the assets of CYRANO UK to CYRANO Inc under the terms of the contract of March 21, 2002, and on the validity of the attestation of the British liquidator of CYRANO UK, especially in consideration of the fact that the certificates of ownership of the sold software were not listed in the appendix to that contract,*
- *give his opinion on which assets are encompassed in receivership in the terms of the sale agreement of May 16, 2002 for the assets of CYRANO SA by Attorney BROUARD, in his capacity as official receiver of CYRANO SA, to Quotium Technologies and Technologies, after having compared the software claimed by CYRANO Inc and the validity of this contract, especially in consideration of the addition in its appendix of certificates of ownership concerning the logiboxes in question,*
- *as a result, give his opinion about the ownership of the claimed software and generally on the reality and nature of the facts in dispute and the alleged damages,*
- *give a hearing to all knowledgeable persons that he considers useful,*
- *conduct his expert operations jointly, and in so far as necessary, advise the parties of his opinion, orally or in writing, in order to obtain their latest observations before filing his report*

Article 238 of the NCPC

*"The technician should give his opinion on the points to be examined for which he has been commissioned He can not deal with other questions, except by written agreement of the parties He should never offer opinions of a legal nature"*

Case 1:05-cv-11558-DPW    Document 35-4    Filed 08/04/2006    Page 7 of 35
Michel LEARD
Expert Report 11/04/2003 Cyrano Inc vs Technologies SA SCP Brouard Daude and Attorney Facques

### 1 3 CONDUCT OF THE EXPERT INVESTIGATION

The order of April 4, 2003 had set a period of three months after payment of the funds for the report to be filed with the clerk  Since the funds were paid on April 30, the deadline for filing the report was therefore July 30, 2003

In a decision of July 21, pursuant to my request, the Court extended that deadline to October 30, 2003

The expert investigation was conducted as follows

| | |
|---|---|
| 04/04/2003 | Paris Court of Commerce orders expert report |
| 04/30/2003 | Payment by CYRANO Inc |
| 06/18/2003 | Meeting No  1 for expert report |
| 06/24/2003 | Informational expert memo No  1 following the meeting |
| 06/25/2003 | List of labels of the logiboxes impounded by Attorney Denis FACQUES |
| 09/02/2003 | Meeting No  2 for expert report |
| 10/24/2003 | Conclusion of communications of exhibits or statements |
| 10/30/2003 | Expert report |

## 2    RESPONSES TO THE QUESTIONS OF THE EXPERT REPORT ASSIGNMENT

### 2 1 SALE OF CYRANO UK ASSETS TO CYRANO INC

• *give his opinion on the validity of the sale of the assets of CYRANO UK to CYRANO Inc under
the terms of the contract of March 21, 2002, and on the validity of the attestation of the British
liquidator of CYRANO UK, especially in consideration of the fact that the certificates of ownership of
the sold software were not listed in the appendix to that contract*

The contract of March 21, 2002 stipulates that the sale of the assets designated as "the software"
includes the software products known as "CYRANO Impact" and "CYRANO Test "

A reading of the contract, whose appendix A entitled "Specification of the products to be delivered"
does not include said specifications, does not allow a decision to be reached about the ownership of
the software sold

The attestation of the British liquidator is an opinion of a legal nature

### 2 2 SALE OF CYRANO SA ASSETS TO TECHNOLOGIES AND QUOTIUM TECHNOLOGIES

• *give his opinion on which assets are encompassed in receivership in the terms of the sale
agreement of May 16, 2002 for the assets of CYRANO SA by Attorney BROUARD, in his capacity
as official receiver of CYRANO SA, to Quotium Technologies and Technologies, after having
compared the software claimed by CYRANO Inc and the validity of this contract, especially in
consideration of the addition in its appendix of certificates of ownership concerning the logiboxes
in question*

In the terms of the May 16, 2002 sale agreement of CYRANO SA's assets, the following logiboxes
were placed in the custody of Attorney Denis FACQUES

• Logibox No 98-11014-00 deposited with the APP on 03/12/98
• Logibox No 98-11015-00 deposited with the APP on 03/12/98
• Logibox No 98-500030-00 deposited with the APP on 12/10/98

The hearings have made it possible to compare their contents with the CYRANO Impact and
CYRANO Test software products

My analyses and investigations are described in the following chapters

• Description of the CYRANO software products (§ 4 1)
• Description of the contents of the logiboxes (§ 4 2)
• List of the software products in dispute (§ 4 3 1)

With respect to the CYRANO Test product, Attorney BROUARD's call for bids *(exhibit No 1, page
2)* as well as the sale document dated May 16, 2002 *(exhibit No 10 § 1 1 2 1 page 7)* mention

*"the source codes for the Test product belong to CYRANO UK Ltd "*

Case 1:05-cv-11558-DPW    Document 35-4    Filed 08/04/2006    Page 9 of 35
Expert Report 11/04/2003 Cyrano Inc vs Technologies SA SCP Brouard Daude and Attorney Facques
Michel BELARD

It is clear, therefore, that the CYRANO Test product was not among those included in the sale

## 2 3 OWNERSHIP OF THE CLAIMED SOFTWARE

• *give his opinion, as a result, about the ownership of the claimed software*

My reasoned conclusions are as follows

CYRANO UK's Research & Development center, based in Bradford, England, carried out the design and development of

• the CYRANO Test product
• the CYRANO Impact product, except for a software component called "Gateway" that was developed by CYRANO SA in Paris

The assets, R&D teams and intellectual property rights of CYRANO UK and CYRANO SA have never been merged

The ownership of the Gateway module was transferred to CYRANO UK on June 30, 1998

CYRANO UK therefore possessed 100% of the CYRANO Test and CYRANO Impact software products when its assets were assigned to CYRANO Inc under the terms of the assignment document dated March 21, 2002

My analyses and investigations are described in the following chapters

• Who created the software in dispute? (§ 4 3 2)
• Ownership of the software products in dispute (§ 4 3 3)
• Additional responses to the statements (§ 5)

## 2 4 REALITY AND NATURE OF THE DISPUTED FACTS AND ALLEGED DAMAGES

• *(give his opinion, as a result, about the ownership of the claimed software   ) and generally on the reality and nature of the facts in dispute and the alleged damages,*

The procedures employed by TECHNOLOGIES SA and Quotium Technologies resulted in costs for CYRANO Inc

It is probable that the actions by TECHNOLOGIES SA and Quotium Technologies in the market, as well as knowledge by customers of the lawsuit, have resulted in lost profits for CYRANO Inc

• Non-renewal of maintenance contracts
• Drop in sales of licenses and services

In the absence of exhibits, I can not express an opinion with certainty about the reality of the loss of profits  It is the responsibility of CYRANO Inc  to provide proof (see § 4 4 Damages suffered by CYRANO Inc )

I leave the determination of damages to the sovereign appraisal of the Court

## 3   CONTENTS OF THE APPENDICES TO THE EXPERT REPORT

### 3 1 APPENDIX I  FOLLOW-UP EXPERT DOCUMENTS EXCHANGED WITH THE COURT

- Order issued April 4, 2003 (9 pages)
- Opinion on the decision of appoint of expert, dated April 7 and received April 25, 2003 (2 pages)
- Acceptance of the assignment by the expert, dated April 30, 2003 (1 page)
- Request for extension of deadline to October 30, 2003, dated July 7, 2003 (1 page)
- Decision to extend the deadline to October 30, 2003, dated July 21, 2003 (1 page)

### 3 2 APPENDIX II  NOTICES OF MEETINGS AND MEMOS TO THE PARTIES

- Notice, dated May 23, 2003, of expert report meeting No 1 (4 pages)
- Record of attendance at the 2 expert report meetings of June 18 and September 1, 2003 (1 page)
- Memo No 1 to the parties, dated June 24, 2003 (5 pages)
- Memo No 2 to the parties, dated September 23, 2003 ( pages)
- 2 e-mails from the expert, dated October 8 and 14, 2003, in response to the e-mail from Mr Dalat, Attorney for TECHNOLOGIES SA and Quotium Technologies, dated October 7, 2003 (2 pages)
- E-mail from the expert, dated October 21, 2003, in response to statement No 3 from TECHNOLOGIES SA and Quotium Technologies dated October 17, 2003 (2 pages)

### 3.3 APPENDIX III: STATEMENTS SUBMITTED BY THE PARTIES

#### 3.3 1   Statements submitted by CYRANO Inc

- Letter dated May 12, 2003 (2 pages) accompanying the dossier of defense arguments, with 19 exhibits numbered from 1 to 19, in accordance with the list dated May 13, 2003
- Statement No 1, by e-mail, dated June 12, 2003 (1 page), with 2 attached documents
  - List of software that is owned by CYRANO Inc by right (4 pages)
  - Litter of invitation to the APP dated June 12, 2003 (2 pages)
- Statement No 2 dated June 25, 2003 (2 pages), with 10 exhibits numbered from 20 to 29, according to the list dated June 25, 2003
- Statement No 3 dated July 17, 2003 (5 pages), with 8 appendices, appendices 4 to 8 constitute 5 new exhibits numbered from 30 to 34
- Statement No 4 dated October 2, 2003 (11 pages), with appendices 1 to 10 constituting 10 exhibits numbered 35 to 44
- Statement No 4 bis dated October 2, 2003 (5 pages) – Statement on questions that are not pertinent
- Statement No 5 dated October 23, 2003 (3 pages), with 3 exhibits numbered 45 to 47
  - Attestation by Mrs Noelle Beaudin (4 pages)
  - Additional attestation by Mr Geoffrey Hall (7 pages)
  - Attestation by Mr Lee-Daniel Sutcliffe (4 pages)

Case 1:03-cv-01558-DPW    Document 35-4    Filed 08/04/2006    Page 11 of 35
Michel KILLARD
Expert Report 11/04/2003 Cyrano Inc vs Technologies SA SCP Brouard Daude and Attorney Facques

Exhibits 1 to 29, which were provided according to lists, are included in Appendix IV Exhibits submitted by the parties

Exhibits 30 to 47, which were provided appended to the statements, are included in Appendix III Statements submitted by the parties

### 3 3 2    Statements submitted by TECHNOLOGIES SA and Quotium TECHNOLOGIES SA

Letters and statements provided by TECHNOLOGIES SA and Quotium Technologies

- Letter dated May 21, 2003 (1 page) accompanying the dossier of defense arguments, of which five exhibits[3] are numbered T01 to T05
- Letter dated June 25, 2003 (1 page)
- Statement No  1 dated July 23, 2003 (13 pages)
- Statement No  2 dated September 19, 2003 (6 pages) with 6 appended exhibits numbered T06 to T11
- Statement No  3 dated October 17, 2003 (3 pages) with one appended exhibit of 7 pages, numbered T12
- "Response to the request for information following statement No  3," dated October 22, 2003, with 3 appended exhibits numbered T13 to T15

Exhibits T01 to T05, which are provided with the dossier of defense arguments, are included in Appendix IV  Exhibits submitted by the parties

Exhibits T06 to T15, which are provided appended to the statements, are included in Appendix III Statements submitted by the parties

### 3 3.3    Statements submitted by SCP BROUARD-DAUDE and Attorney FACQUES

Letters and statements provided by SCP BROUARD-DAUDE and Attorney FACQUES

- Letter dated May 27, 2003 accompanying the dossier of defense arguments, of which four exhibits[4] are numbered B04, B05, B08 and B13
- Letter dated October 7, 2003, (4 pages) with copy of the letter to Attorney FACQUES dated October 7, 2003
- Letter dated October 15, 2003 (1 page) with copy of the letter to Attorney FACQUES dated October 13, 2003

Exhibits B04, B05, B08 and B13, which are provided with the dossier of defense arguments, are included in Appendix IV  Exhibits submitted by the parties

---

[3] Not included are exhibits already recorded as having been provided by CYRANO Inc

[4] Not included are exhibits already recorded as having been provided by CYRANO Inc

**3 4 APPENDIX IV  EXHIBITS SUBMITTED BY THE PARTIES**

We have recorded a total of 67 exhibits

CYRANO Inc has provided 47 exhibits

- 19 exhibits numbered 1 to 19 according to the list dated May 13, 2003 attached to the letter dated May 12, 2003,
- 10 exhibits numbered 20 to 29 according to the list dated June 25, 2003 attached to statement No 2,
- 5 exhibits numbered 30 to 34 according to appendix to statement No 3 dated July 17, 2003,
- 10 exhibits numbered 35 to 44 according to list of appendices attached to statement No 4 dated October 2, 2003
- 3 exhibits numbered 45 to 47, attached to statement No 4 dated October 23, 2003

The expert added 1 exhibit

- 1 exhibit 4a  fax from Attorney Brian BANDEY to Technologies, attached to exhibit 4

TECHNOLOGIES SA and Quotium Technologies provided 15 exhibits, in addition to exhibits already recorded as exhibits provided by CYRANO Inc

- 5 exhibits numbered T01 to T05, provided with the dossier of defense arguments
- 6 exhibits numbered T06 to T11, appended to statement No 2 dated September 19, 2003
- 1 exhibit numbered T12, appended to statement No 3 dated October 17, 2003
- 3 exhibits numbered T13 to T15, appended to the remainder dated October 22, 2003

SCP BROUARD DAUDE provided exhibits according to a list, 4 exhibits of which were in addition to what were already recorded as exhibits provided by CYRANO Inc

- 4 exhibits numbered B04, B05, B08 and B13

3 4 1 List of exhibits in numerical order

| No | Date | Title |
|----|------|-------|
| 1 | 11/12/2001 | Invitation to tender issued by Atty BROUARD on November 12, 2001 |
| 2 | 12/11/2001 | Order to sell off part of the assets of CYRANO SA dated December 11, 2001 |
| 3 | 03/13/2001 | Ruling of the Commercial Court of Paris dated March 13, 2002 |
| 4 | 04/10/2002 | Letter from Atty LEGER to Atty BROUARD dated April 10, 2002 |
| 4a | 04/03/2002 | Fax from Dr Brian Bandey to TECHNOLOGIES SA dated April 3, 2003 |
| 5 | 05/17/2002 | Letter from Cabinet ATK to Atty LEGER dated May 17, 2002 |
| 6 | 05/24/2002 | Letter from Cabinet ATK to Atty LEGER dated May 24, 2002 |
| 7 | 06/12/2002 | Letter from Atty LEGER to Atty FACQUES dated June 12, 2002 |
| 8 | 06/14/2002 | Letter from Atty LEGER to Atty FACQUES dated June 14, 2002 |
| 9 | __/__/2001 | List of software applications being held by SCP BROUARD DAUDE |
| 10 | 05/16/2002 | Contract for the sale of parts of the assets [of CYRANO SA] to TECHNOLOGIES SA signed by Atty BROUARD on May 16, 2002 |
| 11 | 03/21/2002 | Contract for the sale of the assets of CYRANO UK to CYRANO INC dated March 31, 2002 and its translation |
| 12 | 06/14/2002 | Letter from Atty BRACKENBURY dated June 14, 2002 and its translation |
| 13 | 06/12/2002 | Letter from Doctor BANDEY dated June 12, 2002 and its translation |
| 14 | __/__/1998 | CYRANO 1997/1998 annual report |
| 15 | __/__/1999 | CYRANO 1998/1999 annual report |
| 16 | 09/1/1997 | Preliminary COB prospectus |
| 17 | 08/30/1996 | Minutes of the meeting of the Board of Directors of IMAGE MULTI MEDIAS that was held on August 30, 1996 |
| 18 | 10/03/1996 | Shareholders' agreement to acquire PERFORMANCE SOFTWARE Ltd , formerly known as CYRANO UK |
| 19 | 09/12/2002 | Declaration of Mr Régis BIZIEN, Statutory Auditor of CYRANO |
| 20 | Not dated | Presentation of CYRANO's DBPack |
| 21 | Not dated | Presentation of CYRANO's ClientPack |
| 22 | Not dated | List of CYRANO Packs |
| 23 | Not dated | CYRANO DBPack sales brochure |
| 24 | Not dated | Presentation of CYRANO's ServerPack |
| 25 | Not dated | CYRANO ServerPack sales brochure |
| 26 | Not dated | CYRANO VTPack sales brochure |
| 27 | Not dated | CYRANO Millenium [sic] Test sales brochure |
| 28 | Not dated | ClientPack sales brochure |
| 29 | Not dated | CYRANO software price list |
| 30 | 10/09/2002 | Deposition no 3, Appendix 4 Mr Malcolm GREEN's declaration |
| 31 | 10/09/2002 | Deposition no 3, Appendix 5 Mr Richard CLARKE's declaration |
| 32 | 06/16/2003 | Deposition no 3, Appendix 6 Mr Martin GREENBANK's declaration |
| 33 | 04/01/1997 | Deposition no 3, Appendix 7 Distribution contract between CYRANO UK and CYRANO SUISSE dated April 1, 1997 |

| 34 | 06/30/1998 | Deposition no 3, Appendix 8 Invoice issued by CYRANO UK to CYRANO SUISSE dated June 30, 1998 |
| 35 | 11/08/2002 | Deposition no 4, Appendix 1 Mr Philippe EYRIES's declaration |
| 36 | 06/21/2000 | Deposition no 4, Appendix 2 E-mail sent by Mr Phil STEPHENSEN-PAYNE on June 21, 2000 |
| 37 | 09/24/2003 | Deposition no 4, Appendix 3 Mr Denis BITAN's declaration |
| 38 | 11/02/2000 | Deposition no 4, Appendix 4 E-mail sent by Mrs Noelle BEAUDIN on November 2, 2000 |
| 39 | 11/01/2000 | Deposition no 4, Appendix 5 E-mail sent by Mr Christopher JONES on November 1, 2000 |
| 40 | 10/02/2003 | Deposition no 4, Appendix 6 List of fee invoices paid by CYRANO INC |
| 41 | 07/31/2002 | Deposition no 4, Appendix 7 E-mail from TECHNOLOGIES SA |
| 42 | 09/19/2003 | Deposition no 4, Appendix 8 Ruling of the Commercial Court of Paris dated September 19, 2003 |
| 43 | 09/14/2003 | Deposition no 4, Appendix 9 Calculation of the lost business opportunities in terms of maintenance contracts |
| 44 | 10/02/2003 | Deposition no 4, Appendix 10 Estimated lost business opportunities in terms of sales of licenses and service in 2002 |
| 45 | 11/11/2002 | Appendix no 1, deposition 5 Mrs Noelle BEAUDIN's declaration |
| 46 | 11/12/2002 | Appendix no 2, deposition 5 Mr Geoffrey HALL's additional declaration |
| 47 | 11/08/2002 | Deposition no 5, Appendix 3 Mr Lee-Daniel SUTCLIFFE's declaration |
| T01 | 07/08/2002 | Writ of summons to appear before the Commercial Court of Paris served by CYRANO INC on July 8, 2002 |
| T02 | 07/17/2002 | Brief submitted by TECHNOLOGIES SA on July 17, 2002 |
| T03 | 02/21/2003 | Brief submitted by CYRANO INC on February 21, 2003 |
| T04 | 06/07/2002 | Extrait KBIS [French certificate of incorporation] of CYRANO SA delivered on June 7, 2002 |
| T05 | 11/30/2001 | TECHNOLOGIES SA's offer to purchase part of the assets of CYRANO SA |
| T06 | 01/10/1996 | Deposition no T2, Appendix 1 The merger between IMM and Performance |
| T07 | 04/01/1997 | Deposition no T2, Appendix 2 Distribution contract – Appendix D – between CYRANO UK and CYRANO SUISSE dated April 1, 1997 |
| T08 | 08/26/1998 | Deposition no T2, Appendix 3 Fax from Martin GREENBANK dated August 26, 1998 |
| T09 | 09/04/2002 | Deposition no T2, Appendix 4 KPMG report dated September 4, 2002 |
| T10 | 09/16/2003 | Deposition no T2, Appendix 5 Testimonies of four former employees of CYRANO SA |
| T11 | 11/26/2002 | Deposition no T2, Appendix 5 The declarations of Mr François WATINE and Mr Olivier COLLARD |
| T12 | 02/15/2001 | OpenSTA Technical White Paper – version 1 2 dated February 15, 2001 (7 page excerpt) |
| T13 | 02/15/2001 | OpenSTA Technical White Paper – version 1 2 dated February 15, 2001 (23 pages) |
| T14 | 03/15/2001 | OpenSTA Technical White Paper – version 1 0 dated March 15, 2001 (32 pages) |
| T15 | 03/15/2001 | OpenSTA Technical White Paper – version 1 0 dated March 15, 2001 (French translation – 34 pages) |

Case 1:05-cv-01558-DPW    Document 35-4    Filed 08/04/2006    Page 15 of 35
Midju)HLLARD
Expert Report 11/04/2005 Cyrano Inc vs Technologies SA SCP Brouard-Daude and Attorney Facques

| B04 | 04/16/2002 | Writ of summons to appear before the Paris District Court served by TECHNOLOGIES SA on April 16, 2002 |
| B05 | 03/28/2003 | Brief submitted by SCP BROUARD DAUDE on March 28, 2003 |
| B08 | 05/02/2002 | Ruling of the Paris District Court dated May 2, 2002 |
| B13 | 06/24/2002 | Letter sent by Atty WERNERT to Atty FACQUES on June 24, 2002 by recorded delivery with acknowledgement of receipt |

### 3 4 2 List of exhibits in chronological order

| No | Date | Title |
|----|------|-------|
| 17 | 08/30/1996 | Minutes of the meeting of the Board of Directors of IMAGE MULTI MEDIAS that was held on August 30, 1996 |
| T06 | 10/01/1996 | Appendix 1, Deposition no T2 The merger between IMM and Performance |
| 18 | 10/03/1996 | Shareholders' agreement to acquire PERFORMANCE SOFTWARE Ltd , formerly known as CYRANO UK |
| 33 | 04/01/1997 | Appendix 7, Deposition no 3 Distribution contract between CYRANO UK and CYRANO SUISSE dated April 1, 1997 |
| T07 | 04/01/1997 | Appendix 2, Deposition no T2 Distribution contract – Appendix D – between CYRANO UK and CYRANO SUISSE dated April 1, 1997 |
| 16 | 09/11/1997 | Preliminary COB prospectus |
| 34 | 06/30/1998 | Appendix 8, Deposition no 3 Invoice issued by CYRANO UK to CYRANO SUISSE dated June 30, 1998 |
| T08 | 08/26/1998 | Appendix 3, Deposition no T2 Fax from Martin GREENBANK dated August 26, 1998 |
| 14 | __/__/1998 | CYRANO 1997/1998 annual report |
| 15 | __/__/1999 | CYRANO 1998/1999 annual report |
| 36 | 06/21/2000 | Appendix 2, Deposition no 4 E-mail sent by Mr Phil STEPHENSEN-PAYNE on June 21, 2000 |
| 39 | 11/01/2000 | Appendix 5, Deposition no 4 E-mail sent by Mr Christopher JONES on November 1, 2000 |
| 38 | 11/02/2000 | Appendix 4, Deposition no 4 E-mail sent by Mrs Noelle BEAUDIN on November 2, 2000 |
| T12 | 02/15/2001 | OpenSTA Technical White Paper – version 1 2 dated February 15, 2001 (7 page excerpt) |
| T13 | 02/15/2001 | OpenSTA Technical White Paper – version 1 2 dated February 15, 2001 (23 pages) |
| T14 | 03/15/2001 | OpenSTA Technical White Paper – version 1 0 dated March 15, 2001 (32 pages) |
| T15 | 03/15/2001 | OpenSTA Technical White Paper – version 1 0 dated March 15, 2001 (French translation – 34 pages) |
| 1 | 11/12/2001 | Invitation to tender issued by Atty BROUARD on November 12, 2001 |
| T05 | 11/30/2001 | TECHNOLOGIES SA's offer to purchase part of the assets of CYRANO SA |
| 2 | 12/11/2001 | Order to sell off part of the assets of CYRANO SA dated December 11, 2001 |
| 9 | __/__/2001 | List of software applications being held by SCP BROUARD DAUDE |

| 3 | 03/13/2001 | Ruling of the Commercial Court of Paris dated March 13, 2002 |
|---|---|---|
| 11 | 03/21/2002 | Contract for the sale of the assets of CYRANO UK to CYRANO INC dated March 21, 2002 and its translation |
| 4a | 04/03/2002 | Fax from Dr Brian Bandey to TECHNOLOGIES SA dated April 3, 2003 |
| 4 | 04/10/2002 | Letter from Atty. LEGER to Atty. BROUARD dated April 10, 2002 |
| B04 | 04/16/2002 | Writ of summons to appear before the Paris District Court served by TECHNOLOGIES SA on April 16, 2002 |
| B08 | 05/02/2002 | Ruling of the Paris District Court dated May 2, 2002 |
| 10 | 05/16/2002 | Contract for the sale of parts of the assets [of CYRANO SA] to TECHNOLOGIES SA signed by Atty. BROUARD on May 16, 2002 |
| 5 | 05/17/2002 | Letter from Cabinet ATK to Atty. LEGER dated May 17, 2002 |
| 6 | 05/24/2002 | Letter from Cabinet ATK to Atty. LEGER dated May 24, 2002 |
| T04 | 06/07/2002 | Extrait KBIS [French certificate of incorporation] of CYRANO SA delivered on June 7, 2002 |
| 7 | 06/12/2002 | Letter from Atty. LEGER to Atty. FACQUES dated June 12, 2002 |
| 13 | 06/12/2002 | Letter from Doctor BANDEY dated June 12, 2002 and its translation |
| 8 | 06/14/2002 | Letter from Atty. LEGER to Atty. FACQUES dated June 14, 2002 |
| 12 | 06/14/2002 | Letter from Atty. BRACKENBURY dated June 14, 2002 and its translation |
| B13 | 06/24/2002 | Letter sent by Atty. WERNERT to Atty. FACQUES on June 24, 2002 by recorded delivery with acknowledgement of receipt |
| T01 | 07/08/2002 | Writ of summons to appear before the Commercial Court of Paris served by CYRANO INC on July 8, 2002 |
| T02 | 07/17/2002 | Brief submitted by TECHNOLOGIES SA on July 17, 2002 |
| 41 | 07/31/2002 | Appendix 7, Deposition no 4 E-mail from TECHNOLOGIES SA |
| T09 | 09/04/2002 | Appendix 4, Deposition no T2 KPMG report dated September 4, 2002 |
| 19 | 09/12/2002 | Declaration of Mr Régis BIZIEN, Statutory Auditor of CYRANO |
| 30 | 10/09/2002 | Appendix 4, Deposition no 3 Mr Malcolm GREEN's declaration |
| 31 | 10/09/2002 | Appendix 5, Deposition no 3 Mr Richard CLARKE's declaration |
| 35 | 11/08/2002 | Appendix 1, Deposition no 4 Mr Philippe EYRIES's declaration |
| 47 | 11/08/2002 | Appendix 3, Deposition no 5 Mr Lee-Daniel SUTCLIFFE's declaration |
| 45 | 11/11/2002 | Appendix no 1, deposition 5 Mrs Noelle BEAUDIN's declaration |
| 46 | 11/12/2002 | Appendix no 2, deposition 5 Mr Geoffrey HALL's additional declaration |
| T11 | 11/26/2002 | Appendix 5, Deposition no T2 The declarations of Mr François WATINE and Mr Olivier COLLARD |
| T03 | 02/21/2003 | Brief submitted by CYRANO INC on February 21, 2003 |
| B05 | 03/28/2003 | Brief submitted by SCP BROUARD DAUDE on March 28, 2003 |
| 32 | 06/16/2003 | Appendix 6, Deposition no 3 Mr Martin GREENBANK's declaration |
| 43 | 09/14/2003 | Appendix 9, Deposition no 4 Calculation of the lost business opportunities in terms of maintenance contracts |
| T10 | 09/16/2003 | Appendix 5, Deposition no T2 Testimonies of four former employees of CYRANO SA |

Expert Report 11/04/2003 Cyrano Inc vs Technologies SA SCP Brouard Daude and Attorney Facques

| 42 | 09/19/2003 | Appendix 8, Deposition no 4 Ruling of the Commercial Court of Paris dated September 19, 2003 |
|----|------------|---|
| 37 | 09/24/2003 | Appendix 3, Deposition no 4 Mr Denis BITAN's declaration |
| 40 | 10/02/2003 | Appendix 6, Deposition no 4 List of fee invoices paid by CYRANO INC |
| 44 | 10/02/2003 | Appendix 10, Deposition no 4 Estimated lost business opportunities in terms of sales of licenses and service in 2002 |
| 20 | Not dated | Presentation of CYRANO's DBPack |
| 21 | Not dated | Presentation of CYRANO's ClientPack |
| 22 | Not dated | List of CYRANO Packs |
| 23 | Not dated | CYRANO DBPack sales brochure |
| 24 | Not dated | Presentation of CYRANO's ServerPack |
| 25 | Not dated | CYRANO ServerPack sales brochure |
| 26 | Not dated | CYRANO VTPack sales brochure |
| 27 | Not dated | CYRANO Millenium [sic] Test sales brochure |
| 28 | Not dated | ClientPack sales brochure |
| 29 | Not dated | CYRANO software price list |

## 4 INVESTIGATION AND ANALYSIS OF THE FACTS

## 4 1 DESCRIPTION OF CYRANO SA SOFTWARE PRODUCTS

The sales brochures provided by CYRANO INC *(exhibits nos 20 to 28)* provide a welcome insight into the software products featuring on CYRANO SA's catalogue  The following table gives an abridged list and summary description of these products

| Pack | Software application | Summary description of the software application |
|---|---|---|
| **CYRANO ClientPack** (runs under Windows) | **CYRANO Standards** | Used to define conventions and rules to ensure the quality and performance of the development of Windows client-server applications |
| | **CYRANO Winscope** | Optimizes the development of Windows client-server applications |
| | **CYRANO Insight** | Analyses client accesses of databases so as to optimize database accesses dynamically |
| | **CYRANO Manager** | Used to schedule tests, to monitor the progress of a testing campaign and to manage anomalies |
| | **CYRANO Robot** | Used to create, modify and activate automated tests on Windows client-server applications |
| **CYRANO DBPack** | **CYRANO Workbench** | Used to analyze requests and transactions performed between the client application and the SQL server so as to identify bottlenecks |
| | **CYRANO Production** | Used to analyze the performance of the database and provide a complete report of transactions on the SQL server which exceed critical thresholds or limits |
| | **CYRANO Watcher** | An independent module designed to feed a statistics database |
| **CYRANO VTPack** | **CYRANO Test** | Application testing and certification tool |
| | **CYRANO Timer** | Response time measurement tool |
| | **CYRANO TestStream** | Automated application certification processes |
| | **CYRANO Video** | Used to record sessions on a terminal for analysis or demonstration/training purposes |
| **CYRANO ServerPack** | **CYRANO Impact** | Used to build and execute workload simulations on a database server |
| | **CYRANO LoadTest** | Used to test Windows client-server applications |
| Standalone products (not included in packs) | | |
| **CYRANO Millenium [sic] Test** | | Y2K validation tool |
| **CYRANO EuroTest** | | Euro switchover validation tool |
| **CYRANO VMS DateWarp** | | |
| **CYRANO DataAge** | | |
| **OpenSTA**[1] | | Used to carry out tests on Web servers and generate performance measurements |

**Table 1**

---

[1] OpenSTA  "Open Systems Testing Architecture "  This is an "open source" product distributed as freeware

## 4 2 DESCRIPTION OF THE CONTENTS OF THE LOGIBOXES [BOXES CONTAINING SOFTWARE FOR REGISTRATION PURPOSES]

Under the terms of the contract for the sale of the assets of CYRANO SA dated May 16, 2002, the following logiboxes were entrusted into the safekeeping of Atty  Denis FACQUES

- Logibox no  98-11014-00 lodged with France's APP on 03/12/98

- Logibox no  98-11015-00 lodged with France's APP on 03/12/98

- Logibox no  98-500030-00 lodged with France's APP on 12/10/98

Further to the discussions between the parties during the expert assessment procedure, on October 7, 2003, SCP BROUARD DAUDE sent Atty  Denis FACQUES the two other logiboxes identified as falling within the scope of this assessment procedure, with a view to entrusting them to him in his capacity as trustee bailee

- Logibox no  99-45008-00 lodged with France's APP on 11/03/99

- Logibox no  99-45009-00 lodged with France's APP on 11/03/99

In a letter dated October 13th, Atty  FACQUES indicated that he had no objection to holding on to these two logiboxes as trustee bailee (this letter was appended to the letter from SCP BROUARD DAUDE dated October 15, 2003)

The table below describes the software products contained in these two logiboxes

| Legend | Software claimed by both CYRANO INC and TECHNOLOGIES SA | |
| | Software whose ownership by TECHNOLOGIES SA is not disputed | |
| | Software belonging to Rational Software | Blank |

| Logibox no | Date lodged | Logibox title | Products (=applications) contained within the logibox | Nature of dispute |
|---|---|---|---|---|
| 98-11014-00 | 03/12/98 | **ServerPack** | CYRANO Impact | |
| | | | CYRANO LoadTest (owned by Rational Software) | Blank |
| | | | Source Safe Back Up (CYRANO Test + Impact PC files) | |
| 98-11015-00 | 03/12/98 | **VTPack** | CYRANO Test v 5 2 Archive | |
| | | | CYRANO TestStream | |
| | | | CYRANO Timer v 5 0 Archive | |
| | | | CYRANO Video v 4 0 Archive | |
| | | | CYRANO MillenniumTest [sic] | |
| | | | CYRANO DateWarp VMS | |
| | | | CYRANO DataAge | |
| 98-500030-00 | 12/10/98 | **VTPack 2** | CYRANO Test v 5 4 | |
| | | | CYRANO TestStream | |
| | | | CYRANO Timer | |
| | | | CYRANO Video | |
| | | | CYRANO MillenniumTest [sic] | |
| | | | CYRANO EuroTest | |
| | | | CYRANO DateWarp VMS | |
| | | | CYRANO DataAge | |
| 99-450008-00 | 11/03/99 | **Client Server Suite** | CYRANO Defect Tracker 1 1 **(1)** | |
| | | | CYRANO Winscope for Developer 2000 2 1 beta **(1)** | |
| | | | CYRANO Winscope for Powerbuilder 3 0 beta **(1)** | |
| | | | CYRANO Standards for Powerbuilder 2 4 beta **(1)** | |
| | | | CYRANO Workbench for Sybase 3 1 3 beta **(1)** | |
| | | | CYRANO Workbench for Microsoft 3 1 3 beta **(1)** | |
| | | | CYRANO Workbench for Oracle 1 5 1 beta **(1)** | |
| | | | CYRANO Production for Sybase 2 5 **(1)** | |
| | | | CYRANO Impact for Corba | |
| | | | CYRANO Impact for Java | |
| | | | CYRANO Impact 2 2 3 | |
| 99-450009-00 | 11/03/99 | **Legacy Server Suite** | CYRANOTest 5 4 | |
| | | | CYRANOTest 5 5 | |
| | | | CYRANO Timer 5 1 | |
| | | | CYRANO Video 5 0 | |
| | | | CYRANO Impact 2 2 3 | |
| | | | CYRANO Impact 3 0 | |

(1) Assigned to TECHNOLOGIES SA

**Table 2**

Case 1:04-cv-11558-DPW    Document 35-4    Filed 08/04/2006    Page 21 of 35
Michel NEIARD
Expert Report 11/04/2005 Cyrano Inc vs Technologies SA SCP Brouard Daude and Attorney Jacques

## 4 3 THE DISPUTED SOFTWARE APPLICATIONS

### 4 3 1 List of the disputed software applications

In table 2 above, the software products whose ownership is claimed by both the plaintiff and the defendant and marked in red

Here is a summary of the disputed software applications

| Packs | Software application | Summary description of the software application |
|---|---|---|
| CYRANO VTPack | CYRANO Test | Application testing and certification tool |
| | CYRANO Timer | Response time measurement tool |
| | CYRANO TestStream | Automated application certification processes |
| | CYRANO Video | Used to record sessions on a terminal for analysis or demonstration/training purposes |
| CYRANO ServerPack(1) | CYRANO Impact | Used to build and execute workload simulations on a database server |
| CYRANO MillemumTest [sic] | | Y2K validation tool |
| CYRANO VMS DateWarp | | |
| CYRANO DataAge | | |
| CYRANO EuroTest | | Euro switchover validation tool |

(1) CYRANO ServerPack also includes CYRANO LoadTest, a software application owned by Rational Software

**Table 3**

### 4 3 2 Who created the disputed software?

During our second meeting, I reminded the parties that the lodging of a logibox does not necessarily serve to demonstrate the depositor's ownership of the contents, contrary to the assertion of TECHNOLOGIES SA and QUOTIUM TECHNOLOGIES in their deposition number 1 *"[ ] the certificates showing that the software applications were lodged demonstrate their ownership by CYRANO SA "* (page 2, section 1, paragraph 4 )

TECHNOLOGIES SA and QUOTIUM TECHNOLOGIES then said in their deposition number 2 *" it is not contested that the only registration of the software with the APP is not enough to prove the ownership of the software "* (page 2, section 1, paragraph 4 )

The question is, who then actually created the disputed software?

Clear answers to this question are provided by three declarations made by the following parties

- Mr Malcolm Charles GREEN, one of the founders of Performance Software Ltd (in 1986), who went on to become Director in charge of Software Development from 1995 to 2000 *(exhibit no 30, CYRANO INC deposition no 3, appendix 4)*

- Mr Richard Arthur CLARKE, one of the founders of Performance Software Ltd (in 1986), who went on to serve as Senior Software Engineer until the company's liquidation in October 2001 *(exhibit no 31, CYRANO INC deposition no 3, appendix 5)*

- Mr Martin Stuart GREENBANK, the former Financial Director of CYRANO UK and a Director of the CYRANO companies (i e CYRANO SA, CYRANO UK, CYRANO INC and other subsidiaries), as well as an employee of Performance Software Ltd between early 1992 and April 1999 *(exhibit no 32, CYRANO INC deposition no 3, appendix 6)*

Here is our understanding of the chronology of the creation of the software applications based on these exhibits *(exhibit no 30, page 2, paragraphs 4 and 5, page 3, paragraph 7, page 5, paragraph 1, exhibit no 31, page 2, paragraph 6, exhibit no 32, page 3, paragraph 6)*

| | |
|---|---|
| April 1990 | The first commercial version of "V-TEST"[2] (v 2 1), available only for VMS systems, is launched in the UK |
| April 1992 | Performance Software Ltd is awarded the "United Kingdom Design Council Award" for its "V-TEST" product |
| 1993 | The company starts to port "V-TEST" to UNIX platforms |
| 1995 | First version of "V-TEST" for UNIX (running on SUN machines only) |
| 1996 | First version of "V-TEST" for Windows, a comprehensive and stable version of "V-TEST" (v 5 0) is now available for a wide range of UNIX platforms |
| 1996 | The decision is taken to develop functions to test databases within "CYRANO Test", the product resulting from this new development is named "CYRANO Impact" |
| 1997 | The first version of "CYRANO Impact" is launched in the UK |
| 2000 | Development of version 3 of "CYRANO Impact" gets under way |
| 11/2000 | The last version of "CYRANO Impact" (v 2 2 4) is launched in the UK |
| *(exhibit no 39)* | before CYRANO UK goes into liquidation on October 31, 2001 |

All the versions of "CYRANO Impact" were first launched in the United Kingdom *(exhibit no 30, page 5, paragraph 12)*

The design and development of "CYRANO Test" took place wholly at the R&D centre of CYRANO UK in Bradford, England *(exhibit no 30, page 3, paragraph 6, exhibit no 31, page 2, paragraph 5)*

The same goes for "CYRANO Impact," with the exception of one software component known as "SQL Capture (Gateway)" which was developed by CYRANO SA in Paris *(exhibit no 30, page 4, paragraph 10 and page 6, paragraph 16iii)*

Around 1996, the R&D team of Performance Software Ltd consisted of over twenty UK nationals based in Bradford, England Performance Software Ltd also had three subsidiaries (1) Performance Software Inc in the United States, (2) Performance Software France SARL and Performance Software Europe NV in Belgium *(exhibit no 32, top of page 3, paragraph 5)*

Prior to the takeover of Performance Software Ltd in 1996, Performance Software Ltd had via its employees created and launched in the UK and from the UK all the versions of V-TEST (from version 2 1, the original version, to version 5 0) *(exhibit no 32, page 3, paragraph 8)*

After the takeover, the Performance Software Ltd and its acquirer did not merge their assets or intellectual property rights *(exhibit no 32, page 5, paragraph 13)*

---

[2] "V TEST" was renamed "Cyrano Test" after IMM acquired Performance Software Ltd in 1996

Michel MILLARD
Expert Report 11/04/2003 Cyrano Inc vs Technologies SA & Cie Edouard Daude and Attorney Pacques

Neither did the companies merge their R&D teams Performance Software Ltd /CYRANO UK retained its own R&D team, consisting of UK nationals based in Bradford, while CYRANO SA maintained two R&D teams in France After the takeover, CYRANO UK continued to develop independently new products and new versions of its existing products, such as "V-TEST," which was renamed "CYRANO Test" *(exhibit no 32, top of page 6, paragraph 14)*

However, TECHNOLOGIES SA and QUOTIUM TECHNOLOGIES, in their deposition no 2, expressed reservations about the declaration of Mr Martin GREENBANK *(deposition no 2, page 3, section 3, the last two paragraphs)*

*"Contrary to what Mr Martin Greenbank claims in his declaration[3], come 1998 CYRANO SA jointly owned Impact "*

*"We therefore call upon the expert to treat Mr Martin GREENBANK's declaration, as produced by CYRANO INC [exhibit no 32 – ed ], with the greatest circumspection, since its content completely contradicts the letter dated 26/08/98 "*

In his letter to KPMG dated 26/08/98 *(exhibit T08)*, Mr Martin GREENBANK states

*"ServerPack the royalties contracts signed by the various sales divisions of CYRANO and the two entities which hold the Title over this application suite stipulate that 30% of the royalties should be shared out between CYRANO SA (one third) and CYRANO UK (two thirds) "*

In his signed declaration, Mr Martin GREENBANK clearly states not only that CYRANO SA was merely responsible for developing a single element of Impact *(exhibit no 32, page 6, paragraph 15)*

*"However, in the case of Impact alone, whereas this product mostly consisted of code developed by UK personnel, there was a minor component (a gateway used to link Impact to other modules) that was supplied on a commercial basis by the people in charge of development at CYRANO SA[4] "*

but also that as a result, CYRANO SA was granted one third of the royalties for that product *(exhibit no 32, page 7, paragraph 18)*

*"The elements licensed from CYRANO SA amounted to 33 1/3 of the overall modules of ServerPack, for CYRANO UK had developed and indeed owned Impact[5] "*

Did TECHNOLOGIES SA and QUOTIUM TECHNOLOGIES by some extraordinary oversight fail to read these revelatory sentences? What declarations should we now read with tremendous circumspection?

---

[3] Underlined by the Court-appointed expert
[4] Free translation rendered by the Court-appointed expert and underlined by him
[5] Free translation rendered by the Court-appointed expert

Case 1:05-cv-11558-DPW   Document 35-4   Filed 08/04/2006   Page 24 of 35
Michel VILLARD
Expert Report - 17/04/2003 Cyrano Inc vs Technologies SA, Dider Bredault Daud and Attorney Jacques

Furthermore, CYRANO INC has submitted, as part of its deposition no 4, a declaration by Mr Philippe EYRES who was the Chairman of the CYRANO companies (i e CYRANO SA, CYRANO UK, CYRANO INC and other subsidiaries) from 1996 to June 2000 *(exhibit no 35, CYRANO INC deposition no 4, Appendix 1)*

Mr Philippe EYRES confirms the statements made by Mr Martin GREENBANK

- after IMM had acquired Performance Software Ltd , each company retained its own R&D teams and continued to develop its own products independently *(page 2, paragraph 4)*,

- the assets, R&D teams and intellectual property rights of CYRANO UK and CYRANO SA were never merged *(page 2, paragraph 5)*

**4 3 3 Ownership of the disputed software products**

**4 3 3.1 "CYRANO Test" and "CYRANO Impact"**

The Research and Development centre of CYRANO UK Ltd , based in Bradford, England, was responsible for designing and developing

- the "CYRANO Test" application,

- the "CYRANO Impact" application, with the exception of a software module known as the "Gateway" which was developed by CYRANO SA in Paris

The respective assets, R&D teams and intellectual property rights of CYRANO UK and CYRANO SA were never merged

CYRANO SA invoiced CYRANO UK for the Gateway module on June 30, 1998, as disclosed by the KPMG report[6] dated September 4, 2002 *(exhibit no T09, page 7)*

*"Pursuant to three separate contracts wherein CYRANO UK referred to the company [CYRANO SA – ed ] as a consultant involved in certain development work up to the marketing stage, the company invoiced CYRANO UK on June 30, 1998 for its involvement to the extent of the wages and costs of the company's personnel who were involved in performing this work, plus 25%*
*CYRANO UK was thus billed for work on three projects*
*CYRANO Evolution            FF 323,538*
*CYRANO Universal Gateway      FF 1,403,188*
*CYRANO White and CYRANO Select    FF 919,006"*

This statement shows that ownership of the Gateway module was transferred to CYRANO UK on June 30, 1998

CYRANO UK therefore owned 100% of the "CYRANO Test" and "CYRANO Impact" software applications at the time when its assets were transferred to CYRANO INC under the contract of sale dated March 21, 2002

---

[6] This exhibit is in fact appendix 4 of deposition no 2 of TECHNOLOGIES SA and QUOTIUM TECHNOLOGIES

**4 3 3 2 The other software products**

During the proceedings, no elements were produced which would enable one to issue an opinion on the ownership of the following products

- CYRANO Timer

- CYRANO TestStream

- CYRANO Video

- CYRANO MillenumTest [sic]

- CYRANO VMS DateWarp

- CYRANO DataAge

- CYRANO EuroTest

I presume that this is because they are of lesser importance than "CYRANO Test" and "CYRANO Impact"

## 4.4 DAMAGE SUFFERED BY CYRANO INC

CYRANO INC has produced elements (deposition no 4, section 5)

The proceedings brought by TECHNOLOGIES SA and QUOTIUM TECHNOLOGIES have caused CYRANO Inc to incur losses

It is likely that certain steps taken by TECHNOLOGIES SA and QUOTIUM TECHNOLOGIES toward the market, as well as clients' awareness of the dispute between the parties, resulted in losses of earnings for CYRANO INC owing to

- the non-renewal of maintenance contracts,

- lower sales of licenses and of services

It is up to CYRANO INC to demonstrate its alleged loss of earnings and business opportunities

Three examples of the steps taken by TECHNOLOGIES SA and QUOTIUM TECHNOLOGIES are submitted by CYRANO INC

- an e-mail sent by Pascal STRAATSMA to opensta-devel@lists sourceforge net on 23/04/2002 *(exhibit no 41, page 3) "It is with great pleasure that I wish to announce that Quotium technologies has now picked up CYRANO's mantle as sponsor of the OpenSTA project While development may have seemed dormant over the last few months following the death of the French software company, it has in fact not been the case, [ ]"*

- an e-mail signed by someone known as "Bastien" on 30/07/2002 *(exhibit no 41, page 2) "Unfortunately, you won't find any contact for CYRANO, in France, UK or US CYRANO doesn't exist anymore and our company, QUOTIUM TECHNOLOGIES, just bought the asset of CYRANO We won't be able to provide you any document concerning your CYRANO activity If you are interested to continue working with CYRANO's Tools, we are looking for competencies in UK You can call Pascal STRAATSMA at +33 1 49 04 71 40 or at pstraatsma@quotium com Best regards, Bastien "*

- an e-mail sent by Pascal STRAATSMA to <u>opensta-users@lists.sourceforge.net</u> on 02/10/2002 (*exhibit no 41, page 3*) "*The situation is actually crystal clear Quotium acquired the assets of CYRANO SA (mother company of CYRANO Inc and CYRANO Ltd) among which the intellectual property of this company's range of products, including OpenSTA and its related developments*"

The addresses of the recipients lead one to believe that the messages sent by Mr Pascal STRAATSMA were sent to a list of OpenSTA developers and a list of OpenSTA users respectively

The OpenSTA product is freeware and is distributed as "open source" (see Table 1 above) It is not one of the disputed software products

Michel AILLAUD
Expert Report N°04/2005 Cyrano Inc vs Technologies SA, SLP & Maître Daude and Attorney Jacques

# 5 ADDITIONAL RESPONSES TO THE DEPOSITIONS

I organized two meetings to gather the parties' responses and comments on each other's depositions following which I drew up memos

The parties' responses are implicitly or explicitly incorporated into the memos and into this report

Here is my position on some of the points evoked in the parties' depositions

## 5 1 UNWARRANTED ASSERTIONS

Some statements made by TECHNOLOGIES SA and QUOTIUM TECHNOLOGIES are not founded on any evidence whatsoever They include the following

- *"CYRANO SA was in control of all software development and allocated this work to its teams in Paris while making use of some of the skills and expertise of its subsidiaries' engineers " (deposition no 1, page 1, last paragraph),*

- *"Right after the takeover [the takeover of Performance Software – ed ], CYRANO SA's teams took over the work that was in progress to develop and finalize V-TEST which was renamed CYRANO Test and Impact, and these were then integrated into the company's software suite " (deposition no 1, page 2, paragraph 3),*

- *"[ ] apart from him [Mr Malcolm Charles Green – ed ] dozens of other developers also worked on this product [CYRANO Test – ed ] at CYRANO UK and CYRANO SA over several years " (deposition no 2, page 2, section 1, paragraph 3),*

The declarations of Mr Malcolm Charles GREEN, Richard Arthur CLARKE and Martin Stuart GREENBANK (exhibits nos 30-32) formally put paid to these unfounded statements

## 5 2 THE FOUR ATTESTATIONS OF FORMER EMPLOYEES OF CYRANO SA

TECHNOLOGIES SA and QUOTIUM TECHNOLOGIES produced four testimonials by former employees of CYRANO SA *(exhibit no T10, TECHNOLOGIES SA deposition no 2, Appendix 5)*

- Mr Pascal STRAATSMA, who was employed by CYRANO SA from October 2, 2000 to October 30, 2001 as a Sales Engineer,

- Mr François WATINE, who was employed by CYRANO SA from July 5, 1999 to October 30, 2001 as a Technical Support Engineer and then went on to become Head of Technical Support,

- Mr Olivier CANTE, who was employed by CYRANO SA from May 20, 1996 to October 2001 as a Project Manager,

- Mr Christophe L'HARIDON, who was employed by CYRANO SA from September 1999 to October 2001 as a Software Engineer

Each of the four employees' declarations features the following 5 sentences verbatim, and extend to just over ½ a page

1    *CYRANO SA was in charge of developing and selling the Test, Impact, Workbench, Production and OpenSTA applications*

2    *The development and marketing of each of these software applications were led and organized from the offices of CYRANO SA*

3    *CYRANO SA would call on the technical and sales expertise of each of its subsidiaries, and in particular CYRANO UK and CYRANO INC*

4    *The development of the software applications was run by CYRANO SA which oversaw production in Paris and which could, for the purposes of the development of some elements of the code, call upon the employees of some of its subsidiaries*

5    *In my opinion, the interaction and interoperability between the software products developed by CYRANO SA, the technologies acquired and the development work that was carried out make it impossible to credit any entity other than the parent company, CYRANO SA, with the complete authorship of any of the software products*

The declaration of Mr Olivier CANTE features an additional sentence

*"I personally worked on the development of the Impact, Workbench, Production and OpenSTA applications "*

Here are my objective comments about these declarations

-    With the exception of the sentence added by Mr CANTE, the four declarations are identical, word for word, which leads one to believe that they were dictated specifically for the purpose of this expert assessment procedure—all the more since they are all dated September 16, 2003

-    How could employees who were not part of the Management of a company which published software applications claim to be so well informed about the <u>decisions of the Management</u> regarding the organization of the marketing and development of these software applications, especially in the case of a company such as CYRANO, where this organization spans several countries? This question applies in particular to the 2nd sentence forming part of the declarations *"The development and marketing of each of these software applications <u>were led and organized</u>[7] from the offices of CYRANO SA ,"* and to the start of the 4th sentence *"The development of the software applications <u>was run</u>[8] by CYRANO SA "*

-    The 3rd sentence is a statement that is of no relevance to this report

-    The 5th sentence is an assessment of a legal nature as to the ownership of the software which it is not within my remit to comment upon

-    Among the software applications mentioned in the 1st sentence, only "Test" and "Impact" form part of the list of disputed software products (see section 4 3 1), CYRANO SA did indeed take part in the development of OpenSTA[9] (an Open Source product) and it did own Workbench and Production (see section [error message] above)

---

[7] Underlined by the Court-appointed expert
[8] Underlined by the Court-appointed expert
[9] Richard Arthur CLARKE states *(exhibit no 31)* that CYRANO SA provided components which were incorporated into "OpenSTA"

Case 2:04-cv-01558-DPW     Document 35-4     Filed 08/04/2006     Page 29 of 35
Michel BILLARD
Expert Report 17/04/2009 Cyrano inc vs Technologies SA/ SG-Brouard Daude and Attorney Jacques

- The fact that Mr Olivier CANTE does not mention "Test" among the software applications which he declared having worked on personally, whereas he does mentions "Impact," is highly revealing

- Apart from the names of the products (Test, Impact, etc ) there is no mention of any technical information about the development work allegedly carried out by CYRANO SA, in spite of the fact that among the four ex-employees involved, two occupied posts that meant they were very closely involved with the products themselves (Sales Engineer, Tech Support Engineer) and two were directly involved in software development (Project Manager, Software Engineer)

- The four declarations dated September 16, 2003 do not refer to any evidence to back their assertions

- By contrast, the declarations of Mr Malcolm Charles GREEN (*exhibit no 30* – 6½ pages), and of Mr Richard Arthur CLARKE (*exhibit no 31* – 4½ pages) are full of technical information chronology of the consecutive versions (V-Test from 1989 onwards, Impact from 1996 onwards), migration from Test to Impact, software architecture of Impact and size of the source codes, etc

In view of these objective comments, I have evolved a deep-seated conviction that these four declarations lack credibility and are absolutely not of a kind that would compel me to reconsider what I stated above in section 4 3 2 Which of the parties created the disputed software in the first place?

## 5.3 PAYMENT OF ROYALTIES

In their deposition no 2, TECHNOLOGIES SA and QUOTIUM TECHNOLOGIES state (page 3, section 3, paragraph 4)

*"Thus it is clearly established that regarding the ServerPack application, i e the Impact application[10], a third of the royalties were paid across to CYRANO SA from 1997 onwards "*

*"CYRANO SA granted CYRANO UK a distribution license over the ServerPack application, i e the Impact application[11], for a fixed fee of 4 million French francs "*

To state that "ServerPack = Impact" is to overlook or conceal "LoadTest," a software product forming part of ServerPack which is owned by Rational Software (see section 4 3 1 above)

In its deposition no 4b[12], CYRANO INC describes a mechanism whereby royalties are paid across to Rational Software by CYRANO SA

This topic does not fall within the remit of my assignment

---

- *An HTTP version of  SQL Capture (Gateway)" (page 4, paragraph 5i),*
- Part of the HTTP execution code and a separate module known as "Script Modeler" *(page 4, paragraph 5i)*

[10] Underlined by the Court-appointed expert
[11] Underlined by the Court-appointed expert
[12] CYRANO INC 's deposition no 4b, which is entitled "deposition about topics not related to the dispute," is appended to this report

Case 1:05-cv-11558-DPW   Document 35-4   Filed 08/04/2006   Page 30 of 35
Michel VEILLARD
Expert Report 17/04/2005 Cyrano Inc vs Technologies SA QCP Brouard Daudé and Antoney Jacques

## 5 4 POSSIBLE THE MERGER OF IMM AND PERFORMANCE SOFTWARE

The issue of the merger between IMM and Performance Software is a legal one which lies outside the remit of my assignment (article 238 of NCPC)

- *"As a result of the acquisition Performance Software Ltd became a fully owned independent subsidiary of IMM but it was not dissolved Nor was it merged with IMM" (exhibit no 32, page 5, paragraph 12)*

- *"IMM and Performance Software merged in 1996" (appendix 1 "merger agreement combining the two companies") (TECHNOLOGIES SA deposition no 2, page 2, section 2, paragraph 1)*

The answer to this question has no bearing on the issue of who created the software applications in the first place

Mr Philippe EYRES *(exhibit no 35, CYRANO INC deposition no 4, Appendix 1)* stated that after the takeover

- each company retained its own R&D teams and continued to develop its own products independently *(page 2, paragraph 4)*,

- the assets, R&D teams and intellectual property rights of CYRANO UK and CYRANO SA were never merged


## 5.5 QUALITY CONTROL ORGANIZATION FOR THE PRODUCTS

In their deposition no 2, TECHNOLOGIES SA and QUOTIUM TECHNOLOGIES state (section 5, last paragraph, page 4)

*"The Quality Control was also centralized in Paris [   ]"*

This issue also lies outside the scope of my duties the particular location of the Quality Control function has no bearing on the question of who created the software applications in the first place


## 5.6 TECHNICAL WHITE PAPER ON OPENSTA

As part of their "Response to the request for information pursuant to deposition no 3," dated October 22, 2003, TECHNOLOGIES SA and QUOTIUM TECHNOLOGIES enclose a document entitled "Technical White Paper on Open STA (version 1 0)" *(exhibit no T14)* as well as a French translation thereof *(exhibit no T15)*, both dated March 15, 2001

They declare that this version is destined to OpenSTA clients and that the persons who signed it are

- nkb, i e Mrs Noelle Kristen Beaudin, Marketing and Development VP for that product,
- gh, i e Mr Geoffrey Hall, the Head of the Software Development Department,
- lds, i e Mr Lee-Daniel Sutcliffe, OpenSTA Technical Production Manager

First of all, I note, that an error has slipped into paragraph 1 of page 2 of this response

Case 1:04-cv-11558-DPW    Document 35-4    Filed 08/04/2006    Page 31 of 35
Michel VILLARD
Expert Report 1704/2005 Cyrano Inc vs Technologies SA SCP Brouard Daude and Attorney Facques

' *It emerges from the French translation produced by CYRANO SA concurrently with the English language document that "performance R&D group in CYRANO" means "the CYRANO SA[13] R&D group in charge of performance issues "*

However, the French translation states as follows (exhibit no T15, appended to deposition no 3, page 10, section 3 2)

*"The CYRANO[14] R&D group in charge of performance issues, which created the OpenSTA project [ ]"*

The error consists in writing "CYRANO SA" rather than "CYRANO "

The *"performance R&D group"* is presented as the originator of the OpenSTA project *(English version, section 3 2 Background, page 8, paragraph 1)*

*"The performance R&D group in CYRANO created the OpenSTA Project "*

It is likely that the term "Performance" refers to the former name of the English company (Performance Software) and/or to so-called "performance" software applications designed to test the performance of applications

In any event, it can happen that a software publisher, in order to strengthen its marketing image, projects an external vision of its R&D organization which does not reflect its internal organization per se, for instance presenting a homogenous R&D unit, whereas in fact its software development projects are disseminated among several independent and in some cases remote business units

This example shows how risky it is to extrapolate reliable information about the actual internal organization of an R&D unit from a marketing document such as this White Paper

The declarations of the three authors of the White Paper *(exhibits nos 45-47)*, which are provided together with CYRANO INC 's deposition no 5, provide clarifications

Mrs Noelle Beaudin states that the role of the French R&D team was limited to developing two modules of OpenSTA Gateway and Modeler *(exhibit no 45, section 6, page 2)*

For his part, Mr Geoffrey Hall declares that

*"The French developers never produced a workload testing tool, but produced diagnostic tools such as Workbench The Bradford development centre was known for its expertise in developing workload testing products (Test, Impact, and later on OpenSTA[15]) " (exhibit no 46, section 8, page 3)*

This confirms the inferences drawn earlier in this report (see section 4 3 2)

---

[13] Underlined by the Court-appointed expert
[14] Underlined by the Court-appointed expert
[15] Free translation performed by the Court-appointed expert

Case 1:03-cv-01558-DPW    Document 35-4    Filed 08/04/2006    Page 32 of 35
Michel VILLARD
Expert Report 11/04/2003 Cyrano inc vs Technologies SA SCP Brouard Daude and Attorney Facques

IN WITNESS WHEREOF
Delivered in our chambers on November 4, 2003

[signature]

The parties' original exhibits and depositions are appended to this report


Copies of this report, excluding the exhibits appended thereto,
Have been sent out to

ITÉANU & Associés
106, rue du Faubourg Saint Honoré – 75008 PARIS
Counsel for CYRANO INC
LOCKER D1380

Atty Fabrice DALAT
WERNERT & ASSOCIÉS
45 av Victor Hugo – 75008 PARIS
Counsel for TECHNOLOGIES SA
LOCKER P0373

Atty Marc DUJARDIN
91, rue du Faubourg Saint Honoré – 75008 PARIS
Counsel for SCP BROUARD-DAUDE and Atty Denis FACQUES
LOCKER P22


Michel VILLARD

LITIGATION

Mr Michel VILLARD
34 rue Jules Ferry
94100 SAINT MAUR DES FOSSES
France

THE OFFICE OF THE COURT CLERK OF
COMMERCIAL COURT OF PARIS
EXPERT REPORTS DEPARTMENT
1, Quai de Corse
75181 PARIS CEDEX 4

## ADDITIONAL FEE NOTE
### Pursuant to lodging an expert report

To the Judge in charge of overseeing the performance of injunctions

**RULING DATED 04/04/2003 – ROLL NO.: 2002050224**

I was appointed to act as an expert in the following case

### CYRANO INC. vs. TECHNOLOGIES SA

Owing to the extent and nature of the dispute, the agreed fee was insufficient to cover my costs (as per the receipts provided herewith)

For this reason, having lodged my report, I wish to claim

1   An additional provision of 1,962 76 euro to be paid by CYRANO INC , and an additional provision of _____ euro to be paid by _____

2   My remuneration, amounting to 9,962 76 euro, including costs

This invoice has been drawn up excluding VAT in accordance with article 293-B of France's C G I [tax laws]

Date  November 4, 2003

Expert  Michel VILLARD

[signature]

[stamp ] Michel Villard – IT expert – 34 rue Jules Ferry – 94100 SAINT MAUR



LITIGATION

Mr Michel VILLARD
34 rue Jules Ferry
94100 SAINT MAUR DES FOSSES
France

THE OFFICE OF THE COURT CLERK OF
COMMERCIAL COURT OF PARIS
EXPERT REPORTS DEPARTMENT
1, Quai de Corse
75181 PARIS CEDEX 4

**APPLICATION FOR DETERMINATION OF REMUNERATION**

**RULING DATED 04/04/2003 – ROLL NO   2002050224**

**CYRANO INC  vs  TECHNOLOGIES SA**

REPORT LODGED ON  November 4, 2003

I hereby apply for determination of my remuneration on the following basis

1  COSTS

| | |
|---|---|
| Travel and accommodation costs (1) | 30 00 |
| Secretarial costs to type correspondence and this report | 1,051 50 |
| Postage and telephone costs | 37 96 |
| Fees or costs of the technician who gave his opinion or performed a particular task (2) | 0 00 |
| Other costs  Reprographics | 203 30 |

2  FEES (3)

| | |
|---|---|
| a) | 0 00 |
| b) 6 hours | 540 00 |
| c) 37 50 hours | 3,375 00 |
| d) 52 50 hours | 4,725 00 |
| i e  in total 96 hours @ 90 euro per hour, namely | 8,640 00 |

|  |  |
|---|---|
| TOTAL excluding tax | € 9,962 76 |
| VAT | |
| TOTAL including tax | |

This invoice has been drawn up excluding VAT in accordance with article 293-B of France's C G I [tax laws]

Delivered in Saint-Maur, France, on November 4, 2003

(1) Please provide details of travel and board costs
(2) Please enclose the invoice of the technician in question
(3) Please break down hours spent  a) on site visits, b) on meetings at your premises, c) on studying the case file and doing research, d) on drawing up correspondence and the report

[signature]

[stamp ] Michel Villard – IT expert – 34 rue Jules Ferry – 94100 SAINT MAUR]

Commercial Court of Paris
Ruling dated 04/04/2003
R G no 2002050224

November 4, 2003

| Date | | FEES (based on time spent) | | | | | | | COSTS (based on expenses) | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Site meetings | Meetings at base | Time spent travelling | Post telephone | Studying the case file | Drawing up memos to the parties, preliminary report | Drawing up the final report | Travel and board | Secretarial costs (32 euro / hour) | Typing | Reprographics | Postage and courier costs |
| 23/05/2003 | Initiating the expert assessment procedure and studying the exhibits | | | | | 4.0 | | | | | | | |
| 12/06/2003 | Summoning the parties to attend meeting no 1 | | | | 1.0 | | | | | 96.0 | | 2.4 | 19.84 |
| 18/06/2003 | Studying CYRANO s deposition no 1 (1 page + 1 enclosure) | | | | | 1.0 | | | | | | 1.5 | |
| 18/06/2003 | Preparing for meeting no 1 | | | | | 2.0 | | | | | | | |
| 24/06/2003 | Holding meeting no 1 2 30 p m to 5 p m | 2.5 | | 1.0 | | | | | 15.0 | 96.0 | 13.0 | 1.5 | |
| 25/06/2003 | Memo no 1 to the parties | | | | | | 3.0 | | | 16.0 | 6.5 | | |
| 07/07/2003 | Examination of the logboxes held by Atty FACQUES | | | 1.0 | | | | | | 48.0 | 32.5 | | |
| 01/08/2003 | Estimating the cost of the assessment procedure | | | | | | 1.0 | | | | | 0.3 | 0.75 |
| | Studying CYRANO INC exhibits (list no 2) | | | | 1.0 | 3.0 | | | | 32.0 | | | |
| | Studying CYRANO INC s deposition no 2 (2 pages + enclosures) | | | | | 1.0 | | | | | | | |
| | Studying TECHNOLOGIES SA's deposition no 1 (13 pages) | | | | | 1.0 | | | | | | | |
| | Studying CYRANO INC s deposition no 3 (5 pages + 8 enclosures) | | | | | 3.0 | | | | | | | |
| | Preparing for meeting no 2 | | | | | 1.0 | | | | | | | |
| | Holding meeting no 2 2 p m to 4 p m | 2.0 | | 1.0 | | | | | 15.0 | | | | |
| | Memo no 2 to the parties | | | | 1.0 | | 3.5 | | | 64.0 | 39.0 | 5.7 | 2.22 |
| | Studying TECHNOLOGIES SA's deposition no 2 (6 pages + 6 enclosures) | | | | | 5.5 | | | | | | | |
| | Studying CYRANO INC s deposition no 4 (9 pages + 10 enclosures) | | | | | 5.5 | | | | | | | |
| | Studying BROUARD-DAUDE s deposition (4 pages + 1 enclosure) | | | | | 1.0 | | | | | | | |
| | Studying TECHNOLOGIES SA s deposition no 3 (3 pages + 1 enclosure) | | | | | 1.0 | | | | | | | |
| | Studying the additional comments on TECHNOLOGIES SA s deposition no 3 | | | | | 1.5 | | | | | | | |
| | Studying CYRANO INC s deposition no 5 (3 pages + 3 enclosures) | | | | 0.5 | | | | | | | | |
| | Sorting through the depositions and exhibits provided by the parties | | | | | 1.5 | | | | 160.0 | 208.0 | 141.9 | |
| 04/11/2003 | Drawing up and submitting the report | | | | | | 7.5 | 37.5 | | 128.0 | 32.5 | 44.0 | |
| | Ending the expert assessment procedure | | | | 2.0 | | | | | | | 6.0 | 15.15 |
| TOTAL | | 4.5 | 0.0 | 3.0 | 5.5 | 32.0 | 15.0 | 37.5 | 30.0 | 720.0 | 331.5 | 203.3 | 37.96 |

Total number of hours =
Total costs/expenses excluding tax =
TOTAL excluding tax =

96 hours @ 90 euro excluding tax =

8,640.00 euro
1 322.76 euro
9 962.75 euro

NB the hourly fee is 90 euro excluding tax / hour  Time spent travelling is billed at half the hourly rate
I hereby swear that this breakdown is accurate
[signature]
[stamp] Michel Villard – IT expert – 34 rue Jules Ferry – 94100 SAINT MAUR

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

CYRANO, INC.,

   Plaintiff,

v.

QUOTIUM TECHNOLOGIES, INC.,
QUOTIUM TECHNOLOGIES, S.A., and
TECHNOLOGIES, S.A.,

   Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)

CIVIL ACTION NO. 05-CV-11558-DPW

## SUPPLEMENTAL AFFIDAVIT OF SCOTT ALMEDA
## IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

I, Scott Almeda, declare and state as follows:

1.   I am the Chief Executive Officer of Vedant Incorporated, formerly known as Cyrano, Inc., a Delaware corporation with a principal place of business located at 26 Parker Street, Newburyport, Massachusetts, U.S.A.   I make this affidavit on personal knowledge.

2.   Vedant distributes software that enables users to test, monitor, and optimize their data processing and information management systems.

3.   I became the Chief Executive Officer of Vedant, then known as Cyrano, Inc., in June 2002.  From October 2001 to June 2002, I served as its Chief Operating Officer, and from March 2001 to October 2001, I served as its Vice President of Business Development. Consequently, I am familiar with every facet of Vedant's business.

4.   Additionally, I have worked in the computer industry and for computer related companies since 1984.  During the course of my career, I have worked as a consultant on information technology and have built and developed the businesses of information services and integration companies.

5.   I have a degree in mechanical engineering from the University of New Hampshire.  I sit on the Board of Trustees for the University of New Hampshire.  I am involved with building programs around engineering in a number of colleges and universities.

6.  Under my direction, a technical team at Vedant recently compared available documentation for Quotium's software product named QTest 4.0 with the software products Test and Impact -- copyrights to which are owned by Vedant; under my direction, comparisons had previously been done for the product named OpenSTA, for which Vedant had more documentation, and for QuotiumPRO. I have examined and discussed with the team the results of their comparison and believe that the core of QTest 4.0 is derived from Test and Impact because of the substantial similarity of the visible components and functionality and the access that Quotium had to Test and Impact when they bought the assets of Cyrano S.A. I note specifically:

   a.  It appears from inspection of the available documentation, and I believe, that OpenSTA, QTest 4.0 uses a Script Control Language ("SCL") that is identical to that invented along with, and is an integral part of, the Test product. Vedant owns the copyright in this SCL product component because Vedant, then known as Cyrano, Inc., purchased it, along with Test, from Cyrano UK's liquidator in March 2002. I understand that the judgment of October 21, 2005 of the Court of Appeal of Paris has finally determined Vedant's ownership of this intellectual property.

   b.  It appears from the documented history of the OpenSTA, QuotiumPRO and QTest 4.0 products, and I believe, that each of these products have common core components with the Test product. The SCL that is common to each of these products requires a script compiler that, for OpenSTA was taken from the V-Test (now known as Test) product developed by Cyrano UK. QuotiumPRO was introduced by Quotium into the marketplace within weeks of their purported purchase of rights to OpenSTA and was identical in appearance and functionality to OpenSTA. If, as now contended by Quotium, QTest 4.0, is, as QuotiumPRO, merely a change of the name of the product for marketing purposes, then all the Test and Impact components in OpenSTA -- which as documented, and I believe, is upwards of two-thirds of the OpenSTA code -- have been carried over into QTest 4.0.

   c.  Although it appears from available documentation that Quotium have gone to some significant trouble to alter the appearance of QTest 4.0 by changing the name of the program as well as of many of the underlying support files, they failed to change QTest 4.0's documentation, which contains language that is almost completely identical to that of Vedant's copyrighted Test, but for the addition of Quotium's claim of ownership. Attached hereto as Exhibit 1 are several examples of these similarities. The Quotium material in Exhibit 1 was printed out from the embedded help files of a distributed (non-source) copy of QTest 4.0. The Test material was obtained from Test's embedded help files, which have not changed since Test was first introduced by Cyrano UK.

7.  Although Quotium now claims that only a name change was made "for marketing reason," they previously announced to the public that QTest 4.0 was a "major new release," with new functionality. See Exhibit D to my affidavit of June 20, 2005. From my experience with the software development and distribution industry, a "new release"

is at least a new version of the software, as there are often internal versions that are not released to the public, and a "major new release" signifies that there is more than just "bug fixes" or "patches." The "major new release" of QTest 4.0 was announced with new functionality. New functionality must be tested with the prior code, using documentation for the prior code. In the case of QTest 4.0, Quotium's use of at least the SCL, script compiler and documentation from Test -- necessary to produce a releasable version -- as well as their publication and distribution of the derivative product constituted infringements of Vedant's copyrights in Test.

8.  Quotium departs from its public statement of a "major new release" apparently to meld Vedant's claim against QTest 4.0 into prior claims against QuotiumPRO that are the subject of the appeal of Quotium's action before Judge Tauro against Cyrano, Inc., in which Cyrano, Inc. was defaulted for failing to produce new counsel with the attendant consequences of not responding to notices to a prior attorney (who did not forward them to me; the present action includes claims against Quotium for fraud in failing to provide proper notice to Cyrano, Inc. and to the Court). Cyrano, Inc. could not make payroll at the time and had no resources to pay a retainer for new counsel. Judge Tauro's adoption of Quotium's argument that Cyrano, Inc. chose to spend its funds on the French action was erroneous, as we are arguing on appeal, the French action then outstanding was one brought by Quotium and there was little, if any, attorney action required at the time. In fact, the only issue pending at the time prior counsel was allowed by Judge Tauro to withdraw other than the order to present new counsel was the outstanding order compelling Quotium to produce documents, with which Quotium has never complied.

9.  This motion for preliminary injunction was prompted by Quotium's threat of a new action to separately enforce a different part of the October 21, 2005, ruling of the Court of Appeal of Paris that confirmed Vedant's ownership of Test and Impact. Although Quotium complains now that Vedant did not move sooner, it would have complained if Vedant did move sooner. Vedant engaged in good-faith negotiations that would have been terminated by such a motion – as it was by the damages hearing before Judge Tauro. That hearing consumed and its briefing is consuming scarce resources, but Quotium's threat to bifurcate the ruling of the Court of Appeal of Paris called for immediate action.

10. Even though the parties are not currently in direct competition, Vedant has the right to enforce its intellectual property that is being infringed -- even if a prior trespass may no longer be actionable, Vedant has not surrendered its rights against preventing continuing instances of trespass. That this motion has urgency is demonstrated by Quotium's expedience in turning a "major new release" into merely a name change for "marketing purposes": Quotium will continue to commingle Vedant's intellectual property in Test and Impact into new versions and releases of the OpenSTA product, making it more difficult to show the infringement.

11. If in fact QTest 4.0 -- contrary to Quotium's representations to the public -- is essentially identical to its prior product, there would be no harm in forcing it to distribute a pre-July 2005 version of QuotiumPRO under the merely changed name. I doubt if Quotium would agree to this.

12.    Especially because Quotium is so cavalier with its representation of the content of QTest 4.0, Vedant respectfully requests that this Court order Quotium to produce immediately full copies of QTest 4.0 and any predecessor release to which Quotium contends that it is identical, their source code and their documentation for analysis under a suitable protective order. (Quotium should not be allowed to litigate a protective order as they did in the prior action, they admit that the parties are no longer competitors.) This would just be a very limited part of what Quotium should have produced in compliance with Judge Tauro's order compelling discovery and would be conducive to a fair hearing on the preliminary injunction motion where Quotium conveniently states that the "major new release" of QTest 4.0 represented a mere name change.

      I declare under penalty of perjury that the foregoing is true and correct.

August 3, 2006
Newburyport, Massachusetts


                    /s/ Scott Almeda
                    Scott Almeda


J:\Docs\82165\00004\01041088.DOC

**Quotium**

## Overview of Script Control Language

SCL, Script Control Language, is a scripting language created by Quotium. Within Quotium Script Editor, it is used to write the Scripts which define the content of your Jobs. Use SCL commands to model Scripts and develop the required Job scenarios.

When a Script is recorded through the Gateway, the raw HTTP/S traffic is represented using SCL code. Scripts are written using SCL code which enables you to model them. This gives you control of the content of the Jobs you create and enables you to simulate the required Job scenarios, no matter how complex.

Script files consist of up to three sections which, if present, must appear in the following order:

- Environment section
- Definitions section
- Code section

The first section is the mandatory **Environment** section. This section defines the global attributes of the Script, i.e. the Script description, Script mode and wait command units. It is introduced by the ENVIRONMENT command and continues until a DEFINITIONS or CODE command is encountered.

The second section is the optional **Definitions** section. This section contains the variable, constant and file definitions for the Script. It starts with the DEFINITIONS command and continues until the CODE command is encountered.

The last section is the mandatory **Code** section, which contains the main Script commands. The start of this section is marked by the CODE command; it continues until the end of the Script file.

Tabs, spaces and form-feeds may be incorporated into the code to align keywords and generally aid legibility; they have no other effect on compilation.

**See also:**

- Character Representation

- Continuation Lines

- Comments

- QTest Data names



# The ENVIRONMENT Section

The Environment section of the SCL source code is introduced by the mandatory ENVIRONMENT command. The command defines the global attributes of the Script, i.e. the Script description, the Script mode and wait command units.

The Environment section must be the first section of the Script, preceding the Definitions section (if present) and Code section. It may, however, be preceded by an INCLUDE statement. For further information, see Including Text from Other Source Files.

**See also:**

- DESCRIPTION Statement

- MODE HTTP Statement

- WAIT UNIT Statement

TEST

## ENVIRONMENT Statement

The Environment section of the SCL source code is introduced by the mandatory ~ENVIRONMENT command. It defines the script name, script description and initial input rate. It may also be used to specify that the VEDANT Test run-time component is to maintain a screen image for the terminal on which the script is executed, or to specify that the script is a set-up or ' Command mode' script.

Only one Environment section may appear in a script, and it must be the first section of the script, preceding the Definitions section (if present) and Code section. It may, however, be preceded by an INCLUDE statement (see Section 3.1.5).

The statements within the Environment section may appear in any order.

The sections that follow describe the mandatory and optional statements in this section of a script source file.



# The DEFINITIONS Section

The Definitions section of the SCL source code defines the variables and constants used by the Script. The section is optional and introduced using the DEFINITIONS command.

Only one Definitions section may appear in a Script; if present, the section must follow the Environment section and precede the Code section.

**See also:**

- INCLUDE Statement

- CHARACTER / STRING Variables

- CONSTANT

- FILE Variables

- INTEGER Variables

- FORM Variables

- Variable Arrays

- Variable Values

- Variable Options

- Example Variable Definitions

TEST

## DEFINITIONS Section

The Definitions section of the SCL source code defines the variables, constants, timers, pipes and files that are used by the script. It is optional, and introduced by the ~DEFINITIONS command. Only one Definitions section may appear in a script; if it is present, it must follow the Environment section and precede the Code section.

For further information on timers, refer to the *Using VEDANT Test for Performance Measurement* chapter in the *VEDANT Test User's Guide.*

 Quotium

# SET SEMAPHORE Command

**Description:**

This command sets a named semaphore to its "Set" state. All users waiting for this semaphore are released and all subsequent wait attempts on this semaphore will return immediately until a call to CLEAR SEMAPHORE on this named semaphore.

The "ON ERROR GOTO err_label" clause can be specified to define a label to which control should be transferred in the event of an error.

**Format:**

```
SET SEMAPHORE semaphore-name {&}
        {,ON ERROR GOTO err_label}
```

**Parameters:**

**semaphore-name**

A character variable or quoted character string containing the name of the semaphore to be set.

**err_label**

A label defined within the current scope of the Script to which control branches if an error occurs.

**Example:**

```
SET LOCAL SEMAPHORE "SERVER-RUNNING"
```

**See also:**

- Synchronization Commands

TEST

## ~SET SEMAPHORE Statement

**Description:**

This command sets a named semaphore to its "Set" state. The semaphore is identified by name and scope (which must be either "LOCAL" or "TEST-WIDE"). A test-wide semaphore is one that is shared by all scripts running as part of a distributed test; a local semaphore is only shared between scripts running on the local node.

The "ON ERROR GOTO err_label" clause can be specified to define a label to which control should be transferred in the event of an error.

**Format:**

~SET scope SEMAPHORE {semaphore-name}                    {&}

        {,ON ERROR GOTO err_label}

**Parameters:**

| | |
|---|---|
| **scope** | The scope of the semaphore to be set. This must be either "LOCAL" or "TEST-WIDE". |
| **semaphore-name** | |
| | A character variable, or quoted character string, containing the name of the semaphore to be |
| **err_label** | A label defined within the current scope of the script, to which control branches if an error o |

**Example:**

~SET LOCAL SEMAPHORE "SERVER-RUNNING"

**See Also:**

~CLEAR SEMAPHORE

Case 1:05-cv-11558-DPW     Document 35-6     Filed 08/04/2006     Page 9 of 30



# WAIT FOR SEMAPHORE Command

**Description:**

This command halts the Script until the specified semaphore is in its "Set" state.

By default, if the semaphore is in its "Clear" state when the WAIT FOR SEMAPHORE command is issued, the virtual user will be suspended until it is in its "Set" state. However, if a time-out period is specified, this represents the maximum number of seconds that QTest will wait for the semaphore to be set before timing out the request. A time of zero indicates that the request should be timed out immediately if the semaphore is not set.

The "ON TIMEOUT GOTO tmo_label" clause can be specified to define a label to which control should be transferred if the request times out. In addition, the "ON ERROR GOTO err_label" clause can be specified to define a label to which control should be transferred in the event of an error, or if the request times out and there was no "ON TIMEOUT GOTO tmo_label" clause.

**Format:**

```
WAIT {period} FOR SEMAPHORE semaphore-name {&}
        {,ON TIMEOUT GOTO tmo_label} {&}
        {,ON ERROR GOTO err_label}
```

**Parameters:**

**period**

An integer variable or value defining the number of seconds to wait. The valid range is 0-2147483647.

**semaphore-name**

A character variable or quoted character string containing the name of the semaphore to wait for.

**tmo_label**

A label defined within the current scope of the Script to which control branches if a time-out occurs.

**err_label**

A label defined within the current scope of the Script, to which control branches if an error occurs, or the command times out and "tmo_label" is not specified.

Case 1:05-cv-11558-DPW    Document 35-6    Filed 08/04/2006    Page 10 of 30

**Example:**

```
WAIT 10 FOR SEMAPHORE "SERVER-RUNNING"
```

**See also:**

- SET SEMAPHORE

- CLEAR SEMAPHORE

TEST

## ~WAIT FOR SEMAPHORE Statement

**Description:**

This command halts the script until the specified semaphore is in its "Set" state. The semaphore is identified by its name and scope (which must be either "LOCAL" or "TEST-WIDE"). A test-wide semaphore is one that is shared by all scripts running as part of a distributed test; a local semaphore is only shared between scripts running on the local node.

By default, if the semaphore is in its "Clear" state when the ~WAIT FOR SEMAPHORE command is issued, the thread will be suspended until it is set into its "Set" state. However, if a time-out period is specified, this represents the maximum number of seconds that VEDANT Test will wait for the semaphore to be set before timing out the request. A period of zero indicates that the request should be timed out immediately if the semaphore is not set.

The "ON TIMEOUT GOTO tmo_label" clause can be specified to define a label to which control should be transferred if the request times out. In addition, the "ON ERROR GOTO err_label" clause can be specified to define a label to which control should be transferred in the event of an error, or if the request times out and there was no "ON TIMEOUT GOTO tmo_label" clause.

**Format:**

~WAIT {period} FOR scope SEMAPHORE semaphore-name          {&}
      {,ON TIMEOUT GOTO tmo_label}              {&}
      {,ON ERROR GOTO err_label}

**Parameters:**

| | |
|---|---|
| **period** | An integer variable or value defining the number of seconds to wait. The valid range is 0 - 3: |
| **scope** | The scope of the semaphore to wait for. This must be either "LOCAL" or "TEST-WIDE". |
| **semaphore-name** | A character variable, or quoted character string, containing the name of the semaphore to wa |
| **tmo_label** | A label defined within the current scope of the script, to which control branches if a time-out |
| **err_label** | A label defined within the current scope of the script, to which control branches if an error o |
| | or the command times out and "tmo_label" is not specified. |

**Example:**

```
~WAIT 10 FOR SEMAPHORE "SERVER-RUNNING"
```

**See Also:**

~CLEAR SEMAPHORE

~SET SEMAPHORE



# ACQUIRE MUTEX Command

**Description:**

This command acquires exclusive access to a shared resource, known as a mutex. The mutex is identified by its name.

By default, if an attempt is made to acquire a mutex that has already been acquired by another Script (within the same scope), then the user will be suspended until the mutex is released. However, if a time-out period is specified, this represents the maximum number of seconds that QTest will wait for the mutex to be released before timing out the request. A period of zero indicates that the request should be timed out immediately if the mutex has been acquired by another Script.

The "ON TIMEOUT GOTO tmo_label" clause can be specified to define a label to which control should be transferred if the request times out. In addition, the "ON ERROR GOTO err_label" clause can be specified to define a label to which control should be transferred in the event of an error, or if the request times out and there was no "ON TIMEOUT GOTO tmo_label" clause.

**Format:**

```
ACQUIRE MUTEX mutex_name {&}
        {,WITH TIMEOUT period {,ON TIMEOUT GOTO tmo_label}} {&}
        {,ON ERROR GOTO err_label}
```

**Parameters:**

**mutex-name**

A character variable, or quoted character string, containing the name of the mutex that is to be acquired. "mutex-name" must be a valid QTest Dataname.

**period**

An integer variable or value, defining the number of seconds to wait before an incompleted request is timed out. The valid range is 0-2147483647.

**tmo_label**

A label defined within the current scope of the Script, to which control branches if a time-out occurs.

**err_label**

When an error occurs, an implicit "goto err_label" is executed. The next statement executed in the script will be the first statement after the err_label label, or the command times out and the "tmo_label" is not specified.

Case 1:05-cv-11558-DPW     Document 35-6     Filed 08/04/2006     Page 13 of 30

**Example:**

```
ACQUIRE MUTEX "MUMPS-SERVER", ON ERROR GOTO mumps-error
```

**See also:**

- Synchronization Commands

TEST

## ACQUIRE MUTEX Statement

**Description:**

This command acquires exclusive access to a shared resource, known as a 'mutex'. The mutex is identified by its name and scope (which must be either "LOCAL" or "TEST-WIDE"). A test-wide mutex is one that is shared by all scripts running as part of a distributed test; a local mutex is only shared between scripts running on the local node.

By default, if an attempt is made to acquire a mutex that has already been acquired by another script (within the same scope), then the thread will be suspended until the mutex is released. However, if a time-out period is specified, this represents the maximum number of seconds that VEDANT Test will wait for the mutex to be released before timing out the request. A period of zero indicates that the request should be timed out immediately if the mutex has been acquired by another script.

The "ON TIMEOUT GOTO tmo_label" clause can be specified to define a label to which control should be transferred if the request times out. In addition, the "ON ERROR GOTO err_label" clause can be specified to define a label to which control should be transferred in the event of an error, or if the request times out and there was no "ON TIMEOUT GOTO tmo_label" clause.

**Format:**

```
~ACQUIRE scope MUTEX mutex-name                    {&}
    {,WITH TIMEOUT period {,ON TIMEOUT GOTO tmo_label}}    {&}
    {,ON ERROR GOTO err_label}
```

**Parameters:**

| | |
|---|---|
| **scope** | The scope of the mutex to be acquired. This must be either "LOCAL" or "TEST-WIDE". |
| **mutex-name** | A character variable, or quoted character string, containing the name of the mutex which is t〈 "mutex-name" must be a valid VEDANT Test dataname. |
| | For a full definition of VEDANT Test datanames, refer to the *Glossary of VEDANT Test Te〈* in the *VEDANT Test Reference Guide*. |
| **period** | An integer variable or value, defining the number of seconds to wait before an unsatisfied re〈 The valid range is 0 - 32767. |
| **tmo_label** | A label defined within the current scope of the script, to which control branches if a time-out |
| **err_label** | A label defined within the current scope of the script, to which control branches if an error o〈 or the command times out and "tmo_label" is not specified. |

**Example:**

```
~ACQUIRE LOCAL MUTEX "MUMPS-SERVER", ON ERROR GOTO mumps-error
```

Case 1:05-cv-11558-DPW          Document 35-6          Filed 08/04/2006          Page 15 of 30



# RELEASE MUTEX Command

**Description:**

This command releases a named mutex. The mutex to be released is identified by its name, which must correspond to the values specified in the corresponding ACQUIRE MUTEX command.

The "ON ERROR GOTO err_label" clause can be specified to define a label to which control should be transferred in the event of an error. Note that an error always occurs if the Script that issues the RELEASE MUTEX request has not previously acquired it.

**Format:**

```
RELEASE MUTEX mutex_name {,ON ERROR GOTO err_label}
```

**Parameters:**

**mutex-name**

A character variable or quoted character string containing the name of the mutex to release.

**err_label**

A label defined within the current scope of the Script to which control branches if an error occurs.

**Example:**

```
RELEASE MUTEX "MUMPS-SERVER"
```

**See also:**

- Synchronization Commands

TEST

## ~RELEASE MUTEX Statement

**Description:**

This command releases a named mutex. The mutex to be released is identified by its name and scope, which must correspond to the values specified on the corresponding ~ACQUIRE MUTEX command.

The "ON ERROR GOTO err_label" clause can be specified to define a label to which control should be transferred in the event of an error. Note that an error always occurs if the script that issues the ~RELEASE MUTEX request has not previously acquired it.

**Format:**

~RELEASE scope MUTEX {mutex-name}                     {&}
       {,ON ERROR GOTO err_label}

**Parameters:**

| | |
|---|---|
| **scope** | The scope of the mutex to release. This must be either "LOCAL" or "TEST-WIDE". |
| **mutex-name** | A character variable, or quoted character string, containing the name of the mutex to release. |
| **err_label** | A label defined within the current scope of the script, to which control branches if an error o |

**Example:**

~RELEASE LOCAL MUTEX "MUMPS-SERVER"

**See Also:**

~ACQUIRE MUTEX



## INTEGER Statement

### Description:

This statement defines a variable with a positive or negative integer value. In SCL, integers are defined as being 4 bytes long, with a range of -2147483647 to +2147483647.

Arrays of integer variables can be defined with a maximum of three dimensions. See Variable Arrays for more information about arrays.

### Format:

```
INTEGER name {[{dimensions}]}|{values} {, options}
```

### Parameters:

**name**

The name of the variable. This must be a valid QTest Dataname.

**dimensions**

The dimensions of the array to be allocated for this variable. Up to three dimensions can be specified with the following format for each dimension "[{dimension size}]".The size for each dimension is optional.

Note: if "dimensions" is specified, "values" cannot be specified.

**values**

A list or range of integer values to be associated with the variable.

Note that if "values" is specified, "dimensions" cannot be. See Variable Values for more information on variable values.

**options**

A list of variable options. See Variable Options for more information on variable options.

### Examples:

```
INTEGER loop-count
INTEGER foo (1-99), SCRIPT
INTEGER values [10][20]
INTEGER array3dWithoutDimension[][][]
```

**See also:**

*TEST*

# INTEGER Statement

**Description:**

This statement defines a variable with a positive or negative integral value. In SCL, integers are defined as being 4 bytes long, giving a range of -2147483648 to +2147483647.

Arrays of integer variables can be defined, with a maximum of three dimensions. For further information about arrays, see Section 3.3.9.

**Format:**

INTEGER name {[dimensions]}{(values)} {, options}

**Parameters:**

| | |
|---|---|
| **name** | The name of the variable. This must be a valid VEDANT Test dataname. For a full definition of VEDANT Test datanames, refer to the *Glossary of VEDANT Test Terms* in the *VEDANT Test Reference Guide*. |
| **dimensions** | The dimensions of the array to be allocated for this variable. Up to three dimensions can be specified, separated by commas, each comprising one or two numbers. |
| | If a dimension has only one number, the elements in that dimension range from 1 to the number specified. |
| | If two numbers are specified, they must be separated by a colon (":"); the elements in this dimension range from the first number to the second |
| | Note, if "dimensions" is specified, "values" may not be. |
| **values** | A list or range of integer values to be associated with the variable. Note that if "values" is specified, "dimensions" may not be. Refer to Section 3.3.10 for further information on variable values. |
| **options** | A list of variable options. Refer to Section 3.3.11 for further information on variable options. |

**Examples:**

```
INTEGER loop-count
INTEGER fred (1-99), SCRIPT
INTEGER values [50:100,20]
```



# CHARACTER/STRING variables

## Description:

These statements define a character string variable made up of ASCII characters, including control characters.

SCL supports STRING (no limit in length) and CHARACTER variables of between 1 and 65535 bytes in length.

Arrays of character variables can be defined, with a maximum of three dimensions. For further information regarding arrays, see Variable Arrays.

## Format:

```
STRING name {[{dimensions}]}|{values} {, options}
CHARACTER{:n} name {[{dimensions}]}|{values} {, options}
```

## Parameters:

**n**

An unsigned integer value in the range of 1-65535, representing the size of the variable in bytes. The default is 1. An asterisk may be used instead of a colon to delimit the size.

**name**

The name of the variable. This must be a valid QTest Dataname.

**dimensions**

The dimensions of the array to be allocated for this variable.
Up to three dimensions can be specified with the following format for each dimension "[{dimension size}]". The dimension size for each dimension is optional.

Note that if "dimensions" are specified, "values" cannot be specified.

**values**

A list of character values to be associated with the variable. Note that if "values" are specified, "dimensions" cannot be. For more information on variable values see Variable Values.

**options**

A list of variable options. See Variable Options for more information.

## Examples:

```
STRING dept
```

```
STRING names ('TOM','JOHN','DICK'), SCRIPT
STRING months [12]
STRING array3dWithoutDimension[][][]

CHARACTER:15 dept
CHARACTER:20 names ('TOM','JOHN','DICK'), SCRIPT
CHARACTER:9 months [12]
```

**See also:**

- The DEFINITIONS Section

*TEST*

# CHARACTER Statement

**Description:**

This statement defines a character string variable consisting of ASCII characters, including control characters. VEDANT Test supports character variables of between 1 and 65535 bytes in length.

Arrays of character variables can be defined, with a maximum of three dimensions.

An asterisk may be used instead of a colon to delimit the size.

**Format:**

CHARACTER{:n} name {[dimensions]}[{values} {, options}

**Parameters:**

| | |
|---|---|
| **n** | An unsigned integer value in the range 1 - 65535, representing the size of the variable in bytes. The default is 1. |
| **name** | The name of the variable. This must be a valid VEDANT Test dataname. For a full definition of VEDANT Test datanames, refer to the *Glossary of VEDANT Test Terms* in the *VEDANT Test Reference Guide*. |
| **dimensions** | The dimensions of the array to be allocated for this variable. Up to three dimensions can be specified, separated by commas, each comprising one or two numbers. If a dimension has only one number, the elements in that dimension range from 1 to the number specified. If two numbers are specified, they must be separated by a colon (":"); the elements in this dimension range from the first number to the second. Note, if "dimensions" is specified, "values" may not be. |
| **values** | A list of character values to be associated with the variable. Note that if "values" is specified, "dimensions" may not be. Refer to Section 3.3.10 for further information on variable values. |
| **options** | A list of variable options. Refer to Section 3.3.11 for further information on variable options. |

**Examples:**

```
CHARACTER:15 dept
CHARACTER:20 names ('TOM','JOHN','DICK'),  SCRIPT
```

CHARACTER: 9 months [12]
CHARACTER*20 staff-by-dept [8,101:150]

# Random Variable Options

The random options are only valid for variables which have an associated set of values; they are mutually exclusive. The two random options are:

```
,RANDOM
,REPEATABLE {RANDOM} {, SEED = n}
```

These options function as follows:

## RANDOM

This option indicates that a value is to be selected randomly from a list or range, when the variable is used in conjunction with the GENERATE command. The values will be selected in a different order each time they are generated; this is achieved by generating a different seed value for the variable each time the variable is initialized. Local variables are initialized when Script execution begins. Script variables are initialized by the first thread to execute the Script.

This option is particularly useful when load testing a system.

This is the default if no random option is specified.

## REPEATABLE {RANDOM}

This option indicates that a value is to be selected randomly from a list or range, when the variable is used in conjunction with the GENERATE command, but in the same order each time the Script is run. This is achieved by using the same seed value for the variable each time the variable is initialized.

This option is particularly useful in regression testing when reproducible input is required.

## SEED = n

This option can be used in conjunction with the REPEATABLE RANDOM option, to specify the seed value that is to be used when generating the random sequence of numbers. This makes it possible to use a different sequence of random values for each repeatable random variable. "n" is a numeric literal in the range of -2147483648 to +2147483647.

See also:

- Variable Options

TEST

## Random Variable Options

The random options are only valid for variables which have an associated set of values; they are mutually exclusive. The two random options are:

,RANDOM

,REPEATABLE {RANDOM} {, SEED = n}

These options function as follows:

RANDOM

This option indicates that a value is to be selected randomly from a list or range, when the variable is used in conjunction with the ~GENERATE command. The values will be selected in a different order each time they are generated; this is achieved by generating a different seed value for the variable each time the variable is initialized. Local variables are initialized when script execution begins. Script variables are initialized by the first thread to execute the script following creation of the script data area.

This option is particularly useful when load-testing a system.

This is the default if no random option is specified.

REPEATABLE {RANDOM}

This option indicates that a value is to be selected randomly from a list or range, when the variable is used in conjunction with the ~GENERATE command, but in the same order each time the script is run. This is achieved by using the same seed value for the variable each time the variable is initialized.

This option is particularly useful in regression testing when reproducible input is required.

SEED = n

This option can be used in conjunction with the REPEATABLE RANDOM option, to specify the seed value that is to be used when generating the random sequence of numbers. This makes it possible to use a different sequence of random values for each repeatable random variable. "n" is a numeric literal in the range -2147483648 to +2147483647.

**Quotium**

# CALL Command

**Description:**

This command calls a subroutine from within a Script. Subroutines must follow the main code section, but such subroutines must not be embedded within the section. Subroutines share the variable definitions of the main module.

It is not possible to branch into or out of a subroutine because a label cannot be referenced from outside of the main module or subroutine in which it occurs. This does mean, however, that each subroutine enables a Script to define up to 255 labels in addition to those used in the main code.

A maximum of eight parameters may be passed from the calling code to the called subroutine. The passed parameters may be character or integer variables, literals or quoted character strings. The calling code must pass exactly the same number of parameters to the called subroutine as the called subroutine has been defined in its SUBROUTINE statement. The names of the variables in the call do not have to be the same as those in the subroutine parameter list, but the data types for each of the parameters must match. A Script error will be generated if these conditions are not respected.

The values of the variables defined as parameters in the subroutine definition are not copied back to the variables in the call, on return from the subroutine. However, if the same variable names are used in the call and the subroutine parameter list, the value of the variable in the call will be changed by a subroutine modification; this is because the calling code and the called subroutine have the same data definitions. Conversely, if different variable names are used, any changes made to variables within the subroutine will not affect the variables in the call.

**Format:**

```
CALL subroutine {[parameter{, parameter ...}]}
```

**Parameters:**

**subroutine**

The name of the called subroutine. The name must be a valid QTest Dataname.

**parameter**

A character variable, integer variable, integer value or a quoted character string. Up to 8 parameters may be defined in the CALL command. This list must have the same number of parameters as there are in the subroutine's definition, and also the data types of the parameters must match.

**Examples:**

Case 1:05-cv-11558-DPW     Document 35-6     Filed 08/04/2006     Page 28 of 30

```
CALL DATE_CHECK
CALL CREATE_FULL_NAME [char_first,char_second,char_title]
```

**See also:**

- Flow Control Commands

TEST

# CALL Statement

**Description:**

This command calls a subroutine from within a script. Subroutines must follow the main code section and must not be embedded within it. They share the variable definitions of the main module.

It is not possible to branch into or out of a subroutine, because a label cannot be referenced outside of the main module or subroutine in which it occurs. This does mean, however, that each subroutine enables a script to define up to 255 labels in addition to those used in the main code.

A maximum of eight parameters may be passed from the calling code to the called subroutine. The parameters passed may be either character or integer variables or literals. The calling code must pass exactly the same number of parameters to the called subroutine as the called subroutine has defined in its ~SUBROUTINE statement. The names of the variables in the call need not be the same as in the subroutine parameter list, but the data types of each of the parameters must match. Failure to comply with these conditions will result in a script error being generated.

The values of the variables defined as parameters in the subroutine definition are **not** copied back to the variables in the call, on return from the subroutine. However, if the same variable names are used in the call and the subroutine parameter list, the value of the variable in the call **will** be changed by a change in the subroutine; this is because the calling code and the called subroutine share the same data definitions. Conversely, if different variable names are used, any changes made to variables within the subroutine will not affect the variables in the call.

**Format:**

~CALL subroutine {[parameter{, parameter ...}]}

**Parameters:**

**subroutine**    The name of the called subroutine. The name must be a valid VEDANT Test dataname.

For a full definition of VEDANT Test datanames, refer to the *Glossary of VEDANT Test Terms* in the *VEDANT Test Reference Guide.*

**parameter**    A character variable or integer variable declared in the Definitions section of the script.

Up to 8 parameters may be declared in the ~CALL command. There must be the same number of parameters in this list as are in the subroutine's definition, and the data types of the parameters must match.

**Examples:**

```
~CALL DCL-SUBROUTINE
~CALL CREATE_FULL_NAME [char_first,char_second,char_title]
```



# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| TECHNOLOGIES, S.A. and<br>QUOTIUM TECHNOLOGIES, S.A.,<br><br>                       Plaintiffs,<br><br>        v.<br><br>CYRANO, INC.,<br><br>                   Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## 02 CV 1 1 4 1 6 JLT

CIVIL ACTION NO._____

### JURY TRIAL
### DEMANDED

## COMPLAINT

Plaintiffs Technologies, S.A. ("Technologies") and Quotium Technologies, S.A.

("Quotium"), by and through their undersigned attorneys, allege upon personal knowledge with

respect to their own acts and understandings and upon information and belief as to all other

matters, as follows:

## NATURE OF THE ACTION

1.    Plaintiffs bring this action against Defendant for, among other claims, copyright

infringement, trademark infringement, trademark dilution, cyberpiracy, unfair competition, false

advertising, unjust enrichment, intentional interference with contractual relations, and unfair and

deceptive trade practices in violation of Mass. Gen. Laws ch. 93A, § 11.

2.    As described more fully below, for the last two months, Defendant has engaged in

a deliberate and unrelenting assault upon Plaintiffs' intellectual property rights and competitive

position.  Defendant's ongoing violations of Plaintiffs' intellectual property rights include, *inter*

*alia*, (a) unauthorized marketing, reproduction, and sale of computer software programs and

related materials owned by Quotium that are protected under federal copyright law (the "Software"), and (b) unauthorized use of the federally registered Cyrano® trademark -- which is also owned by Quotium.

3.    Furthermore, acting at all relevant times under the Cyrano® name without authorization, Defendant has knowingly and repeatedly misrepresented to actual and prospective purchasers of the Software that it owns a valid copyright for, and/or is an authorized distributor of, the Software.

4.    Through these and other unlawful acts, Defendant has inflicted substantial economic injury and irreparable harm upon Plaintiffs. Quotium and its parent, Technologies, have been unlawfully deprived of profits related to the licensing of the Software and the sale of related goods and services; the goodwill associated with the Cyrano® trademark has been substantially devalued; and Plaintiffs have suffered damage to their business reputations. Defendant has also inflicted irreparable harm in the form of, *inter alia*, deprivation of Quotium's right to exclusive control over the use of its intellectual property, and the creation of market confusion regarding the origin, affiliation, sponsorship, and approval of the Software.

5.    Despite due demand by Plaintiffs, Defendant has failed and refused to cease its unlawful conduct. Due to the purposeful and continuing nature of Defendant's misconduct -- and the irreparable harm that continues to mount as a result thereof -- Plaintiffs respectfully request, among other relief, that this Court issue a preliminary injunction relief barring Defendant from further infringement of Plaintiffs' intellectual property rights, as well as permanent injunctive relief, damages in an amount to be determined at trial, and other relief specified below.

## PARTIES

6.    Plaintiff Technologies is a French corporation with its principal office at 84-88 Boulevard de la Mission Marchand in Courbevoie, France. Technologies is essentially a holding company that produces and distributes commercial software through a group of wholly-owned subsidiaries. The company was founded in 1983 by Michel Tiberini -- who remains the company's President.

7.    Plaintiff Quotium is wholly-owned subsidiary of Technologies. Like Technologies, Quotium is a French corporation with its principal office at 84-88, Boulevard de la Mission Marchand in Courbevoie, France. Technologies formed Quotium in January 2002 to pursue opportunities in the growing international market for software that enables users to test, monitor, and optimize their data processing and management solutions. Mr. Tiberini is also the President of Quotium.

8.    Defendant Cyrano, Inc. is a corporation formed under the laws of the state of Delaware with its principal office at 26 Parker Street, Newburyport, Massachusetts.

## JURISDICTION AND VENUE

9.    This Court has subject matter jurisdiction because this is an action arising under the Copyright Act, 17 U.S.C. § 101 et seq., jurisdiction being conferred in accordance with 28 U.S.C. § 1338(a), and under the Lanham Act, 15 U.S.C. §§ 1051-1127, jurisdiction being conferred in accordance with 15 U.S.C. § 1121 and 28 U.S.C. § 1338(a). This Court has supplemental jurisdiction over the related state law claims pursuant to 28 U.S.C. §§ 1338(b) and 1367.

10.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391.

## FACTS COMMON TO ALL COUNTS

**Plaintiffs' Investment In The
Intellectual Property Rights At Issue**

11.     The intellectual property rights at issue in this action were all previously owned by Defendant's former parent company, Cyrano, S.A. On June 11, 2001, the Commercial Court of Paris (the "Commercial Court") declared a bankruptcy proceeding against Cyrano, S.A. On October 15, 2001, the Commercial Court ordered the liquidation of Cyrano, S.A. (the "Liquidation") and appointed the firm SCP Brouard-Duade as trustee of the liquidation (the "Trustee").

12.     On November 10, 2001, the Trustee invited bids on certain tangible and intangible assets of Cyrano, S.A.

13.     On November 15, 2001, Plaintiff Technologies submitted to the Trustee an offer to purchase certain of those assets, including, *inter alia*, the intellectual property rights at issue in this action.

14.     On March 13, 2002, the Commercial Court ordered the sale of Cyrano, S.A.'s tangible and intangible assets to Technologies (the "March 13 Judgment").

15.     In accordance with French liquidation procedure, on May 16, 2002, Technologies, Quotium, and the Trustee entered into a Contract of Transfer of Business Components (the "Transfer Contract"). Pursuant to the Transfer Contract, Quotium was granted "all intellectual property rights belonging to [Cyrano, S.A.]" in the following software products and all materials related hereto: DBPack, ClientPack, ServerPack, and VT Pack (together, as limited by the following sentence, the "Software"). Two modules of ClientPack software suite (Robot and

- 4 -

Manager), and one module of the ServerPack suite (Loadtest) did not belong to Cyrano, S.A., and were not transferred to Quotium.[1]

16.    The entire contents of the Software are copyrightable subject matter protected under the laws of France, and fully protected as copyrighted matter under the laws of the United States pursuant to the Convention of the Protection of Literary and Artistic Works -- a/k/a the "Berne Convention" -- to which France and the United States are parties, 17 U.S.C. § 104.

17.    During the negotiation of the Transfer Contract, Defendant submitted a claim of ownership to the Trustee as to the Test and Impact software modules (the "Contested Software"), which are modules in the ServerPack and VT Pack software suites, respectively. In response to Defendant's claim, the Trustee advised the parties that all rights, materials, and documentation held by Cyrano S.A. relating to the Contested Software would be held in escrow for thirty (30) days, during which time Defendant was to prove its ownership of the Contested Software. Accordingly, the Contested Software was not transferred to Quotium under the Transfer Agreement. (Plaintiffs are not aware of any determination to date by the Trustee regarding the rightful ownership of the Contested Software.)

18.    At no time during the Liquidation proceedings or the negotiation of the Transfer Contract has Defendant claimed to own any rights relating to the use or ownership of the Software.

19.    The Transfer Contract also granted to Quotium "all artistic, intellectual or industrial property rights which may exist" in certain trademarks owned by Cyrano, S.A. (the

---

[1] Quotium was also granted all intellectual property rights owned by Cyrano, S.A. in version 0.9.1 of a software program called OpenSTA. Plaintiffs understand and believe at this time that version 0.9.1 may have been offered to the public for use pursuant to an open source license agreement. Plaintiffs continue to investigate the scope of Quotium's rights in connection with this software program and reserve all rights related thereto.

"Trademarks"), including, among other rights, the federally registered trademark in the name "Cyrano," U.S. Registration Number 2,175,949. The Cyrano® trademark is valid and subsisting, and Quotium owns all, right, title, and interest therein.

20.  At no time during the Liquidation proceedings or the negotiations of the Transfer Contract did Defendant claim any rights relating to the Cyrano® trademark, or any of the other Trademarks.

**Illegal Conduct Of Defendant**

21.  As explained above, Defendant's ongoing participation in the Liquidation pre-dates the execution of the Transfer Agreement. Defendant has thereby known, at all times since May 16, 2002, that Quotium is the exclusive owner of the Software and the Trademarks. Defendant has also known at least as early as the execution of the Transfer Agreement that Defendant has is not authorized to produce, distribute or sell the Software.

22.  In connection with that unauthorized activity -- which continues unabated -- Defendant is falsely holding itself out to the public as the copyright holder, and/or a lawful source and distributor, of the Software. For example, Defendant falsely represents on its publicly available web site -- www.cyrano.com (the "Web Site") -- that it is authorized to grant end-user licenses to the Workbench and Production modules of DBPack. ("If you have a CYRANO CD and would like to obtain a full licensed version of the product you are using, please contact our Support Centers and you will receive a license immediately").

23.  Defendant is also using Quotium's federally registered Cyrano® trademark without authorization in connection with its sale and marketing of software products in the United States. Defendant does business under the name "*Cyrano, Inc.*" (emphasis added) and illegally advertises and sells certain modules of the Software on the Web Site.

- 6 -

24.    Defendant's pattern and practice of knowingly false and deceptive sales and marketing activity is further evident in Defendant's statements on the Web Site about its own business. Defendant falsely represents in English that it is currently affiliated with Cyrano, S.A., and does not explain in English that Cyrano S.A. is in liquidation. Notably, every press release posted on the Web Site is posted in English, *except* for a September 2001 press release announcing the liquidation of Cyrano, S.A., which appears only in French.

25.    Counsel for Plaintiffs has notified Defendant that Defendant does not have any legal right or authority to distribute the Software. Despite due demand by Plaintiffs, Defendant failed and has refused to cease its ongoing campaign of infringement upon Quotium's intellectual property rights and false and misleading sales and marketing activity.

## COUNT I

### (Copyright Infringement In Violation of 17 U.S.C. § 101)

26.    Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 25 of this Complaint as if fully set forth herein.

27.    The Software was first published in France on both another member nation of the Berne Convention at the time of such first publication.

28.    Quotium is, and at all times since May 16, 2002 has been, the sole owner of all right, title, and interest in and to all copyrights in the Software.

29.    Quotium has not authorized Defendant to reproduce, distribute, license or otherwise utilize the Software.

30.    Since May 16, 2002, Defendant has reproduced and distributed some or all of the Software and has thereby infringed Quotium's copyrights in the Software.

31.    By reason of Defendant's acts of copyright infringement, Quotium has suffered, and will continue to suffer, substantial and irreparable damage to its business reputation and goodwill, as well as diversion of trade and economic losses in an amount not yet ascertained.

32.    Defendant's acts of copyright infringement have caused Quotium irreparable injury, and Defendant has refused to cease and desist and threatens to continue to commit these acts. It is difficult or impossible to calculate fully the amount of compensation by money damages which could afford Quotium adequate relief for these continuing acts.

33.    Quotium has no adequate remedy at law for Defendant's wrongful conduct in that (i) Defendant's infringement constitutes an interference with Quotium's goodwill, business reputation, business market, and customer relationships; and (ii) Defendant's wrongful conduct, and the damages resultant to Quotium therefrom, is continuing. Accordingly, Quotium is entitled to preliminary and permanent injunctive relief pursuant to 17 U.S.C. §502.

34.    Quotium also is entitled to recover actual damages and profits in an amount to be determined at trial (17 U.S.C § 504(b)) or statutory damages (17 U.S.C. § 504(c)), as well as their attorneys' fees and costs of suit pursuant to 17 U.S.C. §505.

## COUNT II

### (Trademark Infringement in
### Violation of § 32(a) the Lanham Act -- 15 U.S.C. § 1114)

35.    Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 34 of this Complaint as if fully set forth herein.

36.    Defendant's unauthorized use of the federally registered Cyrano® trademark on or in connection with the promotion and sale of software products is likely to cause confusion, to cause mistake, or to deceive the relevant purchasing public so that it would be led to believe that

- 8 -

Defendant's products originate from or are produced, provided, or authorized by Quotium, when that is not the case.

37.    Defendant's unauthorized use of the federally registered Cyrano® trademark on or in connection with software products trades on the goodwill which Quotium has developed and/or purchased with respect to the Cyrano® trademark, and such acts damage the rights of Quotium in its trademark and the goodwill represented thereby within Quotium's relevant market, all to the damage of Quotium.

38.    As a result direct and proximate of Defendant's unauthorized use of the Cyrano® trademark, Defendant has caused Quotium irreparable harm and injury and will continue to do so unless Defendant is restrained and enjoined by this Court from further violations of Quotium's rights.  Accordingly, Quotium is entitled to preliminary and permanent injunctive relief pursuant to 15 U.S.C. § 1116.

39.    Quotium also has suffered, and will continue to suffer, substantial economic loss in an amount to be determined at trial.

## COUNT III

### (Trademark Dilution in Violation of § 43 (c) of the Lanham Act -- 15 U.S.C. § 1125(c))

40.    Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 39 of this Complaint as if fully set forth herein.

41.    The Cyrano® trademark is distinctive and famous, and has been so since before Defendant began its infringing activity, based upon:  (a) the mark having inherent as well as acquired distinctiveness in the United States; (b) the mark having been long used throughout the United States and the world in connection with software programs; (c) the mark having been

- 9 -

extensively advertised and publicized throughout the United States and the world for many years;

(d) the mark's trading area being extensive, covering both the United States and the world;

(e) the mark's being used in a variety of different channels of trade; (f) the mark's being highly

recognizable in a variety of trading areas and channels of trade; and (g) the trademark being

currently registered in the United States.

42.      Defendant's unauthorized use of the Cyrano® trademark in the advertising,

promotion and sale of software products is diluting Quotium's substantial rights in its Cyrano®

trademark.

43.      Defendant's unauthorized use of the Cyrano® trademark has caused Quotium

irreparable harm and injury and will continue to do so unless Defendants is restrained and

enjoined by this court from further violations of Quotium's rights.  Accordingly, Quotium is

entitled to preliminary and permanent injunctive relief pursuant to 15 U.S.C. § 1116.

44.      Quotium also has suffered, and will continue to suffer, substantial economic loss

in an amount to be determined at trial.

## COUNT IV

**(Unfair Competition in Violation
of § 43(a) the Lanham Act -- 15 U.S.C. § 1125(a))**

45.      Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 44

of this Complaint as if fully set forth herein.

46.      The acts of Defendant described above -- including without limitation its

representations to the public that it is the rightful copyright holder and/or authorized distributor

of the Software and its misuse of the Cyrano® trademark -- constitute false and/or misleading

representations in connection with commercial advertising and promotion in violation of Section

43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

47.    Defendant has made false and/or misleading descriptions and representations of

fact in commerce relating to the Software and the Cyrano® trademark, which were intended to

cause, and have caused and/or are likely to cause, confusion or mistake regarding the origin,

sponsorship or approval of those products.

48.    Defendant has made false and/or misleading representations of fact in commercial

advertising or promotion that misrepresent the nature, characteristics, origin or qualities of the

Software and the Cyrano® trademark.

49.    Defendant's conduct constitutes unfair competition with Plaintiffs, and has

enabled and will continue to enable Defendant to make sales and earn profits to which Defendant

is not in equity or good conscience entitled.

50.    As a direct and proximate result of Defendant's above-described conduct,

Defendant has caused Plaintiffs irreparable harm and injury and will continue to do so unless

Defendant is restrained and enjoined by this Court from further violations of Plaintiffs' rights.

Accordingly, Plaintiffs are entitled to preliminary and permanent injunctive relief pursuant to 15

U.S.C. § 1116.

51.    Plaintiffs also have suffered, and will continue to suffer, substantial economic loss

in an amount to be determined at trial.

## COUNT V

**(Violation of the Anticyberpiracy Consumer Protection Act
a/k/a § 43(a) of the Lanham Act -- 15 U.S.C. § 1125(d))**

52.    Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 51 of this Complaint as if fully set forth herein.

53.    Defendant has a bad faith intent to profit from Quotium's federally registered Cyrano® mark.

54.    Defendant has registered, is trafficking in and/or is using the cyrano.com domain name which is identical or confusingly similar to, or dilutive of, Quotium's federally registered Cyrano® mark.

55.    Defendant's conduct constitutes trademark cyberpiracy in violation of the Lanham Act, 15 U.S.C. § 1125(d), and has enabled and will continue to enable Defendant to make sales and earn profits to which Defendant is not in equity or good conscience entitled.

56.    As a direct and proximate result of Defendant's above-described conduct, Defendant has caused Quotium irreparable harm and injury and will continue to do so unless Defendant is restrained and enjoined by this Court from further violations of Quotium's rights. Accordingly, Quotium is entitled to preliminary and permanent injunctive relief, specifically the forfeiture or cancellation of the cyrano.com domain name or the transfer of the cyrano.com domain name to Quotium, the owner of the Cyrano® mark.

57.    Quotium also has suffered, and will continue to suffer, substantial economic loss in an amount to be determined at trial.

## COUNT VI

### (False Advertising in Violation of Mass. Gen. Laws ch. 266, § 91)

58.    Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 57 of this Complaint as if fully set forth herein.

- 12 -

59.    The actions of Defendant described above constitute untrue, deceptive, or

misleading advertising in violation of Mass. Gen. L. ch. 266, § 91.

60.    Defendant knew, or on reasonable investigation might have ascertained, that its

statements were untrue, deceptive or misleading.  In fact, Defendant actively participated in the

Liquidation and the negotiation of the Transfer Contract pursuant to which all rights relating to

the Software and Cyrano® trademark were transferred to Quotium.

61.    As a direct and proximate result of Defendant's above-described conduct,

Defendant has caused Plaintiffs irreparable harm and injury and will continue to do so unless

Defendant is restrained and enjoined by this Court from further violations of Plaintiffs' rights.

## COUNT VII

### (Trademark Dilution in
### Violation of Mass. Gen. Laws ch. 110B, § 12)

62.    Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 61

of this Complaint as if fully set forth herein.

63.    Defendant's unauthorized use of the federally registered Cyrano® trademark has

and will continue to injure Quotium's business reputation and dilute the distinctive quality of

Quotium's trademark.

64.    As a result of Defendant's unauthorized use of Quotium's Cyrano® trademark,

Defendant has caused Quotium irreparable harm and injury and will continue to do so unless

Defendant is restrained and enjoined by this Court from further violations of Quotium's rights.

Accordingly, Quotium is entitled to preliminary and permanent injunctive relief pursuant to

Mass. Gen. Laws ch. 110B § 12.

- 13 -

65.    Quotium also has suffered, and will continue to suffer, substantial economic loss in an amount to be determined at trial.

## COUNT VIII

### (Common Law Unfair Competition)

66.    Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 65 of this Complaint as if fully set forth herein.

67.    As explained above, Defendant has made false and/or misleading statements with the intention of misleading and deceiving the public in order to make sales and earn profits to which it is not in equity or good conscience entitled, which has been to Defendant's benefit and to Plaintiffs' detriment.

68.    Defendant's conduct constitutes unfair competition with Plaintiffs.
As a direct and proximate result of Defendant's above-described conduct, Defendant has caused Plaintiffs irreparable harm and injury and will continue to do so unless Defendant is restrained and enjoined by this Court from further violations of Plaintiffs' rights.  Plaintiffs also have suffered, and will continue to suffer, substantial economic loss in an amount to be determined at trial.

## COUNT IX

### (Intentional Interference with Contractual Relations)

69.    Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 68 of this Complaint as if fully set forth herein.

70.    The Transfer Contract constitutes a binding and enforceable contract between Plaintiffs and the-court appointed Trustee in the Liquidation of Cyrano, S.A.

- 14 -

71.    At all times relevant to this action, Defendant has been aware of the Transfer Contract and the rights of Plaintiffs' thereunder.

72.    Defendant knowingly and willfully interfered with the Transfer Contract and deprived Plaintiffs of the full benefit of the consideration they received under the Transfer Contract.

73.    Defendant's interference with the Transfer Contract was improper and wrongful in motive and means.

74.    As a result of Defendant's interference, Plaintiffs have suffered economic loss in an amount to be determined at trial.

## COUNT X

### (Unjust Enrichment)

75.    Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 74 of this Complaint as if fully set forth herein.

76.    Defendant knowingly received benefits from its unauthorized reproduction, distribution and sale of the Software and its unauthorized use of the Cyrano® mark.

77.    Defendant unjustly failed to pay Plaintiffs for its use of the Software and the Cyrano® trademark.  As a consequence, Plaintiffs have suffered and will continue to suffer substantial and foreseeable damages.

78.    Plaintiffs are entitled to receive any profits that Defendant made through the wrongful distribution of the Software and use of the Cyrano® trademark.

## COUNT XI

### (Violation of Mass. Gen. Laws ch. 93A, §11)

79.     Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 78 of this Complaint as if fully set forth herein.

80.     Plaintiffs and Defendant are "persons" and engaged in "trade or commerce" within the meaning of Mass. Gen. Laws ch. 93A, § 1.

81.     The acts and practices of Defendant described above occurred primarily and substantially in the Commonwealth of Massachusetts.

82.     The actions of Defendant constitute unfair and deceptive business practices in violation of Mass. Gen. Laws ch. 93A, § 11.

83.     Defendant's unfair and deceptive acts were committed knowingly and willfully.

84.     As a direct and proximate result of Defendant's above-described conduct, Defendant has caused Plaintiffs irreparable harm and injury and will continue to do so unless Defendant is restrained and enjoined by this Court from further violations of Plaintiffs' rights.

85.     Defendant's violations of Mass. Gen. Laws ch. 93A also have cost Plaintiffs the loss of money and property in an amount to be determined at trial.

86.     Plaintiffs are entitled to recover up to treble damages, and no less than double damages, for said acts and omissions pursuant to Mass. Gen. Laws ch. 93A, § 11. Plaintiffs are also entitled to recover their reasonable attorneys' fees and costs incurred in this action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

1.     Enter an order granting, *inter alia*, the following preliminary injunctive relief:

- 16 -

(a)    Ordering Defendant to immediately cease and desist reproducing, distributing or otherwise using the Software and the Cyrano® trademark;

(b)    Ordering Defendant to return to Quotium -- within three (3) business days of the issuance of the Order granting such preliminary injunctive relief -- the originals and copies of the Software and all related materials currently in Defendant's possession, custody, or control, and to certify in writing to the Court that it has done so;

(c)    Ordering Defendant to immediately and permanently shut down the Cyrano web site;

(d)    Ordering the forfeiture or cancellation of the cyrano.com domain name or the transfer of the cyrano.com domain name to Quotium; and

(e)    Enjoining Defendant from making any further false or misleading statements regarding the Software and/or the Cyrano® trademark.

2.    Enter an order granting judgment in Plaintiffs' favor on all Counts asserted in this Complaint.

3.    Enter an order granting the following permanent injunctive relief:

- 17 -

(a)    Ordering Defendant to immediately cease and desist reproducing, distributing or otherwise using the Software and the Cyrano® trademark;

(b)    Ordering Defendant to return to Quotium -- within three (3) business days of the issuance of such permanent injunctive Order -- the originals and all copies of the Software and all related written materials currently in Defendant's possession, custody, or control, and certify in writing to the Court that it has done so;

(c)    Ordering Defendant to shut down immediately the www.cyrano.com web site;

(d)    Ordering the forfeiture or cancellation of the cyrano.com domain name or the transfer of the cyrano.com domain name to Quotium; and

(e)    Enjoining Defendant from making any further false or misleading statements regarding the Software and/or the Cyrano® trademark.

4.    Enter an order requiring an accounting to determine Defendant's revenues, sales and profits gained by way of its illegal activity.

5.    Pursuant to the Federal Copyright Act, 17 U.S.C. §§ 504 and 505, award Plaintiffs the greater of the following as to Count I of this Complaint:

(a)    the actual damages suffered by Plaintiffs as a result of Defendants' infringement of the copyrights at issue and any profits of Defendants that are attributable to the infringement, including

- 18 -

without limitation profits on any services related to Plaintiffs'
products and any other profits Defendant earned from any of its
operations that were enhanced by its illegal activity;

(b)    prejudgment interest on the actual damages suffered by Plaintiffs;
and

(c)    Plaintiffs' costs of suit in this action, including but not limited to
reasonable attorneys' fees;

OR

(a)    statutory damages, as determined by the Court;

(b)    prejudgment interest on the actual damages suffered by Plaintiffs;
and

(c)    Plaintiffs' costs of suit in this action, including but not limited to
reasonable attorneys' fees;

6.    Award Plaintiffs treble damages pursuant to Mass. Gen. Laws ch. 93A §
11 and their reasonable attorneys' fees and costs in connection with this
action;

7.    Enter an order disgorging Defendants of all ill-gotten gains obtained
through their unlawful conduct;

8.    Award Plaintiffs prejudgment interest in an amount to be determined prior
to entry of final judgment in Plaintiffs' favor; and

9.    Grant such other and further relief as this Court deems just and equitable
under the circumstances.

- 19 -

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury of all issues so triable.

Dated: July 12, 2002                    Respectfully submitted,

                                        TECHNOLOGIES, S.A. and
                                        QUOTIUM TECHNOLOGIES, S.A.,
                                        By their attorneys,


                                        Kevin J. O'Connor (BBO# 555250)
                                        Kristina E. Barclay (BBO# 640848)
                                        Liza J. Tran (BBO# 646818)
                                        TESTA, HURWITZ & THIBEAULT, LLP
                                        125 High Street
                                        Boston, MA 02110
                                        (617) 248-7000

2426902-5

- 20 -

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

TECHNOLOGIES, S.A., and )
QUOTIUM TECHNOLOGIES, S.A., )
 )
     Plaintiffs and )
     Defendants-in-Counterclaim, )
 )
v. )     Civil Action No. 02-CV-11416-JLT
 )
CYRANO, INC., )
 )
     Defendant and )
     Plaintiff-in-Counterclaim. )

## SUPPLEMENTAL AFFIDAVIT OF DENIS BITAN

I, Denis Bitan, declare and state as follows:

1.    My name is Denis Bitan.  I am an executive officer of Sofitrade, a French company and I also live in Paris , 75116 – 114, rue Lauriston - France.  As indicated in my prior affidavit, prior to joining Sofitrade, I was involved in various capacities with Cyrano S.A, ("Cyrano SA"), Cyrano UK Limited ("Cyrano UK"), and Cyrano Inc. ("Cyrano US") (collectively "the Cyrano companies") from 1996 through mid-2002.

2.    I was one of the founders of IMM, a French software company, which was renamed Cyrano S.A. in 1996.  After the establishment of IMM and until it was renamed Cyrano SA, I served as its Director.

3.    In late 1996, IMM and Performance Software Limited became affiliated.  IMM and Performance Software Limited did not merge but rather IMM purchased the shares of Performance Software Limited and continued to own it as a separate and legally distinct wholly-owned subsidiary.  As a result, the names of Performance Software Limited and

its wholly owned subsidiary Performance Software Inc. were changed to Cyrano UK and Cyrano Inc. respectively and IMM's name was changed to Cyrano SA.

4.      As a result, in late 1996, with Cyrano SA's knowledge, Cyrano US began using the trademark "Cyrano" throughout the world, including in the domain name of the website cyrano.com, it hosts and manages.  To the best of my knowledge, Cyrano US has used the Cyrano® trademark uninterruptedly since 1996.  No license agreement or other agreement governing the use of that mark was ever signed between Cyrano SA and Cyrano US.  Cyrano SA never stated or implied through its conduct that Cyrano US could not use the Cyrano® mark.  Nor did it require Cyrano US to pay Cyrano SA to use the mark.  Over the years, Cyrano US has spent substantial resources (money and staff) in building its reputation around the world and developing the goodwill associated with the Cyrano® mark.

5.      After the renaming of the companies to Cyrano SA and Cyrano UK, each company maintained separate research and development teams and developed their own separate software products.  They did not merge their intellectual property rights or copyright ownership.  Cyrano UK's research and development offices were in Bradford, England and its research and development team was composed of employees who were United Kingdom nationals while Cyrano SA's research and development offices were in Paris, France.  Accordingly, when the companies were liquidated, they were each liquidated separately by different trustees and under laws of different countries.

6.      As I indicated in my prior affidavit, after the renaming of Performance Software Limited to Cyrano UK  in late 1996 and until approximately 1998, I also served as Secretaire General of Cyrano SA.  In that role, I was mainly responsible for Cyrano SA's

2

initial public offering and its intellectual property on an administrative level. From 1999 to 2001, I served as a director on the Boards of Directors for both Cyrano UK and Cyrano US. I also served as the Managing Director of the Cyrano Companies (i.e., managing director of both Cyrano UK and Cyrano SA and other affiliates) from 1998 to October 2001, at which time the Court ordered that Cyrano S.A. be liquidated.

7.      In October 2000, I signed a certificate of registration of OpenSTA version 0.9.1 with the Agency for the Protection of Programs in Paris ("APP") that stated OpenSTA was an "original work of Cyrano, S.A." Technologies, S.A. and Quotium Technologies, S.A. (collectively "Technologies") have asserted that this certificate contradicts paragraph 9 of my prior affidavit dated October 1, 2002, which states:

> At all times prior to the liquidation of Cyrano UK, it owned the copyrights to Test, Impact, and OpenSTA (with the exception of minor components and a commercial module known as Modeller). Prior to being liquidated, Cyrano UK did not transfer or assign its copyrights to Test, Impact, and OpenSTA to any entity, including Cyrano SA.

I disagree with Technologies' conclusion. By signing the APP registration, I was not intending to make any representation concerning the copyright ownership of OpenSTA among the different companies. Based upon my understanding, APP is not a copyright registration system like the United State Copyright Office; it is simply a method of protecting software from copying by a third party. I was simply trying to protect OpenSTA's source code and to guarantee to Cyrano's customers and stockholders that OpenSTA's source code was safe from third parties even if any of the Cyrano companies became financially unstable. I am not a lawyer and did not consult with legal counsel or the Chief Technical Officer of Cyrano prior to registering OpenSTA with APP and did not understand that my representation could be interpreted as a representation as to

3

copyright ownership between the Cyrano companies. When I indicated the OpenSTA was an "original work of Cyrano S.A.," I was simply referring to Cyrano S.A. to represent the group of Cyrano companies. I was not intending to define who amongst the Cyrano companies owned OpenSTA and was only concerned with keeping the software safe from outsiders.

8.    As set forth in my earlier affidavit, Cyrano UK developed and owned the majority of OpenSTA with the exception of minor components and some commercial modules and, after its liquidation, Cyrano US acquired Cyrano UK's copyright to OpenSTA.

9.    Technologies also implies that the amendments to the International Distributor Agreement, which were signed by Robert Ernens and me, were fraudulent. Such a characterization is inaccurate and unwarranted. The Distributor Agreement was first amended on August 31, 2000 primarily to add OpenSTA and its associated modules as licensed products under the Agreement. The first public release of OpenSTA was scheduled for September 2000. Cyrano SA developed certain components (Gateway and the Modeller) and commercial modules such as DB Monitor for OpenSTA and had the right as the owner to license them to Cyrano US. As indicated in Section 9.1 of the International Distributor Agreement with Cyrano US, Cyrano SA further obtained the right to license the remainder, and majority, of OpenSTA from its licensor, Cyrano UK.

10.    When the Agreement was first amended in August 2000, Cyrano SA also made the decision to convert the Distributor Agreement from a non-exclusive agreement to an exclusive agreement (with the exception of Europe and Africa) because the number of staff in the Cyrano UK's offices was decreasing as a result of financial difficulties, the French marketing staff was not fluent in English, the project managers of OpenSTA,

4

Fax émis par: 33 01 42 86 97 97    RightFAX * Pg 7/7    le 08/11/02 18:02 A4 FIN Pg: 7/7
RIAL TRADING

US and all of the Cyrano SA's contracts were kept in its office and the Trustee subsequently collected them.

13.    I have never seen the Bankruptcy Declaration of Cyrano SA, which Technologies alleges should have listed the Distributor Agreement as an asset of Cyrano SA. Robert Emens and I disclosed the existence of the Distributor Agreement to the Liquidation Trustee and never sought to conceal it.

14.    Additionally, the Liquidation Trustee never sought my consent or that of any other executive of Cyrano SA concerning the invitation to bid, which listed OpenSTA as intangible asset of Cyrano SA. As discussed in detail in my prior affidavit, Mr. Emens wrote several letters to the Liquidation Trustee and his lawyer concerning Cyrano UK's rights to OpenSTA. Cyrano UK owned the copyright to the majority of OpenSTA with the exception of minor components and some commercial modules, including Modeller. Accordingly, the Liquidation Trustee did not have the power to sell the majority of OpenSTA. It appears from the French Transfer Contract between the Liquidation Trustee of Cyrano SA and Technologies that the Trustee recognized the risks inherent in the sale of the intellectual property. Section 4.1 of the Contract states that the Liquidator is unable to make guarantees about the intellectual property sold to Technologies.


I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Signed this _8_ day of November 2002 at rue Lauriston - France.


Denis Bitan

6

23/02 2004 19:27 FAX 0145002026          V & V AVOCATS                    ☒ 002

# PARAGON



<u>BY USPS GLOBAL EXPRESS MAIL</u>

November 26, 2003

Dominique Wernert, Esq.
Counsel
48 Avenue Victor Hugo
75116 Paris, P373
FRANCE

RE: *Technologies, S.A., et. al. v. Cyrano, Inc.*, Civ. A. No. 02-11416-JLT

Dear Dominique:

As you know, this firm represents Quotium Technologies, S.A. and related entities (together "Quotium") in the pending litigation here in the United States of America between Quotium and Cyrano, Inc. (the "U.S. action"). I understand you are Quotium's counsel in its pending action against Cyrano, Inc. in the Republic of France (the "French action"). I also understand that in the French action, Quotium has requested a declaratory ruling that the alleged "International Distributor Agreement" (as allegedly amended in 2000 and 2001) between Cyrano, Inc. and its former parent company, Cyrano S.A., was extinguished in the judicially-ordered liquidation of Cyrano, S.A. (the "Liquidation"). I am writing to explain why the interests of justice and judicial economy support Quotium's request for an expedited appellate decision in the French action.

Among Quotium's claims in the U.S. action are claims for copyright and trademark infringement relating to intellectual property rights that Quotium purchased in the Liquidation. In regard to at least two of the software products at issue – namely, Workbench and Production – there is no dispute that Quotium owns all copyrights in the products and has *not* authorized Cyrano, Inc. to distribute them. Cyrano, Inc. defends its continuing sale and marketing of Workbench and Production based on alleged "exclusive distribution rights" that it claims to have been awarded by Cyrano, S.A. prior to the Liquidation. Specifically, Cyrano, Inc. claims to have been awarded "exclusive rights" to distribute Workbench and Production through two amendments to the International Distributor Agreement in the 11 month period leading up to Cyrano, S.A.'s bankruptcy filing. (Notably, Cyrano, Inc. does not dispute that neither amendment was ever approved by the board of directors or shareholders of Cyrano, S.A. before its liquidation.)

---

184 High Street, Boston, Massachusetts 02110   ·   Tel. (617) 399-7950   ·   Fax (617) 399-7955

The determination in the French action of whether the Alleged Distributor Agreement (as allegedly amended) was extinguished in the liquidation of Cyrano, S.A. is of critical importance to Quotium's copyright and trademark infringement claims in the U.S. action. A timely appellate court ruling in the French action would likely resolve the issues in the U.S. action of whether Cyrano, Inc.'s post-Liquidation sale and marketing of Workbench and Production constitute copyright and trademark infringement. Resolution of those issues would, in turn, spare the parties the risk of inconsistent legal rulings in the French and U.S. actions regarding the enforceability of the International Distributor Agreement and the considerable cost of taking fact discovery in the U.S. action concerning the enforceability of the International Distributor Agreement (as allegedly amended).

Fact discovery in the U.S. action must be completed by April 7, 2003. In order to spare the parties potentially unnecessary discovery and minimize the risk of inconsistent rulings in the French and U.S. actions, Quotium should request an expedited ruling on its appeal in the French action by January 2004.

Please let me know if you have any questions or if further information will assist the appellate court in France in ruling on this request.

Very truly yours,

Kevin J. O'Connor

cc: Mr. Michel Tiberini